# Exhibit C

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 22-50073 (JAM) |
| HO WAN KWOK, *et al.*, | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |
|  | ) |  |
| Pacific Alliance Asia Opportunity Fund L.P. and | ) | Adv. P. No. 22-05032 (JAM) |
| Luc A. Despins, Chapter 11 Trustee for the Estate | ) |  |
| of Ho Wan Kwok, | ) | Re: ECF No. 3 |
|  | ) |  |
| Plaintiffs | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| Ho Wan Kwok, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## APPEARANCES

Peter Friedman
Stuart M. Sarnoff
Daniel Cantor
Mia N. Gonzalez
O'Melveny & Myers LLP
Seven Times Square
New York, NY 10001

    *and*

David V. Harbach II
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, D.C. 10036

Patrick M. Birney
Annecca H. Smith
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

*Attorneys for Plaintiff Pacific Alliance Asia Opportunity Fund L.P.*

Luc A. Despins                              Douglas S. Skalka
Paul Hastings LLP                           Nancy Bohan Kinsella
200 Park Avenue                             Patrick R. Linsey
New York, N.Y. 10166                        Neubert Pepe & Montieth P.C.
                                            195 Church Street
        *and*                               New Haven, CT 06510

Nicholas A. Bassett
Paul Hastings LLP
2050 M Street NW
Washington, D.C. 20036

*Plaintiff Luc A. Despins, Chapter 11 Trustee for the Estate of Ho Wan Kwok, and his Attorneys*

David S. Wachen                             Jeffrey Hellman
Wachen LLC Law                              Offices of Jeffrey Hellman, LLC
11065 Montague Court                        195 Church Street, 10th Floor
Potomac, MD 20854                           New Haven, CT 06510

        *and*

Aaron A. Mitchell
Lawall & Mitchell, LLC
55 Madison Avenue, Suite 400
Morristown, NJ 07960

*Attorneys for Defendant Ho Wan Kwok, Debtor*

### MEMORANDUM OF DECISION
### GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION

Julie A. Manning, United States Bankruptcy Judge

## I.    INTRODUCTION

Before the Court is Pacific Alliance Asia Opportunity Fund L.P.'s ("PAX") Application

for a Temporary Restraining Order and the Motion for Preliminary Injunction (the "Motion").

(ECF Nos. 3 (redacted) and 5 (sealed).)  PAX, *inter alia*, requests the Court enjoin Mr. Ho Wan

Kwok (the "Debtor" or "Defendant") from various acts relating to an alleged social media and

protest campaign allegedly organized by the Debtor.  Because of the nature of the evidence presented in this adversary proceeding, the Court notes that the Debtor's Chinese name is pronounced Guo Wengui in Mandarin Chinese and Kwok Ho Wan in Cantonese Chinese.[1] Guo/Kwok is the Debtor's family name and Wengui/Ho Wan is his given name.[2]  The Debtor is also known, among numerous aliases, as Miles Kwok or Miles Guo.[3]

Mr. Luc A. Despins, the Chapter 11 Trustee appointed in the Debtor's Chapter 11 case (the "Chapter 11 Trustee," and together with PAX, the "Plaintiffs") has intervened in this adversary proceeding and joined in the Motion.  (ECF No. 25.)

The claims asserted in this adversary proceeding and in the Motion present very important, substantial, and serious issues.  These issues include the intersection of the integrity of the bankruptcy court system with free speech protections contained in the Constitution.  After an extensive review of applicable law, and upon consideration of the evidence presented and arguments made during the Hearing, for the reasons set forth below, the Court grants in part the Motion for Preliminary Injunction.

## II.  BACKGROUND

The Debtor filed a voluntary Chapter 11 petition in this Court on February 15, 2022. (Main Case ECF No. 1.)[4]  The Debtor's case is jointly administered with two affiliated corporate Chapter 11 cases.  (Main Case ECF Nos. 970 and 1141.)

Among early developments in the Debtor's Chapter 11 case, the Debtor's largest creditor, PAX, filed a Motion to Dismiss or Convert the Debtor's case (the "Motion to Dismiss," Main

---

[1] ECF No. 97, at 97:4–8.
[2] Kwok Direct, ECF No. 97, at 133:23–25.
[3] Kwok Direct, ECF No. 97, at 107:20–21.
[4] References to the docket in the Debtor's individual Chapter 11 bankruptcy case *In re Kwok*, Case No. 22-50073 (JAM) (Bankr. D. Conn.), will be styled "Main Case ECF," while references to the docket in this adversary proceeding will be styled "ECF."

Case ECF No. 183).  Although the facts surrounding the Motion to Dismiss are complex and more fully set forth in the Debtor's Chapter 11 case, on June 15, 2022, the Court entered a Memorandum of Decision and Order Denying Motion to Dismiss Without Prejudice and Granting Joinder to Motion for Appointment of Chapter 11 Trustee (the "Order Granting Motion for Appointment of Chapter 11 Trustee," ECF No. 465).  *In re Kwok*, 640 B.R. 514 (Bankr. D. Conn. 2022).  On July 8, 2022, Mr. Luc A. Despins was appointed as the Chapter 11 Trustee (the "Order Granting Appointment of Chapter 11 Trustee," Main Case ECF No. 523).

Since the appointment of the Chapter 11 Trustee, the Debtor, PAX, the Chapter 11 Trustee, and other parties have filed numerous and extensive pleadings in the Debtor's Chapter 11 case.  A multitude of issues have been brought before the Court, including, in pertinent part, numerous discovery issues relating to the Chapter 11 Trustee's investigation into the assets of the Debtor, (*See* Main Case ECF Nos. 756–58, 856, 923, 995, 1046, 1184, 1303), issues relating to the Debtor's Chapter 11 bankruptcy estate's (the "Estate") interest in certain properties (*See, e.g.*, *HK Int'l Fund Invs. (USA) Ltd. LLC v. Despins ex rel. Kwok*, Case No. 22-05003 (JAM) (Bankr. D. Conn.) and *Despins ex rel. Kwok v. Bravo Luck Ltd.*, 22-05027 (JAM) (Bankr. D. Conn.)), and issues relating to the Chapter 11 Trustee's control of the Debtor's economic and corporate governance rights (*See* Main Case ECF No. 717, the "Corporate Governance Order").

On November 16, 2022, a hearing was held on, *inter alia*, the Trustee's motion to hold the Debtor in contempt of court for alleged failure to comply with his duties under the bankruptcy code and under the Corporate Governance Order (Main Case ECF No. 913).  During the contempt hearing, the Chapter 11 Trustee first alerted the Court and the Office of the United States Trustee as to the subject matter of this adversary proceeding, namely an alleged social media and protest campaign to harass and intimidate the Plaintiffs relating to their involvement

4

in these cases, the Chapter 11 Trustee's ongoing investigation of the Estate's assets, and PAX's multi-year pursuit of its claim against the Debtor which totals more than $200 million.  (*See* Main Case ECF No. 1108.)  On November 21, 2022, the Trustee filed a statement, with attached exhibits, further detailing this alleged campaign.  (Main Case ECF Nos. 1133 (redacted) and 1136 (sealed).)

On November 22, 2022, PAX commenced this adversary proceeding against the Debtor. (ECF No. 1, the "Complaint.")  The Complaint makes additional allegations about the alleged social media and protest campaign.  Along with the Complaint, PAX filed an Application for a Temporary Restraining Order and Motion for Preliminary Injunction. On November 22, 2022, the Chapter 11 Trustee moved to intervene as an additional Plaintiff in the adversary proceeding, which was granted.  (ECF No.  25.)

On November 23, 2022, a hearing was held on the Application for a Temporary Restraining Order.  Although the Debtor is represented by counsel in his Chapter 11 case, and that counsel appeared at the TRO hearing, the Debtor did not appear in this adversary proceeding through counsel until December 1, 2022.  (ECF No. 47.)

At the conclusion of the TRO hearing, the Court granted a portion of the relief sought in the Motion and entered a temporary restraining order (the "TRO").  (ECF No. 26.)  The TRO restrained the Debtor from (1) posting false and harassing materials about the Plaintiffs, their counsel, and their relatives; (2) publishing online the home addresses and other personal information of the Plaintiffs, their counsel, and their relatives; (3) encouraging, inciting, suggesting, or directly or indirectly financing protests at homes and offices of the Plaintiffs, their counsel, and their relatives; and (4) interfering with the integrity of these Chapter 11 cases.  The TRO also directed the Debtor to take down social media posts that (a) published online home

5

addresses and other personal information of the Plaintiffs, their counsel, and their relatives or (b) encouraged, incited, or suggested protests at homes and offices of the Plaintiffs, their counsel, and their relatives.

The TRO also scheduled an evidentiary hearing on the request for a preliminary injunction (the "Hearing") to begin on December 2, 2022.  (ECF No. 39.)  The Court continued the Hearing one business day to December 5, 2022, upon motion of the Debtor.  (ECF No. 51.)  On December 2, 2022, the Debtor filed his objection to the Motion.  (ECF No. 58, the "Objection.")  Under Federal Rule of Civil Procedure 65(b)(2), the TRO was due to expire at 6:00 p.m. on December 7, 2022.  During the third day of the Hearing, while evidence was continuing to be presented, but before the expiration of the TRO, the Court issued an order at 5:57 p.m. on December 7, 2022, extending the TRO for good cause in accordance with Rule 65(b)(1)(2) (the "Order Extending the TRO," ECF No. 80).  The Hearing concluded on December 12, 2022.  Counsel for PAX, the Chapter 11 Trustee and his counsel, and the Debtor and his counsel, presented witnesses, evidence, and their respective arguments professionally and respectfully.

In order to fully and fairly analyze and determine these complex issues, the Court has had to consider and review voluminous evidence introduced during the four-day Hearing.  Nine witnesses were called to testify during the Hearing, including the Debtor, one expert witness, and one of three interpreters who participated in the Hearing.  The parties introduced 100 exhibits during the Hearing, the majority of which were videos and other postings made on various internet platforms.  The ability to make specific findings of fact based on video evidence and other evidence that is not in document form is challenging and requires not only additional time, but additional technological resources.  Although the parties were able to project the videos and

internet platform screen shots during the Hearing, that evidence then need to be provided to the Court to become part of the official record of this adversary proceeding. After all of the evidence became part of the official record, the Court was able to prepare findings and fact and conclusions of law as set forth below.

## III.     JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This Court has authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. The instant proceeding is a statutorily core proceeding concerning the ability of this Court to address matters concerning the administration of the Estate, the liquidation of assets of the Estate, and the adjustment of the debtor-creditor relationship in accordance with the provisions of Title 11. 28 U.S.C. §§ 157(b)(2)(A) and (O).

The Court finds that its exercise of jurisdiction is not unconstitutional under *Stern v. Marshall*, 564 U.S. 462, 487–99 (2011), because the Court is not determining the merits of a personal injury tort claim or a defamation claim as in *Stern*. Although the Debtor disagrees, the Complaint does not assert a defamation cause of action, but rather asserts causes of action under 28 U.S.C. § 1651(a) and 11 U.S.C. § 105(a). The Plaintiffs may assert such causes of action pursuant to 11 U.S.C. §§ 105(a) and 1109(b) and Fed. R. Bankr. P. 7001(7). The Court concludes the Complaint is not pretextual.

The Debtor argues that the relief sought in the Complaint is an improper use of § 105(a). The Court disagrees, noting it is common practice in adversary proceedings. *See, e.g.*, *Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020); *Roman*

7

*Catholic Diocese v. Doe (In re Roman Catholic Diocese)*, 628 B.R. 571 (Bankr. N.D.N.Y. 2021);

*Mgmt. Tech. Corp. v. Pardo (In re Mgmt. Tech. Corp.)*, 56 B.R. 357 (Bankr. D.N.J. 1985);

Complaint, *Purdue Pharms. L.P. v. Commonwealth of Massachusetts (In re Purdue Pharms.*

*L.P.)*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Sept. 9, 2018), ECF No. 1, *requested relief*

*granted by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Oct. 11, 2019),

ECF No. 82, *most recently amended by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL)

(Bankr. S.D.N.Y. Dec. 5, 2022), ECF No. 400.

Should a reviewing court disagree with this Court's exercise of jurisdiction, the Court

submits this Memorandum of Decision as proposed findings of fact and conclusions of law in

accordance with Fed. R. Bankr. P. 7052. The Plaintiffs consent to the Court's jurisdiction over

the claims in this adversary proceeding, but the Debtor does not. *See Wellness Int'l Network,*

*Ltd. v. Sharif*, 575 U.S. 665 (2015).

Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.    FINDINGS OF FACT

Based on the testimony and exhibits admitted during the Hearing, and upon taking

judicial notice of pleadings filed in the jointly administered Chapter 11 cases and related

adversary proceedings, the following are the Court's findings of fact:[5]

---

[5] Because of the nature of the testimony during the hearing, the Court notes that, in a civil proceeding such as this adversary proceeding, a fact finder may draw adverse inferences against a party when said party refuses to testify in response to probative evidence offered against him or independent evidence exists of the fact to which the party refuses to answer. *Mirlis v. Greer*, 952 F.3d 36, 47 (2d. Cir. 2020) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil cause." (emphasis in original)); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[A]n adverse inference can be drawn when independent evidence exists of the fact to which the party refuses to answer.")) Adverse inferences are appropriately admitted into evidence only if they are relevant, reliable, and not unduly prejudicial. *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983). *But see Woods v. Start Treatment & Recovery centers, Inc.*, 864 F.3d 158, (2d Cir. 2017) (finding a court improperly admitted into evidence a defendant's invocation of Fifth Amendment privilege against

### *Entities Related to the Debtor*

1. The Debtor began what is known as "The Whistleblower Movement."  He is the founder of the New Federal State of China (the "NFSC") and the Rule of Law Foundation (the "ROLF").  ROLF's mailing address is the same as the address the Debtor listed on his bankruptcy petition as his personal address.  PAX 35[6], 40B, 55A, 64.  Main Case ECF No. 1.  Kwok Direct,[7] ECF No. 97, at 106:10–25, 123:25–124:12, 124:15–21, 148:5–149:6, 149:17–151:19, 189:2–23, 190:4–11; Cheng Direct, ECF No. 98, at 432:21–25.

2. NFSC is associated, affiliated, and/or connected to the Debtor, ROLF, Farms, The Whistleblower Movement, Miles Guo Live Broadcast, and the GSeries.  The GSeries includes the following entities: Himalaya Exchange, Gettr, GFashion, GMusic, GClubs, GNews, and GEdu.  The Farms are also known as Himalaya Farms, which are social media groups used by members of the NFSC to communicate with each other.  The NFSC home page directs visitors to The Farms via a hyperlink.  PAX 34–36.  Kwok Direct, ECF No. 97, at 187:8–18; 188:9–19; Jiao Cross, ECF No. 98, at 374:17–376:25.

3. The G in GSeries stands for Guo.  The Debtor founded and controls GNews.  GNews is connected to Saraca Media.  The Debtor created GFashion.  GFashion is connected to GNews, Gettr, and GCoin.  PAX 34–36.  Kwok Direct, ECF No. 97, at 187:8–18, 188:4–19, 192:24–193:2. The Debtor also controls Saraca Media Group and a related entity "GTV," which is

---

self-incrimination in her deposition because such invocation was irrelevant and unduly prejudicial to the proceeding).  The Debtor did appear and testify during the hearing and invoked his Fifth Amendment privilege almost 200 times in response to questioning by the Plaintiffs' counsel.

[6] References to PAX's exhibits will be styled PAX [No.].  References to the Debtor's Exhibits will be styled Kwok [No.].  References to an exhibit where a witness wrote something down for the court will be styled [Witness's family name] [No.].

[7] The Court will refer to testimony by [Witness's family name] [Type of testimony] followed by a cite to the redacted transcripts as they appear on the docket.  The page number of the underlying transcripts, which are consecutively paginated for convenience, are used – not the page number on the Electronic Case Filing ("ECF") stamp.

commonly referred to collectively as GTV.  Jiao Cross, ECF No. 98, at 377:11–16, 413:23–24.
GTranslators provides translation services for GNews broadcasts.  PAX 26B, 40B.

    4.  NFSC is associated, affiliated, and/or connected with the Himalaya Global Alliance
(together with affiliated Himalaya entities, such as Himalaya Exchange and Himalaya Farms,
"Himalaya").  PAX 6B.

    5.  Himalaya entities, such as Himalaya New World, organize against the CCP.
Himalaya New World writes articles and creates social media content to expose the truth about
China and the CCP.  Jiao Bing Shang is the President of Himalaya New World, Inc.  Jiao Cross,
ECF No. 98 at 373: 11–24, 397:25–398:6.  Himalaya New World, Inc., also helps people to buy
G-Club.  Jiao Cross, ECF No. 98, at 413:25– 14:11.

    6.  The Whistleblower Movement, NFSC, ROLF, and Himalaya are involved in the
protests.  PAX 3B, 3D, 6B, 9, 10B, 11B, 19B, 20B, 23, 24B, 26B, 28B, 38B, 39B, 40B, 42, 43B,
45, 47B, 51B.  Kwok 8.  Jiao Cross, ECF No. 98, at 353:19–354:1, 357:18–21, 367:11–19,
373:8–374:3; Cheng Direct, ECF No. 98, at 434:17–435:13; Cheng Cross, ECF No. 98, at
465:12–15; Li Direct, ECF No. 98, at 475:3–476:18; Li Cross, ECF No. 98, at 490:8–12, 22–23.

    7.  The Debtor is the leader of The Whistleblower Movement, NFSC, ROLF, and
Himalaya.  The Whistleblower Movement, NFSC, ROLF, GSeries, and Himalaya serve the
purposes of the Debtor, serve as business vehicles for the Debtor, and their members are
personally loyal to the Debtor.  PAX 6B, 34–36, 39B, 40B, 55A, 59, 64.  Kwok Direct, ECF No.
97, at 106:10–25, 123:25–124:12, 124:15–21, 148:3–149:6, 149:17–151:19, 187:8–18, 188:4–19,
189:2–23, 190:4–11; 192:24–193:2; Jiao Direct, ECF No. 98, at 340:22–24; Cheng Direct, ECF
No. 98, at 435:4–6; Cheng Cross, ECF No. 98, at 450:6–11; Li Cross, ECF No. 98, at 491:4–
492:25.  The Debtor's followers deny any association with the Debtor, but insist their motive

behind protesting is: ". . . [The Debtor] is the spiritual leader, leader of the Chinese Whistleblowers, he is being followed by at least 500 million freedom-loving Chinese people . . . it is just like the Dalai Lama, of the spiritual leader of hundreds of millions of people from around the world.  When he's under persecution or under attack by the CCP, people from around the world step forward . . .."  Kwok 8.

8.   The Debtor communicates with members of NFSC, The Whistleblower Movement, and Himalaya via, *inter alia*, group chats, including group chats on WhatsApp.  For example, the Debtor referred to one of the witnesses who testified during the Hearing, Ms. Yaqin Li, as "great, wise, beautiful sister" in a WhatsApp post commending her for her protest efforts.  PAX 86.  Li Cross**,** ECF No. 98, at 498:4–499:4, 503:9–505:19, 507:5–19.

9.   The Debtor uses, *inter alia*, single use "burner" phones to communicate with members of NFSC, The Whistleblower Movement, and Himalaya.  Kwok Direct, ECF No. 97, at 125:24–126:10, 126:17–127:2.  The Debtor is aware of his duty to cooperate with the Chapter 11 Trustee regarding his communications.  Kwok Direct, ECF No. 97, at 235:2–6.  The Debtor has used burner phones for communications on matters related to his bankruptcy cases.   Kwok Direct, ECF No. 97, at 125:24–126:10, 126:17–127:2, 235:7–10.

10.   Associates of the Debtor have visited his office address at 3 Columbus Circle, New York, NY. PAX 85, 56, 57; Jiao Cross, ECF No. 98, at 418:15–419:20; Cheng Cross, ECF No. 98, at 463:8–19.  GNews internet broadcasts, and the Debtor's October 2022 internet announcement made to his followers to stop protesting which was posted on NFSCTV's YouTube Channel, contain the same backdrop as a photograph taken at 3 Columbus Circle, New York, N.Y.  PAX 39B, 40B, 67, 68.  Associates of these entities that are closely affiliated with

the Debtor also appear in photographs taken at the Sherry-Netherland apartment in which the

Debtor has resided and/or resides.  PAX 38A, 38B, 38D, 38E, 41B, 41C, 44, 58.

### *Persons Related to the Debtor*

11.  The Debtor is familiar with the individuals named Fay Fay (a/k/a Fei Fei), Beile Li

(a/k/a Xiao Wangzi, Prince Li, Prince, or Little Prince), Huo Lai (a/k/a Fire Lai), Pamela Tsai

(a/k/a Meiling Pam or Nicole), Jiao Bing Shang (a/k/a Ah Bing), Shan Mu, Roy Guo, Elliot

Dordick, and Yaqin Li.  PAX 3B, 3D, 8, 38A, 38B, 38D, 38E, 41B, 41C, 42, 43B, 44, 45, 56–58,

67–79, 81, 85, 86, 94, 95A, 95B, 95D.  Kwok Direct, ECF No. 97, at 163:23–166:9, 168:2–

170:6, 171:13–173:1, 173:6–11, 173:16–174:23, 175:2–10, 177:24–178:7, 178:18–22, 180:21–

181:10, 187:19–24; 191:24–192:3, 192:13–15, 193:13–193:22, 194:22–195:9, 195:14–21,

195:25–196:11, 206:12–14, 206:20–207:1.  The Debtor invoked his Fifth Amendment against

self-incrimination t in response to several questions about whether he recognized individuals in

photographs and videos.  However, the Debtor stated in a video posted on either December 5 or

6, 2022, after the completion of his testimony during the Hearing, "The most important thing

today is that comrades Prince, Huo Lai, Shan Mu, Nicole, and Luoyi were all there—they asked

me to identify each—I spent the entire day looking at your faces." PAX 95B and 95D.

12.  Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Jiao Bing Shang, Shan Mu, Yaqin Li, Roy

Guo, and Ziheng Cheng are associated with The Whistleblower Movement, NFSC, the G-Series,

Himalaya, and/or ROLF.  PAX 3B, 3D, 8, 38B, 56–58, 67–79, 81, 85, 86, 93, 94, 95A, 95B,

95D.  Jiao Cross, ECF No. 98, at 353:19–354:1, 357:18–21, 367:11–19, 373:8–374:3; Cheng

Direct, ECF No. 98, at 434:17–435:13; Cheng Cross, ECF No. 98, at 465:12–15; Li Direct, ECF

No. 98, at 475:3–476:18; Li Cross, ECF No. 98, at 490:8–12, 22–23.

13.  Elliot Dordick is an employee of Gettr.  PAX 47B, 94.

14.   Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Jiao Bing Shang, Shan Mu, Yaqin Li, Ziheng Cheng, and Elliot Dordick are friends, employees, servants, associates, followers, and/or colleagues of the Debtor.  PAX 3B, 3D, 8, 38A, 38B, 38D, 38E, 41B, 41C, 42, 43B, 44, 45, 56–58, 67–79, 81, 85, 86, 94, 95A, 95B, 95D.  Kwok Direct, ECF No. 97, at 163:23–166:9, 168:2–170:6, 171:13–173:1, 173:6–11, 173:16–174:23, 175:2–10, 177:24–178:7, 178:18–22, 180:21–181:10, 187:19–24; 191:24–192:3, 192:13–15, 193:13–193:22, 194:22–195:9, 195:14–21, 195:25–196:11, 206:12–14, 206:20–207:1.

15.   Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Jiao Bing Shang, Shan Mu, Yaqin Li, Roy Guo, Ziheng Cheng, and Elliot Dordick are involved in the protests.  PAX 19B, 24B, 38B, 40B, 42, 43B, 45, 47B, 58, 86, 93, 94.  Kwok Direct, ECF No. 97, at 170:7–171:10.  Jiao Direct, ECF No. 98, at 334:10–335:10; Cheng Direct, ECF No. 98, at 434:13–24; Li Direct, ECF No. 98, at 473:25–474:14.

### Social Media Accounts Related to the Debtor

16.   Mr. Brian Napierala, an intelligence analyst at Guidepost Solutions, LLC ("Guidepost"), was qualified as an expert witness during the Hearing to testify about open-source intelligence and cyber investigations regarding social media postings.  Napierala Direct, ECF No. 97, at 36:15–19.  Display names on Gettr can be changed at any time by anyone using the associated Gettr account.  Napierala Direct, ECF No. 97, at 64:3–7.  Handles, also known as usernames, are "a little more sticky" in that they require some form of dual authentication to change.  Napierala Direct, ECF No. 97, at 64:19–65:2, 67:24–68:10.  While multiple accounts may have the same display name, a handle is unique to an account.  Napierala Direct, ECF No. 97, at 65:3–15, 68:11–17.  Napierala Cross, ECF No. 97, at 80:11–13.  Gettr marks verified accounts with a white "v" inside a red circle.  Napierala Direct, ECF No. 97, at 66:2–19.  Gettr

verifies accounts through a process to identify that the account holder is who they claim to be. Napierala Direct, ECF No. 97, 66:2–19.  Gettr accounts are password protected with potential dual authentication requirements in certain instances.  Napierala Direct, ECF No. 97, at 68:18–70:8. Users can, *inter alia*, post, re-post others' posts, and like others' posts on Gettr.  Napierala Direct, ECF No. 97, 73:1–74:1.

17.  Gettr generates the date of a posting or a measure of when a post/repost was posted relative to when it was viewed.  Napierala Direct, ECF No. 97, at 74:2–17, 75:24–76:4.  When a timestamp appears at the bottom of a post/repost, that timestamp is Gettr generated and it is correct, except possibly with respect to the time zone.  ECF No. 97, at 90:8–91:2.  Internal timestamps in videos are generated by the recording program.  Napierala Direct, ECF No. 97, at 78:19–21.  Guidepost recorded capture time where it could discern the time.  Napierala Direct, ECF No. 97, at 75:7–19, 76:11–77:3.

18.  The @Miles Gettr account is verified by Gettr.  *See* Fact 16, *supra*.  The @Miles Gettr account formerly used "MILES GUO Official" as its display name.  *See* Fact 19, *infra*. The @Miles Gettr account used a photograph of the Debtor, which photograph is also used by the NFSC Website under a heading labeled "Who is Miles Guo," and is the profile picture of the @MilesGuo Gettr account.  Kwok Direct, ECF No. 97, at 107:17–19.  At the top of the @Miles Gettr account is a banner with the NFSC emblem and Rule of Law Foundation emblem.  The account's description stated: "We are the Citizens of the New Federal State of China" and "Our Mission is to Take Down the EVIL Chinese Communist Party."  The @Miles Gettr account reposts @NFSCSpeaks posts, @himalaya_mos posts, @gmusic posts, @QMAY007 (Display Name "QMAY") posts, which accounts are all verified by Gettr.  The @Miles account posts its own original content, including "Miles Guo's Broadcast Highlights," as well as G-News video

14

content, and Fay Fay Show (a/k/a Fei Fei Show) videos.  Several posts and re-posts contain content related to the protests.  PAX 8, 35, 61.

19.  The @Miles account's display name was changed to "NFSCTV" on Gettr, and the profile picture was changed from a photograph of the Debtor to the NFSC emblem.  It is unclear whether the description of the account remains unchanged.  PAX 60.

20.  The @MilesGuo Gettr account is verified by Gettr.  *See* Fact 16, *supra*.  The @MilesGuo Gettr account at the time of capture used "MILES GUO" as its display name, and the @MilesGuo Gettr account uses a photograph of the Debtor, which photograph is also used by the NFSC Website under a heading labeled "Who is Miles Guo," and was formerly the profile picture of the @Miles account. Kwok Direct, ECF No. 97, at 111:12–14.  At the top of the Gettr account is a banner with the NFSC emblem and Rule of Law Foundation emblem. The @MilesGuo account has "liked" posts from the @Miles account, and various accounts associated with NFSC and the term "Himalaya" in their handle that discuss the protests.  PAX 8, 35, 53, 61. Kwok Direct, ECF No. 97, at 127:21–128:6.

21.  The Debtor controls and at times personally uses the @Miles and @MilesGuo accounts.  Others may also post on the accounts on his behalf.  Kwok Direct, ECF No. 97, at 126:14–16.  Although the Debtor did not necessarily go through a verification process regarding his Gettr accounts, Gettr, an entity associated with him as part of the GSeries, verified his accounts.  *See* fact 16, *supra*.  PAX 8, 34–36, 61. Kwok Direct, ECF No. 97, at 107:22–108:2, 111:17–19, 112:2–113:8, 117:22–118:12, 161:17–162:8; Jiao Cross, ECF No. 98, at 356:5–357:17; Cheng Cross, ECF No. 98, at 464:23–465:9.

22. The @MilesGuoLive Gettr account is verified by Gettr and includes a photograph of the Debtor as its profile picture. *See* Fact 16, *supra*. The @MilesGuoLive account reposts @NFSCSpeaks and @MilesGuo posts. PAX 50.

23. The Debtor controls @MilesGuoLive. PAX 50. Kwok Direct, ECF No. 97, at 132:6–8, 132:25–133:5, 135:25–137:4.

24. The Debtor uses Gettr to reach a wide audience. Kwok Direct, ECF No. 97, at 118:13–19.

25. The @NFSCSpeaks Gettr account is controlled by NFSC – it is verified by a related entity, namely Gettr. *See* Fact 16, *supra*. PAX 34–36.

26. NFSCTV's YouTube page prominently features an artist's rendition of the Debtor at the banner at the top of the page. Thumbnails of the videos available for viewing on the page indicate the Debtor is a frequent subject of the videos posted on the NFSCTV YouTube page. PAX 59.

### Timeline of Relevant Events

*i. Events following the appointment of the Chapter 11 Trustee on July 8, 2022*

27. On July 8, 2022, the @Miles account posted a statement from the Debtor that "the entire process of changing the trustee and my personal bankruptcy case is among the greatest treasures of our New Federal State of China and is of immense significance." The Debtor believes the Chapter 11 Trustee should be removed from his case for alleged conflict of interest. PAX 30A. Kwok Direct, ECF No. 97, at 110:24–111:4, 243:2–11, 245:22–247:5.

28. On July 13, 2022, the @Miles Gettr account posted a statement of the Debtor that the Debtor and undisclosed other parties would do their best to investigate the Chapter 11 Trustee's past work as a bankruptcy trustee and as a lawyer working on IPOs. There was a video

16

embedded in the posting showing the Debtor, in a GNews broadcast with subtitles by G Translators, making this same claim.  PAX 28A and 28B.

29.  On July 19, 2022, the @Miles Gettr account posted a statement about the Chapter 11 Trustee, stating "Please spread the words about the revelations of the CCP military intelligence and the truths about the trustee of my bankruptcy case.  All the U.S. DOJ officials and lawyers from various law firms who want to deport me and harm me will be sent to prison.  I have the most unique voice in the world because almost every part of my body that can voice has been tortured by the CCP."  PAX 26A.

30.  Mr. Stephen Kindseth, an attorney for the Debtor in his Chapter 11 case, testified that, after the Order Granting the Motion for Appointment of Chapter 11 Trustee entered on June 15, 2022, PAX and the Debtor engaged in settlement discussions.  The settlement discussions occurred between July 2022 and September 2022.  Kindseth Direct, ECF No. 111, at 844:1– 844:19.  The Debtor would have paid money to PAX under the settlement.  Kindseth Cross, ECF No. 111, at 869:4–7, 870:9–15.  Settlement discussions started with the creditor's committee in September 2022 and continued through October 2022.  Kindseth Direct, ECF No. 111, at 844:17–21.  Mr. Kindseth requested throughout settlement discussions that the Trustee slow his investigation to give room for settlement talks.  Kindseth Cross, ECF No. 111, at 894:11–895:11.

31.  On October 21, 2022, the Debtor made a statement in a GNews broadcast posted on the NFSCTV YouTube Channel asking the audience, which included "fellow fighters," "friends of the New Federal State of China," and his personal supporters, to stop spreading the personal information of PAG's[8] executives and their families and counsel.  The Debtor stated he recognized this was a necessary condition for settlement and reconciliation.  The Debtor stated

---

[8] PAG is the managing partner of PAX.

that numerous parties he had accused of supporting the Chinese Communist party may one day

become friends of NFSC.  PAX had demanded the Debtor stop the doxing[9] of PAG's executives

and their families as part of settlement discussions.  PAX 39B.

> Q [Attorney Friedman]: Okay. And do you-- do you recall Mr. Kwok making a
> statement on social media calling on people not to dox PAX, and not to dox
> people related to PAX made in connection with ongoing settlement discussions?
> A [Attorney Kindseth]: I recall that my client, at the request of PAX, complied
> with a term in the term sheet to post a video.  And he posted a video, as requested
> by PAX and PAX's counsel.
> Q: And do you recall that part of that was him saying he would call on supporters
> not to dox PAX?
> A: Yes.
> Q: And not to harass PAX and family members who worked at PAX?
> A: As best as I can recall, because that came across my email, the terms that
> should have been contained in the video.  I remember that request, and I believe
> he satisfied the request.  I've never seen the video, but based on conversations
> with counsel, I thought he complied with that request.
> Q: Okay. Do you recall him saying that it was necessary not to dox in order to
> have an effective bankruptcy process in the United States?
> A: Who would say that?
> Q: Your client.
> A: I don't recall that.

Kindseth Cross, ECF No. 111, at 870:16–871:14.

32.  On October 30, 2022, the Chapter 11 Trustee submitted a term sheet to the Debtor

and his counsel regarding a global settlement and negotiations stretched into November 2022.

Kindseth Direct, ECF No. 111, at 844:20–16.  In November, PAX also demanded further

financial security, but Mr. Kindseth believed things had been worked out with PAX by

November 16, 2022.  Kindseth Direct, ECF No. 111, at 845:17–23.

33.  On November 11, 2022, the Debtor was deposed by the Chapter 11 Trustee in

connection with the Chapter 11 Trustee's motion seeking to hold the Debtor in contempt of the

---

[9] Doxing is defined as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge" *See Dox*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/doxing (last visited January 10, 2023).

Corporate Governance Order. During questioning on the involvement of Yvette Wang with the entity known as Ace Decade Holdings, which is the subject of the contempt proceedings, the Debtor's responses devolved into accusations that Paul Hastings was like the CCP. Main Case ECF No. 1096 Ex. 27. In partial resolution of the Motion for Contempt, the Court later entered an order in which the Debtor agreed not to appeal the finding that he was, at least prior to the appointment of the Chapter 11 Trustee, the beneficial owner of Ace Decade Holdings. Main Case ECF No. 1110, the Partial Resolution Order.

34. On November 15, 2022, the NFSC Gettr Page, @NFSCSpeaks, posted personal home addresses of the Chapter 11 Trustee, the Chapter 11 Trustee's family members, the chairman of PAG, family members of the chairman of PAG, and the law offices of the Chapter 11 Trustee's Counsel, and PAX's counsel. The @NFSCSpeaks post called for a 90-day protest at these locations. The post also contained photographs of some of the individuals living at the home addresses listed in the post. PAX 6B.

*ii. Events surrounding the Contempt Hearing held on November 16–18, 2022, including the Court being made aware of Call to Protest on November 16, 2022*

35. On November 16, 2022, Mr. Kindseth transmitted to the Trustee a letter summarizing terms for a global settlement that were acceptable to the Debtor. Kindseth Direct, ECF No. 111, at 841:24–843:24. The Chapter 11 Trustee called Mr. Kindseth's partner seeking to meet, which the Debtor agreed to do. Kindseth Direct, ECF No. 111, at 841:18–23, 846:19– 21. Mr. Kindseth wanted to settle the case before the settlement fell apart on account of things "heating up" inside and outside of this Court. Kindseth Direct, ECF No. 111, at 845:24–846:18. The contempt proceeding, the 2004 subpoenas, and the money paid by third parties to the Debtor's lawyers to defend contempt and the subpoenas, were reasons things were "heated."

19

Kindseth Cross, ECF No. 111, at 874:3–13, 874:16–875:6. Another reason things were "heated" was the social media campaign. Kindseth Cross, ECF No. 111, at 875:7–16.

36. On November 17, 2022, there was a settlement meeting at the New York office of Brown Rudnick. Kwok Direct, ECF No. 97, at 230:17–20; Despins Cross, ECF No. 99, at 672:23–673:5; Kindseth Direct, ECF No. 111, at 849:2–5. The Debtor, his attorneys Aaron Mitchell and Mr. Kindseth, and his translator Ms. Wilkinson, were all present at the meeting. The Chapter 11 Trustee and his attorney, Nicholas Bassett, were also present at the meeting. Kwok Direct, ECF No. 97, at 230:21–231:20; Despins Cross, ECF No. 99, at 673:6–12; Kindseth Direct, ECF No. 111, at 841:15–17, 848:24–849:1; Kindseth Cross, ECF No. 111, at 891:22–892:1. Prior to the meeting, the parties attending the meeting entered into a nondisclosure agreement. Kwok Direct, ECF No. 97, at 228:6–8; Kindseth Cross, ECF No. 111, at 892:2–893:2.

37. During the meeting, the Chapter 11 Trustee spoke to the Debtor about the SEC and the IRS Proofs of Claim filed in the Debtor's Chapter 11 case, invoking Al Capone. Despins Cross, ECF No. 99, at 673:16–18, 693:17–22, 739:6–25, 740:1–5; Kindseth Direct, ECF No. 111, at 862:18–863:15. While Mr. Kindseth believed it was an unwarranted, thinly-veiled threat, he was aware that the SEC filed a Proof of Claim in the Debtor's Chapter 11 case, but was not aware of the contents of the SEC Proof of Claim. Mr. Kindseth was also not aware of the Chapter 11 Trustee's duties to the SEC and IRS. The Chapter 11 Trustee denied he was threatening the Debtor. Despins Cross, ECF No. 99, at 693:17–19; Despins Redirect, ECF No. 99, at 744:12–745:10; Despins Recross, ECF No. 99, at 745:17–746:10; Kindseth Direct, ECF No. 111, at 868:5–9; Kindseth Cross, ECF No. 111, at 871:18–872:22, 876:24–877:6. The Chapter 11 Trustee also told the Debtor that he believed the Debtor's legal arguments that

20

various interests in property were not property of his bankruptcy estate were weak and he would

lose in court. Kindseth Cross, ECF No. 111, at 898:15–899:2. The Chapter 11 Trustee asked for

$250 million to resolve the Debtor's Chapter 11 case, which he meant – and Mr. Kindseth

understood – was to be paid to the Estate as part of a settlement and not to the Chapter 11

Trustee personally. Despins Direct, ECF No. 99, at 638:24–639:1; Despins Cross, ECF No. 99,

at 692:5–20, 741:3–22; Kindseth Direct, ECF No. 111, at 864:24–865:4; 881:25–882:4; 888:8–

14. Mr. Kindseth found this demand outrageous because it deviated greatly from the global

settlement he envisioned. Despins Cross, ECF No. 99, at 740:11–741:2, 742:18–24; Kindseth

Direct, ECF No. 111, at 866:1–8. Mr. Kindseth called the demand "extortion" in the "heat of the

moment". Kindseth Direct, ECF No. 111, at 867:7–11, 867:25–868:4. The Chapter 11 Trustee

made it clear to Mr. Kindseth that the Debtor – or whoever paid the $250 million – could retain

the surplus if less than $250 million in claims were allowed. Kindseth Cross, ECF No. 111, at

882:5–13. Mr. Kindseth believes it his duty to make sure the Debtor understands settlement

proposals. Kindseth Cross, ECF No. 111, at 885:18–886:8. The Debtor believed he was close to

accord and satisfaction with PAX, but the Trustee's request for $250 million destroyed the deal.

Kwok Direct, ECF No. 97, at 247:8–19. Neither Mr. Kindseth nor his wife, with whom he

discussed the issue, leaked the contents of the meeting on social media. Kindseth Cross, ECF

No. 111, at 893:3–14.

   38. The Debtor did not report the alleged extortion to any authority. Kwok Direct, ECF

No. 97, at 118:25–119:6, 244:2–245:21. Mr. Kindseth did not report the alleged extortion to any

authority. Kindseth Cross, ECF No. 111, at 899:12–18.

   39. On November 19, 2022, two days after the meeting with the Chapter 11 Trustee, the

Debtor recorded a video which was posted on November 20, 2022, on the

NFSCTV@chinatruth2022 account,[10] a verified Gettr account.  In the video, the Debtor represents he "personally, strongly oppose[s]" such protests "in front of PAX office building and other places."  The video makes no mention of protests in front of the homes of the Chapter 11 Trustee and his family, the offices of Paul Hastings, nor the homes of the PAG chairman and his family.  The video also tells viewers "if you really want to protest . . . be sure to consult a lawyer first, within the perimeter of the law, act within the perimeter of the law, and be sure to observe your state ordinances and local police . . . I strongly oppose and absolutely do not support such protests."  Kwok 6A.  Kwok Direct, ECF No. 97, at 212:14–18.

40.  On or before November 20, 2022, a subpoena was served on Jiao Bing Shang as the President of Himalaya New World, Inc.  The subpoena was issued in accordance with an Order Granting a Motion for a Rule 2004 Examination of Himalaya New World, Inc. in the Debtor's Bankruptcy case.  Upon being served with the subpoena, Ms. Jiao did not contact an attorney, she contacted Fay Fay.  Jiao Cross, ECF No. 98, at 406:3–408:18, 409:3–5.  Receipt of the legal papers was "part of the reason" why Ms. Jiao organized the protests in Washington D.C. at the offices of PAX's counsel, O'Melveny & Myers.  Jiao Redirect, ECF No. 98, at 424:21–425:2.

41.  On November 20, 2022, the @NFSCSpeaks account posted a statement identifying the Chapter 11 Trustee's daughters and stating their father is aiding and abetting the CCP.  The post also contained photographs of the Chapter 11 Trustee and his daughters and identified where they work.  PAX 7.  Despins Direct, ECF No. 99, at 589:24–590:1.  The @Miles account reposted this @NFSCSpeaks post on its Gettr page.  PAX 8.

---

[10] It is unclear if, at the time of posting, the handle of this account was @Miles and the display name MILES GUO Official, because while Gettr handles are unique, multiple accounts could have the display name NFSCTV.

42.  On November 20, 2022, protests occurred directly in front of the Chapter 11 Trustee's home.  The protesters held signs which for the most part, were targeted directly at the Chapter 11 Trustee.  PAX 9 and 91.  Despins Direct, ECF No. 99, at 591:5–17.

*iii. Events following the filing by the Chapter 11 Trustee of a*
*Statement About Social Media Campaign November 21, 2022*

43.  On or before November 21, 2022, protesters at the Chapter 11 Trustee's home distributed leaflets to neighbors describing the Chapter 11 Trustee and his Counsel as enablers of the CCP and accusing the Chapter 11 Trustee of racism.  PAX 48 and 91.  Despins Direct, ECF No. 99, at 614:21–615:8.

44.  On November 21, 2022, the Debtor participated in an internet broadcast acknowledging the 2004 subpoenas issued in the Main Case and advised the audience to avoid receipt of subpoenas by, *inter alia*, not going home.  The Debtor told viewers that, if they are "stupid" and receive subpoenas, the Himalaya Global Alliance and the Rule of Law foundation would hire attorneys to help them contest the subpoenas.  PAX 38A, 38B, 38D, 38E.

45.  In the same internet broadcast described above, the Debtor stated, that the Chapter 11 Trustee and Paul Hastings would suffer "calamities" because of the 2004 subpoenas.  The Debtor said "To deal with this rogue, we have our rogue's ways.  In a few days you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities!"  PAX 38B.

*iv.  Events following commencement of the Adversary Proceeding on November 22, 2022, and*
*the entry of the TRO on November 23, 2022*

46.  The Debtor is aware of the TRO.  Kwok Direct, ECF No. 97, at 105:10–105:17, 119:25–120:3.

47.  On November 22, 2022, GNews conducted an internet broadcast from the protests outside O'Melveny & Myers New York, New York offices, stating that it was the third day of

protests.  The protesters held placards with stylized, inflammatory depictions of O'Melveny &
Myers, attorneys as well as the Chapter 11 Trustee.  PAX 45.

48.  On November 23, 2022, the @NFSCSpeaks Gettr account posted a video of protests
that occurred immediately in front of the home of a family member of PAG's chairman.
Protesters displayed signs with photographs of PAG's chairman with the word "SPY" and
"CCP" prominently displayed.  PAX 16 and 17.

49.  On November 24, 2022, a video was posted on YouTube, in which the Debtor
personally called for "Comrades" to "persevere with the 90-day protest."  He stated ROLF
supports the Debtor's legal efforts and protests.  He cited the Chapter 11 Trustee's 2004
subpoenas as a reason for the protests, stating the Chapter 11 Trustee's behavior was mafia-like
and worse than that of the Chinese Communist Party. PAX 3B and 3D.

50.  On November 24, 2022, the @MilesGuoLive account posted photographs of these
protests occurring at the home of PAG's chairman's son with supportive emojis and stated
"Comrades who have worked so hard to protest on the frontline, rain or shine, salute you!".  The
placards in the photograph are largely targeted at PAG's Chairman.  PAX 12 and 13.

51.  On November 25, 2022, the TRO was discussed on the Fay Fay Show, an internet
broadcast.  PAX 43B.

52.  On November 25, 2022, the @NFSCSpeaks account posted a video, with an internal
timestamp of November 23, 2022, of protesters picketing and parading through the private lobby
of 200 Park Avenue, New York, New York, the building which houses the New York Paul
Hastings office.  The protesters carried placards displaying inflammatory, edited photographs of
the Chapter 11 Trustee, the Chapter 11 Trustee's counsel, and PAX's counsel.  Several protesters
wore hats with the G-Fashion logo.  A large banner with the "New Federal State of China"

24

emblem was carried by the protesters. Beile Li stated "To everyone at Paul Hastings . . . Millions of People that have been persecuted by the CCP with curse you, will curse your family, curse every single person in your life because there is blood on your hands" and "the people of the New Federal State of China, 500 million of us . . . .we stand against Paul Hastings, and we stand against O'Melveny. There is no going back, there is no recourse. You have committed a crime, and now you're going to suffer the consequences of your actions." PAX 19B, 91. Despins Direct, ECF No. 99, at 581:10–583:7; Despins Cross, ECF No. 99, at 650:4–651:1.

53. On November 25, 2022, the @Miles account posted an NFSCSpeaks broadcast, with an internal timestamp also of November 25, 2022, of protesters picketing in front of the Chapter 11 Trustee's home with signs accusing him of various things and standing behind an NFSC banner. PAX 10B, 91. Despins Direct, ECF No. 99, at 576:21–578:18.

54. On November 25, 2022, the @Miles account posted images of protests occurred at the home of relative of PAG's chairman. Protesters in front of the home carried signs with photographs of a targeted party. There are two NFSC flags displayed behind the protesters. PAX 15.

55. On November 25, 2022, the Chapter 11 Trustee received a series of emails at his work email from the same unknown ProtonMail email address with consecutive subject lines "I wish" and "i kill." The "I wish" email had the body text "hhhhhhhhhhahahahaha." The "i kill" email had no body text. PAX 29, 91. Despins Direct, ECF No. 99, at 603:20–606:19, 607:19– 608:14; Despins Cross, ECF No. 99, at 654:7–15. The Trustee believed these emails to be a threat. Despins Redirect, ECF No. 99, at 744:2–4.

56. On November 25, 2022, the @NFSCSpeaks account posted a video, with internal date stamp of November 25, 2022, depicting protests outside Paul Hasting's Tokyo office holding pickets directed at the Chapter 11 Trustee. PAX 20B and 91.

57. On November 26, 2022, the @Miles account posted an NFSCSpeaks internet broadcast, with an internal timestamp also of November 26, 2022, of protesters picketing in front of the Chapter 11 Trustee's home with signs accusing him of various things and standing behind an NFSC banner. PAX 11B, 91. Despins Direct, ECF No. 99, at 579:8–581:2.

58. On November 26, 2022, the @NFSCSpeaks Gettr account posted a link to a prfree.org article in support of a comment that stated "$250 Million Dollar EXTORTION OF THE CENTURY" and "DOJ Appointed Trustee Despins Blackmails $250 Million, Threatens to 'Tear Apart' Chinese Dissidents." The post included an inflammatory photograph of the Chapter 11 Trustee's face. On November 30, 2022, the @MilesGuoLive Gettr account posted the same text with a stylized image of the Chapter 11 Trustee. PAX 21 and 33.

59. The "$250 Million Dollar Extortion of the Century" article from prfree.org fueled additional individuals to protest and/or organize protests. Jiao Cross, ECF No. 98, at 353:4–354:14; Cheng Direct, ECF No. 98, at 434:13–435:13; Cheng Cross ECF No. 98, at 445:19–446:22; Li Direct, ECF No. 98, at 477:23–478:6.

60. On November 26, 2022, numerous Paul Hastings employees received emails from multiple senders with the same body text and attachment. The body of the email stated the New Federal State of China and "Chinese whistleblowers" called upon Paul Hastings employees to speak up against the Trustee and/or leave the law firm. The email included a link to a prfree.com article on the alleged extortion, a Gettr post, and stated "if you have any question, please contact NFSCspeaks@proton.me. The attachment to the email speaks about the alleged extortion and

26

calls upon Paul Hastings to contact their elected officials and to "request them to investigate Paul Hastings and Luc Despins." PAX 22A, 22B, 91. Despins Direct, ECF No. 99, at 594:12–595:1, 595:15–18, 596:3–598:9.

61. On November 26, 2022, an unknown caller left a voicemail on the Chapter 11 Trustee's work telephone number stating "Luc, you are CCP's running dog. You need to go to Hell. You just did something so ridiculous and your end is so close. F-U-C-K." PAX 23, 91. Despins Direct, ECF No. 99, at 587:13–19, 588:13–20; Despins Cross, ECF No. 99, at 654:16–655:11. The Chapter 11 Trustee believed this message to be a threat. Despins Redirect, ECF No. 99, at 743:23–744:1.

62. On November 28, 2022, the @MilesGuoLive posted "NDA . . . (Non-disclosure agreement)" with an image of a post from an unknown social media site including an image of an NDA titled "Agreement Regarding November 17, 2022 Case Status Meeting" and including the caption of these Chapter 11 bankruptcy cases. PAX 32.

63. On November 28, 2022, the @Miles Gettr account posted a broadcast of protests occurring in front of the O'Melveny & Myers's office in Washington, D.C. and New York. Protesters carried signs targeting PAG Chairman Shan Weijan. The protests were reported and broadcast by a program with the NFSC emblem displayed, and two individuals wearing G-Fashion labels. PAX 18C and 18D.

64. The Debtor was aware of protests at Grand Central Station on November 29, 2022, targeted at the Chapter 11 Trustee. PAX 50. Kwok Direct, ECF No. 97, at 137:17–138:2.

65. On December 3, 2022, the @Miles Gettr account posted a video of protesters picketing in front of PAX's counsel Attorney Sarnoff's apartment building in New York City. PAX 51B.

66.  On December 3, 2022, a video was posted on Gettr depicting protesters placing a placard including a stylized image of Attorney Sarnoff at the door of Attorney Sarnoff's home and sliding a letter under his door.  PAX 93.

67.  On or before December 5, 2022, the protestors rented a home in California directly across from the home of a relative of PAG's chairman and placed on it with a billboard and signs targeting PAG's chairman.  PAX 89.  On December 5, 2022, on an internet broadcast hosted by Gettr, the Fay Fay Show discussed this activity.  PAX 92.

68.  On or before December 6, 2022, and after his testimony during the Hearing on December 5, 2022, the Debtor filmed a video discussing his testimony and the proceedings in this Court.  In the video, the Debtor identified several individuals, whose images had been presented to him during his testimony and about whom he had asserted his Fifth Amendment right against self-incrimination.  PAX 95A, 95B, 95D.

69.  On or before December 7, 2022, protests accusing the Chapter 11 Trustee of soliciting a bribe and seeking to destroy a Chinese dissident organization occurred at the Chapter 11 Trustee's daughter's and his ex-wife's homes.  Despins Direct, ECF No. 99, at 621:8–622:2.  The Chapter 11 Trustee hired a bodyguard for his daughter.  Despins Cross, ECF No. 99, at 657:20–24.  The protestors swarmed his ex-wife.  Despins Cross, ECF No. 99, at 658:3–12.

70.  On or before December 7, 2022, protests accusing the Chapter 11 Trustee of being an antisemite and profiting from antisemitism accompanied with images of the Chapter 11 Trustee as a Nazi officer occurred at Grand Central Station, which is adjacent to Paul Hastings's New York City office.  PAX 90.  Despins Direct, ECF No. 99, at 618:7–619:17.

71.  On December 7, 2022, the Chapter 11 Trustee encountered protestors at his home when leaving for work in the morning at about 8:15 or 8:20 a.m.  It was a peaceful encounter, but the protestors were trying to take photos of him.  Despins Direct, ECF No. 99, at 592:17–594:1.

### *Debtor's Involvement With Protests*

72.  The Debtor has offered legal support to those individuals and entities served with subpoenas.  PAX 38B.  Kwok Direct, ECF No. 97, at 176:1–12, 207:6–24

73.  The Debtor considers those protesting to be his comrades.  PAX 3B and 3D.  Kwok 6A.  Kwok Direct, ECF No. 97, at 207:25–208:8, 211:16–212:9.

74.  The Debtor, or someone the Debtor controls or directs, breached the NDA about the November 17, 2022, meeting for the purposes of creating the prfree.org article.  PAX 21 and 33.  Kwok Direct, ECF No. 97, at 230:21–231:20, 231:21–232:2; Despins Cross, ECF No. 99, at -673:6–12; Kindseth Direct, ECF No. 111, at 841:15–17, 848:24–849:1; Kindseth Cross, ECF No. 111, at 891:22–892:1, 893:3–14.

75. The Debtor has the alias Seventh Brother.  PAX 44, 95A.  Kwok Direct, ECF No. 97, at 191:17–20.

76.  The Debtor supports the protests.  Facts 6–7, 14–15, 34–74, *supra*, and their supporting evidence.  PAX 3B, 3D, 8, 86.  Kwok Direct, ECF No. 97, at 212:14–18, 215:17–216:1.

77.  The Debtor supports, encourages, and is the leader of a social media and protest campaign targeting the Plaintiffs, their counsel, and their relatives, at personal homes and workplaces.  The social media campaign and protests are tied to the Plaintiffs' involvement in the Chapter 11 cases, including the appointment of Chapter 11 Trustee which resulted in a divestiture of the Debtor's control over his Chapter 11 case, discovery efforts of the Chapter 11

29

Trustee and his efforts to discover and recover Estate assets, and the efforts of PAX to satisfy its claim which was reduced to judgment before the Debtor filed his Chapter 11 case. The social media and protest campaign accuses Plaintiffs and their counsel of, *inter alia*, being members or agents of the Chinese Communist Party, supporting and financing genocide in Xinjiang, seeking to destroy the NFSC and The Whistleblower Movement, anti-Chinese racism, and antisemitism. Facts 1–76, *supra*, and their supporting evidence. Kwok Direct, ECF No. 97, at 220:1–5.

### *Plaintiffs' Connections With China*

78. Paul Hastings LLP has offices in China. Despins Cross, ECF No. 99, at 640:17–18.

79. The percentage of Paul Hastings LLP's revenue that comes from China is *de minimis*. Despins 1. Despins Cross, ECF No. 99, at 640:23–643:9. This revenue comes from American companies doing business in China as well as from Chinese companies. Despins Cross, ECF No. 99, at 643:16–644:4. As an equity partner, the Chapter 11 Trustee would receive a portion of this revenue. Despins Cross, ECF No. 99, at 643:13–15. Paul Hastings LLP has previously represented PAG. Despins Cross, ECF No. 99, at 644:5–14.

80. The Chapter 11 Trustee does not finance genocide. Despins Direct, ECF No. 99, at 591:20–22.

81. The Chapter 11 Trustee has never been retained by the Chinese Communist Party for any purpose. Despins Direct, ECF No. 99, at 592:1–3.

82. The Chapter 11 Trustee is not racist against Asian Americans. Despins Direct, ECF No. 99, at 623:7–9.

83. The Chapter 11 Trustee has not served as counsel to companies in China. Despins Direct, ECF No. 99, at 639:2–3.

84. O'Melveny & Myers has represented China VAST, whose founder, executive director, and president is a member and politician of the CCP. Kwok 14 and 17.

### Effects of Debtor's Social Media and Protest Campaign
### on the Chapter 11 Trustee's Investigation

85. The Chapter 11 Trustee plans his schedule around avoiding the protestors. Despins Cross, ECF No. 99, at 649:5–650:3.

86. Because of the circumstances of these cases, Paul Hastings has neither billed for nor received any fees and expenses incurred in the Debtor's Chapter 11 case and all related cases. Despins Cross, ECF No. 99, at 647:19–24.

87. The Chapter 11 Trustee is concerned that the Debtor's inflammatory rhetoric, and the response to such rhetoric, is escalating and is directed not only to the Chapter 11 Trustee, but also to others with no involvement in these cases. In support of this concern, the Chapter 11 Trustee testified about an instance where a protestor chased and screamed at colleagues on their way up the escalator into Paul Hastings's office. The Chapter 11 Trustee is concerned that "crazies" might come to the conclusion to "take out the Trustee." Despins Direct, ECF No. 99, at 622:3–20; Despins Cross, ECF No. 99, at 703:23–704:10, 704:24–705:9.

88. Paul Hastings has had to hire multiple firms in relation to cyber security risks, exposing the firm to potential liability, given the current social media and protest campaign. Despins Direct, ECF No. 99, at 623:14–624:12; Despins Cross, ECF No. 99, at 707:12–708:6.

89. Partners at Paul Hastings are concerned about how long the social media and protest campaign will last and how much it will impact the firm. Despins Direct, ECF No. 99, at 625:25–626:5. The Chapter 11 Trustee has spent dozens of hours meeting with partners not involved in these cases as a result of the current social media and protest campaign. Despins

Direct, ECF No. 99, at 626:6–9.  There have been discussions at Paul Hastings about having the Chapter 11 Trustee resign.  Despins Direct, ECF No. 99, at 626:20–23.

90.  The Chapter 11 Trustee's counsel are nervous about coming to work through the gauntlet of protestors.  Despins Direct, ECF No. 99, at 636:18–637:12.  Hybrid work has slowed down the Chapter 11 Trustee's investigation into the Debtor's Estate compared to working together in person.  Despins Direct, ECF No. 99, at 637:13–638:2.

91.  The Chapter 11 Trustee has spent numerous hours arranging protection with the U.S. Marshals and providing incoming evidence to the U.S. Marshals.  Despins Direct, ECF No. 99, at 633:25–635:25.

92.  The Chapter 11 Trustee and Paul Hastings have been sued by Beile Li in the United States District Court for the Southern District of New York for being unregistered foreign agents for the Chinese Communist Party.  The Trustee believes Li's lawsuit is related to this case because the filings also talk about PAX despite PAX not being a party to the case.  Despins Direct, ECF No. 99, at 626:24–627:22.

93.  Mr. Dordick has filed an ethics complaint against the Chapter 11 Trustee and several of his counsel ostensibly because the Chapter 11 Trustee cited to an article about the Debtor in a counterclaim in a related adversary proceeding, which article itself Dordick asserts has run in papers that have also run allegedly antisemitic content.  The Chapter 11 Trustee believes that Dordick's action relates to the placards depicting the Trustee as a Nazi officer.  Despins Direct, ECF No. 99, at 627:23–629:7.

94.  The Chapter 11 Trustee believes this adversary proceeding is a damaging diversion from his investigation into the assets of the Debtor – for both him and the Court – setting the investigation back weeks.  Despins Direct, ECF No. 99, at 629:15–630:6; Despins Cross, ECF

No. 99, at 708:7–709:3, 710:12–711:25.  The process of attempting to recover assets of the estate has been delayed.  The delay is particularly harmful because there may not be an adequate remedy at law to compensate for the delay.  The Chapter 11 Trustee cannot hire professionals to assist with the investigation without Estate assets and Estate assets may be being placed outside the reach of creditors while the investigation continues to be delayed.  Despins Direct, ECF No. 99, at 630:7–631:14.

> A [Despins]. . . we know that the assets that in front of us are, the Lady May, the Sherry-Netherland, the $37 million.  Those Paul Hastings can see.  We can deal with that.  Up or down, the Court will rule, whether we prevail or not on that.  So putting that aside, those assets are not sufficient to pay creditors.  Far from it. So what we need to do is go after other assets, and Paul Hastings cannot do that on its own.  It needs the assistance of forensic accountants.  When you have a Debtor that testified that they're using burner phones, the only way to go after the cash that's in the system out there is through forensic investigation.  That costs a lot of money.  The only way to get there is to get money into the estate, and that's why it's so critical that we get to that point as soon as possible, or not, meaning the Court may rule that Mr. Kwok is right, and that—that will be the end of it. But we—we need to get to that point, and without that, the passage of time –this case—this is not, like, good wine.  It doesn't get better with age.  The data gets stale.  The funds can be moved all the time, and it's critical that we go forward. And this is a huge distraction and a costly distraction at that.

Despins Direct, ECF No. 99, 630:18–631:14.

95.  The Chapter 11 Trustee's investigation has relied on unpaid informants who are very concerned by the social media and protest campaign, fearing it could turn against them.  Despins Direct, ECF No. 99, at 631:15–633:12.

96.  The Chapter 11 Trustee is encountering creditor hesitancy to participate in the Debtor's case due to the social media and protest campaign, fearing such actions could turn against them.  The Chapter 11 Trustee has had to devise methods for creditors to file confidential claims, necessitating that he seek to employ a claims agent – another cost to the Estate.  Despins Direct, ECF No. 99, at 633:13–24; Despins Cross, ECF No. 99, at 703:17–22.

33

97.  The Chapter 11 Trustee feels obliged to fulfill his fiduciary obligations as Chapter 11

Trustee of the Debtor's Estate despite the difficulties presented by this case.  Despins Direct,

ECF No. 99, at 638:9–23.

## V.  DISCUSSION

There are extremely difficult issues of law implicated by the Plaintiffs' requested relief

and the Debtor's opposition to that relief.  Despite these obvious difficulties, for the reasons

stated below, the Court concludes that the law requires granting the Motion in part and,

therefore, a Preliminary Injunction will issue.

### A.  Section 105(a) Preliminary Injunction Standard

The Debtor argues that the Court should apply the Second Circuit's general standard for

injunctive relief under Fed. R. Civ. P. 65, which standard is articulated in *Jackson Dairy, Inc. v.*

*H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).  *See Citigroup Global Mkts., Inc. v.*

*VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010) (holding

*Jackson Dairy* remains the law of the Second Circuit).  As set forth below, however, an alternate

standard for injunctive relief is available in bankruptcy cases under 11 U.S.C. § 105(a).  *See e.g.,*

*Ball ex rel. Soundview Elite Ltd. v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543

B.R. 78, 115 (Bankr. S.D.N.Y. 2016) ("The Court issues a preliminary injunction under each of

Fed. R. Civ. P. 65(a) and Bankruptcy Code section 105(a), each of which provides separate

authority for such measures.").  The Plaintiffs have asserted their claims under section 105(a)

and seek injunctive relief under 11 U.S.C. § 105(a).  The Court considers their request under that

applicable standard.

The Second Circuit has "repeatedly emphasized the importance of the bankruptcy court's

equitable power," stating that "[s]ection 105(a) should be 'construed liberally to enjoin [actions]

34

that might impede the reorganization process.'" *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (upholding bankruptcy court equitably estopping debtor from objecting to claims) (internal citations omitted). While the Second Circuit clarified in *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 91–92 (2d Cir. 2003), that 11 U.S.C. § 105 cannot be used to "'create substantive rights that are otherwise unavailable under applicable law,'" the Court is not being petitioned to do so here. Rather, the Court is being asked to insure the proper administration of the Estate under the provisions of the bankruptcy code. Furthermore, the Plaintiffs also invoke 28 U.S.C. § 1651(a), the power of which "extends, under appropriate circumstances, to persons who . . . are in a position to frustrate the implementation of a court order or the proper administration of justice . . .." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977) (holding that 28 U.S.C. § 1651(a) supported an order requiring telephone company officials to provide technical assistance and facilities to law enforcement); *United States v. Int'l Brotherhood of Teamsters*, 266 F.3d 45 (2d Cir. 2001) (in pertinent part, affirming that district court could issue an injunction in furtherance of a consent decree under 28 U.S.C. § 1651(a)).

While the Second Circuit has not articulated a standard for injunctive relief under 11 U.S.C. § 105(a), *see Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61 (2d Cir. 1986), it has affirmed injunctions issued under 11 U.S.C. § 105(a), *see, e.g.*, *Securities Inv. Protection v. Bernard L. Madoff Inv. Securities LLC (In re Madoff)*, 429 B.R. 423 (Bankr. S.D.N.Y.), *aff'd by Marshall v. Picard (In re Bernard L. Madoff Inv. Securities LLC)*, 740 F.3d 81 (2d Cir. 2014). The Ninth Circuit Court of Appeals, and courts sitting in bankruptcy within the Second Circuit, have issued injunctive relief under 11 U.S.C. § 105(a), with the "traditional preliminary

35

injunction standard as modified to fit the bankruptcy context." *Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel Innovations)*, 502 F.3d 1085 (9th Cir. 2007) (applying the Ninth Circuits preliminary injunction standard, modified to fit the bankruptcy context); *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal citations omitted); *Dunaway*, 619 B.R. at 38; *Roman Catholic Diocese*, 628 B.R. at 571; *Soundview Elite*, 543 B.R. at 115 (Bankr. S.D.N.Y. 2016); *Lyondell Chemical Co. v. CenterPoint Energy Gas Services (In re Lyondell Chemical Co.)*, 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009); Complaint, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Sept. 9, 2018), ECF No. 1, *requested relief granted by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Oct. 11, 2019), ECF No. 82, *most recently amended by* Order, *Purdue Pharms.*, Case No. 19-08289 (SHL) (Bankr. S.D.N.Y. Dec. 5, 2022), ECF No. 400.

. Section 105(a) injunctive relief may enter if (1) there is a likelihood of successful reorganization; (2) there is an imminent irreparable harm to the estate in the absence of an injunction; (3) the balance of harms tips in favor of the moving party; and (4) the public interest weighs in favor of an injunction. *Calpine*, 365 B.R. at 409; *see Soundview Elite*, 543 B.R. at 119; *Lyondell,* 402 B.R. 571, 588–89 (Bankr. S.D.N.Y. 2009).  Injunctive relief may issue in a bankruptcy case without a showing of (2) imminent irreparable harm "'where the action to be enjoined is one that threatens the reorganization process'" and "'the threat to the reorganization process must be imminent, substantial and irreparable.'"  *Calpine*, 365 B.R. at 409–10; *see Lyondell*, 402 B.R. at 590–91.  Irreparable harm to the estate or the reorganization process must be "likely," not merely possible, to support a preliminary injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## B. Application of § 105(a) Standard

### i. Likelihood of a Successful Reorganization

To establish the first element, there must be a "'*reasonable* likelihood of a successful reorganization,'" unless "the acts sought to be enjoined *cause* it to fail." *Lyondell*, 402 B.R. at 589–90 (internal citation omitted; emphasis in original). The Plaintiffs argue this element has been met. Aside from the Debtor's intransigence, the Plaintiffs contend the Debtor's Chapter 11 case is not complex or difficult. Since the Debtor's Chapter 11 case has been pending in this Court, PAX has consistently and forcefully argued that the Debtor has many undisclosed assets that are hidden in a maze of corporate entities held by family members and associates. The Chapter 11 Trustee was appointed to investigate these claims for the benefit of creditors. The Plaintiffs argue that it is likely that the Debtor has ample disclosed and undisclosed assets to fund a Chapter 11 plan, which assets the Chapter 11 Trustee will liquidate or his investigation will uncover. The Debtor does not address this element, arguing as noted above, that the Court should instead be considering likelihood of success on the merits regarding an unasserted claim for defamation.

The Chapter 11 Trustee's investigation, which has been met with opposition at every step in the process, is likely to liquidate *disclosed* assets – such as the Debtor's malpractice action against Clark Hill PLC or the Debtor's U.K. action against UBS. The investigation is also likely to bring at least some of the currently *contested* assets – such as the Sherry-Netherland Apartment, subject to the outcome of the Bravo Luck Ltd. adversary proceeding, or the Lady May, subject to outcome of the HK International Funds Investments (USA) Ltd. LLC adversary proceeding– into the Estate for the benefit of creditors. The Court reaches this conclusion for several reasons. For example, despite his representations that he has no income or assets, the

37

Debtor has demonstrated that he is able to marshal assets when he needs them. (*See, e.g.*, Main Case ECF Nos. 117 and 197.) Prior to the appointment of the Chapter 11 Trustee, the Debtor proposed a Plan of Reorganization in which the Lady May, a luxury yacht that the Debtor asserts he does not own or control, was pledged to the Estate for benefit of creditors. In addition, although the Debtor represented that he owned no assets and had no income when he filed his Chapter 11 case, he was able to obtain financing of more than $8,000,000.00 to fund the administration of the Estate. Furthermore, other courts that have entered a judgment against the Debtor have held that the Debtor hides assets in corporate entities and in the *de jure* ownership of family members and associates. *See, e.g.*, Decision & Order, *Pac. All. Asia Opportunity Fund, L.P. v. Kwok Ho Wan*, Index No. 652077/2017 (N.Y. Sup. Ct. Feb. 9, 2022), NYCEF No. 1181. The Court also notes that the Debtor has already asked the Court to enter the Partial Resolution Order of the contempt proceedings, which order finds he owns assets he previously stated he did not own. For these reasons, the Court concludes it is likely that the Chapter 11 Trustee will bring *some* assets into the Estate. Importantly, moreover, the Court concludes that the Chapter 11 Trustee's investigation will be more fulsome than the investigation of a hypothetical Chapter 7 trustee. Therefore, the Court believes the Chapter 11 Trustee's investigation will liquidate and recover enough assets to fund a confirmable Chapter 11 plan. The Court would consider such a plan, if confirmed, a successful result for the Debtor's Chapter 11 case.

Furthermore, both the Debtor's own testimony and the testimony of his bankruptcy counsel support the Court's finding of fact that there was meaningful progress made towards reaching a settlement with PAX, by far the largest creditor in these cases. The Debtor's bankruptcy counsel believed a global settlement was within reach. Both the Debtor and his

bankruptcy counsel blamed the Chapter 11 Trustee for the current lack of a global settlement. Regardless of that belief, the Court concludes that the Chapter 11 Trustee, an equity-partner and co-chair of the restructuring department at a large law firm with decades of experience in bankruptcy cases, is not at all opposed to reaching a settlement in this case. The Chapter 11 Trustee has fiduciary duties to creditors other than PAX, including those creditors who have not yet filed proofs of claim. Although the Debtor's bankruptcy counsel testified that he repeatedly asked the Chapter 11 Trustee to "stand down," the Court appointed the Chapter 11 Trustee precisely to fulfill those fiduciary duties. The Debtor, for his part, has declared his wish to fairly and equitably resolve the claims of his creditors in these cases. *See* Main Case ECF No. 107. The Court has every reason to believe, while this case may be fraught with litigation for some time, that there is a reasonable likelihood that some form of settlement will be reached and a Chapter 11 plan will be advanced that meets the best interest of creditors test.

As discussed more fully in the succeeding section on irreparable harm, "there is no reason to believe or suspect that [the Debtor's] reorganization will fail—unless, of course, the acts sought to be enjoined cause it to fail." *Lyondell*, 402 B.R. at 590. The Chapter 11 Trustee testified extensively about the effect of the Debtor's social media and protest campaign on his investigation. The Debtor's bankruptcy counsel testified regarding efforts to seek a settlement before things "heated up." This fact, coupled with the Defendant's October 21, 2022, video calling for cessation of agitation against PAX so that reconciliation could be reached, establishes that at least the Debtor believes such behavior is not conducive to reaching such a global settlement. The Court agrees. The issuance of a preliminary injunction will support the ability to successfully reorganize, through the Chapter 11 Trustee's investigation and/or any attempt to reach a global settlement. If the actions that are enjoined were allowed to continue, the ability to

successfully reorganize—through the Chapter 11 Trustee's investigation, settlement, or some combination thereof—will be greatly diminished. *See Lyondell*, 402 B.R. at 590.

### ii. Irreparable Harm to the Estate or the Reorganization Process

The Plaintiffs argue there is irreparable harm to the reorganization process for several reasons, including that the Debtor's conduct is disruptive of the investigation efforts and has a chilling effect on potential witnesses and creditors. The Plaintiffs further argue that the Chapter 11 Trustee's investigation is being stymied and distracted by this adversary proceeding, and that ultimately the economic realities of the case may force the Chapter 11 Trustee to resign. The Debtor does not argue this element and instead argues that defamation damages are not irreparable as they can be adequately compensated by legal remedies.

The Debtor is correct that the general rule is that a harm, to be irreparable, must be the sort that cannot be adequately compensated by legal remedies. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding that a district court "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages"); *see CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994)("Even if economic harm were sufficient in itself to justify a prior restraint, however, we previously have refused to rely on such speculative predictions as based on 'factors unknown and unknowable'. . . . If CBS has breached its state law obligations, the First Amendment requires that Federal remedy its harms through a damages proceeding rather than through suppression of protected speech.") (internal citation omitted). Nevertheless, the United States Supreme Court has held that this rule is not necessarily applicable in bankruptcy. *See Grupo Mexicano*, 527 U.S. at 322 ("The law of fraudulent conveyances and bankruptcy was developed to prevent [the disposition of assets pending adjudication].")); *Rubin v.*

40

*Pringle ex rel. Focus Media Inc. (In re Focus Media Inc.)*, 387 F.3d 1077 (9th Cir. 2004); *see also In re Owens Corning*, 419 F.3d 195, 208 n. 14 (3d Cir. 2005).

More importantly, however, as noted above, the Court does not agree with the Debtor's framing of the issue. The irreparable harm in this case is the harm to the Debtor's Chapter 11 Estate and the reorganization process itself. As noted above, the Court credits the Chapter 11 Trustee's testimony that (1) the Chapter 11 Trustee's investigation is currently unfunded and it is unsustainable unless it continues to press forward – this is about more than just cost: it is about whether there is an investigation at all, which investigation this Court concluded was necessary; (2) the Debtor's conduct is having a chilling effect on potential witnesses and creditors in these cases; and (3) there is a very real risk that the Chapter 11 Trustee will ultimately be forced to resign if the Debtor does not stop his conduct.

All of the Chapter 11 Trustee's testimony supports a finding of likely irreparable harm to the reorganization process or the Estate. *Calpine*, 365 B.R. at 409–10. As to (1), unnecessary delay is likely to lead to the dissipation of assets and reduced recoveries to creditors, which in bankruptcy, as discussed above, may be considered irreparable harm. *Cf. Grupo Mexicano*, 527 U.S. at 322. As to (2), any chilling of the investigation or of creditors coming forward would undermine the purpose of these proceedings, which were voluntarily initiated, as the Debtor states, to fairly and equitably bring finality to claims against him. As to (3), the Court granted a Motion to Appoint a Chapter 11 Trustee to investigate the affairs of the Debtor for the benefits of creditors. The resignation of the Chapter 11 Trustee, under these circumstances, is unlikely to lead to the appointment of a replacement Chapter 11 Trustee and will thwart the Court's previous decision that a Chapter 11 trustee should be appointed in this case. Any replacement trustee would have to start over again and would likely face opposition from the Debtor immediately

upon appointment, as the Chapter 11 Trustee has faced since his appointment. These enumerated harms establish that irreparable harm exists for which there is no adequate remedy at law.

Furthermore, as noted above, the Debtor believed that actions consistent with the current social media and protest campaign were harmful to a settlement with PAX. On October 21, 2022, the Debtor called for the members of his movements – the NFSC and The Whistleblower Movement – as well as his personal followers, to cease doxing PAX to allow for peace and settlement between the Debtor and PAX.

Although the Debtor argues that there is no evidence of irreparable harm to PAX, this objection is, again, working within the wrong framework. Nevertheless, the Court reinterprets the objection as an argument that the conduct leveled against PAX is not harm to the bankruptcy process.

The Court disagrees. PAX is a creditor in these cases. In fact, PAX is the largest creditor in the Debtor's case and has filed alter ego claims in the Corporate Debtors' cases. As discussed above, the Defendant is aware that his conduct damages the prospect of settlement with PAX. The chapter 11 process provides a framework to encourage parties to settle and restructure debts within the guardrails provided by the confirmation requirements and the equitable powers of the Bankruptcy Court. Chilling the possibility of settlement is irreparable harm to the bankruptcy process and to the Debtor's Estate, particularly with respect to the Debtor's largest creditor, PAX.

The Court concludes, for all of these reasons, that the Debtor's conduct "embarrass[es], burden[s], delay[s] or otherwise impede[s] the reorganization proceedings," *Lyondell*, 402 B.R. at 490, in that, for all of the above reasons, it makes the equitable resolution of the Estate's affairs much less likely. The Court also notes that the United States Supreme Court has stated

42

"'A State may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow from the fair and orderly working of the judicial process.'" *Cox v. State of Louisiana*, 379 U.S. 559, 565 (1965). The Court believes that it may similarly protect these bankruptcy proceedings from the possibility of the public drawing the conclusion that their results were the product of intimidation rather than the fair and orderly working of the judicial process. Such a conclusion is likely if the Debtor's conduct continues and causes the Chapter 11 Trustee to resign.

Finally, the Court also notes that since the issuance of the TRO, the Plaintiffs have informed the Court that the social media and protest campaign is, at this point, still ongoing and in certain instances has escalated. The irreparable harm continues to occur, which is extremely alarming.

### iii. Balance of the Harms

The Plaintiffs argue that the above enumerated harms outweigh the harms to the Debtor's First Amendment rights, which they argue are limited upon the facts of this case. The Debtor argues that the harm to the Debtor's First Amendment rights grossly outweighs the likely harm, if any, to the Estate or the reorganization process.

The Debtor would be subject to a prior restraint on his speech if a preliminary injunction issues. The Debtor is generally correct that he would suffer a grave harm insofar as the speech is protected by the First Amendment. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931). However, the extent to which his speech is protected under the First Amendment must be determined by the Court. Therefore, the Court's balancing of the harms is guided by First Amendment precedent. Accordingly, the Court applies strict scrutiny to the provisions of the preliminary injunction to be issued.

43

### 1. Narrowly Tailored to Serve Compelling State Interests

As required by the United States Supreme Court, this Court's injunction must be looked at "as we look at a statute [or ordinance], and if on its face it abridges rights guaranteed by the First Amendment, it should [not issue]." *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971). Content-based injunctions, such as this injunction, which prohibits expression with particular valences, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Moreover, the injunction enjoins protesting in public streets – traditional public forums – also suggesting the application of strict scrutiny. *Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988).

Unlike in the plethora of cases cited by the Debtor, there are two established compelling state interests supporting the present injunction.[11]

---

[11] *Compare Frisby*, 487 U.S. at 484 ("'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.'"); *Picard v. Magliano*, 42 F.4th 89, 103–05 (2d Cir. 2022) (finding *Cox*, 379 U.S. at 562 ("There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy.") remains good law) *with, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011) (no compelling state interest in allowing recovery for extreme emotional distress arising from protests that occurred 1000 feet away from funeral, involved matters of public concern, were peaceful and in accordance with law, and were overseen by the police); *Bartnicki v. Vopper*, 532 U.S. 514, 528–35 (2001) (Neither the deterrence of antisocial conduct nor the preservation of privacy of communication, as it relates to issues of public concern, is a compelling state interest supporting the punishment of the "publisher of information [who] has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully . . .."); *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989) (Against the state interest in protecting B.J.F.'s privacy, "[w]e hold only that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order, and that no such interest Is satisfactorily served by imposing liability under [statute prohibiting disclosure of sexual assault victims' names by police] to the appellant under the facts of this case [namely their receipt of disclosed name of a sexual assault victim, relating to a matter of public concern.]"); *Texas v. Johnson*, 491 U.S. 397 (1989) (no compelling state interest in prosecuting a protester who, without breaking the peace, burned the American flag in front of Dallas City hall); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (criminal defendant's right to an impartial jury was not a compelling state interest sufficient to enjoin the press from publishing information of public concern.); *N.Y. Times Co. v. United States*, 403 U.S. 670 (1971) (Government presented no compelling state interest to prevent publication of the Pentagon Papers); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 429 (1971)

44

## a. Narrowly Tailored to Serve Quiet Enjoyment of Private Homes

In *Frisby*, the United States Supreme Court held regarding "'[t]he State's interest in protecting the well-being, tranquility, and privacy of the home," 487 U.S. at 484, that

> The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt: 'To those inside . . . the home becomes something less than a home when and while the picketing . . . continue[s] . . .. [The] tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility.'

487 U.S. at 486. *Frisby* distinguished *Keefe*, the case the Debtor has repeatedly relied on and cited as the most similar case to the instant case. *Id.* However, as *Frisby* noted, *Keefe* itself observed in reaching its conclusion that "Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record," *particularly where ". . . respondent is not attempting to stop the flow of information into his own household but to the public*," *Keefe*, 402 U.S at 429 (emphasis added). *Frisby*, 487 U.S. at 486 (distinguishing *Keefe*).

Here, as in *Frisby*, the injunction is attempting to stop the flow of information into households. *Id.* To the extent the Chapter 11 Trustee, his counsel, his children, and his former spouse, as well as PAG's chairman and his family and PAX's counsel are subject to targeted

---

("Designating the conduct as an invasion of privacy, the apparent basis for the injunction here, is not sufficient to support an injunction against peaceful distribution of informational literature of the nature revealed by this record," particularly where ". . . respondent is not attempting to stop the flow of information into his own household but to the public."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) (absent finding of actual malice, no compelling state interest in allowing public figures or officials from recovering for defamation.)

protests at their personal homes, the Court finds *Frisby* is controlling law – not *Keefe* – and that the state has a compelling interest in protecting the "well-being, tranquility, and privacy of [their] home[s]." *Frisby*, 487 U.S. at 484. "The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt. . . *the actual size of the group is irrelevant; even a solitary picket can invade residential privacy*." *Frisby*, 487 U.S. at 486-87 (emphasis added).

Under *Frisby*, the Court may, in serving this compelling state interest, completely ban picketing "'before or about the residence or dwelling of any individual.'" *Id.* at 477. Like in *Frisby*, this restraint on speech is narrowly tailored. *Id.* at 487–88 ("Thus, the 'evil' of targeted residential picketing, ' the very presence of an unwelcome visitor at the home,' is 'created by the medium of expression itself.' Accordingly, the Brookfield ordinance's complete ban of that particular medium of expression is narrowly tailored.") The Court accordingly adopts a complete ban on picketing "before or about" the residences at issue in this case, for the reasons stated in *Frisby*.

Although the Court is issuing a complete ban on picketing "before or about" the residences, the Court may not ban "'[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses,'" which would be accomplished if the injunction provided for a complete ban within a "300-foot zone around the residences." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 755 (1994) (internal citations omitted). Nevertheless, a court may issue "a limitation on the time, duration of picketing, and number of pickets outside a smaller zone." *Madsen*, 512 U.S. at 755. For this reason, the Court additionally imposes a ban on picketing within 200-feet[12] of the residences at issue during the

---

[12] The Court chooses 200-feet because the United States Supreme Court has held that 300 feet is too expansive, *Madsen*, 512 U.S. at 755, and because 200 feet should provide enough room for cars to safely drive into and out of a neighborhood. It should also provide ample room as a noise buffer for most unamplified noises.

hours the parties at issue are likely to be resting at home and traveling to and from work or

school.  The Court concludes that (a) the quiet enjoyment of the home includes quietude at night,

which supports greater restriction on picketing at night,[13] and (b) the quiet enjoyment of the

home is also destroyed when the home is turned into a bunker where ingress and egress are

subject to protest, which supports greater restrictions on picketing when people are leaving for

work or school and coming home.[14]  The Chapter 11 Trustee testified as to his efforts to avoid

leaving and returning to his targeted residence during protests.  The Debtor could still picket or

parade within the relevant neighborhoods – but not "before or about" the relevant homes – at

other times of day.

The Court also finds that *Frisby* justifies enjoining the Debtor from inciting the picketing

the Court is enjoining, such as by posting or reposting on social media the home addresses of the

Chapter 11 Trustee, his counsel, and his family members and of PAG's chairman, his counsel,

and his family members or by calling for protests at their homes.  The Debtor cannot evade the

injunction through calling on or supporting others to act in his stead.

### b.  Narrowly Tailored to Serve the Integrity of the Judicial Process

In addition, the United States Supreme Court in *Cox* stated

There can be no question that a State has a legitimate interest in protecting its
judicial system from the pressures which picketing near a courthouse might
create.  Since we are committed to a government of laws and not of men, it is of
the utmost importance that the administration of justice be absolutely fair and

---

[13] The Court is concerned about noise at night.  The Plaintiffs submitted into evidence photographs and videos which plainly displayed protesting, picketing, leafletting, and assemblage in front of residences in Connecticut, New York, Massachusetts, and California.  The Court reviewed the codified ordinances in the relevant towns and cities for a survey of restrictions currently applicable in the area.  All of the relevant towns and cities have nighttime noise ordinances.

[14] The Court enjoins from 3:00 p.m. to 10:00 a.m. because it has added the normal hours for commute to the 9:00 p.m. to 7:00 a.m. framework discussed in the previous footnote.  This is extended to weekends because (a) many of the targeted parties are lawyers who are probably working at least Saturday and (b) it is normal to rest more on weekends.

orderly.  This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy. . . There is no room at any stage of the judicial proceeding for such intervention; mob law is the very antithesis of due process.

379 U.S. at 562; *see Picard*, 42 F.4th at 103–05 (finding *Cox* remained good law as suggested by *Burson v. Freeman*, 504 U.S. 191 (1992) (upholding restrictions to electioneering near polling location)); *cf. Alix v. McKinsey & Co., Inc.*, 23 F.4th 196, 204 (2d Cir. 2022) ("More specifically (and more importantly) we believe the district court gave insufficient consideration to the fact that McKinsey's alleged misconduct targeted the federal judiciary.  As a consequence, this case requires us to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes.  Litigants in all of our courts are entitled to expect that the rules will be followed . . ..").

While in both *Cox* and *Picard*, the statutes in question were found unconstitutional as applied, they were found facially constitutional.  *Cox*, 379 U.S. at 560–64 & 568–75 (finding statute facially constitutional but unconstitutional as applied because, while "near" was not unconstitutionally vague, the protesters relied in good faith on the sheriff's representation that they were allowed to protest where they did so); *Picard*, 42 F.4th at 101 & 103–05 (finding the statute facially constitutional but unconstitutional as applied because the protest was "general advocacy unconnected to any specific trial" in combination with the protest being "effected through leafletting rather than more overt and disruptive forms of communication").

The statute at question in *Picard* prohibits

On or along a public street or sidewalk within a radius of two hundred feet of any building established as a court house . . . call[ing] aloud, shout[ing], hold[ing] or display[ing] placards or signs containing written or printed matter, concerning the conduct of a trial being held in such courthouse or the character of the court or jury engaged in such trial or calling for or demanding any such specified action or determination by such court or jury in connection with such trial.

48

*Id.* at 95.  The protests here, in contrast to the leafletting in *Picard* and in even starker contrast to *Keefe*, the Debtor's lead case, which did not involve protests targeting court proceedings, involve picketing and parading targeted at particular parties, namely, the Plaintiffs, including an officer of the Court, namely, the Chapter 11 Trustee, and at particular litigation, namely, these bankruptcy cases.  This Preliminary Injunction and the TRO before it only enjoin future action (and only direct future action), so there is no issue of reliance as in *Cox*.

The Court concludes that this injunction's measures relating to personal homes, discussed above, are also narrowly tailored in service of the compelling state interest articulated in *Cox* – targeted picketing of fellow parties in interest, their counsel, and their families at their homes threatens to transform the legal process into "mob law" – or at least the appearance thereof.  *Cox*, 379 U.S. at 562.  The Court further concludes that the protests at the homes of uninvolved relatives only serve to intimidate the Plaintiffs and may be completely banned under *Cox.*

*Cox's* concern about "mob law" also applies to the offices and other workplaces of the Chapter 11 Trustee and his counsel as well as PAX and its counsel.  The Court enjoins picketing and parading within 100 feet[15] during the likely hours of ingress and egress to these workplaces so as to avoid close encounters between protestors and workers, which encounters could, minimally, undermine the appearance that these bankruptcy cases are legal proceedings or, maximally, affect the outcome of these bankruptcy cases.  *See id.*  The Court concludes that this 36-foot access corridor, modeled after similar corridors discussed in abortion cases, *see Madsen*, 512 U.S. at 768–770, burdens no more speech than is necessary to prevent the legal process from being dominated or appearing to be dominated by "mob law," *Cox*, 379 U.S. at 562.  The Debtor

---

[15] The Court chooses 100 feet because it concludes most pedestrian traffic – from parked cars, transit stops, and homes – destined for the offices should occur within this distance from the offices.

may picket and parade near the workplaces of the Chapter 11 Trustee and his counsel, as well as PAX and its counsel, at distances and at times other than those restricted by this preliminary injunction.  However, the Debtor may not, at any time, picket within 100 feet of the parties' relatives' offices and workplaces because the Court concludes that such picketing of uninvolved relatives only serves to intimidate the Plaintiffs and may be completely banned under *Cox*.

The Court also finds that *Cox* and *Picard* justify enjoining the Debtor from inciting the picketing it is enjoining, such as by calling for protests at the workplaces of the Chapter 11 Trustee and his counsel or PAX and its counsel.  As noted above, the Debtor cannot evade the injunction through calling on or supporting others to act in his stead.

### 2. Under the Specific Facts and Circumstances of These Cases, the Debtor's Speech Is Due Less Protection

While the above rationale is sufficient to support the injunction, there are also circumstances in this case lessening the protection due the Debtor's speech.  *See Gertz v. Robert Welch Inc.*, 418 U.S. 323, 345–48 (1974) ("Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery."); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–61 (1985) ("In contrast, speech on matters of purely private concern is of less First Amendment concern.").

#### a. Chapter 11 Trustee is Not a Public Official or Public Figure

Although the Debtor argues to the contrary, the Court concludes that the Chapter 11 Trustee is not a public official.  *See Obsidian Finance Grp., LLC v. Cox*, 740 F.3d 1284, 1292–93 (9th Cir. 2014).  Similarly, the Court concludes, despite the Debtor's contentions otherwise, that the Chapter 11 Trustee is not a public figure. *See Gertz*, 418 U.S. at 352 ("We would not lightly assume that a citizen's participation in community and professional affairs rendered him a

public figure for all purposes.  Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.  It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy.").  The Chapter 11 Trustee appears in Court and meets and confers with parties in interest and professionals in these cases.  His role is not public facing. These cases are not widely covered by the bankruptcy press or any press, other than Debtor affiliated media of limited reach.  Because the Chapter 11 Trustee is neither a public official nor a public figure, the public has less of a vested interest in speaking about him than it would if he were a public figure.  *Compare Gertz*, 418 U.S. at 339–48 *with Sullivan*, 376 U.S. at 269.

There was no argument and no evidence in the record establishing that any of the other targeted parties were public officials or figures.  *Gertz*, 418 U.S. at 352.  Therefore, the Debtor's speech is due less protection.  *Id.* at 345–48.

### b.   Debtor's Case Is Not a Matter of Public Concern

The Court also finds that the specific facts and circumstances in these cases are not an issue of public concern.  Speech relates to public concerns "when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder*, 562 U.S. at 453.

In *Snyder*, in determining that the Westboro Baptist Church's protests were about an issue of public concern, the Supreme Court noted two factors that cut the other way in the instant case.  The Supreme Court noted

51

> And even if a few of the signs – such as 'You're Going to Hell' and 'God Hates You' – were viewed as containing messages related to Matthew Snyder or the Snyders specifically, that would not change the fact that the overall and dominant theme of Westboro's demonstration spoke to broader issues.

*Id.* at 454. Here, the overall and dominant theme of the signs are inflammatory assertions about the targeted individuals along-side inflammatory stylized portraits of their faces – and the few signs that are arguably targeted at broader issues do not change this fact. The personal nature of the dispute is further underscored by the protests at uninvolved family members' homes.[16]

> In addition, the Supreme Court noted

> We are not concerned in this case that Westboro's speech on public matters was in any way contrived to insulate speech on a private matter from liability. Westboro had been actively engaged in speaking on the subjects addressed in the picketing long before it became aware of Matthew Snyder, and there can be no serious claim that Westboro's picketing did not represent its 'honestly believed' views on public issues.

*Id.* at 455. Here, the Court is very seriously concerned that the Debtor's speech on the only matters arguably of public concern – the alleged extortion and alleged pension theft – are contrived to insulate speech on a private matter. The other acknowledged issues animating the protests - the Chapter 11 Trustee's motion to hold the Debtor is in contempt for alleged violation of the Corporate Governance Order which the Debtor's bankruptcy counsel testified was "heating up" these cases and the Court-approved 2004 subpoenas which are repeatedly referred to in the Objection, several of the broadcasts, and Ms. Jiao's testimony – are not a matter of public concern. They are issues about the administration and investigation of an individual debtor's Chapter 11 bankruptcy estate relating to a bankruptcy that gets very little press other than from Debtor affiliated outlets, such as GNews.

---

[16] The protests at the home and work addresses of relatives is afforded less protection under the First Amendment for this reason.

The pension theft and extortion claims, however, are alleged crimes, and crimes are generally a matter of public concern. *Obsidian Finance*, 740 F.3d at 1291–92. However, the Court concludes the alleged pension theft is not a matter of public concern. There is no suggestion in the record that PAX is being investigated or prosecuted regarding its alleged involvement with the pension fund. Furthermore, Ms. Jiao's testimony about the alleged pension theft was not supported any evidence. She could not explain how PAX was stealing monies of the fund by investing it. For his part, Mr. Cheng did not know why he was protesting O'Melveny & Myers – his stated rationale was directed at the Chapter Trustee – not PAX – and he was not entirely sure how O'Melveny & Myers was involved in these cases.

The Court also concludes the alleged extortion is not a matter of public concern. The Court finds there is no evidence that there is a criminal investigation into the alleged extortion. While the Debtor initially testified that he had reported the Chapter 11 Trustee to the authorities, he could not, when pressed, specify to what authority he had reported the Chapter 11 Trustee, ultimately suggesting he had merely discussed it with his counsel – not an authority.

Also, although the Debtor testified that he believed the Chapter 11 Trustee had attempted to extort him, the Debtor's bankruptcy counsel testified that he knew that the Trustee was not asking to be personally paid $250 million, but was rather asking for $250 million to be paid to the Estate as part of a global settlement. In the heat of the moment, the Debtor's bankruptcy counsel did accuse the Chapter 11 Trustee of extortion at the November 17th settlement meeting. Despite that exclamation, he understood that extortion had not actually occurred but rather a settlement offer was made. The Debtor's bankruptcy counsel also testified that it was his duty to the Debtor to explain settlement terms, such as the Chapter 11 Trustee's demand for $250 million for the Estate. The Court infers from this testimony that he informed the Debtor that,

despite his exclamation during the meeting, the Chapter 11 Trustee had not tried to extort the Debtor.

Although the Debtor's testified that he was more afraid during the settlement meeting with the Chapter 11 Trustee than he was while he was in prison in China, that testimony is not persuasive. While the testimony suggests that the Chapter 11 Trustee made unfortunate comments during the settlement meeting, the testimony did not establish the basis for such fear from the Debtor. Moreover, the Debtor's equivocation about whether he had reported the incident to the authorities and, if so, to whom, renders his testimony on this issue unpersuasive.

Finally, at the time of the alleged extortion, the uncontroverted testimony of the Debtor, the Chapter 11 Trustee, and Mr. Kindseth is that there were six people – the Debtor, Mr. Kindseth, Mr. Mitchell representing the Debtor, the Debtor's translator, the Chapter 11 Trustee, and Mr. Bassett representing the Trustee – present at the meeting and that they were bound by a non-disclosure agreement. The Court infers, given the nature of the accusation and how it was utilized as part of the social media and protest campaign, that the article was not leaked by the Chapter 11 Trustee or Mr. Bassett, but rather some party connected to the Debtor.

Therefore, the Court concludes that neither the allegation of pension theft nor the allegation of extortion makes the present matter an issue of public concern. They are issues designed to cloak matters of private concern in the speech protection afforded matters of public concern. *Cf. Snyder*, 562 U.S. at 455. Therefore, the Debtor's speech is due less protection. *Greenmoss Builders*, 472 U.S. at 758–61.

### 3. Debtor Has No Standing Regarding Unnamed Parties

The Debtor also argues that the request for a preliminary injunction is overbroad because it contains language based on Fed. R. Civ. P. 65(d)(2), which states

> (2) Persons Bound. The order binds only the following who receive actual notice of it by personal service or otherwise:
>
>> (A) the parties;
>> (B) the parties' officers, agents, servants, employees, and attorneys; and
>> (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

As the Plaintiffs note, however, the Debtor, a named party does not have standing to make this objection. *Madsen*, 512 U.S. at 775–76.

For all of the above reasons, the Court finds that the balance of harms tips in favor of granting the preliminary injunction. As the Court noted above in the preceding section, the harm to the Plaintiffs continues to occur despite the existence of the TRO, which is alarming.

### iv. Public Interest

Finally, the Court concludes that issuing injunctive relief vindicates the public's interest in the integrity of the bankruptcy process as well as court proceedings more generally. *Alix*, 23 F.4th at 204. Bankruptcy is process through which a debtor's financial affairs are put in order and all claims against the debtor are treated fairly and equitably. Furthermore, in the case of an individual, such as the Debtor, a debtor gets a fresh start. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("This Court has certainly acknowledged that a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"). It is a benefit to the public to have such a system and for that reason, its integrity must be maintained.

Issuing injunctive relief also serves the public's interest in preserving the sanctity and privacy of the home and the rule of law, as discussed in the previous section. *Frisby*, 487 U.S. at 484; *Cox*, 379 U.S. at 562.

55

The Court further notes that the Chapter 11 Trustee is an "officer in or of" this Court for the purposes of 18 U.S.C. § 1503. *United States v. Crispo*, 306 F.3d 71 (2d Cir. 2002). The Court does not opine as to whether this statute has yet been violated, but the Court is concerned by the threats the Chapter 11 Trustee has received and the intensity of the rhetoric. *See United States v. Turner*, 720 F.3d 411 (2d Cir. 2013). The Court is mindful of the escalating nature of the situation. There is potential for conflict in the current situation. Given that both sides have argued that the Debtor is the leader of the protesting movement – either as the Debtor's supporters would have it, as a Dalai Lama-esque figure, or as the Plaintiffs would have it, as a boss – the Court believes that efforts by the Debtor to pull back from the brink, in compliance with this Preliminary Injunction, would be successful in lowering the temperature in these cases.

### C. Parties Bound

Based upon the clear language in Fed. R. Civ. P. 65 and binding Second Circuit law, "persons in active concert" is properly defined as a party who knowingly aids or abets the Debtor to violate the injunction. *Doctor's Associates, Inc. v. Reinert & Duree, P.C.* 191 F.3d 297, 303 (2d Cir. 1999). While courts typically can bind only the parties to a proceeding, it is settled law that "Rule 65(d) is designed to codify the common-law doctrine that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Doctor's Associates, Inc. v. Reinert & Duree, P.C.* 191 F.3d 297, 303 (2d Cir. 1999) (internal quotation marks omitted). The relevant inquiry under 65(d) is whether the nonparty aided or abetted the defendant's violation of the court's orders. *Next Investments, LLC v. Bank of China* 12 F.4th 119, 134 (2d Cir. 2021) (Quoting *NML Cap. Ltd. V. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013)).

Non-parties to an injunction are in active concert with an enjoined party after receiving actual notice of the injunction and the challenged action was taken for the benefit of, or to assist, a party subject to a preliminary injunction. *Havens v. James*, 435 F. Supp.3 d 494, 504 (W.D.N.Y. 2020); *see also Artista Records, LLC* 122 F. Supp. 3d 32, 35–36 (S.D.N.Y. 2015) (finding a third-party internet service provider with knowledge of an injunction falls within an injunction's reach if those services are knowingly used to facilitate injunction violations). In *Havens*, a twenty-year permanent injunction was in place, enjoining protesters from protesting outside a specific abortion clinic, and protesters believed since they were not named in the injunction, they were not in active concert with the named parties. The court in *Havens* rejected this assertion, and found protesters were acting "in concert" with the named parties because: the non-parties had notice of the injunction, and both (1) coordinated efforts with the named parties in the injunction, and (2) shared the same common goal of deterring women from seeking abortion services at the facility providing those services. *Havens* at 507.

Furthermore, a successor-in-interest may be bound by an earlier injunction. The Second Circuit has upheld a preliminary injunction enjoining a successor-in-interest to a named enjoined entity and found protesters who were not named as parties to the prior injunction were also bound by the injunction and could be held in contempt for violating its terms. *N.Y. by Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("We are aware of the difficulties faced by a trier of fact in cases such as this, where similarly situated groups of individuals move fluidly between multiple unincorporated associations that share the same basic leadership and goals.") Under *Operation Rescue Nat'l*, the relevant inquiry for successors-in-interest to an enjoined party is whether there is substantial continuity of identity between two organizations, *Id*., at 70,

57

and whether they share the "same basic leadership and goals" with the named defendant. *Id.* at 71.

Additionally, lower courts within the Second Circuit have found an unnamed party to an injunction may be considered bound by the injunction if the party is "substantially intertwined" with the named enjoined parties.[17] *John Wiley & Sons v. Book Dog Books, LLC*, 327 F. Supp. 3d. 606 (S.D.N.Y. 2018) (quoting *In re Sledziejowski*, 533 B.R. 408, 424 (Bankr. S.D.N.Y. 2015) ("Where an enjoined party is substantially intertwined with a non-party, including the shared occupation of office space, payment of employee expenses between the non-party and enjoined party, considerable control by the enjoined party over the non-party's operations, and other substantial interconnections.")). However, such injunction must be limited to identified third parties and the parties the court finds to be "in active concert" with the defendant. *Spin Master Ltd. V. 158*, 463 F.Supp.3d 348 (S.D.N.Y. 2020) (Dismissing without prejudice the plaintiff's proposed permanent injunction, finding the language and effect of the injunction overbroad and beyond the Court's powers).

The persons named in the Preliminary Injunction are bound by it. Applying the "substantially intertwined" standard set forth in *John Wiley & Sons* as to individuals, the Debtor has "considerable control" over a number of individuals, but more significantly, has "substantial interconnections" with several individuals involved in organizing and planning protests and evading subpoenas. Here, the Debtor has used multiple social media accounts to broadcast his

---

[17] Notably, in *Next Investments, LLC v. Bank of China* 12 F.4th 119, 134 (2d Cir. 2021), the Second Circuit briefly discusses the application of the "substantially intertwined" standard used in *John Wiley & Sons Inc. v. Book Dog Books*, 327 F. Supp. 3d 606, 638 (S.D.N.Y. 2018), as applied in the district court, but opined "The ultimate answer to this question might also depend on the common-law understanding of aiding and abetting, which would ask whether a nonparty's assistance is sufficiently 'substantial' to be proscribed by the Rule. . . . *but such an understanding is best uncertain and our sister courts have not adopted it.*" (emphasis added, internal citations omitted).

views and to communicate to his associates his advice and support. While the Debtor himself does not always personally post videos of himself using social media, others may do so on his behalf using accounts associated with the Defendant, including @Miles, @MilesGuo, @MilesGuoLive, @NFSCSpeaks, and @chinatruth2022. The Debtor also uses his varied media outlets, which are substantially controlled by the Debtor, to broadcast his views through news anchors on "GNews." These news anchors also appear at protests. The Debtor frequently appears on the Fay Fay Show, which show also appears on a GTV broadcast. The host of the Fay Fay Show, Fay Fay, has been a contact to others in the GSeries web through WhatsApp. Further, the Debtor appears with a small group of individuals at intimate gatherings at the Sherry-Netherlands apartment. Some of the individuals seen at the protests in front in individuals' private homes and the protests taking place at the Plaintiffs' counsels' office buildings attend these intimate gatherings and meals. Others involved in the protests have met the Debtor at 3 Columbus Circle, New York, NY and/or engaged with the Debtor via social media as members of at least one, if not many, of the Debtor's many affiliated organizations. Accordingly, based upon the evidence presented during the Hearing, the Court concludes that the Debtor and the following individuals are "substantially intertwined:" Fay Fay, Beile Li, Huo Lai, Pamela Tsai, Roy Guo, Jiao Bing Shang, Shan Mu, Yaqin Li, Ziheng Cheng, and Elliot Dordick, as well as any persons or entities acting at their direction or on their behalf are the Debtor's officers, are the Debtor's officers, agents, servants, employees, attorneys, and/or other persons who are in active concert or participation with the Debtor, his officers, his agents, his servants, his employees, and his attorneys.

In addition to the individuals, the entities named in the Preliminary Injunction are bound by it. Applying the standards established by the Second Circuit in *Operation Rescue Nat'l*,

59

"substantial continuity of identity" and "same leadership and goals" to related entities, the Himalaya entities, NFSC, GTV, GNews, and ROLF are all under the leadership of the Debtor and share the same common goal of "taking down the CCP."  There are numerous additional entities which all share these qualities, and often an emblem for one entity will appear beside another.  The entities are substantially related, existing within the "GSeries."  Accordingly, the Court finds entities NFSC, Himalaya, ROLF, GSeries entities, including GTV and GNews, as well as any persons or entities acting at their direction or on their behalf are the Debtor's officers, agents, servants, employees, attorneys, and/or other persons who are in active concert or participation with the Debtor, his officers, his agents, his servants, his employees, and his attorneys and are bound by the preliminary injunction.

## VI.  CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion is **GRANTED IN PART** and a preliminary injunction will issue consistent with this Memorandum of Decision.  The Debtor's cross-motion to dissolve the TRO is **DENIED** as moot, and the Debtor's cross-motion to dismiss is **DENIED**.

Dated at Bridgeport, Connecticut this 11th day of January, 2023.

*Julie A. Manning*
United States Bankruptcy Judge
District of Connecticut