

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 3, 2023

<u>VIA ECF</u>
Hon. Analisa Torres
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

> **Re:**   ***United States v. Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal," S1 23 Cr. 118 (AT)***

Dear Judge Torres:

The Government writes in opposition to the memorandum in support of pretrial release submitted by Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok" or the "defendant"). ("Def. Mem." or "defendant's Memorandum") (Dkt. 24.) As detailed in the Government's March 15, 2023 letter seeking detention ("Gov't. Ltr." or the "Letter") (Dkt. 7), Kwok is a unique defendant with extensive foreign contacts and tens of millions of dollars in resources that he can leverage to flee the United States. The defendant also poses a significant ongoing danger to the community and his obstructive acts and intimidation present a clear threat to the judicial process.

Indeed, since the Government filed its Letter, the evidence supporting detention has continued to mount. Kwok lied to Pretrial Services in an effort to conceal his wealth and employment. Kwok even violated the rules and regulations at the Brooklyn Metropolitan Detention Center ("MDC"), where he is currently detained. Moreover, the judicially authorized searches of his co-defendant's condominium and Kwok's multi-million-dollar residences revealed additional evidence of the defendant's significant resources and abilities to flee. The defendant's Memorandum largely ignores these facts, and draws (false) equivalencies with other cases. Kwok's proposed defense bail package is woefully inadequate to address his substantial foreign contacts and the strong incentives and significant resources he has to flee. It does not at all mitigate the pervasive danger Kwok's release presents to the community and to the judicial process. No bail package could.

Pretrial Services is correct. There are no conditions, or combination of conditions, that can reasonably assure the Court that the defendant will appear in court and that the public will be safe from harm. The Court should adopt the recommendation of Pretrial Services. Pretrial detention is absolutely appropriate this in this case.

## I.    The Pretrial Services Report

On March 15, 2023, during his Pretrial Services interview, Kwok advised that he has been "unemployed since the end of 2016." He claimed total assets in the "approximate amount of $10,000 . . . that was *not* liquid cash," but comprised of the value of "two cellphones and clothing" (emphasis added). Kwok denied owning property or vehicles. He claimed that his Greenwich, Connecticut estate, which he valued at $9 million, is owned by his wife, and that his Manhattan penthouse is owned by his son. Kwok estimated his monthly expenses (food, clothes, cellphones and "bodyguards") to be $100,000, which expenses he represented were paid for by his family. The defendant also stated that he filed for bankruptcy in 2022. Kwok stated that, before he became "unemployed," he worked as a "grand representative" for his family businesses, from approximately 2000 through 2014. As Pretrial Services noted in its report, Kwok was unable to "estimate his income" for his work as a "grand representative."

Regarding his connections to the United States, Kwok informed Pretrial Services that he had not left the country for the past six years, but said that he had traveled to approximately "fifty" different countries between 1991 and 2017. Kwok noted that his wife and daughter live in the United States and emigrated from China, while his son lives in London. No members of Kwok's immediate family are U.S. citizens. Further, Pretrial Services was unable to corroborate the information Kwok provided about his family, because Kwok did not provide the correct phone number for his daughter.

Pretrial Services identified nine risk factors evidencing Kwok's risk of nonappearance: possession of a passport, extensive history of foreign travel, family ties outside the United States, his status as a foreign citizen who may be subject to removal, mental health history, use of aliases, multiple reported residences, unemployment, and the presence of unverified assets. Pretrial Services also identified the nature of the charged offenses as a risk factor suggesting danger to the community.

Pretrial Services concluded that there are "no conditions or combination of conditions that will reasonably assure the appearance of the defendant at future proceedings . . . . [and] respectfully recommend[ed] the defendant be detained."

## II.    Materials Recovered on March 15, 2023 Pursuant to Search Warrants

On March 15, 2023, the Federal Bureau of Investigation executed a series of search warrants at premises, including (i) Kwok's Manhattan Penthouse (where he was arrested); (ii) Kwok's 50,000 square-foot mansion in Mahwah, New Jersey; and (iii) Kwok's seven-bedroom, approximately 12,000 square-foot estate in Greenwich, Connecticut. The FBI also executed a search warrant at the Manhattan condominium of Kwok's co-defendant, Yanping Wang, who was arrested the same day. Among other things, the FBI recovered the following materials:

- **Kwok's Mahwah Mansion:**

  ○ Approximately $394,000, €5000, HK$188,05,[1] and ¥250 in cash, and approximately 156 gold coins (alongside a receipt, which indicated that the coins were valued at approximately $109,555), which were found inside a safe located in a closet that was attached to what appears to be Kwok's dressing room. (Ex. A.) That dressing room stored approximately 30 Brioni custom-made suits, each of which bore the hand-stitched words "Brioni for Miles Kwok" inside the jackets.

  ○ A copy of Kwok's expired United Arab Emirates passport. (Ex. B.)

  ○ A cellphone scrambler.[2]

  ○ 10 computers or laptops; 16 external media storage devices (USB and hard drives); and nine cellphones.

- **Kwok's Manhattan Penthouse**

  ○ Inside Kwok's bedroom, the FBI discovered a cellphone that was concealed underneath Kwok's Duxiana-brand mattress. (Ex. C.)

  ○ 15 other cellphones, 14 external media storage devices (USB and hard drives), and four computers.

  ○ Gold pins with symbols of the Chinese Communist Party. (Ex. D.)

- **Kwok's Greenwich Estate:**

  ○ A 2021 a Lamborghini Aventador, which was purchased with fraud proceeds.

  ○ Three computers or laptops, five cellphones, and 13 USB drives.

- **Co-defendant Wang's Condominium:**

  ○ Kwok's expired Republic of Vanuatu Passport and Vanuatu non-citizen identification card, which were kept in Wang's safe. (Ex. E.) Stamps in the passport reflect that Kwok traveled to England in March 2017 using his Vanuatu Passport, and further reflect that Kwok was entitled to remain in

---

[1] HK$188,050 is worth approximately $23,900.

[2] A cellphone scrambler is an external device that attaches to a cellphone. Cellphone scramblers are designed to defeat Government wiretaps and other eavesdropping technologies. Scramblers work by converting voice into non-interpretable analog noises for transmission over the phone network. A receiver on the other end of a call re-converts the analog signals to understandable speech.

England for six months.  Wang's safe also contained Kwok's expired and currently valid Hong Kong passports.  The expired Hong Kong passport reflected substantial foreign travel by Kwok.  The valid Honk Kong passport reflects travel to England, Scotland, the Bahamas, and Japan in 2016.

o   Approximately $138,000 in U.S. currency and additional foreign currency, located in the above-described safe.

o   Printed documents that reflect bank account balances as of March 13, 2023 (*i.e.*, two days before the defendants' arrests) for various entities that the Government alleges Wang managed and controlled, which are all associated with the charged fraud.  Those documents reflect balances of at least approximately $34 million.

### III.   The Defendant's Arguments for Release Should be Rejected

The defendant's Memorandum responds to the Government's March 15, 2023 Letter by proposing a set of conditions pursuant to which Kwok believes pretrial release would be appropriate.  The defendant's Memorandum further seeks to draw parallels between this case and other fraud cases where pretrial detention was not ordered.  Finally, the defendant attempts to rebut the Government's detailed recitation of factors outlined in its March 15, 2023 Letter demonstrating that Kwok is a risk of flight, poses a danger to the community, and is likely to obstruct justice.  As explained below, the defendant's arguments should be rejected.

### A.   The Defendant's Proposed Bail Package Is Inadequate

Kwok proposes a bail package of eight conditions:  (i) home detention at his Greenwich estate or an "other" unidentified location approved by the Court; (ii) a $25 million bond secured by $5 million cash and two unidentified adult cosigners, "one of whom is not a family member;" (iii) "24/7 surveillance by a security company" with "at least one licensed and qualified guard;" (iv) GPS monitoring; (v) surrender of travel documents and surrender of his wife and daughter's travel documents; (vi) limitation on Kwok's ability to enter financial transactions; and (vii) no communications with co-defendants outside the presence of counsel.

*First*, the defendant proposes that he be released on "home detention" to his seven-bedroom, 12,000 square-foot Greenwich, Connecticut estate, pictured below, which has a pool, private tennis court, "living pavilion," and three external fireplaces:



The Greenwich estate was purchased in February 2020 by Greenwich Land, LLC—*an entity that has received millions of dollars in fraud proceeds*. Specifically, the Government's investigation has revealed that between August 2020 and April 2021, co-defendant Kin Ming Je, a/k/a "William Je" (the financial architect of the fraud) transferred approximately $34 million of fraud proceeds, primarily raised through the Farm Loan Program (*see* Indictment ¶ 14), to entities that are 100% owned by Kwok's family members; those transfers included an approximately $5 million transfer in October 2020 to Greenwich Land, LLC.[3]  To say the least, it would be inappropriate for Kwok to live in the palatial Greenwich estate that he maintained with the proceeds of his fraud as a means of avoiding pretrial detention.

    *Second*, the defendant's bail proposal does not identify the source of the $5 million in cash that he intends to use to secure the proposed $25 million bond.  That omission is significant, given that the defendant filed for bankruptcy and informed Pretrial Services that he only has assets worth $10,000, consisting of "two cellphones and clothing."  Given those representations, the fact that the defendant now claims to have access to such a large amount of cash raises questions about the legitimacy of those funds and is further evidence of the defendant's lies to Pretrial about his assets. As noted above, although the defendant told Pretrial Services that he did not have any cash assets he in fact had $394,000 in his safe in his Mahwah Mansion.   In any event, given Kwok's bankruptcy filing and his extensive subterfuge in hiding his fraud proceeds, any bond amount—

---

[3] Notably, in Kwok's bankruptcy proceeding, the court-appointed Chapter 11 Trustee filed for a declaratory judgment that Greenwich Land is nothing more than another alter ego used by Kwok to conceal his assets. *In re Ho Wan Kwok, et al.*, No. 22-05003 (JAM), Dkt. 1604 (D. Conn. Bankr. Mar. 27, 2023.)  In support of the motion, among other things, the Trustee cited an August 2020 email from Greenwich Land's real estate broker in which the broker stated that the Greenwich estate was "bought by Miles [Kwok] under Greenwich Land."  (*Id*. Ex. 41.)

secured or not—is likely to be based entirely on assets that are encumbered by bankruptcy proceedings, forfeitable as proceeds of his fraud, or both.[4]   The defendant's bond proposal is therefore meaningless. Kwok pledging money that is not his (or is subject to the Chapter 11 proceedings) does not any provide "moral suasion" against his flight. *See United States v. Zhang*, No. 22-CR-208-4 (CBA), 2022 WL 17420740, at \*4 (E.D.N.Y. Aug. 3, 2022) ("Giving up investment property with unclear ownership that may already be in some jeopardy may seem like a small price to avoid life imprisonment") (citing *United States v. Martinez*, 151 F.3d 68, 71 (2d Cir. 1998) (discussing bond package in terms of its "ability to exercise moral suasion" over the defendant "should he decide to flee"), *aff'd*, 55 F.4th 141 (2d Cir. 2022)).[5]

*Third*, the defendant proposes that he be monitored—at all times—by private security. Kwok's argument that pretrial release would be appropriate only if he were always surveilled by armed guards is tantamount to a concession that he must be detained.  He is simply arguing that he be detained in his Greenwich estate, rather than in the federal system, where those without access to his level of resources are held. *United States v. Banki*, 369 Fed. App'x 152, 154 (2d Cir. 2010) (explaining private security "conditions might be best seen not as specific conditions of release, but simply as a less onerous form of detention available only to the wealthy").  Thus, this Court should be troubled by the defendant's private jail proposal which, "at best 'elaborately replicate[s] a detention facility without the confidence of security such a facility instills.'" *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (quoting *United States v. Gotti*, 776 F. Supp. 666, 672 (E.D.N.Y. 1991) (rejecting private jail proposal)).

In support of his private armed-security proposal, the defendant points to *United States v. Sabhani*, 493 F.3d 63 (2d Cir. 2007), but that case is distinguishable.  (Def. Mem. at 23-24.)  In *Sabhani*, the Government identified conditions it believed would mitigate against a risk of flight, which included armed security. *Id.* at 65.  The Government does not similarly agree here. Moreover, since the 2007 *Sabhani* decision, the Second Circuit and district courts have cast doubt on the feasibility of private security arrangements.[6]  Even the defendant concedes that the Court

---

[4] Indeed, recently the federal bankruptcy court has issued a series of orders temporarily restraining and enjoining a series of Kwok-related entities (generally held in the names of is children) from encumbering, transferring, alienating, dissipating, paying over, or assigning any property and/or assets. (Ex. G (collecting orders).)

[5] It is also telling that that the defendant has not yet identified any proposed co-signers to the Court or the Government.  Sureties must have a "net worth which shall have sufficient unencumbered value to pay the amount of the bail bond."  18 U.S.C. § 3142(c)(1)(B)(xii); *see United States v. Batista*, 163 F. Supp. 2d 222, 225-26 (S.D.N.Y. 2001) ("a defendant must [also] show that the proposed sureties exercise moral suasion to ensure the defendant's presence at trial.").

[6] The defendant relies on *Sabhani*, claiming that case supports the defendant's contention that a defendant may not be subject to pretrial detention "where the defendant's wealth *is the reason* the defendant is deemed a flight risk."  (Def. Mem. at 24.)  This argument is a strawman.  The Government is not contending that Kwok's wealth is the only reason he is a flight risk, nor is risk of flight the only reason he should be detained.  For similar reasons, the defendant's reliance on *United States v. Weigand*, 492 F.Supp.3d 317, 319 (S.D.N.Y. 2020), should be discounted. *Weigand* concerned a foreign-national who was initially detained and later released because the primary risk of flight concerned his wealth. *Id.* at 318.  There were no allegations of ongoing

of Appeals is clear that the "Bail Reform Act does *not* permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) (emphasis added); *Banki*, 369 Fed. App'x at 153-54 (stating the Court was "troubled" by the possibility of "allow[ing] wealthy defendants to buy their way out by constructing a private jail."); *United States v. Cilins*, No. 13 Cr. 315 (WHP), 2013 WL 3802012, at *3 (S.D.N.Y. July 19, 2013) ("'it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the Government, even if carefully selected'" (quoting *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001))); *United States v. Valerio*, 9 F. Supp. 3d 283, 292 (E.D.N.Y. 2014) (Bianco, J.) ("There is nothing in the Bail Reform Act that would suggest that a defendant (or even, hypothetically, a group of defendants with private funding) has a statutory right to replicate or construct a private jail in a home or some other location.").

It is reasonable for courts to be reluctant to allow wealthy defendants to finance their own security as an alternative to pretrial detention.[7]  That reluctance is also driven by real-world uncertainties, such as whether defendant-funded private security would, as a practical matter, be accountable to the courts, and whether the guards would have the authority to use force to prevent the defendant from escaping, which could expose them to civil liability.  *See Valerio*, 9 F. Supp. 3d at 294 ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail.").  As the Government argued in its March 15, 2023 Letter, if the defendant's appearance can only be assured through use of round-the-clock armed guards, the defendant belongs in a federal detention center, not released under bail conditions that effectively create a private prison for one in a luxurious Greenwich estate.  *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 3681423, at *12 (S.D.N.Y. June 16, 2016) ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?" (quotation and citation omitted).)

*Fourth*, as the Government argued in its March 15, 2023 Letter, GPS monitoring is substantially inadequate.  The technology is far from foolproof and will do little to prevent Kwok's flight—a sophisticated international traveler with reams of cash, cellphone scramblers, private aircraft, and a network of supporters located across the globe.  *See United States v. Freeman,* 21 Cr. 88 (JSR) (S.D.N.Y. Feb. 19, 2021) (ordering detention in $2.3 million money laundering case and noting "electronic monitoring and the like, as indicated previously, those are far from perfect devices for preventing flight"); *see also* Gov't Ltr. at 22 (collecting cases).

*Fifth*, this Court should have little faith that the defendant will surrender all of his travel documents and refrain from obtaining new ones.  Kwok's access to travel documents is

_____

danger or obstruction, and Judge Rakoff's October 5, 2020 opinion cited the "unique circumstances of the COVID-19 pandemic" as the basis for pretrial release.  *Id.* at 319.

[7] Here, and generally in his Memorandum, the defendant does not identify the source of funds he intends to use to finance 24/7 private security or other aspects of his proposed pretrial detention.

remarkable.  During an interview on April 19, 2017, Kwok claimed that he "own[s] about 11 passports," including "three passports of some middle-east countries."[8]  Kwok's statement is corroborated by the copy of the UAE passport that the FBI located in Kwok's Mahwah Mansion (although the actual passport has not been not located), and Kwok's Republic of Vanuatu passport located in his co-defendant's safe.[9]  Although the Vanuatu and UAE passports are expired and other recovered documents suggest Kwok may no longer have Vanuatu citizenship, these materials demonstrate Kwok's ability to acquire travel documents when he needs them.  The defense is simply wrong to suggest that Kwok (and his wife and daughter) could not "logistically manage" to travel outside the United States based on a court order to surrender travel documents and not obtain new ones.  (Def. Mem. 13).  Given Kwok's one-time access to up to 11 passports, and the fact that Kwok and his family have historically traveled internationally on various private air- and seacrafts, the defendant's assurances to this Court are meritless.  Notably, and particularly troubling, Kwok did not inform Pretrial Services about his Vanuatu or UAE passports.  Concealing his travel documents from Pretrial Services is reason enough to order pretrial detention, and it puts to lie any claim that the Court can trust the defendant to abide by conditions of release.

Further, it is not credible for the defense to contend that Kwok cannot travel at all, due to his fear of repatriation to China.  According to the defense's motion, Kwok fled Hong Kong on January 1, 2015, has never returned due to the danger that his returning to China would pose, and cannot travel internationally due to fear of repatriation to China.  (Def. Mem., at 7.)  But Kwok *has* traveled *internationally* since he fled China—including using his Vanuatu passport.  The claim that Kwok can be nowhere except the United States, to avoid "the long reach of the CCP," is overblown and contravened by Kwok's extensive travel history.  (Def. Mem. at 13.)

*Sixth*, the condition that the defendant refrain from any financial transactions (without permission from the Government or the Court) is hollow and does nothing to insulate the public from Kwok's ongoing economic harm.  Due to his bankruptcy, Kwok is already effectively subject to this condition.  However, as a review of the bankruptcy docket indicates, Kwok has acted through others and a network of shell companies to conceal his assets and finances.  Indeed, the Indictment itself establishes that Kwok engaged in financial transactions by directing others to act on his behalf.  Moreover, Kwok has demonstrated a willingness to flout and undermine court orders, providing little assurance that this condition would have any impact on him.  *In re: Ho Wan Kwok, et al.,* Chapter 11 Case No. 22-50073 (JAM) (Bankr. D. Conn. Jan. 11, 2023) (Dkt. 7, Ex. C, at 23 -29 (detailing interference with the Chapter 11 bankruptcy proceedings by Kwok and his followers despite the issuance of a temporary restraining order prohibiting such actions).  Kwok's bankruptcy filing was, itself, an attempt to circumvent a New York State Supreme Court Judge's order subjecting Kwok to sanctions for failing to follow that court's orders.  *See* PAX

---

[8] Complaint Exhibit 1B, *HNA Grp. Co., Ltd*., *v. Guo Wengui*, No. 653281/2017, Dkt. No. 7 (NY Sup. Ct. Aug. 30, 2017) (English translation of April 19, 2017 interview between Kwok and Voice of America).

[9] Vanuatu is a small island nation in the South Pacific.  It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country.  *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports)

Lawsuit, No. 652077/2017, 2018 BL 236400, Dkt. 716. (N.Y. Sup. Ct. Feb. 9, 2022) (order directed Kwok to pay $134 million contempt fine). Indeed, the defendant has already violated this proposed condition by lying to Pretrial Services about his assets—during his interview, Kwok did not disclose the nearly $400,000 in cash and foreign currency he kept in a safe in his Mahwah Mansion, nor did he disclose other bank accounts he controls through intermediaries. Kwok's long and documented history of undermining the judicial process and his deception during his Pretrial Services interview demonstrate that this condition would have no impact on Kwok.

## B.  Detention in this Case is Consistent with Precedent

The defendant cites to several fraud cases where defendants were subject to pretrial conditions, even though substantial losses were alleged.[10] (*See, e.g.*, Def. Mem. at 1-2, 21-22.) The Government does not dispute that there are examples of cases in which defendants charged with serious economic crimes were granted bail. But the cases the defendant relies on are starkly different from the circumstances presented here by (1) Kwok's extensive foreign ties and minimal ties to the United States, and (2) the ongoing danger posed by Kwok's release. Courts in this District regularly order pretrial detention in cases concerning financial crimes where, such as here, the Government demonstrates that no conditions provide reasonable assurance the defendant will appear in court or the community will be safe. All the cases cited by the defense are distinguishable because they involved the Government's *consent* to pretrial release at the time of arrest,[11] and

---

[10] Several of the defendant's cited cases are an order of magnitude different in terms of alleged economic harm than the instant case. *United States v. Gulkarov, et al.*, No. 22 Cr. 20, (S.D.N.Y. 2022) concerned a $30 million healthcare fraud. *See id.*, Dkt. 1, at 3. The $100 million figure Kwok cites pertains to several interrelated cases. *See United States v. Akbar, et al.*, No. 20 Cr. 563, Dkt. 1, at 4 (S.D.N.Y. 2020) ("potential loss to USPS of up to $15 million"); *United States v. McFarland*, No. 17 Cr. 600 (NRB), Dkt. 20, at 4 (S.D.N.Y. 2017) ("defendant caused losses to at least seventy victim-investors, totaling more than $20 million dollars"). Kwok is charged with defrauding thousands of victims of more than $1 billion.

[11] The cases cited by Kwok where the Government ultimately sought pretrial remand were *United States v. McFarland, United States v. Madoff,* and *United States v. Belfort*. In *McFarland*, after the Government consented to pretrial release, on June 18, 2018, it sought detention because McFarland was charged with additional crimes while on release. Judge Buchwald granted the Government's motion. (*Id.*, Dkt. 43.) In *Madoff*, the Government consented to pretrial release on the day of Madoff's arrest. Nearly two weeks later, the Government sought remand, because it learned that Madoff had mailed expensive items to relatives and friends. When seeking remand, the Government conceded that mailing items did not violate "the specific conditions of bail" set in Madoff's criminal case. No. 09 Cr. 213, Dkt. 15, at 5 (SDNY Jan. 12, 2009). Ultimately, Magistrate Judge Ellis denied the Government's motion because, *inter alia*, "the Parties had agreed that the measures in place were adequate" to address concerns about flight. *Id.* at 9. In declining to find a serious risk of obstruction, the court considered only whether Madoff's mailing of assets to others constituted obstruction and whether those acts suggest a serious risk of future obstruction. *Id.* at 12. As to the potential ongoing danger, the court considered merely whether the "potential future dissemination of Madoff's assets would rise to the level of an economic hard cognizable under § 3142," not whether Madoff would continue to commit further crimes. *Id.* at 19. The record before this Court is starkly different. Kwok's obstructive efforts extend far beyond mailing some assets to family and friends. He has threatened witnesses, orchestrated harassment

involve defendants with substantially more ties to the United States.[12]  By contrast, Kwok has continually lived in the United States for just five years (several of which were during the height of the COVID-19 pandemic, when international travel was limited).  For more than four of those five years, Kwok used the United States as the staging ground to run a billion-dollar fraud enterprise.  Further, none of the cases Kwok cites concern defendants with the extensive history of harassment and deception that Kwok has exhibited,[13] let alone the ongoing economic harm Kwok seems adamant to continue inflicting, including by relocating his fraud operations and proceeds abroad to the UAE.   Nor do those cases concern defendants with foreign ties anywhere close to the extent that Kwok has.  As discussed above, Kwok claims to have had access to 11 foreign passports, has substantial foreign assets, has family abroad, has access to planes and seacraft, and is likely to be helped by his co-defendant, William Je, who is himself an international fugitive hiding in the UAE.

Nonetheless, there are ample examples of individuals charged with fraud and other similar crimes that have been detained over the last several years.  Many such cases concern economic losses far smaller, and less complex, than Kwok's billion-dollar fraud.  For example:

---

campaigns directed at court-appointed officials, and circumvented court orders. (Gov't Lt. 12-16.) Moreover, here, the Government does not believe—as it did in Madoff—that conditions can be set which can ameliorate the risk of flight or danger.  The *Belfort* docket is unclear as to why the Government ultimately sought detention and the disposition of the request.

[12] *See United States v. Bankman-Fried,* 22-cr-673 (S.D.N.Y. 2022) (American citizen born in the United States); *United States v. Hwang*, 22-cr-240 (S.D.N.Y. 2022) (58-year old naturalized American citizen present in the United States since childhood with a family of American citizens located in New Jersey); *United States v. Gulkarov, et al.*, No. 22-cr-20 (S.D.N.Y. 2022) (present in the United States for over 20 years with family in the U.S. including young children in the United States); *United States v. McFarland*, No. 17-cr-600 (S.D.N.Y. 2017) (American citizen born in the United States); *United States v. Tucker, et al.*, No. 16-cr-91 (S.D.N.Y. 2016) (same); *United States v. Madoff*, No. 1:09-cr-00213-DC-1 (S.D.N.Y. Dec. 11, 2008) (same); *United States v. Holmes et al*, No. 5:18-cr-00258-EJD-1 (N.D. Cal. June 15, 2018) (same); *United States v. Causey et al.*, No. 4:04-cr-00025-2 (S.D. Tex. Feb. 19, 2004) (same regarding Jeffrey Skilling); *United States v. Belfort, et al.*, No. 1:98-cr-00859-AMD-1 (E.D.N.Y. Sept. 4, 1998) (same).

[13] For these reasons *United States v. Bankman-Fried* is not analogous.  In *Bankman-Fried*, during an appearance before Magistrate Judge Gorenstein, the Government consented  to pretrial release due to the following factors, none of which are present here: (i) defendant waived extradition and voluntarily returned to the United States; (ii) no history of flight; (iii) family and community ties; (iv) diminished assets frustrating flight ability; and (v) a "marginal" concern of ongoing harm to the community because the defendant is no longer associated with FTX.  No. 22 Cr. 673, Dkt. 36, at 6-8 (S.D.NY. Jan. 20, 2023) (transcript of initial appearance).  Magistrate Judge Gorenstein found that the weight of the evidence favored pretrial detention but permitted pretrial release, given the parties' agreement, the defendant's U.S. citizenship with "very strong ties to this country in terms of growing up here and having family who currently lives here," and his inability to conduct future financial transactions due to his notoriety mitigating harms.  *Id.*, at 13-14.  Bankman-Fried's later use of a VPN and improper contact with a single witness does not come close to Kwok's obstructive conduct, concealment of assets, and danger presented by Kwok.

- *United States v. Celvin Freeman*, 21 Cr. 88 (JSR) (S.D.N.Y.) (defendant who resided in New Jersey was charged for laundering approximately $2.3 million in fraud proceeds for Ghanaian criminal enterprise and detained because of lack of legal status, strong ties to Ghana, attempted flight during arrest, and significant potential jail time). When ordering detention, Judge Rakoff observed, with respect to co-signers: "We're not relying on his assets; we're relying on the assets of others, and the kind of scheme that he has involved himself in suggests that his regard for other human beings is modest at most. As for electronic monitoring and the like, as indicated previously, those are far from perfect devices for preventing flight." (Feb. 19, 2021, Bail Hearing Tr. at 19-20)).

- *United States v. Fred Asante*, 21 Cr. 88 (JSR) (S.D.N.Y.) (defendant who resided in Virginia with his family was charged for laundering approximately $6.7 million in fraud proceeds for Ghanaian criminal enterprise and detained because of prior drug felony, prior flight to Ghana using a fake passport, access to substantial sums of money, and lack of disclosure to pretrial services).

- *United States v. Sheng-Wen Cheng*, 21 Cr. 261 (AJN) (S.D.N.Y.) (defendant who resided in Manhattan was charged with $7 million COVID-19 pandemic loan fraud and detained because defendant had no legal status, substantial access to financial means, strong family ties abroad, and crime involved use of stolen identities).

- *United States v. Muge Ma,* 20 Cr. 407 (RMB) (S.D.N.Y.) (defendant who resided in Manhattan and had legal permanent resident status in the United States was charged with attempted $20 million COVID-19 pandemic loan fraud and detained because he was a Chinese national with strong ties abroad, faced substantial prison time, and the crime involved fabricated documents).

- *United States v. Malhotra*, No. 19 Cr. 411 (ALC) (S.D.N.Y. May 7, 2020) (defendant, an Indian-national, charged with defrauding victims out of more than $3 million by promising false computer repair services, was detained based on defendant's risk of flight and lack of contacts to the United States).

- *United States v. Raniere*, 18-CR-204 (NGG), 2018 WL 3057702, at *7-8 (E.D.N.Y. June 20, 2018) (detaining defendant based upon flight risk where defendant had no declared assets but appeared to have access to enormous resources offered to be guarded by a private security company).

- *United States v. Ho*, No. 18-1641-cr, (Aug. 30, 2018 2d Cir. 2018) (affirming denial of pretrial release where Chinese-national defendant charged with $2.5 million bribery scheme).

- *United States v. Zarrab,* No. 15 Cr. 867 (RMB), Dkt. 41 (S.D.N.Y. June 16, 2016) (denying pretrial release and rejecting proposal of armed guards, $50 million PRB secured by $10 million cash, and GPS monitoring. Defendant was charged with various crimes related to violations of sanctions laws).

As with the above defendants, detention is appropriate here in light of Kwok's substantial means and motive to flee, his demonstrated history of obstruction, and the ongoing danger he poses if released.

### C.  The Government Has Demonstrated by a Preponderance of the Evidence that Kwok is a Flight Risk

The defense's attempts to frame Kwok's personal circumstances as reasons why he is unlikely to flee are unavailing and ignores or minimizes key facts.  The defense ignores, and therefore does not significantly dispute, the strength of the Government's evidence and the seriousness of the charges in the Indictment.  The defense pays little attention to the decades-long potential prison sentence Kwok faces as a result of his crimes and the powerful motive this creates for him to flee the United States, especially since his connections here are tenuous.  At most, Kwok claims that the presence of his wife and daughter in the United States incentivizes him to remain. (Def. Mem. 13.)  But this overlooks the fact that in 2015 Kwok left his wife and daughter to enter the United States, *see* Def. Mem. at 7 and 22, and ignores that Kwok's son presently lives in the United Kingdom.  Kwok cannot claim on the one hand that his daughter's and wife's presence in the United States incentivizes him to remain and that, on the other hand, his son's presence in a foreign country does exert any pull to leave.

Kwok's argument that he will remain in the United States relies on the proposition that he will not travel, at all, because of security concerns due to the threat posed to him and his family by the CCP.  (*See* Def. Mem. at 14 ("Kwok [has] real and substantial security concerns about the threat posed by the CCP were he to travel abroad."), *id.* at 22 ("threats that are far more likely to become realities should Mr. Kwok flee the United States").)  This argument does not withstand scrutiny.  Kwok claims to have fled China in 2015 because he feared arrest by the CCP.  Yet Kwok continued to travel internationally, despite the CCP's attempts to repatriate him.  (*See* Gov't Ltr. at 2.)  It may be that Kwok has not traveled internationally since applying for asylum in 2017, since the application precludes it, but Kwok's asylum application is seriously jeopardized in light of the Indictment.  With an asylum denial looming, his incentive to remain in the United States completely dissolves.[14]

Next, the defense argues that Kwok lacks the financial means to flee.  This argument also collapses under closer inspection.  If it is true, as the defense claims, that Kwok has the ability to put forth a $5 million cash bond, cover the expenses of round-the-clock armed guards, and cover

---

[14] Kwok conclusory suggests that, even if he were convicted, he would be "eligible" to remain in the United States pursuant to the Convention Against Torture. (Def. Mem., at 15.)  Even if granted that protection, which is not certain, the Convention does not require that those eligible remain in the United States.  *See Lin v. U.S. Dep't of Just.*, 432 F.3d 156, 161 (2d Cir. 2005) (affirming denial of application for relief under the CAT to prevent return to China).  Those protected under CAT may be removed to third-party countries.  *Mudiangomba v. Holder*, 372 F. App'x 161, 164 (2d Cir. 2010) (affirming decision removing individual to alternative country).  In any event, the theoretical possibility that Kwok, after conviction, and after serving a prison term, *might* be eligible to remain in the United States hardly suggests he is incentivized to remain now while subject to substantial criminal consequences.  Kwok's theoretical CAT protection does not come close to rebutting the factors offered by the Government demonstrating by a preponderance Kwok's extraordinary flight risk.

$100,000 of monthly expenses, he has the finances to escape from this country. Indeed, the Government found more than $500,000 in United States currency, foreign currency, and gold coins in one of his homes—all assets that he did not disclose to Pretrial Services. His co-defendant Wang had another $138,000 in cash in her apartment. And William Je, the financial architect of the fraud, *is a fugitive* believed to be hiding in the UAE. Je is believed to have access to millions of dollars of fraud proceeds in foreign accounts that can be used to facilitate Kwok's and his family's flight. The bank documents found in Wang's condominium corroborate the presence of other assets. Those documents reflect balances, as of March 13, 2023, of at least approximately $34 million held in the names of entities associated with the fraud. Given this backdrop, the defense argument that Kwok's bankruptcy filing means he lacks the finances to flee is simply wrong. (Def. Mem. at 28-29.) If anything, Kwok's bankruptcy further supports his pretrial detention, because it is evidence of the extreme lengths, and judicial gamesmanship, that Kwok undertakes to conceal his wealth.

Further, as described above, Kwok has stated he held *eleven* passports. The Government presently possesses his Hong Kong and Republic of Vanuatu passports. Kwok appears to hold a UAE passport that is unaccounted for, and it is not clear what other countries provided Kwok with travel documents. The fact that Kwok has obtained travel documents from at least three countries—and possibly as many as eleven—demonstrates that no court order can prevent Kwok from obtaining additional travel documents for himself and his family members. Kwok is also believed to have a private plane in Europe under the control of his son. As evidenced by the many stamps in his Hong Kong passport, and his admission to pretrial of traveling to more than "fifty" countries, Kwok is a deeply experienced international traveler who is comfortable in many locations throughout the world. *Zarrab*, 2016 WL 3681423, at *8 (citing "lack of ties to the United States; his significant wealth and his substantial resources; his extensive international travel; and his strong ties to foreign countries" as relevant considerations when ordering pretrial detention). Kwok's support is not limited to his son. As the bankruptcy court decisions have made clear, Kwok has a vast network of supporters willing to harbor and assist him should he request their help. Kwok has access to a deep well of resources—finances, documents, and a global network of supporters. No court-imposed conditions can ameliorate that.

While the Government believes there are many locations to which Kwok can flee, the United Arab Emirates is an obvious destination for several reasons. G|CLUBS and the Himalaya Exchange have offices and personnel in the UAE. Indeed, earlier this year, two American citizens associated with G|CLUBS and other entities used in the fraud obtained visas to work, and stay, in the UAE. If G|CLUBS personnel can obtain visas, then certainly Kwok—*i.e.* "The Principal" of the fraud—can do so as well. The defense ignores that Kwok has promoted sending funds to the UAE as a way to avoid the "long arm jurisdiction of the U.S." (Gov't Ltr. at 19.) Thus, Kwok knows the UAE is a relatively safe place for him to hide his assets, his family, and himself. Indeed, as noted, Kwok's co-defendant is believed to be hiding there right now. It is not credible for the defense to summarily claim there "is not evidence that Kwok would or could flee to the UAE." (Def. Mem. at 13-14.)

### D. The Government Has Demonstrated that Kwok is a Danger to the Community and the Judicial Process

The defendant generally ignores the substantial evidence the Government has put forth demonstrating Kwok's propensity to inflict further economic harm on the community. As

described in the Government's March 15 Letter, the defendant's fraud has escalated over the course of years. Kwok has not stopped despite intervention by the SEC, closing of his accounts, receipt of grand jury subpoenas by entities affiliated with him, seizure of $630 million dollars, contempt rulings by a New York Supreme Court judge, and similar findings by a federal bankruptcy judge. (*See* Gov't Ltr. at 19-20.) The potential for ongoing harm is not theoretical. Just one month before his arrest, Kwok started promoting the "A10" offering—a purported investment opportunity that is consistent with the hallmarks of all of Kwok's other fraudulent offerings. (*Id.* at 10.) This Court can have no reasonable assurances that Kwok will simply stop his fraud efforts because he is ordered to do so, nor that he will not engage in financial transactions if this Court so directs him—particularly where the defendant has demonstrated extraordinary sophistication.[15] The defendant uses dozens of different cellphones and cellphone scramblers; he has relied on an intricate and dense web of shell corporations, middle men, and subterfuge. Kwok's ability to conceal his actions is not speculative. Federal and state court judges have found as much. *See e.g.*, *Eastern Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631 at *1 (finding by Judge Liman that "Eastern Profit Corporation," nominally held by Kwok's daughter, was "in essence, a shell corporation" for Kwok); February 9, 2022 Decision and Order, at 1, *PAX v. Kwok*, Index No. 652077/2017 (N.Y. Sup. Ct.), NYSCEF Doc. No. 1181 (finding Kwok used shell companies to shield his assets); *In re: Ho Wan Kwok, et al.*, Chapter 11 Case No. 22-50073 (JAM), at 10 (Bankr. D. Conn. Jan. 11, 2023) (Filed at Dkt. 7, Exhibit C) (identifying five organizations and movements which "serve as business vehicles for [Kwok], and their members are personally loyal to the [Kwok]").

The defense does little to contend with the mountain of evidence demonstrating Kwok's risk of obstruction of justice if he were released. Indeed, Kwok already appears to be engaged in such efforts. On March 29, 2023, the Government was advised by MDC staff that Kwok's "family members have been manipulating the [legal call] system and providing false information to circumvent the legal call system." (Ex. F.) On at least two occasions, Kwok communicated with individuals who appear to be family members using the legal call system, which is intended to be used only by inmates and their counsel. One occasion was after Kwok and his family were warned that the legal call system may not be used for social calls. Virtual legal calls are not recorded, whereas calls between an inmate and their family members are generally subject to monitoring. It appears that Kwok circumvented the rules of the MDC in an effort to avoid law enforcement

---

[15] Kwok relies on *United States v. Stein* in support of the argument that a defendant's past involvement in criminal activity is not itself sufficient to demonstrate an ongoing danger. In *Stein*, unlike here, the Government did not undertake any "real effort to suggest that there is a substantial risk that [the defendant] will continue to [commit crimes] if released pending trial." No. S1 05 Cr. 888 (LAK), 2005 WL 8157371, at *8 (S.D.N.Y. Nov. 14, 2005). Here, the Government has shown that, no matter the circumstances, Kwok continues to flout court orders and law enforcement actions and continues to commit fraud. In any event, *Stein* is a case in which the defendant charged with economic crimes *was detained pending trial* because, *inter alia*, the defendant was a flight risk whose financial disclosure was misleading. *Id.*; *see also id.* at *2 ("nonviolent witness tampering and obstruction poses a danger to the community and that the risk of such activities, in an appropriate case, would support pretrial detention" (citing *United States v. LaFontaine*, 210 F.3d 125, 132 (2d Cir. 2000)).

monitoring his activities.  As a result, Kwok was temporarily banned from remote attorney visits.[16]
If Kwok cannot abide by the rules of the MDC, there is no reasonable assurance that he will follow
any conditions of pretrial release.

Tellingly, the defense does not meaningfully respond to or refute the many examples of
obstruction described in detail in the Government's March 15, 2023 Letter, including:  (i) Kwok's
use of civil lawsuits to avoid payments to creditors; (ii) Kwok's February 15, 2022 bankruptcy
filing to avoid a contempt ruling by a New York State Judge; (iii) the January 2023 findings by a
federal bankruptcy judge that Kwok, despite the issuance of a TRO, continued to harass (through
intermediaries) a court-appointed bankruptcy Trustee, his law firm Paul Hastings, and the law firm
of O'Melveny & Meyers who represents one of Kwok's largest creditors, where those involved in
the bankruptcy have received death threats from Kwok's supporters; (iv) Kwok's statements, in a
January 23, 2023 video on his Gettr page following the bankruptcy court's preliminary injunction,
in which Kwok encouraged his followers to obstruct the bankruptcy court and flood the docket
with unsupported claims; (v) Kwok's video presentation in November 2022, explaining to his
followers how to avoid subpoenas issued in connection with the bankruptcy[17]; (vi) Kwok's attacks
against Individual-2, branding that person a "demon" and CCP spy, thereby subjecting
Individual-2 to attacks by Kwok's followers; (vii) threats against victims who have complained
about Kwok's fraud; (viii) Kwok's attacks against his critics, including calling for violence against
a pastor who criticized Kwok; and (ix) Kwok's mobilization of his followers against a journalist
in Canada, which resulted in physical assault of the journalist's friend.

At most, the defense generalizes these facts and suggests that they do "not constitute
obstruction of justice." (Def. Mem. at 18.)  The defense is wrong.  While Kwok is not presently
charged with obstruction-of-justice crimes, that does not mean the Court should excuse Kwok's
substantial and dangerous obstructive conduct described in the Government's letters.  That conduct
includes many instances of Kwok using his power and his followers to interfere and pressure those
who have instigated judicial proceedings against him.  It includes Kwok's threatening of victims,
encouraging witnesses to avoid legal process, encouraging thousands to disrupt bankruptcy
proceedings, and mobilizing a pressure campaign that relies on violent threats (and sometimes
actual violence) to dissuade others from acting against him.  These are definitionally obstructive
acts.  The defense alternatively asserts that, even if these actions are obstructive, none of them are
attributable to Kwok.  The defense is again mistaken.  Among other things, Kwok is literally on
video engaging in obstructive conduct.

Finally, the defendant's contention that his proposed conditions would "eliminate any risk
of obstruction" is unsupported and unpersuasive.  (Def. Mem. at 18.)  *First*, for all the reasons
outlined above, this Court can have no reasonable assurance that Kwok will follow its orders (as
opposed to the other court orders Kwok has defied).  *Second*, Kwok is called "The Principal," by
his co-conspirators for a reason.  He operates through agents.  Kwok issues directives to his co-
conspirators and followers, who then act on his wishes while enabling Kwok to disclaim

---

[16] The Government subsequently advised the MDC the identity of Kwok's counsel and will work
with the MDC to ensure that remote attorney visits with Kwok's counsel may resume.  The
Government will also work with the MDC to ensure Kwok has access to case materials and can
meaningfully assist in the preparation of his defense.

[17] https://www.youtube.com/watch?v=KkKFfGzb7jE

involvement.  Already, while incarcerated Kwok appears to have evaded the Bureau of Prison's rules.  And already, Kwok's associates appear intent on obstructing justice in *this* case (as they have in others).  For example, on March 30, 2023, Kwok's Gettr account posted false accusations about members of the undersigned prosecution team and an attorney with the Securities and Exchange Commission.[18]  This post was made in Kwok's name, and on his account; it strains credulity to believe it was not authorized by Kwok himself.

While this Court can have no assurance that Kwok would abide by conditions of release, the Court can be reasonably assured that, if Kwok were released, his ability to coordinate a burgeoning campaign to obstruct these proceedings and to intimidate and endanger witnesses as well as Government employees merely performing their jobs, would increase exponentially.

IV.   <u>**Conclusion**</u>

Pretrial Services was right to recommend detention.  This Court should order the same. The Government has met its burden and demonstrated there are no conditions or combination of conditions that can satisfy this Court that the defendant will appear in court as required or that the community will be safe.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/_____
        Ryan B. Finkel
        Juliana N. Murray
        Micah F. Fergenson
        Assistants United States Attorney
        (212) 637-6612 / 2314 / 2190

Enclosures

Copy to:   William R. Baldiga, Stephen R. Cook, and Stephen A. Best, *counsel for the defendant*
                 Stephen Boose, Pretrial Services, Southern District of New York

---

[18] https://gettr.com/post/p2cy7sycdbf