```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                        Docket #23cr118/
 UNITED STATES OF AMERICA,         : 23m2007

                      Plaintiff,   :

  - against -                      :

 WANG, YANPING,                    : April 4, 2023
                                       New York, New York
                     Defendant.    :

----------------------------------- : BAIL HEARING

                      PROCEEDINGS BEFORE
             THE HONORABLE ROBERT W. LEHRBURGER,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                      BY:  JULIANA MURRAY, ESQ.
                           RYAN FINKEL, ESQ.
                      One Saint Andrew's Plaza
                      New York, New York 10007

For Defendant:        LIPMAN LAW PLLC
                      BY:  ALEX LIPMAN, ESQ.
                      45 West 29th Street, Suite 303
                      New York, New York 10001

                      CHAUDHRY LAW PLLC
                      BY:  PRIYA CHAUDHRY, ESQ.
                      147 West 25th Street
                      New York, New York 10001

INTERPRETER PRESENT


Transcription Service: Carole Ludwig, Transcription Services
                       155 East Fourth Street, #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None    |        |       |           |          |       |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

1

PROCEEDING                        3

1
2          THE CLERK:  We're here in the matter for a bail
3   hearing, U.S. v. Yanping Wang, 23cr118.  Attorneys,
4   please state your name for the record starting with the
5   Government.
6          MS. JULIANA MURRAY:  Good afternoon, Your
7   Honor, Juliana Murray and Ryan Finkel on behalf of the
8   United States.  We're joined by Paralegal Specialist
9   Jeffrey Merns (phonetic).
10         MR. RYAN FINKEL:  Good afternoon.
11         MR. ALEX LIPMAN:  Good afternoon, Your Honor,
12  Alex Lipman, Lipman Law PLLC, and with me is my co-
13  counsel Priya Chaudhry, Chaudhry Law PLLC.  We're here
14  for the defendant Yanping Wang.  And she's here present
15  and she's being assisted by a Mandarin interpreter.
16         THE COURT:  All right, thank you.  Good
17  afternoon.  Ms. Wang, can you hear and understand
18  everything the interpreter is saying?
19         MS. YANPING WANG:  Yes, I do.
20         THE COURT:  All right, terrific.  So when we
21  law saw each other, you were going to see Judge Torres
22  in regard to Mr. Kwok and also seek possibly her say so
23  on this matter.  I understand she has left it in my
24  hands.  So I guess I will hear from the parties as to
25  where we are and what can be done, should be done in

PROCEEDING                    4

1
2  respect to the financial suretors that the Government
3  says are not sufficient to meet the obligation under the
4  conditions set by Judge Parker that two financially
5  responsible people be able to sign on to the bond.
6          And this is really defendant's application in
7  that they raised this concern, and so I'll hear from
8  defense counsel first.  But why don't you also let me
9  know if there's been any developments during the last
10 week that make any difference and/or whether anything
11 that happened before Judge Torres influences what
12 happens here.
13         MS. MURRAY:  Just briefly, Your Honor, I just
14 wanted to confirm that this is being recorded, this
15 proceeding, because I don't see a court reporter.  So
16 just for the record.
17         THE COURT:  It is being recorded
18 electronically.
19         MS. MURRAY:  Thank you.
20         MR. LIPMAN:  May I begin, Your Honor?
21         THE COURT:  Yes, please.
22         MR. LIPMAN:  Your Honor, in our view, from the
23 beginning, the Government never actually established by
24 preponderance of the evidence that the defendant is a
25 flight risk.  And I want to go – we actually agreed to

1

2    the bond conditions, but we agreed to the bond

3    conditions based on conversation that we had with the

4    Government that in which the Government made certain

5    representations about what was found in Ms. Wang's

6    apartment.  And so we were told that, we didn't have a

7    lot of time to discuss things with our client, but we

8    thought, all right, it seems reasonable, and then we

9    agreed that we were going to propose names of two co-

10   signers for the bond and, frankly, didn't think that

11   this was going to be an issue.

12          Then the Government made certain statements on

13   the record, and as we started having trouble having them

14   approve the people we proposed, we at some point asked

15   them for support for some of the things that they said

16   were the reasons that our client is a flight risk.  And

17   so then they eventually provided it to us, and what we

18   found is basically one of three things.  The Government

19   either made statements that are half true, and so we

20   need to actually fill in the blanks and realize that

21   what they said isn't really right.  They have made

22   statements that are contradicted by the evidence that

23   they gathered in Ms. Wang's apartment, and then they

24   made statements for which they're just conjectures.

25   They're not actually supported by any evidence.  So let

```
 1                        PROCEEDING                    6
 2  me back up and start at the beginning.
 3            THE COURT:  Okay.
 4            MR. LIPMAN:  So Ms. Wang and her co-defendant,
 5  Mr. Kwok, knew that the Government was looking at them
 6  for a very long time, so much so that in September, and
 7  according to the indictment, in September and October of
 8  last year the Government seized a bunch of assets,
 9  according to the indictment it's something like on the
10  order of $700 million, and the Government seized those
11  assets.  It was a civil seizure, but it referenced, as
12  specified (indiscernible).  Right?  So $700 million
13  seized, I'm not sure that I can say for the Court that
14  my client understood the full scale of what was seized,
15  but she certainly understood that the Justice Department
16  has seized a bunch of money, right.
17            And then there was an SEC settlement for the
18  GTV case which is the one that's relevant to her, and
19  GTV paid back something in the order of I want to say
20  $500 million, which incidentally they didn't pay after
21  the - they first paid the money and then the SEC issued
22  a settlement order.  So it's in the reverse order from
23  the Government says happened.  Okay?  So she knew, she
24  knew that the Government was looking at her and that she
25  was potentially in severe legal jeopardy.
```

```
 1                         PROCEEDING                    7

 2              Despite that, she didn't go anywhere, but

 3  there's more.  The Government says she had the passport

 4  from, a Chinese passport that she could've traveled on,

 5  right, and that she, and she's an asylum applicant, and

 6  because she's an asylum applicant, they say this is one

 7  of the factors to consider in her not having ties to the

 8  United States is somehow she count against her.

 9              Well, because she's an asylum applicant and she

10  doesn't want to lose her asylum application, she did

11  want to go travel, and she applied to the United States

12  government for a furlough so that if she traveled, her

13  asylum application would not get denied.  So the

14  Government, and that happened, she received permission

15  to travel between December and January of last year, so

16  December '22 to January I want to say 27, I'm probably

17  wrong on the exact date, but something from mid-December

18  to the third week of January --

19              THE COURT:  And when was the seizure of the

20  money that you referred to?

21              MR. LIPMAN:  September and October according to

22  the indictment.  I think it's September 18 and October,

23  was it is, 24, 26.

24              So she put the government on notice that she

25  was going to go travel despite all of this going on.
```

```
 1                         PROCEEDING              8
 2  She did not travel during that window.  It expired.  It
 3  expired for reasons that have nothing to do with
 4  anything other than she had a particular trip that she
 5  had in mind to make, she couldn't get, it didn't work
 6  out logistically.  She then applied for another
 7  application, and I believe that was, according to her
 8  immigration counsel, that was on February 8, 2023.  So a
 9  month before she was arrested.
10          So the idea that she is a flight risk is, given
11  all of that, is a little far-fetched, but there is a
12  reason for it, and the reason is this.  Ms. Wang is in
13  different times would be called a revolutionary.  She
14  has put herself, her family, everything she's done at
15  risk because she is opposing the communist party of
16  China, and whatever it is that they say in the
17  indictment, there is no dispute, none whatsoever, that
18  she has put herself in jeopardy.  Her son is in China,
19  her husband, the man, the one and only boyfriend she's
20  ever had, they're not allowed to have any communication
21  with her --
22          THE COURT:  Right, but as I understand the
23  Government, I don't know if they've pivoted or whether
24  they always asserted this, but their concern is with
25  fleeing to other jurisdictions, be it the United Arab
```

Case 1:23-cr-00118-AT   Document 57   Filed 04/26/23   Page 9 of 87

1                              PROCEEDING                         9

2  Emirates where supposedly Mr. Je, a co-conspirator, is

3  or Vanuatu where she has an expired passport application

4  or wherever.

5              MR. LIPMAN:  So, Your Honor, let me take

6  Vanuatu first because that's easiest.  Okay?  Together

7  with the passport that's expired, they also found two

8  documents both for her and Mr. Kwok in her apartment

9  saying that she's renouncing Vanuatu citizenship.  So

10 that's not an issue.  The other thing is she got the

11 passport for Vanuatu I believe in 2016, if I have that

12 correctly, that was before she came to the United

13 States.  China and Vanuatu have since become good

14 friends, and it's a different situation now, and I don't

15 think it would be safe for her to go there.

16              As far as going to United Arab Emirates, the

17 United Arab Emirates does not, from what we heard this

18 morning from the Government in Mr. Kwok's hearing,

19 United Arab Emirates does not extradite its citizens to

20 the United States.  It does have an extradition treaty

21 with China.  She's not a citizen of United Arab

22 Emirates, nobody's suggesting that she is.  She's not,

23 she doesn't have a passport from there.  The only

24 passport that she had that was still live, they have

25 possession of that passport.  They found it in her

1
2    apartment.  So no, she cannot go somewhere else.

3              Now let's talk about whether she --

4              THE COURT:  Wait, wait, wait, I want to stop

5    you there, just on the issue of the extradition with

6    United, with the UAE.  What I heard you say was that

7    they don't have an extradition agreement with respect to

8    citizens of the UAE, and then I thought I heard you say

9    that they have an extradition treaty with China which,

10   of course, she's not going to go back to, and this isn't

11   a proceeding in China.  What is their status with

12   respect to extradition of a citizen of a third-party

13   country, if you will, and extraditing to the United

14   States?  I'm sure the Government can tell me but I'm

15   wondering if you have an understanding.

16             MR. LIPMAN:  As far as I know, there is no

17   extradition treaty with the United States, but it's an

18   irrelevant issue rather because, first of all, she can't

19   get there.  Okay?  And, second, she's not concerned

20   about being extradited to the United States; she's

21   concerned about being extradited to China --

22             THE COURT:  I understand.

23             MR. LIPMAN:  -- where she's going to get

24   arrested and shot.  I mean there's a difference.  You

25   know, as bad as the MDC is, it's not exactly a Chinese

```
1                        PROCEEDING                    11
2    prison.
3              THE COURT:  But is your point if she shows up
4    at the UAE, she's going to get exported or extradited to
5    China automatically?
6              MR. LIPMAN:  Well, I don't know about
7    automatically, but she certainly is in great danger of
8    that happening.  That's absolutely true.  And, look, in
9    the hearing that we had earlier this morning, the
10   Government actually, it was discussed, all the efforts
11   that the Chinese government has undertaken to get Mr.
12   Kwok back to China, including bribing American
13   officials, there's a case going on now, a criminal trial
14   I believe is going on right now in D.C. in which several
15   government officials who've been bribed by China in
16   order to facilitate Mr. Kwok's deportation from the
17   United States to China.
18              Well, the Government, this woman, according to
19   the Government, is Mr. Kwok's chief of staff, whatever
20   that means.  Well, I don't think that they seriously
21   will dispute that she is in danger.  So --
22              THE COURT:  I'm sorry, that she's what?
23              MR. LIPMAN:  In danger.
24              THE COURT:  In danger.
25              MR. LIPMAN:  Meaning I don't think they
```

```
 1                        PROCEEDING                    12
 2   seriously dispute that if she went to China, got into
 3   China or that China wants her.
 4            THE COURT:  Right.
 5            MR. LIPMAN:  There can't be a serious dispute
 6   about that.  So now let's talk about what would happen
 7   if she were in the United States.  Basic reason, basic
 8   reason, she is Mr. Kwok's, according to the Government,
 9   chief of staff.  She's very recognizable.  Right?  She's
10   recognizable in the community of people who are here.
11   This is a community of thousands of people in the United
12   States.  So the Government says, oh, they will hide her.
13   Well, first of all, that's, forgive me, but that's just
14   an improper inference.  To think that thousands of
15   people who are on the U.S. soil will secret a fugitive,
16   is it because they're Chinese, is it because they speak
17   Mandarin --
18            THE COURT:  No, because they're, because they
19   potentially were victims of the fraud.
20            MR. LIPMAN:  Except for this.  If they are
21   victims of the fraud, they know what's going on, they're
22   adults, and so they could at any time become persuaded
23   that, in fact, she should be returned to the United
24   States government if she is a fugitive.
25            But there's more to this, and the more is this,
```

1                                PROCEEDING                        13

2   if the Chinese – we know from what I've read in the

3   paper, that the Chinese communist party has parking

4   Chinese communist officials from their police in their

5   United States consulate in New York.  For a second can

6   we think that they're not keeping tabs on her?  And that

7   if she showed up anywhere in any community where people

8   speak Mandarin as their primary language that she would

9   be spotted?  For a second can anybody conceive that the

10  Chinese communist party wouldn't find her and identify

11  her and tell the government exactly where she is?

12          Now let's take the alternative.  Let's assume

13  for a second that she decided to hide herself in, I

14  don't know, Utah among white people.  She speaks English

15  with a heavy accent, and her first language in Mandarin.

16  Would she not stick out like a sore thumb?  The idea

17  that this woman can hide is blatantly absurd.  It's

18  absurd.  And the idea that she could rely on people to

19  hide her in the United States.  So where are we?  She

20  can't leave and she can't hide.  That's not flight risk.

21          But there's more.  And the more is this.  The

22  Government said, and this is why we actually thought we

23  were okay with the bail package that they proposed.

24  They said we found stuff in her apartment that tells you

25  that she's a flight risk.  What is it?  We found twelve

PROCEEDING                    14

1  phones.  Of these twelve phones, six of them were

2  secreted in boxes that were, that looked like brand new

3  boxes of iPhones and these were used – this is a

4  representation from the Government of the United States

5  to a court in the United States.  So we said, all right,

6  let's look at the pictures.  Send us the pictures.

7  Well.  May I approach, Your Honor?

8          THE COURT:  You may.

9          (pause in proceeding)

10          MR. LIPMAN:  This is the evidence log, Your

11  Honor, that was of collected items from her apartment.

12  This is what we got from the Government.  Okay?

13          THE COURT:  Uh huh.

14          MR. LIPMAN:  I'm going to assume that

15  everything on here is true and correct because it came

16  from the Government.  If it's not, they should tell Your

17  Honor.  Here's a list of phones and where they were

18  found.  On the first page.  Numbers 1, 2, 3, 4, 5, 6, 7.

19  These are all iPhones, and they were all found on the

20  kitchen table.  Now, Your Honor, if the Court would like

21  to see, I have pictures of them.

22          They were found on the counter in the kitchen,

23  three of them.  They were plugged in in plain view.

24  There was a phone that was on the side of the table,

```
 1                        PROCEEDING              15

 2  there was another phone someplace on the side.  There's

 3  a description here.  On nightstand, right of bed.  On

 4  changing --

 5            THE COURT:  Right, well, those - all right, and

 6  they didn't say all of them were --

 7            MR. LIPMAN:  Your Honor --

 8            THE COURT:  -- secreted --

 9            (interposing)

10            MR. LIPMAN:  -- trust me, trust me --

11            THE COURT:  Let's just --

12            MR. LIPMAN:  I'm not bypassing --

13            THE COURT:  I didn't think you were, but we

14  don't need to go over the ones that are sort of obvious.

15            MR. LIPMAN:  Well, Your Honor --

16            THE COURT:  Okay.

17            MR. LIPMAN:  I wouldn't be talking to you if,

18  right?

19            THE COURT:  No.

20            MR. LIPMAN:  Okay.  So here we go.  On page 6

21  of 9 --

22            (pause in proceeding)

23            THE COURT:  Okay?

24            MR. LIPMAN:  Oh, I'm sorry.  I'm sorry, Your

25  Honor.  I apologize.
```

```
1                        PROCEEDING                    16

2              THE COURT:  Sure.

3              MR. LIPMAN:  On page 7 of 9.

4              THE COURT:  Okay.

5              MR. LIPMAN:  Do you see where it says 56 --

6              THE COURT:  Yes.

7              MR. LIPMAN:  -- white phone, 57, white phone --

8              THE COURT:  Yes.

9              MR. LIPMAN:  -- 58, white phone --

10             THE COURT:  In bag in closet.

11             MR. LIPMAN:  In bag in closet.  Not in a box

12   pretending like it's new.  It's in a bag in closet.  I

13   have a picture of the closet.  I'm happy to show the

14   Court the bag that it was in.  There is, in fact, in

15   that picture one white box for an iPhone in that

16   picture.  One box.  And according to this none of these

17   phones came out of that bag, that box.  But even if one

18   did, that's one.

19             Now, also on this page you see, Your Honor,

20   where it says Mac book number 55 in between clothes?

21             THE COURT:  Uh huh.

22             MR. LIPMAN:  Okay, so one of the things that

23   they said is, oh, look, she's hiding stuff in between,

24   in her closet.  She's secreted a laptop in between her

25   clothes.  So a couple of things about that.  Number one,
```

```
 1                         PROCEEDING                17
 2  as the Government well knows, Ms. Wang is not unfamiliar
 3  with what happens when the FBI raids somebody.  They
 4  raided Mr. Kwok previously.  She knows what happens when
 5  that happens.  Okay?  So the idea that she could think
 6  that she could hide a laptop in between her sweaters is
 7  absurd.
 8          But there's more now, Your Honor.  Here is the
 9  - if I may - which is this?
10          ATTORNEY:  46.
11          MR. LIPMAN:  If I may approach, Your Honor.
12          THE COURT:  You may, and just, I want to
13  confirm something.  Are we looking at evidence and
14  material that was not available before the hearing
15  before Judge Parker?
16          MR. LIPMAN:  This was not available to us
17  before - we got this - so here's what happened.  We
18  asked them some of these questions about the phone,
19  right, we asked those questions I think it was on the
20  29th.  Do you have our letter?  But essentially, Your
21  Honor, we got these the night before we saw you.
22          THE COURT:  Okay, so that was well after Judge
23  Parker's ruling.
24          MR. LIPMAN:  If I may approach, Your Honor.
25          THE COURT:  Yes.
```

1                           PROCEEDING                    18

2              MR. LIPMAN:  Your Honor, this is the FBI

3    schematic of the apartment that Ms. Wang lives in.  By

4    the way, it's 740 square feet.  This is a woman who

5    apparently defrauded people up to, for something like a

6    billion dollars.  Anyway, so on this page, Your Honor, I

7    call the Court's attention on what is in the apartment

8    and what is not.  There is a bed in the bedroom, and

9    there's a side table.  There is a couch in the

10   livingroom, and there's something in front of the couch,

11   it's actually a (indiscernible).  There is nothing else

12   in this apartment.  There's no wardrobe, there's no

13   chest of drawers, there's no desk, there's nothing.  So

14   where does she keep her stuff?  In the closets.  All of

15   her stuff is in the closets.  Her old phones were in the

16   closet.  Right?  There's nothing nefarious about putting

17   stuff in the closet when you don't have any furniture.

18              So then, so then they say, okay, we found money

19   in her apartment.  We found money, we found $138,000.

20   Ms. Murray said in recent bills, she thought they were

21   recent bills.  Okay.  So then we thought, all right, can

22   we see the pictures of the money?  Why did we ask for

23   pictures of the money?  Because we had reason to think

24   that a bunch of that money was in red envelopes which

25   apparently in Chinese culture it is common on holidays

```
 1                          PROCEEDING                    19
 2  like Chinese New Year to give people gifts of money, and
 3  they found red envelopes.  And so I wanted to see where
 4  the money is, what it looks like, and how old it is.
 5  Right?
 6             So asked for the pictures.  That's actually,
 7  truth be told, that's the thing that kind of prompted
 8  this conversation to begin with.  (indiscernible) the
 9  money.  Okay?
10             So what did we find?  (pause)  May I approach,
11  Your Honor?
12             THE COURT:  Yes, you may.
13             (pause in proceeding)
14             MR. LIPMAN:  This, Your Honor, is the pouch in
15  which the money was found.  Now, the Government says in
16  a letter to you, Your Honor, in their latest letter,
17  they said conveniently in a bag for easy retrieval.
18  Really?  Okay, let's look at it.  It's a bank bag.  This
19  is what money comes from when you get money from the
20  bank.  What else do we see here?  We see that there are
21  a bunch of this is in red envelopes.  Now there's other
22  cash in here, and, in fact, there's another picture.
23             THE COURT:  Look, you don't need to go in this
24  much detail on the cash.  And, you know, I agree with
25  you, I don't find the fact that it's in a bag
```

PROCEEDING                    20

1

2   particularly persuasive that means someone's necessarily

3   going to run because it's in a bag.  It's organized.

4   But one thing maybe you can tell me is, and I realize

5   this is shifting time a bit, but I thought that in their

6   filing that, their last filing that prompted putting

7   this over, that they had indicated and represented that

8   Ms. Wang did not disclose this $138,000 to Pretrial, but

9   I was under the impression this had already been seized

10  a couple of weeks before.

11          MR. LIPMAN:  No, it was seized on the day of

12  her arrest, okay, and the question that she was asked,

13  the relevant question was did you have any money cash on

14  you when you were arrested.  She was arrested at 6:15

15  a.m., she was in her pajamas.  The truthful answer to

16  that question is no.  We checked out notes, we don't see

17  any other questions that would have elicited a different

18  answer.  So did she disclose it voluntarily?  No.  I

19  don't know that she was asked about it.

20          THE COURT:  Okay.

21          MR. LIPMAN:  Okay?

22          THE COURT:  I get it.

23          MR. LIPMAN:  But, Your Honor, even if she had

24  been asked about it, there were a dozen FBI agents in

25  her apartment ripping it up.  Okay, I mean she was, she

```
 1                          PROCEEDING                  21
 2   was beyond stressed.  She's sitting and talking, in a
 3   situation that she's never encountered, she's being
 4   asked these questions.  Is it crazy that, you know, the
 5   question is have you, do you have any cash on you, and
 6   she says – did you have any cash on you when you
 7   arrested and the answer is no and she doesn't say
 8   anything else?  I mean really?
 9             All right.  Now, by the way, before – because
10   they're going to bring up another picture for you, Your
11   Honor, and I don't want to be accused of giving you
12   something less than the full picture.  And the full
13   picture is that when they made another picture of the
14   money – I apologize, Your Honor.  I've gotten so
15   excited, I lost the other picture of the money.  Here it
16   is.  May I approach?
17             THE COURT:  Yes.
18             (pause in proceeding)
19             MR. LIPMAN:  This is the picture that makes it
20   look as if more of this money is more recent because you
21   can see there are some old bills, some new bills.
22   However, with that said, as I told the Government,
23   there's a good explanation for why some of that money is
24   recent.  Okay?  And the explanation, and I told the
25   Government this, is that she had some pounds that she
```

PROCEEDING                        22

brought over from, with her herself at some point in her

previous travels, and that those pounds, you know,

however they got to her, but those pounds needed to be

replaced because apparently when the Queen died, they're

exchanging their money for money that looks, that has a

picture of the King.  Okay, so over time she had that

replaced, so there's got to be something like $30,000,

$40,000 in there that's recent that has to do with that.

I asked to see the bills yesterday when it was

too late for me to go do it, they said you can come see

it.  I'll see them at some point.  But my point though,

Your Honor, the idea that this is money secreted so that

she can get out of Dodge, no, no, that doesn't make any

sense.

THE COURT:  No, but it is suggestive that she

has access to significant funds even if that particular

one wasn't what she was intending to use.

MR. LIPMAN:  Let's address that.  Okay?  The

Government says she didn't disclose all of the bank

accounts over which she had control.  I had a specific

conversation with the Government in which I said if

you're asking about accounts for which she can actually

transact, meaning no third people, right, in other

words, but my bank account, I can go and do stuff.  My

1                          PROCEEDING                    23

2   firm's bank account, not necessarily.  Well, in my case

3   yes, but, you know, if you work for a firm, you may be

4   able to direct somebody to do whatever, that's firm

5   business, but you can't take it and put it in your

6   pocket.  Okay?  So what I said to the Government is we

7   are aware of two accounts, right, that are hers.  We're

8   aware of another business account where she could have,

9   she could transact.  We gave them the account and the

10  number.  Right?  We're not aware of any other accounts.

11  That is not, we did not hide from the Government that

12  she owns this BBI entity.  That's not – the question was

13  --

14          THE COURT:  I understand, that's, of the list

15  of four things, three of them were business entities,

16  two of them weren't even hers directly.  What about the

17  Himalayan cryptocurrency?

18          MR. LIPMAN:  Good question.  So I've been

19  trying to figure out what happened with the Himalayan

20  thing, and there are two things about that.  Number one,

21  the document that they're referring to, remember how I

22  said there are some things where there's evidence, there

23  are some things that are half-truths, there are some

24  things that are contradicted, and then there are some

25  things were it's just a leap?  Right?

1                            PROCEEDING                    24

2          So what are they looking at?  They're looking

3    at a schedule that says allocation, okay, allocation.

4    They're not looking at an account at H Coin.  They're

5    not looking – they're looking at an allocation.  I've

6    been trying to figure out what happened to that

7    allocation.  The best I can ascertain is that she has no

8    idea what happened.  I'm not saying that something

9    didn't happen with it.  I'm saying that she has no idea.

10   Okay?

11              THE COURT:  But which is --

12              (interposing)

13              MR. LIPMAN:  But there's more --

14              THE COURT:  The current value of that, right,

15   at least the Government says is something like $13

16   million.  I'm sure it was less than, well, maybe who

17   knows given the market.  But you would think that

18   someone – I'm going to assume it was a significant

19   amount of cyber currently at the time in that to her it

20   was significant, and you would think one would keep

21   track of that significant amount.

22              MR. LIPMAN:  If one thought that it was theirs,

23   then one would.  But, Your Honor, here's – so the

24   Government seized hundreds of millions of dollars,

25   including from the Himalayan exchange.  The Government

1

2   is alleging that it's all a fraud.  Out of one side of

3   their mouth they say it's worthless, and people can't

4   actually turn it into cash.  The SEC said, in its

5   complaint the SEC says people tried to turn it into cash

6   but couldn't.  Well, is it or isn't it?  Because if it

7   is, then maybe it's worth $13 million, though we don't

8   know how to access it.  But if it isn't, if their

9   allegations are correct, then I don't know what the

10  mechanism is for turning this into cash.  Okay?

11          So this is all to say that the presumption is

12  that she would be released or released pursuant to

13  conditions that are least restrictive to assure her --

14          THE COURT:  Right, but are we arguing anew?  I

15  mean this comes back to the question, Judge Parker

16  implemented or ordered conditions.  The crux of the

17  problem is that one of her conditions is not being

18  fulfilled because the Government has taken the position

19  that none of the persons offered to be financially

20  responsible are going to be sufficient suretors either

21  because they don't exercise moral suasion, because they

22  aren't financially responsible, or they are a victim or

23  a participant in the alleged fraud.  And there's a

24  question of, okay, what happens if they keep on not

25  accepting these people.  So I just want to be careful

1

2   about thinking of this as brand new when Judge Parker

3   has already set conditions.

4           MR. LIPMAN:  So, Your Honor, if I may.

5           THE COURT:  Yeah.

6           MR. LIPMAN:  So, first of all, according to

7   3142, 18 U.S.C. 3142(e)(iv)(3), "The judicial officer

8   may at any time amend the order to impose additional or

9   different conditions of release."

10          THE COURT:  Yes.  Understood.

11          MR. LIPMAN:  So that's number one.  Number two,

12  as I explained to the Court, we agreed to $5 million –

13  I'm sorry, Your Honor, I used to be in, you know, for a

14  brief time at the U.S. Attorney's Office.  When the

15  prosecutor says we found recent cash, we found stuff,

16  they told us they found stuff, documents hidden in her

17  cushions of her, the only piece of furniture she has.

18  So they said they found in the cushions of her loveseat

19  or whatever it is, okay.  Well, somewhere here is my

20  other exhibit that I'm going to, sorry, Your Honor, I

21  get excited.

22          Anyway, somewhere here, I'll get it for the

23  Court, yeah, this is fantastic, thank you.  This is

24  important.  So, first, let me finish the first thing.

25  Okay?  So the photographs, the log of the photographs

1
2    that were taken.  I was looking to see if I can find a

3    photograph or a log of a document hidden in the

4    cushions.  That doesn't exist.  You know what else

5    doesn't exist?  They said in their – this is a

6    representation to a court, they said we found a phone

7    hidden between mattresses in her bedroom.  I want to see

8    this picture.  I want to find it on the log of pictures

9    that are taken.  Where is it?  It doesn't exist.  Or at

10   least it hasn't been given to us.

11         Now, there is a picture like that that was

12   taken at Mr. Kwok's search, and – thank you.

13              (pause in proceeding)

14         MR. LIPMAN:  May I approach, Your Honor?

15         THE COURT:  Yes.

16         MR. LIPMAN:  So that's a picture of a phone

17   hidden between mattresses.  But it's not from her

18   apartment.  And I have yet to see the one from her

19   apartment.

20         One other thing, they said she has stuff in

21   her, in the pouch for easy retrieval, right, the money

22   was in the pouch for easy retrieval.  Everything was in

23   a pouch for easy retrieval.  You know what else was in

24   the pouch for easy retrieval?  I think every credit card

25   she's ever had.  I mean a bunch of old expired credit

1

2  cards, easy retrieval.  It doesn't make sense.

3          Now let me, Your Honor, let me just now switch

4  over to the other piece of this which is the proposed

5  co-signers, the Government's refusal to approve any, and

6  what this is about.  And I want to start with something

7  that I actually did not plan on doing because it only

8  happened in the courtroom this morning.  You see these

9  people here, many of these people here are here to

10  support her.

11          She got emotional in the courtroom and started

12  crying because she realized that all these people are

13  here to support her, and let me explain what that means.

14  The Government probably doesn't know this, but surely it

15  is actually unlawful for the Government to disclose that

16  somebody's an asylum applicant.  There's a regulation

17  that says that.  I didn't know.  I found out recently.

18  I'm sure they don't know.  I'm sure they didn't do it

19  deliberately.

20          But the reason is obvious.  Right?  If you have

21  somebody coming from a country, you identify them as

22  somebody who's seeking asylum somewhere else, that

23  immediately puts them in danger.  All of these people

24  simply by coming here, do you think there's no one here

25  from the Chinese communist party in this room right now

```
 1                     PROCEEDING                    29
 2  monitoring this?  All these people simply by coming up
 3  and standing up for her have exposed themselves, their
 4  families --
 5           THE COURT:  I don't think anyone questions
 6  perhaps their intent.  The question does the --
 7           MR. LIPMAN:  Does she care about them?
 8           THE COURT:  -- does the defendant care enough
 9  about these people that she's going to be concerned
10  enough about whatever monetary means they're putting on
11  the line versus taking flight, and one would paint the
12  picture, if you're the Government, saying she's alleged
13  to have committed fraud, you've got strong evidence.  So
14  why would she care about the people she defrauded?
15           MR. LIPMAN:  Fair amount, Your Honor, I was
16  about to address it.
17           THE COURT:  Okay.
18           MR. LIPMAN:  There are different ways to think
19  about moral suasion.  Right?  I think we all agree that
20  a brother can sign for a brother, and the first brother
21  is not going to care.  They're relatives, they're
22  brothers, but they're not going to care.  It's also true
23  that people can connect in some way, they could be
24  strangers, but they connected, right, and so somebody
25  can have moral suasion over somebody else who actually
```

1

2  they don't have all that much interaction.  They just

3  love each other.  Right?

4          But there's another kind, and the other kind is

5  this, if you are a member of a certain kind of community

6  and you're – and this community is important to you,

7  it's important to you what happens to the members of

8  this community.  Now, the Government's going to say, oh,

9  my God, a billion dollars, these people are victims.

10 Well, they're here, they don't think they're victims,

11 but that's another story.  Okay?

12         But here's the thing, look at the indictment,

13 Your Honor.  Mr. Kwok is alleged to have bought himself

14 a Lamborghini.  I would love one.  Okay?  But does she

15 have one?  No.  He apparently is living in a mansion and

16 has other mansions and boats and this and that and the

17 other thing.  Where in the indictment is there an

18 allegation that any of this money went to her?  The

19 closest they've come is this allocation of the coin

20 allocation.  Right?  And we don't know what happened to

21 that.  Okay.

22         So the question you have to ask yourself is why

23 is she doing this?  Why does she leave her family, her

24 son, her one true love, right, and moved to a foreign

25 country where she is basically exposing herself as a

1
2   revolutionary, why did she do this?  Okay.  There's an
3   answer, but that she's trying to enrich herself is not
4   the answer.  So then the question is would she, given
5   what the Government has alleged about her, not about her
6   co-defendants, but about her, because what happens to
7   the co-defendants is relevant but what matters really is
8   what happens to her.

9           And also the question, given the allegations
10  that the Government has made, right, is she the kind of
11  person who will stick one of these people with a $5
12  million debt?  And the answer to that is obviously no,
13  she lives in a 740 square foot apartment without
14  furniture, away from her family with whom she cannot
15  have anymore contact.  It's just beyond belief that we
16  have given them eight people, grownups, right, they
17  don't like all of them, that's fine.  They say we didn't
18  get enough documents with respect to certain people.
19  Really?  Somebody's willing to put up a $3 billion
20  house, what other documents do you want?  We couldn't
21  post that house unless we were able to prove to them
22  that that house existed and belongs to the person who's
23  posting it.  Right?  That person is an adult who
24  understands what's going on and thinks that she, that
25  that person has moral suasion over her and thinks that

1                                PROCEEDING                        32

2    she's not – there are three people, the co-signers who

3    are in this room today.

4            So where does the Government, forgive me, Your

5    Honor, but where does the Government get off making

6    those judgments for these people?

7            THE COURT:  Well, that's part of what, I mean

8    they get to form that judgment, and if you don't agree

9    with it, that's why we're here, but they, the Government

10   needs to be assured or feel assured that the financial

11   security that's being posted is sufficient to reasonably

12   assure that the defendant will not flee, and there is a

13   valid concern I think in theory that if you have folks

14   that are allegedly victims of a fraud that's being

15   committed, that the fraudster or alleged fraudster may

16   not be so incented as one might normally be,

17   theoretically.

18           MR. LIPMAN:  Your Honor, one cannot paint

19   everything with a broad brush.

20           THE COURT:  I agree.

21           MR. LIPMAN:  One really needs to look at the

22   particular circumstances, and the particular

23   circumstances is that the Government is not alleging

24   that she stole money.  It's just that simple.  They're

25   alleging that the other two stole money.  They're not –

1                    PROCEEDING                    33

2    meaning for herself.  They're going to get up and say,

3    well, you know --

4              THE COURT:  Yeah, she was allegedly

5    instrumental and in the middle of it.

6              (interposing)

7              MR. LIPMAN:  -- this and that.  You know, and,

8    by the way, forget the presumption of innocence like

9    whatever.  Anyway, the point is that they're not

10   alleging she enriched herself at the expense of these

11   people.  So then the question is what is the reasonable

12   conclusion, I mean a reasonable basis for concluding

13   that she will do so with respect to this bond.

14             But, Your Honor, but I tell you this, everyone

15   she knows falls into one of two categories.  They're

16   either friends (indiscernible) or a family, okay, or

17   they're members of this community.  You know, it's –

18   sometimes people say, well, how is this possible?  She's

19   lived in the country for seven years and she doesn't

20   have any friends.  Well, she doesn't because she's a

21   revolutionary, Your Honor, because she has a mission in

22   life, and her mission is something different than making

23   friends.

24             So my point is this, these people can only come

25   from one of these two groups, okay, and if the

1
2  Government cannot approve cosigners who belong to one of
3  these two groups because as a category they
4  (indiscernible), then, Your Honor, you have the
5  authority to change this, and, in fact, as the Court is
6  well aware, one of the provisions in here is that you
7  cannot have a financial condition that makes it --
8          THE COURT:  "The judicial officer may not
9  impose a financial condition that results in the
10 pretrial detention of the person."  18 U.S.C.
11 3142(c)(2).  And yet the Government seems to have found
12 cases that say that in the context of the statute, that
13 does not trump but rather what trumps is whether the
14 conditions will reasonably assure the presence of the
15 defendant at future proceedings.  And even a case you
16 rely on, U.S. v. Panaronda, says that too, and they said
17 the ultimate question is the Court should consider
18 whether that particular financial condition is a
19 necessary part of the bail conditions to provide
20 reasonable assurance of the defendant's appearance.  I
21 mean that's really what we have to decide.
22         MR. LIPMAN:  And, Your Honor, that case, I'm
23 going to mispronounce names so I apologize --
24         THE COURT:  Panaronda.
25         MR. LIPMAN:  Okay, what happened in that case

PROCEEDING                    35

is Judge Sweet, we'll change the conditions.  I mean and
he said, look, there's $250,000 bail here, this person
is never going to either meet it or get anybody who is
good for $250,000.  I'm going to reduce it to something
that people can meet and still satisfy the conditions.

          We proposed, just so that we're clear, in
addition to posting, you know, property to secure the
bond that would be more than enough, right, because, you
know, it says two.  There are three people who together
have more property than $5 million.  They can post it
all.  They're prepared to do it.  But separately.  She
has access, as far as I know, and the Government doesn't
actually know anything different, she personally only
has access at this point to two accounts that belong to
her and that she has value in her apartment, we already
posted that.  So her apartment, one of her accounts
completely --

          THE COURT:  With $400,000.

          MR. LIPMAN:  Well, I'm not sure exactly.

          THE COURT:  Well, that was the one that you
offered up --

          MR. LIPMAN:  Yeah, yeah.  And then the second
one monitor it.  I mean we're happy to have - in other
words, she --

| | PROCEEDING | 36 |

1
2          THE COURT:  I get it.

3          MR. LIPMAN:  -- would have no money --

4          THE COURT:  Right.

5          MR. LIPMAN:  Now, the Government says, well,

6   you know, supporters, this and that, they can – that's

7   true in every case.  Your Honor, I'm going to sit down

8   because I've been going on, you've indulged me and I

9   appreciate that.  But, Your Honor, there's no reason why

10  this woman should spend another night in prison.

11  There's no reason.  She's not a flight risk.  She has

12  already put up her apartment.  We're happy to have the

13  three co-signers that are here are happy to go down and

14  sign the bond today.  We can post the – in fact, I will

15  take personal responsibility for the two accounts.

16  Thank you.  My much wiser co-counsel reminded me that

17  what these people have on the hook is not $5 million.

18  It's their lives and their families' lives because of

19  what they're proposing to do for Ms. Wang.

20          If that is not an indication that they think

21  they have moral suasion --

22          THE COURT:  That's not, it's not, I don't

23  question their thought process on it.  And I just want

24  to confirm something.  In terms of what you did propose

25  in terms of possibly modifying the conditions is you

1                              PROCEEDING                          37

2    wanted the Court to approve two of the eight that you

3    had offered.  You have three here now.  You were going

4    to, in addition to the security for the apartment, you

5    were going to put up the $400,000 account and the

6    $130,000 cash that was seized.  You were going to put

7    additional security through others that you now say I

8    think that you could get to an amount in total of $5

9    million.  Do I have that right?

10             MR. LIPMAN:  Yeah, we could.  I mean we have

11   three people willing to post their property, and one of

12   those houses is I think $3 million, one is 1.7 if I

13   remember correctly, but yes.

14             THE COURT:  And then you proposed also that the

15   Government monitor and approve any expenditures from the

16   $500,000 account.

17             MR. LIPMAN:  I'd rather Pretrial did it and not

18   the U.S. Attorney's Office, but yes.

19             THE COURT:  Yeah, again, one of the driving

20   concerns here is – I'm just looking for where this was

21   said, that, and this is from U.S. v. Melville I think.

22   "Bail is not for the purpose of providing funds to the

23   Government to seek the defendant should he go

24   underground or flee the jurisdiction.  Bail is intended

25   as a catalyst to aid the appearance of the defendant

PROCEEDING                    38

1

2   when warranted."  So, again, I just want to emphasize

3   that we're talking about what is the defendant going to

4   be motivated to do.

5          MR. LIPMAN:  I appreciate that, Your Honor,

6   but, Your Honor, and I don't want to annoy you --

7          THE COURT:  No, no, you're not annoying me.

8          MR. LIPMAN:  -- with I've already said, but the

9   fact of the matter is that --

10          THE COURT:  And I'm not saying I think

11   necessarily that she won't be motivated.  I just want to

12   make sure we're all on the same page about what's

13   important.

14          MR. LIPMAN:  Your Honor, you and I are on the

15   same page, absolutely, but, again, when a woman starts

16   getting emotional because people come here to support

17   her, when the Government does not allege that her

18   participation in the scheme, even if true, was for the

19   purpose of benefitting her, I mean, really, she did all

20   this so that somebody else can drive in a Ferrari?

21   Really?

22          Anyway, they're not alleging that she did this

23   for personal gain, and this is as good an indication as

24   there is that what she's not going to do is stiff

25   somebody for the 2 million.

```
 1                        PROCEEDING                       39

 2              THE COURT:  Okay.

 3              MR. LIPMAN:  Okay.  So I already said that she

 4   is a revolutionary.  She believes in the cause.  If she

 5   didn't believe in the cause, if she didn't believe in

 6   these people – thank you.

 7              THE COURT:  The two are not mutually exclusive,

 8   fraud and belief in a cause.

 9              MR. LIPMAN:  Well, Your Honor, that's true,

10   but, again, you have to look at the individual and what

11   is it that they did --

12              THE COURT:  Of course.

13              MR. LIPMAN:  And so --

14              THE COURT:  I agree.

15              MR. LIPMAN:  -- they call each other, so I've

16   talked to a bunch of people --

17              THE COURT:  I think I get enough.

18              MR. LIPMAN:  You get it.  And they call each

19   other – just before I sit down, they call each other

20   brother and sister, okay, and I've talked to a bunch of

21   them, and I mean all I can say is that they're willing

22   to risk everything, and she has not done anything to

23   indicate that she would do, she would jeopardize them

24   at, jeopardize them personally for her own, for her own

25   personal gain.
```

```
 1                        PROCEEDING                    40
 2              THE COURT:  Understood.  Thank you.
 3              MR. LIPMAN:  Thank you, Your Honor.
 4              THE COURT:  All right, I will hear from the
 5    Government.
 6              MS. MURRAY:  Thank you, Your Honor.  Just one
 7    brief point that Mr. Lipman just raised.  With respect
 8    to the defendant's personal gain, the Government would
 9    note that the defendant's living in a $1.1 million
10    apartment.  The defendant has nearly a million dollars -
11    -
12              THE COURT:  One might consider that poor in the
13    middle of New York, but, you know, nonetheless.
14              MS. MURRAY:  Has nearly a million dollars in
15    cash and her bank accounts, the two that were disclosed,
16    and I'll get to that point.  We have evidence that she
17    was allocated $7 million approximately of what was a
18    cryptocurrency or a purported cryptocurrency at the time
19    of the initial coin offering at a lower valuation.  So
20    that would be worth substantially more now.  And she had
21    over approximately $138,000 of cash in her safe.
22              But I would like to reset with respect today's
23    proceedings.
24              THE COURT:  Okay.
25              MS. MURRAY:  At the very outset, Your Honor
```

PROCEEDING                    41

1
2  asked about the status of the bail proceedings, and no,
3  there have no further discussions between the defense
4  and the Government regarding proposed suretors.  The
5  Government has not received any documentation additional
6  to the documents that the defense submitted in
7  connection with their motion that support the various
8  purported financial situation of the suretors that they
9  proposed even though they were on notice from the
10 Government's submission that we believe the
11 documentation to be incomplete or inadequate to make an
12 accurate determination or assessment.  The Government
13 has not successfully reached the eighth co-signer that
14 the defense had proposed and, therefore, has been unable
15 to interview that person.  So that's where we are today.
16        Now, there are really three questions for the
17 Court today.  First, with respect to the defendant's
18 motion, whether the Court should direct that the
19 defendant has satisfied the conditions of her bond, the
20 conditions that Judge Parker imposed when she was
21 initially presented on March 15, several hours after her
22 arrest.  The answer is clearly no.
23        The second question is whether the Court should
24 modify the conditions of that bond that Judge Parker
25 imposed to remove the co-signers requirement, which is

PROCEEDING                    42

1

2   one of the first modification requests the defense is

3   asking for, or potentially in connection with or an

4   alternative various different modifications, be it

5   posting additional property or cash in support of the

6   bond, adding co-signers, aggregating co-signers.  Again,

7   with respect to modification, the answer is plainly no,

8   the Court should not do that.

9           And, finally, the third question, which was

10  raised in the Government's submission last Friday,

11  whether the defendant should be detained pending trial

12  because there are no conditions or set of conditions

13  that will reasonably assure her presence at future court

14  proceedings.  And, Your Honor, the answer to that is

15  yes.

16          So I'll take each of those points in turn.

17          First, with respect to the proposed co-signers,

18  the defense submitted documentation and names and

19  information about those co-signers to the Court.  That

20  is because they are not approved by the Government.  So

21  under the statute the basis for the Court to approve

22  unapproved co-signers is to evaluate documentation,

23  information about those co-signers, and then determine

24  whether they have a net worth with sufficient

25  unencumbered value to pay the full amount of the bond,

here $5 million.  And I'm not going to go over each of
the individuals, Your Honor, because we laid this out in
great detail in our initial submission.  We went through
each of the seven proposed co-signers that the defense
has presented to the Court here with documentation,
again, setting aside the eighth whom we were not able to
interview.

         For each of those seven, based on the documents
that the defense is providing to Your Honor for your
consideration of whether those individuals meet the
standard of the statute, first of all, Your Honor, none
of them has appropriate moral suasion over the
defendant.  And, again, we laid this out but I would
like to make that point a bit more finely because it's
extremely important where here the defense is saying
that these individuals exercise moral suasion.

         And, Your Honor, is correct, it's not a
question of whether the proposed co-signers believe that
they have influence or moral suasion over the defendant.
It's a question of how the defendant feels, and while we
can't put ourself in our head or in her heart, what we
can do is we can look at the evidence that's in front of
us.

         These seven proposed co-signers for Your

1                        PROCEEDING                    44

2    Honor's consideration, some of them have never met Ms.

3    Wang, never spoken with her.  A handful of them have met

4    her at events, generally speaking.  Most do not know

5    where she works.  Most do not know where she lives.

6    They don't talk to her frequently.  They don't appear to

7    have a personal relationship.

8            Interestingly, and I'll get to this point, one

9    of the individuals actually believes that Ms. Wang works

10   at Gettir, which is one of the alleged entities involved

11   in the fraud and a potential instrumentality.  And

12   believes that because that individual met Ms. Wang in

13   connection with interviewing for a position at Gettir.

14   I'll talk about why that's relevant.  Another individual

15   believes that she works at a company called HCHK

16   Properties.  Again, one of these shell companies that's

17   used in the course of this billion dollar fraud.

18           And these proposed co-signers whom defense

19   argues exercise moral suasion, they don't know the

20   defendant well enough to even have personal relationship

21   with her, and, therefore, we have no comfort that Ms.

22   Wang would in any way be dissuaded by their signing a

23   bond from fleeing, from leaving them responsible for

24   paying the amount of the bond.

25           THE COURT:  Well, even if they don't have what

```
 1                         PROCEEDING                    45
 2  we think of as a traditional personal relationship or
 3  family relationship or a deep friend relationship, why
 4  can't they be bonded over a cause?
 5              MS. MURRAY:  They could be bonded over a cause,
 6  Your Honor.  In this particular situation, and this is
 7  why the Government's argument about these individuals
 8  being potential victims of the fraud or apparent victims
 9  of the fraud is important, this fraud has been largely
10  perpetuated targeting that community.  It is a fraud
11  that has focused on preying on and mobilizing people who
12  support Mr. Kwok's and Ms. Wang's and Mr. Je's movement
13  against the CCP.  Those are the exact individuals who
14  have been identified and targeted to send hundreds of
15  millions dollars, over a billion dollars, of money to
16  line Mr. Kwok's pockets, Mr. Je's pockets, their
17  families, to reinvest in the companies that are the
18  instrumentalities of the fraud, companies that Ms. Wang
19  manages and works for, some on paper and some functional
20  control.
21              So there's no comfort that the Government can
22  derive from the argument that because an individual is a
23  member of the allegedly community that Ms. Wang has
24  supporters, that that will influence Ms. Wang to not
25  flee.
```

1                           PROCEEDING                        46

2              And, Your Honor, I just note, moral suasion

3    factors vary, but some of the considerations include the

4    strength of ties between the defendant and the proposed

5    suretor.  Again, here, with respect to all of the

6    proposed suretors in front of this Court which the

7    defendant provided to Your Honor, that factor doesn't

8    exist.

9              Also, the defendant's roots in the community,

10   we understand from defense counsel that Ms. Wang

11   essentially works and then works within this community,

12   but I would just note during the second attempt at this

13   bail hearing for Ms. Wang Judge Netburn did note that

14   Ms. Wang has lived in the country for seven years and is

15   representing that she knows no one, no one who could

16   potentially come forward as a co-signer who either isn't

17   a potential victim within this community or a potential

18   subject or co-conspirator of the fraud.

19             And then also the regularity of contact.  And

20   here, again, we don't have regular contact between these

21   proposed suretors and Ms. Wang.

22             Now, turning to the second factor in evaluating

23   the proposed suretors that are before the Court is

24   financial responsibility.  And, again, here, I don't

25   want to belabor the point because we have gone through

```
 1                          PROCEEDING                    47
 2  each of the proposed suretors, but these individuals do
 3  not have sufficient assets of an unencumbered value to
 4  support the full amount of the bond.  That is the
 5  statutory framework that we're working within at this
 6  point where conditions have been imposed, where the
 7  Government has unapproved suretors, and the defense has
 8  now moved to bring them before the Court --
 9          THE COURT:  Well, why I am hearing at least
10  from the defense that with an entire package and the
11  supposed three FRP's who are here, suretors, that they
12  do have $5 million.  Let me just verify something,
13  counsel for the defense, are you saying that that is
14  unencumbered, 5 million?
15          MR. LIPMAN:  Yeah, we have three people who
16  have unencumbered - well --
17          THE COURT:  Net unencumbered.
18          MR. LIPMAN:  Thank you.  Yes, net I think adds
19  up to - let's put it this way, together with the million
20  dollars that she has definitely, I know that one is $3
21  million.  I'm sorry, I'm spacing on one of them, but I'm
22  pretty sure that those three cover $5 million.  But that
23  they do including the --
24          THE COURT:  Right, she's got the million, she's
25  also got the 400, she's got the 138.  So we're good for
```

1                        PROCEEDING                    48

2   1.5 about.

3              MR. LIPMAN:  Right.

4              MS. MURRAY:  So a few responses to that, Your

5   Honor.

6              THE COURT:  Yeah.

7              MS. MURRAY:  First, this is the first kind of

8   question that I had mentioned that's before the Court

9   which is simply whether the Court should direct that she

10  has satisfied the conditions of her bond, the conditions

11  that were imposed.  And those are the conditions of two

12  co-signers.  And what defense has brought before Your

13  Honor in this motion are seven or eight specific names

14  with specific documentation they are purporting

15  justifies the Court directing that two of those co-

16  signers be approved.

17             Now, it's not clear which two the defense is

18  asking Your Honor to approve --

19             THE COURT:  No, but she has, look, there are

20  three here today that he's specifically proposing.  I

21  don't know who they are at the moment, but I think he

22  has one specifically in mind is my point, and one might

23  also take, might be offering to say, well, geez, we want

24  to but, you know what, the Government should pick the

25  ones they think are best.  Just saying there are ways to

1                              PROCEEDING                      49

2    deal with that.  But I understand.

3              MS. MURRAY:  Sure.  Yeah, and I understand,

4    Your Honor.  So then I guess I'll move to the second

5    question which is whether the Court should modify the

6    conditions of the defendant's bond, either to remove the

7    co-signer to alter in and adjust the bond so that

8    there's more cash or property securing the bond.  As I

9    said, the answer is plainly no to that as well.

10             And I just want to make a few points about the

11   representations that counsel has made --

12             THE COURT:  Before you do, let's assume for the

13   moment there are no financially responsible people in

14   your view because they don't know her personally except

15   for having maybe met her a couple of times, they're not

16   family, and the only thing they have in common is this

17   cause.  If I am to assess whether that particular

18   condition is necessary to reasonably assure the presence

19   of the defendant at future proceedings as opposed to

20   some other combination of provisions, putting aside, of

21   course, all the provisions that are already in place,

22   the home detention, electronic monitoring, etc., why

23   can't I then or why shouldn't I then consider other

24   things that are being offered insufficient to take that

25   place?  Why does it have to be two financially

PROCEEDING                    50

1

2    responsible people as opposed to, you know, another

3    combination of what's being offered?

4         MS. MURRAY:  Your Honor can consider modifying

5    the conditions of the bond certainly if you determine

6    that there is a set of conditions that would reasonably

7    assure the defendant's appearance at future court

8    proceedings.

9         THE COURT:  And to be clear, I'm not saying

10   what I have in mind is anything less than what Judge

11   Parker would think, and I'm not pretending to put myself

12   in her shoes.  But I could imagine that given that the

13   Government and the defendant came to essentially an

14   agreement on most of the terms of a package, that Judge

15   Parker no doubt was assuming at the point that there

16   would be two financially responsible people.  And if she

17   was presented with an argument that said, well, the

18   Government's willing to agree to this, but we don't have

19   anybody we're going to approve, she might take a

20   different tact.  She might not, she might say, you know

21   what, it's the Government's prerogative, the Government

22   offered this package, they can't satisfy it, t's not

23   going to do it, then I'm going to detain.

24        So I'm not saying it should necessarily come

25   out differently, but I think it's a little too pat in

1
2   some respects – well, again, why that condition as

3   opposed to what else is being offered?

4          MS. MURRAY:  Well, there are actually multiple

5   conditions, and, Your Honor, the reason is that when the

6   Government discussed a proposed bail package on consent

7   with defense, it was hours after the defendant was

8   arrested on March 15.  The Government had not had the

9   opportunity to go through the evidence that was then

10  being collected from the defendant's apartment in

11  connection with the FBI's premises search.  And,

12  frankly, the Government was not yet aware that the

13  defendant was going to lie to this Court, to Pretrial

14  Services --

15         THE COURT:  I don't understand what the lies

16  are.  I have to say I didn't, you know, in your letter

17  you accuse the defendant of dissembling on this.  The

18  only one that grabbed me as a possible dissembling would

19  be the cryptocurrency.  But it's certainly plausible

20  that you could have a cryptocurrency that was allocated

21  in 2016 I think the date was and, you know, it may have

22  never materialized into anything.  It certainly

23  suggests, you know, where did that go, can't someone

24  tell us, but right now she's saying she has no control

25  over access to it because she doesn't even know where it

1                              PROCEEDING                         52

2   is or what it is.

3             MS. MURRAY:  So a few points there, Your Honor.

4   First, the defendant during her Pretrial Services

5   interview indicated she's been unemployed since

6   September of 2022.  Now, documents that the Government

7   reviewed late last week that had been seized from her

8   apartment and additional evidence that the Government

9   has, and, as you know, we can proceed by proffer in

10  detention hearings --

11            THE COURT:  Yes.

12            MS. MURRAY:  This is not a mini trial.  But the

13  Government's evidence is that the defendant was, in

14  fact, continuing to work in connection with her named

15  position with family offices of Mr. Kwok's family money

16  and also with some of the other entities that I

17  mentioned that are instrumentalities of the fraud up

18  until effectively the date that she was arrested.  We

19  have seen documents that lay out the financial position

20  of various of the different entities that are associated

21  with the fraud.  Those include Gettir which is, as I

22  mentioned, one of the proposed suretors believes Ms.

23  Wang formally works for.  They include HCHK Property

24  which another of the suretors believes Ms. Wang formally

25  works for, and the Government's evidence shows Ms. Wang,

1                           PROCEEDING                           53

2    in fact, is the 99.999 percent shareholder of HCHK

3    through her BBI entity.

4            They include G Clubs which is one of the arms

5    of the fraud that is outlined and alleged in the

6    Government's indictment.  They include the Rule of Law

7    Society and the Rule of Law Foundation which are

8    charities, purported charities that Mr. Kwok and others

9    founded in 2018 that laid the groundwork and the basis

10   for collecting all these monies through the different

11   arms of the fraud.

12           And, Your Honor, these are printouts of

13   balances of accounts, accounts raised through present

14   which, as reflected in the documents, was variously

15   February 2023 or March 13 of 2023, two days before the

16   defendant was arrested.

17           THE COURT:  But those are corporate funds,

18   right, but you're using it for the point about

19   employment.

20           MS. MURRAY:  I'm using it for the point about

21   employment, Your Honor, and also effective control.  Mr.

22   Lipman indicated he doesn't know what the Government

23   means when it uses the general phrase chief of staff.

24   What the Government is alleging by so characterizing Ms.

25   Wang is that she manages and controls these various

1

2  entities.   Now, like Mr. Kwok, she doesn't have her name

3  on each of the different companies that she is involved

4  with, but the Government has no question in light of the

5  evidence both found in Ms. Wang's apartment, the fact

6  that people associate Ms. Wang formally with these

7  companies because they interviewed with her for jobs at

8  some of these companies or they had contracts with her

9  in connection with their work with some of the

10  companies.

11          Ms. Wang runs the show with respect to these

12  instrumentalities.  She has done so up until the day of

13  her arrest contrary to what she told Pretrial Services.

14  And the Government would allege that part of the reason

15  that she lied to Pretrial Services was to disclaim

16  association with the various different instrumentalities

17  of the fraud.  To say that she took herself out of the

18  fraudulent entities, notably, Your Honor, right around

19  the time that the Government started to seize $630

20  million in fraud proceeds.

21          So in the Government's view, at the time of the

22  initial presentment and bail argument, we were not aware

23  that we were going to find concrete evidence in the

24  defendant's apartment that, in our view, proves what the

25  Government already alleged and believed to be true from

1

2    its investigation which is Ms. Wang has continued

3    working for these companies up until the time of her

4    arrest.  So that is one point, Your Honor.  It's a

5    change in circumstances.  The Government has a change in

6    circumstances from where it was at the time of the

7    initial presentment.

8              Now, with respect to accounts, the allocation

9    of H coin or one of the purported cryptocurrencies that

10   is traded on the Himalaya exchange, again, another arm

11   of the fraud, the allocation document was found in Ms.

12   Wang's apartment with various other documents that seem

13   to support the fraud.  Your Honor is correct, defense is

14   correct, there's no way for the Government to prove that

15   Ms. Wang holds that money, and, in fact, the

16   Government's allegation is that it's not cryptocurrency,

17   but we're not alleging it's valueless.  We're alleging

18   that certain people have it and the people who are

19   quickest to redeem can basically have an exit scam and

20   get out with their money.

21             I would note while, again, we don't have access

22   to an account that Ms. Wang has where the money is held,

23   Your Honor correctly identified approximately $7 million

24   worth of a cryptocurrency asset would be something you

25   would want to keep track of.  The allocation indicates

PROCEEDING                              56

1

2    Yanping Wang, and then it has the allocation, it's in

3    her name.

4         I would note that some of the other individuals

5    or entities who are allocated HCN in the document that

6    the Government has include Ms. Wang's co-conspirator,

7    William Je.  It says Sue Ming Je and family, that's one

8    of his family members.  It includes Mr. Kwok's son, it

9    includes friends of Mr. Kwok's son, all named by their

10   names.  Ms. Wang is also named by her name.  Allocated 7

11   million.

12        Now, I don't know if she forgot or she just

13   didn't think it was relevant to disclose to Pretrial

14   Services, but this is a newly discovered fact the

15   Government found in the course of reviewing evidence

16   that was taken from Ms. Wang's apartment that gives us

17   serious pause, and it's something that's different from

18   when the Government first agreed to the conditions of

19   the proposed bond with defense counsel.

20        Another point I would like to note, with

21   respect to the accounts to which the defendant has

22   access, I understand that the way that the condition is

23   worded it could be read narrowly or broadly.  In the

24   Government's view it certainly imposes an obligation on

25   the defendant to be forthcoming.  And the condition

1                        PROCEEDING                    57

2  included the requirement that the defendant disclose

3  assets or accounts that she controls in her name or that

4  are in companies that she controls or is affiliated with

5  and, broadly speaking, cryptocurrency and other real

6  property.

7           The Government has found evidence, again, dated

8  as recently as a few days before the defendant's arrest

9  from her apartment, as I said, that show bank account

10 information, account information, Ms. Wang signing off

11 on payroll for some of the instrumentalities that she

12 doesn't control, but that the Government certainly

13 alleges that she manages and works for in her role as

14 Mr. Kwok's chief of staff.  So to the Government that

15 indicates effective control over those finances.

16          Even setting that aside though, Your Honor, Mr.

17 Lipman mentioned that there were credit cards and other

18 items in the safe.  The Government had indicated that

19 there was cash in one of the pouches, another pouch with

20 certain items that appeared to be and are ready to take

21 at the ready.

22          THE COURT:  You mentioned a safe.  Was there a

23 safe?

24          MS. MURRAY:  There was a safe.  Yes.  So the

25 bag with the cash and another bag that had credit cards

1                        PROCEEDING                    58

2   and other items, including the passports, those were all

3   concealed in a safe in defendant's apartment.

4            The credit cards notable that were taken from

5   one of those pouches in the safe, looking at the front

6   cover of those credit cards which were photographed and

7   we provided to defense counsel last week, there are

8   numerous cards that indicate accounts that are not yet

9   expired in the defendant's name that the defendant did

10  not disclose to the Government or to Pretrial Services.

11  And at this point, we have no way of determining what

12  assets are in those accounts, how the defendant

13  continues to control those accounts, but it's, again,

14  another layer, Your Honor, where we cannot derive

15  comfort that the defendant is being truthful with

16  Pretrial Services, with the U.S. Attorney's Office, or

17  with the Court.

18           And at a very high level, to talk through those

19  accounts, there is a Citibank account for one of the

20  Kwok family entities that the defendant controlled that

21  was active through last month when she was arrested.  So

22  it was active at the time.  There were two personal Bank

23  of America debit cards, different account numbers, both

24  in the defendant's name, in her name, personal accounts.

25  One which expired last month but, again, active when she

PROCEEDING                                  59

1     was arrested.  The next which expires next year.  There

2     is a Citibank personal account in the defendant's own

3     name which doesn't expire for another year.  There's a

4     DBS Treasures account at a Singapore Bank, and the

5     Government explicitly asked about foreign accounts as

6     well.  That card doesn't expire until January of 2025,

7     again, in the defendant's name.  And, finally, a China

8     Bank of Communications account, it's a Chinese bank.

9     That account, the card indicates it expires September of

10    2023, also in the defendant's name.

11              It's another example, Your Honor, of

12    indications to the Government that the defendant has

13    access to accounts, assets, funds that she could use in

14    order to flee.  And if they are funds that we needed to

15    rely on the defendant to disclose to satisfy another

16    condition of the bond that was imposed.  Separate and

17    apart from the question of co-signer, she was obligated

18    under the conditions imposed to disclose her assets, her

19    accounts, her cryptocurrency, her property to the

20    Government and to Pretrial Services.

21              She represented through counsel that she had

22    done that simply by disclosing two personal accounts,

23    one at Morgan Stanley Bank, one at TD Bank, and then

24    this account that was associated with one of the

1                          PROCEEDING                    60

2   companies.  She did not disclose in the Government's

3   view by any stretch the corpus of money that she has

4   access to.

5              These are examples of new circumstances that

6   gives the Government grave concerns.  Grave concerns

7   about the defendant's incentives to flee, about her

8   ability to flee, about the fact that we cannot trust

9   representations that the defendant is making.  And, Your

10  Honor, in those situations where we have so many red

11  flags and so many concerns that the Government would not

12  necessarily have identified if we hadn't found this new

13  information.  We simply do not have any assurances that

14  there are any conditions or set of conditions that will

15  assure the defendant's appearance at future court

16  appearances.

17             So that goes to the third prong, Your Honor.

18  It's the fact that the Government is now coming to the

19  Court saying we agreed on these proposed bail conditions

20  at the time of her arrest based on what we knew then.

21  The world has changed since then, and it has only gotten

22  more concerning for the Government which already had a

23  significant concern about the defendant's risk of flight

24  but believed that there may be certain conditions that

25  could assure her appearance.  We no longer feel that

1                        PROCEEDING                        61

2    way.  We do not believe there are conditions or a set of

3    conditions that can reasonably assure her appearance.

4             THE COURT:  One clarification.  In regards to -

5    you referred to, I think you referred to, I don't know

6    if you were referring to the allegations of the

7    indictment or something else, but you referred to Mr.

8    Kwok and Mr. Je as being the ones who were sort of

9    lining their pocket and getting rich.  Are you in

10   agreement with defense counsel that the indictment

11   doesn't make allegations that the defendant here herself

12   was lining her pockets so to speak?

13            MS. MURRAY:  I guess to answer Your Honor's

14   question, the indictment does make allegations that the

15   defendant herself was personally responsible for a

16   hundred million dollar misappropriation of fraud

17   proceeds --

18            THE COURT:  I understand.

19            MS. MURRAY:  But that's to the point of

20   misappropriation.  Now, with respect to the indictment

21   which is a charging document that contains some

22   allegations, we haven't specifically outlined personal

23   money that the defendant herself misappropriated, but,

24   again, we don't believe that that is in any way germane

25   to her risk of flight and her access to money here and

2  to a network.

3           And another point that I would like to note is

4  with respect to travel documents and passports.  Mr.

5  Lipman said that the defendant had been seeking

6  permission to travel at the end of last year or

7  beginning of this year, and she was going to go I

8  believe to the U.K.  Travel internationally.

9           The Government recovered a Vanuatu passport and

10  a Hong Kong passport from her safe.  The Vanuatu

11  passport was expired, and we did see evidence which we

12  disclosed that that passport had been kind of not

13  revoked but that the defendant had removed her request

14  from the passport.  But she has the ability to obtain

15  travel documents as does her co-defendant Miles Kwok who

16  allegedly has had 11 passports at various points.

17           THE COURT:  Well, she's not Miles Kwok.

18           MS. MURRAY:  I understand --

19           THE COURT:  I understand she could be part of a

20  network where things like that can be made available is

21  what you're suggesting I think.

22           MS. MURRAY:  That's exactly right, Your Honor,

23  it's exactly right that she can both be part of the

24  network where things can be made available and she is

25  the one who is tasked with holding onto those travel

PROCEEDING                           63

 1
 2   documents both for herself and Mr. Kwok.  She is a
 3   trusted person who is entrusted with the responsibility
 4   of having those travel documents --
 5              THE COURT:  What do you make of the defense's
 6   points that the defendant certainly would've been aware
 7   in September or October of 2022 about the seizure of
 8   phones and that something was afoot and then there was
 9   the dealings with the SEC, together with the fact that,
10   again, as defense has represented, that she applied for
11   a furlough to be able to travel despite her asylum aps.
12   Aren't those, if true, sort of indicative of someone
13   who's not going to run?
14              MS. MURRAY:  Not necessarily, Your Honor, and I
15   would also note that while, you know, there may be a
16   question of whether those are at odds, and I'm happy to
17   address that in a moment, I would also note that the
18   defendant's willingness and, in fact, desire to travel
19   to the U.K. even though she has these serious concerns,
20   the CCP's persecution of repatriation, indicates that
21   those concerns are not so grave that she's not willing
22   to travel internationally.
23              But I don't know the circumstances of the
24   defendant's requested furlough.  I don't know what the
25   purpose was of her going on that trip.  I will say that

PROCEEDING                    64

1

2  there's no reason - if we're speaking in hypotheticals

3  in this instance, there's similarly no reason to believe

4  that she didn't request furlough to go to the United

5  Kingdom without any intention of returning after she was

6  aware the funds had been seized.  And, again, I'm

7  speaking in hypotheticals only because we were asked a

8  question by the Court, but I think you can draw various

9  different conclusions from these facts.  And at bottom,

10 her seeking to travel to the U.K., her willingness to

11 travel internationally, doesn't cut against the fact

12 that she poses a significant risk of flight.

13         And I'd also note, it's a risk of flight non-

14 appearance at future court appearances.  We don't need

15 to establish that she's going to go to a foreign

16 jurisdiction --

17         THE COURT:  No.

18         MS. MURRAY:  She could flee from the city, she

19 could flee from the several block radius.  She could cut

20 her bracelet.  And it could be that her vast network of

21 supporters enable and harbor her.  We don't know the

22 circumstances, but the bottom fundamental point is the

23 defendant poses a significant risk of flight.  The

24 Government sees no condition or set of conditions in

25 light of the strength of the evidence, the seriousness

1
2  of the charges here, the defendant's personal

3  circumstances, her access to substantial assets, foreign

4  connections including her co-defendant William Je who is

5  alleged to be in the UAE as a fugitive of where he has

6  charges, her network of supporters, and the new

7  information that we have found in the last two weeks,

8  indicating that the defendant has not been forthcoming

9  with the Court, Pretrial, or the Government.  We simply

10 don't believe there are any conditions that can ensure

11 her appearance at future court proceedings.

12          THE COURT:  All right.  I assume you want to

13 respond some.

14          MR. LIPMAN:  Oh, yes, Your Honor.  Thank you.

15          THE COURT:  Just let me say to my 3:30, sorry,

16 that we're going to be running late.  Just sit tight,

17 and we'll eventually get there.  Go ahead.

18          MR. LIPMAN:  I'll do this as quickly as I can,

19 Your Honor.  So I want to start with the following.

20 Everything I said about what they misrepresented in

21 their conversations with the Court and submissions

22 apparently is true because none of it did they take

23 issue with.  So all of that stuff about finding, you

24 know, a phone between mattresses, phones secreted in

25 whatever it that they were, a document hiding in between

1                          PROCEEDING                    66

2    the cushions, none of that apparently happened.  It is,

3    it was represented to the Court.

4            So now we get to the point of trust.  They said

5    trust.  You can't trust this defendant.  Really?  But

6    you can trust this Government?  Let's just see, let's

7    just parse through what Ms. Murray just said.  She said

8    that she found photographs of cards, some of those

9    showed that the card is not yet expired.  How do we go

10   from there to, oh, and there's an account that goes with

11   it?  What evidence does she have?  None.  None

12   whatsoever.

13           What she knows – by the way, Your Honor, I have

14   never, the words Great Britain never left my mouth.

15   Okay?  That means that they knew that she was about to

16   travel.  Why didn't they arrest her?  If they thought

17   that she was going to get out of Dodge and they were

18   concerned that she was a flight risk, well, when they

19   found out that she applied, well, arrest her.  What,

20   they didn't have a border watching her?  Really?

21   Because the Department of Justice has changed that much

22   since I was there?  I don't think so.

23           So now let's get to her employment.  Once

24   again, what was the question that was asked?  Are you

25   currently employed?  No.  No.  If the question were

PROCEEDING                         67

1  asked are you still a member of a revolutionary movement

2  that does whatever it is that they try to do to get rid

3  of the communist party of China, the answer to that is

4  yes.

5  

6          THE COURT:  Well, wasn't she working for one or

7  more of the companies?

8          MR. LIPMAN:  She was working for the family

9  office.

10          THE COURT:  Yeah.

11          MR. LIPMAN:  There's no dispute that she had

12  input into various things that happened.  I'm not taking

13  issue with what they say that she interviewed people for

14  whatever it is and this and that.  The Government knows,

15  yeah, the Government knows that she was the 99.999

16  percent owner of this entity that owns these three other

17  companies.  None of that is a secret.  Okay?

18          THE COURT:  But was she --

19          MR. LIPMAN:  But was she --

20          THE COURT:  Was she employed?

21          MR. LIPMAN:  No, she got, she was not getting,

22  drawing a salary anymore.  She was not employed.  She

23  worked, she continued to do certain kind of work, but

24  she did not get paid.  She was volunteering.  And the

25  reason she's volunteering, Your Honor, this goes back to

1                                    PROCEEDING                                68

2    what we talked about before.  The reason she is

3    volunteering is because this is a political movement

4    that she --

5              THE COURT:  What was she doing for a source of

6    funds then?

7              MR. LIPMAN:  Well, she's still, she has --

8              THE COURT:  I understand she has accounts.

9              MR. LIPMAN:  And, by the way, Your Honor, the

10   house that she bought, her apartment, she bought before

11   any of these fraud allegations --

12             THE COURT:  Yeah, I understand.

13             MR. LIPMAN:  And, Your Honor, look, I'm sorry,

14   but the few things that the Government says, they say

15   change in circumstances.  What's the change in

16   circumstances again?  That she's volunteering whereas

17   she used to – of course.  So what?  So what?  The day

18   before her arrest, did she know she was about to get

19   arrested?  Because if she did know that she was about to

20   get arrested and she didn't get out of Dodge, then she's

21   not a flight risk.  So she was going about her normal

22   life.  What is so, what's the new – what is new about

23   that?  Absolutely nothing.

24             Now, and then what is they say – she lied to

25   disclaim that she had nothing to do with any of these

PROCEEDING                                  69

1
2   companies?  When?  To whom?  And I had a specific
3   conversation with the Government when they say, well,
4   Ms. Murray says, she says that, broadly speaking, the
5   question could be that broadly construed or narrowly
6   construed.  Well, first of all, nobody's taken my
7   client's Fifth Amendment (indiscernible), not that I
8   have heard, and when she was asked the question, she
9   gave an answer, the answer was truthful.  If they wanted
10  to know more, they should've asked.  And I specifically
11  had a conversation with the Government, and I said
12  excluding anything that she may have control over by
13  virtue of corporate ownership or whatever, these are the
14  accounts.

15          She's not a flight risk, Your Honor.  There's a
16  question that I keep asking myself is this.  Why?  Why
17  is the Government misrepresenting evidence?  Why is the
18  Government stretching stuff, stretching stuff?  Even if
19  they believe that, you know, there's more to this.  Even
20  — I'm sorry, I'm sorry, I'm reminded that on her
21  employment question, we actually invoked, she invoked
22  her Fifth Amendment right.  Okay?  Thank you.

23          Even — I lost my train of thought.  I
24  apologize.  I think I was responding to this idea that
25  she controls stuff.  There's no — we never hid that.

1                          PROCEEDING                        70

2   The only question is is she a flight risk?  What is it

3   about her that makes you think that she's not going to

4   show up?  She will show up, Your Honor.  She's got

5   nowhere to go.  Nowhere.  And the Government keeps –

6   this is where I was, thank you.

7              Why are they stretching it?  Why?  What is the

8   reason?  I mean, really, does she look dangerous?  What

9   is it --

10             THE COURT:  They're not moving on

11  dangerousness.

12             MR. LIPMAN:  I'm sorry, no --

13             THE COURT:  They're not moving on danger.

14             MR. LIPMAN:  There is a reason why they're

15  doing it.  They want her to cook.  They want her to get

16  a flavor of the MDC because she was the chief of staff,

17  Your Honor, and that is not okay.  That is immoral.  And

18  when the Government obtains that result by, among other

19  things, misrepresenting, saying that she's a flight risk

20  on the basis of things that they cannot support, that

21  contradict the evidence that's collected, that is – is

22  anybody other than me think that it's a little bit

23  peculiar or ironic that the Government is alleging that

24  she violated certain antifraud provisions that make it

25  unlawful to make a statement that in light of all

1                           PROCEEDING                       71

2   circumstances is materially misleading and yet this is

3   what the Government is doing?  Why?

4            Your Honor, this woman needs to be released.

5   She's not a flight risk.  She's not going anywhere.

6   She's going to have an ankle bracelet, she'll have GPS

7   monitoring.  We can have all of her money tied up so

8   that she can't breathe without Pretrial or somebody

9   giving her approval.

10           And one last thing, if she's not released, her

11  defense is going to be severely prejudiced.

12           THE COURT:  It's true for anybody who doesn't

13  get released.

14           MR. LIPMAN:  Except, except when that person

15  also has Mandarin as her first language, when the

16  Government asks for a disk to put 2 terabytes of data on

17  it.  This is not a case that's going to be resolved

18  quickly, and it is a case in which it's going to be very

19  important to have your client's assistance.

20           THE COURT:  Okay, thank you.  Ms. Murray, do

21  you want to have the last word here?

22           MS. MURRAY:  Yes, Your Honor, briefly.  I want

23  to start by saying there is nothing that the Government

24  has misrepresented to the Court.  The Government has not

25  reached on facts.  The Government has provided evidence

1                        PROCEEDING                    72

2   substantiated information that it has presented to this

3   Court and to the defense.  With respect to the credit

4   cards Mr. Lipman mentioned, it's not a photo of the

5   cards.  It's a photo of the cards that we have before

6   the Court and the defense today.  They were the physical

7   cards.  But we resent the claim that we are in any way

8   acting other than --

9            THE COURT:  I know --

10           MS. MURRAY:  --fully forthcoming and in good

11  faith.

12           THE COURT:  -- I have no doubt you're operating

13  in good faith.  But he did point out some things that

14  were discrepancies it seemed between what was

15  represented in terms of where certain pieces of evidence

16  were found in her apartment versus what was inventoried

17  and how it was inventoried.  Can you speak to that?

18           MS. MURRAY:  Sure, Your Honor.  There aren't

19  discrepancies.  What Mr. Lipman has done is he's pointed

20  to an evidence log that has a column where there are

21  certain notations made when the FBI is collecting

22  evidence that indicates where the item was recovered.

23  Typically, it indicates the room by letter based on the

24  map that Mr. Lipman provided to the Court and a brief

25  description.  It does not indicate in a detailed

1                        PROCEEDING                        73

2  narrative where each and every item that is taken as

3  evidence was recovered from, what condition it was in,

4  how it was found.

5         So with respect the laptop between clothes,

6  that is consistent with the Government's representations

7  to Judge Parker at the initial presentment that the

8  laptop was found between sweaters in the closet.  It

9  doesn't say specifically what items of clothing --

10         THE COURT:  No.

11         MS. MURRAY:  -- or where, but it's consistent.

12  With respect to the iPhones that the Government had

13  indicated had been in boxes, yes, in a bag in the

14  closet, and you can see those are the items that Mr.

15  Lipman pointed Your Honor to in the 50's on the evidence

16  log.  And you'll note that nearly each of them has the

17  same PIN code or passcode.  So those are items that at

18  first the FBI thought might not have any content, and

19  then the FBI had technicians on site during the search

20  warrant, they plugged them in, and they determined they

21  had content.  There are no misrepresentations.

22         Mr. Lipman is now, again, Your Honor,

23  essentially trying to hold a trial on the merits of the

24  Government's case here at a point of a detention hearing

25  by, first of all, requesting information from the

1                              PROCEEDING                    74

2    Government which we happily provided and would have so

3    provided in the course of discovery in this case as

4    well, and then trying to hold it against the Government

5    by claiming that because there isn't a photo of each

6    stage of every step of the process that evidence was

7    collected, then the Government can't be trusted.  It is

8    simply not true, and it's disrespectful, Your Honor.

9            With respect to a couple of other points, I

10   would just like to note the defendant lied.  She lied

11   about the cash in her apartment.  I have now heard the

12   defense during the course of this argument split hairs

13   on several topics, and that is another example of what

14   gives the Government pause.

15           THE COURT:  Well, how do we know – it is

16   important what was asked.  Do you have any money on you?

17   Do you have any money in your apartment?  There's a

18   difference.

19           MS. MURRAY:  I understand, Your Honor, and the

20   Government obviously is not privy --

21           THE COURT:  And particularly for someone of a

22   different language and culture, it might be all the more

23   important that there's nuance to what's asked.  I don't

24   know what was asked.

25           MS. MURRAY:  Sure, and nor do we because the

1                            PROCEEDING                      75

2  Government is not part of Pretrial Services interview

3  with the defendant.  She was assisted by a Mandarin

4  speaking interpreter during that interview.  The

5  Government is also aware from its investigation that Ms.

6  Wang is quite fluent in English.  We know that from

7  various different pieces of evidence we've collected,

8  including statements that she's made and her voice

9  during conversations.  She doesn't appear to have an

10 issue understanding.

11         But with respect to the questions that were

12 asked, again, I don't know, I was not there.  The

13 defendant is very much so splitting hairs on several

14 topics.  I will note that the Pretrial Services report

15 indicates that the defendant was asked about assets,

16 assets, not specific accounts that she is the sole

17 signatory on, not specific accounts that are active that

18 she has control over and log-in information to.  We're

19 not splitting hairs.  Pretrial Services asked about

20 assets, and she did not disclose $138,000 worth of cash

21 that was sitting in a safe in her apartment.

22         With respect to her employment, the defense

23 just indicated that she had invoked – the Pretrial

24 Services report with respect to employment history

25 indicates that the defendant advised she has been

1                          PROCEEDING                    76

2   unemployed since September 2022.  Now, with respect to

3   the source of additional money that she has since then

4   or that she is living on, the defendant declined to

5   answer, and that is her right.  But she did provide this

6   statement in response to Pretrial Services report, she's

7   been unemployed since September of 2022.

8           Now, Mr. Lipman says that the defendant has

9   been volunteering in various organizations that she

10  previously might have worked in a more formal employment

11  capacity.  I just want to go back briefly to the

12  personal gain point that Your Honor has asked about.

13  Yes, I understand $1.1 million might not be an expensive

14  apartment in Manhattan, but it's a $1.1 million

15  apartment purchased in cash.  The defendant has nearly

16  another million dollars in her accounts.  The defendant

17  was up until her purported decision to terminate her

18  employment and start volunteering was earning a salary

19  of approximately $250,000 from the Kwok entities that

20  she worked for formally, in a formal capacity.  That is

21  personal gain in the Government's view.

22          It is also inconsistent with now the claims

23  that September 2022, right when the Government started

24  seizing funds, the defendant stopped working in a formal

25  capacity.  She can't be held responsible for any of

PROCEEDING                        77

1

2  these bank accounts that she's signing off on payroll

3  for, that she has access to the funds for.

4        Your Honor, at bottom the defendant is a risk

5  of flight.  There are no conditions that can reasonably

6  assure her appearance.  She has lied.  The Government

7  has not misrepresented itself to the Court.  And we have

8  no comfort that we can believe that she will make

9  accurate representations to the Court, that we will have

10  the ability to monitor her in any meaningful way that

11  would assure her appearance at future court proceedings.

12        THE COURT:  Thank you.  Mr. Lipman, I see you,

13  do you want to respond?  Go ahead.

14        MR. LIPMAN:  Your Honor, answering the question

15  that's posed truthfully is a complete answer.  It's not

16  splitting hairs --

17        THE COURT:  Look, the bottom line is we don't

18  know really what was asked and how it was asked --

19        MR. LIPMAN:  Well, we were there.

20        THE COURT:  Fine, but I'm saying we don't have

21  a record --

22        MR. LIPMAN:  But, Your Honor, there is no

23  record, and there is no proof of these things that the

24  Government says --

25        THE COURT:  I --

```
 1                          PROCEEDING                    78
 2              MR. LIPMAN:  -- which is what --
 3              (interposing)
 4              THE COURT:  I didn't say which way it cuts.
 5              MR. LIPMAN:  No, but, Your Honor, they said we
 6   found a credit card.  Well, that means she didn't
 7   disclose an account.  No, you found a credit card.
 8   Okay?  We found a statement that said that whatever,
 9   that she was allocated some coin.  Yes, that's what you
10   found, that's what you have.  You don't have anything
11   else.  So to tell me that she needs to be detained and
12   she cannot be trusted because they found something that
13   they don't fully understand, I'm sorry, but that's a
14   bridge too far.
15              And, yeah, a bunch of her accounts, by the way,
16   as the Government knows, were closed, and the
17   Government's investigation kind of followed that.  So
18   like the Citi accounts, for example, were closed.  Other
19   accounts at other banks were closed recently, they were
20   closed.  And the other thing, Your Honor, when they say
21   she controls this or she controls that or whatever,
22   okay, she worked somewhere, she no longer works there,
23   she doesn't draw a salary.  What she does with her time
24   is her business.  It's not cutting - it's not lying to
25   anybody, it's not any of that.  Okay?
```

1                          PROCEEDING                    79

2               And the Government essentially conceded – no,

3  not essentially.  The Government conceded the key point

4  that this was not, her participating, according to their

5  indictment, was not for the benefit for her personal

6  monetary gain.  It was for some other reason.  And the

7  apartment was bought before any of the allegations with

8  other money.  She did make money, but she didn't spend

9  it.  I already described to the Court how she lived.

10 And so the key question is why does she do this and, if

11 she did it, did she do it to benefit herself, and if

12 not, then is that sufficient reason to think that she's

13 now going to hurt these people because she did not put

14 any money that came out of their pockets and put it into

15 hers.  There's no reason to believe that having not done

16 that, being around all this money and not putting any of

17 it in your pocket.  For all of these years she didn't do

18 that.

19              So what is going to make her do it now?  And

20 the answer is that this is a revolutionary movement,

21 okay, these people are her brothers and sisters.  They

22 together want to see the CCP overthrown.  And so she's

23 not going to put them in financial jeopardy that she

24 dedicated her life, her life to this cause.

25              THE COURT:  All right.

1                          PROCEEDING                        80

2              MS. MURRAY:  Your Honor, just a final point.  I

3   want to be clear the Government made no concession on

4   that point in any stretch, and a key question is whether

5   she poses a risk of flight, that is the question.

6              THE COURT:  All right, look, one thing that

7   I've been asked to do is to determine if the, or at

8   least order that some of the financial suretors that

9   have been offered are sufficient to meet the

10  requirements and conditions that were issued by Judge

11  Parker, and the defense has indicated here they have

12  three for which they believe that there's sufficient

13  property that can be offered as security along with the

14  enhanced package, if you will, of funds that were

15  offered on behalf of the defendant.

16             I don't have it in front of me information

17  about those three FRP's in terms of the property that's

18  being offered.  That is part of what I need to consider.

19  I realize I am also being asked by the Government for

20  detention anew in light of new material.  But it's

21  incumbent upon me to review whatever material the

22  defendant is going to provide to substantiate it's

23  offered financial suretors.

24             So I want a package of whatever it is that you

25  must or that you think is enough.  If there is

PROCEEDING                          81

1
2  documentation you haven't provided the Government

3  already on others that you can provide, including the

4  so-called eighth or others, provide it.  And part of

5  what I'm going to do is assess that material.  It

6  doesn't mean I'm necessarily going to find obviously

7  that that is sufficient and that the conditions have

8  been met, but it is one of the things I am going to

9  consider in addition to considering whether a different

10  set of conditions should be imposed or whether the

11  defendant should be detained.

12        So she's going to continue to be detained

13  pursuant to Judge Parker's order of all conditions being

14  satisfied before she's released pending the submission

15  of this additional information and my review of it which

16  I will try to do as quickly as possible.

17        Let me ask Mr. Lipman, when can you get that

18  material to me and the Government?

19        MR. LIPMAN:  Your Honor, I will start working

20  on it as soon as I leave this courtroom.  I would ask

21  for 24 hours.

22        THE COURT:  Well, sure.

23        MR. LIPMAN:  Oh yes, yes.  Yes.  That's a good

24  point.  Your Honor has a lot of personal information,

25  rather than redacting it and filing it in various ways -

```
1                        PROCEEDING                    82
2   -
3              THE COURT:  You can file it under seal.
4              MR. LIPMAN:  Okay.  All right.
5              THE COURT:  And you'll provide it to the
6   Government obviously in unredacted form.
7              MR. LIPMAN:  Of course.  You know what, Your
8   Honor, I said 24 hours --
9              THE COURT:  Give yourself more time.
10             MR. LIPMAN:  Yeah.
11             THE COURT:  It's your call sort of because your
12  client is going to remain detained.  So you obviously --
13             MR. LIPMAN:  I understand.  But how about this,
14  we will provide it no later than 48 hours from now, but
15  we will attempt to provide it as soon as humanly
16  possible.
17             THE COURT:  Okay.  All right, I mean it's
18  important I think also if you need a little more time,
19  to be able to put together something stronger that might
20  assure the Government.  Grant it that they're saying
21  there are changed conditions and they want detention.
22  But anything you can do to make stronger the financial
23  suretor application would be helpful to me in being able
24  to review and its significance.  Okay?
25             MR. LIPMAN:  Thank you, Your Honor.
```

```
 1                         PROCEEDING                      83

 2              THE COURT:  All right.  Anything else from the

 3   Government?

 4              MS. MURRAY:  No, Your Honor.  Thank you.

 5              THE COURT:  Anything else from the defense?

 6              MR. LIPMAN:  No, Your Honor, thank you.

 7              THE COURT:  All right, we're adjourned.  Thank

 8   you all.

 9              MS. MURRAY:  Your Honor, sorry.

10              THE COURT:  Oh, one administrative thing

11   actually.  I just want to note for the record that the

12   defense handed up exhibits marked 1, 45, 46, and 26, and

13   finally 27.

14              MS. MURRAY:  Your Honor, just briefly before we

15   adjourned.  To the extent the defense is going to submit

16   something to the Government and to the Court, we would

17   ask for a response date.

18              THE COURT:  Fair.

19              MS. MURRAY:  We can figure out the timing once

20   the defense has actually submitted the materials, and we

21   can coordinate with Your Honor on that if that makes

22   sense.

23              THE COURT:  All right.  Should we set a defined

24   time now?  I think it would be appropriate.

25              MR. LIPMAN:  Yes, please.
```

2              THE COURT:  So I would – I don't know about the

3   weekend.  So you're going to get to me and the

4   Government before the weekend it sounds like.

5              MR. LIPMAN:  Yes, I will get it to you as soon

6   as humanly possible.

7              THE COURT:  All right, well, I'm going to give

8   the Government, I was going to say five days --

9              MR. LIPMAN:  Your Honor.

10             THE COURT:  Too much?

11             MR. LIPMAN:  Five days at the MDC.

12             THE COURT:  Yeah, and the Government has

13   partial information on some of these already.  I'll give

14   the Government three days.  If for any reason something

15   turns out that is particularly complex that requires

16   more, let me know, but I'm giving the Government three

17   days --

18             MR. LIPMAN:  Your Honor, may I just for a

19   second, and I hear that, you know, I don't know why they

20   need three days.  I apologize --

21             THE COURT:  I don't know what's going to be in

22   the package.  Three days.

23             MR. LIPMAN:  Okay.  What I was going to say,

24   Your Honor, is this, what I would like to get to the

25   Court is evidence of real estate that is available.  It

```
 1                      PROCEEDING                    85

 2  is our position that if there's sufficient proof that

 3  the person proposing to cosign actually owns this real

 4  estate and the real estate has the value that they say

 5  it does, that's really all that the Government needs.

 6  In other words, right, because whether they make money

 7  or not --

 8           THE COURT:  I don't know what the Government

 9  needs, but you need to assure the Court --

10           MR. LIPMAN:  I'm sorry?

11           THE COURT:  You need to assure the Court at the

12  very least.  I don't know exactly what that is you will

13  give to me.  Certainly, it'll be important to know who

14  is the owner, whether there are any other ownership

15  interests, what are the liens, what are the mortgages,

16  etc.  So I think you have an idea.

17           It's not going to necessarily take away from

18  whether someone is an alleged victim or has one of the

19  other faults, but at least I want a more complete

20  picture, and it's part of my obligation to make that

21  assessment.  And I don't want to make a sweeping

22  statement at the moment that just because anyone is an

23  alleged victim and is not a family tie in some way, that

24  necessarily makes them inadequate.  But that's why I

25  need to see it individually.
```

1

2          MR. LIPMAN:  Okay.

3          MS. MURRAY:  Your Honor, with respect to the

4   response date, assuming that the defense submits

5   something on Thursday, that would make the Government's

6   response due on Easter Sunday.  We would respectfully

7   ask --

8          THE COURT:  Monday.

9          MS. MURRAY:  -- that we get until Monday.

10  Thank you.

11         THE COURT:  Yes, of course.  Okay, all right,

12  we are adjourned.  Thank you.

13         MS. MURRAY:  Thank you.

14         MR. LIPMAN:  Thank you, Your Honor.

15         (Whereupon the matter is adjourned.)

16

17

18

19

20

21

22

23

24

25

87

## C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, United States of

America versus Wang, Docket #23cr118/23m2007, was

prepared using PC-based transcription software and is a

true and accurate record of the proceedings.


Signature_____

                Carole Ludwig

Date:  April 5, 2023