UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

YANPING WANG,

                    Defendant.

Case No. 23-CR-118-AT

**DEFENDANT YANPING WANG'S MEMORANDUM OF LAW
IN SUPPORT OF HER MOTION FOR AN ORDER REVOKING
THE MAGISTRATE JUDGE'S ORDER OF DETENTION
DATED APRIL 21, 2023, AND AUTHORIZING PRETRIAL RELEASE**

Priya Chaudhry
CHAUDHRYLAW PLLC
147 W. 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 785-5550
Email: priya@chaudhrylaw.com

Alex Lipman
LIPMAN LAW PLLC
147 W. 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 401-0070
Email: alexlipman@lipmanpllc.com

*Attorneys for Defendant Yanping Wang*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................... iii

I.   FACTUAL AND PROCEDURAL BACKGROUND ........................................3

II.  ARGUMENT ...................................................................................................7

     A.   The Government Failed to Show That Ms. Wang Was a Flight Risk ...........10

     B.   The Government Failed to Carry Its Burden to Show That Ms. Wang Was a Flight Risk Under the 18 U.S.C. § 3142(g) Factors .........................................11

          1.   The charges against Ms. Wang do not support detention because the allegations against her are limited in scope and severity ....................11

          2.   Ms. Wang is a dissident – nothing in her background suggests that she would defraud the other members of her dissident movement ..........12

          3.   Ms. Wang did not flee knowing that criminal charges may be coming ............................................................................................................15

          4.   Ms. Wang is not a flight risk because she has nowhere to go and because she is being watched by the Chinese government even in New York ...............................................................................................16

          5.   Ms. Wang has sufficient ties to the United States ...............................19

     C.   Magistrate Judge Lehrburger Wrongly Concluded That Ms. Wang's Financial Means and International Contacts Provide a Sufficient Basis to Deny Bail ..............................................................................................................21

          1.   Courts recognize that the mere fact that a defendant is financially well-off and is a foreign national who can flee to a country that may not grant extradition is not a sufficient basis to deny bail ..................21

          2.   Ms. Wang would not have the financial means to flee .........................23

               a)   Contrary to the government's suggestion and Judge Lehrburger's suspicions, Ms. Wang does not hold any cryptocurrency...........................................................................23

               b)   Contrary to the government's suggestion and Judge Lehrburger's suspicions, Ms. Wang did not lie to PTS about the cash found in the safe in her apartment..............................28

**D.**     **The Government Failed to Meet Its Burden of Proving That No Combination of Conditions Will Assure Defendant's Appearance**........................................**33**

    **1.**     **The court must consider all reasonable, less restrictive alternatives to detention** ................................................................................**34**

    **2.**     **The condition of home detention is the limit of what is permissible to assure Ms. Wang's appearance** ..............................................**35**

**E.**     **Detention Interferes with Ms. Wang's Ability to Participate in Her Own Defense**............................................................................................**38**

**CONCLUSION** ............................................................................................**40**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Barker v. Wingo*,
    407 U.S. 514 (1972) ....................................................................................38

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ....................................................................................36

*Campbell v. McGruder*,
    580 F.2d 521 (1978) ................................................................................36, 37

*Duran v. Elrod*,
    542 F.2d 998 (7th Cir. 1976) ....................................................................36

*Hung v. United States*,
    439 U.S. 1326 (1978) ..................................................................................21

*Moreland v. United States*,
    968 F.2d 655 (8th Cir. 1992) ....................................................................35

*Powell v. Alabama*,
    287 U.S. 45 (1932) ......................................................................................39

*United States v. Berrios-Berrios*,
    791 F.2d 246 (2d Cir. 1986) ..............................................................9, 33, 34

*United States v. Bodmer*,
    No. 03 CR 947 (SAS), 2004 U.S. Dist. LEXIS 959 (S.D.N.Y. Jan. 28, 2004)...........10, 21

*United States v. Boustani,*
    932 F.3d 79 (2d Cir. 2019) ..........................................................................7

*United States v. Briggs*,
    697 F.3d 98 (2d Cir. 2012) ........................................................................35

*United States v. Bruno*,
    89 F. Supp. 3d 425 (E.D.N.Y. 2015) ..........................................................8

*United States v. Choudhry*,
    941 F. Supp. 2d 347 (E.D.N.Y. 2013) ........................................................8

*United States v. Cole*,
    715 F. Supp.  677 (E.D. Pa. 1988)..............................................................9

*United States v. Friedman*,
    837 F.2d 48 (2d Cir. 1988) ........................................................................8, 10

*United States v. Gotti*,
    358 F. Supp. 2d 280 (S.D.N.Y. 2005) ..............................................................8

*United States v. Hanson*,
    613 F. Supp. 2d 85 (D.D.C. 2009).......................................................9, 16, 22

*United States v. Himler*,
    797 F.2d 156 (3d Cir. 1986) .............................................................................9

*United States v. Infelise*,
    934 F.2d 103 (7th Cir. 1991) ..........................................................................35

*United States v. Jackson*,
    823 F.2d 4 (2d Cir. 1987) ...............................................................................38

*United States v. Khashoggi*,
    717 F. Supp. 1048 (S.D.N.Y. 1989) ...............................................................22

*United States v. Leon*,
    766 F.2d 77 (2d Cir. 1985) ..............................................................................8

*United States v. Ling*,
    No. 4:21-mj-00336, 2021 U.S. Dist. LEXIS 101132 (N.D. Tex. May 24, 2021) .......10, 16

*United States v. Molina*,
    No. 11 Cr. 528 (JFK), 2012 WL 3564013 (S.D.N.Y. Aug. 16, 2012) .............................7

*United States v. Motamedi*,
    767 F.2d 1403 (9th Cir. 1985) ..........................................................................7

*United States v. Paulino*,
    335 F. Supp. 3d 600 (S.D.N.Y. 2018) ..............................................................8

*United States v. Sabhnani*,
    493 F.3d 63 (2d Cir. 2007) ....................................................................passim

*United States v. Salerno*,
    481 U.S. 739 (1987) .........................................................................................7

*United States v. Shakur*,
    817 F.2d 189 (2d Cir. 1987) .............................................................................7

*United States v. Speed Joyeros, S.A.*,
    204 F. Supp. 2d 412 (E.D.N.Y. 2002) ........................................................... 35

*United States v. Stein*,
    No. S1 05 Cr. 0888 (LAK), 2005 WL 8157371 (S.D.N.Y. Nov. 14, 2005) ........................ 8

*United States v. Torres*,
    929 F.2d 291 (7th Cir. 1991) ........................................................................... 7

*United States v. Townsend*,
    897 F.2d 989 (9th Cir. 1990) ........................................................................... 7

*United States v. Vitta*,
    653 F. Supp. 320 (E.D.N.Y. 1986) ................................................................ 39

*United States v. White*,
    No. 3:21-mj-04070, 2021 U.S. Dist. LEXIS 100544 (M.D. Tenn. May 27, 2021) ....... 9, 10

*United States v. Wright*,
    No. 2:18-cr-336-DN, 2018 U.S. Dist. LEXIS 121974 (D. Utah July 20, 2018) .............. 11

*United States v. Zarzuela*,
    2019 U.S. Dist. LEXIS 206270 (S.D.N.Y. Nov. 27, 2019) ................................... 9

**STATUTES**

8 C.F.R. § 208.18 ........................................................................................... 20

15 U.S.C. § 78f .............................................................................................. 3

15 U.S.C. § 78j(b) .......................................................................................... 3

17 C.F.R. § 240.10b-5 .................................................................................... 3

18 U.S.C. § 1343 ............................................................................................ 3

18 U.S.C. § 1957 ............................................................................................ 3

18 U.S.C. § 2 .................................................................................................. 3

18 U.S.C. § 3141 ............................................................................................ 6

18 U.S.C. § 3142 ...................................................................................... 34, 36

18 U.S.C. § 3142(e) ...................................................................................... 34

18 U.S.C. § 3142(f)(1) .................................................................................... 7

18 U.S.C. § 3142(f)(2) ........................................................................................................7

18 U.S.C. § 3142(g) ...........................................................................................................8

18 U.S.C. § 3142(j) ..........................................................................................................35

18 U.S.C. § 3145(b) ...........................................................................................................7

18 U.S.C. § 371 ..................................................................................................................3

1984 U.S.C.C.A.N. 3182 ...................................................................................................7

1984 U.S.C.C.A.N. 3189 ...................................................................................................7

## OTHER AUTHORITIES

*In re GTV Media Grp., Inc., Saraca Media Grp., Inc. & Voice of Guo Media, Inc., Respondents*,
Release No. 94107 (Jan. 31, 2022) ............................................................12, 15

S. Rep. No. 98-225 (1983) .................................................................................................7

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, adopted Dec. 10, 1984, Treaty Doc. No. 100–200,
1465 U.N.T.S. 85 ............................................................................................20

Ms. Yanping Wang is not a flight risk, at least no more than anyone who is charged with federal white-collar crimes by the government, because she has nowhere to go, no means to get there, and no intention to do so. Nevertheless—and despite also having no criminal record and not being accused of being a danger to anyone—Ms. Wang has now been detained in MDC Brooklyn since March 15, 2023, first because the government would not approve her proposed bond co-signers and now on the grounds that there is no combination of conditions that could reasonably assure her appearance at trial. This motion seeks reversal of the order of detention that was entered against Ms. Wang on April 21, 2023, after a hearing by Magistrate Judge Robert W. Lehrburger. Judge Lehrburger's decision was based on erroneous facts proffered by the government and a misapplication of the law. As well, he did not have the benefit of certain additional facts, discussed below, that undercut the most critical aspects of his decision.

Ms. Wang is one of the leaders of a dissident movement whose aim is nothing short of the overthrow of Chinese Communist Party ("CCP") rule in China. The government does not dispute that. She is well known and easily recognized in the Chinese community. She moved from Hong Kong to New York in 2017 because she feared for her safety at the hands of Chinese authorities. Although she is a Chinese patriot who longs to liberate and return to her country, she filed an application for asylum in the U.S. because she is afraid for her life if she were to return to China. She has dedicated her life as well as sacrificed her personal safety and her relationship with her son and husband in China to fight against the tyranny of the Chinese government. The indictment is entirely devoid of any allegation that any purported victim money came to rest in her pockets. She wants her day in court. She wants the world to know she stole nothing and victimized no one.

The magistrate judge's decision to deny bail to Ms. Wang was based on many erroneous factual assertions and critical unsubstantiated suppositions by the government which now must be

reconsidered in light of new or additional evidence. This combination of incorrect assertions and unsubstantiated suppositions effectively shifted the burden to Ms. Wang to prove a negative, *i.e.*, that the government was wrong in what it *thought* was factual. In short, the government improperly created a false impression that Ms. Wang was a flight risk, or, at a minimum, that she was much more of a flight risk than is the truth, as we demonstrate below.

In addition, there are certainly conditions that will reasonably assure Ms. Wang's appearance at trial. In fact, she is less likely to flee than many other defendants. She literally has nowhere to go. She will not flee to China or Hong Kong because she would be arrested and likely killed for her anti-CCP activities. Were she to flee somewhere else abroad, she could only go to a country that does not extradite to the U.S. or China and would have to find a way to hide despite her notoriety, her accent, and her Chinese ethnicity. There likely is no such country, and the government has identified none. She would also clearly lose any chance of gaining asylum if she left the U.S. in violation of bail conditions. Furthermore, before she was charged, Ms. Wang was fully aware that she could potentially face criminal charges in the U.S., but she did not attempt to flee. Even with the possibility of jail, the U.S. is the safest place in the world for Ms. Wang. She does not have the financial resources alleged originally by the government nor the international connections, which would facilitate her flight. Finally, the government predicts that trial in this case will not commence for more than one year, and to detain Ms. Wang for that length of time is not only cruel but will greatly interfere with her ability to assist in her own defense. There is simply no factual or legal basis that would justify such a period of pretrial detention for a person like Ms. Wang.

Ms. Wang proposes and is prepared to accept extremely strict conditions of release:

- A $2 million personal recognizance bond, secured by $1 million in property, one of her bank accounts, and $138,000 in cash;

- Restrictions on use of her other bank account, such that she can withdraw money only for necessities or with pre-approval by Pretrial Services ("PTS");
- Travel restricted to the Eastern and Southern Districts of New York, except upon application to PTS and the government;
- Surrender of all travel documents with no new applications;
- Strict supervision by PTS;
- Location monitoring technology as directed by PTS;
- Home confinement with GPS monitoring, except for court appearances, meetings with counsel, or as otherwise permitted by PTS;
- No contact with co-defendants, witnesses, or purported victims without attorneys present; and
- Home monitoring by a friend who will live with her and will be responsible for reporting any violations.

Under these conditions, it will be impossible for Ms. Wang to flee the U.S. Accordingly, we submit that Ms. Wang should be released on the above-stated conditions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On March 29, 2023, a grand jury returned a superseding indictment, S1 1:23-cr-00118-AT, which added Ms. Wang as a defendant to the indictment charging her co-conspirators, Ho Wan Kwok and Min King Je. The superseding indictment charged Ms. Wang with (1) conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, in violation of 18 U.S.C. § 371; (2) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; (3) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78f; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2; and (4) unlawful monetary transaction, in violation of 18 U.S.C. §§ 1957 and 2. (ECF No. 19).

Prior to that, on March 15, 2023, Ms. Wang was arrested on a complaint and on the same day, Magistrate Judge Katharine H. Parker set bail at $5 million and required Ms. Wang's bail secured by $1 million in cash or property and co-signed by two financially responsible people. (ECF No. 3). Additionally, the Court ordered Ms. Wang to surrender her travel documents and to make no new applications for same; to disclose all financial accounts over which she exercised control; pretrial supervision as directed by PTS; home detention; location monitoring technology

as directed by PTS; and GPS tracking. (*Id.*). Finally, Judge Parker ordered Ms. Wang detained until the bail conditions were met. (*Id.*).

These conditions were imposed substantially because the government had made several representations to Ms. Wang's counsel and to the Court that turned out to be wrong. On the day of Ms. Wang's arrest, in conversation with counsel, the government represented that the search of her apartment generated several concerning findings. The government claimed, *inter alia*, that a dozen phones were found in her apartment and that many of them were unplugged and hidden in what looked like their original boxes to make them look new when they were not. The government claimed that a phone was found hidden in the bed between mattresses; that documents were hidden between couch cushions; and that there was $138,000 in *new* one-hundred-dollar bills in her safe.[1] The government also claimed that a laptop was hidden in the closet between sweaters. Assuming the government to be telling the truth, especially given the specificity of its factual assertions—and not having had an adequate opportunity to confer with Ms. Wang, who was very shaken up—counsel agreed to a $5 million bond co-signed by two financially responsible persons and secured by the equity in Ms. Wang's apartment, ankle monitoring, surrender of travel documents, and travel restrictions. Counsel told the government, however, that home confinement was unnecessary and that Ms. Wang should be released and given a reasonable amount of time to meet her bail conditions. Counsel for the government advised that, given the search findings, "it would be malpractice" to agree to that and that the government would insist on home confinement and detention pending the satisfaction of all bail conditions.

---

[1] The government focused on the purportedly "new" $100 bills as evidence of recent preparation to flee.

In the argument that followed, the government repeated the same factual assertions to the Court. It argued that the purportedly secreted phones and hidden documents were "powerful evidence of concealment and hiding evidence that we would allege to be certainly evidence of the crimes." (ECF No. 10-3 at 12:13–15). In other words, the government used this purported evidence to demonstrate Ms. Wang's guilt and the need for bail conditions reflecting attempted concealment of incriminating evidence. As to the cash, the government called it "an emergency flight fund" and relied on it as evidence of intent to flee. (*Id.* at 19:12–21). Faced with these damning allegations, Judge Parker was persuaded by and sided with the government; the government got what it asked for, and Ms. Wang was remanded pending satisfaction of her bail conditions.

As it turned out, none of the representations listed above was either true or not misleading, given the other facts the government knew. To begin, there was only one phone in an iPhone box in Ms. Wang's apartment. The government did not take it; it *was* new. All other phones were either plugged in and in plain sight or were old phones kept together in one bag in a closet. There was no phone hidden in the bed between mattresses or in any other way. There were no documents hidden between couch cushions. The cash did not contain new bills; in fact, the most recent year on any of the bills is 2017. (Glenn Decl. ¶ 6). This was not a stash of recent bills prepared by someone ready to flee: 2017 *predates* the purported start of the charged conspiracy. (ECF No. 19 ¶ 1). Much of the cash was in red gift envelopes ("Hongbao") that were given to Ms. Wang over several years, as is customary for Chinese people to do at Lunar New Year.[2]

Ms. Wang attempted to meet her bail conditions. She posted her apartment as security; it is valued at over $1 million. She offered several potential co-signers whom she would not want to saddle with a $5 million debt. Despite an offer of at least eight people willing to co-sign her

---

[2] https://studycli.org/chinese-culture/hongbao/

$5 million bond, however, the government refused to approve two co-signers. Essentially, the government disqualified all the proposed co-signers either because they were not close enough to Ms. Wang or were deemed not to be sufficiently financially responsible or both.

Ms. Wang then sought intervention from the magistrate court. On March 22, 2023, a brief hearing was held before Magistrate Judge Sarah Netburn. The judge was not inclined to overrule her colleague as to the bail conditions and thought that the hearing was premature and that she did not have enough specific information to go on. On March 24, 2023, Ms. Wang filed a motion with the magistrate court for an order directing that Ms. Wang complied with the terms of her bail conditions and to rule that the government's refusal to approve her bond co-signers had been arbitrary. In the alternative, Ms. Wang asked the Court to amend her bail conditions to eliminate the requirement that she obtain two financially responsible persons to co-sign her bond. (ECF No. 8). The hearing on that motion was scheduled for March 31, 2023.

On March 31, 2023, less than an hour before the hearing, the government filed a letter contending that it had discovered certain additional information that "could justify more restrictive bail conditions" but ended the letter stating that Ms. Wang "should be detained pending trial." (*Compare* ECF. No. 22 at 1 *with* ECF No. 8 at 2). Most significantly, this letter now claimed that Ms. Wang had undisclosed cryptocurrency assets and that she failed to disclose to PTS that she had $138,000 in cash in her apartment when it was searched. (ECF No. 22). Because these were new allegations, Judge Lehrburger postponed the bail hearing until April 4, 2023.

On April 4, 2023, Judge Lehrburger conducted the bail hearing and asked the parties to submit additional materials. (ECF No. 39). On April 21, 2023, the judge ordered Ms. Wang detained based on his assessment of flight risk. (ECF No. 56).

## II.     ARGUMENT

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, requires pre-trial release of the defendant "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." *United States v. Boustani,* 932 F.3d 79, 81 (2d Cir. 2019) (quoting 18 U.S.C. § 3142(b)); *United States v. Sabhnani*, 493 F.3d 63, 78 (2d Cir. 2007) (noting that even where a court determines that a defendant poses a flight risk, there remains a statutory presumption in favor of the defendant's release "unless the government demonstrates that no conditions of release can be imposed to assure the defendant['s] appearance in court"). "Reasonably assure" does not mean "guarantee," *see generally United States v. Salerno*, 481 U.S. 739 (1987), and pretrial detention is appropriate *only* where there is "no condition or combination of conditions [that] will reasonably assure the appearance of the [defendant]," *Sabhnani*, 493 at 75.[3]

---

[3] Through the passage of the Bail Reform Act of 1984, Congress intended and expected that only "a small but identifiable group of particularly dangerous defendants" would be detained pending trial. S. Rep. No. 98-225, at 6 (1983); *see also United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985) (noting that detention is warranted in "rare cases"); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) (Kennedy, J.) ("Only in rare circumstances should release be denied."). Most defendants, Congress anticipated, would continue to be released on their own recognizance or on an unsecured bond. S. Rep. No. 98-225, at 12. In part, to ensure that detention was rare, Congress authorized detention only after a detention hearing, permitted a detention hearing under only specific circumstances, 18 U.S.C. §§ 3142(f)(1)–(2), imposed a high burden on the government, and afforded defendants expansive means for challenging the government's assertions, 18 U.S.C. § 3142(f). Consistent with Congress' intention, the Supreme Court has recognized, "[I]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Following the Supreme Court's guidance, other courts have recognized that "[p]retrial detention is still an exceptional step." *United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991), *citing Salerno*, 481 U.S. at 749; *accord United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990) ("Only in rare cases should release be denied."). *See also United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) ("[I]t is only a 'limited group of offenders' who should be denied bail pending trial.") (quoting S. Rep. No. 98-225, at 7 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3189).

Under 18 U.S.C. § 3145(b), "[i]f a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." *United States v. Molina*, No. 11 Cr. 528 (JFK), 2012 WL 3564013, at *3 (S.D.N.Y. Aug. 16, 2012). A "district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate[] but reach its own independent conclusion." *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). The Bail Reform Act has been construed to require that a district judge conduct a *de novo* review of a magistrate's bail determination. *United States v. Gotti*, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005).

In considering whether bail is appropriate, the court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person in the community that would be posed by the person's release.[4] 18 U.S.C. § 3142(g). The "power to incarcerate before trial must be exercised with circumspection [and] may be involved only when and to the extent justified by danger which the defendant's conduct presents." *United States v. Bruno*, 89 F. Supp. 3d 425, 428–29 (E.D.N.Y. 2015) (quoting *United States v. Choudhry*, 941 F. Supp. 2d 347, 350 (E.D.N.Y. 2013)). Importantly, it is well-established that a greater showing than the "commission of a serious crime and the fact of a potentially long sentence [is

---

[4] The government does not contend that Ms. Wang is a danger to the community. Although Judge Lehrburger stated that while "there is no indication that Wang poses a physical danger to any person or community if released, she potentially could harm people if she were to reengage in fraudulent activity." (ECF No. 39). This observation is not a sufficient finding to support detention based on danger to the community because "[a]n order of detention based on the safety of other persons and the community must rest on a finding supported by clear and convincing evidence." *United States v. Stein*, No. S1 05 Cr. 0888 (LAK), 2005 WL 8157371, at *1 (S.D.N.Y. Nov. 14, 2005). No such evidence was even offered.

necessary] to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988); *accord United States v. Paulino*, 335 F. Supp. 3d 600, 619 (S.D.N.Y. 2018).

The government bears the burden of showing "by a preponderance of the evidence that the defendant . . . presents an *actual* risk of flight." *Sabhnani*, 493 F.3d at 75 (emphasis added). "Mere opportunity for flight is not sufficient." *United States v. Zarzuela*, 2019 U.S. Dist. LEXIS 206270, at *3 (S.D.N.Y. Nov. 27, 2019) (quoting *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986)). Instead, evidence substantiating "an actual risk of flight" must be something akin to evidence that the defendant possesses an intent to flee, as several courts have observed. *See, e.g.*, *United States v. Hanson*, 613 F. Supp. 2d 85, 90 (D.D.C. 2009) ("In this case, . . . there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the [U.S.]"); *United States v. Cole*, 715 F. Supp.  677, 680 (E.D. Pa. 1988) (defendants told undercover agents they would flee if arrested); *United States v. White*, No. 3:21-mj-04070, 2021 U.S. Dist. LEXIS 100544, at *21 (M.D. Tenn. May 27, 2021) ("A case involves a 'serious risk of flight,' as opposed to a mere risk of non-appearance, if it involves a serious risk that the defendant intentionally will avoid court proceedings.").

Even if an actual risk of flight is established, "the presumption in favor of bail still applies." *Zarzuela*, 2019 U.S. Dist. LEXIS 206270, at *3 (quoting *United States v. Berrios-Berrios*, 791 F.2d 246, 251 (2d Cir. 1986)). Accordingly, the government bears a secondary burden to "demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." *Sabhnani*, 493 F.3d at 75 (noting it was "[p]lainly . . . incorrect" for the government to act as though "this second burden fell on the defendant, or that [the government] had the benefit of a statutory presumption of detention that the defendant was obligated to rebut").

**A.      The Government Failed to Show That Ms. Wang Was a Flight Risk**

The government failed to meet its burden with respect to intent to flee because it offered very little by way of evidence, relying, instead, on supposition and conjecture. As noted above, the purported "evidence" the government offered at Ms. Wang's presentment turned out to be false, aside from the assertion that a computer had been found between sweaters in one of the closets; and we dispose of that allegation below. The government then followed up with additional allegations that, as also discussed below, it cannot prove. Indeed, in one instance, the government *admits* that, despite its argument to the contrary, it does not know whether Ms. Wang actually owned any cryptocurrency. We dispose of that below also. But in each instance, what the government offers is not evidence. Instead, the government offers conjecture. And conjecture (as opposed to actual evidence corroborating a contention) cannot satisfy the government's burden under the Bail Reform Act, as numerous courts have observed. *See, e.g.*, *United States v. Bodmer*, No. 03 CR 947 (SAS), 2004 U.S. Dist. LEXIS 959, at *8 (S.D.N.Y. Jan. 28, 2004) (holding that the government had failed to meet its burden because its argument was "based, in large part, on speculation[,] without any evidence to support [its] claim"); *United States v. Ling*, No. 4:21-mj-00336, 2021 U.S. Dist. LEXIS 101132, at *14 (N.D. Tex. May 24, 2021) ("[T]he Government adduced no evidence to support [its] contention" that the amount of drugs indicated "a large-scale operation with significant amounts of cash, which could provide a means for Defendants to flee.").

By forcing Ms. Wang to dispose of these conjectures, the government effectively shifted the burden of proof to her not to rebut its evidence but to disprove a negative, *i.e.*, to disprove that what the government *alleges* is not true. In other words, Ms. Wang should be released on bail for the simple reason that the government failed to present (or even proffer) any actual evidence that she was a flight risk beyond the risk associated with being a criminal defendant. *See Friedman*, 837 F.2d at 50 ("[M]ore than the seriousness of the allegations and a potentially long sentence

[are] necessary for a finding of risk of flight."); *White*, 2021 U.S. Dist. LEXIS 100544, at *20 ("[*E*]*vidence* (or at least concrete information proffered by the Government), and not mere conclusory assertions, of serious risk of flight are required to warrant the holding of a detention hearing") (citing *United States v. Wright*, No. 2:18-cr-336-DN, 2018 U.S. Dist. LEXIS 121974, at *2 (D. Utah July 20, 2018)).

**B.     The Government Failed to Carry Its Burden to Show That Ms. Wang Was a Flight Risk Under the 18 U.S.C. § 3142(g) Factors**

**1.     The charges against Ms. Wang do not support detention because the allegations against her are limited in scope and severity.**

Despite describing Ms. Wang as Mr. Kwok's "chief of staff," (ECF No. 19 ¶ 8), the indictment does not charge her with profiting from the alleged fraud, and the allegations relating to her are relatively narrow considering the scope of the entire indictment. The indictment charges a conspiracy to engage in four separate alleged frauds: the GTV offering, the Farm Loan Program, G|CLUBS, and the Himalayan Exchange. However, aside from summary paragraphs in the conspiracy count, Ms. Wang's name is mentioned only in connection with the GTV offering allegations. (*Id.* ¶¶ 1–25). Indeed, as an indication of her relative alleged culpability in the acts charged in the indictment, Ms. Wang's name appears in only twenty-two paragraphs or subparagraphs out of the total of 154 paragraphs and subparagraphs in the indictment.

Specifically, Ms. Wang is charged in only four of the twelve indictment counts: conspiracy, wire fraud relating to the GTV offering, securities fraud relating to the GTV offering, and engaging in a monetary transaction by wiring $100 million of the proceeds of the GTV offering to a hedge fund controlled by Relative-1. (*Id.*). The only overt act in furtherance of the conspiracy that mentions Ms. Wang is the same wire of the $100 million to Relative-1's hedge fund. (*Id.* ¶ 32.b). Even with respect to the GTV allegations, Ms. Wang's name comes up only in connection with the same $100 million wire, aside from an allegation that she was listed as an "Executive Director"

of GTV in its Private Placement Memorandum ("PPM"). (*Id.* ¶ 13.c). There are no allegations that Ms. Wang personally made any false statements to anyone in connection with the GTV offering.

Moreover, as the indictment alleges, the $100 million was misdirected, meaning it was invested in a manner inconsistent with the use-of-funds disclosure in the PPM. (*Id.* ¶ 13.h). And although $30 million of the $100 million was lost, according to the indictment, that $30 million represents investment losses, not siphoning funds for personal use. (*Id.*; *see also In re GTV Media Grp., Inc., Saraca Media Grp., Inc. & Voice of Guo Media, Inc., Respondents*, Release No. 94107 (Jan. 31, 2022)). In any event, all that money has now been recovered because GTV and other entities disgorged all the relevant amounts with prejudgment interest. (*See In re GTV.*). Ms. Wang's personal history and characteristics do not support detention.

### 2.     Ms. Wang is a dissident – nothing in her background suggests that she would defraud the other members of her dissident movement.

Ms. Wang is a Chinese dissident who gave up a comfortable life and her family by joining and becoming one of the leaders of the pro-democracy movement opposing the CCP. Her personal characteristics militate in favor of release on bail because she is dedicated to her movement and its members, she is a responsible and prominent member of her community, and she wants her day in court so that her supporters can see that she did not defraud them and did not financially benefit from any of the alleged schemes described in the indictment.

Ms. Wang is forty-four years old. She was born into a well-to-do Chinese family. Her parents were financially successful. They were the first local couple to own a color TV, a refrigerator, a landline telephone, and, later, a Motorola cell phone. Nevertheless, certain events demonstrating the CCP's disregard for Chinese people and the resulting suffering that she and her family endured led to Ms. Wang's fierce opposition to the CCP. First, when her mom became pregnant with Ms. Wang's younger brother, her parents faced a difficult choice of violating the

one-child policy or ending the pregnancy. Ms. Wang's parents chose to keep their second child and suffered serious consequences. This was the moment, when she was still a child, that sparked Ms. Wang's opposition to the CCP. Second, in late 2004, Ms. Wang's mother was diagnosed with lung cancer. She died eight months later. She was forty-nine. She was never a smoker, but the family lived in a province that suffers from heavy pollution due to the CCP's reckless disregard for the environment. Ms. Wang's father was also diagnosed with lung cancer in the spring of 2017. He died a year later at sixty-one.[5] Ms. Wang's environmental concerns resulting from her parents' deaths also fuel her fundamental opposition to the CCP.

Ms. Wang was able to attend good schools as well as study abroad. She was a stellar student, and she eventually obtained two bachelor's degrees from her college in China and two master's degrees in France. Ms. Wang met her husband in college in China. He, too, was a good student who earned two bachelor's and two master's degrees. Ms. Wang and her husband were each other's first significant others. In 2013, Ms. Wang gave birth to her son, her only child. She and her husband led a comfortable life in China. They owned their home in Beijing, a vacation home, and three cars. They worked hard, and they were frugal. They were a happy family. She had no personal reasons to leave them and every reason to stay with them. But for her anti-CCP activities, she would be with them now.

Nonetheless, Ms. Wang left mainland China in 2015 never to return. By then, while working for one of Mr. Kwok's family's companies, she joined the dissident movement. This made her a target of Chinese authorities. She was based in Hong Kong in 2015 and 2016, afraid of going

---

[5] Three months after her father's death, Ms. Wang was herself diagnosed with stomach cancer. She had the cancer removed, and she is in remission.

back to the mainland for fear of being detained there.[6] For example, Chinese authorities repeatedly visited her father, brother, and husband and had arrested her husband several times and detained him. Ms. Wang's husband was under constant surveillance; he was followed wherever he went. Her bank and credit card accounts in China were being closed. And although she was able to move some of her money to Hong Kong, her bank accounts there also started to be closed and flagged for no specific reason. Eventually, she had to move what was left of her savings to New York. In short, Ms. Wang began to live in fear of being detained in Hong Kong also. She travelled a lot then, and she obtained a Vanuatu passport in 2016 in case she could not travel on her Chinese passport in the event she needed to escape the Chinese police.[7]

Ms. Wang moved to New York in the spring of 2017. In late 2017, she lost all contact with her son and her husband. Ms. Wang last saw her son in person when he was only two years old. For some time, she was able to speak with her son by video call. That was very hard. Ms. Wang's mother-in-law would tell her that Ms. Wang's son kept asking his father whether they could go to the supermarket and buy a new mom. And although her son would be happy to see her on video when he was younger, as he got older and realized that she was not coming home, he became sullen, and his eyes would well up with tears. Ms. Wang could well understand that with their own hearts breaking, her in-laws could not continue to lie to him and tell him that she would be coming home soon. In addition, her in-laws did not approve of her politics and wanted to cut off all contact. Eventually, Ms. Wang did lose all contact with her son, her husband, and her in-laws. It is her understanding that her husband was forced to divorce her. Over time, her brother was harassed so

---

[6] Even when her father got sick in 2017, Ms. Wang was unable to go back to China to help when he was dying or to attend his funeral.

[7] This passport is now expired and is in the possession of the government.

much that even her contact with him had to be severely curtailed. She has not spoken with her brother at all since some time last year.

This is too much for one woman to bear, and Ms. Wang is emotionally scarred. As mentioned, the government does not have and has not identified any evidence that Ms. Wang personally benefitted from any of the schemes alleged in the indictment. (*See generally* ECF No. 19). As discussed below, she did not even take advantage of the purported cryptocurrency allocation that the government claims was hers. Ms. Wang did not give up her son and the love of her life for thirty pieces of silver.[8] This is very hard for the government to understand; she is doing what she does on principle. Her choices are not career moves.

### 3.    Ms. Wang did not flee knowing that criminal charges may be coming.

One other strong indication that Ms. Wang is not a serious flight risk is that she did not flee after learning in September and October of last year that the government seized hundreds of millions of dollars in assets from the various entities associated with Mr. Kwok. (*Id.* ¶ 55.a-ii). She also did not flee following the resolution of the SEC case against GTV. (*See In re GTV.*). She did not flee when she learned that the government was serving grand jury subpoenas on various companies associated with Mr. Kwok. She also did not flee when she learned that Mr. Kwok was the target of a grand jury investigation that eventually led to the charges in this case. These were not whispers that she could ignore, this was the thunderous sound of the cavalry coming for her. Yet, she did not flee. Not only that, but when she thought she needed to travel for business to London and the British Virgin Islands at the end of last year, she gave the government notice by applying for a furlough to preserve her asylum application. And when that trip did not pan out, she

---

[8] This is also why she would never endanger her co-signers who are also members of the movement. She has dedicated her life to them and their common cause.

notified the government again when seeking permission to travel early this year. Put differently, consistent with her desire to maintain her U.S. asylum application and inconsistent with an intent to flee, she sought the U.S. government's permission to travel and, when her first travel plan fell through, she applied again.[9] These are not actions of someone who intends to flee. *See, e.g.*, *Hanson*, 613 F. Supp. 2d at 90 ("In this case, . . . there is no strong circumstantial evidence indicating that Mrs. Hanson intends to flee the United States.").

> **4.   Ms. Wang is not a flight risk because she has nowhere to go and because she is being watched by the Chinese government even in New York.**

As a prominent dissident, Ms. Wang is very recognizable in the Chinese expatriate community. She could not escape and hide among other Chinese immigrants in the U.S. She also could not hide from Chinese communities in the U.S. because she speaks with a distinct accent and would be very noticeable among any other group or groups. The government parries by suggesting that the other members of her pro-democracy movement could secret her and help her escape. This is pure conjecture, and it assumes that these members of the movement, many of whom are themselves seeking asylum in the U.S., would be willing to break U.S. law by harboring a fugitive. Again, standing on conjecture alone, the government cannot carry its burden to show flight risk. *See e.g.*, *Ling*, 2021 U.S. Dist. LEXIS 101132, at *14.

In any event, while it is entirely speculative to suggest that other pro-democracy dissidents would assist Ms. Wang should she flee, there can be no doubt that Chinese spies living in the U.S. would relish an opportunity to find and report her. Specifically, on April 17, 2023, the National Security Division of the Department of Justice and the United States Attorney's Office for the

---

[9] The risk of being extradited to China from Great Britain or from a British territory is about the same as being extradited from the U.S., which is why Ms. Wang felt it would be safe to go to those places. And, of course, she would be extradited to the U.S. from either place.

Eastern District of New York ("EDNY") announced the filing of two criminal complaints against a total of thirty-four Chinese nationals, officers of the national police of the People's Republic of China ("PRC") – the Ministry of Public Security ("MPS") – with persecuting Chinese nationals residing in the New York metropolitan area and elsewhere in the U.S.[10] According to the two complaints filed in that case, these Chinese government officials executed repression schemes targeting U.S. residents who engaged in anti-CCP activities in the U.S., such as advocating for democracy in the PRC. (*See United States v. Bai Yunpeng et al.*, No. 23-mj-334-sjb, ECF No. 2; *United States v. Lu Jianwang et al.*, No. 23-mj-265-jrc, ECF No. 4). Among other things, as part of their harassment scheme, these Chinese agents attempted to gin up prosecutions of their victims by U.S. authorities, trashed their victims' reputations, and worked on ways to repatriate their victims to China for punishment. One of the victims discussed in the complaints, Victim-1, in fact, is Miles Kwok, Ms. Wang's co-defendant and the lead defendant in this case. (*Yunpeng*, No. 23-mj-334-sjb, ECF No. 2). And although Ms. Wang herself is not mentioned in the complaints, the list of victims is not exhaustive. She is a prominent dissident in her own right, she is close to Mr. Kwok, and she, too, has been subject to similar harassment and abuse by the Chinese authorities. In fact, she has an order of protection to prove it. (*See* Lipman Decl., Exhibit A;[11] *see also* Exhibits B–D).

What these arrests and charges underscore and prove is that one reason Ms. Wang is not a flight risk from the point of view of the government—wholly separate and apart from having no

---

[10] Press Release, United States Attorney's Office, Eastern District of New York, 34 Officers of People's Republic of China National Police Charged with Perpetrating Transnational Repression Scheme Targeting U.S. Residents (Apr. 17, 2023), https://www.justice.gov/usao-edny/pr/34-officers-peoples-republic-china-national-police-charged-perpetrating-transnational.

[11] All exhibits referenced in this brief are annexed to the Declaration of Alex Lipman submitted in support of the instant motion.

intention to flee—is that the CCP is on the hunt for her and would like nothing more than to see her continued detention and prosecution if they are unable, as is undoubtedly their first choice, to have her repatriated to China. Put differently, Chinese government agents, using sophisticated electronic means, track, follow, and report on their ideological enemies in the U.S., such as Ms. Wang. These agents are far better than electronic monitoring equipment and more reliable than private security; as Ms. Wang well understands, they would make sure that she is found in the U.S., and they would make sure that she would be found anywhere else.[12]

Since her arrival in New York, Ms. Wang has had to put up with harassment by the Chinese authorities here. By then, Mr. Kwok had made his anti-CCP activities public. Her phone and laptop were repeatedly hacked. She received random, repeated calls from Chinese and Hong Kong numbers in the middle of the night that continued for the whole night. Her phone turned on and off by itself. She received trash messages with curses and threatening language. She repeatedly lost access to her email without any apparent reason. She even began to get emails in a new email account from an account to which she had previously lost access. There were posts on the Internet, on Twitter, and on YouTube trashing her and falsely claiming she had an affair with Mr. Kwok. She saw photos of her son posted on the Internet as well as a fake "Looking for lost wife" posting with her photo and ID, purportedly posted by her husband. She eventually learned that almost all

---

[12] And if the irony of the Chinese government aiding the U.S. government in enforcing its bail conditions were not piquant enough, while all but two of the Chinese spy operatives (because this is what they are in plain English, *a la* a less glamorous 007) appear to have been outside the U.S. when the charges against them were announced. The two who were not outside the U.S. were arrested and released on bail. (*See United States v. Jianwang Lu*, No. 23-mj-265-jrc, ECF No. 9; *United States v. Jinping Chen*, No. 23-mj-265-jrc, ECF No. 12). In other words, Chinese spies operating in the U.S. who have every incentive to flee to their home country—and can be expected to be helped by their government to flee—were released on bail based on a finding that there were conditions of release that sufficiently secured their appearance. One of their victims, on the other hand, a woman whom they can be expected to track (even while awaiting their trial) to make sure she complied with *her* bail conditions is denied bail as too much of a flight risk.

her family, friends, and acquaintances received fake audios and messages purportedly disclosing her alleged affair with Mr. Kwok.

Most consequentially, in light of the charges by the EDNY discussed above, Ms. Wang had to obtain a restraining order against four individuals who followed her around, confronted and harassed her, made death threats and threats of bodily injury, and encouraged others to harm her by means of Internet posts.[13] As recited in the order of protection, (Exhibit A), one of these individuals needed to be further restrained because he continued to harass her despite the restraining order.

### 5.    Ms. Wang has sufficient ties to the United States.

One factor that seemed to have weighed heavily against Ms. Wang's release by the magistrate court is that she does not seem to have close friends other than Chinese people who are also members of the anti-CCP movement that she helps lead. She was criticized for not having put down sufficient roots. The government has certainly made that point. (*See* ECF No. 33 at 46:12–18). Anyone inclined to criticize an immigrant who has been in the U.S. less than seven years for not having friends outside of her close group of other similarly situated immigrants is ignorant of what it means to be an immigrant and of what it means to speak with a heavy accent. Navigating social situations in a foreign country is daunting even for the most well-travelled. Immigrants who arrive in the U.S. as adults or teens know well the difficulty inherent in not knowing local customs, both afraid to offend and getting offended as well as being roundly ridiculed and abused. The best educated immigrants know what it feels like to be treated like an idiot because of how one sounds. It is not easy to make friends under those circumstances. It takes decades, and often one does not succeed at all, which is why Queens, New York may be the most international place on earth, but

---

[13] It appears that the people involved in harassing Ms. Wang are not on the list of those who had been arrested by EDNY. *Supra* note 10.

its residents group themselves geographically in the borough largely by their countries of origin. But there is more here as it relates to Ms. Wang: approximately two-and-a-half years of her time in the U.S. was during the COVID-19 pandemic (she arrived in the U.S. in 2017). Thus, for almost half of her time in this country she was isolated from most other people by the pandemic, and she is from China, the home of the "China Virus."

Separately, Ms. Wang is a refugee and a dissident; she did not come here to seek asylum so she could have a better life in America. She is a Chinese patriot who dreams about liberating her country to be reunited with her son and husband. She came here to work hard to make that happen. This is why she lives in a 740-square-foot apartment without furniture that is within a short walk of her office. She did not come here to *seek* asylum; she came here because she *needed* asylum. Ms. Wang does not want to lose her asylum application.[14] She cannot be sent to China or Hong Kong, where she would be arrested and likely killed for her anti-CCP activities. Were she to flee abroad, she could only go to a country that does not extradite to the U.S. or China and would have to find a way to hide there, despite her accent and her Chinese ethnicity. There is likely no such country and the government has identified none. Given all this, it is nothing short of extremely offensive for the government to claim that one indication that she is a flight risk is that her friends are mostly her fellow dissidents.

Finally, Ms. Wang spent the entire pandemic in her tiny apartment in Manhattan. She continued to go to the office even when employees were told to work from home. Almost every day, she and a few others organized, packed, and delivered personal protective equipment to police

---

[14] Even if she were convicted, she would likely not be deported after serving her sentence because of the U.S.'s participation in the Convention Against Torture. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted Dec. 10, 1984, Treaty Doc. No. 100–200, 1465 U.N.T.S. 85. The Convention Against Torture is implemented at 8 C.F.R. § 208.18.

precincts, hospitals, and the elderly in New York. New York is now Ms. Wang's only home. She really has nowhere else to go.

C.   **Magistrate Judge Lehrburger Wrongly Concluded That Ms. Wang's Financial Means and International Contacts Provide a Sufficient Basis to Deny Bail**

Judge Lehrburger concluded that Ms. Wang is a risk of flight because (1) she can flee to countries other than China given her global connections; and (2) she has considerable financial means at her disposal. (ECF No. 56 at 18–19). However, merely having global connections or means to flee are not sufficient reasons for denying bail; as discussed below, courts in this and other circuits recognize that the mere fact that a defendant is financially well-off and is a foreign national who can flee to a country that may not grant extradition is not a sufficient basis to deny bail. *See Bodmer*, 2004 WL 169790, at *2 (rejecting the government's argument that a Swiss defendant had a strong incentive to flee because the Swiss government would not extradite Swiss nationals because that "alone cannot be a basis for denying bail because if taken to its logical conclusion, no Swiss national would ever be eligible for bail"). In any event, Judge Lehrburger was mistaken as to both of those factual conclusions. Ms. Wang cannot go anywhere else, and she does not have the financial means to go anywhere or to support herself there.

1.   **Courts recognize that the mere fact that a defendant is financially well-off and is a foreign national who can flee to a country that may not grant extradition is not a sufficient basis to deny bail.**

The mere fact that a defendant is a foreign national with means is insufficient to deny bail. *See generally Hung v. United States*, 439 U.S. 1326 (1978) (Brennan, J.). In *Hung*, the Supreme Court reversed a post-conviction detention order of a Vietnamese national and granted his release pending appeal. *Id.* at 1329. The Court explained that even though the defendant had "not established a permanent residence in this country; and[,] should applicant flee to Vietnam, the

United States would have no means to procure his return[,] . . . these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee." *Id*. Similarly, in *Hansen*, the Sixth Circuit affirmed a district court's pretrial release of a Danish defendant despite the government's inability to extradite from Denmark. The court explained that "[t]he bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition." 108 F. App'x at 332.

In *United States v. Flotron*, a judge in the District of Connecticut released a Swiss national, who was awaiting trial on charges of wire fraud, commodities fraud, and conspiracy to commit the same, pursuant to a bail package that included home confinement in his girlfriend's home in the District of New Jersey, GPS monitoring, and a personal recognizance bond secured by approximately $3 million in assets. *See* Order Setting Conditions of Release at 2, *United States v. Flotron*, No. 1 7-cr-220 (D. Conn. Sept. 22, 2017), ECF No. 10; Appearance Bond, *Flotron*, No. 1 7-cr-220, ECF No. 11. Likewise, in 2015, Judge Vernon Broderick of the Southern District of New York released on bail Chinese national and billionaire businessman, Ng Lap Seng, pursuant to conditions that included home confinement in a Manhattan apartment and round-the-clock private armed security responsible for ensuring Mr. Seng's appearance and preventing his flight from the U.S. *See* Order, *United States v. Seng*, No. l5-cr-706 (S.D.N.Y. Oct. 23, 2015), ECF No. 53. Like Switzerland, China does not extradite its citizens to the U.S. and yet, Mr. Seng was deemed eligible for release. In *United States v. Khashoggi*, Judge Keenan of the Southern District of New York released on bail an "enormously wealthy" Saudi Arabian defendant who was facing trial on mail fraud charges despite that there was no extradition treaty in place. 717 F. Supp. 1048, 1050–52 (S.D.N.Y. 1989).

### 2. Ms. Wang would not have the financial means to flee.

Separately, as a factual matter, Ms. Wang would not have the means to get anywhere or live there. Ms. Wang has agreed to either use her bank accounts to secure her bail or to have her accounts restrained such that she could not withdraw anything without PTS's advance permission. She has posted her apartment to secure her bond. Her cash has been seized. She has nothing else.[15]

### a) Contrary to the government's suggestion and Judge Lehrburger's suspicions, Ms. Wang does not hold any cryptocurrency.

The government predicated its argument that Ms. Wang was a flight risk in part on an assertion that Ms. Wang failed to disclose approximately $13.5 million in cryptocurrency that she could have used to fund her escape.[16] (ECF No. 42 at 3). This, the government claimed, was evidence of intent to flee and support for the proposition that Ms. Wang would not abide by her conditions of release because she could not be trusted. (*Id.*). This argument was perhaps the one that gave Judge Lehrburger the greatest concern as to the issue of flight risk because it raised the possibility that Ms. Wang had other undisclosed assets.

There are three problems with this argument: (i) it is based on hearsay documents that the government admits it does not understand, and the government's assertions about the import of these documents are pure conjecture (and evidentiarily inadequate); (ii) the government's

---

[15] Again, the government's contention that other pro-democracy dissidents would support her as a fugitive is entirely speculative and assumes that these dissidents would be willing to break the law of countries other than China to help. In addition, flight would be tantamount to an admission of guilt. One would expect that other pro-democracy dissidents would refuse to help someone who admitted to fleecing them in the name of the movement. Finally, the Chinese government would do all it could to track her regardless of where she ended up, and it could be expected to use the very sophisticated electronic means at its disposal to track people.

[16] The indictment alleges a fraudulent scheme by co-defendants Mr. Kwok and Mr. William Je related to the issuance of a digital currency: Himalaya Coin ("HCN"), which is convertible into Himalaya Dollars ("HDO") and traded on the Himalaya Exchange. (*See* ECF No. 19 ¶ 22).

conjecture is wrong because, since Judge Lehrburger's decision, counsel for Ms. Wang have been able to confirm that she was unable to convert any allocation of Himalaya Coin ("HCN") into Himalaya Dollar ("HDO"); and (iii) in any event, even if she did own HDO, she could not use her HDO to fund her escape.

In support of its argument that Ms. Wang has failed to disclose significant crypto assets, the government relied on two documents it found in the search of her apartment. One is a schedule that the government calls, "HCN Allocation at USD0.1." (Exhibit E). This document appears to show an allocation of 6,999,800 HCN to Ms. Wang. The document is hearsay, and the government has not offered any testimony by anyone with knowledge to explain its meaning or import. Similarly, the government claims—without any supporting evidence or testimony from a person with knowledge—that another document, Exhibit F, shows that a certain number of HCN were "minted" and that reflects a distribution of HCN to various people and entities, including to "Yvette." (ECF No. 42 at 2). Relying on these two unexplained hearsay documents, the government makes the following evidentiary and logical leaps: that Ms. Wang received an allocation of 6,999,800 HCN, that she converted her 6,999,800 HCN into HDO at a price of 0.1 per HCN by paying a total of $699,980 for a total of 699,980 HDO, that her current holdings of HDO are now worth approximately $13.5 million, and that she failed to disclose these holdings so she could use them to fund her escape. (*Id.* at 2–3). These evidentiary leaps are flawed as a matter of fact and logic.

There is nothing on the face of Exhibit F that confirms either the date on which it was created or whether it reflects an *anticipated* distribution or one that has already taken place.[17] There

---

[17] Exhibit F also contains untranslated Chinese writing as well as hand-written cross-outs of certain numbers, including the number matching the name "Yvette" and no explanation as to why those numbers are crossed out.

is also no indication that Exhibit F reflects HCN that had been converted into HDO; it is merely a schedule of allocated (or "distributed") HCN expressed in U.S. dollars ("USD"). In fact, Exhibit F seems to contemplate that a distribution of HCN would be in exchange for payments in USD to effectuate the acquisition of the "distributed" HCN; it appears to show a total sum of all such anticipated payments. In other words, as the government well knows and does not dispute the allocation of HCN was to be effectuated by a payment by the recipient of the allocation—much the same as a purchase of an option by an employee to whom the option is granted. The government has offered no proof—not even an allegation—that Ms. Wang personally paid $700,000 for the HCN purportedly allocated or "distributed" to her. The government will not find any such evidence. In fact, the government *admitted* that it could not prove that Ms. Wang held the assets they claim were hers. (ECF No. 33 at 55:8–56:3).[18] All the government has are two hearsay

---

[18] Consider the following admission by the government:

> *Your Honor is correct, defense is correct, there's no way for the Government to prove that Ms. Wang holds that money*, and, in fact, the Government's allegation is that it's not cryptocurrency, but we're not alleging it's valueless. We're alleging that certain people have it and the people who are quickest to redeem can basically have an exit scam and get out with their money. I would note while, again, we don't have access to an account that Ms. Wang has where the money is held, Your Honor correctly identified approximately $7 million worth of a cryptocurrency asset would be something you would want to keep track of. The allocation indicates Yanping Wang, and then it has the allocation, it's in her name.

(ECF No. 33 at 55:8–56:3 (emphasis added)).

In other words, the government claims that Ms. Wang lied, but it also admits that it does not know what the truth is. Note also, that it is too late for the "exit scam" supposition offered by the government. As discussed below, the Himalaya Exchange has been deprived of its reserves by the government's seizure of its bank accounts and has set limitations on redemptions. Additionally, in the same paragraph, the government first claims that these assets are *not* cryptocurrency and then takes Ms. Wang to task for not reporting it *as* cryptocurrency.

documents that are not at all clear on their face, that are undated, that contain untranslated Chinese writing, and for which there is no context or explanation. (*See* Exs. E–F).

It appears that Judge Lehrburger found that it was not credible that Ms. Wang did not remember what had happened with the allocation of HCN to her. Counsel for Ms. Wang did not deny that there appeared to have been an *intended* allocation of HCN to Ms. Wang. But counsel advised that she could not remember what happened, and that she did not possess the HDO now. (ECF No. 33 at 24:2–5). Judge Lehrburger appears to have thought that, given the sums involved, one would be expected to remember what had happened. That would be true only if Ms. Wang had successfully exercised her HCN and converted them into HDO, meaning she could be expected to remember paying almost $700,000 for approximately 700,000 HDO now purportedly worth $13.5 million. But she knew she did not do that; she knew she would not have had the sum of $700,000 to put into cryptocurrency. Put differently, she knew she did not do what she needed to have done to secure these assets for herself, but she could not recall what happened when she did not. Here, again, she was tasked with proving a negative.

Because Ms. Wang had to have paid to convert any allocation of HCN into HDO, counsel have, since Judge Lehrburger's decision, found and reviewed Ms. Wang's relevant bank statements to ascertain whether she had made any payments (in any amount) that looked like payments associated with the Himalaya Exchange. Counsel has found evidence of a wire to "Himalaya Internati" in the amount of $42,300 on September 27, 2021. (*See* Exhibit G). The same amount of $42,300 was returned to Ms. Wang's account at the same bank on October 7, 2021. (*Id.*). There are no other transfers or wires that are relevant here. It is counsel's understanding, based on refreshed recollections, that these wires represent the one and only attempt to convert certain HCN allocated to Ms. Wang, but that the conversion was not successful, and she never

26

attempted to do so again. This is why she could not remember exactly what happened; she thought something may have happened and she was not sure what it was. She also did not want to say something that was false.

But the government's claims about HCN are also highly misleading: contrary to the government's claims, one cannot convert HCN holdings into cash except in limited amounts wholly insufficient to fund an escape. And the government knows this. In its submissions to Judge Lehrburger, the government assigned a wholly theoretical value to 700,000 HCN purportedly allocated to Ms. Wang. The government correctly asserted that "on April 12, 2023, HCN was purportedly trading at 19.34 HDO. . . ." (ECF No. 42 at 2). This means that the value of HCN listed on the Himalaya Exchange represented what bidders were willing to pay in HDO not in USD or any other fiat currency. The government followed this true assertion with a sleight of hand by claiming next that "[s]tated otherwise, 1 HCN equals approximately $19.34." (*Id.*). That *would be true* if 1 HDO were actually convertible into 1 USD, but, as the government well knows, *it is not*. Indeed, according to the government and the SEC, investors who have attempted to convert their HDO into dollars were unable to do so, and the fraud allegations relating to the Himalaya Exchange (both in the indictment and in the SEC complaint) include allegations that, contrary to the government's representations, HDO were *not* convertible into USD and could *not* be used to purchase goods and services. (*See* ECF No. 19; SEC Complaint, No. 23-CV-02200, March 15, 2023, ECF No. 1 ¶ 128).

In any event, one reason HDO cannot be convertible into USD now is that the government seized from the Himalaya Exchange much, if not all, of the cash that would be the reserve the Himalaya Exchange could use to allow HDO holders to redeem HDO for USD. (*See* ECF No. 19 at ¶ 25(b) ("Following the seizures, the Himalaya[] Exchange website continued to represent that

HDO was backed by a 'Reserve consisting of USD and cash-equivalent assert' when, in truth, it was not.")). And, as the government also knows, the Himalaya Exchange has notified its customers that it is unable to redeem HDO for USD except in $5,000 increments and only once a month. (*See* Exhibit H). In sum, even if Ms. Wang held 700,000 HCN now, contrary to the government's representations, she could not fund her escape, and it is not worth, in the real world, anything like $13,537,613.20 that the government falsely claims it is worth. (*See* ECF No. 42 at 2–3).

> **b)** **Contrary to the government's suggestion and Judge Lehrburger's suspicions, Ms. Wang did not lie to PTS about the cash found in the safe in her apartment.**

In a further attempt to paint Ms. Wang as a serious flight risk because she allegedly lied about her assets, the government presented Judge Lehrburger with what looked like a transcript of a pretrial interview conducted on the day of Ms. Wang's arrest. But this was not an actual transcript—because no such transcript exists. The government was not there, and there is no official recording (video, audio, or stenographic). Indeed, as counsel learned only *after* Judge Lehrburger's decision, there were no notes of any kind kept by PTS. (*See* Exhibits J–K). Worse still, there are no scripts or lists of questions that the relevant PTS officer used and none for the PTS trainee who was also present. (Ex. J). According to this purported transcript, Ms. Wang said "no" in answer to the following questions: (1) "At the time of your arrest, or within your residence, or on your person, did you have any cash to your name?"; and (2) "Are there any business accounts under your name or that you oversee, or any additional cash anywhere else?" (Exhibit I). According to the government, this purported transcript showed that Ms. Wang hid from PTS that she had $138,000 in cash in her apartment.

The interactions between the government and counsel for Ms. Wang provide other reasons to doubt the accuracy of that purported transcript, including that the alleged script was not put in writing until almost a month later. According to the government's email to counsel, dated April

25, 2023 (and unbeknownst to counsel or Judge Lehrburger), the government interviewed the PTS

officer on April 10 and again on April 11, almost *thirty* days after Ms. Wang's PTS interview on

March 15. (Exhibit L). And while the government's purported transcript was described to counsel

as "notes . . . created contemporaneously with . . . calls [made to the pretrial officer to ascertain

what was said] (so on 4/10 and 4/11, respectively)," it is contained in one email, dated *April 11* at

5:42 p.m., from AUSA Juliana Murray to herself. (Ex. I). That strongly suggests that, contrary to

the government's assertion, the relevant portion of the "contemporaneous notes"—the part

purporting to reflect a transcribed conversation between Ms. Wang and the PTS officer—was not

taken contemporaneously (on April 10) but was written down a day later (April 11), after the

government had a follow-up call with the PTS officer. (Note that the while the government

provided handwritten notes of its various interviews with FBI agents, the only purportedly

contemporaneous notes not taken by hand are contained in the April 11 email from AUSA Murray

to herself).

 Moreover, the purported transcript has these two curious exchanges:

> Q: "Do you happen to have any savings or checking accounts under
> your name or under your businesses?" A: Disclosed two accounts.
> Initially stated it was a JPMC account, attorney said it was a MSSB
> account. Attorney gave the estimated balances and Pretrial Services
> confirmed with YW that was correct.

> Q: Specific bank / institution. A: Provided.

(*Id.*). These purported exchanges are curious because the quoted answers cannot possibly be actual

quotes; they are descriptions of what purportedly transpired. In other words, what the government

made to look like a transcript to make it appear that some thirty days after the relevant

conversation, the PTS officer had a clear word-for-word recollection – without the benefit of any

notes – of what she said and what Ms. Wang said, was, at best, merely a summary of what the PTS

officer *thought* transpired. At worst, this is AUSA Murray's recollection of the substance of what the PTS officer said to her the day before.

Separately, counsel for Ms. Wang *were* present for the interview and took contemporaneous notes. (*See* Exhibits M–N). Neither counsel remembers the exact relevant questions that the government claims were asked: (1) "At the time of your arrest, or within your residence, or on your person, did you have any cash to your name?"; or (2) "Are there any business accounts under your name or that you oversee, or any additional cash anywhere else?" In fact, counsel do not recall any questions whatsoever about cash in Ms. Wang's residence nor questions about additional cash anywhere else. Instead, counsels' notes—both sets taken contemporaneously, simultaneously, and out of sight of each other—are consistent with a different relevant question, *i.e.,* in substance, "Did you have any cash on you when you were arrested?" One counsel's notes contain the following: "No cash on her when arrested." (Ex. N). The second has a note stating: "No cash on person." (Ex. M). This is what counsel remember and their recollection is consistent with their notes. And, even if the government were correct about the questions that were asked, it is clear from counsel's notes—again, the only existing *contemporaneous* notes— that Ms. Wang's answer was limited to stating that she had no cash on her person when she was arrested. In short, what the government has created is more like a dramatic re-imagining of the interview, and it should be weighed as such.[19]

---

[19] The presentation of this purported transcript also fails to mention that Ms. Wang's interview was conducted with the aid of an interpreter, meaning what the government presents as the precise questions posed to Ms. Wang is not necessarily what she was asked. As anyone who has had to face this issue knows, language translation is often imprecise, and this is especially true with Mandarin. Counsel contacted the interpreter after Judge Lehrburger's decision, and the interpreter represented he did not have any notes or remember what was said.

Regardless, there is no doubt that there is a serious dispute—based, at a minimum, on the contemporaneous attorney notes and the thirty-day lapse of time between the PTS interview and the creation of the purported "transcript"—about what was said in that interview and that recollections are inconsistent. This is yet another instance of the government being unable to prove the existence of a fact by a preponderance of the evidence. Ms. Wang cannot be determined to be a flight risk based on this purported interview transcript, let alone be determined to be a *serious* flight risk.

Finally, the cash found in Ms. Wang's apartment was not hidden in the floorboards or in the refrigerator. It was in the safe—together with passports and other things that are normally found in safes—and government agents had no difficulty locating the safe and accessing its contents. Ms. Wang saw the agents begin the search of her apartment. The idea that she would lie about cash stored in her safe at home in the hope that a search by nine FBI agents would not result in the discovery of her safe makes no sense whatsoever, especially considering her clear understanding, as described immediately below, of how thorough the FBI is in conducting searches. As well, the safe was in a closet together with all the other things she kept there (as described below, all of Ms. Wang's possessions were crammed into her closets). It is simply implausible that she could hope that the FBI would miss her safe while tearing apart the only places worth searching, her closets.

In support of its claim that Ms. Wang is a flight risk, the government has emphasized that the FBI agents who conducted the search of her apartment found documents and electronics in bags or suitcases in her closet. But any suggestion that these items were secreted in closets is entirely belied by the description and condition of Ms. Wang's apartment. Ms. Wang lives in a spartan, 740-square-foot, one-bedroom apartment. She does not own a desk, a wardrobe, or any

bookshelves or other furniture where documents or electronics could be stored. Exhibit O, a government-drawn floorplan of Ms. Wang's apartment, shows that her living room furniture consists of a couch, a bean bag chair, an ottoman, a stool, a stand-up mirror, a side table without drawers, and a bench. There is no furniture that could hold electronics, documents, or anything else. Similarly, her bedroom furniture consists of a bed without any drawers, a side table without any drawers, inside of which sits a printer (on the floor between its legs), and a set of five narrow drawers that hold some personal items and intimate clothing. Because she cannot store her possessions anywhere else, all of Ms. Wang's possessions, old and new, are crammed into her closets. (*See* Exhibit P). This is why old phones were kept in a bag in the closet, documents were found in suitcases, and an old laptop was on the same shelf as her clothing. They were not being secreted; they were being stored as tightly and carefully as they could be, given the space constraints.

In addition, Ms. Wang is familiar with what happens when one's premises are searched. For example, in 2019, Ms. Wang witnessed the FBI search Mr. Kwok's office and residence. On that occasion, two dozen or more agents participated in the search. She knew how thorough the FBI agents were; the search lasted approximately twelve hours, and she understood that they searched through every room, every drawer, every closet, and every safe that was on the premises. The suggestion that Ms. Wang hid old phones and documents in her closet to avoid their discovery during a search simply cannot be credited. For the same reasons, the notion that she could have thought that the agents searching her apartment were not going to find her safe or not look inside (and find her cash) also cannot be credited. She well understood how thorough and exhaustive an FBI search is. All this knowledge is in addition to her familiarity with law enforcement searches generally because of her experiences with searches in China.

### D.      The Government Failed to Meet Its Burden of Proving That No Combination of Conditions Will Assure Defendant's Appearance

Magistrate Judge Lehrburger erroneously failed to consider reasonable, less restrictive alternatives to detention. Essentially, the judge offered two reasons for his conclusion that there were no conditions that would assure Ms. Wang's appearance: "First, the fact that [Ms.] Wang has not been able to identify financially responsible persons with moral suasion is itself a substantial change in circumstances since conditions were set by Judge Parker." (ECF No. 56 at 20). "Second, [Ms.] Wang has not been forthcoming in fully disclosing her assets." (*Id.*). Even assuming these conclusions to be correct (and they are not, as discussed above), the detention order did not speak to, or even consider, what bail conditions could address these specific circumstances; the order simply states, in conclusory terms, that no bail conditions exist that would be sufficient here.

But the Bail Reform Act requires more: it requires proof by the government and a finding by the court—by a preponderance of the evidence—that no such conditions exist. *See Sabhnani*, 493 F.3d at 75. To get there, the court must consider alternatives and explain why those alternatives are insufficient. Authoritative in that regard is *Berrios-Berrios*, where the Second Circuit remanded for further proceedings to determine whether there were "any viable alternatives to [the defendant's] continued detention pending trial" because the district court had "fail[ed] to explain on the record the extent to which it considered any alternatives to incarceration and, if so, on what basis they were rejected." 791 F.2d at 251. In other words, the court cannot find that no combination of conditions would exist to assure a defendant's appearance—as the government bears the burden to show under the Bail Reform Act to permit pretrial detainment—unless the court specifically considers all alternatives to pretrial detention and assesses why each of those alternatives cannot prevent, as alleged here, a risk of flight.

As in *Berrios-Berrios*, the record here is devoid of any consideration by Judge Lehrburger of any reasonable, less restrictive alternatives to detention. Further, the record is also barren of any proffer by the government of alternatives—far from it. In effect, as was the case with the risk-of-flight aspect of the government's presentation here, the government shifted the burden to Ms. Wang by identifying risks and then making a conclusory statement that there were no conditions that would adequately assure her appearance given those risks, leaving it to Ms. Wang to show that sufficient conditions *do* exist.[20]

### 1.   The court must consider all reasonable, less restrictive alternatives to detention.

18 U.S.C. § 3142(e) emphasizes that a judicial officer must explore all available options before resorting to pretrial detention. The section provides that detention should only be ordered

---

[20] In addition, in violation of Supreme Court guidance, neither the government, nor Judge Lehrburger followed proper procedure. That is error. *See Salerno*, 481 U.S. at 752 (upholding the procedural protections of the Bail Reform Act and emphasizing that an order of detention may be issued under the Act only after the provision of robust procedural safeguards, including a "full-blown adversary hearing," "findings of fact," and a "statement of reasons for a decision to detain"). Contrary to these procedural protections, in its letter submitted in advance of the scheduled March 31, 2023, hearing before Judge Lehrburger, the government sought detention in a wholly contradictory way. Despite this being the letter in which the government accused Ms. Wang of not being forthcoming about her purported crypto assets and lying to PTS, the government first stated that it was asking for more restrictive conditions—in effect admitting that some set of conditions existed that were adequate even given its new allegations—but ended the letter with an outright demand for remand. (ECF No. 22). Thereafter, as Judge Lehrbruger noted in his decision, at the follow-up hearing on April 4, 2023, the government now argued for detention solely. (ECF No. 56). Several things follow: (1) the government never made a proper motion for a remand hearing, and neither did Judge Lehrburger as required by 18 U.S.C. § 3142 ("The judicial officer shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community."); (2) for that reason, the government did not meet its burden of proving that the risk of flight was serious enough to justify even having a detention hearing; (3) the government was not put to its proper burden to prove that detention is appropriate; (4) because the motion was not properly teed up, Ms. Wang and her counsel were deprived of adequate opportunity to prepare for a detention hearing; they expected a hearing about the specific bail conditions that were already in place and whether they had been satisfied or, alternatively, whether they could be altered to meet Ms. Wang's specific circumstances; and (5) substantively, one cannot both claim that there are sufficient conditions to support release on bail and that also there are no such conditions.

if no other measures can reasonably ensure the appearance of the defendant and the safety of others in the community. Therefore, a judicial officer must exhaust all reasonable, less restrictive alternatives before resorting to pretrial detention. *See Berrios-Berrios*, 791 F.2d at 251. In other words, pretrial detention should be used sparingly and only when it is truly necessary to protect the community and ensure the defendant's appearance in court. *See United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991) (remanding because trial court failed to consider whether the defendant's proposed electronic surveillance anklets were a reasonable alternative to detention).

### 2. The condition of home detention is the limit of what is permissible to assure Ms. Wang's appearance.

Because the "interest in liberty" is "fundamental," it is a "general rule of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 750. The reason is that the pretrial detention of a defendant conflicts with both the Eighth Amendment and the presumption of innocence. *See United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 437 (E.D.N.Y. 2002) ("The Constitution, in its guarantee that excessive bail should not be required, established the default rule that defendants should be detained prior to trial unless necessary. This is because the right to freedom before conviction is basic. Similarly, the right to release on bail is inextricably related to the presumption of innocence of an accused."); *Moreland v. United States*, 968 F.2d 655, 660 n.9 (8th Cir. 1992) ("It is important to note that, when determining the conditions of release, the judicial officer must maintain the presumption of innocence of the presentencing defendant.") (citing 18 U.S.C. § 3142(j)). In fact, pretrial detention solely based on risk of flight, in the absence of danger to the community or clear intent to flee, may not be constitutionally sound. *See United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012) ("Pretrial detention satisfies due process only if its purpose is regulatory rather than

punitive. . . . Permissible    regulatory    purposes    include    'preventing    danger    to    the
community,' . . . and 'ensur[ing] [a defendant's] presence at trial[.]'") (citations omitted)).

As the Supreme Court said in *Bell v. Wolfish* in the context of a challenge to prison
conditions by pretrial detainees:

> The petitioners assert, and respondents concede, that the "essential
> objective of pretrial confinement is to insure the detainees' presence
> at trial." . . . While this interest undoubtedly justifies the original
> decision to confine an individual **in some manner**, we do not accept
> respondents' argument that the Government's interest in ensuring a
> detainee's presence at trial is the *only* objective that may justify
> restraints and conditions once the decision is lawfully made to
> confine a person. "**If the government could confine or otherwise
> infringe the liberty of detainees only to the extent necessary to
> ensure their presence at trial, house arrest would in the end be
> the only constitutionally justified form of detention.**"

441 U.S. 520, 539 (1979) (bold emphasis added) (quoting *Campbell v. McGruder*, 580 F.2d 521,
529 (1978)). In other words, once a defendant is lawfully remanded, the government's interest in
maintaining a prison may subject a detainee to the same conditions as other inmates. Otherwise,
if the government's only interest is the run-of-the-mill risk of flight, the constitutional limits of
pretrial detention may be home confinement. Put differently, in the absence of something extreme,
like proven intent to flee, a defendant must be released or, at most, if the risk of flight justifies it,
confined at home. This reading of the constitutional limits of pretrial detention is, as discussed
above, consistent with the requirements of 18 U.S.C. § 3142 and its legislative history.
Significantly, the Supreme Court was quoting the District of Columbia Circuit opinion in
*Campbell*. There, in the same context of a challenge to prison conditions, the D.C. Circuit, relying
on the Seventh Circuit opinion in *Duran v. Elrod*, 542 F.2d 998, 999–1000 (7th Cir. 1976), having
established that as a matter of due process, pretrial detainees may suffer no more restrictions than
are reasonably necessary to ensure their presence at trial, said the following:

**If the government could confine or otherwise infringe the liberty**

> **of detainees only to the extent necessary to ensure their presence at trial, house arrest would in the end be the only constitutionally justified form of detention.** Since this would render pretrial detention a virtual impossibility and **thus frustrate the government's interest in protecting the safety of the community,** we must acknowledge as an aspect of that interest the government's ability to manage the institution of pretrial detention in an administratively feasible manner. . . . The myriad of prosaic details involved in that enterprise—the choice of menus, the assignment of cells, the scheduling of recreation and other events— take on a life independent of the primary justifications of the confinement.

580 F.2d at 529 (emphasis added) (internal citation omitted). In other words, the Supreme Court was quoting and relying for this reasoning on a case that took an even narrower view of the limits of pretrial detention, linking it to the safety of the community.

In the instant case, the physical restrictions proposed by Ms. Wang are "extraordinary," to borrow a phrase used by the Second Circuit in *Sabhnani* to describe conditions of home confinement that are substantively identical to those proposed by Ms. Wang here. 493 F.3d at 77. Indeed, *Sabhnani* is instructive here, as its facts bear a striking resemblance to those of this case. There, husband and wife defendants, who were citizens of India and Indonesia, respectively, faced charges for harboring illegal aliens in their Long Island home and for the forced labor of those illegal aliens, who were effectively treated as domestic slaves. *Id*. at 65. The defendants also possessed millions of dollars in assets. *Id*. The government sought pretrial detention on the basis that the defendants were a flight risk. According to the government, detention was necessary because (a) "the evidence of [the defendants'] guilt was compelling"; (b) they "faced a significant term of incarceration" of forty years' imprisonment; (c) their "vast financial resources" provided "means and opportunity to flee"; (d) they had "personal and professional contacts with numerous foreign countries" with which the "United States had no extradition treaty"; and finally (e) during their initial interview with PTS, they had misrepresented their assets. *Id*. at 67, 72.

To mitigate the government's concerns about potential flight, the defendants agreed to sign a personal recognizance bond secured by some of their assets and agreed to severe restraints on their physical liberty. They agreed to surrender their passports and be subject to home confinement with electronic monitoring and unannounced visits by PTS. *Id*. at 77. Despite the defendants' agreement to these conditions, the district court ordered the defendants detained. *Id*. at 72.

The defendants immediately appealed the detention order to the Second Circuit, requesting expeditious review. *Id*. at 73. The Second Circuit, in a unanimous opinion authored by Judge Reena Raggi, reversed, noting the "extraordinary" physical restrictions agreed to by the defendants. *Id*. at 77. The Second Circuit reiterated the "statutory presumption in favor of release," and explained that "there is no reason in this case to think that the proposed conditions of home confinement cannot reasonably mitigate any concerns about defendants' risk of flight." *Id*. at 78. Accordingly, the Second Circuit remanded the case back to the district court and articulated its "expectation that . . . the district court *will* enter appropriate bail release orders." *Id*. (emphasis added).

### E.     Detention Interferes with Ms. Wang's Ability to Participate in Her Own Defense

The government has indicated that the trial in this case should be expected to take place a year from now because of the volume of discovery and the complexity of the issues. Two things follow: first, this means that Ms. Wang would be in pretrial detention for over a year even before the trial starts. Requiring Ms. Wang to remain incarcerated for the entire time it takes to bring this case to trial simply cannot be reconciled with the Bail Reform Act or any standard of fairness. *United States v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987) ("grave due process concerns" are implicated by a seven-month period of pretrial detention). Forcing her to remain incarcerated for an indeterminate amount of time is the equivalent of forcing Ms. Wang to serve a prison sentence before she has been convicted. In addition, detention at the MDC will deny her the ability to

meaningfully participate in the preparation of her own defense and will cripple her counsel's ability to understand the relevant documents, conduct the necessary factual investigations, and to prepare for trial. *See Barker v. Wingo*, 407 U.S. 514, 533 (1972) ("[I]f a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious."); *United States v. Vitta*, 653 F. Supp. 320, 337 (E.D.N.Y. 1986) ("The quality of the detainee's legal defense is likely to diminish dramatically as long as he or she is incarcerated. The interlude between arraignment and trial is 'perhaps the most critical period of the proceedings . . . when consultation, thoroughgoing investigation and preparation . . . [are] vitally important . . . .'") (quoting *Powell v. Alabama*, 287 U.S. 45, 57 (1932)).

This is especially so given that much of the material will be in Mandarin, will involve cultural nuances, and require the ordering and prioritizing of a very large volume of evidence. Counsel can already attest to the fact that Ms. Wang's detention has seriously complicated, delayed, and impeded this bail litigation.

**CONCLUSION**

For the forgoing reasons, Ms. Wang should be released forthwith and given ten business days to fulfill all the bail conditions set forth on pages 2–3 above.


Dated:    June 5, 2023                                    Respectfully submitted,

                                                         */s/ Alex Lipman*

                                                         Priya Chaudhry
                                                         CHAUDHRYLAW PLLC
                                                         147 W. 25th Street, 12th Floor
                                                         New York, New York 10001
                                                         Tel: (212) 785-5550
                                                         Email: priya@chaudhrylaw.com

                                                         Alex Lipman
                                                         LIPMAN LAW PLLC
                                                         147 W. 25th Street, 12th Floor
                                                         New York, New York 10001
                                                         Tel: (212) 401-0070
                                                         Email: alexlipman@lipmanlawpllc.com

                                                         *Attorneys for Defendant Yanping Wang*