UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>YANPING WANG,<br><br>                Defendant. | Case No. 23-CR-118-AT |

**DEFENDANT YANPING WANG'S REPLY
IN SUPPORT OF HER MOTION FOR AN ORDER REVOKING
THE MAGISTRATE JUDGE'S ORDER OF DETENTION
DATED APRIL 21, 2023, AND AUTHORIZING PRETRIAL RELEASE**

Priya Chaudhry
CHAUDHRYLAW PLLC
147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 785-5550
Email: priya@chaudhrylaw.com

Alex Lipman
LIPMAN LAW PLLC
147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 401-0070
Email: alexlipman@lipmanpllc.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

I. THE GOVERNMENT IGNORES AND THUS CONCEDES IMPORTANT LEGAL AND FACTUAL ISSUES AS TO FLIGHT RISK .......................................................... 4

    A. The Government Does Not Show that Ms. Wang Intends to Flee ..................... 4

    B. Ms. Wang Has Strong Communal Ties ............................................................... 7

    C. Ms. Wang Has Nowhere Else to Go ..................................................................... 8

    D. The Government Abandons Its Cryptocurrency Theory for Another Theory That Is Equally Groundless ................................................................................... 9

    E. The Government Fails to Address the Case Law Supporting That Wealth and the Possibility of Non-Extradition Alone Do Not Justify Pretrial Detention .............................................................................................................. 11

    F. Ms. Wang Did Not Lie to Pretrial Services ....................................................... 11

II. THE GOVERNMENT HAS FAILED TO SHOW THAT NO CONDITIONS EXIST THAT WOULD REASONABLY ASSURE MS. WANG'S APPEARANCE .............. 12

III. THE GOVERNMENT SHOULD BE PRECLUDED FROM MAKING NEW ALLEGATIONS OR ASSERTING NEW GROUNDS FOR DETENTION THAT IT DID NOT ASSERT BEFORE JUDGE PARKER AND JUDGE LEHRBURGER ... 13

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*AT&T Corp. v. Syniverse Techs., Inc.*,
No. 12-CV-1812-NRB, 2014 WL 4412392 (S.D.N.Y. Sept. 8, 2014) ................................5

*Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*,
No. 22-CV-05006-CM, 2022 WL 17342495 (S.D.N.Y. Sept. 30, 2022) ............................5

*Hung v. United States*,
439 U.S. 1326 (1978) ....................................................................................4, 5

*United States v. Barnett*,
986 F. Supp. 385 (W.D. La. 1997) ....................................................................7, 8

*United States v. Berger*,
No. 06-CR-130-NGG, 2006 U.S. Dist. LEXIS 55844 (E.D.N.Y. Aug. 9, 2006) .............14

*United States v. Byrd*,
969 F.2d 106 (5th Cir. 1992) ..............................................................................13

*United States v. Carriles*,
481 F. Supp. 2d 792 (W.D. Tex. 2007) ...................................................................7

*United States v. Kostadinov*,
572 F. Supp. 1547 (S.D.N.Y. 1983) .......................................................................5

*United States v. Yaming Nina Qi Hanson*,
613 F. Supp. 2d 85 (D.D.C. 2009) .........................................................................6

## Statutes

18 U.S.C. § 3142(c)(2) .......................................................................................13

18 U.S.C. § 3142(f) ............................................................................................14

18 U.S.C. § 3148 .................................................................................................5

Yanping Wang is a typical white-collar defendant in the Southern District of New York—she has no criminal history, faces charges with enormous alleged loss amounts (creating elephantine sentencing guidelines), and has no history of failing to appear in court or fleeing to avoid capture. Pretrial detention is an extraordinary measure that *cannot* be deployed lightly and *is not* employed for other defendants situated similarly to Ms. Wang. The reality is that if Ms. Wang was not connected to Mr. Miles Kwok and rather appeared as a lone defendant on the exact same allegations, she would very likely have been released on bail conditions that she could meet, like Sam Bankman-Fried. It is, and has always been, the government's burden to demonstrate by a preponderance of the evidence that Ms. Wang is enough of a flight risk to warrant detention and that no set of conditions would reasonably assure her appearance. Unable to meet this burden, the government has consistently attempted to shift the burden to Ms. Wang to demonstrate why she should not be detained, including in its opposition. The government has failed to meet its burden. Ms. Wang must be released on bail.

The government's jejune opposition suffers from three fatal flaws: (1) it fails to demonstrate by a preponderance of the evidence that Ms. Wang presents enough of a flight risk to warrant detention; (2) it fails to establish why the current detention order is appropriate for Ms. Wang and instead merely repeats its case for detention of Mr. Kwok (perhaps hoping the Court would not notice that these are distinct defendants); and (3) it inappropriately throws into its opposition entirely new allegations and then misconstrues the law to argue that these new allegations would (on their own, or in addition to the current allegations) warrant detention. In essence, the government simply pays lip service to its burdens of proof, as evidenced by its utter failure to address several issues that are central to whether those burdens have been satisfied.

One reason the government fails to meet its burden of showing that Ms. Wang is likely to flee is that it paints with too broad a brush, thereby overstating Ms. Wang's alleged culpability in support of its assertion that the strength of its evidence favors detention. An important example of this: the government positions its case as one in which all the companies mentioned in the indictment, as well as any other company associated with Mr. Kwok, were fraudulent, such that any work for any of these companies was in furtherance of the various frauds charged in the indictment. That is simply not so. Each of the relevant companies—G|Clubs, GTV, G|Fashion, Hymalaya Exchange, Gettr, HCHK Technologies, and HCHK Properties—are or were real companies with real businesses and real employees. Consistent with that, the government admitted in a *Brady* letter sent to counsel on June 26, 2023, that, █████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████ It also cannot be disputed that these companies were used, at least in part, to advance the cause of the anti-CCP movement (as the government alleges, this is precisely what incentivized the dissident community to invest) and that their products and services were meant to advance the movement in some way—for example, supporting the maintenance of an online anti-CCP presence (HCHK Technologies), distributing anti-CCP content (GTV), fostering social interaction among members of the anti-CCP dissident movement (G|Clubs), and designing and selling fashionable clothes for the anti-CCP dissident movement participants, many of which bear anti-CCP slogans and symbols (G|Fashion). In fact, the real gravamen of the government's case is not that all these companies were not real or that *all* of the money raised was diverted. Rather, the core of the allegations is that people other than Ms. Wang made false statements in connection with raising the funds (Mr. William Je wrote the PPM (ECF No. 19 ¶ 13c)

and Mr. Kwok made public statements to his supporters (*id.* ¶ 13a)), and that *some* of the money raised for these companies from the dissident community was diverted for the personal use of Messrs. Kwok and Je (and their families) as well as invested in a manner inconsistent with the use-of-funds disclosures given to prospective investors. Put another way, the government's allegation is not that these businesses were illegal *per se*, *but that in connection with these legal businesses, the defendants (mainly Messrs. Kwok and Je) committed discreet illegal acts*.

What this means is that Ms. Wang's mere participation in a company's business—for example, by reviewing legitimate payroll and interviewing prospective employees—is not, in the absence of evidence that the specific activity in question was directly related to fraudulent conduct—evidence of fraud. The government simply makes a logical leap (without sticking the landing) that Ms. Wang's participation in *any* activity related to any of these companies is by itself evidence of her involvement in the conspiracy and all the allegedly fraudulent conduct. Considering all circumstances, this logical leap improperly shifts the burden to Ms. Wang to disprove the government's suppositions about her role.

Equally as grave, instead of assessing the relevant issues, the government attempts to introduce several new allegations and grounds for detention never previously raised. The government should not be able to do so, as permitting the government to proceed in this manner is an afront to the procedural parameters set forth in the Bail Reform Act. But even if these strategically delayed contentions were to be considered, they nevertheless fail to support detention. For example, as we discuss below, Ms. Wang cannot be detained on the basis that she has engaged in "obstructive behavior" because the cases upon which the government relies are inapposite. Unlike those cases, Ms. Wang has in no way engaged in witness tampering or worse. But even on the merits, the government's proffer on this issue is weak, as we detail below.

In addition, the government also fails to show that no conditions would reasonably assure Ms. Wang's appearance. While it is true that Ms. Wang requests this Court to set bail conditions less onerous than originally set, the government fails to address the adequacy of some of the conditions that Ms. Wang proposes. The government fails to explain why a secured $2 million personal recognizance bond (representing Ms. Wang's entire net worth) would be insufficient to reasonably assure Ms. Wang's appearance. The government also does not even bother to offer its reasons for why in-home monitoring by a responsible person is insufficient to assure compliance with home confinement, given that whoever monitors (and lives with Ms. Wang for that reason) would be doing so on pain of being held in contempt, should the monitor fail to carry out her responsibilities faithfully. Such failures should prevent the conclusion that the government has carried its burden on this issue.

I. **THE GOVERNMENT IGNORES AND THUS CONCEDES IMPORTANT LEGAL AND FACTUAL ISSUES AS TO FLIGHT RISK**

   A. **The Government Does Not Show that Ms. Wang Intends to Flee**

We raised the issue of evidence of a defendant's intent to flee as being a necessary component to whether the defendant presents sufficient flight risk to warrant detention, as numerous courts have held. (ECF No. 81 at 9). Specifically, we explained with supporting case law that "evidence substantiating 'an actual risk of flight,'" *i.e.*, the required risk-of-flight showing in the Second Circuit, "must be something akin to evidence that the defendant possesses an intent to flee." (*Id.*). We then argued that the government "failed to meet its burden with respect to an intent to flee because it offered very little by way of evidence, relying, instead, on supposition and conjecture." (*Id.* at 10). Tellingly, the government stands silent on this issue, effectively conceding.

To be sure, holding that Ms. Wang *is* a flight risk would directly conflict with the cases we cited and would run afoul of the Supreme Court's guidance in *Hung v. United States*, where the

4

Supreme Court assessed a similar issue of whether the district court had erred in revoking a defendant's bail after he was convicted. 439 U.S. 1326, 1326 (1978) (citing 18 U.S.C. § 3148). Assessing that issue, the Supreme Court reversed the appellate court, which had found no abuse of discretion in the district court's decision to revoke the defendant's bail because, among other reasons, the defendant supposedly posed a risk of flight. *Id.* at 1326–27. In assessing whether the appellate court's conclusion that there was no set of conditions that would reasonably assure the defendant's appearance, the Supreme Court focused predominantly on what the evidence established with respect to the defendant's state of mind—*i.e.*, his "inclination" to flee. *Id.* at 1329 ("But if these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee. And other evidence supports the inference that he is not so inclined."). *See also United States v. Kostadinov*, 572 F. Supp. 1547, 1551 (S.D.N.Y. 1983) ("Thus, in . . . *Hung* Justice Brennan noted that opportunities for flight alone are insufficient grounds for denial of bail. There must also be a showing that, if released, defendant has an inclination to flee."). Consistent with *Hung*, the Court should conclude here that the government has failed to show that Ms. Wang has an intention to flee and, therefore, Ms. Wang is not a flight risk.

This conclusion is especially true here, given the government's silence on the issue. By staying silent, the government has conceded it, meaning that the Court should conclude that an "actual risk of flight" requires evidence akin to an intent to flee, as we have contended. *See Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, No. 22-CV-05006-CM, 2022 WL 17342495, at *3 (S.D.N.Y. Sept. 30, 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief."); *AT&T Corp. v. Syniverse Techs., Inc.*, No. 12-CV-1812-NRB, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (factual issue was conceded through silence; collecting SDNY cases).

Furthermore, as the government failed to proffer evidence of an intent to flee, the Court should conclude that this obvious omission favors finding that Ms. Wang is not a flight risk or that some set of conditions would ensure her appearance. *See, e.g.*, *United States v. Yaming Nina Qi Hanson*, 613 F. Supp. 2d 85, 90 (D.D.C. 2009) ("In this case, . . . there is no strong circumstantial evidence indicating that [the defendant] intends to flee the United States."). Indeed, the government has not even bothered *to argue* that Ms. Wang possesses an intent or even an inclination to flee. Instead, the government has asserted that she may have *opportunity* to flee, which we debunked (ECF No. 81 at 11–20), or help from others to facilitate flight (also debunked, *id.*); but it is silent as to state of mind. No wonder: as we demonstrated in our brief, Ms. Wang has no intention to flee, if for no other reason than that she is more afraid of the CCP (which would likely torture and kill her) than she is even of a long sentence in the U.S. (The government has now admitted that Victim-1 in the Eastern District indictment is Mr. Kwok ("[T]he Government can confirm that Kwok is 'Victim-1.'"). Ms. Wang's fear of being harassed, followed, and exposed by the Chinese government's agents in the U.S. should she flee are well-founded (ECF No. 81 at 16–17), and the government does not spare a single word refuting that because it is true.

The government's argument that Ms. Wang's application to travel for business is evidence of flight risk stands logic on its head. Knowing that the federal prosecutor cavalry was coming for her (*id.* at 15–16), she informed the government of her desire to travel to save her asylum application. If she were inclined to flee and had the means and opportunity to do so, as the government alleges (if, for example, she *were* able to hide in Abu Dhabi or anywhere else)—she would have boarded a plane on her Chinese passport and left.

In short, the government makes no attempt to provide any evidence akin to corroborating that Ms. Wang intends to flee, relying instead on conclusory supposition and conjecture for its

6

proffer on this issue. (*See* ECF No. 89 at 27 ("With this backdrop, it is not credible for Wang to claim she has 'no intention to flee.'")). Absent evidence of intent to flee, much less a discussion of it, the Court should hold that Ms. Wang does not present enough of a flight risk to warrant detention.

### B. Ms. Wang Has Strong Communal Ties

That Ms. Wang's community in the U.S. consists primarily of other members of the anti-CCP movement who are also in the U.S. is a sufficient showing of community ties, unless, of course, the government were to take the position that immigrants living here cannot form a community. Again, Ms. Wang is not only a member, but a leader, of the anti-CCP movement in the U.S. (ECF No. 81 at 1 ("Ms. Wang is one of the leaders of a dissident movement whose aim is nothing short of the overthrow of Chinese Communist Party (CCP) rule in China."), 13, 19–20). The government is once again silent on these points and thereby concedes that Ms. Wang does in fact have strong ties to the anti-CCP community here in the U.S.

However, even if the government's concession on this issue were somehow not enough to establish strong communal ties, many facts would still heavily support a finding of a strong bond between Ms. Wang and the anti-CCP community. Perhaps most probative of this is the fact that many individuals from within that community voluntarily came forward to offer their assets as security to ensure Ms. Wang's release. Moreover, even more of the same came in solidarity to attend Ms. Wang's detention hearing. Those facts strongly favor finding a strong community to which Ms. Wang belongs, as some courts have observed. *See, e.g.*, *United States v. Carriles*, 481 F. Supp. 2d 792, 796 (W.D. Tex. 2007) ("[The defendant] has ample ties to the community, as evidenced by the thousands of supporters who have signed petitions on his behalf and volunteered their personal resources to aid in his defense."); *United States v. Barnett*, 986 F. Supp. 385, 396

(W.D. La. 1997) ("[A]pproximately fifteen to twenty members of the community appeared at [the defendant's] . . . hearing, indicating that he retains strong ties to this community.").

### C. Ms. Wang Has Nowhere Else to Go

Relying on the connections of her co-defendants but not Ms. Wang's, the government attempts to portray her as someone having substantial international connections, implying that she would use these connections of others to flee the U.S. (ECF No. 89 at 28 ("As described above, **Kwok and others** have been moving the operations of the Himalaya Exchange and other Kwok-controlled entities to the UAE for the admitted purpose of evading the U.S. legal system. . . . Her **co-defendant, Je**, is presently believed to be hiding in the UAE.") (emphasis added)). In doing so, the government entirely ignores our analysis showing that Ms. Wang has nowhere else to go. (ECF No. 81 at 2 ("She literally has nowhere to go."), 20 ("She really has nowhere else to go.")). So, even if Ms. Wang did have an expansive network of international connections of her own (she does not), the fact would still remain that Ms. Wang is incapable of utilizing those networks to ensure she remains unfound.

Notably also, Ms. Wang's supposed international connections, really others' connections, could not ensure her flight from the U.S. Missing from the government's analysis is any explanation as to how Ms. Wang is tied to the connections of others that she would supposedly utilize. For example, the government points to Ms. Wang's co-defendant as being "suspected" of being in the UAE but presents no evidence supporting this, much less evidence supporting that Ms. Wang would desire to join him or that he (presumably, a fugitive in hiding) would want her to, such that she could lead the authorities to him. In sum, the government's entire presentation of Ms. Wang's international contacts can be summarized as: she knows people in other parts of the world. But so does almost every single New Yorker and defendant in this district. That does not,

8

and cannot, demonstrate an intent or ability to flee. That is quite the stretch. The government's proffered international connections theory should in no way sustain continued detention.

> D. **The Government Abandons Its Cryptocurrency Theory for Another Theory That Is Equally Groundless**

Previously, the government sought to show that Ms. Wang had access to substantial funds to support flight from the U.S. because she held and had allegedly failed to disclose millions of dollars in cryptocurrency. We already detailed why the government's cryptocurrency theory failed to hold water (*id.* at 23–28), and tellingly, the government failed to address that point, providing no specifics as to Ms. Wang's purported crypto holdings. In place of its cryptocurrency theory, the government has now pivoted to trying to establish Ms. Wang's alleged access to funds by painting an image of Ms. Wang as being highly connected to the entities that allegedly carried out the conspiracy and now purportedly contain a treasure trove of money that is all supposedly accessible to Ms. Wang and that she would use if given the chance to flee. (*See* ECF No. 89 at 28–30 ("[T]his claim is belied by Wang's role in the fraud and her effective control over tens of millions of dollars, as described in greater detail herein.")).

The elephant in the room here is that, as noted, these are real businesses with real employees. For this reason, the government is unable to even proffer any evidence showing that Ms. Wang can access the funds for *her own use* from these entities. Even if the government were correct (and it is not), it has presented no evidence that Ms. Wang *still* has access to the funds associated with any of these entities. The summary of accounts that the government points to does not establish access to funds. (*See id.* at 30 ("[T]he defendant had printed summaries of account balances for six bank accounts held in the names of Kwok-controlled GF Italy, GFNY, HCHK Technologies, and HCHK Property in her purse, which indicated that those six accounts alone held more than $55 million as of March 13, 2023.")). Clever phrasing in the government's opposition

9

makes it seem like Ms. Wang now has access to numerous bank accounts, (ECF No. 89 at 29 n.22), but read closely, the language indicates that she may have *had* access, not that she still does. The government offers no explanation for how Ms. Wang could access corporate funds of active businesses for her *personal* use, none. Moreover, the bulk of that $55 million is in HCHK Technologies and HCHK Properties. But, as the government well knew before filing its opposition, both HCHK Technologies and HCHK Properties (and all their assets) were transferred to an assignee (acting as a fiduciary of those companies) for the benefit of their creditors. Ms. Wang is not one of them.

Indeed, neither the indictment nor any other allegation made by the government to date has mentioned Ms. Wang's ability to divert or participation in diverting corporate funds for anyone's personal use. The only specific allegation in the indictment relating to misuse of funds by Ms. Wang is *investing* funds in a manner inconsistent with use-of-funds disclosure to investors. (*Id.* at 18 ("On June 5, 2020, Wang authorized the $100 million wire transfer . . . [and t]he subscription agreement, which Wang signed, made clear that $100 million *investment* . . . was made on behalf of Saraca, whose ultimate beneficial owner is Kwok's son.") (emphasis added)). In other words, concluding that Ms. Wang would appropriate funds for *her own* use is yet another leap untethered to facts or logic.[1] In short, only because it benefits the government's conclusory theory does the government now claim that Ms. Wang, a salaried employee, can now take and use

---

[1] The government's opposition paints with a broad brush and attempts to expand the nature of Ms. Wang's involvement in the conspiracy to extend beyond the GTV Private Placement. (*See* ECF No. 89 at 19). But a review of the indictment reveals that Ms. Wang is only specifically connected to the GTV Private Placement, nothing more. (ECF No. 81 at 11–12).

10

the funds that she never once touched or received before.[2] Unsupported hypotheses are not evidence.

### E. The Government Fails to Address the Case Law Supporting That Wealth and the Possibility of Non-Extradition Alone Do Not Justify Pretrial Detention

The government does nothing to try and refute the cases we cited showing that affluent foreign nationals who may possibly flee to jurisdictions where extradition is impossible cannot be detained on those grounds alone. (*See* ECF No. 81 at 21–22). Nevertheless, those grounds are essentially the grounds upon which the government seeks to detain Ms. Wang. As we have discussed, at base, the government believes Ms. Wang will flee because she allegedly has access to a substantial amount of money and reason to flee—supposedly having no connection here but many connections elsewhere—to countries where extradition would be impossible, such as the UAE. Yet at this moment, Sam Bankman-Fried, who indisputably had and likely still has actual access to opulent wealth and boundless resources—and faces staggering sentencing guidelines, while periodically disobeying Judge Kaplan—fights his case from his home. The government cannot (and therefore it did not) distinguish Ms. Wang from Mr. Bankman-Fried; neither of them warrants detention. And yet one—the foreign national with modest personal funds and nowhere to go—is detained. The Court should follow the authorities we cited and conclude that this is an insufficient basis upon which to detain Ms. Wang.

### F. Ms. Wang Did Not Lie to Pretrial Services

We thoroughly addressed and refuted the government's assertion that Ms. Wang lied to Pretrial Services ("PTS") about cash in her home safe. (*See id.* at 28). In response, the government

---

[2] In the absence of proof of personal enrichments, the government has attempted to paint Ms. Wang's salary as extraordinary. Ms. Wang's compensation was consistent with that of other similar executives. *See* https://www.privatebank.citibank.com/ivc/docs/Executive-reward-and-retention-strategies-in-family-offices-Citi-Private-Bank.pdf. This is certainly not evidence of receiving fraud proceeds.

completely fails to address the fact that it presented an imaginary transcript of Ms. Wang's PTS interview. Indeed, the Court now has additional evidence supporting Ms. Wang's truthful assertion that she was not asked whether she had any cash aside from what was on her person at the time of her arrest. As the Court is aware, certain confidential notes were accidentally filed with our motion. Those notes indicate that Ms. Wang disclosed to counsel prior to her PTS interview that she had cash in her safe. Two things follow: one, Ms. Wang was not hiding the fact that she had cash in her apartment; and two, had the right question been asked and Ms. Wang had given an incorrect answer, counsel would have corrected the record on the spot in the interview. That did happen with respect to another question asked in the PTS interview. When asked about her bank accounts, Ms. Wang mistakenly identified one of them as JPMorgan instead of Morgan Stanley. Counsel, who had asked that question before the interview, immediately corrected her.

## II. THE GOVERNMENT HAS FAILED TO SHOW THAT NO CONDITIONS EXIST THAT WOULD REASONABLY ASSURE MS. WANG'S APPEARANCE

Though the government bears the burden of proof on this issue, it nevertheless fails to show by a preponderance of the evidence that no conditions exist that would reasonably assure Ms. Wang's appearance. One problem with the government's analysis of this issue is that it fails to describe how or why many of Ms. Wang's proposed conditions would be insufficient to reasonably assure her appearance. For instance, Ms. Wang proposes that restrictions be placed upon her ability to use her bank accounts—*e.g.*, she would only be able to use funds for necessities. The government says nothing about this, though it writes at length about how Ms. Wang's resources lean in favor of her being a flight risk. Likewise, the government says nothing directly refuting the efficacy of Ms. Wang's proposal to have a friend live with and monitor her to ensure Ms. Wang's compliance with her proposed conditions. (*See* ECF No. 89 at 40 (contending generally that Ms. Wang's past conduct should lead the Court to believe that she would not comply

12

with her proposed conditions)). For obvious reasons, someone willing to submit to this Court's contempt power has a strong incentive to report Ms. Wang should she not abide by her conditions. At the very least, that incentive creates *reasonable* assurance that Ms. Wang will appear.

Separately, up to now, Ms. Wang has been penalized for not knowing enough wealthy individuals who could afford to act as sureties. Indeed, although Ms. Wang continues to believe that she has sufficient moral suasion over the individuals whom she offered as potential sureties, Ms. Wang was forced to lower the amount of her proposed bond (from $5 million to $2 million) because this is all she has. Any amount above that would run afoul of Congress' enacted directive that financial conditions may not be imposed if they result in the pretrial detention of the defendant. *See* 18 U.S.C. § 3142(c)(2) ("The judicial officer may not impose a financial condition that results in the pretrial detention of the person.").

### III. THE GOVERNMENT SHOULD BE PRECLUDED FROM MAKING NEW ALLEGATIONS OR ASSERTING NEW GROUNDS FOR DETENTION THAT IT DID NOT ASSERT BEFORE JUDGE PARKER AND JUDGE LEHRBURGER

Notably absent from the government's opposition is any authority supporting its present attempt to make allegations and raise grounds for detention that it previously did not. The government is in essence engaging in a game of "whack-a-mole" in which the government raises a new allegation every time Ms. Wang addresses a prior false contention of the government. The Court should not permit this. Instead, the Court should conclude that the government is estopped at this juncture from making any new allegations and from raising any new grounds for detention. Alternatively, the Court should hold a hearing at which the government would be required to provide Ms. Wang with adequate discovery to examine and opportunity to challenge these new allegations. *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("Detention can be ordered, therefore, only 'in a case that involves' one of the six circumstances listed in (f), and in which the

judicial officer finds, after a hearing, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."). At the pretrial detention hearing, the defendant "shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise." 18 U.S.C. § 3142(f).

As it did before Judge Lehrburger, the government has waited until the eleventh hour to create a new justification for detaining Ms. Wang. Now, the government would have this Court detain Ms. Wang on the basis that she is an obstructionist because she has supposedly lied to PTS, violated bankruptcy orders, and continues to operate the alleged conspiracy from behind bars. (ECF No. 89 at 32–39). While the prejudice to Ms. Wang caused by the belated nature in which the government raises these issues cannot be overstated, the Court need not address any of these issues because the authority upon which the government relies is entirely inapposite. What the government ignores in raising this issue is that only a specific type of "obstruction" has been recognized by courts as warranting pretrial detention. As the Eastern District of New York observed, "[i]n such cases, defendants have consistently been found to have engaged in severe witness tampering or worse to support a finding of obstruction." *United States v. Berger*, No. 06-CR-130-NGG, 2006 U.S. Dist. LEXIS 55844, at *13 (E.D.N.Y. Aug. 9, 2006) (collecting cases). As the government raises no such allegations, the Court should not detain Ms. Wang on its alleged "obstructive behavior" grounds.

But even if the Court were to consider the government's new allegations, the Court should still not detain Ms. Wang on the basis that she has engaged in the alleged obstructive behavior. To begin, Ms. Wang was not herself subject to any order that the government alleges was violated. All that the government alleges is that *Mr. Kwok* was held in contempt for violating a court order

14

and that a court found troubling an adverse party's *allegation* that Ms. Wang transferred a company after the court found that company to be property of the estate. (Significantly, Mr. Kwok was found not to have communicated proper instructions to Ms. Wang. (ECF No. 89, Exhibit D ¶ 5)). The type of behavior alleged here—involvement in others disobeying a court order or giving instructions to run a business, including by informing others who are not alleged to be co-conspirators where company funds are located—does not rise to the type of "obstruction" that leads courts to snatch up and lock up defendants. As this Court well knows, disobeying a condition of release, on its own, does not necessarily result in a remand; it usually warrants a strict lecture from the supervising PTS officer.

## CONCLUSION

For all the forgoing reasons and those we raised in our motion, Ms. Wang should be released and given ten business days to meet all her proposed bail conditions.

Dated:   June 30, 2023                                          Respectfully submitted,

/s/ Alex Lipman

Priya Chaudhry
CHAUDHRYLAW PLLC
147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 785-5550
Email: priya@chaudhrylaw.com

Alex Lipman
LIPMAN LAW PLLC
147 West 25th Street, 12th Floor
New York, New York 10001
Tel: (212) 401-0070
Email: alexlipman@lipmanlawpllc.com

*Attorneys for Defendant Yanping Wang*