**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        *Plaintiff,*

   v.

HO WAN KWOK,

        *Defendant.*

**FILED PARTIALLY UNDER SEAL**

Case No. 1:23-CR-118-1 (AT)

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO COMPEL DISCOVERY**

Sidhardha Kamaraju
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490

*Attorneys for Defendant Ho Wan Kwok*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ............................................................................. 1

RELEVANT BACKGROUND ............................................................................... 3

    I.  Operation Fox Hunt ................................................................................... 3

    II.  The New Federal State of China (NFSC) ................................................. 5

    III.  ███████████████████████████ ............................................... 8

    IV. The Indictment & the Government's *Brady* Disclosures ......................... 9

        A. The Indictment .................................................................................. 9

        B. The Government's *Brady* Disclosure .............................................. 10

    V.  Mr. Kwok's Discovery Requests and the Government's Response ........... 11

        A. Mr. Kwok's Discovery Requests ..................................................... 11

        B. The Government Refuses to Produce the Fox Hunt *Brady* Evidence and the August 26 Recording ...................................................... 13

ARGUMENT ....................................................................................................... 14

    I.  Applicable Law ....................................................................................... 15

    II.  Discussion .............................................................................................. 17

        A. Any Fox Hunt *Brady* Evidence Should Be Disclosed ..................... 17

        B. The August 26 Recording Is Discoverable ...................................... 27

        C. The Government Should Identify Any Other U.S. Government Agency that the Government Knows Possesses the Aforementioned Information ......................... 28

CONCLUSION ..................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                        **Page(s)**

*Brady v. Maryland,*
   373 U.S. 83 (1963) ..................................................................................... *passim*

*Giglio v. U.S.,*
   405 U.S. 150 (1972) ...............................................................................12, 16

*Kyles v. Whitley,*
   514 U.S. 419 (1995) .........................................................................................16

*United States v. Abu-Jihaad,*
   630 F.3d 102 (2d Cir. 2010) ............................................................................17

*United States v. Aref,*
   533 F.3d 72 (2d Cir. 2008) ..............................................................................17

*United States v. Coonan,*
   938 F.2d 1553 (2d Cir. 1991) ..............................................................19, 23, 24

*United States v. Coppa,*
   267 F.3d 132 (2d Cir. 2001) ............................................................................16

*United States v. Ji,*
   2022 WL 595259 (E.D.N.Y. Feb. 28, 2022) ...................................................22

*United States v. LaVallee,*
   469 F.2d 1239 (2d Cir. 1972) .........................................................................25

*United States v. Lloyd,*
   992 F.2d 348 (D.C. Cir. 1993) .......................................................................15

*United States v. Martinez,*
   844 F. Supp. 975 (S.D.N.Y. 1994) ................................................................16

*United States v. Percoco,*
   2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) .................................................21, 24

*United States v. Poindexter,*
   725 F. Supp. 13 (D.D.C. 1989) .......................................................................17

*United States v. Rittweger,*
   524 F.3d 171(2d Cir. 2008) ...............................................................21, 22, 23

*United States v. Stein,*
   488 F. Supp. 2d 350 (S.D.N.Y. 2007) ...........................................................15

*United States v. Stevens*,
985 F.2d 1175 (2d Cir. 1993)............................................................................................15, 16

*United States v. Zanfordino*,
833 F. Supp. 429 (S.D.N.Y. 1993) ..................................................................................16

**Statutes**

Fed. R. Crim. P. 16 ...........................................................................................................1

Fed. R. Crim. P. 16(a)(1)(B) ............................................................................................15

Fed. R. Crim. P. 16(a)(1)(E)(i) ........................................................................................15

**Other**

Just. Manual § 2052(B)(2) ...............................................................................................17

Defendant Ho Wan Kwok respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rule of Criminal Procedure 16, for an order compelling the government to produce several categories of exculpatory evidence concerning (i) the Chinese Communist Party's (the "CCP") targeting of Mr. Kwok, his family, the political movement of which he is part, and his fellow movement members through a campaign of harassment and intimidation commonly known as "Operation Fox Hunt"; (ii) the credibility of Mr. Kwok's movement, the New Federal State of China (the "NFSC"); (iii) ███████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ and (iv) the identity of any U.S. government agency, other than the FBI, possessing any of the aforementioned information.

## PRELIMINARY STATEMENT

Having charged Mr. Kwok with a purported billion-dollar fraud, the government now refuses to produce evidence that goes to—and dramatically undercuts—its case. ████████ ███████████████████████████, Mr. Kwok is one of the most—if not the most— pursued targets of the CCP's Operation Fox Hunt.  Operation Fox Hunt is a campaign of intimidation, harassment, and violence designed to suppress dissidents like Mr. Kwok, who are trying to overthrow the CCP and bring democracy to China.  The CCP has targeted Mr. Kwok through varied and heinous methods, including attempted kidnapping, suppression of speech, and detention of his family members.  Other members of the NFSC have also been targeted, including *by* ███████████████████████████████████████████ █████████████████████████████████

The government cannot seriously dispute any of these facts, given that in public statement after public statement, the government has decried Operation Fox Hunt ███████████████ ████ as illegal.  Indeed, the government has filed criminal charges against several CCP agents and others for their participation in these operations.  Nor can the government seriously contest the relevance of Operation Fox Hunt to this prosecution <u>because the government has already disclosed, as *Brady* material,</u> ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████  That concession is frankly inescapable—Operation Fox Hunt and the CCP's suppression of dissident voices permeate this case.  It is thus hardly shocking that Mr. Kwok and the NFSC would take certain measures to counter the CCP's campaign against them, including measures that the government points to as evidence of wrongdoing, such as (i) the NFSC wanting its own social media platform (GTV) after the CCP successfully de-platformed them from other social media platforms; (ii) finding a remote and secure location to meet and conduct their business (the Mahwah Facility) when they and their families are under constant threat of kidnapping or detention by the CCP; (iii) taking measure to address and counter the CCP's persistent interference with their relationships with commercial banks; or (iv) using multiple cellphones to try to defend against the CCP's widespread cyber-hacking operations.  These are not peripheral matters—the CCP's harassment provides an alternative explanation for the conduct at issue that bears directly on, and materially undercuts, the government's allegations in this case.

It is therefore obvious that information about the CCP's targeting of Mr. Kwok and the NFSC is exculpatory and must be produced.  But the government refuses to search for and produce any additional information about the CCP's campaign from the government's files or the FBI's files, ████████████████████████████████████████████████████.  The

government's position is inexplicable and unsupportable.  The government is seeking to convict Mr. Kwok of offenses that could yield decades-long prison terms.  He is entitled to evidence that supports his defense.  Thus, Mr. Kwok respectfully requests that the Court order the government to review and produce this information within fourteen (14) days of the Court's ruling.  Mr. Kwok's constitutional rights require nothing less.

## RELEVANT BACKGROUND

### I.   Operation Fox Hunt

In the nearly 75 years that the CCP has ruled China, the party has brooked little dissent, for example, forcibly quashing peaceful pro-democracy protests in Tiananmen Square in Beijing on June 4, 1989.  More recently, the CCP has embarked on a purported "anti-corruption" campaign, through which it regularly pursues trumped-up charges of financial crimes to sideline whistleblowers and political dissidents.  *See*, *e.g.*, *Operation Fox Hunt: How China Exports Repression Using a Network of Spies Hidden in Plain Sight*, *available at* https://www.propublica.org/article/operation-fox-hunt-how-china-exports-repression-using-a-network-of-spies-hidden-in-plain-sight (last visited Oct. 26, 2023) (quoting former Assistant Attorney General John Demers as saying, "we also know that the Chinese government has used the anti-corruption campaign more broadly within the country with a political purpose," and that "some of these people didn't do what they are charged with having done").

In furtherance of its purported anti-corruption campaign, the CCP launched Operation Fox Hunt to ruthlessly repress and silence its critics throughout the world, as acknowledged in the DOJ's—including the SDNY USAO's—own filings.  *See id.*; *see also United States v. Ying*, 22 Mag. 1711 (S.D.N.Y.) (bringing criminal charges against alleged participants in Operation Fox Hunt).  As described in the *Ying* complaint, since 2014, the CCP through Operation Fox Hunt "has

engaged in unsanctioned, unilateral, and illegal practices, including coercion, extortion, and intimidation," to try to force "'fugitive' targets"—*i.e.*, Chinese nationals who have fled to foreign countries, including the United States—and their families to cooperate with, or repatriate to, the People's Republic of China ("PRC"). (Barkan Decl. **Exhibit A** ¶ 10(a).)[1] According to the government, Operation Fox Hunt even includes co-opting the FBI and other U.S. law enforcement officers. (*See id.* ¶¶ 20, 22; *see also United States v. Chun*, 16 Cr. 518 (VM) (S.D.N.Y.), Dkt. No. 7 (FBI employee pleading guilty to acting as an agent of China and providing sensitive FBI information to China); *United States v. Liu*, No. 22 Cr. 311 (LDH) (E.D.N.Y.), Dkt. No. 8 (charging, among others, Department of Homeland Security officer in connection with providing sensitive agency information to China).)

Mr. Kwok is one of the most prominent Operation Fox Hunt victims in the world. ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1] "Barkan Decl." or "Barkan Declaration" refers to the declaration of Matthew S. Barkan, dated November 17, 2023, submitted in support of this motion.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████

A primary goal of Operation Fox Hunt is to return purported "fugitives" back to China to face criminal charges. (Barkan Decl. Ex. A, ¶ 10(a).) In this regard, the CCP has gone to significant, and frankly remarkable, lengths to try to return Mr. Kwok to China and thus prevent him from continuing his criticism of the CCP. ████████████████████████████████; filed Interpol "red notices" against him, which the Department of Justice has recognized as a tactic of the CCP in furthering Operation Fox Hunt (*see United States v. Feng*, 20 Mag. 1025 (E.D.N.Y.), attached at Barkan Decl. **Exhibit C** ¶ 17); and bribed U.S. citizens to lobby senior U.S. government officials for the "removal and return" of Mr. Kwok to China. *See, e.g.*, https://www.justice.gov/opa/pr/elliott-broidy-pleads-guilty-back-channel-lobbying-campaign-drop-1mdb-investigation-and *and* https://www.cnbc.com/2020/10/08/trump-ex-fundraiser-elliott-broidy-charged-with-lobbying-violation.html. Strikingly, China also successfully corrupted a lawyer at the Department of Justice as part of the latter effort. *See United States v. Higginbotham*, No. 18 Cr. 343 (CKK), Dkt. No. 13, ¶¶ 6-8, 11 (D.D.C. 2019) (describing how DOJ attorney attempted to illegally facilitate Mr. Kwok's extradition to China).

## II.   <u>The New Federal State of China (NFSC)</u>

To escape the CCP's targeting of him, Mr. Kwok sought refuge in the United States, arriving in 2014. Beginning in or about 2017, Mr. Kwok began to speak publicly about corruption within the CCP and the need for democratic reform. As Mr. Kwok continued to broadcast, he attracted more and more followers on social media, eventually developing a following of hundreds of thousands of pro-democracy Chinese dissidents from around the world, including in the United

States, the United Kingdom, the European Union, Asia, and Australia.  Mr. Kwok's and his fellow dissidents' movement was referred to as the "Whistleblower Movement."  In 2018, to help support this political movement, Mr. Kwok helped found two non-profit organizations, the Rule of Law Foundation (the "ROLF") and the Rule of Law Society (the "ROLS").  According to ROLF's website, the organization is "a nonprofit exposing the inherent evil of the authoritarian Chinese Communist Party government and supporting those seeking freedom and human rights for China." *See* ROLF website, *available at* https://rolfoundation.org/.

On or about June 4, 2020, Mr. Kwok publicly announced the formation of the New Federal State of China (*i.e.*, the NFSC) during a ceremony in New York, New York.  The NFSC continues to oppose the CCP and works in support of establishing democracy in China.  *See* NFSC website, *available at* nfscofficial.com.  The NFSC's political activities in support of these goals include broadcasting news and opinion pieces about events in China to counteract misinformation disseminated by the CCP, lobbying government officials on matters of concern to the Chinese pro-democracy movement, and organizing pro-democracy protests.  Mr. Kwok and other NFSC members regularly broadcast about the need for the Chinese people to be free of CCP oppression and for those opposed to the CCP to develop critical infrastructure not controlled by the CCP, including communication channels and currency.  The NFSC's (and Mr. Kwok's) message was endorsed, amplified, and supported by prominent American businesspersons and political figures.

To evade the CCP, Mr. Kwok and other

movement members began broadcasting through an independent media company called Guo Media, which was owned by Saraca Media Group ("Saraca").  Guo Media generated substantial excitement in the Chinese pro-democracy community, as well as significant investor interest.  In response to this investor interest in Guo Media, in 2020, GTV was founded to, among other things, break through the Chinese media censorship firewall (commonly known as the "Great Firewall of China"), a CCP censorship program intended to prevent the Chinese people from accessing accurate information that painted the CCP in a negative light.  (Barkan Decl. **Exhibit D** (offering memorandum) at 11.)  In April 2020, a private placement offering in GTV was announced. Saraca—the owner of Guo Media—was also the majority shareholder of GTV, owning 80% of the company.  On or about June 2, 2020, around the same time as the NFSC's founding, Mr. Kwok announced that GTV had gone live.

As the Court knows, many of the allegations in the Indictment relate to the private offering of GTV shares to Mr. Kwok's fellow Chinese pro-democracy dissidents, *i.e.*, members of the NFSC.  Despite the very public accusations of fraud by the government and the SEC against Mr. Kwok, and the government's continued denigration of that movement, the NFSC's political activism has not dampened.  Even after these charges were made public, on or about June 4, 2023, the NFSC hosted a third anniversary event at the Mahwah Facility.  The event was attended by multiple members of the U.S. Congress, some of whom addressed the gathering.  Other guests included a former U.S. ambassador and chairman of the House Intelligence Committee; a retired high-ranking U.S. military officer who had formerly served as Director for Cybersecurity Policy, Strategy, and International Affairs in the Office of the Secretary of Defense; and a sitting U.S. mayor.  The gathering was attended by hundreds of NFSC members. The NFSC also continues to

broadcast informational materials, including, from the Mahwah Facility until the Bankruptcy Court enjoined NFSC members from accessing the property.

**III.**   ███████████████████████████████████████
████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

IV.     **The Indictment & the Government's *Brady* Disclosures**

   A.      **The Indictment**

On or about March 6, 2023, a grand jury sitting in this District returned a sealed indictment against Mr. Kwok and co-defendant Kin Ming Je (the "Original Indictment"). (*See* Dkt. No. 2.) On March 29, 2023, the government filed the Indictment charging Mr. Kwok, Kin Ming Je, and Yanping Wang with, *inter alia*, securities fraud, wire fraud, and money laundering. The Indictment alleges that Mr. Kwok was the leader of a scheme in which the defendants defrauded investors through a series of allegedly fictitious businesses and investment opportunities for the defendants' personal enrichment. (*See* Ind. ¶¶ 1-2, 4.) The (disputed and incorrect) allegations of the defendants' purported misappropriation of funds are central to the Indictment. (*See, e.g.*, *id.* ¶¶ 4, 16(a)-(e), 23.)

The Indictment alleges fraud in connection with four business ventures related to the NFSC. *First*, the Indictment alleges that money was misappropriated from the GTV private placement funds to make an investment in a hedge fund on behalf of Saraca, GTV's majority owner. (Ind. ¶ 13). *Second*, the Indictment alleges that money was misappropriated from membership fees paid to the company GCLUBS to pay for property for the benefit of Mr. Kwok and his family, most notably the Mahwah Facility. (*Id.* ¶¶ 15-16). *Third*, the Indictment alleges that money was misappropriated from a lending program implemented by regional movement organizations called "Farms," referred to as the "Farm Loans Program," and used for, among others, Mr. Kwok's and his family's benefit, as well as for the benefit of Mr. Je's family. (*Id.* ¶ 14). *Fourth*, the Indictment alleges that Mr. Kwok and Mr. Je defrauded alleged victims in connection with purchase of two digital currencies known as the H-Dollar and H-Coin. (*Id.* ¶¶ 17-23). In connection with its allegations about these four schemes, the government relies heavily on purported consciousness

of guilt evidence, including the use of multiple bank accounts in connection with the relevant
financial transactions and Mr. Kwok's use of dozens of cellphones.  (*Id*. ¶ 3; Govt. Opposition to
Pretrial Release, Dkt. No. 26 at 3, 14.)

      In the Indictment, the government also appears to assert that Mr. Kwok and his fellow
movement members are not genuine dissidents.  For example, the Indictment refers to Mr. Kwok
as a "purported" dissident who "claim[ed] to advance a movement against the [CCP]."  (Ind. ¶
6(a); *see also id.* ¶ 6(b) (describing Mr. Kwok's "purported campaign against the [CCP].)
Likewise, the Indictment describes ROLF and the ROLS as "purported non-profits" through which
Mr. Kwok attracted supporters for his "purported" dissident campaign.  (*See id*.)  These assertions
thus squarely put into play evidence concerning the authenticity of the NFSC and Mr. Kwok's
dissident status.  In fact, the Indictment's assertions are belied by the actions of the CCP (and the
DOJ's own allegations elsewhere), ███████████████████████████████
precisely because his dissident efforts against the CCP were effective and sincere.  That the
government now conveniently changes position from its own reasoning ██████ is reason enough to
grant the motion to compel, because the materials sought will confirm that Mr. Kwok, the NSFC,
and the other parts of Mr. Kwok's movement are entirely genuine.

    **B.**    **The Government's *Brady* Disclosure**





## V.  Mr. Kwok's Discovery Requests and the Government's Response

### A.  Mr. Kwok's Discovery Requests

On September 29, 2023, Mr. Kwok sent a discovery demand to the government, in which he requested production of several categories of records, including eight requests that call for production of information concerning Operation Fox Hunt and related topics (collectively, the "Fox Hunt *Brady* Evidence") (Barkan Decl. **Exhibit I**).  Those requests are summarized in the following table:

---

[2] *See, e.g.*, Barkan Decl., **Exhibit H** (G|CLUBS membership agreement).

| Request Number | Request |
|---|---|
| 1 | Records concerning the allegations in the *Bai* complaint, including the underlying evidence of targeting of ███████████████ |
| 2 | Records concerning the Government of China's targeting of Mr. Kwok as part of Operation Fox Hunt, including ███████████████ ████████████████████████████████████ ██████████████████ (iii) the payment of bribes to U.S. citizens to solicit U.S. government officials to extradite Mr. Kwok to China; and (iv) any cyber-attacks on any property used or owned by Mr. Kwok or his family |
| 3 | Records concerning the targeting of Mr. Kwok's family by the Chinese government, including as part of Operation Fox Hunt |
| 4 | Records concerning the targeting of any of the alleged victims of the schemes described in the Indictment by the Chinese government, including as part of the Operation Fox Hunt |
| 5 | Records concerning the NFSC, including any intelligence assessments concerning the NFSC or records reflecting the targeting of the NFSC or its members by the Chinese government, including as part of Operation Fox Hunt |
| 6 | Records concerning the targeting of Mr. Kwok's co-defendants by the Chinese government, including as part of Operation Fox Hunt |
| 7 | Records concerning the targeting of the corporate entities relevant to the Indictment, including GTV, Saraca Media, G\|CLUBS, G\|Fashion, and the Himalaya Exchange, by the Chinese government, including as part of Operation Fox Hunt |
| 8 | Any statements from purported "victims" concerning the NFSC |

In addition, Mr. Kwok's counsel noted that the government had indicated that it "may" produce classified discovery to the defense, and defense counsel therefore requested that the government produce any classified information that qualified as *Brady* or *Giglio* material within 15 days of the September 29 Discovery Letter.  (Barkan Decl. Ex. I (Kwok letter at 5-6)).  Defense counsel further requested that the government indicate whether it would produce the Fox Hunt *Brady* Evidence by October 9, 2023.  (*Id.* at 7).

**B.      The Government Refuses to Produce the Fox Hunt *Brady* Evidence and the August 26 Recording**

On October 17, 2023, the government responded to Mr. Kwok's discovery requests (the "October 17 Government Response," Barkan Decl. **Exhibit J**) and represented that the USAO-SDNY had produced everything it has received concerning the *Bai* complaint.  Yet the USAO-SDNY argued that, because the prosecutors responsible for this case had not participated in the investigation underlying the *Bai* complaint, the government need search no further than the USAO-SDNY's files.  (Barkan Decl. Ex. J at 1).  The government also asked defense counsel to articulate why the information sought by Requests 3 through 8 in Mr. Kwok's discovery demand was relevant or discoverable.  (*Id*.).  Finally, that same day, the government produced, for the first time, ███████████████████████ that led to the 2019 Search Warrants, and the application, affidavit, and warrant for the Supplemental 2019 Warrant.

The next day, on October 18, 2023, Mr. Kwok's counsel responded by email.  In their email, counsel stated that (i) ████████████████████████████████████████████████████████████████████████████████████████████; and (ii) the government had put at issue the bona fides of the NFSC as a political movement on multiple occasions.  Counsel also requested that the government confirm that it had or would produce the August 26 Recording. (Barkan Decl. **Exhibit K** at 3-4).

Three days later, on October 21, 2023, the government responded in a letter, disputing, among other things, █████████████████████████████████████████████████████████; claiming that the government had insufficient information to consider Mr. Kwok's request for the Fox Hunt *Brady* Evidence; and clarifying that the government had not produced the August 26 Recording, without any

13

explanation of why it was not produced or whether its production was forthcoming. (Barkan Decl. **Exhibit L**).

That same day, on October 21, 2023, Mr. Kwok's counsel responded by email stating that the government was well-equipped to evaluate the relevance of the requested evidence because, among other things, Mr. Kwok had provided an example of how the Fox Hunt *Brady* Evidence was relevant in his recent filings, and the requests were predicated, in material part, on the government's own *Brady* disclosure. Mr. Kwok's counsel also specifically identified an example of how a document about the NFSC would be relevant. Finally, defense counsel asked specifically whether the government intended to produce the August 26 Recording, and if not, why not. (Barkan Decl. Ex. K at 1-2).

On October 25, 2023, the government responded with a brief note that it disagreed with Mr. Kwok's counsel's "recounting of facts and [its] assessment of the law." The government contended that the materials in question "do not appear relevant to this matter." The government once again requested that Mr. Kwok "explain the relevance of the information." (Barkan Decl. Ex. K at 1). Given the government's stubborn unwillingness to acknowledge the relevance of this information, even though *the government included it in its Brady Disclosure*, Mr. Kwok filed the instant Motion.

## ARGUMENT

To prepare his defense, Mr. Kwok respectfully requests an order compelling the government (i) to search for and produce the information sought in Requests 2 through 8 and 19 of his September 29 Discovery Request; (ii) to produce the August 26 Recording and any other statements of Mr. Kwok's in the government's possession, custody, or control; and (iii) to identify any other government agency that holds any exculpatory evidence concerning Operation Fox Hunt

or the NFSC, and/or any exculpatory statements by Mr. Kwok, so that Mr. Kwok can serve them with Rule 17 subpoenas.

The foregoing evidence is directly relevant to the allegations in the Indictment—it not only rebuts the government's attacks on Mr. Kwok's and the NFSC's bona fides as a pro-democracy dissident movement, but it also helps explain the conduct in the Indictment.  Such evidence is the paradigmatic example of *Brady* material essential to Mr. Kwok's defense.  Indeed, the government has all but admitted as much through its *Brady* Disclosure and the subject matter of the Indictment.  Accordingly, Mr. Kwok respectfully requests that the Court direct the government to produce this evidence.

## I.    Applicable Law

"Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense."  Federal Rule of Criminal Procedure 16(a)(1)(E)(i).  Similarly,  the government is required to produce any recorded statement of the defendant's in the government's possession or control, or about which the prosecutor knows or could learn about "through due diligence."  (*Id.*, 16(a)(1)(B).)

The "materiality standard [of Rule 16] normally is not a heavy burden; rather, evidence is material as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony,  or assisting impeachment or rebuttal."  *United States v. Stein*, 488 F. Supp. 2d 350, 356-57 (S.D.N.Y. 2007) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).  In other words, evidence is material "if it could be used to counter the government's case or to bolster a defense."  *United*

*States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993). "The Government should interpret the language of Rule 16 broadly to ensure fairness to the defendant." *United States v. Martinez*, 844 F. Supp. 975, 982 (S.D.N.Y. 1994). "A narrow view of Rule 16(a)[1][E][i] is inappropriate; failure to provide reasonably available material that might be helpful to the defense and which does not pose any risks to witnesses or to ongoing investigation is contrary to requirements of due process and to the purposes of the Confrontation Clause." *United States v. Zanfordino*, 833 F. Supp. 429, 432 (S.D.N.Y. 1993).

In addition, the government has a legal and ethical obligation to identify all material that might aid the defense under *Brady v. Maryland*, 373 U.S. 83 (1963). "The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Brady*, 373 U.S. at 87). This broad duty covers not only exculpatory material, but also information that could be used to impeach a key government witness. *Coppa*, 267 F.3d at 135 (citing *Giglio v. United* States, 405 U.S. 150, 154 (1972)). In determining whether evidence is material under *Brady*, a court's analysis "turns on the cumulative effect of all such evidence suppressed by the government." *Kyles v. Whitley*, 514 U.S. 419, 421 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 675 & n.7 (1985)). Thus, the government has the responsibility to "gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id.* at 437. This duty extends to learning about "any favorable evidence known to the others acting on the government's behalf in the case." *Id.*

In fulfilling its *Brady* obligations, the government's search "must extend to sources that are readily available to the government and that, because of the known facts and nature of the case, should be searched as a function of fairness to the defendant," including sources in possession of

the U.S. intelligence community (the "IC"). Just. Manual § 2052(B)(2). Moreover, the Second Circuit has adopted a more permissive standard than *Brady* in cases involving classified information in the possession of the IC, requiring disclosure of any information that may be "relevant and helpful" to the defense. *United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008) (recognizing that "information can be helpful without being 'favorable' in the *Brady* sense.").

The fact that discoverable information may be classified does not relieve the government of its obligation to disclose the material to the defendant. *See United States v. Poindexter*, 725 F. Supp. 13, 32 (D.D.C. 1989) (stating that "the protection of the rights of the defendant is paramount under the statutory scheme" of the Classified Information Procedures Act); *see also United States v. Abu-Jihaad*, 630 F.3d 102, 141 (2d Cir. 2010) (stating that the states-secrets privilege is not absolute but "must—under some circumstances—give way . . . to a criminal defendant's right to present a meaningful defense"). Here, for example, any purported classified information should still be produced, given that Mr. Kwok has two cleared counsel and has a substantial "need to know" this information because it is critical to his defense.

## II.  **Discussion**

### A.  **Any Fox Hunt *Brady* Evidence Should Be Disclosed**

#### (1) **Requests 2-4 and 7-8 Seek Discoverable Information about CCP Targeting of Relevant Parties to this Case**

Requests 2, 3, 4, 7, and 8 all generally call for evidence related to the CCP's targeting of Mr. Kwok, his family, his co-defendants, and the corporate entities relevant to the Indictment, *i.e.*, GTV, Saraca, G|CLUBS, G|Fashion, and the Himalaya Exchange. These documents are critical to Mr. Kwok's defense.

The government has repeatedly and consistently contended Mr. Kwok is not a true political dissident and that the NFSC is not a true Chinese pro-democracy movement. (*See*, *e.g.*, Ind. ¶ 6(a)

(describing Mr. Kwok as "claiming to advance a movement against the [CCP]"); ¶ 6(b) (describing Mr. Kwok's "purported campaign against the [CCP]" and the ROLF and ROLS as "purported" non-profit organizations); Barkan Decl. Ex. F (Supplemental 2019 Warrant) at USAO-0054409 (██████████████████████████████████████████████████████████); Govt. Stay Opp. at 2 (describing the NFSC as a "purported" political movement in its opposition, and accusing its members of obstructing justice).)

The government's disparagement of the political activism of hundreds of thousands of pro-democracy advocates is purely tactical, and deployed in service of trumpeting a (false) narrative that Mr. Kwok is a fraudster who, according to the government, promoted purported money-making "opportunities" related to GTV, G|CLUBS, the Farms, and the Himalaya Exchange to defraud his followers, rather than to further their shared political goals.  (*See* Ind. ¶ 6).  Thus, whether Mr. Kwok is a true political dissident is relevant to both the government's case-in-chief and Mr. Kwok's defense, and it will be a key disputed issue of fact at trial.

Given that the government has put the legitimacy of Mr. Kwok's political activism at issue, Mr. Kwok is entitled to defend himself by rebutting the government's attack on his and the NFSC's opposition activities to the CCP, which activities encompass the alleged criminal conduct identified in the Indictment.  There is no better evidence of the genuineness of the Chinese pro-democracy dissident movement—and the all-too-real risks of participating in it—than the fact that one of the world's most powerful nations has not only tried to silence Mr. Kwok and the political activism that the government now derides, but moreover, has gone to extraordinary lengths to do so, including ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████; and (iv) co-opting American citizens to bribe U.S. politicians to cause Mr. Kwok's extradition to China.  (*See supra* p. 5.)  The CCP's actions are strong evidence that Mr. Kwok's and the NFSC's political activism is not contrived to support a fraud, as the government contends, but genuine activism sufficient to provoke a criminal response from the CCP.

Evidence of Operation Fox Hunt thus undercuts the government's narrative that Mr. Kwok and his movement engage in "purported," rather than actual, political activism.  That political activism, in turn, explains Mr. Kwok's nonfraudulent intent in promoting GTV, G|CLUBS, the Farm Loans, and the Himalaya Exchange, and is thus relevant.  *See United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

Moreover, the ways in which the CCP has targeted Mr. Kwok and other members of the NFSC are directly relevant to other specific allegations in the Indictment, including, for example, the following:

**The Formation and Value of GTV**:  The government alleges that Mr. Kwok knowingly orchestrated the formation of and private placement for GTV to defraud his followers, and did so, by, among other things, overstating the value of the company.  (Ind. ¶ 14(d).)  GTV is a social media company, however, and, like all such early-stage companies, its eventual value depended in part on its ability to attract users.  *See*, *e.g.*, "How to Value a Social Media Company – PWC Valuation Index," available at https://pwc.blogs.com/press_room/2011/05/how-to-value-a-social-media-company-pwc-valuation-index.html (describing how valuation of a social media company

turns on whether the company can attract and monetize its user base).  As the GTV Confidential Offering Memorandum makes clear, GTV's purpose was to break through the Great Firewall of China, which currently prevents Chinese citizens from accessing numerous social media and news websites, including the NFSC and Mr. Kwok's messaging.  As the Indictment concedes, even before GTV, Mr. Kwok's pro-democracy messaging was powerful enough to amass hundreds of thousands of followers who were sympathetic to his message and the prospects of a democratic China.  (Ind. ¶¶ 2, 6(b).) ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ Without the formation of a company like GTV, the NFSC's pro-democracy messaging might have been silenced entirely.

Given the number of Mr. Kwok's followers and the population of China, the potential user base for GTV included millions of individuals who believed like Mr. Kwok in the corruption of the CCP and the need for reform, but who increasingly had nowhere to turn to access that message. Moreover, Mr. Kwok had reason to believe that NFSC users of GTV would be particularly enthusiastic in supporting GTV's business because they were similarly committed to GTV's mission to combat the CCP and believed their support of GTV would help that mission.  Under these circumstances, Mr. Kwok reasonably could anticipate that as the appeal of the NFSC's message grew, GTV would enjoy explosive growth and turn into an immensely valuable company—a reasonable thesis supported by an independent valuation of GTV—and Mr. Kwok wanted to provide NFSC members the opportunity to share in it.

The role of Operation Fox Hunt in creating both the necessity for, and the potential monopoly position of, GTV is thus critical to demonstrating Mr. Kwok's intent when making statements concerning GTV's potential value. Accordingly, evidence concerning the CCP's targeting of Mr. Kwok's and the NFSC's social media presence—███████████████████████ ██████████—is "favorable to the defense" and should be produced. *See United States v. Rittweger*, 524 F.3d 171, 181 (2d Cir. 2008) (evidence is *Brady* evidence where it "len[ds] credence" to defendant's innocent belief in connection with an alleged misrepresentation); *see also United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *23 (S.D.N.Y. Dec. 11, 2017) (ordering pre-trial production of *Brady* material pertaining to information that supported defendant's belief of appropriateness of particular conduct).

**The Purchase of the Mahwah Facility**: A central (and incorrect) allegation in the Indictment is that Mr. Kwok and his alleged co-conspirator William Je misappropriated millions of dollars to purchase and renovate the Mahwah Facility for the benefit of Mr. Kwok and his family. (Ind. ¶¶ 4, 16(b)-(c).) Mr. Kwok will demonstrate at trial, however, that the Mahwah Facility was never intended to serve as Mr. Kwok's residence. Rather, it was purchased by G|CLUBS for use as a secure meeting place for its members, many of whom are also members of the NFSC. The need for secrecy and security around the Mahwah Facility is easily explainable against the backdrop of Operation Fox Hunt and the CCP's efforts to threaten and harm members and disrupt their activities. Put simply, it is entirely reasonable for Mr. Kwok to believe the movement required a secure location to conduct its business given that, ██████████████████████ █████████████████████████████████. Similarly, the need for members of the NFSC to be able to discreetly conduct its affairs out of public view makes perfect sense when the CCP uses private investigators to identify and hunt down Fox Hunt victims. *See*

*United States v. Ji*, No. 21 CR 265, 2022 WL 595259, at *2-6 (E.D.N.Y. Feb. 28, 2022) (denying motion to dismiss brought by private investigator ultimately convicted of acting as an illegal agent of the PRC, conspiracy to commit interstate stalking, and interstate stalking, alongside two others convicted of similar crimes); *see also* "Federal Jury Convicts Three Defendants of Interstate Stalking of Chinese Nationals in the U.S. and Two of Those Defendants for Acting or Conspiring to Act on Behalf of the People's Republic of China," *available at* https://www.justice.gov/usao-edny/pr/federal-jury-convicts-three-defendants-interstate-stalking-chinese-nationals-us-and (June 20, 2023).  The CCP even established secret police stations in New York City to "threate[n] and coerc[e] Chinese political dissidents living in the United States in an effort to silence them."  *See United States v. Jianwang*, No. 23 Mag. 265 (E.D.N.Y.) Dkt. No. 4 at ¶¶ 2-10, (attached hereto as **Exhibit M**).[3]  Showing that Operation Fox Hunt posed real security risks to Chinese political dissidents like Mr. Kwok and his fellow NFSC members will help explain to the jury why the movement would need a building like the Mahwah Facility and Mr. Kwok's involvement with it. *See Rittweger*, 524 F.3d at 181 (evidence that "lend credence" to defendant's innocent belief in connection with an alleged misrepresentation is *Brady*).

    **The Use of Multiple Bank Accounts**: The government also makes much of its allegations that some of the financial transactions were conducted through multiple bank accounts in multiple parties' names.  (Ind. ¶¶ 3, 16, 50.)  The government contends this was an attempt to evade detection of illegal activity by U.S. authorities and financial institutions.  At trial, however, Mr. Kwok will show that this was not done for the purposes of evading U.S. authorities, but a necessary

---

[3] Indeed, while the government refuses to even search for the information Mr. Kwok requested, it nevertheless produced transcripts from the trial of Prakazrel Michel, who was convicted of, among other things, participating in the attempted illegal extradition of Mr. Kwok, presumably because the government believes this testimony is relevant.  (Barkan Decl. **Exhibit N** at 8 (October 26 Government Response).)

by-product of Operation Fox Hunt and the targeting of Mr. Kwok and the NFSC.  In this regard, the CCP has not hesitated to target political dissidents by, among other things, interfering with their banking relationships.[4]  Information showing that the CCP was interfering with Mr. Kwok's and the NFSC's ability to maintain bank accounts and transfer funds—or indeed even information that would tend to show a reasonable belief on Mr. Kwok's part that such interference was likely to happen—would dramatically undercut the government's contention that the reason why the alleged co-conspirators used multiple bank accounts was to conceal illegal activity from U.S. authorities.  *See Coonan*, 938 F.2d at 156 ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."); *Rittweger*, 524 F.3d at 181 (evidence that "lent credence" to defendant's innocent belief is *Brady*).

**The Use of Multiple Cellphones**:  The government has also contended that the fact that the defendants (including Mr. Kwok) allegedly used dozens of cellphones shows consciousness of guilt.  (*See* Govt. Opposition to Pretrial Release, Dkt. No. 26 at 3, 14; *see also* Dkt. No. 7 at 20.) The government's speculation as to "consciousness" is contradicted by the context Operation Fox

---

[4]  *See, e.g.*, "'Beijing blocked my bank accounts': Chinese dissident in US says Communist Party froze his life savings," *available at* https://finance.yahoo.com/news/beijing-blocked-bank-accounts-chinese-093000123.html (Nov. 11, 2020).

Hunt provides.  It is no secret that the CCP is a prolific state sponsor of hacking and that it targets those on U.S. soil[5] and Chinese political dissidents.[6]

Mr. Kwok and his fellow NFSC members are themselves no strangers to Chinese cyber-attacks.  The government itself has produced records in discovery concerning ██████████ ████████████████████, presumably because the government believes that such hacking was targeted at Mr. Kwok or otherwise bears on the issues in this case.  (Barkan Decl. **Exhibit O,** ██████████████████████████) Evidence that demonstrates that Mr. Kwok and his fellow NFSC members had a well-founded belief that the CCP was attempting to hack them would explain why they switched cellphones regularly—*i.e.*, to avoid surveillance and interference from the CCP.  *See Coonan*, 938 F.2d at 156; *see also Percoco*, 2017 WL 6314146, at *23 (ordering pre-trial production of *Brady* material pertaining to information that supported defendant's belief of appropriateness of particular conduct).

### (2) Requests 5 and 19

Request 5 properly calls for records related to the targeting of any of the government's alleged victims as part of Operation Fox Hunt.  As part of Operation Fox Hunt, the CCP has corrupted the American judicial system by filing false lawsuits against dissidents.  *See*, *e.g.*, *United States v. An*, No. 22 Cr. 460, Dkt. No. 9 ¶ 40 (E.D.N.Y. 2022) (describing how defendant, an

---

[5] In fact, on July 7, 2020, a little more than a month after the GTV private placement closed, FBI Director Christopher Wray stated that "[i]f you are an American adult, it is more likely than not that China has stolen your personal data" and noted how "in 2014, China's hackers stole more than 21 million records from OPM, the federal government's Office of Personnel Management."  *See* "The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States," *available at* https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states (July 7, 2020).

[6] *See*, *e.g.*, "The Chinese dissident's 'unknown visitors," https://www.ft.com/content/c590cdd0-016a-11df-8c54-00144feabdc0 (January 14, 2010).

Operation Fox Hunt operative, sought to coerce victim to return to China by knowingly filing a false civil lawsuit in New York state court).  Given that the government alleges here that it was Mr. Kwok's followers that were defrauded, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, there is the very real possibility that at least some of the government's purported "victims" in this case have been coerced by the CCP into making false claims to U.S. authorities.  Mr. Kwok is entitled to proffer such evidence for the jury's consideration at trial.  *See, e.g.*, *United States v. LaVallee*, 469 F.2d 1239, 1240 (2d Cir. 1972) (evidence that police tortured trial witness to make particular statement prior to witness's trial testimony "is disclosed to the jurors so that they may pass upon the witness' veracity and credibility and determine whether the testimony given in open court is truthful and worthy of consideration.").[8]

Request No. 19 calls for any statement by the government's purported victims in which they discussed the NFSC.  Statements by the government's purported victims about the NFSC would be *Brady* in several ways.  *First*, if any of these purported victims gave their time or skills to support the NFSC's activities (or, for that matter, those of the ROFL or ROLS), that would bolster Mr. Kwok's contention that the NFSC is a real political movement, and not the sham that the government claims.  *Second*, if any of the government's purported victims themselves described the NFSC as a valid political movement, those statements also would rebut the

---

[8] Given that this information constitutes *Brady* material, it should be produced now, rather than at trial.

government's claim that the NFSC is fraudulent.  *Third*, Mr. Kwok intends to prove at trial that before any individual was able to invest in GTV, they were vetted to assess their commitment to the NFSC's cause.  To the extent any of the government's alleged victims invested in GTV to further its anti-CCP objectives (███████████████████████████████████ █████████████████████████), that too would bolster the reasonableness of Mr. Kwok's alleged valuation of GTV, by demonstrating that the supporters of GTV, *including its users and investors*, were highly motivated to make repeated use of the platform and otherwise help the fledgling company in whatever way they could.  *See*, *e.g.*, "How to Value a Social Media Company – PWC Valuation Index," *available at* https://pwc.blogs.com/press_room/2011/05/how-to-value-a-social-media-company-pwc-valuation-index.html (describing how valuation of a social media company turns on whether the company can attract and monetize its user base).

### (3) Request 6 Calls for the Production of Discoverable Material

Request 6 calls for any documents concerning the NFSC, including, but not limited to intelligence assessments about the NFSC and evidence about the targeting of the NFSC.  This evidence is exculpatory, and thus discoverable, because it demonstrates the NFSC's bona fides as a political movement.  *First*, that other U.S. government agencies believe the NFSC is a valid opposition movement to the CCP (which is likely given that the movement has received support from a one-time senior advisor to the White House, multiple U.S. congresspersons, a former U.S. ambassador, and a former high-ranking U.S. military official) rebuts the government's claim to the contrary in this prosecution.  (*See supra* pp. 7.)[9]  *Second*, any records showing that the NFSC

---

[9] To the extent any of these intelligence assessments (or any other discoverable material) are classified, that does not shield them from discovery. (*See supra* pp. 17.)  Rather, the government can either declassify this information or produce it in classified discovery to Mr. Kwok's cleared counsel, Sabrina Shroff and Sid Kamaraju, both of whom have security clearances, and any of Mr. Kwok's counsel that are subsequently cleared.

has been a target of Operation Fox Hunt refutes any contention by the government that the movement itself is fraudulent.  (*See supra* pp. 17-19).  *Third*, evidence showing that the NFSC has been targeted by the CCP supports Mr. Kwok's argument that the actions alleged in the Indictment were not driven by a desire to evade U.S. law enforcement, but rather to evade the CCP.  (*See supra* pp. 3-5).  Put simply, the government cannot simultaneously attack the NFSC as a "purported" political movement while at the same time denying Mr. Kwok access to evidence showing that the organization is genuine.

### B.    The August 26 Recording Is Discoverable

The August 26 Recording is material to the defense and exculpatory.  ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████

It is clear this recording is discoverable.  ███████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████  Obviously, Mr. Kwok should have the opportunity to review the recording to see if it offers a basis for a *Franks* motion.  ██████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████  The government

should produce the August 26 Recording, as well as any other of Mr. Kwok's statements that the government has in its possession or control but has not produced.

### C. The Government Should Identify Any Other U.S. Government Agency that the Government Knows Possesses the Aforementioned Information

Finally, the government has stated that it intends to file a motion pursuant to Section 4 of the Classified Information Procedures Act to delete, *i.e.*, withhold classified information. This suggests that the prosecutors have reviewed classified information in the custody of other government agencies beyond the FBI, including agencies belonging to the IC. To the extent any *Brady* evidence that falls within the categories of information sought by this motion is in these other agencies' possession, and the government refuses to produce that evidence on the purported basis that the evidence is not within the possession of the so-called "prosecution team" (as the government has asserted with respect to the Trustee and the SEC), then the government should disclose which agencies hold this information so Mr. Kwok can subpoena these agencies for this exculpatory information. Such disclosure is not different than the government's prior *Brady* Disclosure, ███████████████████████████████████████

███████████████████████████████████████████████████████████

## **<u>CONCLUSION</u>**

For the foregoing reasons and the reasons set forth in his opening brief, Mr. Kwok respectfully requests that the Court enter an order requiring the government to produce the requested discovery and granting Mr. Kwok such other and further relief as this Court deems just and proper.

Dated: New York, New York
       November 17, 2023

                     PRYOR CASHMAN LLP

By: _____
       Sidhardha Kamaraju
       Matthew S. Barkan
       Daniel J. Pohlman
       John M. Kilgard
       Clare P. Tilton

       7 Times Square
       New York, NY 10036
       (212) 421-4100
       skamaraju@pryorcashman.com
       mbarkan@pryorcashman.com
       dpohlman@pryorcashman.com
       jkilgard@pryorcashman.com
       ctilton@pryorcashman.com

       Sabrina P. Shroff
       80 Broad Street, 19th Floor
       New York, NY 10004
       (646) 763-1490

       *Attorneys for Defendant Ho Wan Kwok*