UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        *Plaintiff,*

    v.

HO WAN KWOK,

        *Defendant.*

**<u>FILED PARTIALLY UNDER SEAL</u>**

Case No. 1:23-CR-118-1 (AT)

---

# HO WAN KWOK'S MEMORANDUM OF LAW IN
# SUPPORT OF HIS RENEWED MOTION FOR PRETRIAL RELEASE

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, New York 10007
(646) 763-1490

Sidhardha Kamaraju
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

*Attorneys for defendant Ho Wan Kwok*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ...........................................................................................3

    Mr. Kwok Is Not a Serious Flight Risk ...............................................................4

    Mr. Kwok Is Not a Future Danger To The Community .......................................9

    The Proposed Conditions Of Release Are Sufficient  ......................................10

ARGUMENT ............................................................................................................11

    I.   The Applicable Legal Standard And The Presumption In Favor Of Pretrial Release .11

    II.  Mr. Kwok Should Be Released On Bail Because He Is Not A Continuing Danger To The Community ..................................................................................13

    III. Mr. Kwok Should Be Released On Bail Because He Does Not Pose a Serious Risk Of Flight And His Appearance In Court Is Reasonably Assured ....................................15

    IV. In Any Event, Bail Conditions Readily Exist That Will Deter Any Serious Flight Risk And Reasonably Assure Mr. Kwok's Return to Court ................................................25

    CONCLUSION...........................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States v. Alatishe,*
    768 F.2d 364 (D.C. Cir. 1985) ........................................................................13

*United States v. Berrios-Berrios,*
    791 F.2d 246 (2d Cir. 1986) ..........................................................................12

*United States v. Boustani,*
    932 F.3d 79 (2d Cir. 2019) ............................................................................21

*United States v. Coonan,*
    826 F.2d 1180 (2d Cir. 1987) ...................................................................12, 14

*United States v. Dabney,*
    No. 20-cr-0027 (KBJ), 2020 U.S. Dist. LEXIS 67127 (D.D.C. 2020) ...................13

*United States v. DeGrave,*
    539 F.Supp.3d 184 (D.D.C. 2021) .................................................................15

*United States v. Friedman,*
    837 F.2d 48 (2d Cir. 1988) ...........................................................................16

*United States v. Gamble,*
    No. 19-cr-0348 (CKK), 2020 U.S. Dist. LEXIS 118007 (D.D.C. April 13,
    2020) .........................................................................................................15

*United States v. Hansen,*
    108 F. App'x 331 (6th Cir. 2004) ..................................................................24

*United States v. Hanson,*
    613 F. Supp. 2d 85 (D.D.C. 2009) ................................................11, 14, 23, 24

*United States v. Karni,*
    298 F. Supp. 2d 129 (D.D.C. 2004) ...............................................................22

*United States v. Khashoggi,*
    717 F. Supp. 1048 (S.D.N.Y. 1989) ...............................................................25

*United States v. Madoff,*
    586 F.Supp.2d 240 (S.D.N.Y. 2009) .........................................................13, 25

*United States v. Marinez-Patino,*
    No. 11-cr-0064, 2011 WL 902466 (N.D. Ill. March 14, 2011) .............................19

*United States v. Mercedes*,
   254 F.3d 433 (2d Cir. 2001) ................................................................13

*United States v. Motamedi*,
   767 F.2d 1403 (9th Cir. 1985) ...........................................................11

*United States v. Munchel*,
   991 F.3d 1273 (D.C. Cir. 2021) ...................................................11, 13

*United States v. Sabhnani*,
   493 F.3d 63 (2d Cir. 2007) ..............................................12, 18, 20, 21

*United States v. Salerno*,
   481 U.S. 739 (1987) ...........................................................11, 13, 14, 16

*United States v. Scott*,
   450 F.3d 863 (9th Cir. 2006) .............................................................16

*United States v. Shakur*,
   817 F.2d 189 (2d Cir. 1987) ..............................................................11

*United States v. Vasquez-Benitez*,
   919 F.3d 546 (D.C. Cir. 2019) ..........................................................12

**Statutes**

18 U.S.C. § 3142 .......................................................................................15

18 U.S.C. § 3142(b) .............................................................................12, 25

18 U.S.C. § 3142(c)(1)(B) ....................................................................12, 25

18 U.S.C. § 3142(e) .............................................................................12, 13

18 U.S.C. § 3142(f)(2)(A) ........................................................................12

18 U.S.C. § 3142(j) .............................................................................14, 16

Defendant Ho Wan Kwok respectfully submits this memorandum of law in support of his renewed motion for pretrial release. For the reasons discussed below, Mr. Kwok is neither a danger to the community nor a serious flight risk, and less restrictive measures than pretrial detention exist that will reasonably assure his future appearances in this Court. Accordingly, the current detention order should be revoked in favor of a comprehensive set of suitable restrictive conditions.

## PRELIMINARY STATEMENT

On April 20, 2023, this Court denied Mr. Kwok's motion for release on bail. *See* Order [ECF Docket No. 51]. On June 14, 2023, the Second Circuit Court of Appeals affirmed the Order for lack of clear error. *United States v. Kwok*, No. 23-6421 [ECF Docket No. 37]. Since the Court initially decided the question of bail, there have been significant developments that impact the question of Mr. Kwok's bail. This renewed motion for pretrial release respectfully follows.

Mr. Kwok is charged with using certain allegedly fraudulent businesses and investment opportunities to defraud others and then laundering those proceeds through various bank accounts to enrich himself and others. Superseding Indictment ¶¶ 1-3 [ECF Docket No. 19]. Mr. Kwok vociferously denies those charges. Release on conditions is necessary here because of several changes in Mr. Kwok's situation that should lead the Court to reconsider its prior decision that Mr. Kwok should be detained pretrial.

First and foremost, Mr. Kwok's continued incarceration is endangering both his health and, in consequence, his ability to properly assist in his own defense. Mr. Kwok is experiencing a number of dangerous symptoms, including sharp needle-like pains in the left side of his face. The pain starts near the jaw and continues through the back of his head and down his neck. He feels a constant throbbing pain in his right arm, and numbness and loss of motor control in his right hand. He suffers from bouts of dizziness, an inability to sleep because of the constant pain, and difficulty in thinking and concentrating. While in prison, Mr. Kwok underwent surgery and had three teeth

1

removed. The surgery has brought him no relief. Instead, his symptoms are increasing in severity. The MDC is unable to properly diagnosis and treat Mr. Kwok's medical problems. His release on conditions is necessary so he can get the care he needs.

In addition to his need for medical treatment, other changed facts support his pretrial release. Key among them is the government's decision, in August 2023, to publicly reveal that ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████. This exposure not only increases the physical danger to Mr. Kwok of CCP retaliation, both within the prison and outside it, but makes it far less likely that Mr. Kwok will ever choose to flee the United States.

Balanced against the increased need for release – to protect Mr. Kwok from retaliation in prison and provide for his medical treatment – is the government's purported concern that Mr. Kwok is a continuing danger to the community and poses a serious flight risk. Neither is true. The alleged fraud scheme/stock offering at issue in this case is no longer active and Mr. Kwok will engage in no obstructive behavior. Nor is Mr. Kwok a serious flight risk. Mr. Kwok has sought asylum in the United States because he is a political dissident who – as demonstrated by Operation Fox Hunt – is being actively persecuted and pursued by the CCP that currently controls the Chinse government. This persecution will only increase now that ████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████.

Should he flee, Mr. Kwok risks being summarily killed or returned to China, whether

through kidnapping or the CCP's abuse of the extradition process. Having arrived in the U.S. – a place that provides him protection from the CCP – ███████████████████████, he intends to stay here. While the government contends that Mr. Kwok has the means and experience to flee, he has no motive or intent to flee because he is only truly safe here in the U.S. Further, Mr. Kwok has every incentive to stay and fight the charges against him because, as the Court observed in its Order, a criminal conviction may negatively affect or void his and his family's asylum claims.

In any event, the analysis mandated by the Bail Reform Act does not end with a finding of continuing danger or of flight risk. The Court must be assured that there is no available combination of conditions which, taken together, will reasonably assure the appearance of Mr. Kwok and the safety of any other person or the community. Importantly, many Courts have successfully released purportedly rich, sophisticated, foreign defendants like Mr. Kwok from detention because they have found detention was not necessary to reasonably assure that they would appear at trial. The same finding is called for here.

While the Court rejected the prior proposed package as insufficient, the Court should reconsider its decision for the reasons set forth below. At the least, Mr. Kwok should be permitted to proffer guarantors that are acceptable to the government and the Court and also have the opportunity to show the efficacy of the package's other conditions.

## STATEMENT OF FACTS

In its prior April 2023 Order, the Court found that detention was necessary because Mr. Kwok posed a risk of financial danger and obstruction to the community, was a serious flight risk, and no conditions could ameliorate those risk. Order at 5-13. Changed circumstances and a robust set of proposed protective conditions, however, rebut those findings and support releasing Mr. Kwok from prison so he can obtain proper medical care as he awaits trial.

**Mr. Kwok Is Not A Serious Flight Risk**

The Court's "flight" findings failed to consider the larger situation facing Mr. Kwok or the many reasons why he must stay in the United States and fight the allegations against him. Mr. Kwok is a Chinese dissident. Because of his various efforts to return the rule of law and human rights to China, he is being actively pursued by China and is currently a refugee here in the United States. The CCP has engaged in a multi-pronged effort to force Mr. Kwok back to China where he can be arrested, jailed, and/or disappeared. *See, e.g., Operation Fox Hunt: How China Exports Repression Using a Network of Spies Hidden in Plain Sight*, available at https://www.propublica.org/article/operation-fox-hunt-how-china-exports-repression-using-a-network-of-spies-hidden-in-plain-sight; *see also United States v. Ying*, 22 Mag. 1711 (S.D.N.Y.) (bringing criminal charges against alleged participants in Operation Fox Hunt); *United States v. Bai*, 23 Mag. 0334 (EDNY) (███████████████████████████████████████). As detailed in *Bai,* which was released shortly before the Court issued its initial bail determination, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████a. *Id.*; *see also United States v. Higginbotham*, No. 18 Cr. 343 (CKK), Docket No. 13, ¶¶ 6-8, 11 (D.D.C. 2019) (describing how DOJ attorney attempted to illegally facilitate Mr. Kwok's extradition to China).

While the Court appeared skeptical of the risk and danger facing Mr. Kwok should he leave the United States, noting that Mr. Kwok "engaged in extensive international travel after leaving China in 2015, prior to filing his application for asylum in the United States" (Order at 7), such skepticism in unwarranted. Mr. Kwok did continue traveling for a time, but doing so became increasing untenable and dangerous for him. Mr. Kwok stopped traveling and formally

applied for asylum in the United States in 2017 because, as his pro-democracy efforts against the Chinese government increased, their persecution of him likewise increased. In this regard, Mr. Kwok did not begin to publicly broadcast his criticisms of the CCP until 2017. Shortly after that occurred, as detailed in the *Bai* complaint, 23 Mag. 0334 (EDNY), the CCP stepped up its efforts ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████.[1] Moreover, the risk to him should he leave the United States, and the Chinese government's unrestrained animus toward him, has now been substantially magnified by the recent disclosure that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. In other words, the risk of travel from the United States to Mr. Kwok dramatically increased in 2017, and now has dramatically increased again. His pre-2017 travel therefore has little relevance to the potential danger he faces at present, should he leave the United States.

Placed in this larger context, it is evident that Mr. Kwok has no real incentive to flee. He has been here for close to a decade, establishing ties in this country and building the New Federal State of China (NFSC) political movement. There is no better place than this country – with its history of freedom and support for democracy, large expatriate Chinese community, and bipartisan political opposition to the Chinese government – to build such a political movement. And any incentive provided by the future possibility of a lengthy sentence (Order at 7) is far

---

[1] For the Court's convenience, the details surrounding Operation Fox Hunt and the CCP's various attacks upon Mr. Kwok are set forth in greater detail in his Motion to Compel papers, previously filed with the Court at ECF Nos. 170-172.

outweighed by the grim and present reality of the CCP's efforts to destroy him and the NFSC. Anywhere else he went – particularly if he went there as a fugitive from the Court – would substantially increase his risk of being deported back to China, where he would be jailed or killed. This includes if he fled to the United Kingdom or the UAE, as the Court previously theorized. *See* Order at 5-6.

Right now, the government's ███████████████████████████████ has appreciably diminished the risk of the U.S. deporting Mr. Kwok, as it provides him with a substantially stronger claim for asylum and for protection under the Convention Against Torture. Flight would destroy the good chance he and his family have to remain here, so Mr. Kwok may continue his pro-democracy efforts. Indeed, becoming an international fugitive would fatally undermine the legitimacy that is crucial to the success of Mr. Kwok's movement, essentially guaranteeing its destruction to the unalloyed benefit of the CCP. Plainly, Mr. Kwok's best chance – for his own survival and survival of the NFSC – is to forcefully contest the fraud charges against him, so he can safely remain here with his wife and daughter and continue his fight against the CCP. For all these reasons, Mr. Kwok will not flee. He will stay and fight.

Many of the acts that the Court notes in its Order, from leaving his wife and daughter in Hong Kong when he fled to the United States (Order at 5), to having multiple passports (*id.* at 6), are undesired consequences of his fight against the CCP, not evidence that he is more likely to flee if released from detention. Mr. Kwok did not choose to abandon his wife and daughter; he was forced to do so when he fled China to save his life, and he was overjoyed when they joined him in the United States.[2] To bootstrap that forced abandonment into a supposed

---

[2] Even the way Mr. Kwok's wife and daughter came to the United States demonstrates the perpetual danger the CCP poses to Mr. Kwok. His wife and daughter were brought to New York City by cabinet-level CCP Ministers as hostages, to be bartered in exchange for Mr. Kwok agreeing to stop his increasingly popular public attacks upon the CCP. The wife and daughter only remain

willingness to violate bail and abandon family is unfair and misplaced. He will not make that choice. Nor will he recklessly threaten their (and his) asylum applications by violating bail.

Similarly, Mr. Kwok's passports, which he obtained as a consequence of his political activities, are all in the possession of the United States government. *See* Order at 6.[3] That Mr. Kwok was able to legally obtain these passports "with ease" (*id.*) does not mean that he will have no issue obtaining new passports illegally or that he will be able to use them. The Court should recognize that any such hypothetical attempt will be undertaken in the face of court-imposed conditions designed to prevent any such attempt, and existing U.S. border and passport controls, including the U.S. "no-fly" list upon which Mr. Kwok already has been placed. The "no-fly" list prevents Mr. Kwok from boarding a domestic flight within the U.S., a private charter, or any international flight.

Perhaps recognizing that obtaining illegal travel documents is too unlikely, the Court previously speculated that Mr. Kwok could, for example, still smuggle himself out of the country in a musical instrument case. Order at 6. Respectfully, such scenarios do not rise to the level of a serious risk of flight. They not only require the recruitment of multiple conspirators willing to participate in a complicated criminal act, but also would require the concomitant failure of the many safeguards that would readily stop any smuggling attempt, including home

in the U.S. ████████████████████████████████████████████████
████████.

_____

[3] During the prior bail proceedings, the government mischaracterized Mr. Kwok as a citizen of the UAE. As the government well knows, however, Mr. Kwok is not a UAE citizen. Specifically, in April 2018, as part of his application for asylum in the United States, Mr. Kwok voluntarily renounced his UAE citizenship, surrendering his then-current UAE passport to a UAE official. In this regard, the government has a copy of Mr. Kwok's asylum file, as well as a copy of the UAE's formal acceptance of Mr. Kwok's renunciation of UAE citizenship. Because of that renouncement, Mr. Kwok is no longer eligible for a UAE passport, and has never tried to reapply for one even knowing he was under investigation. The UAE passport seized by the FBI during Mr. Kwok's arrest (*see* Order at 6) was old and invalid.

confinement, surprise visits and electronic monitoring by Pretrial Services, additional 24/7 physical monitoring of Mr. Kwok by a private security service, and strict restrictions on who he can meet or contact. Any such unlikely scenario is further hampered by Mr. Kwok's continuing bankruptcy. He no longer has "access to a yacht and a jet" (*id.*) as both those assets have been sold. At this time, Mr. Kwok's possessions are controlled by the bankruptcy trustee, and he has become dependent on donations provided by members of his pro-democracy NFSC movement.

Given Operation Fox Hunt and the CCP's continued malevolent focus upon him, Mr. Kwok is not similarly situated to other defendants – the risks to him of flight are exponentially greater than those faced by others. Even if Mr. Kwok somehow managed to successfully evade all the conditions that routinely prevent flight in this District; then thwart border security controls designed to ensure that he cannot leave the country while under an active arrest warrant; and then arrange for transportation abroad while being on a "no-fly" list and under an INTERPOL Red Notice; he would still have to spend the rest of his life avoiding recapture, whether by being directly kidnapped by the CCP or extradited to China from whatever country he traveled to as a fugitive. Mr. Kwok is far from anonymous – he has been the subject of numerous news articles and has himself broadcast hundreds of hours of video footage. Thus, it strains belief that, as the subject of an active search by the CCP and the U.S., two governments with virtually unlimited resources, he could avoid detection in another country for any meaningful period of time.  Even now, there are CCP operatives specifically tasked with returning him to China and destroying his movement. Those operatives would happily take full advantage of the golden opportunity Mr. Kwok's flight would provide. Whatever resources and guile the government believes Mr. Kwok to have, it is simply untenable to believe he would be

capable of avoiding the reach of not one, but two, of the most powerful nations in the world.

Given the above, the Court's should reconsider and reject its prior finding that Mr. Kwok is a serious flight risk.

## Mr. Kwok Is Not A Future Danger To The Community

The Court concluded that Mr. Kwok posed a future danger because, despite an SEC cease and desist order and related seizure of funds, Mr. Kwok continued to encourage his followers to invest "in the fraud scheme alleged in this case," meaning that he "will not abide by court orders and continue to cause economic harm to the community if released." Order at 12. Mr. Kwok disputes that he engaged in any fraud, either prior to or after the SEC's order. Regardless, detention is always required to be a last resort. The Court did not explain why lesser measures, such as banning Mr. Kwok from communicating with his followers about any financial matters or this case would be insufficient to prevent the potential economic harm identified. *See generally id.* at 11-12. Nor did the Court explain why the strict 24-hour custodian arrangement proposed as one of the protective measures here could not reasonably ensure that Mr. Kwok would abide by the conditions of his release. *Id.*

The Court also concluded that Mr. Kwok would likely attempt to obstruct justice if he is released from detention. Per the Court, "Defendant's history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released." Order at 11. Among the identified conduct is misstating his assets (*id.* at 8 and 10); filing for bankruptcy six days after being ordered to pay a judgment in a civil matter (*id.* at 8); posting false and harassing material on social media about people that were connected to the company that had sued him (*id.*); encouraging others via social media to protest the bankruptcy trustee, his family, and his counsel and also file claims in his bankruptcy to drive up the trustee's attorney's fees (*id.* at 9); publicly

publishing confidential settlement documents on the internet (*id.*); and using social media to threaten alleged victims of his purported frauds and incite his followers to harass them (*id.* at 10).

Mr. Kwok apologizes for his past behavior and the upset he caused others. He will not undertake such actions again. In addition, as described in more detail immediately below, through the following proposed conditions of release, his ability to do so will be expressly and tightly circumscribed.

**The Proposed Conditions Of Release Are Sufficient**

Mr. Kwok proposes that the following conditions be imposed on his release, in addition to the standard release conditions and any other conditions the Court deems appropriate. They are: (i) the posting of property; (ii) the continued surrender of his passports to the government and continued presence on the "no-fly" list; (iii) home confinement under the supervision of a responsible third-party custodian; (iv) 24/7 electronic GPS monitoring, along with additional, frequent telephonic and in-person visits by Pretrial Services; (v) a restriction on contacting any consulate, whether in-person or remotely, (vi) a restriction on contacting or meeting with persons other than his attorneys and his family outside the presence of counsel; (vii) a ban on accessing the Internet or going online or speaking to his followers about financial matters or the case; and (viii) a ban on opening new financial accounts or making financial transactions. Of course, the Court may impose any other conditions the Court deems appropriate. Taken together, these conditions will ameliorate any purported risk and reasonably assure that Mr. Kwok returns to Court as and when directed. Plainly, someone under home confinement and 24-hour physical and electronic oversight, and subject to other broad restrictions banning outside contact, internet use, and financial activity, will not pose a risk of danger or flight if released from detention. The exceptionally strict physical and electronic monitoring provisions that form part of these

restrictions also will ensure that Mr. Kwok abides by the conditions of his release, as any failure to do so will be immediately identified and lead to Mr. Kwok's return to detention.

Given these conditions, the Bail Reform Act requires Mr. Kwok's release, a public policy goal that is greatly amplified here by the importance of getting Mr. Kwok proper medical care as soon as possible.

## ARGUMENT

### MR. KWOK'S RENEWED MOTION FOR PRETRIAL RELEASE SHOULD BE GRANTED

## I.    THE APPLICABLE LEGAL STANDARD AND THE PRESUMPTION IN FAVOR OF PRETRIAL RELEASE

Incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the Right to be Monitored,"* 123 YALE L. J. 1344 (2014). Accordingly, '[o]ur system of criminal justice embraces a strong presumption *against* detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (same). Hence, the Court "should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur,* 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984)). Courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1407 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Consistent with these principles, the presumption of innocence afforded to every defendant, and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure [1] the appearance of the person as required and [2] the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

As the Bail Reform Act "generally favors bail release, the government carries a dual burden in seeking pretrial detention." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). First, the government must prove, by a preponderance of the evidence, that Mr. Kwok poses a "serious risk" of flight, or prove, by clear and convincing evidence, that he is a danger to the community. *See* 18 U.S.C. § 3142(f)(2)(A). Second, if the government makes such a showing, it must then show, by the same quantum of proof that no conditions of release will reasonably assure Mr. Kwok's appearance. *See* 18 U.S.C. § 3142(e); *Sabhnani*, 493 F.3d at 75; *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (emphasizing that the "requirement that courts expressly consider alternative conditions is central to the Bail Reform Act").[4]

While it is Mr. Kwok that renews his request for release, the burden of proof is on the government to prove that his continued detention remains appropriate. *Sabhnani*, 493 F.3d at 75. As discussed below, the government cannot meet its heavy burden of proving that Mr. Kwok must

---

[4] Because pretrial detention is truly a last resort, a court faced with the issue must "make explicit their findings with regard to the adequacy [or inadequacy] of possible conditions for release." *United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir. 1987). "Whatever the district court ultimately decides, it should explicate the reasons underlying its conclusion." *Berrios-Berrios*, 791 F.2d at 253.

remain in pretrial detention. He should be released pending trial.

## II.   MR. KWOK SHOULD BE RELEASED ON BAIL BECAUSE HE IS NOT A CONTINUING DANGER TO THE COMMUNITY

The government cannot meet its heavy burden in proving "continuing danger" by simply alleging that a defendant is a dangerous person or pointing to past conduct. Harm is a forward looking evaluation; the government must prove harm or obstruction will take place in the future if a defendant is released, and that this risk of future harm can only be prevented by pretrial detention. *See, e.g., United States v. Madoff*, 586 F.Supp.2d 240, 249-250 (S.D.N.Y. 2009). Therefore, for pretrial detention to be consistent with the Due Process Clause, the government must prove that a defendant "presents an identified and articulable threat to an individual or the community" and that pretrial detention is necessary to "disable the arrestee from executing that threat." *Munchel*, 991 F.3d at 1280 (emphases in original) (quoting *Salerno*, 481 U.S. at 751). Here, pretrial detention is not necessary to "disable" Mr. Kwok from carrying out any "identifiable and articulable threat" to either a specific person or the larger community.[5]

The Court previously found that Mr. Kwok poses a community danger in two ways. First, because he will continue to defraud the community if he is released from detention. Order at 11-12. Second, because he will attempt to obstruct justice if he is released from detention. *Id.* at 7-11. The Court should reconsider and reject both of its prior findings in light of the current facts and

---

[5] In cases involving, *inter alia*, crimes of violence, 18 U.S.C. § 3142(e) applies a rebuttable presumption that a defendant must be detained to ensure community safety. That rebuttable presumption does not apply here. Even if it did, to rebut that presumption, a defendant bears only a limited burden of production – not a burden of persuasion – requiring the defendant to come forward with evidence that he/she does not pose a danger to the community or a risk of flight. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) ("Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community."); *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (same); *United States v. Dabney*, No. 20-cr-0027 (KBJ), 2020 U.S. Dist. LEXIS 67127, *2 (D.D.C. 2020) (finding presumption rebutted).

proposed conditions.

The Court's finding that Mr. Kwok posed a risk of future financial harm to the community by "clear and convincing evidence" (Order at 12), rests on the improper assumption that Mr. Kwok will be convicted of fraud in this case. This is the only way the Court could find that encouraging investment "in the fraud scheme alleged in this case," would "cause economic harm to the community." *Id.* Mr. Kwok, however, remains entitled to a presumption of innocence in bail determinations, *see* 18 U.S.C. § 3142(j), and the Court should not have used a presumption of guilt to conclude the government had met its heavy burden of proof of showing future economic harm would result if Mr. Kwok was not detained.

Moreover, detention is always required to be a last resort. *Salerno*, 481 U.S. at 755; *Hanson*, 613 F. Supp. 2d at 87. Lesser measures, such as banning Mr. Kwok from communicating with his followers about financial matters and this case during the few months preceding trial, is sufficient to prevent the potential economic harm identified. In this regard, while the Court questioned whether Mr. Kwok would abide by lesser restrictions (Order at 12), some of the other proposed restrictions, such as the strict 24-hour custodian arrangement, will reasonably ensure that his conditions of release will be honored. *Id.* Certainly, the Court did not explain, as it should have, why this combination of conditions could not reasonably ensure Mr. Kwok's compliance. *See, e.g., United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir. 1987) (stating that courts must "make explicit their findings with regard to the adequacy [or inadequacy] of possible conditions for release").

As to obstruction, not all obstructive behavior counts. There must be an identified serious and genuine threat that, absent pretrial detention, the defendant will materially obstruct the judicial integrity of the proceeding at issue. *Salerno*, 481 U.S. at 753. *United States v. Riley*, 21-cr-69

(D.D.C. Feb. 24, 2021), Hr'g. Tr. 33:14-33:19 ("what [18 U.S.C. § 3142](f)(2)(B) is really getting at is not just obstructive intent generally, but, rather, the risk that somebody's going to . . . obstruct or attempt to obstruct a judicial proceeding."); *United States v. Gamble*, No. 19-cr-0348 (CKK), 2020 U.S. Dist. LEXIS 118007, *6-10 (D.D.C. April 13, 2020) (granting bail and, inter alia, rejecting the government's speculation that Gamble might tamper with witnesses if released, when his only obstructive act was attempting to conceal physical evidence and other release conditions would be sufficient to ameliorate any such danger). For the most part, only the most serious obstructive conduct – *viz*, witness tampering – justifies detention to prevent continued obstruction. *See United States v. DeGrave*, 539 F.Supp.3d 184, 199 (D.D.C. 2021) (collecting cases). Here, Mr. Kwok has not attempted to tamper with witnesses in this judicial proceeding and will not do so. Moreover, most of the identified behavior involved the use of social media. The proposed conditions of release ban Mr. Kwok from accessing the internet and severely restrict his contacts with persons other than his attorneys and his family. These conditions are sufficient to prevent any future obstructive conduct, whether through social media or otherwise, like the conduct identified by the Court in its Order. For these reasons, Mr. Kwok's continued detention on this basis is improper.

### III.  MR. KWOK SHOULD BE RELEASED ON BAIL BECAUSE HE DOES NOT POSE A SERIOUS RISK OF FLIGHT AND HIS APPEARANCE IN COURT IS REASONABLY ASSURED

Pretrial detention may only be had where "flight risk" is so serious that detention is required. As discussed above (*see* Statement of Facts), changed circumstances and the comprehensive set of protective conditions proposed by Mr. Kwok mean that Mr. Kwok is not a serious flight risk.

To try and show serious risk of flight, the government will likely point again to the charges set forth in the Superseding Indictment. It is well settled, however, that more than the alleged

commission of a serious crime and potential lengthy sentence is required to detain a defendant as a flight risk. *See, e.g., United States v. Friedman*, 837 F.2d 48, 49-50 (2d Cir. 1988) (*per curiam*); *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) (stating that "[n]either *Salerno* nor any other case authorizes detaining someone in jail while awaiting trial … based merely on the fact of arrest for a particular crime"). A charge is merely an allegation, and the Bail Reform Act does nothing to limit the presumption of innocence. *See* 18 U.S.C. § 3142(j).

The "flight risk" finding put a lot of weight on the fact that Mr. Kwok is not a United States citizen and very wealthy. In so asserting, too little weight was given to the ties that Mr. Kwok and his family have established over the last near decade in the United States, and the reasons why they have chosen to come to the United States and seek asylum here. Mr. Kwok is a fugitive from the CCP. Mr. Kwok (and his family) have applied for asylum and citizenship in the United States because Mr. Kwok is the target – ███████████████ – of an existing and active CCP influence campaign. The CCP has gone to great lengths in the past to try to coerce Mr. Kwok to return to China and, if he were to leave the United States, he would place himself at great risk of being kidnapped or murdered by the CCP. This risk is particularly acute, both within and outside the prison, now that the United States Attorney's Office has ███████████████████████ ███████████████████████████████████. *Cf. United States v. Zarrab*, No. 15 Cr. 867 (RMB), Docket No. 708 (S.D.N.Y. 2016) (█████████████████████ ████████████████████████████████████████).[6]

---

[6] Mr. Zarrab was part of a conspiracy that sought to defraud the United States Treasury, violate the International Emergency Economic Powers Act, and commit bank fraud and money laundering, all on behalf of, and for the benefit of, the Iranian government. His conditions of release, which were later modified and relaxed with the consent of the government, included home detention with electronic and GPS monitoring, random unannounced searches by Pretrial Services and/or the FBI, ability to leave home detention only to receive medical care, attend court proceedings, or meet with the government, five million dollar bond secured by $100,000, continued surrender of his travel documents and no applications for new travel documents, no phone or computer, except as approved by the government and containing monitoring software,

Nor is Mr. Kwok's wealth significant. As the Court knows, Mr. Kwok has filed for bankruptcy, and the trustee is now monitoring and controlling his financial affairs. Mr. Kwok has surrendered his passports and is on the no-fly list. That, together with the proposed conditions that may be imposed upon him, make it effectively impossible for him to flee the jurisdiction and become a fugitive.

With the overwhelming risks facing Mr. Kwok were he to flee, any attenuated and highly speculative flight concern proffered by the government would not be serious and could not justify continued incarceration. Further, the Court could set bail conditions, including home confinement; 24-hour electronic monitoring; continuous supervision by a third-party custodian; and barring him from contacting or visiting any consulate or location necessary for him to obtain new travel documents, that would ameliorate any supposed risk. Numerous courts have found these conditions to be sufficient in similar circumstances.

In *United States v. Naik*, 1:19-cr-00373-TSC (D.C. Cir.), the government appealed a magistrate judge's ruling allowing pretrial release of Mr. Naik, a foreign citizen charged with child pornography offenses that carried a mandatory minimum sentence. Below and on appeal, the government argued that Mr. Naik could easily go to the consulate for Afghanistan, get a new passport, and flee. In rejecting the government's argument and upholding the decision of the Magistrate Judge, the District Court (Chutkan, J.) reasonably resolved the government's purported concern by requiring that Mr. Naik be accompanied by a third-party custodian and only leave the home to appear in Court. Judge Chutkan also added a condition forbidding the defendant from applying for any international travel documents or visiting any consulate. The docket sheet in the

---

and the hiring of a security company, paid for by the defendant and approved by the government, to provide continuous oversight and protection. *See United States v. Zarrab*, No. 15 Cr. 867 (RMB), Docket No. 708 (S.D.N.Y. 2016). Similar conditions of release have been proposed here.

*Naik* case proves the efficacy of these conditions. Mr. Naik did not visit any consulate, appeared for trial, was convicted, and a motion to set aside his conviction notwithstanding the verdict was granted. If the Court deems it necessary, Mr. Kwok is ready to be subjected to similar restrictions as a condition of his release.[7]

On top of that, the government is fully able to monitor and regulate entry and egress from the United States and prevent Mr. Kwok from leaving the United States – indeed, the government already has placed him on a no-fly list. While Mr. Kwok has traveled under a different name in the past and taken other measures to avoid surveillance, such as burner phones and Faraday bags, he did so to evade the CCP and the ever-present danger the Chinese government poses to him. Here, the government unfairly posits an entirely contrary situation, where Mr. Kwok runs toward the danger of the CCP, rather than away from it by remaining here in the United States. Moreover, rather than simply traveling incognito as in the past, Mr. Kwok would now have to do much more. He would have to break home confinement and obtain false documents under the nose of his custodian, all while evading government monitoring of both his ankle monitor and the U.S. border. He would have to leave his wife and daughter behind, and he would be impoverishing any sureties who, in an act of trust and good faith, agreed to be jointly and severally liable on a bond. Even if he managed to make it to a third country, it would be a pyrrhic victory at best. Not only would it

---

[7] While the Court observed that GPS monitors can be removed and "only ensure a reduced head start should a defendant decide to flee" (Order at 13), this is just one of many conditions of release, including a 24/7/365 custodial arrangement with a private security firm, that Mr. Kwok would be subject to upon release. Courts have found that, combined with other restrictions, GPS monitoring and home confinement can ensure attendance in court even for those charged with serious crimes. *See* "Former IMF chief Dominique Strauss-Kahn granted bail," May 20, 2011, available at http://goo.gl/oYgRM9, where Strauss-Kahn, who was charged with rape and had the means and connections to flee; was released on bail terms that included electronic monitoring and home confinement. *See also United States v. Bankman-Fried*, Case No. 22-00673 (S.D.N.Y), ECF No. 14 (requiring GPS monitoring as bail condition); *United States v. Sabhnani*, 493 F.3d 63, 77 (2d Cir. 2007) (approving pretrial release on combination of conditions that included GPS monitoring and physical monitoring by on-site private security guards answerable to the court).

result in the destruction of the NFSC as a viable pressure group, but Mr. Kwok would be a hunted fugitive with no real chance of long evading both U.S. law enforcement and the CCP agents expressly tasked with incapacitating him and his movement. And Mr. Kwok supposedly would be doing all this to avoid non-violent fraud charges to which he has myriad defenses. This makes no sense.

The majority of Mr. Kwok's life, interests, and family are now firmly located in the United States. His lack of criminal history, his reasons for coming here, and his demonstrated desire to continue living and working here, all show that he is not a serious flight risk. To the contrary, Mr. Kwok has every incentive and intent to appear in court and vigorously fight the charges against him. If he went anywhere else in the world as a fugitive from justice, he would effectively be handing himself over to the Chinese government.

Many courts have not hesitated to reject the government's base contention here – that purportedly having ties to, and money in, another country automatically makes a defendant such a serious flight risk that he or she must be detained pretrial. *See, e.g.*, *Naik*, discussed *supra*; *United States v. Marinez-Patino*, No. 11-cr-0064, 2011 WL 902466, *6 (N.D. Ill. March 14, 2011) ("[i]t is the risk that a defendant will flee, and not just his immigration status, that a court must consider under Section 3142(d)").

In *United States v. An*, 1:22-cr-00460-KAM (E.D.N.Y.), Quanzhong An, one the Fox Hunt defendants ███████████████████████, was granted bail, with Judge Kiyo A. Matsumoto reconsidering her earlier decision to deny bail based on flight risk. Like Mr. Kwok, Mr. An is a person purportedly with access to significant wealth whose health issues materially worsened while he was in the MDC. Unlike Mr Kwok, Mr. An has little real connection to the United States and continues to have significant and abiding ties to China and the CCP. There is no

question that Mr. An would be entirely safe from prosecution if he managed to reach China. Nevertheless, Judge Matsumoto, on renewed application, released Mr. An from detention, subject to a combination of conditions, including a $30 million bond; home confinement supervised by Pretrial Services, restrictions on traveling outside New York City or to the Chinese consulate in New York City; and no visits from co-defendants other than his daughter. *See An*, 1:22-cr-00460-KAM (E.D.N.Y.), Docket No. 97 (Appearance Bond). Notably, the foregoing conditions of release are far less onerous than the conditions proposed here for Mr. Kwok, despite the far greater risk of flight posed by Mr. An.

In *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007), the Second Circuit Court of Appeals reversed the district court's order of detention of defendants, who were natives of Indonesia. The Second Circuit ordered their pretrial release despite (i) defendants' "strong motive to flee" because of serious charges of human slavery involving violent acts; (ii) "strong" direct and circumstantial evidence of guilt; (ii) the "lengthy term of incarceration" defendants faced if convicted; (iii) the defendants possessing "ample means to finance flight;" (iv) defendants having "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East;" and (v) finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations." 493 F.3d at 76-77. Ultimately, the Second Circuit ordered defendants' release because there still were restrictive conditions that would reasonably assure the defendants' presence at trial:

> The physical restrictions proposed by the government and agreed to by defendants in this case are extraordinary. Defendants would not only surrender their passports and be subject to home confinement with electronic monitoring and unannounced visits by the court's Pre-Trial Services Office; they agree to 24-hour-a-day visual surveillance of their Long Island home by on-site private security guards answerable to the court. Private security officers would also wiretap defendants'

> telephone, monitor their computer use, search their children when they entered and left the family home, and escort defendants on all authorized trips outside their home.

*Id.* at 77-78. Clinching the matter, the government would be the one choosing the private security firm, while defendants would pay all costs associated with their home confinement, "thus avoiding the drain on limited government resources." *Id.*; *see also United States v. Boustani*, 932 F.3d 79, 81 (2d Cir. 2019) (endorsing the use of private security as a bail condition). There is no reason why Mr. Kwok cannot be subject to the same type of extraordinary conditions as the *Sabhnani* defendants and to the same result – pretrial release.

Nor are the decisions granting release in *An* and *Sabhnani* unique or unusual. In *United States v. Ng*, 15 Cr. 706 (VSB) (S.D.N.Y), Judge Broderick granted bail to defendant Ng who had no ties to the United States; was not a citizen; did not speak English; had seemingly endless wealth with which to flee; and was an older man, for whom a 20-year sentence could effectively be a life sentence. The Court found that all these factors could be adequately balanced and ameliorated by restrictive conditions.

Recently, in *United States v. Zhao*, 2:23-cr-00179-RJ (W.D. Wash.), Changpeng Zhao, the CEO of Binance, was accused of laundering billions of dollars in hundreds of thousands of transactions that allowed various terrorists, criminal, and human trafficking organizations to operate. *See, e.g.*, Nov. 21, 2023 DOJ Press Release, *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, available at https://www.justice.gov/usao-wdwa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution. Despite the serious charges against him, his vast wealth measured in the tens of billions of dollars, and lack of any ties to the United States, Mr. Zhao was permitted to continue residing in the UAE, where he, his partner, and three young children live, and most of his financial assets are located, during the pendency of the case. *Zhao*, 2:23-cr-00179-RJ (W.D. Wash.), Docket No. 34. Notably, the UAE has no extradition treaty with

the United States and, in an unusual and rare move, Mr. Zhao was granted citizenship by the UAE government. *Id.* Despite all this, even after he pled guilty, Magistrate Judge Tsuchida of the Western District of Washington court allowed Mr. Zhao to return to the UAE pending sentencing, pursuant to a $175 million appearance bond (just $20 million of which is within the jurisdiction of the U.S. legal system). *Id.*, Docket Nos. 33, 34.

Likewise, in *United States v. Larry Harmon*, 1:19-CR-395- BAH (D.D.C.), the government opposed revocation of an order of detention for the same sort of reasons the government invokes here. Per the government, Larry Harmon (i) had deep personal and financial ties to Belize, (ii) was a defendant in a bitcoin-related case with substantial incarceratory and financial penalties; and (iii) had an abundance of money and the type of internet-savvy and darkweb connections that would allow him to flee. The District of Columbia court considered the government's arguments, rejected them, revoked the order of detention, and granted Mr. Harmon his release. That release was conditioned on home detention in Ohio, location monitoring, travel restrictions, computer restrictions, internet restrictions, and prohibitions on opening new financial accounts or making cryptocurrency transactions. *See id.* at ECF Docket Nos. 20 and 21. If these conditions were sufficient to allow the release of Mr. Harmon, who is far more "technologically sophisticated" than Mr. Kwok (*see* Order at 10-11), then, *a fortiori*, they are sufficient here.

Moreover, the nature of the charges here further support pre-trial release. While the instant charges are serious, they are, at bottom, financial fraud charges. Courts have found pre-trial release under similar circumstances even when the alleged charges involved threats to national security.

For example, in *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), the defendant was alleged to have violated the Export Administration Act and the International Emergency Economic Powers Act (IEEPA) by acquiring nuclear triggers and exporting them to Pakistan.

Defendant was an Israeli national who had resided in South Africa for the 18 years preceding his arrest and had "no ties to the United States or the Washington, D.C. area" of any kind. *Id.* at 132. Indeed, he "was only in this country in order to participate in a ski vacation with his wife and daughter." *Id.* Although "the weight of the evidence against Defendant is substantial," the Court found that none of the foregoing justified pretrial detention under the Bail Reform Act. *Id.* at 132-133.

*United States v. Kafrani*, 1:21-cr-00501-EGS-1 (D.D.C.), involved an Iranian citizen resident in Canada who was arrested in the United States for sending two mass spectrometers, a gas chromatograph, and an autosampler to Iran in violation of IEEPA. Although Mr. Kafrani had no ties of any kind to the United States, was alleged to be an Iranian agent, and was facing serious and essentially admitted allegations, the Court released him pursuant to a set of 25 conditions. *See id.*, Docket No. 30 (Order Setting Conditions of Release, filed 11/19/21). Those conditions included (i) surrender of all travel documents; (ii) entry of a bond; (iii) home detention; (iv) continuous GPS monitoring; (v) being placed in the custody of a third-party custodian (the imam of a local mosque) acceptable to the Court and the government who was required to visit Kafrani twice each day, call him once a day, and accompany him every time he left the home; (vi) frequent home visits by Pretrial Services; (vii) no internet access; and (viii) being banned from "all airports, train stations, and bus stations in the greater D.C. metropolitan area" or contacting "any consulate or any consulate employee for any country or the Iranian section in the Pakistani Consulate." *Id.*

In *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009), the Court ordered the release of a defendant accused of violating IEEPA and the Export Administration Regulations. While a naturalized citizen of the United States, defendant had "strong ties to [her home country of] China,"

including owning property in China, spending almost all her ten years of marriage living abroad with her husband, and spending only 22 days in the United States in 2008. *Id.* at 87. Further, the *Hanson* Court acknowledged that the charges against the defendant "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items." *Id.* at 87. Nevertheless, the Court declined to order pretrial detention.

The government may also raise extradition concerns. Such concerns are no impediment to pretrial release on suitable conditions. In *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004), for example, the Sixth Circuit Court of Appeals affirmed the district court's order of pretrial release, even though the defendant, charged with bulk cash smuggling and forfeiture, was a resident and citizen of Denmark, a non-extradition country. The Court of Appeals noted that the "bail statute does not ... require that foreign defendants be detained simply because their return cannot be guaranteed through extradition." *Id.* at 332. *See also United States v. David Sidoo*, 19-cr-10080-NMG, Docket No. 13 (D. Mass) (allowing defendant Sidoo, who had no status in the United States, to reside in his home in Canada during the pendency of his United States criminal case charging him with conspiracy to commit wire fraud, honest services fraud, and money laundering); *Zhao*, 2:23-cr-00179-RJ (W.D. Wash.) (allowing defendant Zhao, who had no status in the United States, to reside in his home in the UAE during the pendency of his United States criminal case, even though  the UAE has no extradition treaty with the United States and Mr. Zhao had unusually been granted UAE citizenship).

In the end, the government can point to no facts in the record showing that Mr. Kwok has taken any concrete steps to flee, that he intends to flee, or that the incentive to flee outweighs the

powerful disincentives facing him were he to run from the United States. Indeed, the record is entirely to the contrary. Almost immediately after the GTV private placement, Mr. Kwok was made aware of an SEC inquiry into that fund raise, and then a subsequent criminal investigation into the conduct charged in the Indictment, and yet, he did not take advantage of his purported wealth or network of connections to flee the country. Though threatened with this very prosecution, he remained in the country for *almost three years before his arrest*.

Any remaining asserted concern that he will flee, or that he will decline to follow the Court's orders and conditions of release, are decisively effaced by the conditions themselves, which are strict and comprehensive and include 24-hour monitoring by third party custodians. Under these facts, all the government could possibly proffer the Court is self-serving speculation involving Rube Goldberg-esque escape fantasies. Such rank, unsupported speculation, however, is insufficient to overcome Mr. Kwok's presumptive right to bail.

## IV.   IN ANY EVENT, BAIL CONDITIONS READILY EXIST THAT WILL DETER ANY SERIOUS FLIGHT RISK AND REASONABLY ASSURE MR. KWOK'S RETURN TO COURT

As the cases and facts discussed herein conclusively demonstrate, the Court may readily set conditions that address any community danger or purported flight risk. The standard is not, as the government may contend, a 100 percent certainty. All the Bail Reform Act requires are conditions that ameliorate those risks and "reasonably assure" a defendant's return to court. *See* 18 U.S.C. § 3142(b) and (c)(1)(B); *Madoff*, 586 F.Supp.2d at 249 (Bail Reform Act "does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance"); *United States v. Khashoggi*, 717 F. Supp. 1048, 1049 (S.D.N.Y. 1989) (although "defendant's vast resources" rendered it impossible for the Court to "conclusively guarantee" his presence at trial, "a substantial bail coupled with significant restrictions on the defendant's freedom will reasonably assure" it). Thus, for example, while the Court is correct that private security "is not as reliable as

a federal jail" (Order at 13), that is not the test – if it were, pretrial release would never be granted. The question at hand is whether a set of meaningful restrictions can be crafted that will *reasonably* deter any serious risk, so Mr. Kwok may leave prison, receive appropriate medical attention; and otherwise prepare for trial. The answer to that question is "Yes."

The government already has taken away Mr. Kwok's passports and placed him on a no-fly list. The Court may impose other suitable conditions sufficient to secure his future appearances, including the ones suggested by Mr. Kwok: (i) the posting of property before he is released from custody; (ii) the continued surrender of his passports to the government and continued presence on the "no-fly" list; (iii) home confinement under the supervision of a responsible third-party custodian; (iv) 24/7 electronic GPS monitoring of Mr. Kwok, along with additional, frequent telephonic and in-person visits by Pretrial Services; (v) a restriction on contacting any consulate, whether in-person or remotely, (vi) a restriction on contacting or meeting with persons other than his attorneys and his family outside the presence of counsel; (vii) a ban on accessing the Internet or going online or speaking to his followers about financial matters or the case; and (viii) a ban on opening new financial accounts or making financial transactions. Of course, the Court may impose any other conditions it deems appropriate.

These thoughtful conditions, taken together, will be more than sufficient to reasonably assure community safety and Mr. Kwok's return to court. Someone under 24-hour physical and electronic oversight, who cannot leave home confinement without a designated minder, who is forbidden from accessing the internet, making financial transactions, or contacting non-approved persons, is not a creditable risk of community danger or flight. Nor could Mr. Kwok, while being closely monitored and controlled by private security, violate his conditions. Any attempt to do so will be quickly seen and stopped by his minders, swiftly followed by the Court returning Mr.

Kwok to detention or imposing some other appropriate penalty. Accordingly, the instant motion for pretrial release should be granted. At the least, Mr. Kwok should be permitted to proffer guarantors that are acceptable to the government and the Court and also have the opportunity to show the efficacy of its other conditions.

## **CONCLUSION**

For each of the foregoing reasons, the Court should (i) revoke the detention order imposed on Mr. Kwok; (ii) order him released with appropriate bail conditions; and (iii) grant him such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 27, 2023

Respectfully submitted,

*/s/ Sabrina P. Shroff*

80 Broad Street, 19th Floor
New York, New York 10007
(646) 763-1490

Sidhardha Kamaraju
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

*Attorneys for defendant Ho Wan Kwok*