UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"

                Defendant.

S1 23 Cr. 118 (AT)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT HO WAN KWOK'S
SECOND MOTION FOR PRETRIAL RELASE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Ryan B. Finkel
Juliana N. Murray
Micah F. Fergenson
Justin Horton
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 1

I. Offense Conduct ........................................................................................................ 1

II. Kwok's Background .................................................................................................. 3

III. Kwok's Obstruction ............................................................................................... 4

    A. Kwok's Efforts to Obstruct His Bankruptcy Proceedings ................................. 4

    B. Kwok's Attacks and Threats Toward Witnesses and His Critics ....................... 5

    C. Kwok's Obstruction in This Case ...................................................................... 6

PROCEDURAL HISTORY ............................................................................................... 8

I. Kwok's First Application for Pretrial Release ......................................................... 8

II. This Court's Decision to Detain Kwok ................................................................... 10

III. The Second Circuit Affirmed This Court's Order of Detention ........................... 12

ARGUMENT .................................................................................................................... 12

I. Kwok Has Not Demonstrated That There Is New Information That Materially Bears on The Court's Order of Detention ............................................................................ 12

    A. Applicable Law ................................................................................................. 12

    B. Argument .......................................................................................................... 13

        *1. Kwok's Medical Treatment Does Not Have a Material Bearing on Detention* ........... 14

        *2. The Government's August Filing Does Not Change the Circumstances Justifying Detention* ................................................................................................................. 17

II. The Law Requires That Kwok Remain Detained .................................................. 22

    A. Applicable Law ................................................................................................. 22

    B. Argument .......................................................................................................... 23

        *1. Kwok Poses a Serious Risk of Flight* ............................................................ 23

        *2. Kwok Presents an Ongoing Economic Danger* ............................................ 27

        *3. Kwok Presents a Danger of Obstruction* ..................................................... 28

        *4. There Are No Conditions or a Combination of Conditions Which Can Assure the Court that the Community Will Be Safe and the Defendant Will Not Flee* ................................. 29

CONCLUSION ................................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*United States v. Ali,*
   No. 12cr45S, 2012 WL 2921642 (W.D.N.Y. July 17, 2012) ................................................... 13

*United States v. Blanco,*
   570 F. App'x 76 (2d Cir. 2014) ...................................................................................... 13, 14

*United States v. Friedman,*
   837 F.2d 48 (2d Cir. 1988) .................................................................................................. 23

*United States v. Mercedes,*
   254 F.3d 433 (2d Cir. 2001) ................................................................................................. 23

*United States v. Rivera,*
   No. 09-CR-619 (SJF), 2010 WL 1687069 (E.D.N.Y. Apr. 21, 2010) ............................... 13, 14

*United States v. Rodriguez,*
   No. 15-MJ-02956, 2015 WL 6503861(S.D.N.Y. Oct. 26, 2015) (Koeltl, D.J.) ............... 13, 22

*United States v. Sabhnani,*
   493 F.3d 63 (2d Cr. 2007) ................................................................................................... 23

*United States v. Zarrab,*
   No. 15 CR 867 (RMB), 2016 WL 3681423 (S.D.N.Y. June 16, 2016) ................................. 31

**Statutes**

18 U.S.C. § 3142(f) ................................................................................................... 12, 13, 22
18 U.S.C. § 3142(g) ......................................................................................................... 23

## PRELIMINARY STATEMENT

The Government writes in opposition to Ho Wan Kwok's second motion for pretrial release.  (Dkt. 177 (Def. Second Mot.).).  Kwok's second motion comes following the Court's April 2023 decision that Kwok be detained pending trial (Dkt. 51)—a decision that the Court of Appeals unanimously affirmed.  Eight months later, Kwok offers no legitimate basis to revisit— let alone reverse—this Court's considered and well-reasoned detention decision.  Indeed, far from meeting the threshold requirement that there is new information that has a material bearing on the reasons for Kwok's detention, the defendant's second motion simply recycles arguments from his first.  Those repackaged contentions do not undermine what this Court has already determined: Kwok is a danger to the community, is willing to obstruct the proceedings of this case (and others), and poses a serious risk of flight.  There are no conditions that can ameliorate those risks.  This second motion for pretrial release should be denied without a hearing.

## BACKGROUND

### I.  Offense Conduct

As this Court is aware, Kwok is charged with leading a scheme to defraud thousands of victims of more than $1 billion.  (Superseding Indictment, Dkt. 19 ("Indictment") ¶ 1).  Kwok's fraud involved a series of complex fraudulent businesses and fictitious investment opportunities associated with dozens of interrelated entities controlled by Kwok.  (Indictment ¶ 1).  Kwok and his co-conspirators laundered their fraud proceeds through foreign and domestic bank accounts and entities, layering the fraud proceeds to conceal their source, as well as using the fraud proceeds to further promote the ongoing fraud.  Kwok also misappropriated victim funds for his own

1

personal use and for the use of family members, including for personal investments and the purchase of luxury residences, vehicles, and goods.  (Indictment ¶¶ 1-4.)

The Superseding Indictment details four arms of the fraud—the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.  Each of these purported investment opportunities involved Kwok promising outsized profits to his victims, as well as making other false and fraudulent misrepresentations.  Kwok himself promoted each of the arms of the fraud to victims in videos that were broadcast on the Internet and distributed to Kwok's hundreds of thousands of online followers via social media.  The Government's evidence includes direct communications between Kwok and prospective investors, during which Kwok made representations about the financial benefits of investing in his offerings.  In interviews with the Government and with the FBI, victims have explained that they relied on Kwok's representations—including, for example, that their money would be used for GTV's business; that they would receive shares of GTV stock through the GTV Private Placement, the Farm Loan Program, and G|CLUBS; and that Kwok personally guaranteed their investments in the Himalaya Exchange—in investing in Kwok's offerings.

Kwok and his co-conspirators laundered more than $1 billion in fraud proceeds through hundreds of accounts held in the names of at least 80 different entities or individuals.  Tens of millions of dollars of fraud proceeds eventually flowed to Kwok's family and to assets that Kwok used and controlled, such as exotic sports cars and a $26.5 million mansion.  For example, despite Kwok having no formal role at G|CLUBS, Kwok was captured on recorded conference calls directing the disposition of G|CLUBS "membership fees" for purposes other than investment in G|CLUBS.

2

The GTV Private Placement drew the scrutiny of the Securities and Exchange Commission, ultimately leading to a cease-and-desist order against GTV and two other entities, which required the three companies to pay more than $539 million in disgorgement and penalties relating to the GTV Private Placement (the "SEC Settlement").  Kwok has attempted to recoup the money that was disgorged pursuant to the SEC Settlement.  Specifically, after the SEC began to disburse funds to victims starting in or around April 2022, Kwok encouraged victims to reinvest any disbursements they obtained back into Kwok's fraudulent offerings.

As described in the Superseding Indictment, the Government seized more than approximately $600 million of Kwok's fraud proceeds between in or about September and October 2022 from bank accounts held in the names of various entities involved in the fraud, including G|CLUBS, G|FASHION, Gettr (a social media company that Kwok controls through a series of shell companies), and the Himalaya Exchange entities.  (Indictment ¶¶ 24, 25).  Despite the SEC Settlement and the Government's seizures, in February 2023, Kwok announced yet another fraudulent offering, which he referred to as the "A10 offering."  (Ex. 6 at 10).  As reported on the Kwok-controlled GNews website, A10 is a purported stock offering for 5% of the Himalaya Exchange and 5% of Gettr.  (*Id.*).  Like the other Kwok investment "opportunities," Kwok has claimed to guarantee investors against any losses they incur through their investment in A10.  (*Id.*).  The A10 investment therefore has all the hallmarks of the prior instrumentalities of Kwok's fraud.

## II.  Kwok's Background

Kwok is a Chinese citizen who emigrated from China to the United States in approximately 2015, seeking political asylum from the Chinese Communist Party ("CCP").  Between March 2017 and August 2017, Kwok traveled internationally, including outside the United States, on three

occasions.  On or about September 6, 2017, Kwok filed an application for political asylum, which remains pending.  Once in the United States, Kwok settled in New York City and purchased a penthouse apartment at the Sherry-Netherland Hotel in Manhattan for approximately $67 million. Kwok has not left the United States for the past six years, but in his Pretrial Services interview estimated that he had traveled to approximately "fifty" different countries between 1991 and 2017. Kwok's wife and daughter live in the United States and emigrated from China, while his son lives in London.  No members of Kwok's immediate family are United States citizens.

### III.  Kwok's Obstruction

Since his arrival in the United States, Kwok has been engaged in dozens of civil lawsuits. As described in prior briefing regarding Kwok's pretrial detention, and as found by this Court, "courts have previously found that Defendant engaged in obstructive behavior."  (Order denying Kwok pretrial release, dated April 20, 2023, Dkt. 51 ("Order") at 8.) Kwok has both engaged in and encouraged others to engage in obstructive behavior, including, for example, Kwok's filing for bankruptcy to shield his assets and his mobilizing of his followers to harass and threaten opponents, including the bankruptcy Trustee and Kwok's critics.

A.  <u>Kwok's Efforts to Obstruct His Bankruptcy Proceedings</u>

Kwok mobilized his supporters to harass the court-appointed Chapter 11 Bankruptcy Trustee who was court-designated to manage Kwok's financial affairs and to obtain assets for disbursement to Kwok's creditors.  By way of example, and as this Court recognized, the Bankruptcy court found that Kwok engaged in various obstructive acts, including: (i) instructing his followers to avoid service of process; (ii) threatening the Bankruptcy Trustee by telling his followers in an internet broadcast "to deal with this rogue [the Trustee], we have our rogue's ways.

In a few days you will see what would happen to him. Calamities, I can tell you guys. They will suffer calamities!"; (iii) encouraging his followers to protest outside the homes of the Bankruptcy Trustee; (iv) violating a non-disclosure order; (v) publicly encouraging followers to threaten the Trustee; and (vi) causing followers to file false accusations and spurious claims against the Trustee. (Order at 9.)

Indeed, even after the Bankruptcy Court issued a preliminary injunction barring Kwok from certain obstructive activities, Kwok violated it. Specifically, Kwok encouraged his followers to flood the bankruptcy docket with claims (regardless of their merit).[1] On January 23, 2023, Kwok posted a video on Getter in which he encouraged more of the same, and revealed the purpose of the filings was to obstruct the bankruptcy court and cause unnecessary expenses for the Trustee: "All of you go to the bankruptcy court . . . Let the attorney's fees of Trustee accumulate to 1 trillion if possible;" and "Think about it, $1,860 an hour as the attorney's fees. How much attorney fees is it after you all registered? How good is that!"

B.   Kwok's Attacks and Threats Toward Witnesses and His Critics

One particular individual who worked with Kwok in connection with the GTV Private Placement before cutting ties with Kwok expressed on social media that Kwok misled and defrauded his followers. Kwok responded by publicly branding that person as a "Demon" and a CCP spy. A Kwok-controlled Farm subsequently sued that person, who now lives in fear and in

---

[1] https://gettr.com/post/p24ybdca10b (last accessed December 7, 2023) ("Greetings, esteemed comrades. Paul Hastings Law Firm is launching a campaign to register creditors! If there are comrades who are not strong-willed, feeling their own investments and past investments, have no sense of security and need to be a debtor, and if you think it is a better choice, you must contact Paul Hastings Law Firm to register in the Bankruptcy Court of Connecticut as soon as possible, and maybe you can become a billionaire." (translated))

hiding as a result of Kwok's public threats. In particular, and as Kwok well knew, branding them as a CCP spy has had the effect of turning Kwok's thousands of followers against that person.

Kwok has also threatened victims who have sought reimbursements or complained about his fraud. Several victims have informed the Government that, after complaining to Kwok about their investments in his offerings, he branded them CCP spies, sometimes in social media or video posts, placing them directly in the crosshairs of Kwok's followers.

Kwok's campaign of threats and encouraging violence extends broadly. In November 2020, an anti-CCP activist ("Activist-1") filed suit against Kwok, alleging that Kwok has led a campaign of harassment and threats against him. Kwok called for actual violence and encouraged hundreds of thousands of followers to protest outside Activist-1's home, offering tens of thousands of dollars in cash and securities for anyone who succeeded in "getting rid of" Activist-1. On November 25, 2020, two of the protesters physically assaulted one of Activist-1's friends by repeatedly kicking the friend in the head and neck as he lay on the pavement outside Activist-1's home. As has been publicly reported, the friend suffered a facial fracture and swollen-shut eyes, and lost a tooth. (*See* https://bc.ctvnews.ca/video-shows-activist-beaten-kicked-amid-unusual-protest-outside-b-c-journalist-s-home-1.5206591.)

C. Kwok's Obstruction in This Case

After his arrest, Kwok obstructed these proceedings. During his Pretrial Services interview on March 15, 2023, Kwok advised that he worked as a "grand representative" for his family businesses from approximately 2000 through 2014 but has been "unemployed since the end of 2016." Kwok claimed total assets in the "approximate amount of $10,000," comprised of the value of "two cellphones and clothing." Kwok denied owning property or vehicles; instead, he claimed

that the residences he lived in—including his approximately $9 million Greenwich, Connecticut estate and his Sherry-Netherland Hotel penthouse—are owned by family members.

Kwok's representations about his assets to Pretrial Services were false.  Indeed, on the day of his arrest, the FBI executed a series of search warrants at various premises, including: (i) Kwok's $67 million Sherry-Netherland Hotel penthouse apartment (where Kwok was arrested); (ii) Kwok's 50,000 square-foot mansion in Mahwah, New Jersey; (iii) Kwok's approximately $9 million estate in Greenwich, Connecticut; and (iv) Kwok's co-defendant Yanping Wang's Manhattan apartment.  From the searches of Kwok's residences, the Government recovered, among other things, more than approximately $400,000 in U.S. and foreign currency and approximately 156 gold coins (which were inside a safe), a copy of Kwok's expired United Arab Emirates ("UAE") passport, gold pins with symbols of the CCP, and a 2021 Lamborghini that had been purchased with more than approximately $800,000 in misappropriated fraud proceeds.[2]

Days after his arrest, on March 29, 2023, Kwok's personal Gettr account "@MilesGuo," which was by then under the control of his agents, posted a three-minute edited and produced video accusing two of the prosecutors on this case of being CCP-aligned agents.  Specifically, in the video, Kwok's followers claimed that two of the AUSAs on this case were CCP agents because they previously worked at law firms that Kwok's followers claimed did work in China.

More recently, Kwok's followers have manipulated evidence.  Specifically, after the Government's indictment was unsealed, Kwok's supporters in the New Federal State of China ("NFSC")—an organization that Kwok controls—occupied the Mahwah Mansion, which Kwok

---

[2] From inside a safe located in co-defendant Wang's residence, the FBI recovered, among other items, Kwok's expired Republic of Vanuatu passport and Vanuatu non-citizen identification card, and approximately $138,000 in U.S. and foreign currency.

purchased with fraud proceeds.  In an attempt to cover up the fact that the Mansion was intended for *Kwok's* use, the NFSC modified the Mahwah Mansion to suit a defense narrative.  Specifically, Kwok's co-conspirators posted placards at room entrances that appear to suggest that the rooms of Kwok's Mahwah Mansion are, in fact, intended as guest rooms for members of the NFSC and/or G|CLUBS.

## PROCEDURAL HISTORY

### I.   Kwok's First Application for Pretrial Release

On March 15, 2023, Kwok was arrested at his penthouse apartment at the Sherry-Netherland Hotel in Manhattan.  He was presented before Magistrate Judge Katharine H. Parker and he consented to detention.  On March 28, 2023, Kwok filed a motion for a bail hearing, and three days later filed a motion for pretrial release (Dkts. 23, 24 ("Def. First Mot.").)  In his First Motion, Kwok argued that he posed no risk of flight, risk of danger, or risk of obstruction, and that detention would interfere with his ability to meet with counsel.  (Def. First Mot. at 3.)  Kwok also attempted to analogize his case to other non-violent cases where the Government did not seek pretrial detention.  (*See, e.g.*, Def. First Mot. at 1-2.)

As to flight, Kwok principally argued that he could not flee because the CCP would pursue him.  (Def. First Mot. at 13 ("Kwok would face intolerable risks to his life were he to expose himself to the long reach of the CCP.").)  In support of that argument, Kwok averred that he has not left the United States since 2017; that there are INTERPOL red notices issued against him; and that his wife and daughter (but not his son) are present in the United States.  (Def. First Mot. at 13-14.)  And thus, despite obtaining at least three passports from three countries in a period of three years, Kwok would be unable to travel abroad.

As to danger, Kwok argued that even if he had committed the crimes with which he is charged, it does not mean he poses an ongoing danger.  And even if it did, restricting Kwok's "ability to engage in financial transactions" would address any concerns.  (Def. First Mot. at 15-17.)  As to obstruction, Kwok asserted that his proposed bail package would limit any such risk.  (*Id.* at 16.)  Kwok also questioned whether "allegations of threats and intimidation," and a $37 million bank transfer of fraud proceeds "made by Mr. Kwok's co-defendant Mr. Je," who since March 2023 has been hiding as a fugitive in the UAE, were "relate[d] to Mr. Kwok."  (*Id.* at 18.)

Finally, in his First Motion, Kwok proposed a bail package consisting of (i) home detention at his Greenwich estate[3] or an "other" unidentified location approved by the Court; (ii) a $25 million bond secured by $5 million cash and two unidentified adult cosigners, "one of whom is not a family member;" (iii) "24/7 surveillance by a security company" with "at least one licensed and qualified guard;" (iv) GPS monitoring; (v) surrender of travel documents and surrender of his wife and daughter's travel documents; (vi) limitations on Kwok's ability to enter financial transactions; and (vii) no communications with co-defendants outside the presence of counsel.  (Def. First Mot. at 11-12.)

The Government argued that Kwok is an extraordinary defendant who had been found by at least two separate judges to disregard court orders; has threatened witnesses and critics with violence; has continued to defraud thousands of victims despite intervention of regulatory authorities and cash seizures; has claimed to have had 11 different passports; is an experienced world traveler with committed followers located across the globe; sent money and personnel to the

---

[3] This proposed bail residence is a seven-bedroom, 12,000 square-foot estate in Greenwich, Connecticut.  This estate has a pool, private tennis court, "living pavilion," three external fireplaces, and was maintained through fraud proceeds.

UAE; lied to Pretrial Services about his lack of access to cash when, in fact, he had nearly $500,000 in cash and gold coins in a safe; likely has money hidden abroad; has a co-conspirator and co-defendant who is hiding in the UAE; uses burner phones and cellphone scramblers; has violated prison rules since his arrest; has limited connections to the United States; is exposed to significant criminal penalties; and is highly incentivized to flee.  (*See generally* Dkts. 7, 26.)

## II.  This Court's Decision to Detain Kwok

On April 20, 2023, in a written decision, this Court ordered Kwok detained pending trial. (Dkt. 51.)  The Court's Order followed extensive briefing by the parties and an oral argument.[4] Kwok was correctly found by this Court to be a risk of flight and a danger to the community, and to pose a serious risk of obstruction.  As for risk of flight, the Court found that the Government had shown that Kwok presents a serious risk of flight, citing, among other things, Kwok's limited connections to the United States, his substantial connections and resources abroad, his "means and know-how to flee," and his strong "incentive to flee":

> Defendant has much incentive to flee. He is facing a maximum sentence of more than 100 years' imprisonment, and the evidence against him is strong. He may also face deportation proceedings. Defendant argues that he would not risk leaving the United States for fear of persecution by the CCP. But, Defendant engaged in extensive international travel after leaving China in 2015, prior to filing his application for asylum in the United States. In other words, it is more likely than not that the pendency of Defendant's asylum application prevented him from traveling internationally between 2017 and the present, rather than his fear of persecution.

---

[4] Specifically, on March 15, 2023, the Government filed a 23-page memorandum seeking detention. (Dkt. 7.)  On March 31, 2023, Kwok filed a 30-page memorandum seeking release. On April 3, 2023, the Government filed a 16-page reply.  (Dkt. 26.)  After the April 4, 2023 oral argument, on April 19, 2023, Kwok filed a five-page supplemental letter accompanied by nearly one-hundred pages of exhibits.

(Order at 6-7 (citations omitted)).

As for obstruction, this Court concluded that Kwok poses a serious risk of obstruction, citing, among other things, Kwok's history of engaging in obstructive behavior—including hiding assets, failing to obey court orders, and provoking harassment of adversaries—and his continued obstructive behavior, even weeks after his arrest and while in pretrial detention.  (Order at 7-11.) The Court determined that Kwok's "history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released."  (Order at 11.)

As to danger, this Court concluded that Kwok's efforts to revictimize individuals who received disbursements from the SEC Settlement, and Kwok's continued promotion of the fraudulent investment opportunities even after the SEC Settlement and the Government's seizure of hundreds of millions of dollars in fraud proceeds in late 2022, was "clear and convincing evidence that Defendant will not abide by court orders and will continue to cause economic harm to the community if released."  (Order at 11-12.)

After finding Kwok was a risk of flight, a serious risk of obstruction, and a risk of danger, the Court analyzed whether there were conditions that could sufficiently ameliorate those risks. There were not.  (Order at 12 (finding "no condition or set of conditions would ensure Defendant's return to court or the safety of the community").)  The Court conducted a careful evaluation of possible conditions of release, including those identified in Kwok's proposed bail package, and reasoned that the proposed $25 million bond would be subject to bankruptcy proceedings, noted Kwok's failure to specifically identify cosigners whose adequacy the court could consider, and remarked on the inadequacy of GPS monitoring.  (Order at 12-13)  Further, this Court determined that the defendant's "past obstructive conduct in civil litigation, in his bankruptcy proceeding, and in this case, as well as his actions following the SEC order and the seizure of funds, demonstrate

11

that the Court does not have reasonable assurance that Defendant will abide by *any* conditions of pretrial release."  (Order at 13 (emphasis added).)

### III.   The Second Circuit Affirmed This Court's Order of Detention

On May 4, 2023, Kwok appealed this Court's Order.  On appeal, the defendant argued: (1) this Court misstated the law concerning the impact of criminal charges on the defendant's asylum application; (2) this Court "clearly erred by accepting the Government's vague and misleading proffer" as to certain issues (Def. Mot. for Relief, *United States v. Kwok*, No. 23-6421, Dkt. 6.1 ("Def. Appeal Br.") at 18 (2d Cir. May 5, 2023)); (3) this Court "clearly erred" by concluding that the defendant presents a danger to the Community (*id*. at 23-29); and (4) this Court "committed reversible error" by concluding that no set of conditions could alleviate risk Kwok posed (*id*. at 30-37).  In support of those arguments, before the Circuit, Kwok again pressed the argument that CCP persecution would preclude Kwok from fleeing.  (Def. Appeal Br. at 1-2, 7-10, 17, 23.)  After considering the Government's briefing and an oral argument, on June 14, 2023, the Second Circuit affirmed this Court's Order.  (No. 23-6421, Dkt. 37 (2d Cir. June 14, 2023).).

### **ARGUMENT**

### I.   Kwok Has Not Demonstrated That There Is New Information That Materially Bears on The Court's Order of Detention

A.   Applicable Law

After a defendant has been ordered detained, "a hearing may be reopened . . . if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 341(f)(2); *United States v. Blanco*, 570 F. App'x 76, 78 (2d Cir.

2014).  Information that has a "material bearing" on the issue of detention requires the movant to demonstrate that "circumstances concerning [the defendant's] bail application have *significantly* changed."  *United States v. Rivera*, No. 09-CR-619 (SJF), 2010 WL 1687069, at *3 (E.D.N.Y. Apr. 21, 2010) (emphasis added).  That is, "'something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event.'"  *United States v. Rodriguez*, No. 15-MJ-02956, 2015 WL 6503861, at *1 (S.D.N.Y. Oct. 26, 2015) (Koeltl, D.J.) (quoting *United States v. Ali*, No. 12cr45S, 2012 WL 2921642, at *3 (W.D.N.Y. July 17, 2012)).

B.  <u>Argument</u>

Kwok's second motion for pretrial release points to just two additional "developments" that he claims were not known to the Court when the first motion was decided.  (Def. Second Mot. at 1.)  *First*, that the defendant is receiving medical treatment while incarcerated; and *second*, in the words of his filing, ████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████ (Def Second Mot. at 2.)  Neither of these so-called "developments" has a "material bearing" as to "whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f)(2).  This is because, *inter alia*, neither assertion should cause the Court to believe that Kwok will abide by any conditions of release.  (*See* Order at 13 (Kwok's "past obstructive conduct in civil litigation, in his bankruptcy proceeding, and in this case, as well as his actions following the SEC order and the seizure of funds, demonstrate that the Court does not have reasonable assurance that Defendant will abide by any conditions of pretrial release.").)  Moreover, in prior

13

filings, Kwok *himself* claimed that he provided information to ███████████████  Thus,

Kwok's second point is not a development at all, let alone one that significantly alters the

information before the Court.

Thus, the only two factors that the defendant puts forth as "developments" do not

demonstrate that the circumstances concerning Kwok's bail application have "significantly

changed." *Rivera*, 2010 WL 1687069, at *3.  The Second Motion for Pretrial Release should be

denied on this basis alone.

### 1. *Kwok's Medical Treatment Does Not Have a Material Bearing on Detention*

Kwok's 31-page brief does not articulate why his medical issues materially change this

Court's conclusions regarding Kwok's danger, risk of obstruction, or risk of flight.  Kwok's

medical issues do not suggest that the bail determination should be revisited. *Blanco*, 570 F. App'x

at 78 (finding no error in district court's finding that a chronic sleep apnea condition was not a

"'new' circumstance so as to support reconsideration" (citing 18 U.S.C. § 3142(f)(2)(B))).

Kwok is receiving appropriate medical attention and care from the MDC.  Moreover, just

days ago, Kwok's own media outlets reported that Kwok is in good health.  On December 2, 2023,

Kwok's NFSC representatives on Gettr—a social media website that Kwok controls—reported

that Kwok's Second Motion for Pretrial Release described that Kwok "was suffering from some

health problem while at the MDC," but that "he is doing pretty well.  He is pretty much back to

his usual self in terms of both mental and physical health." (*See* https://gettr.com/post/p2vubitbba1

(last accessed Dec. 5, 2023).)  That report also noted that Kwok is in frequent contact with his

attorneys and that "different groups of lawyers see him every day." (*Id.*)  Thus, Kwok's medical

issues, which rely upon Kwok's subjective concerns about pain in his forearm and dizziness, are

improving, according to his own media outlets and, according to the same individuals, Kwok is meaningfully participating in his defense, contrary to assertions in the second motion.

Prior to filing this motion, Kwok's counsel had not raised with the Government any issues concerning the quality of medical care that Kwok is receiving.  In any event, the Government confirmed with the MDC that Kwok is receiving medical treatment for his complained-of symptoms. ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████ (Ex. A at 44, 146 (Kwok MDC records).) ███ ████████████████████████ on July 21, 2023. (Ex. A at 42.)   On July 24, ████████████ ███████████████████████████ and, ████████████████████████████, on July 25, 2023.███████████████████████████████████████. (Ex. A at 35 – 37.) Kwok was ████████████████████████████████████████████ ██████████████████████████. (Ex. A at 32.)  Kwok was seen in the MDC on August 4, 2023 ██████████████████████████████ (Ex. A at 28.)  On August 17, 2023, Kwok ███ ██████████████████████ (Ex. A at 23.)  On August 23, 2023, █████████████████ ██████████████████████ (Ex. A at 21, 137.) █████████████████████████████ on September 8, 2023, September 19, 2023, September 25, 2023 (with an oral surgeon), and October 18, 2023.  (Ex. A at 10, 14, 15, 17.) ███████████████████████████████, but that is because despite "multiple attempts" by MDC staff, Kwok was unavailable, because "he has been in lengthy legal visits."  (Ex. A at 88.)  Kwok has clearly been able to sufficiently meet with his

counsel to prepare for trial, further undermining his counsel's claim that Kwok has been unable to do so.  (Def. Second Mot. at 1.)

In late October, Kwok ███████████████████████████████████ (Ex. A at 7.)
█████████████████████████████.  (Ex. A at 7.)  On November 7, 2023, Kwok was
████████████████████████ (Ex. A at 3.) ████████████████████████████████
████████████████████████████████ (Ex. A at 112-122.) ███████████████████████
████████████████████ is being scheduled.  MDC staff informed the Government in no uncertain terms that it has the resources to treat Kwok, will continue to monitor Kwok's symptoms, and will provide him treatment including, where appropriate,███████████████████

None of Kwok's complained-of symptoms presents the Court with additional information that significantly alters its April 2023 detention decision.  It does not disturb the Court's finding that Kwok undertook efforts to revictimize those who received disbursements from the SEC—*i.e.*, activities "constitut[ing] clear and convincing evidence that Defendant will not abide by court orders and will continue to cause economic harm to the community if released."  (Order at 12.) The defendant's health concerns do not undermine the fact that Kwok is a serious flight risk who "has substantial connections and resources abroad, including his son and a co-defendant who resides in the United Kingdom, but is currently believed to be a fugitive in the United Arab Emirates."  (Order at 5.)  Nor does any reported medical concern materially alter the Court's conclusion that the "Defendant has the means and know-how to flee . . . ., has much incentive to flee . . ., the evidence against him is strong[, and h]e may also face deportation proceedings." (Order at 5-7.)  Further, Kwok's medical treatment at the MDC does not rewrite Kwok's history, as documented by multiple courts (including this one), of his obstructive efforts and unwillingness

16

to abide by court orders.  (Order at 11 ("Defendant's history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released.").)  Thus Kwok's reported medical issues do not require the Court to revisit its detention decision.

    2.   *The Government's August Filing Does Not Change the Circumstances Justifying Detention*

Next Kwok contends that an August 4, 2023 Government filing that, Kwok claims, "publicly revealed ███████████████████████████████████████████████████ ██████████████████████████████████ constitutes a changed circumstance requiring his release. (Second Mot. at 6.)  Kwok is wrong.  The four-month-old filing about which Kwok complains changes nothing relevant to his detention.  Indeed, it said nothing substantially different than Kwok's *own* prior public filings.

To start, Kwok grossly mischaracterizes the content of the Government's August 4, 2023 filing.  The Government wrote ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

The Government publicly said nothing of the sort and does not now adopt those characterizations.

In contrast to the statement in the Government's filing, just two weeks after his arrest, *Kwok's own public filing* disclosed to the world that Kwok claims to have provided the FBI

17

information about "CCP agents" to "allow[ ] the FBI the opportunity to detain and question" those

agents.  (Dkt. 24 at 8.)  The relevant excerpt from Kwok's public filing follows:

> A week after Mr. Kwok's family arrived, four Chinese security officials traveled to New York on transit visas, which do not permit the holder to conduct business while in the United States. CCP agents demanded a meeting with Mr. Kwok. They spent many hours in his apartment, trying to persuade him to return to China, offering him assurances that if he curtailed his criticism of the CCP he would be restored to good standing in China. This visit caught the attention of the FBI, who interviewed Mr. Kwok about his visit from the Chinese officials. *Mr. Kwok notified the FBI agents that the Chinese security officials were planning to return to his home in two days, allowing the FBI the opportunity to detain and question them about their activities in the United States.*

(Def. First Mot., Dkt. 24, at 8 (emphasis added).)

Thus, in a public document filed months before the complained-of Government filing,

Kwok himself chose to voluntarily broadcast across the planet a claim that he provided the FBI

information as to when "Chinese security officials were planning to return to [Kwok's] home."

(*Id*.)  And—*according to Kwok*—it was his information that provided the "FBI the opportunity to

detain and question [Chinese security officials] about their activities in the United States."  (*Id*.)

Therefore, if anything, it is because of Kwok that ████████████████████████████████

Kwok provided information to interdict Chinese security officials, question them, and detain them.

(Def. Second Mot. at 2.)  Kwok's sudden strategic attempt to criticize the Government's ████████

████████████████████████████████████████████████████████████████████████

█████████████████ is meritless, as is his claim that the Government's August 4, 2023

filing materially changed the circumstances justifying his pretrial detention.

Other prior Kwok filings provide further evidence that Kwok's claim about the August 4

filing is without merit.  On April 19, 2023, Kwok filed on the public docket a supplemental letter

18

that stated that Kwok was designated as "Victim-1" in a complaint captioned *United States v. Bai*, which was unsealed in the Eastern District of New York, charging officers of the national police of the People's Republic of China with harassing Chinese nationals residing in the New York. (Dkt. 50 at 4.)  In contrast, in his memorandum in support of the instant motion, Kwok strategically redacted what he previously chose to make public.  Specifically, Kwok's Second Motion redacted the parenthetical descriptor for *United States v. Bai*, which read ████████████████████ ███████████████████████" Kwok also redacted in the instant motion sentences describing the *Bai* complaint including that ████████████████████████████ ████████████████████████████████████████████████ ███████████████████████ (Def. Second Mot. at 4.)  These redactions stand in stark contrast to Kwok's publicly filed April 19 Supplemental letter, which cast a spotlight on the *Bai* complaint and emphasized (literally) that the complaint described how CCP agents "***employed numerous methods to effect Victim-1's capture or arrest***."  (Dkt. 50 at 3 (emphasis in original).)  The contrast between what is public in the April 2023 supplemental letter and redacted in Kwok's Second Motion's is further evidence that Kwok's sudden purported fear of the Government's August 4 filing is nothing more than a legal tactic deployed in an effort to advance this motion.

Kwok's contention about the August 4 filing is further undermined by the context surrounding his sudden complaint.  The defendant waited nearly four months to assert that ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

19

███████████████████████████████████████████████████

████████████████████████████. But any resulting harm to Kwok is nothing more

than hypothetical.  Kwok's contention that the August 4 filing increases the risk of "retaliation in

prison" from ███████" is belied by the facts.  (Def. Second Mot. at 2, 19.)  Kwok has *not*

requested to enter protective custody at the MDC; Kwok has *not* been the victim of any attacks at

the MDC; and there are no documented threats at the MDC aimed at him.  It also defies common

sense that the MDC would be any less safe from ███████" than an uncontrolled environment

outside the facility.  (*See* Kwok First Mot. at 28 ("Mr. Kwok and his family now enjoy relative

safety from CCP threats in the United States.").)  These surrounding circumstances demonstrate

that Kwok's sudden decision to latch onto the August 4 filing as a new "development" (that

occurred four months ago) is mere posturing in an effort to simulate compliance with the

requirements of 18 U.S.C. § 3142(f)(2).

At bottom, Kwok's core point is the Government's August 4 filing risks his safety and

makes it less likely that he would flee, given the threat posed to him by the CCP.  (Def. Second

Mot. at 2.)  But those are not new circumstances at all.  Kwok's claim that the CCP is out to get

him was featured prominently during his first motion for pretrial release: "Kwok experienced and

continues to experience political persecution and credible threats against his life and the lives of

his wife and children [from the CCP], threats that are far more likely to become realities should

Mr. Kwok flee the United States."  (Def. First Mot. at 22.)[5]  During oral argument before this

---

[5] *See also* Def. First Mot. at 10 ("The CCP has also targeted Mr. Kwok in various other ways starting that same year, including by: orchestrating false criminal charges against him that have led to the issuance of INTERPOL Red Notices; hacking the server of the law firm that filed his asylum application, extracting his highly sensitive information from that application, and then publicly disseminating it across the internet; bringing and funding numerous spurious litigations

Court, Kwok repeated the same.[6]  And on April 19, 2023, Kwok filed a supplemental letter to argue that the CCP will go to great "lengths . . . to silence Mr. Kwok, one way or another. . . . [so] he will remain in the United States if he is released on bond. If, for no other reason, than because the risk to his life is simply too great for him to leave."  (Dkt. 50 at 4.)  Kwok therefore has "not proffer[ed] evidence that the factors relied upon in ordering the defendant's detention [in April 2023] have actually and materially changed. . . . [H]e merely seeks to argue against the Court's previous determination." *Rodriguez*, 2015 WL 6503861, at *2 (rejecting subsequent pretrial release challenge).   This Court considered Kwok's arguments,[7] the Government's contrary

---

against him, some of which remain active today; and detaining, torturing, and imprisoning many of his family members and former colleagues. Since 2017, the CCP has frozen and seized family assets and purported assets in China and Hong Kong, making it impossible for Mr. Kwok to even maintain a bank account."); *id.* at 12 ("Mr. Kwok likely would face a fate far worse than incarceration in the United States should he attempt to flee"); *id.* at 13 ("Even if he wanted to flee the United States, Mr. Kwok would face intolerable risks to his life were he to expose himself to the long reach of the CCP outside the protection of this country."); *id.* at 14 ("It is simply not reasonable to assume Mr. Kwok to be a flight risk in light of the extreme and well documented dangers that would accompany a decision to run."); *id.* ("the absence of *any* international travel since he filed his asylum application five years ago evidences Mr. Kwok's real and substantial security concerns about the threat posed by the CCP were he to travel abroad.").

   [6] *See* Dkt. 45 4/4/23 Hr'g Transcript, at 22 ("Why didn't he leave? Well, first of all, there's a Red Notice against him issued by China."); *id*. at 23 ("the Chinese Communist Party's interest in my client is well documented, well-known and indisputable"); *id*. at 24 ("The level of attention that Mr. Kwok generates from the Chinese Communist Party is undeniable and extreme"); *id*. at 25-26 ("The four Chinese agents that accosted him in 2017 highlighted and elevated his level of concern as to his own safety were he to leave the United States to a level that hadn't been seen before").

   [7] *See* Order at 7 ("Defendant argues that he would not risk leaving the United States for fear of persecution by the CCP.").

positions, and the Court rejected Kwok's arguments after a full and fair hearing and ordered him detained.  The Second Circuit affirmed.  No new developments undermine the Court's conclusion.

Accordingly, the defendant's second motion for bail should be summarily denied because Kwok has not met the threshold requirements of § 3142(f)(2).  The Court need consider no more.

## II.   The Law Requires That Kwok Remain Detained

Even if the Court were to determine that Kwok's reported medical issues or the Government's August 4, 2023 filing were material developments sufficient to reopen the prior detention decision, an evaluation of all relevant circumstances demonstrates that Kwok should remain detained pending trial.

### A.   Applicable Law

A district court must detain a defendant pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).  In seeking pretrial detention, the Government bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks.  *See id.*; *see also United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cr. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *United States v. Friedman*, 837 F.2d 48, 29 (2d Cir. 1988).

In assessing a defendant's risk of flight and the danger to the community presented by his release, Congress has directed courts to consider several factors: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of

the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

B.  Argument

The Government does not intend to repeat each and every argument raised before this Court during the extensive first pretrial release litigation.  Instead, it responds to the arguments raised in the defendant's present motion.

    *1.  Kwok Poses a Serious Risk of Flight*

*First*, Kwok's second motion for pretrial release argues that he is not a risk of flight because the CCP has targeted him.  (*See* Def. Second Mot. at 4-9.)  The Court rejected that argument in April.  (Order at 7 ("Defendant argues that he would not risk leaving the United States for fear of persecution by the CCP. But, Defendant engaged in extensive international travel after leaving China in 2015, prior to filing his application for asylum in the United States." (citation omitted).) The Court was correct to do so.  Kwok's argument that his persecution by the CCP diminishes his willingness to travel is undermined by the facts.  "Defendant engaged in extensive international travel after leaving China in 2015, prior to filing his application for asylum in the United States. In other words, it is more likely than not that the pendency of Defendant's asylum application prevented him from traveling internationally between 2017 and the present, rather than his fear of persecution."  (Order at 7 (citations omitted).)  Further, Kwok is an extremely sophisticated and experienced world traveler who, while he claims the Chinese government was in hot pursuit, escaped his home country of China to avoid arrest there.  Kwok's connections to the United States mostly consist of the entities and instrumentalities of the charged crimes.  That is, the "Defendant

has limited connections to the United States." (Order at 5.)  The strength of the connections he trumpets in his motion, with his children, are belied by the fact that the "Defendant told Pretrial Services that he has 'irregular' contact with his children." (*Id.* at 5 (citing Pretrial Services Report).)  Moreover, the Court correctly concluded that Kwok's history demonstrates that he is willing to leave his family behind if necessary to flee.  (*Id.*)[8]  Any CCP targeting of Kwok is not an impediment to his flight.

*Second*, it is not credible for the defense to state that Kwok has "no real incentive to flee." (Def. Second Mot. at 4.)  To the contrary, and as this Court previously found, "Defendant has much incentive to flee. He is facing a maximum sentence of more than 100 years' imprisonment, and the evidence against him is strong. He may also face deportation proceedings."  (Order at 7 (citations omitted).)

*Third*, as he did during the first pretrial detention litigation, Kwok again argues that he does not have access to passports, because the Government has seized two of them.  (Def. Second Mot. at 7.)  This ignores that Kwok "previously claimed during an interview on April 19, 2017, that he had eleven passports"—not just two.  (Order at 6 (citations omitted).).  The argument also misses the point.  Kwok was able to obtain passports from two countries—Vanuatu and the United Arab Emirates—while, according to Kwok, he was the target of CCP persecution.  In light of those facts,

---

[8] Kwok now claims that he "did not choose to abandon his wife and daughter; he was forced to do so when he fled China to save his life."  (Def. Second Mot. at 6.)  The defense misses the point—here, Kwok is faced with the very real possibility of decades in prison, which could amount to a life-sentence, and even if not, the high likelihood of deportation after prison.  Given that reality, it is clear that Kwok would flee if given the opportunity and rely on the hope that his family can later join him.

and as this Court correctly noted, "it is clear that Defendant is able to obtain travel documents with ease." (Order at 6.)

*Fourth*, Kwok theorizes that flight is unlikely because he is famous, and he could not "avoid detection in another country for any meaningful period of time." (Def. Second Mot. at 8.) Kwok again misses the salient point. "[T]he Government need not show that Defendant is likely to flee internationally, but only that Defendant is not likely to return to court." (Order at 7.) Given his incentive to flee, "extensive network of devoted followers around the world" who could harbor him (Order at 5), and his access to troves of capital that he secreted across the globe, there are no reasonable assurances that Kwok will appear in court as required. He has the means and support to hide anywhere.

In any event, there is a clear place for Kwok to hide from the United States (and Chinese authorities): the United Arab Emirates. Kwok's co-defendant has been hiding in the UAE since this case was unsealed. The co-defendant has apparently been safe from CCP targeting there. (*See* Order at 5 (noting Kwok's "co-defendant who resides in the United Kingdom, but is currently believed to be a fugitive in the United Arab Emirates").) It is no surprise, then, that Kwok moved his fraud operations to the UAE, and his co-defendant "attempted to transfer $46 million from domestic bank accounts associated with Himalaya Exchange to a bank account in the United Arab Emirates" to avoid U.S. seizure. (Order at 4.)

Even if it is true that Kwok surrendered his passport and renounced his citizenship to the UAE in April 2018, Def. Second Mot. n.3, that does not mean that Kwok is not welcome in the

UAE.[9]  The mere fact that the UAE is emerging as Kwok's new base of operations (and apparent residence for his fugitive co-defendant) strongly suggests that the UAE would receive him. Indeed, the Government has uncovered additional evidence suggesting that Kwok has close ties to the UAE government.  During the execution of the March 15, 2023 search warrants, the FBI located a basement safe in Kwok's Mahwah Mansion.  In that safe, Kwok maintained documents and materials that appear to relate to ███████████████ including, *inter alia*, a report in English (with Mandarin translations) documenting ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. These documents and materials were concealed in a taped-shut brown box with the label "PERRIER® Carbonated Mineral Water ORIGINAL," which box was stored in the large basement safe in Kwok's Mahwah Mansion.  That box also held documents that appear to relate to Kwok's business arrangements.   These materials suggest that Kwok maintained special relationships with individuals in the UAE *even after* he purportedly renounced his Emirati citizenship in April 2018, and further underscore Kwok's deep and substantial foreign connections—irrespective of the

---

[9] Even Kwok admits that the renouncement of his UAE citizenship was "part of his application for asylum in the United States." (Def. Second Mot. n.3.)  Properly understood, it was a self-serving decision for Kwok to renounce UAE citizenship to try to take advantage of what he viewed as a better opportunity, asylum in the United States.  Now that asylum in the U.S. is likely foreclosed to Kwok, if he is released, there is nothing to stop him from doubling back and seeking UAE citizenship again.   (*See* https://u.ae/en/information-and-services/ passports-and-traveling/emirati-nationality#:~:text=How%20can%20you%20acquire%     20UAE,and%20 Citizenship%20for%20more%20information (explaining that UAE citizenship is available to "an investor" who owns property in UAE).

*current* status of his UAE citizenship. The UAE is one of many foreign jurisdictions to which Kwok has substantial connections and to which Kwok can flee if released.[10]

### 2. *Kwok Presents an Ongoing Economic Danger*

In April, the Court determined that "the Government ha[d] shown by clear and convincing evidence that Defendant poses a risk of economic harm to the community." (Order at 11.) Nothing Kwok now argues changes that conclusion. In fact, Kwok's Second Motion barely challenges this finding. Nor could he. Kwok's fraud escalated over the course of years. He repeatedly modified his tactics to evade regulators, conceal the source of funds, and move stolen funds overseas. Indeed, even after the GTV Private Placement was thwarted by the SEC, Kwok was not deterred—he brazenly continued to sell GTV stock through other mechanisms, including by embedding the stock within purported "convertible loan" agreements, which were extended to individual investors by a diffuse group of "Farms," and disguising the stock as one of the purported benefits of G|CLUBS "membership." These sophisticated adaptations have caused more than $500 million of additional harm to Kwok's victims and plainly demonstrate Kwok's ability, and desire, to continue his fraud, regardless of regulatory or other enforcement action. The defendant offers nothing in his second motion to rebut these facts.

---

[10] Kwok also tries to analogize this case to other cases, including ten out of district cases, where defendants were released pretrial. Kwok did the same during the first pretrial release litigation. (Def. Second Mot. 19-24.) Those cases are all distinguishable from this one. Indeed, the defense relies on them only for issues related to flight -- not for dangerousness or obstruction concerns, which are readily present here. Moreover, for every case that the defense cites, the Government can, as it did during the first round of briefing, point to financial fraud cases with allegations far less serious than this one where detention was ordered. (*See* Dkt. 26 at 9-11 (collecting cases).)

    3.  *Kwok Presents a Danger of Obstruction*

In his second motion, rather than deny that he obstructed other litigations, Kwok, through counsel, "apologizes" for his actions and "the upset he caused others."  (Def. Second Mot. at 10.) This self-serving apology represents nothing more than a change in legal tactics. The apology, which comes from an individual who, the evidence demonstrates, will say anything to advance his then-present interests, does nothing to undermine the very real risk of obstruction that Kwok poses. It certainly does not alter Kwok's lengthy record of serious and unrelenting obstruction.  This includes, as the Court found:

-   "On February 9, 2022, Justice Barry Ostrager entered an order of civil contempt against Defendant for avoiding and deceiving his creditors by hiding substantial personal assets with corporations, trusted confidants, and family members;"

-   "Bankruptcy Judge Julie A. Manning issued a temporary restraining order on November 23, 2022, restraining Defendant from posting false and harassing materials about people associated with the Pacific Alliance Asia Opportunity Fund, their counsel, and their relatives; publishing online the home addresses and personal information of those individuals; encouraging, inciting, suggesting, or financing protests at the homes or offices of those individuals; and interfering with the integrity of the pending bankruptcy proceedings;"

-   Two days after Judge Manning's order, Defendant posted a message on one of his social media accounts, encouraging followers to file claims in his bankruptcy proceeding. *See* Miles Guo (@MilesGuo), GETTR (Jan. 13, 2023), https://gettr.com/post/p24ybdca10b (last accessed Apr. 11, 2023). Defendant later posted a video encouraging his followers to file claims in order to drive up the trustee's attorneys' fees;"

-   "On March 30, 2023, after Defendant was detained in this case, a message posted on one of Defendant's social media accounts accused the prosecutors in this case of "represent[ing] the CCP kleptocrats."

-   "Defendant branded [victims and his critics] 'CCP spies' on social media to incite his followers to harass them, or threatened to post on social media that members of the victims' families who were residing in China were associated with Defendant's anti-CCP movement, which would place those family members at risk of Chinese government retaliation."

28

- "Defendant falsely represented to Pretrial Services that he had a total of $10,000 in assets, including two phones and his clothing;" and

- "Defendant is technologically sophisticated and likely to delete, encrypt, or transfer electronic evidence and fraud proceeds if released."

(Order at 7-10 (citations and footnote omitted).)

Those are just a handful of examples of the defendant's obstruction. And obstruction has continued. Kwok-aligned social media accounts, including official accounts of the Himalaya Farms have continued to malign the Trustee. (*See e.g.*, https://gettr.com/post/p2vwtaz9328 (Dec. 4, 2023 post from NFSC Gettr account claiming that the Trustee was "hired by the CCP"). As this Court determined, the "Defendant's history of obstructive behavior in prior cases and his conduct in this matter establish that he is likely to continue this pattern if released." (Order at 11.) His counsel's offer of a half-hearted apology does not change that conclusion.

4.  *There Are No Conditions or a Combination of Conditions Which Can Assure the Court that the Community Will Be Safe and the Defendant Will Not Flee*

Kwok next accuses this Court of failing to "explain, as it should have" why the defendant's proposed restrictions "could not reasonably ensure Mr. Kwok's compliance." (Def. Second Mot. at 14.)[11] The defendant is wrong again. The Court was clear that *no* conditions could reasonably assure the Court that the community will be safe, or that the defendant will not obstruct or flee, because "Defendant's past obstructive conduct . . . demonstrate that the Court does not have

---

[11] The defendant made the same argument in the Court of Appeals, and the Second Circuit rejected it. (*See* Def. Appeal Br. at 32) ("The District Court failed to adequately explain on the record the extent to which it considered alternatives to Mr. Kwok's pre-trial detention, and, if applicable, on what basis they were rejected.").)

reasonable assurance that Defendant will abide by any conditions of pretrial release." (Order at 13.).

In any event, the conditions Kwok now proposes are *less strict* than the conditions he proposed in April 2023. Kwok now offers financial conditions, including the "posting of property" that he does not identify. (Def. Second Motion at 26.) But such a condition is meaningless, because Kwok "has filed for bankruptcy and claims to have assets worth only $10,000. In attempting to enforce the bond against Defendant, the Government would be one in a long line of creditors." (Order at 12.) Despite being detained for eight months, Kwok still has not identified potential cosignors—but, even if he had, the threat of financial harm to others will not dissuade Kwok from violating his conditions, particularly given Kwok's documented willingness to separate individuals from their money for his own self interests. Next, Kwok posits that an order precluding him from obtaining travel documents, as well as restrictions on contacting other persons, accessing the internet, speaking about financial matters, and making financial transactions, will prevent flight and criminal activity. Not so. Such restrictions rely on the defendant's compliance with court orders, which Kwok has proven he does not do. Further, such restrictions are virtually impossible to enforce and can easily be overcome, especially given Kwok's resources and ability to rely on his extensive network of loyal followers.[12]

Kwok then offers that an unidentified "responsible third-party custodian" would supervise him. (Def. Second Mot. at 26.) The defense previously contended that 24-hour armed security

---

[12] Kwok also contends he is on the "no fly list." The "no fly list" is for terrorists, and Kwok is not on that list. Though there are restrictions designed to thwart Kwok's ability to leave the United States, none of those restrictions is foolproof, and the FBI is aware of defendants who have successfully fled the country, despite their inclusion on lists designed to limit their ability to travel out of the United States.

was appropriate, but now proposes a lesser restriction.  If the defendant's appearance, and the community's safety, can only be assured through use of round-the-clock custodians, the defendant belongs in a federal detention center, not released under bail conditions that effectively create a private prison of one.  *See United States v. Zarrab*, No. 15 CR 867 (RMB), 2016 WL 3681423, at *12 (S.D.N.Y. June 16, 2016) ("What more compelling case for an order of detention is there than a case in which only an armed guard and the threat of deadly force is sufficient to assure the defendant's appearance?" (quotation and citation omitted).); *see also* Order at 13 ("The Court also rejects Defendant's proposal regarding the use of private security because it is not as reliable as a federal jail.").  Similarly, home detention and electronic monitoring remain insufficient.  "GPS monitoring is inadequate, as ankle monitors can be removed and ensure only a reduced head start should a defendant decide to flee."  (Order at 13.)  That is particularly true here, given the defendant's sophistication and self-professed ability to avoid capture by the CCP for several years.

Moreover, Kwok's second motion operates on the unsupported conclusion that, if he were to try to flee or endanger the community, he would be "stopped."  (Def. Second Mot. at 26.)  The defense has it backwards.  The question is not whether the Government has adequate tools to capture Kwok if he tries to flee, harm others, or obstruct the proceedings.  The question is whether he will attempt any of those activities in the first place and, if so, whether conditions can prevent him from doing so.  The Court already answered that question:  Kwok poses a danger to the

community, a danger to these proceedings, and serious risk of flight.  There are no conditions that ameliorate the Court's well-founded concerns.

## **CONCLUSION**

Kwok has not cleared the threshold requirements necessary to revisit this Court's April 2023 detention decision (*see* 18 U.S.C. § 3142(f)(2))—a decision that the Second Circuit affirmed. But even if Kwok had met the requirements necessary to reopen the detention determination, detention is still appropriate.  The risks of releasing Kwok are too grave, and there are no conditions, or a combination of conditions, that can reasonably assure this Court otherwise.  No hearing is necessary to deny the defendant's second motion for release.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
   Ryan B. Finkel
   Juliana N. Murray
   Micah F. Fergenson
   Justin Horton
   Assistants United States Attorneys
   (212) 637-6612 / 2314 / 2190 /2276

Enclosures

Cc:     All counsel (by ECF and Email)