**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                    *Plaintiff,*

          v.

HO WAN KWOK,

                    *Defendant.*

Case No. 1:23-CR-118-1 (AT)


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

Sidhardha Kamaraju
E. Scott Schirick
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
sschirick@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490

*Attorneys for Defendant Ho Wan Kwok*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................1

RELEVANT BACKGROUND .......................................................................................5

    I.  Mr. Kwok's Political Activism and Flight from the People's Republic of China .........5

    II.  The Alleged Fraud ...........................................................................................5

ARGUMENT .................................................................................................................8

    I.  LEGAL STANDARDS FOR DISMISSAL OF AN INDICTMENT ...........................8

    II.  COUNTS FIVE AND SEVEN SHOULD BE DISMISSED BECAUSE THEY FAIL TO ALLEGE THAT THE PURPORTED SCHEME TO DEFRAUD WAS "IN CONNECTION" WITH A SECURITIES TRANSACTION ......................................9

        A.  Applicable Law ........................................................................................9

        B.  Discussion ............................................................................................10

            (1)  Count Five Should Be Dismissed Because the Farm Loans Program Does Not Involve a Securities Transaction ...................................................10

            (2)  Count Seven Should Be Dismissed Because the G|CLUBS Membership Purchases Do Not Involve a Securities Transaction ........................................15

    III.  COUNTS TWO THROUGH EIGHT FAIL TO ALLEGE MATERIAL MISREPRESENTATIONS OR OMISSIONS ...........................................................18

        A.  Applicable Law ......................................................................................18

            (1)  Securities Fraud Requires a Material Misrepresentation or Scheme to Defraud ...................................................................................................18

            (2)  Liability under 10b-5(b) Requires the Defendant To Have Made a Material Misstatement or Omission ................................................................19

            (3)  Wire Fraud Requires a Material Misrepresentation .........................................21

        B.  Discussion ............................................................................................21

(1) The GTV Counts (Counts Two and Three) Should Be Dismissed for Failing to Allege a Material Misrepresentation or Omission ............................................22

    (a) The Indictment Does Not Allege a Specific Misrepresentation in the April 2020 Video ................................................................................................22

    (b) The PPM Does Not Contain Material Misrepresentations ........................23

        (i)     The PPM Does Not Contain False Statements ..............................23

        (ii)    Even if the PPM Does Contain an Inaccurate Statement, These Inaccuracies Are Not Material ........................................................25

(2) The Farm Loans Counts (Counts Four and Five) Should Be Dismissed for Failing to Allege a Knowing Material Misrepresentation or Omission ...........28

    (a) Mr. Kwok's Alleged Promise Regarding the Farm Loans and GTV Shares Is Not A Material Misrepresentation ..........................................................28

    (b) Mr. Kwok's August 2020 Statement about the Value of GTV Was an Opinion that Cannot Form the Basis of a Fraud Claim ............................30

    (c) The Indictment Fails to Allege that Mr. Kwok Made a Knowing Misrepresentation Regarding the Farm Loans' Use for the Farms' Working Capital ......................................................................................32

(3) The G|CLUBS Counts (Counts Six and Seven) Should Be Dismissed for Failing to Allege a Material Misrepresentation or Omission .........................33

    (a) The Indictment's Allegations of Misappropriation of G|CLUBS Membership Fees Do Not Support a Fraud Claim....................................33

    (b) The Government's Other Alleged Misrepresentations with Respect to G|CLUBS Fare No Better .......................................................................35

(4) The Himalaya Exchange Count (Count Eight) Should Be Dismissed for Failing to Allege a Material Misrepresentation or Omission.........................37

IV. TO THE EXTENT THEY ALLEGE SO-CALLED "SCHEME LIABILITY," COUNTS THREE, FIVE, AND SEVEN SHOULD BE DISMISSED BECAUSE THEY FAIL TO ALLEGE DECEPTIVE CONDUCT ASIDE FROM AN ALLEGED MISREPRESENTATION.................................................................................42

    A. Applicable Law ....................................................................................43

    B. Discussion ............................................................................................43

V.  COUNTS NINE THROUGH ELEVEN SHOULD BE DISMISSED FOR
FAILURE TO ALLEGE AN ESSENTIAL ELEMENT OF THE CHARGED
OFFENSES .................................................................................................44

   A.  Counts Nine Through Eleven Should Be Dismissed Because the Predicate
Offenses Fail ....................................................................................44

   B.  Counts Nine and Eleven Should Be Dismissed Because They Fail to Allege a
Money Laundering Transaction Distinct from the Underlying Offense...............45

   C.  In the Alternative, Count Nine Should Be Dismissed Because It Fails to Allege an
International Transaction Made with the Intent to Promote Unlawful Activity....47

VI. COUNT ONE OF THE INDICTMENT SHOULD BE DISMISSED AS
IMPERMISSIBLY DUPLICITOUS & FOR FAILURE TO STATE
AN OFFENSE  .............................................................................................49

   A.  Applicable Law .................................................................................50

   B.  Count One Impermissibly Combines Multiple Conspiracies .............................51

   C.  The Duplicitous Indictment Prejudices Mr. Kwok and Should Be Dismissed......52

CONCLUSION......................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyce Motor Lines, Inc. v. United States*,
    342 U.S. 337 (1952)................................................................................................5

*Chadbourne & Park LLP v. Troice*,
    571 U.S. 377 (2014)...............................................................................10, 12, 13, 17

*Chiarella v. United States*,
    445 U.S. 222 (1980)........................................................................................34, 39

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014).......................................................................... *passim*

*In re Eastman Kodak Co. Sec. Litig.*,
    632 F. Supp. 3d 169 (W.D.N.Y. 2022) ...................................................................34

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).....................................................................26, 32, 37, 38

*Endico v. Endico*,
    No. 19-CV-7231 (JCM), 2022 WL 3902730 (S.D.N.Y. Aug. 30, 2022) ..............................30

*Freedman v. Value Health, Inc.*,
    No. 95-CV-2038 (JCH), 2000 WL 630916 (D. Conn. Mar. 24, 2000)..............................29, 41

*Goldfine v. Sichenzia*,
    118 F. Supp. 2d 392 (S.D.N.Y. 2000) ...................................................................36

*Graham v. Select Portfolio Servicing, Inc.*,
    156 F. Supp. 3d 491 (S.D.N.Y. 2016)....................................................................36

*Great Atl. & Pac. Tea Co., Inc. v. 380 Yorktown Food Corp.*,
    No. 16-CV-5250 (NSR), 2020 WL 4432065 (S.D.N.Y. July 31, 2020)..............................24

*Greco v. Qudian Inc.*,
    No. 20-CV-577 (GHW), 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022) ..........................26, 29

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002).........................................................................20, 25, 28, 39

*Haymount Urgent Care PC v. GoFund Advance LLC*,
    No. 22-CV-1245 (JSR), 2023 WL 5521901 (S.D.N.Y. Aug. 28, 2023)................................36

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).................................................................................19

*Lasker v. New York State Elec. & Gas Corp.*,
    85 F.3d 55, 59 (2d Cir. 1996)................................................................19

*Libaire v. Kaplan*,
    No. 06-1500, 2008 WL 794973 (E.D.N.Y. Mar. 24, 2008)...................16

*Livingston v. Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) ............................................ *passim*

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)...............................................................10, 11, 13, 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................20, 30

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ....................................................................34

*Precedo Cap. Grp. Inc. v. Twitter Inc.*,
    33 F. Supp. 3d 245 (S.D.N.Y. 2014)......................................................39

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999)..............................................10, 12, 13, 17

*Retirement Bd. of Policemen's Annuity and Benefit Fund of Chicago v. FXCM*
    *Inc.*, 767 F. App'x 139 (2d Cir. 2019) ..................................................37

*Reves v. Ernst & Young*,
    491 U.S. 56 (1990)................................................................................11

*Rice v. Branigar Org., Inc.*,
    922 F.2d 788 (11th Cir. 1991) ..............................................................16

*Romano v. Kazacos*,
    609 F.3d 512 (2d Cir. 2010)..................................................................10

*Russell v. United States*,
    369 U.S. 749 (1962)........................................................................8, 9, 11

*S.E.C. v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)..............................................43, 44

*S.E.C. v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006).....................................................43

*In re Salomon Analyst AT&T Litig.*,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004)..................................................................31

*SEC v. Life Partners, Inc.*,
   87 F.3d 536 (D.C. Cir. 1996)............................................................................17

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)..........................................................................................16

*SEC v. Zandford*,
   535 U.S. 813 (2002)..........................................................................................10

*Sec. & Exch. Comm'n v. Rio Tinto plc*,
   No. 17-CV-7994 (AT), 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019)...........19, 32, 43

*Singh v. NYCTL 2009-A Tr.*,
   No. 14-CV-2558, 2016 WL 3962009 (S.D.N.Y. July 20, 2016)............................................30

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014)..................................................................31

*Stephenson v. Citgo Group Ltd.*,
   700 F.Supp.2d 599 (S.D.N.Y. 2010)..................................................32, 37, 38, 42

*Tierney v. Omnicom Grp. Inc.*,
   No. 06-CV-14302 (LTS)(THK), 2007 WL 2012412 (S.D.N.Y. July 11, 2007) ....................14

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)..............................................................................30

*United Housing Found., Inc. v. Forman*,
   421 U.S. 837 (1975)..........................................................................................16

*United States v. Abakporo*,
   959 F. Supp. 2d 382 (S.D.N.Y. 2013)..................................................................50, 52

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012)................................................................................9

*United States v. Aleynikov*,
   737 F. Supp. 2d 173 (S.D.N.Y. 2010)..................................................................9

*United States v. Alkins*,
   925 F.2d 541 (2d Cir. 1991)..............................................................................51

*United States v. Aracri*,
   968 F.2d 1512 (2d Cir. 1992)............................................................................50

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)..................................................................21, 34, 39

*United States v. Benjamin*,
   No. 21-CR-706 (JPO), 2022 WL 174038 (S.D.N.Y. Dec. 5, 2022) ......................18

*United States v. Berlin*,
   472 F.2d 1002 (2d Cir. 1973)................................................................................32

*United States v. Bongiorno*,
   No. 05-CR.-390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006)...................34

*United States v. Calderon*,
   944 F.3d 72 (2d Cir. 2019)............................................................................21, 38

*United States v. Carroll*,
   No. 19-CR-545 (CM), 2020 WL 1862446 (S.D.N.Y. Apr. 14, 2020)...................20

*United States v. Connolly*,
   24 F.4th 821 (2d Cir. 2022) .......................................................... *passim*

*United States v. Contorinis*,
   692 F.3d 136 (2d Cir. 2012)............................................................................30, 37

*United States v. Finnerty*,
   533 F.3d 143 (2d Cir. 2008)................................................................19, 22, 33, 42

*United States v. Frankel*,
   682 F. App'x 20 (2d Cir. 2017) .....................................................................21, 25

*United States v. General Dynamics Corp.*,
   644 F. Supp. 1497 (C.D. Cal. 1986) ..................................................................24

*United States v. Gleason*,
   616 F.2d 2 (2d Cir. 1979)..................................................................................20

*United States v. Gonzalez*,
   686 F.3d 122 (2d Cir. 2012)...................................................................................8

*United States v. Gramins*,
   No. 21-5, 2022 WL 685 3273 (2d Cir. Oct. 12, 2022)..........................................21

*United States v. Jackson*,
   935 F.2d 832 (7th Cir. 1991) .............................................................................48

*United States v. Liberto*,
   No. 19-CR-0600 (RDB), 2020 WL 5994959 (D. Md. Oct. 9, 2020)...................24

*United States v. Litvak,*
    808 F. 3d 160 (2d Cir. 2015)........................................................................19, 20

*United States v. Nachamie,*
    101 F. Supp. 2d 134 (S.D.N.Y. 2000)......................................................................50

*United States v. Nejad,*
    No. 18-CR-224 (AJN), 2012 WL 6702361 (S.D.N.Y. Dec. 6, 2019) ......................8

*United States v. O'Hagan,*
    521 U.S. 642 (1997)....................................................................................13, 14, 17

*United States v. Olaniyi-Oke,*
    199 F.3d 767 (5th Cir. 1999) ................................................................................48

*United States v. Olmeda,*
    461 F.3d 271 (2d Cir. 2006)...................................................................................50

*United States v. Pierce,*
    224 F.3d 158 (2d Cir. 2000)............................................................21, 45, 47, 49

*United States v. Shellef,*
    732 F. Supp. 2d 42 (E.D.N.Y. 2010) ....................................................................45

*United States v. Silver,*
    203 F. Supp. 3d 370 (S.D.N.Y. 2016)....................................................................45

*United States v. Starks,*
    515 F.2d 112 (3d Cir. 1975)............................................................................52, 53

*United States v. Sturdivant,*
    244 F.3d 71 (2d Cir. 2001)...............................................................................9, 50

*United States v. Szur,*
    289 F.3d 200 (2d Cir. 2002)...................................................................................35

*United States v. Taveras,*
    504 F. Supp. 3d 272 (S.D.N.Y. 2020)......................................................................9

*United States v. Trejo,*
    610 F.3d 308 (5th Cir. 2010) ................................................................................46

*United States v. Tutino,*
    883 F.2d 1125 (2d Cir. 1989)..........................................................................50, 51

*United States v. Walsh,*
    194 F.3d 37 (2d Cir. 1999).............................................................................8, 11

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017)................................................................................21

*United States v. Williams*,
205 F.3d 23 (2d Cir. 2000)................................................................................51

*Universal Health Servs., Inc. v. United States*,
136 S.Ct. 1989 (2016)......................................................................................33

*Walsh v. Rigas*,
No. 17-CV-4089 (NRB), 2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) .............................20, 43

*West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*,
No. 08-CV-0606 (RWS), 2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) ..............................45

**Statutes**

Section 10(b) of the Securities and Exchange Act of 1934,
15 U.S.C. § 78j(b) .................................................................................. *passim*

15 U.S.C. § 78ff .........................................................................................1

18 U.S.C. § 371 ..........................................................................................1

18 U.S.C. § 1343 ....................................................................................1, 21

18 U.S.C. § 1956 ...........................................................................1, 2, 46, 47

18 U.S.C. § 1957 ...............................................................................2, 46, 57

17 C.F.R. § 240.10b-5 ............................................................................ *passim*

17 C.F.R. § 240.10b5-2(b) ...............................................................................35

Fed. R. Crim. P. 7 .......................................................................................8

Fed. R. Crim. P. 8 ......................................................................................50

Fed. R. Crim. P. 12 ...............................................................................1, 8, 9

Defendant Ho Wan Kwok respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rule of Criminal Procedure 12(b), to dismiss the superseding indictment filed in this matter (the "Indictment").

## PRELIMINARY STATEMENT

The Indictment is rife with factual errors and Mr. Kwok is innocent of all of these charges—he has never defrauded anyone, let alone any of the fellow members of his political movement. But even if these incorrect assertions were taken as true, as the law requires the Court to do on a motion to dismiss an indictment, each of the Indictment's counts against Mr. Kwok are fatally deficient.

The Indictment charges Mr. Kwok with eleven counts spread across four ill-pleaded "schemes": (i) one count of conspiracy in violation of 18 U.S.C. § 371 ("Count One" or the "Conspiracy Count"); (ii) one count of wire fraud in violation of 18 U.S.C. § 1343 ("Count Two") and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff ("Count Three," and together with Count Two, the "GTV Counts") in connection with a private placement of stock in a social media company called GTV; (iii) one count of wire fraud ("Count Four") and one count of securities fraud ("Count Five," and together with Count Four, the "Farm Loans Counts") in connection with a lending program amongst Mr. Kwok's fellow Chinese pro-democracy dissidents; (iii) one count of wire fraud ("Count Six") and one count of securities fraud ("Count Seven," and together with Count Six, the "G|CLUBS Counts") in connection with sale of memberships by a company called G|CLUBS; (iv) one count of wire fraud in connection with the sale of digital currencies by the Himalaya Exchange (the "Himalaya Exchange Count" or "Count Eight," and together with Counts Two through Seven, the "Alleged Fraud Counts"); (v) one count of international promotional money laundering in violation of 18 U.S.C. § 1956(a)(2) ("Count Nine");

(vi) one count of international concealment money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i) ("Count Ten"); and (vii) one count of unlawful monetary transactions in violation of 18 U.S.C. § 1957 ("Count Eleven," and together with Counts Nine and Ten, the "Money Laundering Counts").    Because each is flawed as a matter of law (and of fact, for that matter), the Indictment must be dismissed.

*First*, the Alleged Fraud Counts distort Mr. Kwok's words beyond recognition, but even the Indictment's skewed recitation does not support securities or wire fraud charges.  As an initial matter, two of the securities fraud counts—Counts Five (related to the Farm Loans) and Seven (related to G|CLUBS) fail because they do not even involve securities.  Moreover, all of the Alleged Fraud Counts should be dismissed because the Indictment does not allege actionable misrepresentations in connection with any of them.  For example, the GTV Counts allege that Mr. Kwok and his co-defendants violated ironclad promises about how GTV investor funds would be used.  But that claim fails on two fronts: for one, these "promises" (which the government concedes Mr. Kwok did not make) were speculative statements upon which no reasonable investor could rely; but even if they were not, the manner in which the funds were used (an intercompany transfer with GTV's parent company) is entirely consistent with these statements.

Similarly, with respect to the Farm Loans, while the government alleges that Mr. Kwok made false representations about the value of GTV and the possibility that participants in the Farm Loans program would receive GTV shares at some point, these are not actionable misstatements both because they are true and because they are too speculative to be material.  And with respect to the allegation that Farm Loan participants were told the loans would be used for the Farms' "working capital," even if that were inaccurate, there is no allegation that Mr. Kwok was even aware of these statements, let alone made them.

The G|CLUBS Counts fail for similar reasons.  Even assuming there was a relevant securities transaction, the government has failed to plead a scheme to defraud: to the extent the Indictment alleges funds were misappropriated (and they were not), that is flatly incorrect, because no one, Mr. Kwok included, ever represented how G|CLUBS would use the membership fees raised, and Mr. Kwok had no duty otherwise to disclose that information.  Similarly, the allegation that Mr. Kwok promised G|CLUBS members they would receive shares in some unspecified entity at some indeterminate time is not a material misrepresentation both because it could still prove true, and even if not, is too vague to be relied upon.  And with respect to Mr. Kwok's alleged misrepresentation about the number of G|CLUBS members in July 2020, the Indictment does not allege that Mr. Kwok knew the statement to be false.

Finally, the Himalaya Exchange Count alleges that Mr. Kwok and his alleged co-defendants made false representations about Himalaya Coin and Himalaya Dollar, two digital currencies issued by the Himalaya Exchange, namely that Himalaya Coin was not a cryptocurrency, that its value was 20% backed by gold, that it could be redeemed for fiat currency, and that it had been used to purchase a Ferrari.  Even accepting these allegations as true for purposes of this motion, the conclusion that they constitute a fraud reflects a profound misunderstanding of cryptocurrencies.  According to the Indictment itself, Himalaya Coin is an early stage digital currency—many established digital currencies were equally illiquid at their inception, but no one questions their status as cryptocurrencies.  Moreover, even if, for purposes of argument, Himalaya Coin was not backed specifically by gold, it was backed by substantial cash reserves, and a *reasonable* investor would not care about that distinction.  With respect to the remaining allegations—that Himalaya Coin could not be exchanged for fiat currency or that Himalaya Dollar was not used to buy a luxury vehicle—those claims are undercut by the very Himalaya Exchange

offering materials upon which the Indictment relies and well-established market practices. Accordingly, all of the Alleged Fraud Counts are all legally deficient and should be dismissed, even if the Indictment's untrue allegations are credited.

*Second*, the Money Laundering Counts are similarly flawed because they are all premised on the Alleged Fraud Counts as the pertinent "specified unlawful activity." But the Alleged Fraud Counts do not allege *any unlawful activity*, much less any unlawful activity specified in the money laundering statutes. As a result, the Money Laundering Counts must also be dismissed. But even accepting that there was "specified unlawful activity," Counts Nine and Eleven are meritless as a matter of law because they do not allege money laundering transactions that are distinct from the underlying alleged fraudulent transactions. Finally, Count Nine should be dismissed because it fails to assert an essential element of the charged offense, namely, that any of the monetary transactions at issue were made with the "intent to promote" any "specified unlawful activity." Accordingly, the Money Laundering Counts should be dismissed.

*Third*, the Conspiracy Count fails for two reasons. First, none of the conspiracy's objects—which are the Alleged Fraud Counts—are, in fact criminal, as described above. Second, the Conspiracy Count is duplicitous—it inappropriately compresses four distinct alleged conspiracies into a single count. In doing so, the Conspiracy Count impermissibly prejudices Mr. Kwok because it exposes him to a real risk of jury confusion, the lack of a unanimous verdict on Count One, and the risk that alleged co-conspirator statements will be improperly smuggled before the jury on the Indictment's substantive counts. Accordingly, Count One should also be dismissed.

## RELEVANT BACKGROUND

### I.     Mr. Kwok's Political Activism and Flight from the People's Republic of China

Mr. Kwok is a businessman and Chinese political dissident who fled the People's Republic of China ("PRC") for the United States in 2015 to escape prosecution for his criticism of the PRC's ruling party, the Chinese Communist Party ("CCP").  (Ind., ¶ 6(a).)  After fleeing the CCP, Mr. Kwok continued his political activism in support of democracy in China[1] in the United States. Through social media and other outlets, Mr. Kwok garnered a substantial online following and became a leading voice of the anti-CCP movement.  (*Id.*)

### II.    The Alleged Fraud

The Indictment (incorrectly) alleges that Mr. Kwok and his co-defendants, Kin Ming Je and Yanping Wang, victimized fellow members of their Chinese pro-democracy movement through four distinct schemes[2]:

*First*, the Indictment alleges Mr. Kwok, Mr. Je, and Ms. Wang engaged in a scheme to defraud investors in connection with a private placement of stock in a social media company known as GTV beginning in April 2020.  GTV was intended to "combine the power of citizen journalism and social news with state-of-the-art technology, big data, artificial intelligence, block-

---

[1] The Indictment appears to contest that Mr. Kwok is a genuine dissident, describing him as a "purported" dissident who "claim[s] to advance a movement against the Chinese Communist Party."  (Ind., ¶ 6(a).)  This skepticism is, quite frankly, nonsense.  If Mr. Kwok's activism is as contrived as the government contends, then he would not, as the Department of Justice (the "DOJ") itself alleges, be the primary target of a CCP campaign to silence him. ███████████ ████████████████████████████████████  It is truly bizarre that out of one side of its mouth, the DOJ disputes Mr. Kwok's status as a dissident, but out of the other side of its mouth, uses his political activism as evidence of motive upon which to base criminal charges against others.

[2] Mr. Kwok does not concede any of the Indictment's factual allegations, and intends to prove at trial that they are incorrect.  Nevertheless, because, as a legal matter, the Court must presume the truth of the Indictment's allegations on a motion to dismiss, *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952), the facts described above are taken from the Indictment.

chain technology and real-time interactive communication."  (Ind., ¶ 13(b).)  In April 2020, Mr. Kwok, Mr. Je and Ms. Wang sought to raise money for GTV through a private stock offering (the "GTV Private Placement").  (*Id.*, ¶ 13.)  Mr. Kwok announced the GTV Private Placement in a video posted to social media on or about April 21, 2020 in which he described the platform and invited potential investors to contact him with questions about the GTV Private Placement.  (*Id.*, ¶ 13(a).)  Potential investors in GTV also received certain formal materials, including a Confidential Information Memorandum (the "PPM"), "author[ed]" by Mr. Je, describing the GTV Private Placement.  (*Id.*, ¶ 13(c).)  The PPM stated that proceeds from the GTV Private Placement would be used "to expand and strengthen the business" and contained a chart setting forth the "contemplated use of the proceeds."  (*Id.*, ¶ 13(d).)  The GTV Private Placement raised over $400 million, and ended in early June 2020.  (*Id.*, ¶ 13.)  The majority of these funds were deposited into accounts in the name of GTV's parent company, Saraca, and approximately $100 million of these funds were invested into a hedge fund on behalf of Saraca.  (*Id.*, ¶¶ 13(f) & (h).)

*Second*, the Indictment alleges that Mr. Kwok and Mr. Je executed a scheme through a lending program (the "Farm Loans") to informal subdivisions ("Farms") of Mr. Kwok's and Mr. Je's Chinese pro-democracy network of dissidents (the "Himalaya Alliance").  Beginning in or about June 2020, members of the Himalaya Alliance were invited to make loans to support their respective Farms (the "Farm Loan Program").  (*Id.* ¶ 14.)  In a video posted to social media on July 22, 2020, Mr. Kwok promoted the Farm Loan Program and invited investors in GTV to participate in the program.  (*Id.*, ¶ 14(c).)  Allegedly, Mr. Kwok and others working for him and at his direction "promised" that such loans would be convertible into GTV common stock.  (*Id.*, ¶ 14.)  According to the loan agreements, the funds loaned in the Farm Loan Program were to be used for a Farm's "general working capital purposes."  (*Id.*, ¶ 14(e).)  Approximately $150 million

was loaned pursuant to the Farm Loan Program.  (*Id.*, ¶ 14.)  Some of these funds were transmitted to accounts held by Mr. Je and to accounts held by family members of Mr. Kwok and Mr. Je.  (*Id.*, ¶ 14(f).)  The Indictment fails to allege the maturity date of the loans or any deadline by which they were to be converted into GTV common stock.

*Third*, the Indictment alleges that Mr. Kwok and Mr. Je participated in a fraud involving a membership club known as G|CLUBS.  Specifically, in or around June 2020, Mr. Kwok promoted G|CLUBS in a video posted on social media.  (*Id.*, ¶ 15(a).)  Formally launched in October 2020, G|CLUBS was an exclusive membership organization that offered members "a gateway to carefully curated world-class products, services and experiences."  (*Id.*, ¶ 15(b).)  Allegedly, Mr. Kwok told his online followers that their purchase of G|CLUBS would entitle them to stock in affiliated entities, such as GTV and G|Fashion.  (*Id.*, ¶ 15(f).)  Different tiers of membership offering different levels of services were available for purchase.  (*Id.*, ¶ 15(c).)  G|CLUBS collected hundreds of millions of dollars in membership fees but failed to provide some of the services it advertised to its members.  (*Id.* ¶ 15(e).)  Some of the membership fees were transferred to accounts controlled by Mr. Je, and used to pay for personal expenses of Mr. Kwok and his family and purchase a piece of real property in Mahwah, New Jersey (the "Mahwah Facility").  (*Id.*, ¶ 16.)

*Fourth*, the Indictment alleges that Mr. Kwok and Mr. Je defrauded their fellow movement members by inducing them to purchase digital assets called Himalaya Coin ("HCN") and Himalaya Dollar ("HDO") on an online exchange called the Himalaya Exchange.  (*Id.*, ¶¶ 17-23.) In a video posted in October 2021, Mr. Kwok described HCN as a digital asset backed by gold and stated that he would compensate investors for any losses in the value of HCN.  (*Id.*, ¶ 18(a).)  It was, however, backed by substantial cash reserves.  (*Id.*, ¶ 24.)  Whitepapers published on the Himalaya Exchange website stated that the Himalaya Exchange operated through the use of credits

that could only be used on the Himalaya Exchange and explained that investors could request to exchange their credits for equivalent payment in U.S. dollars. (*Id.*, ¶ 22(a).)

## ARGUMENT

## I.   LEGAL STANDARDS FOR DISMISSAL OF AN INDICTMENT

The U.S. Constitution provides that a citizen shall not be "deprived of life, liberty, or property, without due process of law," and that a criminal defendant must "be informed of the nature and cause of the accusation against him." U.S. Const. amends. V, VI. Rule 7 of the Federal Rules of Criminal Procedure, which codifies those constitutional rights, requires that all criminal indictments include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "The wording of this Rule imposes two requirements: the statement of the essential facts *and* the citation of the statute. *They are separate requirements and not a restatement of one another*." *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) (emphasis in original; internal alterations and citation omitted).

To meet these requirements, an indictment must "first, contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and, second, enable[] him to plead an acquittal . . . in bar of future prosecutions for the same offense." *United States v. Nejad*, No. 18-CR-224 (AJN), 2012 WL 6702361, at *15 (S.D.N.Y. Dec. 6, 2019) (quoting *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013)). An indictment also must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999); *see also Russell v. United States*, 369 U.S. 749, 764 (1962) (dismissing indictment for failure to specify question that defendant failed to answer during congressional committee).

Rule 12(b) of the Federal Rules of Criminal Procedure permits a defendant to move to

dismiss an indictment for certain enumerated grounds, including "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v); *see United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (noting "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute"); *United States v. Taveras*, 504 F. Supp. 3d 272, 277-78 (S.D.N.Y. 2020) ("[A] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged.") (citation omitted). "Dismissal is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute." *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010). Likewise, an indictment must be dismissed for lack of specificity, *see Russell*, 369 U.S. at 764, or if it improperly joins two or more offenses in the same count (duplicity). Fed. R. Crim. P. 12(b)(3)(B)(i), (iii); *see United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). Here, the Indictment must be dismissed on all of these bases.

## II. COUNTS FIVE AND SEVEN SHOULD BE DISMISSED BECAUSE THEY FAIL TO ALLEGE THAT THE PURPORTED SCHEME TO DEFRAUD WAS "IN CONNECTION" WITH A SECURITIES TRANSACTION

The Indictment stretches beyond the reach of Section 10(b) in charging the Farm Loans (Count 5) and G|CLUBS (Count 7) securities fraud counts. Because these counts—in which Mr. Kwok is alleged to have induced his fellow political movement members to make *loans* and purchase *club memberships*, respectively, in support of their pro-democracy objectives—fail adequately to allege the necessary connection to a relevant securities transaction, they must be dismissed as a matter of law.

### A. Applicable Law

As the Court knows, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, criminalize making a

material misstatement or employing a manipulated or deceptive device "in connection with the purchase or sale" of securities. Conduct is considered to be "in connection with the purchase or sale" of securities when it "coincide[s] with a securities transaction." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (internal quotation marks omitted); *see also SEC v. Zandford*, 535 U.S. 813, 825 (2002). Courts in the Second Circuit interpret the phrase "in connection with the purchase or sale" to require that the fraudulent conduct either "induces" or "turn[s] on" such a transaction; that is, where the conduct "necessarily allege[s], necessarily involves[s], or rest[s] on" such a transaction. *Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (internal quotation marks omitted).

However, the "in connection with the purchase or sale" requirement is not met when the fraudulent conduct and the securities transaction are "independent" events. *Zandford*, 535 U.S. at 819–20. The Supreme Court has explained that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered' security." *Chadbourne & Park LLP v. Troice*, 571 U.S. 377, 387 (2014). A logical corollary is that a "manipulative or deceptive device or contrivance" is only used "in connection with" the purchase or sale of a security where the device "somehow induced the purchaser to purchase the security at issue." *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999).

### B. Discussion

### (1) Count Five Should Be Dismissed Because the Farm Loans Program Does Not Involve a Securities Transaction

As an threshold matter, the Indictment is hopelessly muddled in identifying what securities are at issue in the Farm Loans securities count, rendering Count 5 defective as a matter of law. On one hand, the Indictment seems to suggest that the alleged Farm Loans fraud was conducted in

connection with GTV's private placement. (*See* Ind., ¶ 14(d) ("After launching the Farm Loan Program, KWOK continued to promote GTV and to falsely represent the value of GTV.") On the other hand, the Indictment's statutory allegations appear to allege that it is the Farm Loans themselves that are the security.   (*Id.*, ¶ 40 (alleging that Mr. Kwok "conducted the Farm Loan Program to obtain money from victims through false statements").)  Because Mr. Kwok should not have to guess as to the government's theory, Count Five should be dismissed on due process grounds alone. *See Walsh*, 194 F.3d at 44; *see also Russell*, 369 U.S. at 764.

To the extent the Indictment can fairly be read to allege that the Farm Loans themselves are the relevant securities, it fails to allege how "the motivations that would prompt a reasonable seller and buyer to enter into" the Farm Loans differ from any routine commercial loan.  *Reves v. Ernst & Young*, 491 U.S. 56, 66 (1990) (noting that where notes "advance some other commercial or consumer purchase" beyond the profit the note is expected to generate, it is unlikely to be a security).  The Indictment also fails to allege that there was some "plan of distribution" of the Farm Loan notes suggesting that they could be traded in a secondary market for "speculation or investment," which would be indicative of a security. *Id.* (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943)).  Without more, the Indictment lacks the factual allegations necessary to allow the Court to conclude that the Farms Loans could be securities and not—as their name itself indicates—merely loans. Accordingly, to the extent the Indictment alleges that the Farm Loans are the relevant securities underlying Count 5, that count must be dismissed as a matter of law.

If, on the other hand, the Indictment relies on GTV equity as the security underlying Count Five, that count fails as a matter of law because the Farm Loan Program was not conducted "in connection with a purchase or sale" of GTV shares.  *See Dabit*, 547 U.S. at 85.As noted above,

11

"[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered' security." *Chadbourne*, 571 U.S. at 387. According to the Indictment, by the time the Farm Loan Program began, the GTV Private Placement had already been completed. (*See* Ind., ¶ 14(a) (no allegation that GTV stock was offered for sale after June 2020).)[3] Thus, the GTV Private Placement cannot be the securities transaction that underlies Count Five because the alleged fraud happened *after* the securities transactions. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999) (to satisfy "in connection" prong, scheme to defraud had to "somehow induc[e] the purchaser to purchase the security at issue").

Nor can the Indictment satisfy the "in connection requirement" by relying on Mr. Kwok's alleged statements that Farm Loans would be convertible into GTV stock on unspecified terms at an indefinite point in the future (*see* Ind., ¶ 14 (alleging that Mr. Kwok and Mr. Je "and others working on their behalf and at their direction" fraudulently solicited investment by "promising that [the Farm Loans] would be convertible into GTV common stock at a conversion rate of one share per dollar loaned").[4] Such a theory fails for multiple reasons. *First*, the Indictment does not allege that any subsequent GTV stock offering or conversion was planned or even contemplated when the Farm Loan Program was announced in August 2020. As noted above, the sale of GTV stock had been completed by the time the Farm Loan Program is alleged to have begun. *Second*, there is

---

[3] Moreover, the Indictment claims that, in connection with the Farm Loan Program, Mr. Kwok allegedly misrepresented the value of GTV when he stated that it had a valuation of $2 billion, even though "GTV was a new business that generated no revenue." (*Id.*, ¶ 14(d).) As described below, *see infra* pp. 30-32, this statement is not false, but even if it were, it was allegedly made on August 2, 2020--two months *after* the GTV Private Placement closed in June 2020.

[4] *See also* Ind., ¶ 40 (alleging that Mr. Kwok and Mr. Je "conducted the Farm Loan Program to obtain money from victims through false statements and misrepresentations, including regarding, among other things, the value of GTV"))

no allegation that any of the loan agreements—which the Indictment concedes were in writing--contained any conversion rights, or that Farm Loan participants were led to believe that the written loan agreements would be amended to include such a conversion right.  (Ind., ¶ 14(e).)  *Third*, Mr. Kwok and Mr. Je allegedly stated only that the Farm Loans "would be convertible into GTV common stock" at some indeterminate point in the future.  (*Id.*, ¶ 24.)  Put simply, even under the government's theory, there is no securities transaction with which Mr. Kwok's alleged fraud regarding the Farm Loans could "coincide" because there was never more than a theoretical opportunity to convert at some future, but yet unknown, date, without reference to any potential triggering event.  *See Dabit*, 547 U.S. at 85 (alleged fraud must at least "coincide with a securities transaction"); *see also United States v. O'Hagan*, 521 U.S. 642, 656 (1997) (noting in insider trading prosecution under Rule 10b-5 that the "in connection" element is satisfied "not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities," so "[t]he securities transaction and the breach of duty thus coincide").

As to the argument that the "in connection with" requirement is satisfied because the opportunity to acquire GTV stock was used to induce lenders to make the Farm Loans, this argument fails on the law.  To satisfy the "in connection with" requirement, the alleged fraud must induce the purchase or sale of a security.  *See Press*, 166 F.3d at 537 (to satisfy "in connection" prong, scheme to defraud had to "somehow induc[e] the purchaser to purchase the security at issue"); *Chadbourne*, 571 U.S. at 387 (to be "in connection" with a security, challenged statement or omission must be material to decision to buy or sell a security).  But here, the Farm Loans were a distinct transaction – money was loaned to the Farms in exchange for recouping the principal plus interest – and *potentially* followed at some indeterminate point in the future by a *separate*

securities transaction.  In other words, here, the alleged fraud was designed to induce the lenders to make the Farm Loans, not to induce them to either purchase or sell a security.  Thus, any alleged fraud related to the Farm Loans Program is not "in connection" with the purchase or sale of GTV stock.  *See O'Hagan*, 521 U.S. at 656 (crediting government's position that 10b-5 would not reach a situation where a defendant defrauded a bank into giving him a loan and then later purchased the securities because "in other words, money can buy, if not anything, then at least many things; its misappropriation may thus be viewed as sufficiently detached from a *subsequent* securities transaction that § 10(b)'s 'in connection with' requirement would not be met") (emphasis added). Accordingly, Count Five should be dismissed.[5]

---

[5] Moreover, the government's theory that an alleged oral statement can transform a written Farm Loan agreement into a convertible note fails to comport with the securities laws' reasonable investor and materiality standards. As an initial matter, the Indictment does not say when Mr. Kwok allegedly represented that Farm Loans would be convertible to GTV stock, nor whether that alleged statement was made before or after supporters began lending funds. (*See* Ind., ¶ 14.)  But it correctly notes that the Farms loans were memorialized in written loan agreements. (*See id.*, ¶ 14(e).) Yet regardless of whether the alleged conversion representation was made before or after supporters signed loan agreements and wired funds, no reasonable investor could have believed that such an oral statement could alter the terms of a written loan agreement—which agreements the government concedes lacked any conversion right. For example, if Mr. Kwok's alleged statement was made *after* loan agreements were documented and funds wired, no reasonable investor could believe that their existing written agreement was unilaterally modified into a convertible note via Mr. Kwok's after-the-fact oral representation. Likewise, in the case where Mr. Kwok's alleged statement about convertibility was made *before* a Farm Loan agreement was signed and funds wired, the fact that the subsequent written agreement concededly lacked any conversion feature would put any reasonably objective person on notice that the loan in fact was not a convertible note (regardless of what was said beforehand). Even assuming for the sake of argument that either of those views could reasonably be taken by an objective investor—and they could not—Mr. Kwok's vague alleged statement about the Farm Loans' potential for conversion to GTV stock lacked the detail necessary to constitute a material representation. For example, Mr. Kwok's alleged representation did not include key terms such as a maturity date, an expiration date or triggering event for the purported conversion right. *Cf. Tierney v. Omnicom Grp. Inc.*, No. 06-CV-14302 (LTS)(THK), 2007 WL 2012412, at *5-6 (S.D.N.Y. July 11, 2007) (holding that a stock option award provision was unenforceable because its terms were too indefinite, including that it lacked any term as to the purported option award's timing). For both of these additional reasons, Count 5 must be dismissed as a matter of law.

### (2)   Count Seven Should Be Dismissed Because the G|CLUBS Membership Purchases Do Not Involve a Securities Transaction

Count Seven, which concerns the purchase of G|CLUBS memberships, similarly fails to allege the necessary connection to a securities transaction.  Like Count Five, the Indictment is impermissibly vague as to whether it is GTV stock or G|CLUBS memberships that it alleges are the relevant securities underlying Count 7.  (*Compare* Ind., ¶ 15(f) ("KWOK … told [his] online followers that their purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion.") *with id.* ¶ 44 (alleging that Mr. Kwok "promoted and marketed G|CLUBS to obtain money from victims through false statements").)  For that reason alone, Count 7 should be dismissed.

To the extent the government contends that the G|CLUBS memberships are themselves securities, Count 7 must be dismissed because club memberships that offer services and other consumptives goods in return for membership fees classically are not securities under Section 10(b). The Indictment alleges that Mr. Kwok directly or indirectly promoted G|CLUBS as "an exclusive, high-end membership program offering a full spectrum of services" and as "a gateway to carefully curated world-class products, services and experience." (Ind., ¶ 15.) It further alleges that G|CLUBS members paid a one-time upfront "membership" fee, together with a tiered annual fee ranging from $10,000 to $50,000 keyed to the level of services and access the club member wanted. (*Id.*) The Indictment contains no allegation that Mr. Kwok or others promoted G|CLUBS memberships by saying memberships would increase in value over time or that the memberships would later be transferable, such that members could realize capital appreciation on them. As alleged, therefore, what G|CLUBS members were promised in return for their membership payments were solely services, access and other consumptive items—not investment returns. Because the Indictment fails to allege that G|CLUBS memberships constituted an "investment of

money" in a "common enterprise" "with profits to come solely from the efforts of others," such memberships cannot be securities. *See SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946).[6]

On the other hand, to the extent the government relies on Mr. Kwok's alleged promise to grant G|CLUBS members an unspecified amount of free GTV stock at some indefinite point in the future, that, too, fails for multiple reasons. *First*, the notion that a vaguely worded promise of a stock "kicker" overwhelmed G|CLUBS members' otherwise clear consumptive motive in buying a membership lacks adequate support in the Indictment. Even assuming that the offer of free stock provided some profit motivation to G|CLUBS purchasers—a facially dubious assertion in the first instance—under *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) and its progeny, transactions in which there are mixed elements of consumption and investment are not securities transactions where the consumptive element outweighs the profit motivation. Here, the Indictment's allegations make clear that the consumptive element in G|CLUBS memberships predominated because the Indictment contains *no* allegations from which the Court can infer that G|CLUBS members reasonably expected to profit from the vague offer of future fee stock. Would members be given one share or ten shares as part of a package for buying a six-figure G|CLUBS membership? And when would the G|CLUBS member receive those shares—upon purchase or several years down the road? Mr. Kwok's statements about the "free stock" on which the Indictment relies contains no such details. And without critical information like this which might

---

[6] *See also Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir. 1991) (holding that purchases of lots and memberships in an adjacent country club were not securities); *Libaire v. Kaplan*, No. 06-1500, 2008 WL 794973, at *7-8 (E.D.N.Y. Mar. 24, 2008) (holding that the purchase of shares in a corporation that operated a private hunting reserve did not involve a security because the purchase was motivated by a desire to access the facility); *Olohana Golf Club, Inc.*, SEC No-Action Letter, 2003 WL 21831944 (July 31, 2003) (golf club membership in Hawaii not a security); *Manchester Country Club*, SEC No-Action Letter, 1999 WL 301382 (May 13, 1999) (golf and country club membership in New Hampshire not a security).

permit purchasers to assess the future stock grant's profit potential, no investor or purchaser of G|CLUBS memberships could possibly have a reasonable expectation of a "financial return" from purchasing a G|CLUBS membership—much less one that predominated over the otherwise clear consumptive motive. *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 547 (D.C. Cir. 1996) (to meet *Howey*'s "expectation of profits" requirement, the purchaser's motivation in participating in the transaction must be to secure "a financial return"). As a matter of law, therefore, Count 7 must be dismissed.

Second, the fraud alleged in Count 7 lacks the requisite connection to the purchase or sale of a security. *See Press*, 166 F.3d at 537 (to satisfy "in connection" prong, scheme to defraud had to "somehow induc[e] the purchaser to purchase the security at issue"). The government's apparent attempt to satisfy the "in connection with" requirement through allegations that the promise of GTV stock was used to induce members to purchase G|CLUBS memberships does not change this conclusion—this inducement argument fails for the same reason it failed with regard to the Farm Loans. As alleged, the purported G|CLUBS scheme involved inducing members to pay membership fees in exchange for non-existent membership benefits, to be followed by, at some indeterminate time, the transfer of an unspecified amount of GTV stock. In other words, G|CLUBS members were allegedly fraudulently induced to pay membership fees, not to buy or sell GTV stock. The alleged fraud, therefore, is "sufficiently detached from a subsequent securities transaction" (in which G|CLUBS members may be entitled to participate, but is distinct from the membership itself) as to fall outside of the ambit of Section 10(b). *See Press*, 166 F.3d at 537; *Chadbourne*, 571 U.S. at 387; *O'Hagan*, 521 U.S. at 656-57; *see also Dabit*, 547 U.S. at 85 (alleged fraud must at least "coincide with a securities transaction").

Moreover, and as noted above, the alleged transaction in GTV shares describes no terms for how G|CLUBS members would receive this "allot[ment]" in some "Kwok-affiliated entities," how much of an "allot[ment]" they would get, when they would get this "allot[ment]," or whether the members would have to pay anything more for their "allot[ment]."  A statement that specifies no terms about when, what, how, or at what cost describes a concept, not a transaction, and interpreting Rule 10b-5's "in connection" requirement to be satisfied by a mere conceptual statement is an unprecedented construction of the rule that should not be adopted for the first time in a criminal prosecution.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (under § 10(b), "the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim"); *United States v. Benjamin*, No. 21 Cr. 706 (JPO), 2022 WL 174038, at *13 (S.D.N.Y. Dec. 5, 2022) ("due process bars a court from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope") (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)).[7]  Accordingly, Count Seven should be dismissed for this independent reason.

## III.  COUNTS TWO THROUGH EIGHT FAIL TO ALLEGE MATERIAL MISREPRESENTATIONS OR OMISSIONS

### A.  Applicable Law

#### (1) Securities Fraud Requires a Material Misrepresentation or Scheme to Defraud

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ,

---

[7] The same would be true of adopting a construction of the "in connection" requirement that encompassed the amorphous statements with respect to GTV that are alleged in Count Five in connection with the Farm Loans Program.  *See supra* pp. 28-32.

in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated thereunder, makes it unlawful to engage in the following conduct "in connection with the purchase or sale of any security": "(a) To employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or; (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5; *see United States v. Finnerty*, 533 F.3d 143, 146 (2d Cir. 2008) (quoting statutes).

### (2) Liability under 10b-5(b) Requires the Defendant To Have Made a Material Misstatement or Omission

In order to be liable under Section 10(b) based upon a misstatement, a speaker must have "made" the alleged misstatement. *Sec. & Exch. Comm'n v. Rio Tinto plc*, No. 17-CV-7994 (AT), 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019). "The maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* (quoting *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)).

The misrepresentation must also be material. But an alleged misstatement is material only if there is "a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." *United States v. Litvak*, 808 F. 3d 160, 175 (2d Cir. 2015). Likewise, an omission is material only "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Livingston v. Cablevision Sys.*

*Corp.*, 966 F. Supp. 2d 208, 216 (E.D.N.Y. 2013).  When—as here—"the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance, [courts] may find the misstatements immaterial as a matter of law." *Litvak*, 808 F.3d at 175; *United States v. Carroll*, No. 19-CR-545 (CM), 2020 WL 1862446, at *5 (S.D.N.Y. Apr. 14, 2020) (same).

"To be material within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac,* 752 F. 3d at 185.  Further, "[t]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances." *Walsh v. Rigas*, No. 17-CV-4089 (NRB), 2019 WL 294798, at *6 (S.D.N.Y. Jan. 23, 2019); *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("[A]n investor reads each statement within such a document, whether of fact or opinion, in light of all its surrounding text, including hedges [and] disclaimers…").  Alleged misrepresentations in offering documents "are immaterial as a matter of law [where] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc*., 295 F.3d 352, 357 (2d Cir. 2002); *Livingston*, 966 F. Supp. 2d at 218 (finding oral statements could not form the basis of a securities fraud action where those statements were contradicted by formal SEC reports on which investors would rely); *Carroll*, 2020 WL 1862446, at *3 ("'Materiality' is the same in both the civil and criminal context."); *United States v. Gleason*, 616 F.2d 2, 28 (2d Cir. 1979) ("It is also settled that the same standards apply to civil and criminal liability under the securities law.").

### (3) Wire Fraud Requires a Material Misrepresentation

"The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) (citing *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)). "To establish the first element, the government must prove (i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *Id*. (citations omitted); *see also United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) ("In order to prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material.") (citation omitted). Thus, "materiality is an element of both securities fraud and wire fraud." *United States v. Gramins*, No. 21-5, 2022 WL 685 3273, at *2 (2d Cir. Oct. 12, 2022), *cert denied*, 143 S. Ct. 2637 (2023).

For purposes of wire fraud, "a matter is material if a *reasonable man* would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *United States v. Frankel*, 682 F. App'x 20, 22 (2d Cir. 2017) (emphasis in original). The question before the Court is thus whether "the misrepresentation [would] actually *matter* in a *meaningful* way to a rational decision maker[.]" *United States v. Calderon*, 944 F.3d 72, 86 (2d Cir. 2019) (emphasis in original).

### B.    Discussion

The Alleged Fraud Counts (including Counts Five and Seven to the extent they can survive Mr. Kwok's "in connection" challenge) should be dismissed for failing to allege a material misstatement or omission, as required to make out securities and wire fraud charges.

21

### (1)  The GTV Counts (Counts Two and Three) Should Be Dismissed for Failing to Allege a Material Misrepresentation or Omission

The Indictment alleges that Mr. Kwok is guilty of securities and wire fraud in connection with the GTV Private Placement.  The Indictment fails, however, to allege that Mr. Kwok made any material misstatements or omissions with respect to GTV.

### (a)  The Indictment Does Not Allege a Specific Misrepresentation in the April 2020 Video

The Indictment alleges that on or about April 21, 2020, Mr. Kwok posted, or caused to be posted "a video on social media announcing the unregistered offering of GTV common stock via a private placement" (the "April 21 Video").  (Ind., ¶ 13(a).)  "In that video, [Mr.] Kwok described, in substance and in part, the investment terms for the GTV Private Placement, and directed people to contact him, via a mobile messaging application, with any questions about the GTV Private Placement."  (*Id.*)  The Indictment does not allege, however, that Mr. Kwok said anything false during that video, and it therefore cannot be the basis for securities fraud.[8]  *See United States v. Finnerty*, 533 F.3d 143, 148-49 (2d Cir. 2008) (no securities fraud where government did not show that defendant had communicated anything misleading to his alleged victims and government merely "undertook to prove no more than garden variety conversion"); *City of Pontiac,* 752 F. 3d at 185 (noting that a statement must be specific to be material).

---

[8] Even if the Indictment did allege that Mr. Kwok said anything misleading in the April 21, 2020 Video, it is still unlikely that a reasonable investor would have relied on his statements in the video, as opposed to the significant written documentation that was provided in connection with the GTV Private Placement.  *See Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 218 (E.D.N.Y. 2013) (finding Chief Operating Officer's public comments were not material misrepresentation upon which investors could base securities fraud claims in light of comprehensive written disclosures).

**(b) The PPM Does Not Contain Material Misrepresentations**

In connection with the April 21 Video, the Indictment alleges that Mr. Je (not Mr. Kwok) authored the PPM and that some unnamed person (not Mr. Kwok) transmitted it to thousands of potential investors, including some in this District, around the same time that the video was released. But regardless of who drafted or transmitted the document, the PPM cannot support a securities or wire fraud charge because it does not contain material misrepresentations.

**(i)  The PPM Does Not Contain False Statements**

The Indictment appears to focus on two alleged misrepresentations concerning the use of investor funds as the basis for its GTV-related securities and wire fraud counts. First, the Indictment characterizes the PPM's statement that GTV planned to use the proceeds from the GTV Private Placement to "expand and strengthen the business" as a "promise." (Ind., ¶¶ 13(d)(ii)-(e).). Second, the Indictment cites to the following chart included in the PPM describing "the contemplated use of proceeds" (*Id*. ¶ 13(d)(ii)).

| Description | Percentage of Proceeds |
|---|---|
| Acquisition of companies to strengthen and grow GTV | Approximate 70% |
| Upgrade of GTV technology and security | Approximate 10% |
| Marketing | Approximate 8% |
| Working capital | Approximate 7% |
| Other | Approximate 5% |
| Total | 100% |

The government fails to allege falsity with respect to both. The government summarily claims that these statements are misrepresentations because *more than a month after* the statements were made, GTV investors deposited funds into bank accounts held in Saraca's name and because

$100 million of the money raised was invested in a hedge fund in Saraca's name. But the Indictment notably fails to allege any deception associated with investors' depositing of money into Saraca's bank accounts. (Ind., ¶ 13.)

The government in fact concedes that Saraca is the parent company of GTV. (*Id.*, ¶ 13(f).) There is nothing inherently fraudulent about an intercompany transfer between a parent and subsidiary, even where those transfers are undocumented. *Great Atl. & Pac. Tea Co., Inc. v. 380 Yorktown Food Corp.*, No. 16-CV-5250 (NSR), 2020 WL 4432065, at *19 (S.D.N.Y. July 31, 2020) (finding undocumented intercompany transfers not fraudulent). There may be any number of legitimate reasons for such a transfer. For example, although the GTV Private Placement was intended to raise $200 million (*see* Declaration of Sidhardha Kamaraju, dated November 15, 2023 ("Kamaraju Decl."), Ex. A (PPM) at 16),[9] more than $450 million dollars' worth of investor funds were ultimately received. (Ind., ¶ 13(e).) Thus, rather than leaving more than $250 million of excess capital on GTV's books, it would be entirely rational for GTV to lend money to Saraca, thus earning interest on the loan for GTV and providing cheaper debt to Saraca.[10] Earning a return on what would otherwise be dead cash on GTV's books would be a use of the funds that "expand and strengthen the business."

---

[9] While the Court must presume the truth of the Indictment's allegations on a motion to dismiss, where, as here, the charged offense is premised on a document and there is no dispute as to what the terms of that document are (though there may be a dispute as to the import of those terms), a court can appropriately consider that document. *See, e.g., United States v. General Dynamics Corp.*, 644 F. Supp. 1497, 1500 (C.D. Cal. 1986) (considering contract on motion to dismiss indictment because "[i]f [the terms of a contract] make it clear that the indictment should not proceed, it would be a travesty if the Defendants were forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence"), *rev'd on other grounds in* 828 F.2d 1356 (9th Cir. 1987); *United States v. Liberto*, 19-CR-0600 (RDB), 2020 WL 5994959, at *7 (D. Md. Oct. 9, 2020) (courts may consider the terms of a contract that is "the very subject of the indictment").

[10] This is merely one example of a legitimate reason for an intercompany transfer.

Moreover, there is no discrepancy between the PPM's "contemplated" use of proceeds and the $100 million transfer. To "contemplate" something means to "view or consider [it] with continued attention." *See* Merriam-Webster's Dictionary, *available at* https://www.merriam-webster.com/dictionary/contemplate#:~:text=transitive%20verb,the%20meaning%20of%20the%20poem (last visited Dec. 14, 2023). It does not mean that one has committed to a certain course. The PPM's chart conveys only that the company has considered, for example, using 70 percent of the funds raised for the "acquisition of companies to strengthen and grow GTV." (Ind., ¶ 12(d)(ii)). Nor does the chart purport to be an exclusive description of how the funds would be used, *i.e.*, that investor funds would only be used for the purposes listed in the chart. Accordingly (and contrary to the Indictment's conclusory claim), there is nothing false about these statements in the PPM, and Counts Two and Three should be dismissed. *See United States v. Connolly*, 24 F.4th 821, 839-40 (2d Cir. 2022) (reversing wire fraud conviction where challenged submissions reflected rates at which bank could have borrowed and thus were not false).

### (ii) Even if the PPM Does Contain an Inaccurate Statement, These Inaccuracies Are Not Material

Even if, *arguendo*, these statements were false, they still would not support either securities or wire fraud because they are not material. *See City of Pontiac,* 752 F.3d at 185 ("To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome…").

The alleged misrepresentations are, at bottom, generalized statements about potential uses of investor funds that are far too vague for a reasonable investor to have relied on. *See Frankel*, 682 F. App'x at 22 ("a matter is material if a *reasonable man* would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question"); *Halperin*, 295 F.3d at 357 (statements "are immaterial as a matter of law [where] it cannot be said

that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering").

For example, in *Lasker v. New York State Elec. & Gas Corp.*, the Second Circuit explained that general statements in a company's public filings about future corporate plans and their potential impact on the company's future profitability—in that case diversification in the natural gas industry—were "puffery" and that "[a] reasonable investor would not believe that, by merely making the broad, general statements cited in this complaint, [the company] had insured against the risks inherent in diversification." 85 F.3d 55, 59 (2d Cir. 1996).  Similarly, in *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, the Second Circuit rejected a securities law claim based on the alleged falsity of a company's public statements that about how the company would leverage its risk management system and reputation, including that the company would "continue to reposition and strengthen [its] franchises with a focus on financial discipline." 553 F.3d 187, 206 (2d Cir. 2009).  The court there found that these statements were not material, because they are "too general to cause a reasonable investor to rely upon [it]" as guaranteeing a specific course of conduct or outcome.  *Id.*

The same is true here.  A statement that investor funds will be used to "expand and strengthen the business" is precisely the type of generalized statement that courts routinely deny as "puffery" that a reasonable investor (or reasonable person) could not rely on.  *See Greco v. Qudian Inc.*, No. 20-CV-577 (GHW), 2022 WL 4226022, at *14 (S.D.N.Y. Sept. 13, 2022) (statements regarding Qudian's "attempts to remain compliant with regulations" are "non-actionable puffery"); *City of Pontiac*, 752 F.3d at 183 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are [non]actionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.  This

is particularly true where ... the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'").  Indeed, every company that raises money does so in an effort to "expand" or "strengthen" its business.  Moreover, a chart listing general and non-exclusive and "contemplated" use of investor funds does not guarantee anything other than the fact that the company has thought about some ways to spend the money.  Such a statement "did not, and could not, amount to a guarantee" as to how the Company would ultimately allocate the funds.  *ECA*, 553 F.3d at 206.

Other statements in the PPM (omitted by the government) only emphasize the non-binding nature of the allocation table.  (*See* Kamaraju Decl., Ex. A at 19-20.)  For example, while the Indictment tries to style these statements as promises, the PPM specifically cautions investors that "[t]he use of proceeds i[n] this memorandum is *illustrative*, and the Company's management will have considerable discretion over the use of proceeds from any offering.  You may not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately."  (Kamaraju Decl., Ex. A at 20 (emphasis added).)  Moreover, the PPM also states that due to its majority ownership of GTV, Saraca "can exert significant control over the [GTV's] business and affairs and have actual or potential interests that may depart from purchasing the common stock," and could exercise its control even over the objections of the other shareholders. (*See id*. at 26.)  In other words, contrary to the Indictment's attempt to strain these statements into an unqualified promise about how the investor funds would be used, GTV investors were told in the PPM that (i) there was no guarantee that their funds would be used as outlined in the PPM; (ii) Saraca would exercise considerable control over those funds; and (iii) investors would have no control and may not agree with the way in which the funds were ultimately spent.  The fact that— as alleged—the funds were invested by Saraca (in a manner that could benefit GTV), *see supra*

p. 24, would simply not be an important detail for GTV investors, given the total mix of information they had. *See Halperin*, 295 F.3d at 360 (finding alleged misstatement not to be material in light of the fact that investors were informed of substantial risks associated with investment); *see also Livingston*, 966 F. Supp. 2d at 218 (finding oral statements could not form the basis of a securities fraud action where those statements were contradicted by formal SEC reports on which investors would rely).

### (2) The Farm Loans Counts (Counts Four and Five) Should Be Dismissed for Failing to Allege a Knowing Material Misrepresentation or Omission

The Farm Loans Counts charge Mr. Kwok with securities fraud in Count Four and wire fraud in Count Five on the basis of three alleged misstatements: (i) that participants in the Farm Loans Program could convert their loans into stock of GTV at some unspecified time (Ind., ¶ 14); (ii) that in August 2020, the valuation of GTV was $2 billion, even though "GTV was a new business that generated no revenue" (*id*., ¶ 14(d)); and (iii) funds raised through the loan program would be used for the Farms' "working capital," but were instead misappropriated (*id*., ¶ 14(e)).[11] None of these alleged misstatements, however, support criminal liability for either securities or wire fraud.

### (a) Mr. Kwok's Alleged Promise Regarding the Farm Loans and GTV Shares Is Not A Material Misrepresentation

With respect to Mr. Kwok's purported commitment that the Farm Loans would convert into GTV stock, the Indictment does not allege why or how that statement was untrue when made. The government does not allege why such conversion could not occur. After all, at the time Mr.

---

[11] The Indictment asserts that Mr. Kwok "promoted the Farm Loan Program" in a July 22, 2020 video posted to social media (the "July 22 Video"). Notably, the Indictment does not identify any specific alleged misstatement contained in the July 22 Video, and thus it cannot sustain the wire or securities fraud charge. *City of Pontiac,* 752 F. 3d at 185.

Kwok purportedly made these statements, there is no allegation that GTV was not a going concern that could offer stock at some future time.  (*Id.*, ¶ 14.)  Moreover, according to the government, Mr. Kwok controlled GTV (*id.*, ¶ 10), meaning, presumably, that he could have caused it to issue stock for the conversion.  Finally, the Indictment does not allege that Mr. Kwok announced any type of deadline by which the loans would convert into GTV stock.  (*Id.*, ¶ 14.)  Thus, absent the government's own actions in indicting and arresting Mr. Kwok,[12] there is no reason to conclude that Farm Loan participants would not be eligible to receive GTV stock at some point, and that his alleged statement was false when made.  *See Connolly*, 24 F.4th 821, 833 (2d Cir. 2022) ("A false statement requires, of course, a 'statement,' which the Supreme Court has characterized as an assertion of fact capable of confirmation or contradiction."); *see*, *e.g.*, *Greco,* 2022 WL 4226022, at *9 ("the Second Circuit has 'rejected the legitimacy of alleging fraud by hindsight'") (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)); *Freedman v. Value Health, Inc.*, No. 95-CV-2038 (JCH), 2000 WL 630916, at *3 (D. Conn. Mar. 24, 2000) (when statement was true at the time it was made, it is insufficient to prove material misrepresentation to show that the statement later became untrue by virtue of a new development).

Moreover, even if this purported promise were a misstatement, it was not a "material" misstatement, as required for both Counts Four and Five, because no reasonable investor would rely on it in loaning money to the Farms.  Specifically, Mr. Kwok's alleged statement that a participant in the program would be able to convert that loan into GTV shares at some point in the future, provides no detail about, for example, when the conversion would happen, what would be the trigger for the conversion, and what conditions, if any, would apply to the conversion.  (Ind.,

---

12 ████████████████████████████████████████████

¶ 14.)  For purposes of the securities and wire fraud statutes, as a matter of law, no reasonable investor or person could rely on a statement that is so speculative as a basis on which to premise whether they should loan money to the Farms.  *See United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (upholding jury instruction stating that "speculative information is not material. The mere fact that some discussion has taken place on matters that may or may not occur is not material…").

### (b) Mr. Kwok's August 2020 Statement about the Value of GTV Was an Opinion that Cannot Form the Basis of a Fraud Claim

Mr. Kwok's alleged statement that GTV should be valued at $2 billion, even though it was a new business without revenues, does not support a fraud count.  The Indictment does not allege why such statement was allegedly false or misleading.  Moreover, the Indictment does not allege that Mr. Kwok is a valuation expert or was retained by GTV to conduct a valuation of the company. At most, the Indictment alleges that Mr. Kwok offered an opinion as to the value of the company, which, after all, is all that a valuation can ever be.  *Cf. Endico v. Endico*, No. 19-CV-7231 (JCM), 2022 WL 3902730, at *10 (S.D.N.Y. Aug. 30, 2022) (excluding testimony regarding the valuation of a company as "improper lay opinion" given "the inherently subjective and fact intensive nature of valuation and projection of profits").

The Supreme Court has held that an opinion is not actionable under the securities laws unless the speaker does not hold a professed belief or if supporting facts supplied in the opinion are untrue.  *Omnicare*, 575 U.S. at 185-86.  Indeed, *Omnicare* only requires that statements be "fairly align[ed] with the information in the issuer's possession at the time."  *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016); *see Singh v. NYCTL 2009-A Tr.*, No. 14-CV-2558, 2016 WL 3962009, at *7 (S.D.N.Y. July 20, 2016), *aff'd*, 683 F. App'x 76 (2d Cir. 2017) (noting that "expressions of opinion . . . are generally not actionable in fraud even if they are false"); *Special Situations Fund*

*III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 435 (S.D.N.Y. 2014) ("To bring a fraud claim based on a supposed misstatement in an opinion, a plaintiff must assert plausible allegations that 'defendants did not [subjectively] believe the statements . . . . at the time they made them.'"); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 465 (S.D.N.Y. 2004) (liability based on opinion requires "not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinion.").

The Indictment alleges nothing that shows that Mr. Kwok was "deliberately misrepresent[ing]" his opinion as to the value of the company—if anything the Indictment and PPM show the reasonableness of his view. For instance, the PPM shows that up to 200,000,000 shares were going to be sold for $1 per share, *i.e.*, $200,000,000, and that that number of shares would equal 10% of the outstanding shares. (Kamaraju Decl., Ex. A at 16.) Accordingly, with simple math, GTV as a whole was valued at $2 billion (*i.e.*, $200,000,000 * 10). And while the government seems to claim that this figure is distorted because GTV did not have any revenues at the time, valuation based on the pricing of anticipated equity investments is a routine method of valuing a start-up that has yet to generate any revenue. *See, e.g.*, Valuing the company, Representing Startups § 7:4 (2023-2024 ed.) (in discussing valuation of a pre-revenue business, describing "a simple example of this valuation process: If the venture investor invests $1,000,000 and obtains 50% of the equity, then the company has been "valued" at $2,000,000, consisting of an original or pre-money "value" of $1,000,000, plus the $1,000,000 invested in the company.").

Moreover, Mr. Kwok is alleged to have made his statement in August 2020—just months after GTV, the "new business that generated no revenue"—had raised *nearly a half a billion dollars in little more than a month*. (Ind., ¶¶ 13(e), 14(d).) Forecasting that the company was

worth $2 billion, which is the valuation set before the company shattered its planned raise amount

by *more than a quarter billion dollars*, is objectively reasonable, and cannot underpin fraud.

### (c)   The Indictment Fails to Allege that Mr. Kwok Made a Knowing Misrepresentation Regarding the Farm Loans' Use for the Farms' Working Capital

Finally, the Indictment's allegation that the Farm Loan agreements claimed that the loaned

funds would be used for the Farms' "working capital," but was instead used in part to pay expenses

on behalf of Mr. Kwok, Mr. Je, and their families also cannot be the basis of securities or wire

fraud.  As an initial matter, should this case proceed to trial, then Mr. Kwok intends to show that

the alleged expenditures of the Farm Loans proceeds are legitimate.  But for purposes of this

motion, even assuming those transfers were inconsistent with the statement that loans would be

for the Farms' "working capital," the Indictment contains no allegations that Mr. Kwok authored,

caused to be made, disseminated, or was even aware of that statement.  *See Rio Tinto*, 2019 WL

1244933, at *13 (in order to be liable under 10(b) based upon a misstatement, a speaker must have

"made" the alleged misstatement); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d

at 198 ("The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive,

manipulate, or defraud.'"); *Stephenson v. Citgo Group Ltd*., 700 F.Supp.2d 599, 619 (S.D.N.Y.

2010) ("Under New York law, a fraud claim requires a material misstatement, known by the

perpetrator to be false…") (citation omitted).  Absent some proof that Mr. Kwok knowingly made

or caused to be made any false statement, then he cannot be liable for fraud, even if the raised

funds were spent inappropriately (and they were not), because he did not knowingly communicate

anything misleading to the participants in the Farm Loans.  *See United States v. Berlin*, 472 F.2d

1002, 1008 (2d Cir. 1973) (reversing conviction for submission of false information to Federal

Housing Administration because indictment failed to plead knowledge of falsity, an element of the crime). Counts Four and Five should be dismissed.

> **(3)     The G|CLUBS Counts (Counts Six and Seven) Should Be Dismissed for Failing to Allege a Material Misrepresentation or Omission**

The gravamen of the G|CLUBS Counts appears to be that Mr. Kwok made certain alleged misstatements to induce Mr. Kwok's followers to purchase G|CLUBS memberships, and then misappropriated a portion of the funds for their own personal benefit.

> **(a) The Indictment's Allegations of Misappropriation of G|CLUBS Membership Fees Do Not Support a Fraud Claim**

Mr. Kwok disputes that he misused any G|CLUBS funds and will demonstrate as much at trial if necessary. But, even accepting the government's allegations as true (as the Court must for purposes of Mr. Kwok's motion to dismiss), these allegedly misappropriated funds cannot form the basis of the G|CLUBS Counts because the Indictment does not allege that Mr. Kwok, his co-defendants, or indeed anyone, made any representations to prospective G|CLUBS members about *how the G|CLUBS membership fees would be used*. While the Indictment alleges that fees were not used to "fund the business of G|Clubs" (Ind., ¶ 16), it fails to allege that Mr. Kwok or anyone represented that the funds would be used in that manner. Without such a commitment, there is no falsity to support a securities or wire fraud charge. *See Finnerty*, 533 F.3d at 148-49 (no securities fraud where government did not show that defendant had communicated anything misleading to his alleged victims and government merely "undertook to prove no more than garden variety conversion"). Indeed, the lack of any statement at all as to the use of G|CLUBS membership fees also dooms any "half-truth" theory. *See Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 2000 & n.3 (2016) ("half-truths" are "*representations that state* the truth only so far as it goes, while omitting critical qualifying information") (emphasis added).

Thus, the only avenue left for the government is an omissions theory.  But the "plain language" of the securities laws "makes it clear that liability for an omission pursuant to subsection (b) requires a statement to have been made" in the first place.  *United States v. Bongiorno*, No.-05 CR.-390 (SHS), 2006 WL 1140864, at *8 (S.D.N.Y. May 1, 2006); *see In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 181 (W.D.N.Y. 2022), *appeal withdrawn sub. nom. Les Investissements Kiz. Inc. v. Eastman Kodak Co.*, No. 22-2788, 2023 WL 3149527 (2d Cir. Jan. 26, 2023) ("Rule 10b-5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state.").  Even assuming Mr. Kwok and others did not disclose that G|CLUBS membership fees would be used to purchase the Mahwah Facility, this would not be actionable as securities fraud because no statement concerning the use of the membership fees was made at all.  *See In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d at 187 (dismissing § 10(b) claim based on alleged material omission where "Plaintiffs have not viably pled that Defendants contravened an affirmative legal disclosure obligation, nor that Defendants omitted information necessary to prevent the statements at issue from being misleading"); *see also Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021) (dismissing claim for securities fraud based on alleged material omission, noting that "disclosure is not a rite of confession").

Similarly, with respect to wire fraud, in the absence of an affirmative misrepresentation, the government must allege an "[o]mission of material information that the defendant has a duty to disclose."  *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).  A defendant has a "duty to disclose" when they "ha[ve] information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."  *Chiarella v. United States*, 445 U.S. 222, 228 (1980) (internal quotation and citation omitted); *see also United States*

*v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002) (same).  The Indictment alleges none of this with respect to Mr. Kwok—it does not allege that he had a fiduciary duty to anyone (nor could it) or that he had a relationship of "trust and confidence," as defined by the relevant securities regulations, with his followers.  *See* 17 C.F.R. § 240.10b5-2(b) (describing circumstances giving rise to relationship of "trust and confidence").  Thus, the allegations of misappropriation of funds do not support any of the G|CLUBS Fraud Claims.

Although the Indictment seeks to smear Mr. Kwok and his other defendants by accusing him of "misappropriation" (Ind., ¶ 15(b)-(c)), even under the government's description such transactions are not improper.  G|CLUBS' business model, even as alleged, is simple: in exchange for membership fees, G|CLUBS provides membership benefits.  (*See id.*)  That is no different than any number of familiar businesses, like gyms or streaming services—their users pay membership fees in exchange for benefits.  By offering these services in exchange for membership fees, the owners of these types of businesses are not committing to their members that they will use their membership fees, *i.e.*, the business's revenues, in any specific way.  No Hulu user can complain, for example, that the owners of that company choose to use their profits to buy themselves a new car or home.  Similarly, absent any representation about how the membership fees would be used, G|CLUBS users cannot be defrauded if the owners of that business (who are not even alleged to include Mr. Kwok (Ind. ¶ 11)), choose to spend the fees earned by their business on whatever they choose.

### (b) The Government's Other Alleged Misrepresentations with Respect to G|CLUBS Fare No Better

Against this backdrop, the Indictment's remaining allegations about G|CLUBS fall flat. The Indictment alleges, in essence, that G|CLUBS members were not provided with the bargained-for benefits in return for their fees.  While that allegation is false, such a claim that G|CLUBS

members contracted for certain benefits, but then did not receive them, sounds in contract, not in fraud. *See Graham v. Select Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 511 (S.D.N.Y. 2016) ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.") (quoting *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)); *Haymount Urgent Care PC v. GoFund Advance LLC*, No. 22-CV-1245 (JSR), 2023 WL 5521901, at *7 (S.D.N.Y. Aug. 28, 2023) (dismissing alleged wire fraud claim, noting, "[a] breach of contract, without more, does not amount to actionable wire fraud"); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 405 (S.D.N.Y. 2000) ("Without making any legally sufficient allegation of fraud, Plaintiffs cannot allege mail fraud. Clearly, the Plaintiffs in this case are simply attempting to dress a common law breach of contract . . . claim as a RICO claim.").[13]

With respect to the Indictment's allegations that Mr. Kwok and Mr. Je misrepresented (i) that G|CLUBS members would receive shares in "Kwok-affiliated entities" and (ii) the number of G|CLUBS members as of July 2020, these allegations cannot save these counts. *First*, as detailed above, Mr. Kwok did not provide any timeline for when G|CLUBS members would receive equity in these "Kwok-affiliated entities" and thus, his statement cannot be contradicted. Accordingly, it is not actionable as fraud. *Connolly*, 24 F.4th at 833 ("A false statement requires, of course, a 'statement,' which the Supreme Court has characterized as an assertion of fact capable of

---

[13] The government's allegations are particularly tenuous given that the G|CLUBS membership agreement ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

confirmation or contradiction."). *Second*, the lack of any terms setting forth how G|CLUBS members would receive such equity, how much equity they would receive, when the equity award would happen, or what would trigger the equity award renders any alleged promises of equity too speculative to be material. *See Contorinis*, 692 F.3d at 143. Thus, these alleged misstatements are not actionable as securities or wire fraud.

Finally, the Indictment alleges that in July 2021, Mr. Kwok overstated the number of G|CLUBS members who had purchased memberships at that point. (Ind., ¶ 15(d).) The Indictment claims this statement was false because internal G|CLUBS records from August 2021 showed that the fewer members had subscribed for club memberships. (*Id.*) The missing connective tissue between these allegations, however, is any allegation that Mr. Kwok was aware of these internal documents or otherwise knew of the purportedly accurate G|CLUBS membership numbers. To sustain a fraud charge, however, the Indictment must allege that Mr. Kwok made a knowing misrepresentation, not simply that he was mistaken or inaccurate. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198; *Stephenson*, 700 F. Supp. 2d at 619; *Retirement Bd. of Policemen's Annuity and Benefit Fund of Chicago v. FXCM Inc.*, 767 F. App'x 139, 142-143 (2d Cir. 2019) (dismissing claim based on "fraud by hindsight," noting that "[c]orporate officials need not be clairvoyant") (quoting *Novak*, 216 F.3d at 309).

### (4)    The Himalaya Exchange Count (Count Eight) Should Be Dismissed for Failing to Allege a Material Misrepresentation or Omission

The Himalaya Exchange Count alleges a wire fraud theory based on the alleged statements made by Mr. Kwok (1) relating to the reserves and/or assets backing HCN, (2) conveying that Mr. Kwok would "bear" losses incurred by HCN purchasers, and (3) relating to the technical operation of the Himalaya Exchange, HCN, and HDO. (Ind., ¶¶ 18, 22.) The Himalaya Exchange Count,

reflects the government's palpable confusion about the workings of digital currencies, and should also be dismissed.

*First*, the Indictment alleges that Mr. Kwok falsely stated that HCN had the "attribute of currency" because "[i]t has 20% gold . . . it is linked to gold . . . clear gold directly . . . no matter how much it raises, 20% will turn to gold." (*Id.*, ¶ 18(a).)  The Indictment further alleges that Mr. Kwok misrepresented that "[i]f the H coin is worthless, [the issuer of Hcoin] can sell all 20% of gold, exchange it to you, and become your money . . . [o]r take all the value of 20% gold and ask everyone to unify it and make it yours."  (*Id.*, ¶ 18(b) (second alteration in original).)  Even assuming this statement is inaccurate, it is not material.  Regardless of whether HCN was literally "linked to gold," the "*meaningful*" manner in which statement would actually "*matter*" to an investor is in assessing whether HCN was adequately backed by assets to protect its value in the event in a downturn.  *See Calderon*, 944 F.3d at 86.  There is no allegation in the Indictment that there was any a deficit in the reserve—indeed, to the contrary, the Indictment alleges that the government seized more than $450 million from the exchange (which, could act as a reserve) and that, despite Mr. Kwok's arrest and the seizure of funds, the value of HCN has not declined (meaning that market participants, *i.e.*, the government's alleged victims, are not concerned about the value of their coins crashing or that the coins are inadequately backstopped).  Moreover, even if Mr. Kwok did erroneously claim that the reserve was comprised in part by gold, the Indictment does not allege that Mr. Kwok had any unique knowledge about or access to the manner in which the Himalaya Exchange maintained its reserve, be it in gold, cash, or some other asset.  Thus, the Indictment does not allege that this was a knowing misrepresentation. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198; *Stephenson*, 700 F.Supp.2d at 619.

*Second*, the Indictment alleges that Mr. Kwok falsely stated that "I can sell H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money . . . [A]nd you can buy anything immediately." (Ind., ¶ 18(d).) It is unclear what, precisely, the Indictment views as false about this statement, given that the Indictment goes on to allege that "HCN purportedly could be traded for only HDO (and only on Himalaya Exchange), and HDO purportedly could only be converted to or from fiat currency (only on Himalaya Exchange)." (*Id.*, ¶ 22.) That is precisely what Mr. Kwok said—that one could trade HCN for HDO on the exchange and then, through the exchange, redeem the HDO for fiat currency, which could be used to buy "anything immediately." In other words, there is no falsity even based on the Indictment's allegations. *Cf. Precedo Cap. Grp. Inc. v. Twitter Inc.*, 33 F. Supp. 3d 245, 253 (S.D.N.Y. 2014) (allegations in complaint that are "contradicted by more specific allegations or documentary evidence are not entitled to a presumption of truthfulness") (internal quotation and citation omitted).

Moreover, to the extent the Indictment claims that Mr. Kwok omitted that the exchange had "discretion" whether to honor a conversion from H-Dollar into U.S. dollars, the Indictment does not allege that Mr. Kwok had the kind of special or fiduciary relationship with any token purchaser requiring disclosure of that fact, as it must to charge wire fraud based on an omission, *see Autuori*, 212 F.3d at 118; *see also Chiarella*, 445 U.S. at 228. Nor can the Indictment rely on a "half-truth" theory, because even if true, the information was available to the token purchasers. Specifically, the Indictment alleges that exchange users could access the Himalaya Exchange White Paper that disclosed the exchange's "discretion" in honoring conversion requests *on its website*. *See Halperin*, 295 F.3d at 360 (finding alleged misstatement not to be material in light of the fact that investors were informed of substantial risks associated with investment); *see also Livingston*, 966 F. Supp. 2d at 218 (finding oral statements could not form the basis of a securities

fraud action where those statements were contradicted by formal SEC reports on which investors would rely).

*Third*, the Indictment alleges that Mr. Kwok falsely represented HCN as a cryptocurrency even though it could not be exchanged for other currencies.  (Ind., ¶ 22.)  The contention that HCN could not be exchanged for other currencies is merely another way of restating that HCN was not liquid at the time.  But even if that contention were credited for purposes of this motion only, that does not distinguish H-Coin from established cryptocurrencies during their early days—until a counterparty was willing to exchange some other currency or good for the cryptocurrency, that cryptocurrency similarly could not be "traded for, or converted into, other currencies."  For example, Bitcoin was not exchanged for fiat currency until approximately nine months after it was first    launched.    *See*    "Eight    Historic    Bitcoin    Transactions,"    *available    at* https://news.bitcoin.com/eight-historic-bitcoin-transactions/   (last visited Dec. 14, 2023).   Of course, no one would claim that Bitcoin was not a cryptocurrency when it was launched.  In other words, the Indictment's claim that HCN is not a cryptocurrency because it could not be traded for other currencies immediately does not reflect fraud, but merely the reality for early stage digital currencies.

*Fourth*, the Indictment faults Mr. Kwok for allegedly stating that he would backstop any losses his supporters suffered on H-Coin.  (Ind., ¶ 18(c).)  Again, while the government claims summarily that this is a misrepresentation, that claim does not hold up under scrutiny because the government cannot prove its falsity.  The Indictment itself alleges that *there have been no losses in HCN*—indeed, the price of HCN has sky-rocketed and has remained well above the opening price.  Moreover, the Indictment alleges that Mr. Kwok is a "purported billionaire," who, according to the Indictment, helped to raise nearly a half a billion dollars in little more than a month.  (*Id.*

40

¶¶ 6(a), 25(a).)  Even *if* HCN holders suffered losses (which they did not), there is no basis to assert that Mr. Kwok could not and would not have made them whole.  *See Connolly*, 24 F.4th at 833 ("A false statement requires, of course, a 'statement,' which the Supreme Court has characterized as an assertion of fact capable of confirmation or contradiction."); *see*, *e.g.*, *Freedman*, 2000 WL 630916 at *3 (when statement was true at the time it was made, it is insufficient to prove material misrepresentation to show that the statement later became untrue by virtue of a new development).

*Fifth*, the Indictment alleges that Mr. Je falsely represented that H-Dollars were used to purchase a Ferrari when that transaction had other component wire transfers.  (Ind., ¶ 21.)  This allegation reflects a profound misunderstanding of the way in which cross-currency transactions occur.  Specifically, to achieve a cross-border financial transaction generally requires a multi-stage process involving different currencies and internal bank transfers—that is the essence of correspondent banking, the lifeblood of a global economy.  For example, if a resident of Japan (the "Purchaser") wanted to buy property in the United States, they could not simply wire yen to the American seller (the "Seller"), because the Seller would not accept yen (*i.e.*, just as the Ferrari seller would not accept HDO).  Rather, at a basic level, the sale would involve multiple steps: (i) first, upon the Purchaser's instruction, the Purchaser's bank in Japan would affect an intra-bank transfer of yen from the Purchaser's account to the Japanese bank's account (*i.e.*, just like the alleged internal HDO transfer that occurred on the Himalaya Exchange (Ind., ¶ 21); and (ii) the Japanese bank would then instruct an American bank with which it has a banking relationship to wire a corresponding amount in U.S. dollars to the Seller in the United States (*i.e.*, just like the

alleged fiat wire transfer to the Ferrari's seller (*see id*.)).[14]   In this arrangement, from the perspective of the Purchaser, they purchased the property using their yen and there is nothing "misleading" about suggesting as much.   If there was, then that would, in effect, delegitimize global banking.[15]

    *Sixth*, as a result of the foregoing, the Indictment does not allege any material misrepresentation or omission in connection with the Himalaya Exchange, it does not matter that the exchange allegedly loaned $35 million to "cover" the cost of a yacht Mr. Kwok had allegedly purchased earlier.   (Ind., ¶ 23.)   Absent misleading conduct there can be no wire fraud, and thus, this transfer does not support a wire fraud charge.   *See Connolly*, 24 F.4th at 843 (government's failure to show "false or misleading [conduct] means it failed to prove conduct that was within the scope of the statute prohibiting wire fraud schemes"); *see also Finnerty*, 533 F.3d at 148-49 (no securities fraud when government did not show that defendant had communicated anything misleading to his alleged victims and government merely "undertook to prove no more than garden variety conversion"); *Stephenson*, 700 F. Supp. 2d at 619 ("Under New York law, a fraud claim requires a material misstatement, known by the perpetrator to be false…").   Accordingly, Count Eight should be dismissed.

---

[14] For more on correspondent banking transactions, *see* Appendix D -- Fundamentals of the Funds Transfer Process, U.S. Treasury Dep't, October 2006, *available at* https://www.fincen.gov/news_room/rp/files/Appendix_D.pdf.

[15] The Indictment also claims that this transaction was misleading because Mr. Je did not disclose that Relative-1 was allegedly the purchaser of the Ferrari, but fails to allege the source of any duty to disclose this fact to prospective users of the exchange.

**IV.   TO THE EXTENT THEY ALLEGE SO-CALLED "SCHEME LIABILITY,"
COUNTS THREE, FIVE, AND SEVEN SHOULD BE DISMISSED BECAUSE
THEY FAIL TO ALLEGE DECEPTIVE CONDUCT ASIDE FROM AN
ALLEGED MISREPRESENTATION**

### A.  Applicable Law

"Courts analyze claims brought under subsections (a) and (c) of Rule 10b-5 together, and

often describe claims brought under these sections as alleging 'scheme liability,'" as distinct from

liability for a misrepresentation under Rule 10b-5(b).  *Rio Tinto, plc*, 2019 WL 1244933, at *15

(S.D.N.Y. Mar. 18, 2019).   Scheme liability cannot lie where its sole basis is an alleged

misstatement or omission.  *Id.*; *S.E.C. v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006),

*superseded on other grounds as recognized in SEC v. Wey*, 246 F. Supp. 3d 894, 926 (S.D.N.Y.

2017) ("Because the core misconduct alleged is in fact a misstatement, it would be improper to

impose primary liability on Yoho by designating the alleged fraud a 'manipulative device' rather

than a 'misstatement.'"); *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme

liability under subsections (a) and (c) of Rule 10b-5 hinges on performance of an inherently

deceptive act that is distinct from an alleged misstatement."); *Walsh*, 2019 WL 294798, at *12 ("In

the Second Circuit, a plaintiff cannot make out a claim under Rule 10b-5(a) or (c) where the sole

bases for such claims are alleged misrepresentations or omissions.") (citing cases).

### B.  Discussion

To the extent they purport to assert "scheme liability," Counts Three, Five, and Seven all

fail because to proceed under such a theory under sections (a) and (c) of Rule 10 requires

allegations of deceptive conduct besides alleged misrepresentations and omissions, and these

counts fail to do so.

In each of these counts, the only alleged conduct other than then the claimed

misrepresentations is the purported "misappropriation" of funds.  But these funds were only

"misappropriated" in light of the government's (false) claim that the purported victims were misled by Mr. Kwok's and others' alleged misrepresentations into sending the funds to GTV, the Farms, or G|CLUBS.  In other words, under the government's own misguided theory, the $100 million in GTV investor proceeds invested by Saraca alleged in the GTV Counts is only problematic because the PPM purportedly made contradictory representations about how the GTV investor funds would be used.  *See supra* pp. 22-25.  Similarly, with respect to the Farm Loan Counts, the only basis to claim that the Farm Loan funds were "misappropriated" in any way is because the government claims that Mr. Kwok's supporters were duped into loaning the money through his and others' purported misrepresentations about the value of GTV, the prospect of receiving GTV equity, and the use of the funds for the Farms' "working capital."  Finally, the G|CLUBS Counts also rest on solely on the Indictment's (incorrect) allegation that Mr. Kwok and others misrepresented, for example, the number of G|CLUBS members or the types of benefits members would receive.  Thus, all of these counts should be dismissed to the extent they assert scheme liability because they fail to allege deceptive conduct distinct from the purported misrepresentation. *See Kelly*, 817 F. Supp. 2d at 344; *see also Wey*, 246 F. Supp. 3d at 926 ("Because the core misconduct alleged is in fact a misstatement, it would be improper to impose primary liability on Yoho by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'")

V.    **COUNTS NINE THROUGH ELEVEN SHOULD BE DISMISSED FOR FAILURE TO ALLEGE AN ESSENTIAL ELEMENT OF THE CHARGED OFFENSES**

A.    **Counts Nine Through Eleven Should Be Dismissed Because the Predicate Offenses Fail**

The Money Laundering Counts (Counts Nine, Ten, and Eleven) all rely on the Fraud Counts to satisfy the statutory requirement that the alleged laundering activity have a connection to "specified unlawful activity."  (Ind., ¶¶ 48, 50, 52.)  Because the Alleged Fraud Counts are

deficient as a matter of law, however, there is no "specified unlawful activity" and the Money Laundering Counts should also be dismissed.  *See United States v. Pierce*, 224 F.3d 158, 160 (2d Cir. 2000) ("Because the government thus failed to establish a fact necessary to provide wire fraud, the [defendants' money laundering] convictions cannot stand."); *United States v. Silver*, 203 F. Supp. 3d 370, 376 (S.D.N.Y. 2016) ("Silver correctly points out that a reversal or order for a new trial on the extortion and honest services fraud counts would also require a reversal or order for a new trial on the money laundering count because the specified unlawful activity that supported the money laundering conviction was the extortion and honest services fraud").

### B.    Counts Nine and Eleven Should Be Dismissed Because They Fail to Allege a Money Laundering Transaction Distinct from the Underlying Offense

Even if the underlying charges survive, Counts Nine and Eleven should be dismissed for the independent reason that they impermissibly merge with their predicate offenses.  "It has been established by the Court of Appeals for this circuit that the underlying offense element of Sections 1956 and 1957 *must be distinct from the money laundering allegation itself*."  *West 79th Street Corp. v. Congregation Kahl Minchas Chinuch*, No. 08-CV-0606 (RWS), 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004) (emphasis added) (collecting cases); *see also United States v. Shellef*, 732 F. Supp. 2d 42, 72-73 (E.D.N.Y. 2010) ("Because, by definition, money laundering involves the proceeds of unlawful activity, it is well settled that the transaction charged as money laundering cannot be the same transaction through which the funds became tainted by crime.").  Put differently, an *essential element* of the government's charges under Sections 1956 and 1957 is that the complained-of transactions be distinct from the underlying offenses.  As the Fifth Circuit aptly explained, "[s]trict adherence to this standard helps ensure that the money laundering statute will punish conduct that is really distinct from the underlying specified unlawful activity and will not simply provide overzealous prosecutors with a means of imposing additional criminal liability any

45

time a defendant makes benign expenditures with funds derived from unlawful acts." *United States v. Trejo*, 610 F.3d 308, 314-15 (5th Cir. 2010) (internal quotation and citation omitted). Counts Nine and Eleven fail to allege a transaction distinct from the underlying offenses, and these Counts must be dismissed.

To establish a violation of Section 1956(a)(2)(A), the government must demonstrate a distinct transaction by which Mr. Kwok moved funds internationally to promote the wire and securities fraud charges alleged in Counts Two through Eight. 18 U.S.C. § 1956(a)(2)(A). The Indictment alleges only a single international transaction that could support the charge in Count Nine. (*See* Ind., ¶ 32(e) ("On or about May 28, 2021, JE transferred approximately $13 million from a bank account in the UAE that JE controlled to a bank account held by an entity (owned by Relative-2) at a particular bank in New York, New York.").) But this alleged transfer is not distinct from the underlying fraud. The government alleges that Defendants defrauded investors "to enrich themselves, their family members, and their co-conspirators, and to fund KWOK's extravagant lifestyle." (Ind., ¶ 2; *see also id.* ¶¶ 4 (Defendants used fraudulently obtained money to purchase a luxury car for Relative-1 and yacht for Relative-2), ¶¶ 14(f)(i) (misappropriated funds were transferred to Relative-1 "to pay for flight crew service on a private jet"), ¶¶ 14(f)(iii) ($2.3 million of misappropriated funds used to cover maintenance expenses on luxury yacht owned by Relative-2), ¶¶ 14(f)(iv) ($10 million of misappropriated funds was transferred to personal bank accounts of Mr. Je and Mr. Je's spouse).) Put differently, the $13 million transfer in ¶ 32(e) *is,* according to the government, part of the alleged fraud, and as such cannot also serve as the basis for a separate money laundering charge.

Count Eleven also fails to allege an unlawful transaction distinct from the underlying offense. To establish a violation of 18 U.S.C. § 1957, the government must demonstrate a

monetary transaction in criminally derived property of a value greater than $10,000 that derives from "specified unlawful activity." 18 U.S.C. § 1957(a). The government alleges that Defendants violated this provision by making "a wire transfer of approximately $100 million derived from the offenses charged in counts Two and Three [*i.e.*, the GTV fraud] to Fund-1." (Ind., ¶ 52.) But again, this $100 million transaction *is*, based on the government's theory, part of the alleged fraud. Counts Two and Three allege that Defendants defrauded investors in GTV by misappropriating $100 million raised from investors and investing those funds in a high-risk hedge fund, contrary to their representations to those investors. (*See id.*, ¶ 13(h) (Defendants "misappropriated approximately $100 million raised from the investors in the GTV Private Placement and directed that those funds by placed with a high-risk hedge fund ('Fund-1') for the benefit of Saraca and its ultimate beneficial owner, Relative-1. This transaction was contrary to the PPM's representations to prospective GTV investors about how investments in GTV would be used.").) Because this transaction is at the heart of the alleged fraud in Counts Two and Three, it cannot also serve as the basis for a separate money laundering offense, and Count Eleven must therefore be dismissed.

### C. In the Alternative, Count Nine Should Be Dismissed Because It Fails to Allege an International Transaction Made with the Intent to Promote Unlawful Activity

On the other hand, if the government tries to contend that Count Nine's transaction is distinct from the fraud, then the count should be dismissed because the government has failed to allege another essential element of 18 U.S.C. § 1956(a)(2)(A): an international transfer of funds made "with the intent to promote" the alleged wire fraud and securities fraud. To establish a violation of Section 1956(a)(2)(A), the government must demonstrate that Mr. Kwok (1) moved funds internationally (2) "with the intent to promote the carrying on of" wire fraud and securities fraud. *Pierce*, 224 F.3d at 165; 18 U.S.C. § 1956(a)(2)(A).

To establish that a financial transaction was made "with the intent to promote" criminal activity, the government must show that the challenged transaction facilitated, aided, or carried on the alleged unlawful activity.  *See United States v. Olaniyi-Oke*, 199 F.3d 767, 770 (5th Cir. 1999) (purchases not intended for use in scheme were not made with "intent to promote" specified unlawful activity).  As discussed above, the Indictment alleges only a single international transfer to support Count Nine.  (*See* Ind., ¶ 32(e) ("On or about May 28, 2021, JE transferred approximately $13 million from a bank account in the UAE that JE controlled to a bank account held by an entity (owned by Relative-2) at a particular bank in New York, New York.").)  The allegation in paragraph 32(e) does not say *anything* about how the $13 million transfer relates to the promotion of unlawful activity, which, in this case, is the alleged fraudulent inducement of members of the movement to contribute to GTV, the Farm Loans, and G|CLUBS.  Those alleged frauds, however, were "complete" when the purported victims sent the money in reliance on these alleged misrepresentations (and indeed, before, when the alleged misrepresentations were made).  The UAE transaction, however, occurred after the purported frauds were completed, and does not otherwise help to further any fraud—it does not, for example, fund the production of a video containing misrepresentations about the Farm Loans or finance the dissemination of the PPM in connection with the alleged GTV fraud.  This transfer, at best, shows that one of the co-defendants allegedly sent some of the purported fraud proceeds to a bank account belonging to Relative-2, which funds constitute the proceeds of the fraud, not the continuance of it .  *See*, *e.g.*, *United States v. Jackson*, 935 F.2d 832, 841 (7th Cir. 1991) ("The government did not prove that the cellular phones played the same role—or indeed, any role—in Davis' drug operations as the beepers. Likewise the rental payments and the checks written to cash; certainly these expenditures

maintained Davis' lifestyle, but more than this is needed to establish that they promoted his drug activities."). Accordingly, Count Nine should be dismissed for this reason as well.

## VI.    COUNT ONE OF THE INDICTMENT SHOULD BE DISMISSED AS IMPERMISSIBLY DUPLICITOUS & FOR FAILURE TO STATE AN OFFENSE

In Count One, the Indictment alleges that Mr. Kwok and his co-conspirators participated in a single, overarching conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering "through a series of complex fraudulent and fictitious business and investment opportunities that connected dozens of interrelated entities." (Ind., ¶ 1.) But the allegations in Count One show not one continuous scheme but four separate, independent alleged conspiracies related to four separate, independent schemes: the GTV Private Placement, the Farm Loans Program, G|CLUBS, and the Himalaya Exchange. Mr. Kwok is innocent of these charges and will demonstrate as much if Count One is ever presented to a jury. No jury, however, should pass on Count One because it (a) is impermissibly duplicitous; and (b) fails to state an offense.

Count One seeks to criminalize not a single conspiracy but four separate conspiracies. Permitting them to proceed in a single count would prejudice Mr. Kwok in the exact manner that the rule against duplicity seeks to avoid: by exposing Mr. Kwok to a verdict in which the jurors are not unanimous about the specific conduct deemed to be illegal, raising the possibility that Mr. Kwok could be sentenced for crimes of which a jury did not convict him, and permitting the government to introduce inadmissible evidence to the jury. Count One should therefore be dismissed as impermissibly duplicitous.

Moreover, because, as discussed further below, the purported schemes that the government charges are not—as a matter of law—illegal schemes at all. *See supra* pp. 9-44. Accordingly, they cannot be the object of an illegal conspiracy as charged in Count One. *See Pierce*, 224 F.3d at 160, 165.

### A.    Applicable Law

An indictment is impermissibly duplicitous where (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a "separate count for each offense," and (2) the defendant is prejudiced thereby. *Sturdivant*, 244 F.3d at 75.  Prejudice occurs when a "challenged indictment affects [the duplicity] doctrine's underlying policy concerns: (1) avoiding uncertainty of general guilty verdict by concealing finding of guilty as to one crime and not guilty as to other, (2) avoiding risk that jurors may not have been unanimous as to any one of the crimes charged, (3) assuring defendant adequate notice of charged crimes, (4) providing basis for appropriate sentencing, and (5) providing adequate protection against double jeopardy in subsequent prosecution." *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) (citing *United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981)).

While "a single count of a conspiracy to commit several crimes is not duplicitous," *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) (internal quotations and citations omitted), a conspiracy count may be duplicitous where it alleges separate independent schemes, *see United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013).  The critical factor is whether the "acts [at issue] could be characterized as part of a single continuing scheme." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989).  When the alleged conspiracy cannot reasonably be characterized as a single comprehensive scheme, dismissal of the count as duplicitous is appropriate. *See United States v. Nachamie*, 101 F. Supp. 2d 134, 153 (S.D.N.Y. 2000) ("[A] court could conclude, as a matter of law, that the allegations in a single conspiracy count improperly charge multiple conspiracies."); *Abakporo*, 959 F. Supp. 2d at 391 (granting motion to dismiss duplicitous conspiracy count).

**B.**     **Count One Impermissibly Combines Multiple Conspiracies**

While the Indictment attempts to unite the independent alleged "schemes" into a single conspiracy by alleging that they were characterized by "promising outsized financial returns and other benefits" to the purported victims and motivated by Defendants' desire to "enrich themselves, their family members, and their co-conspirators," *id.* ¶ 2, the allegations, even if the government could prove them, fail to allege a "single continuing scheme," as required to make out a conspiracy. *See Tutino*, 883 F.2d at 1141.   In determining whether a single conspiracy exists, courts consider "whether there is mutual dependence among the participants, a common aim or purpose or a permissible inference from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000) (quoting *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989)).   "Multiple conspiracies exist where the evidence shows separate networks operating independently of each other." *United States v. Alkins*, 925 F.2d 541, 554 (2d Cir. 1991).

Here, Count One alleges four separate criminal schemes, each involving separate entities and methods, not a single unified conspiracy.   The disparate schemes involve different actors, entities, and methods:

- *First*, while Count One charges all three of the defendants for conspiring with respect to all four alleged schemes, the remainder of the Indictment charges Ms. Wang only in connection with the GTV Counts, and not the others.

- *Second*, each alleged scheme involved different entities.   The GTV Counts involved GTV and Saraca, the Farm Loans Counts involved an informal group of regional Farms; the G|CLUBS Counts involved G|CLUBS, and the Himalaya Exchange Count involved the Himalaya Exchange.

- *Third*, each conspiracy involved different methods  While the Indictment alleges (incorrectly) that each of these alleged schemes involved misrepresentations, the purported misstatements are distinct.   In the case of the GTV Counts, the

misstatements are made in the course of a private stock offering that ended prior to any of the other alleged schemes.  With respect to the Farm Loans Counts, the GCLUB Counts, and the Himalaya Exchange Counts, almost all (and all in the case of the Himalaya Exchange Count) of the misrepresentations concern entities that are not GTV.  While the Indictment tries to stitch together a connection between the Farm Loans Program and G|CLUBS by pointing to alleged misrepresentations concerning GTV in the context of those schemes, those purported statements came *after the GTV Private Placement had concluded*.  (*Compare* Ind., ¶ 13(e) (alleged GTV Private Placement occurred "[b]etween on or about April 20, 2023 and on or about June 2, 2020") *with id.*, ¶ 14(c) (Kwok first promoted Farm Loan Program "[o]n or about July 22, 2020").)

Looking carefully at the allegations underlying the Indictment, it is clear that it does not charge a single overarching conspiracy, but rather four distinct schemes, requiring dismissal.  *See Abakporo*, 959 F. Supp. 2d at 391 (conspiracy count impermissibly combined separate conspiracies to commit wire fraud and securities fraud).

### C.    The Duplicitous Indictment Prejudices Mr. Kwok and Should Be Dismissed

Permitting the government to proceed on Count One poses substantial risks of an unfair proceeding to Mr. Kwok because he may be denied his constitutional right to jury unanimity and sentenced for crimes of which a jury did not convict him.  *See Abakporo*, 959 F. Supp. 2d at 390 ("By charging both conspiracies in a single count, the Government has invited the very problems to which the prohibition against duplicity is directed (jury unanimity, notice, sentencing).").  An indictment involving a duplicitous conspiracy count also creates evidentiary risks relating to the admission of co-conspirator statements.  *See United States v. Starks*, 515 F.2d 112, 117-18 (3d Cir. 1975) ("Joining conspiracy and substantive offenses in the same count present this [evidentiary] vice in a particularly aggravated form, because of the admissibility of declarations made by coconspirators.").

The potential for jury confusion and resulting prejudice to Mr. Kwok is perhaps best understood through the Indictment's curious structure with respect to which alleged co-conspirator is charged in which count.  Count One claims that Mr. Kwok conspired with both Ms. Wang and

Mr. Je to commit the four alleged schemes, *i.e.*, that they all agreed to engage in that conduct.  But then, when it comes to three of the underlying schemes (the Farm Loans Counts, the G|CLUBS Counts, and Himalaya Exchange Count)—the very objects of the alleged conspiracy—then only Mr. Kwok and Mr. Je are charged.  Thus, there is a very real risk of jury confusion as to what conduct is actually covered by Count One, resulting in "the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another" and "the risk that the jurors may not have been unanimous as to any of the crimes charged."   The confusion also creates the possibility that the overly broad conspiracy count allows the government to smuggle in statements by Ms. Wang as alleged co-conspirator statements and use them against Mr. Kwok in connection with the substantive counts in which he, but not her, is charged.  *See Starks*, 515 F.2d at 117-18 ("Joining conspiracy and substantive offenses in the same count present this [evidentiary] vice in a particularly aggravated form, because of the admissibility of declarations made by coconspirators.").The Court should accordingly dismiss Count One.

## **CONCLUSION**

For the foregoing reasons, Mr. Kwok respectfully requests that the Court dismiss the Indictment in its entirety.

Dated: New York, New York
December 14, 2023

PRYOR CASHMAN LLP

By: _____
Sidhardha Kamaraju
E. Scott Schirick
Matthew S. Barkan
Daniel J. Pohlman
John M. Kilgard
Clare P. Tilton

7 Times Square
New York, NY 10036
(212) 421-4100
skamaraju@pryorcashman.com
sschirick@pryorcashman.com
mbarkan@pryorcashman.com
dpohlman@pryorcashman.com
jkilgard@pryorcashman.com
ctilton@pryorcashman.com

Sabrina P. Shroff
80 Broad Street, 19th Floor
New York, NY 10004
(646) 763-1490

*Attorneys for Defendant Ho Wan Kwok*