## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>      **Complainant**<br><br>      **-v-**<br><br>**HO WAN KWOK,**<br>      **a/k/a "Miles Guo,"**<br>      **a/k/a "Miles Kwok,"**<br>      **a/k/a "Guo Wengui,"**<br>      **a/k/a "Brother Seven,"**<br>       **a/k/a "The Principal,"**<br><br>**KIN MING JE,**<br>      **a/k/a "William Je," and**<br><br>**YANPING WANG,**<br>      **a/k/a "Yvette,"**<br><br>**Defendants.,**<br><br>      **Defendant.** | Criminal No.:   23 Cr. 118 (AT)<br><br><br>**REPLY OF THIRD PARTY CUSTOMERS OF THE HIMALAYA EXCHANGE ON THEIR MOTION FOR RETURN OF PROPERTY SEIZED BY COMPLAINANT** |

Customers of the Himalaya Exchange, by and through undersigned counsel, Bradford L. Geyer, Esq., whose investments in the Exchange have been seized as actions ancillary to the core criminal prosecution in this case, hereby file this REPLY to the Government's letter objection, in support of their Motion for the Return of Property Seized by the Complainant, United States of America.

### TABLE OF CONTENTS

I.      The Big Picture:  Himalaya Exchange Thrown In As An After-Thought      4

II.      Parallel Chapter 11 Bankruptcy  In Connecticut And Objection Here      3

III.      Lack Of Jurisdiction Over The Himalaya Exchange      6

IV.      Points Of Clarification:      8

V.      Purported Customers Assertion:                                10

VI.     Customer Data Safety Concerns:                               13

VII.    Doj's Responsibility For Customer Safety:                    18

VIII.   Data Protection And Legal Obligations:                       18

IX.     Hamalaya Exchange Not Part Of Bankruptcy Estate             19

X.      Allegations Of Indictment Paragraph 21:                      32

Undersigned counsel now represents in excess of 3,539 customers of the Himalaya Exchange ("the Exchange"), who hold Himalaya Dollar (HDO) and Himalaya Coin (HCN) cryptocurrency ("Petitioners"),[1] but who have been prevented by the actions of the DOJ and prosecutors in the Southern District of New York from withdrawing their investments into hard currency removed from the Exchange, creating a total loss of their investment funds.

Undersigned counsel addresses and replies to the Government's response to the Motion for Return of Property, dated December 7, 2023 [2] (Attachment A - ECF 188) that counsel received without any discernible effort to engage in a meet-and-confer process after learning about the filing via Twitter.

---

[1] https://himalaya.exchange/web/hex Undersigned counsel estimates represented Exchange customers will continue to increase as word of mouth reaches other victims who until now have never received notification from the Government about their funds being seized and it becomes clear that our intentions are authentic and genuine. Among the challenges that exist, many Exchange customers are fearful and ironically assume the U.S. government action may be a stalking horse for other governments.

[2] In light of the Government's Response, we will seek leave to amend the motion and proposed order for relief. The Government's Response confirms the need for this Court to exercise its equitable jurisdiction in this matter. The petitioners have no adequate remedy at law to protect their confidentiality and to ensure the return of their seized assets without the hardships outlined in their Motion that will be caused by extreme delay. See ." De Almeida v. United States, 459 F.3d 377, 382 (2d Cir. 2006)(" (1) the movant has "no adequate remedy at law", and (2) "the equities favor the exercise of jurisdiction." ) The petitioners require the Court's supervision over the actions of federal law enforcement officials." Id. at 382 (internal quotation marks omitted) (citing Floyd v. United States, 860 F.2d 999, 1003 (10th Cir. 1988) and Hunsucker v. Phinney, 497 F.2d 29, 34 (5th Cir. 1974)).

The U.S. Department of Justice ("DOJ") purports to be protecting the undersigned counsel's clients against being defrauded through the solution of the DOJ itself seizing counsel's clients' funds and depriving them of their investments.  Thus, the DoJ is causing the harm they purport to be seeking to avoid.  The DOJ is involved in conversion of counsel's client's investment funds into U.S. Treasury funds.

The DoJ's actions in this Court and others place the Honorable Presiding Judge in the uncomfortable position of likely causing a total loss of the funds of at least 3,539 investors and thousands of other investors, in the name of protecting them.  The black eye to this Court that is developing of a total loss of the investment of those to be protected, which the DoJ is creating, is caused by directly seizing counsel's client's funds in the form of the Himalaya Exchange's reserve funds.

In addition to the loss of HDO stable coin funds, which is pegged 1:1 by the USD cash reserve, currently seized by the DoJ,  counsel's clients have already incurred a substantial devaluation of $136M of their HCN trading coin value as a result of the seizure. Taking into account the price before seizure and the current price of the HCN, the difference is a $136M devaluation loss that clearly qualifies under Article 3 to approach this Honorable Court. This only relates to the current represented customers.  If the HDO stable coin reserve is not restored to counsel's clients and the HCN value ends up at zero then the total loss/damages will amount to an estimated $329,737,812 exclusive of reserves.  Undersigned counsel's clients hold both HDO coin and HCN coin balances. Therefore, the longer the delay in the resolution of repayment the greater the loss is likely to be to counsel's clients.  If this is left as suggested by the DoJ until after the trial where the forfeiture procedure commences there is serious risk of irreparable harm to counsel's clients. If  the HCN crashes to zero they will have lost all of their investment. The

DoJ seemed to ignore this issue in their Response and fail to acknowledge the possible draconian consequences that are likely to flow from their ill-informed seizure.

## THE BIG PICTURE:  HIMALAYA EXCHANGE THROWN IN AS AN AFTER-THOUGHT TO UNRELATED PROSECUTION

The allegations in the indictment lodged with this Court concern various actions by Kwok and Je.

The Himalya Exchange, is a company organized and resident in the British Virgin Islands ("BVIs"), a country which became independent of the British Crown around 1850.  Under the U.S.A.'s diplomatic positions and treaties and the Caribbean Basin Initiative, the U.S. Government is committed to respecting the sovereignty, independence, and importance of smaller countries like the BVIs.

Furthermore, the indictment confesses that the Himalaya Exchange was created and is operated now under "foreign based companies."   Therefore, the Himalaya Exchange is not a U.S. company, but a company of the British Virgin Islands, an independent sovereign country. And the DOJ admits that it in turn is operated by "foreign based companies."

Not only is the Himalaya Exchange thrown into this mix as an after-thought, but it is distinctly different in that the U.S. Government has no jurisdiction over the Exchange.   We have a complex series of many transactions involving many companies, and then the Exchange was simply pulled in for no discernible reason.

The only slender thread by which there is an attempt to bring the Exchange into this case at all are vague and legally unfounded concepts.

The indictment neither explicitly nor implicitly alleges any hint of wrongdoing by the Himalaya Exchange itself or any of the undersigned's clients.

Curiously, the DOJ describes the Himalaya Exchange in the past tense.  In fact, the Exchange is still operating, yet without the ability to redeem digital currency for hard currency because the DOJ is holding the reserve funds seized from the Exchange.  Why the DOJ views the Exchange in the past tense is curious.  Is this an awareness that the DOJ itself planned to kill off the Himalaya Exchange?

**PARALLEL CHAPTER 11 BANKRUPTCY  IN CONNECTICUT AND OBJECTION HERE**

I also acknowledge the involvement of Bankruptcy Counsel representing the Chapter 11 Trustee Luc Despins and have enclosed a letter addressed to the same counsel today (Attachment B). The updated Motion for Return of Property, aims to streamline the issues, economize judicial resources, and prevent the creation of an ethical cloud over the criminal case.

 Additionally, I raise concerns about potential compromises to counsel's client's confidentiality due to the Chinese connections of the Bankruptcy attorneys to its Chinese office (Attachment C : ECF 561). This is of great concern.

The Paul Hastings letter filed on behalf of Luc Despins (Attachment D -ECF 189 without notice or any meet-and-confer effort-) asserts that counsel's customer motion implicates property of the chapter 11 estate and claims that relief granted by the Honorable Court would violate the automatic stay.  The bankruptcy is in the U.S. Bankruptcy Court of the District of Connecticut.

It should be noted that the Trustee Luc Despins in the Connecticut Chapter 11 proceeding, although not speaking for himself but only through counsel at Paul Hastings who are not appointed as Trustees, is clearly engaged in massive "churning" of this case, requesting that

counsel's clients and others pay Despins' fees and expenses of **which he has made claims already in excess of $21 million**. Thus, it appears that those who are supposed to be protected by this case are in fact being plucked like chickens. The massive number of filings in the Chapter 11 bankruptcy case and enormous fees and expenses being requested are no doubt likely to be paid out of customer funds if the Trustee oversees any fund distribution and are further reasons for concern by this Court. Please see the astronomical fees claimed by the trustee to date (Attachment E) and the highlighted text suggesting that the trustee has an concerning interest in counsel's clients' funds (Attachment E1)..

## LACK OF JURISDICTION OVER THE HIMALAYA EXCHANGE

In this case here in this Court and in the Chapter 11 case in the U.S. Bankruptcy Court for the District of Connecticut, the DOJ is suffering from several major mistakes.

The Himalaya Exchange is based in the British Virgin Islands.  It has no connection with the United States of America.  The governing documents forbid any transaction with any U.S. resident or any person transacting on behalf of or as trustee or agent for any such person.

Therefore, the DOJ has no jurisdiction over the Himalya Exchange or counsel's clients as they never committed any act or omission that would create U.S. jurisdiction.

There are no allegations that the Himalaya Exchange committed any act or omission that would create U.S. jurisdiction. While the indictment seems to be written to induce assumptions, none of the activities of the Himalaya Exchange took place within U.S. jurisdiction.  If a Manhattan-based stock advisor recommended in his investment newsletter investing in biodiesel projects in the Bahamas, that would be the advisor's action.  Being mentioned by a U.S. person would not be an act by the Bahamian company within the United States.  By prohibiting any

transaction with the United States, the Himalaya Exchange makes clear that there is no jurisdiction by the United States of America and that the Exchange has been designed to prevent any jurisdiction of the U.S. Government over any of the Exchange's activities.

Therefore, the DOJ has no jurisdiction over the Himalaya Exchange or counsel's clients. Indeed, in Paragraph 11 of the indictment (which we assume the DOJ wrote for the Grand Jury to sign), the DoJ writes

**"… Kwok held no formal position or title at the Himalaya Exchange."**

Therefore, the DoJ admits that nothing Kwok did or alleged against Kwok has any relevance to the Himalaya Exchange either as to its involvement in any fraud by Kwok, as any instrumentality of Kwok.

Instead, the indictment confusingly and vaguely attempts to combine unrelated issues of Hon Wan Kwok (Miles Guo) and King Ming Je, to obscure and inter-mingle matters that do not apply to the Himalaya Exchange.

Furthermore, while admitting that only Je has any relevance to the Himalaya Exchange, the DOJ through paragraph 11 of the indictment alleges that the Himalaya Exchange was

**"founded and operated through various entities he [Je] owned, which were based abroad."**

Therefore, the DOJ admits that at all times it knew and knows now that the Himalaya Exchange is outside of the jurisdiction of the United States of America.   Not only are there no facts to bring the Himalaya Exchange within the jurisdiction of this Court, the Connecticut Bankruptcy Court, or the DOJ or SEC, but even the parent companies of the Exchange are "based abroad."

In paragraph 11, the indictment vaguely makes obscure references to the idea that other Kwok / Guo entities had "purported business relationships with the Himalaya Exchange."

However, one does not describe any ownership relationship as a "business relationship." A "business relationship" implies a lack of ownership and a lack of direct control, but instead an arm's length free-market transaction.

Furthermore, of course there is nothing illegal or potentially illegal about a "business relationship." And the nature of this comment is unexplained. Did the Exchange buy office supplies or left-over office furniture unwanted by other companies?

Nevertheless, the Himalaya Exchange is under the jurisdiction of the British Virgin Isles.

**POINTS OF CLARIFICATION:**

A second major mistake, related, of the DOJ's actions is failing to investigate that the roughly $335 million to $609 million (per the indictment's numbers) which the DOJ admits that it seized is beneficially owned by counsel's clients and other customers of the Exchange and is held in trust for counsel's clients and other customers. Using the indictment's numbers supplied by the DOJ, the indictment recites that DOJ seized $335 million from the Himalaya Exchange but then says DOJ later seized $274 million from both the Himalaya Exchange and G|Clubs together, without clarifying how much was seized from the Himalaya Exchange rather than from G|Clubs. Therefore, the indictment is unclear about the seizure from the Himalaya Exchange alone, but the Forfeiture bill of particulars (ECF 38 Attachment F) indicates a total of $302,081,718.48 for all Himalaya related accounts.

The DOJ has at every stage confused the Himalaya Exchange's funds as if they were the funds of the criminal Defendants in this case, Kwok and Je. The funds seized by the DOJ are the reserve funds guaranteeing counsel's clients' investment in the HDO digital currency.

Strangely, the indictment tries to twist the reality that the reserve funds seized by DOJ are beneficially owned by counsel's clients and held in trust on their behalf into a basis for fraud.

This is no different from the fractional reserves of a bank to protect depositors, except that here the reserves are 100% of redemption value, not partial or fractional reserves.

If bank examiners observed that a bank was secured by $500 million in fractional reserves, then seized those reserves, forcing the bank into insolvency, they could not plausibly claim that the bank's promises to depositors were originally fraudulent because the government later seized the bank reserves, causing the problem.

By seizing the reserve fund of the Himalaya Exchange, the DOJ has destroyed the investments it is purporting to protect. Undersigned counsel's clients are incapable of converting their crypto currency investments into hard money by redeeming the digital HDO "coins" from the reserve fund. Thus, holders of the coins can trade HCN coins, but cannot withdraw their profit of those trades received in HDO into U.S. dollars and remove their money.

The DOJ attempts to hint at customer redemption being a false promise. In fact, based on the financial information provided, counsel's clients received a total of $26,772,727.65 in redemption to date into their own named bank accounts (redeeming HDO back into USD into their account). This is for the clients I represent and does not include other customers, therefore this figure is likely to be higher. This genuine and functioning process of redemption was interrupted only by the DOJ seizing the reserve fund from which redemptions are made.

Now, however, the funds held in trust as reserves and pledged to investors like counsel's clients has been stolen from them and deposited in the U.S. Treasury instead. The Exchange has therefore not been able to redeem any money back to their customers as the reserve has been taken.

While there may be some cause to ensure that the reserve funds will be used exclusively for their intended purpose of funding redemptions of investors wanting to withdraw their funds from the Exchange, perhaps putting a non-bankruptcy trustee in control of those funds, is one thing that cannot happen:  The DOJ cannot engage in conversion of client funds for the benefit of the U.S. Treasury and the churning of the Chapter 11 Trustee. Further comments are made in relation to this below.

### PURPORTED CUSTOMERS ASSERTION:

Both the Department of Justice (DOJ) and the Trustee have insinuated the presence of alleged customers, suggesting that the customers implicated in the motion are fictional. This assertion is unequivocally rejected and, to say the least, deeply unsettling.[3] Both entities claim to be safeguarding victims in distinct ways, and their entire proceedings hinge on this assumption. However, both have initiated a strategy to undermine the legitimate claims of actual victims. This strongly indicates their true motive, which is to seize and retain these funds through any available means. The anticipated approach would involve cooperation to promptly return these

---

[3] If the trustee has a concerning focus on my clients' money, the Government has a concerning focus on the identity of my clients and we are asking this Honorable Court for assistance. The meet and confer, that was partially described correctly if it should have been described at all, and which lasted 42 minutes following the government being provided with a draft of the filing, suggested a lack of concern about the sensitivity of the personal information.  How personal information is shared about my "purported" clients is a matter of great concern since the US Department of Justice has proved a poor steward of personal information even of its own employees.  ECF 186 FN10.  Here its likely the CCP government entity that compromised millions of clearance files of DOJ employees may have an even keener interest in Exchange customers identities. I can't state this more clearly: exchanging information and repatriating the funds through the wrong procedure imperils my clients.

funds to victims as proposed in the motion, and avoiding the depletion of their funds through administrative and trustee fees. Instead, they have opted for a narrative that accuses victims of falsehoods and cite legal technicalities and case law to justify their inaction. None of these arguments hold any merit  upon examination and do not offer reasonable justifications for their conduct.

The creation of a smokescreen to divert attention from the core facts should be approached with extreme caution. No compelling reasons supported by actual evidence have been provided to justify withholding these funds. In a case of this nature, one would expect the prosecuting authority to adopt an approach that aids and expedites assistance to victims with methods which do not engage depleting those Funds with extortionate admin or legal fees . However, they have taken an adversarial stance inconsistent with their professed commitment to protecting victims.

The problem in this circumstance and the motion filed by the undersigned's clients and the issue before the Court is the improper seizure of the reserve fund.  The DOJ must release the entire Himalaya Exchange reserve fund as a whole.

 It is really no concern of this Court or the DOJ how the Himalaya Exchange conducting regular business according to its business obligations and legal governing documents carries out its normal business of redeeming digital coin from that reserve fund.  The claim before the Court is that the reserve fund was improperly seized and should be returned to the custody of the Exchange operating under the laws and authority of the British Virgin Islands' Government.

Otherwise, the DOJ would have to recreate the function of the Exchange in processing individual redemptions of digital coins to many thousands of Exchange customers. That is what the Exchange does. We are not asking the DOJ to go into the cryptocurrency business.

Therefore, it is unnecessary for the DOJ or this Court to concern itself with the identity of the depositors / investors who have a claim against the reserve fund. Maybe the DOJ might conceivably have an interest in whether any of the depositors / investors in digital coin at the Himalaya Exchange are actually the same persons as the Defendants whom the DOJ is prosecuting or their agents. But that would not justify any of the DOJ's actions or the seizure of the reserve fund. The DOJ cannot seize an entire bank and impoverish 99.99999% of its depositors on the mere possibility that 2 of the depositor accounts might belong to people they are prosecuting. The focus can only be on the actual Defendants, not everyone else.

In fact, however, questions about the Exchange customers are easily answered and laid to rest – without waiving of course jurisdictional objections. But the insinuations lose sight of the situation. The issue is that the DOJ had no authority to seize the reserve funds in the first place, nor does it have the right to interrogate individual Exchange customers.

Enclosed is a letter from Candey, an independent legal firm appointed by the Exchange, confirming their commitment to overseeing the selection of an independent forensic accounting firm (Attachment G). This firm will conduct an audit to verify the authenticity of the Himalaya account number ("HID") provided by counsel's clients upon retaining legal services against the Himalaya Exchange database and verify records exist for them. This report will be ready on December 21 2003 and will be filed with the Court. Similar to a bank account number, this HID is unique to each customer account and was a requisite when consenting to the legal retainer for

representation. It cannot be arbitrarily generated and is known exclusively to the Himalaya account holder.

A comprehensive list of HIDs, completing the consent form for the Exchange to release their financial information, has been submitted to the Exchange along with the requested information for each customer, which had been received prior to the filing of the motion . Simultaneously, counsel's clients have submitted five (5) interim victim witness statements during this period.  Himalaya Customer Statements (Subtitles) - YouTube . This will in due course be followed proper affidavits and other information needed. These are a small group who at great risk have put themselves forward to be representatives of fellow customers, many of whom are counsel's clients. This is the normal course followed in class actions. The victims should not have to face procedural hurdles outside the norm in a case where they risk serious harm.

### **CUSTOMER DATA SAFETY CONCERNS:**

In response to heightened concerns regarding the security of customer data, the Exchange was requested to furnish an illustrative instance underscoring these apprehensions. As part of the compliance protocol, customers undergo ID verification and an AI facial recognition process facilitated by the independent service provider, Jumio. An alarming Jumio photograph was discovered within a customer's application, revealing potential threats directed at an individual attempting to register using her details. The attached image depicts a man brandishing a knife behind a woman applying for a customer account, prompting serious concerns about customer safety.

This unsettling discovery serves as compelling evidence of the extent to which suspicious actors are willing to go in an attempt to masquerade as genuine customers. Moreover, it raises awareness of the potential threats faced by Chinese dissidents in various scenarios. If these actors are willing to resort to such extremes for onboarding, it begs the question of the potential risks when they identify the actual customers on the Exchange. The responsibility of the Department of Justice (DoJ) is called into question, considering the serious harm to individuals that could result from any leaked data. The presented evidence is a tangible example, indicating that the fears expressed by counsel's clients are not mere exaggerations but genuine concerns. The urgency of the situation prompts reflection on whether the DoJ will recognize the gravity of the issue before irreparable damage occurs.



Home > Users > User Profile █████████ ?gmail.com

# User Profile: ███████████@gmail.com

**Profile**    WhiteListed IPs    Risk Scoring    Security Question    Supporting Documents

## User Details

| | | | | |
|---|---|---|---|---|
| ID | 11efb5eb-0127-4cb5-abed-4ec501c3f5bd | | ENABLED | ██ |
| DATE CREATED | Sunday, February 6, 2022 | | APPROVED | |
| DISPLAY NAME | ███████ | | DELETED | ██ |
| USER TYPE | Individual | | LOCKED OUT | |
| FIRST/MIDDLE NAME | ███ | | STOP DEPOSITS | |
| LAST NAME | ███ | | STOP TRADING | |
| FULL NAME | █████ | | STOP WITHDRAWALS | |
| BIRTH DATE | █████ | | FORCED TO CHANGE PASS | |
| E-MAIL ADDRESS/USERNAME | ████ gmail.com | | 2-FACTOR AUTHENTICATION | ██ |
| MOBILE PHONE | █████ | | ONLINE | |
| ADDRESS LINE 1 | ██████████ | | ABLE TO ACCESS API KEYS | ██ |
| ADDRESS LINE 2 | | | | |
| RESIDENCE COUNTRY | Taiwan | | | |
| CITY | ████ | | | |
| STATE | Please Select State  ████████ | | | |
| POST CODE | █████ | | | |
| CITIZENSHIP COUNTRY | Taiwan | | | |
| ID DOCUMENT NUMBER | ██████ | | | |
| COMMENTS | | | | |
| LAST COMMENT BY | | | | |
| FAILED LOGIN ATTEMPTS | 0 | | | |

## User Settings

| | |
|---|---|
| CURRENT TIER | 0 |
| DAILY WITHDRAWAL REMAIN | 0 ██████ |
| MONTHLY WITHDRAWAL REMAIN | ██████ USD |
| TOTAL BALANCES IN USD | 0.00 |
| DIFFERENT IP VERIFICATION | Disabled |



Home > Users > Risk Scoring: ███████ mail.com

# Risk Scoring: ████████@gmail.com

Profile    WhiteListed IPs    **Risk Scoring**    Security Question    Supporting Documents

| INTERNAL ID | HR3MJMT |
| MANUALRISKSCORE | 0    Save |
| TOTAL RISK SCORE | ██ |
| RISK LEVEL | ████ |
| COMPLYADVANTAGE HITS | 0 |
| COMPLYADVANTAGE LINK | ComplyAdvantage Link |
| VERIFICATION APPLICATION STATUS | Pending |
| CATEGORY | ▽    Save & Inform User |
| NUMBER OF ATTEMPT TO JUMIO | 1    Reset |

## Risk Score Update History

| DATE & TIME | FULL NAME | ROLE | |
|---|---|---|---|
| 2/6/2022 2:54:46 AM | Auto (System) | Auto (System) | ██ |

## KYC Questionnaire



| QUESTION SORT ORDER | QUESTION | ANSWER |
|---|---|---|
| 10 | Place of birth | ██ |
| 11 | Citizenship on the document | Taiwan |
| 12 | Please tell us about your current employment status. | ███ |
| 13 | Please tell us about your occupation or business activity. | ████████ |
| 14 | Please tell us about business you may conduct in other country(s) besides where you are registered for tax purposes? | █ |
| 15 | Is your individual activity or business registered or conducted in preferential tax zone (for instance, free economic zone, offshore jurisdiction)? | █ |
| 16 | Please tell us about your annual turnover, in individual or business activity, which is handled in cash. | ████████ |
| 17 | Please tell us about your annual turnover, in individual or business activity, which is handled in cryptocurrency. | █████████ |
| 18 | Please tell us about your source(s) of income/funds. Select more than one box if necessary. | ██████ |
| 19 | Please tell us about your source(s) of wealth? Select more than one box if necessary. | ██ |
| 20 | Please select the service(s) you plan to use. Select more than one box if necessary. | ████████████ |
| 21 | How much do you plan to deposit per year (USD and crypto combined)? | █ |
| 22 | Please tell us which countries the funds will be received and/or transferred from. | ███ |
| 23 | Let us know what your level of experience is with cryptocurrency trading? Please select one: | ██ |

**DOJ'S RESPONSIBILITY FOR CUSTOMER SAFETY:**

The DOJ needs to consider these safety concerns seriously rather than suggesting the existence of false customers due to nondisclosure of full names. The unique Himalaya account number (HID) will be disclosed when there are safeguards in place as suggested.   Each unique HID  is linked to a genuine customer/real person holding a  Himalaya Exchange  account. After seizing assets and placing customers at high risk, the DOJ has a responsibility to safeguard individuals potentially at risk due to their actions.[4]

**DATA PROTECTION AND LEGAL OBLIGATIONS:**

The Exchange emphasized to me that by providing this image to me as requested by counsel's clients that it does not waive any obligations under data protection, legal requirements, privilege, or any other legal rights it holds. This disclosure aims to enhance understanding of the real threats faced by innocent victims. Proper legal procedures must be followed to request any additional material or customer information.

In addition to the Government's response (ECF 188 Attachment A) and the Bankruptcy Trustee's lawyer which was filed immediately after in this Court (ECF 189 Attachment D), the Trustee also seems to have filed a motion in the bankruptcy court in Connecticut on December 8,

---

[4] Attorney General Guidelines for Victim and Witness Assistance, 2022 Edition | Office for Victims of Crime (ojp.gov) Privacy Considerations for Victims and Witnesses page 5.

2023 (ECF 2425 Attachment H), raising different reasons and omitting the implication of chapter 11 property or violation of an automatic stay. The Trustee's motion emphasizes the leadership of the Debtor over Himalaya Exchange entities and ongoing reviews of the Motion's impact on the chapter 11 case:

> "As the Court will recall, the Court previously found, in connection with its order granting a preliminary injunction against the Debtor and certain related parties, that Himalaya Exchange and various other affiliated Himalaya entities are "all under the leadership of the Debtor" and "business vehicles for the Debtor." The Trustee also notes that numerous proofs of claims have been filed in this chapter 11 case asserting claims based on "investments" in or with Himalaya Exchange.
>
> The Trustee is reviewing the Motion and evaluating next steps. Given that the Motion, if granted, would interfere with the administration of this chapter 11 case, including as it relates to the resolution of claims and the distribution of estate property, the Trustee is available the Court's discretion, to the extent the Court wishes to schedule a status conference on this matter." (footnotes omitted) [5]

## HAMALAYA EXCHANGE NOT PART OF BANKRUPTCY ESTATE

The Bankruptcy trustee lacks the authority and jurisdiction to intervene in the motion presented by the undersigned counsel in this esteemed Court, and their request should be rejected for the following reasons:

  a) After a thorough review of the bankruptcy case dockets no such judgment referred to has been found declaring that the Himalaya Exchange or the stable coin reserve funds, initially held in trust by the Himalaya Exchange for its customers and now seized by the DoJ, are part of the Chapter 11 estate.

---

[5] Attachment H (ECF 2425 Trustee Motion For Return)

b) If these assets were indeed part of the Chapter 11 estate, there is no order from the Bankruptcy Court, as evident from the docket or presented to this Court, confirming this status.

c) There is no evidence or any proper reasoning that any of counsel's clients or the motion itself would interfere with the administration of the chapter 11 estate. Serious complaints will be raised if it is asserted that any of them have engaged or attempted to engage in any conduct or that this motion in anyway amounts to interference to the Trustee or the DoJ. These Victims have a right to be fairly heard and have due process of their motion without being targeted and tarnished with historic events related to the injunction.  All of counsel's clients are located outside of the U.S and have exercised their right to claim their legitimate money by instructing a Lawyer and have not warranted any suggestion of interference. It is their money and they have legal right to claim it back. There is no justified reason for this assertion to be made and again highlights the bold stance made by this Trustee based on running a narrative to divert the fact there is no real proper basis for his interference in their claim.

d) During a recent hearing concerning the Mawah Mansion, the Chapter 11 Trustee Luc Despins expressed his intention to administer the Exchange funds seized by the DoJ, as highlighted in the attached transcript (ECF 2174 Attachment I; pages 24-29). Regardless of the wisdom behind allowing the bankruptcy attorney to administer the funds, it is evident that he currently lacks the authority to manage these funds, and there is no indication that the funds are part of the Estate. The representations made to this Court in the Paul Hastings

letter appear to be misleading and inaccurate. This is further supported by the fact that the motion to the Bankruptcy Court does not reference the Exchange, its assets, or customer funds as part of the chapter 11 estate.

e)   So there are also serious concerns after the comments made by the trustee in relation to obtaining access to the entire amount  of the seizure in the criminal case and acting as receiver and using the blueprint of the Mawah Mansions to obtain more money for the estate. It is very clear from the narrative of the document that he seems to be persuading the court that he can act as the receiver of the DOJ seized funds and bring those funds into the bankruptcy court for administration.

f)   This narrative raises serious concerns about a trustee charging substantial fees, claiming that these fees are derived from the sale of the house namely $1m will be part of the estate and the house is being sold to assist the Department of Justice (DOJ) in securing and liquidating real property. The trustee suggests that this action is necessary due to the difficulty the DOJ would face in seizing the property. Additionally, there is open discussion in court about funds from a criminal case that are irrelevant to the estate's jurisdiction. It is crucial to emphasize that counsel's client's funds do not belong to the estate, and there seems to be a premeditated effort to create questionable circumstances with motives aimed at implying a connection to Kwok.

g)   The comments made by the trustee in this docket are evidently prejudicial and detrimental to the victims' claims. The trustee discusses that the Bankruptcy Court and him can decide on who has a claim and who is a victim, bearing in

mind he has no involvement in the criminal trial or any of the evidence. In effect he want to indirectly be allowed to decide which facts he wants to take into account in this assessments without any proper safe guards and requirements of actual evidence.  His indication that counsel's clients' Fund could be distributed to other creditors is highly inappropriate in itself in a case of this nature where each customer has a easily identifiable accounts and balances in order to distribute the funds distribution of client funds poses significant risks of loss to extortionate legal fees and other third parties lacking legal rights to these funds.

h) The improper seizure of counsel's client's funds, specifically the Mawah Mansions, and other funds seized by the Government, is directly linked to the ongoing criminal case. This Court not only possesses the necessary authority but also the capability to address the administration and distribution of these seizures. The DOJ has permitted the trustee to intervene in matters exclusive to this case by either remaining silent and taking no action and all or claiming priorityOver Himalaya exchange reserve funds to that of the Trustee. The Trustee's strategic plan, formulated well before any adverse jury finding, raises serious concerns about diverting funds from innocent victims based on a perceived connection to Kwok, creating a prejudicial situation. The Trustee's apprehension about this motion or counsel's clients interfering with the Ch11 Estate adds further cause for concern.

i) We respectfully request the Court's intervention to prevent the trustee from interfering with the seizures in this case.

j)   Furthermore, Luc Despins would face a conflict of interest in administering counsel's client's funds without their or undersigned counsel's consent. The unique statutory authority of a bankruptcy trustee requires consent in other contexts. Regardless of the perspective, the funds held by the Exchange were in trust for clients as beneficiaries and do not fall within the estate.

k)   The primary concern before this esteemed Court is the return of legitimate Customer Funds. This money does not belong to Kwok, who is the subject of the the chapter 11 estate. The estate lacks the authority or legal basis to claim ownership or administer the funds. The ownership, control, or leadership of the Himalaya Exchange has no bearing on these customer reserve funds.

l)   Please refer to audit reports and the balance of the seizures from the Himalaya accounts (Attachments J and K). These audit reports confirm customer stable coin reserve funds held in trust by the Himalaya Exchange for the HDO, of which counsel's clients are the owners. The petitioners are the beneficiaries of this trust, and only the customers have the legal right to claim this money. The DOJ seizure related to the Himalaya Exchange accounts appears to comprise of the HDO stable coin reserves, and the best evidence suggests that all the money belongs to counsel's clients. It is unclear how these funds were used as instrumentalities of the crimes. These funds essentially remain in these accounts until HDO is redeemed, and the customers are paid in US dollars by financial institutions.

m)  Before the seizure, customers regularly redeemed their HDO, and the funds for these redemptions were paid from the stable coin reserve held by the Exchange.

Regardless of the perspective, this money does not constitute part of the Exchange's assets, property, or revenue. The Exchange has no ownership rights, proprietary claims, or the right to use the money for any purpose other than redeeming it upon the customer's request. Customers purchased HDO as a stable coin backed by USD $1: 1 x HDO.

n) The Exchange's governing rules also indicate that a reserve of hard currency would be held by the Exchange for every HDO sold, hence the hard currency equivalent. Customers essentially purchased a product comprising HDO backed by a hard currency cash reserve, and the product is the cryptocurrency coin attached to the reserve.

o) The DOJ's seizure from the Himalaya account seizures is just short of the stable coin reserve total indicated in the audit reports. The last audit report was conducted just weeks before the seizure. The best evidence suggests that all the money of which counsel's clients are beneficiaries is there, maintained by the Exchange in properly safeguarded accounts, and it is not clear how these funds were used as instrumentalities of the crimes. These funds essentially remain in these accounts until HDO is redeemed, and the customers are paid in US dollars by financial institutions.

p) At its core, the primary theory of this case is simple: like any asset that serves as security for a loan or obligation, the funds seized by the DOJ are not free and clear. They are pledged to counsel's clients and held in trust for the benefit of the Himalaya Exchange depositors, investors, and customers. These funds guarantee counsel's client's rights to redeem their digital coins, convert them

into hard currency, and withdraw their investments as normal banking funds or currency.

q) Importantly, recent regulations worldwide promote setting stable coin reserves at 100%, as evident from the funds seized and the total reserve indicated in the audit report, confirming the reserve being held by the Exchange in proper bank accounts at 100%. An example of that development in regulation can be found at   https://www.thebanker.com/Custody-of-stablecoin-reserves-under-MiCA-1693986077. Therefore, the DOJ and the Chapter 11 Trustee have made the serious mistake of confusing the reserve fund held by the Exchange as being ***profit*** owned by the criminal Defendants as their personal funds rather than a reserve fund for the benefit of investors like counsel's clients.

The trustee lacks jurisdiction to assert that these funds fall within the Chapter 11 estate, even if it were determined that the Himalaya Exchange is part of it, which it is not. The funds seized by the DOJ do not belong to the estate any more than a bank would have proprietary rights over money deposited by its customers. Therefore, the motion has been appropriately filed in the correct court and forum, and there are no grounds for it to be considered within the Chapter 11 estate or that it violates an automatic stay. Consequently, the trustee's motion should be denied.

a) It is a matter of serious concern that the trustee has referenced an unrelated injunction application concerning different matters to assert that the Exchange and its customers (i.e., the clients represented by

undersigned counsel) are under the leadership of Miles Guo.

Undersigned counsel denies this claim, representing customers who

reject this farfetched fabrication, that the motion is potentially crafted to

cause interference. It is submitted that this appears to be the motivation

of the Trustee rather than innocent victims.

b)   As an illustrative example, Dr. Martin Luther King was the

acknowledged leader of the civil rights movement in the 1960s, yet it

did not imply that Dr. King had command, control, ownership,

influence, or a financial stake in the operations of any specific Baptist

Church considering itself part of the civil rights movement.

c)   Leadership in a freedom and liberty movement does not constitute

evidence, nor does it imply any form of ownership, over customer stable

coin funds held in trust by the Exchange, for which the customers are

the sole legal beneficiaries. No other party worldwide has the right to

claim, use, or distribute these funds.

d)   However, the DOJ proceeded to confiscate these funds from counsel's

clients without any prior notice or explanation. This action is unrelated

to the actions or conduct of these customers, and suggesting that

innocent victims of DOJ seizures, residing outside the U.S., would

interfere with the administration of the Chapter 11 estate is not only a

manipulative use of facts to create a false illusion of interference but is

also defamatory towards these victims. It appears that the trustee is

attempting to infer conduct that is the subject of a historic injunction

and historic acts alleged by others and applying that as a basis or
evidence that will or likely will interfere. These victims have the right to
be heard and make their motion, and the focus should be on the trustee's
interference in this motion, not on the innocent victims themselves.

e) The customers bringing forth this Motion have not engaged in any acts
or actions that warrant such accusations and public defamation (the
filings are publicly available) in this manner.

f) They have followed the proper legal procedures and engaged legal
representation, as is their right, to receive due process without being
subjected to such conduct. The Trustee's application and the
representations made by the DoJ in their reply strongly suggest an
attempt to prevent the court from hearing this Motion by using strategic
false tactics, reflecting not only impropriety but also collusion between
them. The DoJ, with the ability to assert priority over the seized funds,
remains silent, allowing this course of events to continue, which
benefits their case

g) Examination of the case dockets indicates that the Trustee has
repeatedly employed this rhetoric in relation to other defendants,
seemingly confident that the Court will accept it at face value and
assume that Exchange customers, including those represented by
undersigned counsel, have or will engage in similar actions.

h) Even if these assertions were true, they do not constitute grounds for the
Court to reject hearing the motion. The claim that this motion amounts

to interference lacks substance and legal standing. The Trustee lacks a declaration that the Exchange and its Customer funds form part of the estate, and the possession of the funds lies with the DOJ. The Court is urged to scrutinize this matter carefully and not allow innocent victims to be subjected to such defamatory behavior. The Trustee has not presented any evidence to suggest that Himalaya Exchange customers, particularly those represented in this motion, have engaged in any acts warranting suspicion or accusation of interference.

i) They have the right to make the motion, be heard, and claim their money. It is reprehensible to characterize this, along with other suggestions, as interference.

j) They are victims of the seizure seeking the return of their money, which is their investment in the Exchange and is not within the ownership rights of the Trustee's estate.

Considering this conduct, the Trustee exhibits clear bias and prejudice against the Exchange customers and is not suitable to administer any Exchange funds.

Additional concerns include the potential distribution of customer money to other creditors first and the allocation of their money towards the Trustee's legal fees. This is evidence in the comments made in the Bankruptcy Court referred to above.

Each customer's claim to the seized funds is traceable to their HDO balance on the Exchange, and only they should receive this money back. The Trustee and DoJ representations of distribution are inappropriate and indicate the transfer of one victim's easily identifiable money

to another. This conduct is distasteful, manipulative, and an abuse of the court process, attempting to unfairly tarnish this innocent group of customers.

This Court possesses the authority to handle these funds, and the Trustee brings no added value or process aside from claiming fees and depleting Customer Funds.

The reliance on received claims lacks merit, as those claims can easily be presented to this Court and addressed accordingly.

The customer Motion suggests a more secure and cost-effective way to ensure the protection of customer funds from depletion with minimal deductions.

As a result of the seizures the DoJ would have obtained bank records from the bank holding the Exchanges reserves.   The DoJ likely has access to bank records and KYC information for a vast number of customers, with evidence of customer deposits and hard currency redemptions in the Exchange bank statements. This information supports the customer's motion and shows the DOJ is aware there are numerous genuine customers. This against the backdrop of the representations about "purported" customers falls short of reasonable nor does it reflect any empathy.

Examining the history of this Trustee and claimed legal fees raises further concerns. There appears to be a no-notice hearing where $37 million in funds belonging to the Exchange, loaned to another party as security until the return of a yacht, were accepted by the Court and the Trustee as security. The boat was returned, yet the security was not released. Once the boat was returned, the Trustee changed tact and then claimed that the third party Company was an alter ego of Miles Guo and, therefore, the loaned money now belonged to the Estate. The Court granted the application, and the estate received the entirety of the security funds.[6] Immediately

---

[6] Attachment G1

afterward, the trustee applied for legal fees and was granted approximately $11 million in legal fees out of the $37M money belonging to the Exchange and counsel's clients.

During the legal proceedings, the Trustee asserted that the Exchange could pursue damages against him in case of future disputes. While the merits of these motions are not explicitly argued or evaluated, there is a reasonable basis to express apprehension regarding the conduct involved. Specifically, concerns arise when an agreement designates the Funds as a security, and later, the Company receiving these funds becomes part of the estate. Instead of repaying the loan, the estate allows the trustee to assert a $11 million claim for his legal fees, encompassing his initial fees since commencement hence an inference this conduct was adopted to claim his legal fees as there was no money in the estate to pay them This matter is brought to attention, particularly because a similar action has now commenced in relation to Himalaya Exchange customer funds, raising legitimate concerns about the potential change in status of customer money under the Trustee's administration.

The concern is substantiated and supported by statements made during the hearing, as referenced in the transcript (Attachment I) where the trustee indicates that the Bankruptcy process will determine who has a valid claim and who is considered a victim. Such conduct is a cause for serious concern. To further support this argument, it is noted that, even at that juncture, the Trustee did not assert that the Exchange and its customer funds were part of the estate.  The docket notes, which are voluminous, have not been included in this communication but can be provided upon request.

No notice of any of these proceedings was given to the Exchange or its customers to contest. The trustee then collaborated with the DoJ to sell the Mahwah mansion detailed in the indictment and agreed to a stipulation with the DoJ to sell the house, retaining $1 million in fees

for doing so, with the remainder placed in escrow to be distributed and decided between them later. This is contested by the Taurus Fund, the actual owner of the house.

There appears to be no pressing reason to sell the house other than the advantage of the trustee receiving fees. While the merits of the above occurrences are not argued, this is raised to provide examples illustrating a clear running theme of the Trustee claiming exorbitant legal fees and depleting estate assets. This fact is relevant to the customer funds, which he now wants to claim. Additionally, he recently presented a bill to the Court for millions in legal fees before moving on to the customer action. There is a genuine fear that customers will receive nothing back if this matter is passed to the Trustee, placing them at the bottom of a list of legal fees and other creditors being paid first.

Both the trustee and DOJ suggest the customers are purported customers, implying that the customers are not genuine. This is denied and is a highly inappropriate allegation leveled against counsel representing them, suggesting collusion with the Exchange to fabricate the entire motion. Please refer to the link of a video provided by some customers sharing their stories. The Exchange lawyers have also provided a letter confirming that the Exchange has instructed them to oversee an independent forensic accounting and audit firm to audit the list of customers making this motion. A report will be provided and filed by December 21st 2023.

There are serious concerns about the delay in customers getting their funds returned. Customers hold two types of assets: HDO, the stable coin, and HCN, the trading coin. The current seizures relate to the HDO stable coin reserve. Some customers have balances of both, and some only have balances of HCN. In any case, they can only realize any value from their HCN by selling it and receiving HDO. If the HCN value drops to zero, they lose their entire asset. Currently, the HCN asset is devalued by $136 million. This is the total HCN balance by the

current customers taking action, accounting for the depreciation in price from the coin price on the date prior to seizure to the current average fluctuating price. If something is not done soon there is a real risk of irreparable harm resulting in substantial losses to counsel's client and other customers.

The timing of the bankruptcy trustee's submission that customer funds fall within the Chapter 11 estate, only when a motion is filed by customers to claim their funds, is also highly suspicious.

Considering that this indication has never been made to this Court before, no application has been filed in the Bankruptcy Court despite awareness of the Exchange for a substantial period, and the fact that he acknowledged the Exchange could claim damages regarding him taking legal fees, it strongly implies that there was no suggestion the Exchange and its customer funds formed part of the estate until the customer motion was filed.

This action appears not to be bona fide and does not align logically. There is a strong suspicion that the Trustee has filed these motions to claim more legal fees and assist the DoJ in derailing the motion, preventing investors like counsel's clients from being protected.

**ALLEGATIONS OF INDICTMENT PARAGRAPH 21:**

Incredibly, the DOJ-drafted indictment argues in paragraph 21 that "Moreover, unlike cryptocurrencies, HCN could not be traded for, or converted into, other currencies." But the DOJ itself seized the reserve fund by which the digital coins could be converted into other currencies.   It is the DOJ's improper actions that are the reason that the investors are being prevented from redeeming their coins into U.S. dollars.

In paragraph 22 of the DOJ-written indictment, the DOJ offers a word salad stew. Having already admitted that Kwok had no role with the Himalaya Exchange in paragraph 11, and claiming that the Exchange was operated by "foreign based" companies by Je without specifics, the DOJ then tries to sell us on the idea that Kwok (with no control over the Exchange) and Je transferred $37 million to buy a yacht that Kwok had already bought.

Although this explanation is opaque, at worst the implication of this would be that the Exchange would be the new owner of the yacht as a tangible investment.  From the Court dockets there was a clear agreement that this was a security until the boat was retuned and a Court order made to that effect. Once it did return the Trustee decided to claim that the boat company who received the loan was in fact the alter ego of Kwok and therefore the money belonged to the estate. The Court made an order against its own previous order where it accepted the $37M was third party money , which was always held in an escrow account and not an account belonging to the Trust and or estate.

However, during this discussion, the DOJ effectively admits that the Exchange Funds were in fact independent of any other business entity of the defendants.  It is admitted that the Exchange as an independent entity loaned money to a Kwok entity, secured by a valuable asset.

Dated:  December 15, 2023                    RESPECTFULLY SUBMITTED

/s/ Brad Geyer
Bradford L. Geyer, PHV
NJ 022751991
Suite 141 Route 130 S.  303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

/s/ Jamie Scher
Jamie Scher
NY 2488435
Myer and Scher LLP
377B South Oyster Bay Road
Plainview, NY 118013
Jamie@myerandscher.com
(516) 713-0655

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

/s/ Brad Geyer
Bradford L. Geyer, PHV
NJ 022751991
Suite 141 Route 130 S.  303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708