UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"

                    Defendant.

**S1 23 Cr. 118 (AT)**


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANT'S MOTION TO COMPEL**


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Juliana N. Murray
Ryan B. Finkel
Justin Horton
Micah F. Fergenson
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 1

I. The Offense Conduct ................................................................................................. 1

II. Procedural History .................................................................................................... 3

III. Discovery ................................................................................................................. 4

IV. The Instant Motion .................................................................................................. 6

    A. The Demands for Other Agencies' Information About a Foreign Government, Kwok's Own "Political Movement," and Another U.S. Attorney's Office's Case............................. 6

    B. The Demand to Produce a Recording ................................................................... 7

    C. The Demand to Identify Potential Targets for Kwok's Rule 17 Subpoenas ................. 7

ARGUMENT ................................................................................................................... 7

I. The Law Does Not Require a Search for Immaterial Information Outside of the Prosecution Team's Files .................................................................................................. 8

    A. Applicable Law ...................................................................................................... 8

        1. The Prosecution Team Limitation ..................................................................... 8

        2. The Defendant's Materiality Burden ............................................................... 10

    B. Discussion ............................................................................................................ 12

        1. Kwok Is Not Entitled to Information the Prosecution Team Does Not Have ............. 12

        2. Kwok Cannot Compel the Production of Information He Already Has ...................... 14

        3. Kwok Is Not Entitled to Information That is Neither Exculpatory Nor Material to Preparing a Valid Defense ........................................................................................... 16

        4. Kwok Is Not Entitled to Information That is Neither Exculpatory Nor Material to Preparing a Valid Defense ........................................................................................... 21

        5. Kwok is Not Entitled to "Intelligence Assessments" About His Own "Political Movement" ................................................................................................................. 22

    II. The Demand That the Government Identify Recipients for Potential Defense Subpoenas Should be Denied.......................................................................................... 23

    CONCLUSION............................................................................................................ 24

## PRELIMINARY STATEMENT

This is a fraud case.  The defendant, Ho Wan Kwok, agrees.  (*See* Dkt. 178 (Def. Second Bail Mot.) at 22 (The "instant charges . . . are, at bottom, financial fraud charges."))  In view of these charges, the Government has timely produced voluminous documents relating to the fraud scheme and material to preparing a defense.  But Kwok now moves to compel the Government to search for and produce an enormous expanse of information that is neither possessed by the prosecution team nor relevant to any valid defense.  (Dkt. 170, "Motion to Compel" or "Mot.")  The Government is aware of its Rule 16 and *Brady* obligations and is complying with them. The Government will similarly discharge its duties under the Jencks Act and *Giglio* in advance of trial. Indeed, as Kwok's own motion makes clear, the Government has produced materials beyond the scope of its discovery obligations.  But Kwok now demands more than what the law permits.  He asks this Court to require a hunt through an unbounded universe of extrinsic information in support of an unsustainable defense theory that Kwok's financial frauds are excused by his political views and the conduct of a foreign government.  They are not.  In a case about stealing other people's money through fraudulent business and investment schemes, Kwok's motion seeks materials that he says will show that he and his associates were "targeted" by a foreign government and that his "political movement" is "credible."  (*See* Mot. at 1.)  The Government's disclosure obligations are broad, but Kwok's demands underscore why they cannot be unlimited.  The Court should deny the defendant's effort to derail the discovery process in a way well outside the bounds of what the law permits and instead keep the parties on an orderly path to trial.

## STATEMENT OF FACTS

### I.  The Offense Conduct

As described in further detail in the Superseding Indictment (Dkt. 19), the defendant is

1

charged with leading a scheme to defraud thousands of victims of more than $1 billion from at least in or about 2018 through at least in or about March 2023.  Kwok's fraud involved a series of complex fraudulent businesses and fictitious investment opportunities associated with dozens of interrelated entities controlled by Kwok.  (Indictment ¶ 1.)  Kwok and his co-conspirators laundered their fraud proceeds through foreign and domestic bank accounts and entities, layering the fraud proceeds to conceal their source, as well as using the fraud proceeds to further promote the ongoing fraud.  Kwok also misappropriated victim funds for his own personal use and for the use of family members, including for personal investments and the purchase of luxury residences, vehicles, and goods.  (Indictment ¶¶ 1-4.)

The Superseding Indictment details four arms of the fraud—the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange.  Each of these purported investment opportunities involved Kwok promising outsized profits to his victims, as well as making other false and fraudulent misrepresentations.  Kwok himself promoted each of the arms of the fraud to victims in videos that were broadcast on the Internet and distributed to Kwok's hundreds of thousands of online followers via social media.  The Government's evidence includes direct communications between Kwok and prospective investors, during which Kwok made representations about the financial benefits of investing in his offerings.  In interviews with the Government and with the FBI, victims have explained that they relied on Kwok's representations—including, for example, that their money would be used for GTV's business, that they would receive shares of GTV stock through the GTV Private Placement, the Farm Loan Program, and G|CLUBS, and that Kwok personally guaranteed their investments in the Himalaya Exchange—in investing in Kwok's offerings.

Kwok and his co-conspirators laundered more than $1 billion in fraud proceeds through

2

hundreds of accounts held in the names of at least 80 different entities or individuals.  Tens of millions of dollars of fraud proceeds eventually flowed to Kwok's family and to assets that Kwok used and controlled, such as exotic sports cars and a $26.5 million mansion.  As described in the Superseding Indictment, the Government seized more than approximately $600 million of Kwok's fraud proceeds between in or about September and October 2022, from bank accounts held in the names of various entities involved in the fraud, including G|CLUBS, G|FASHION, Gettr USA, Inc., and the Himalaya Exchange entities.  (Indictment ¶¶ 24, 25).

## II.   Procedural History

On March 6, 2023, a Grand Jury in the Southern District of New York returned indictment 23 Cr. 118 (AT), charging the defendant in eleven counts (the "Indictment").  Those charges were conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, in violation of 18 U.S.C. § 371 (Count One); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two, Four, Six, and Eight); securities fraud, in violation of 15 U.S.C§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 (Counts Three, Five, and Seven); international promotional money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2 (Count Nine); international concealment money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2 (Count Ten); and engaging in unlawful monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2 (Count Eleven).

On March 15, 2023, the defendant was arrested at his penthouse apartment at the Sherry-Netherland Hotel in Manhattan.  He was presented before Magistrate Judge Katharine H. Parker and arraigned on the charges in the Indictment.

On March 29, 2023, a Grand Jury in this District returned Superseding Indictment S1 23 Cr. 118 (AT), charging co-defendant Yanping Wang, a/k/a "Yvette" in Counts One, Two, Three, and Eleven.

On April 4, 2023, the defendant was arraigned on the charges in the Superseding Indictment.

### III.  Discovery

Throughout the course of this case, the Government has produced voluminous discovery to the defense.  That discovery includes lengthy preserved recordings of Kwok's own public statements (including Kwok's own statements about the different arms of the fraud on recorded videos and in written posts), subpoena returns (including productions from a host of entities involved in the schemes), search warrant returns (including for email accounts of individuals involved in the schemes), the extracted contents of more than approximately 170 devices (including the contents of devices seized directly from Kwok and from his various residences, as well as from devices of his key partner in the fraud, co-defendant Yanping Wang), and photographs taken during the execution of premises warrants, among other things.  To date, the Government has produced more than approximately 15 terabytes of data and over 2.2 million pages of discovery.  The produced discovery includes statements made by Kwok, bank records, files from Kwok-controlled entities (including G|CLUBS, Gettr, and the HCHK entities), communications between Kwok and his co-conspirators, and complaints by victims seeking refunds of their investments.  The discovery also already includes information regarding the New Federal State of China, or "NFSC"—which Kwok describes as his "political movement" (*see* Mot. at 13)—because the NFSC was used by Kwok and his co-conspirators to facilitate Kwok's crimes.  Whether any particular entity was outwardly represented by Kwok to be, for example, a sovereign nation state (NFSC), a cryptocurrency exchange (Himalaya Exchange), a luxury life-style club (G|CLUBS), a lending apparatus (the Farms), or a media company (GTV), the entities Kwok controlled within

his global criminal enterprise were, at bottom, vehicles used during the course of the schemes charged in this fraud case to collect money from Kwok's followers on the basis of Kwok's lies.

Beyond the materials within the possession of the prosecution team, the undersigned AUSAs requested, produced, and continue to produce files maintained by teams conducting separate investigations, including materials obtained from the SEC and materials related to an investigation of Kwok's criminal enterprise by a different U.S. Attorney's Office and federal agency. Materials that constitute Rule 16 discovery or *Brady* materials have been included in the Government's discovery productions to date and the Government will continue to produce such materials to the defense, consistent with the Government's disclosure obligations.

On June 26, 2023, the Government sent a discovery-related letter to counsel for defendants Kwok and Wang (the "June 26 Letter"). (Def. Mem. Ex. G.) The June 26 Letter contained information that the Government disclosed to both defendants pursuant to its obligations under *Brady* "and the Government's other disclosure obligations, and in an abundance of caution." (*Id.* at 1). Among other disclosures, the Government advised the defendants that it had learned from a separate prosecution team at the U.S. Attorney's Office for the Eastern District of New York that Stephen Cook—at that time, *Kwok's own criminal defense attorney in this case*—had informed the EDNY prosecution team ███████████████████████████████████████████ ████████████████████████████████████████████████ (Ex. G at 1.) The Government also advised that *Cook* subsequently informed the undersigned that "[Cook's] investigators were aware of other purported victims in this case whom ████████████████ ████████████████████████████████████ (*Id.* at 1-2.)

On September 29, 2023, Kwok's counsel sent a discovery request to the Government seeking, among other things, the information that is the subject of this Motion to Compel. (Mot.

at 11-12, Ex. I.)  On October 17, 2023, the Government responded to Kwok's letter, directing the defense to certain of the requested information and asking the defense to articulate how, if at all, other categories of requested information was relevant to this case.  (Mot. Ex. J.)  Kwok's counsel declined to address that question directly and stated that "through our various filings we have provided examples of why Operation Fox Hunt material . . . is exculpatory."  (Mot. Ex. K.)  Over the next week, the Government reiterated its request that Kwok's counsel explain the relevance of the demanded materials.  Kwok's counsel did not respond and instead filed this motion.

## IV.   The Instant Motion

On November 17, 2023, the defendant filed the instant Motion to Compel.  The motion begins by referencing four purported "categories of exculpatory evidence," (Mot. at 1), but ultimately requests a three-part order (*id.* at 14).

### A.   The Demands for Other Agencies' Information About a Foreign Government, Kwok's Own "Political Movement," and Another U.S. Attorney's Office's Case

Kwok first asks this Court to compel the Government "to search for and produce the information sought in Requests 2 through 8 and 19 of [Kwok's] September 29 Discovery Request." (Mot. at 14; *see also* Dkt. 171 (Barkan Declaration, Exhibit I (Sept. 29 Discovery Request)) at 2–5.)  These requests demand information "in the possession of *any relevant government agency*" without regard to whether those agencies are a part of this case's prosecution team.  (Barkan Decl., Ex. I at 1) (emphasis added).)  Five of these eight demands (Requests 3–5 and 7–8) seek "[a]ll documents and communications"—from every conceivable source—"concerning the targeting of" various individuals and entities "by the Government of China."  (*Id.* at 3–4.)  Request 2 seeks "documents and communications" from a prosecution of a person who is neither a party to nor a witness in this case, led by a separate prosecution team, in another United States Attorney's Office. (*Id.* at 2–3.)  Request 6 seeks "[a]ll documents and communications"—again, from every

6

conceivable source—"concerning the 'New Federal State of China'" (*id.* at 3), which the Motion to Compel describes as Kwok's "political movement" (Mot. at 13), and Request 19 demands "[a]ny statements from purported 'victims' that reference the New Federal State of China." (Barkan Decl., Ex. I at 5.)

### B.  The Demand to Produce a Recording

Kwok next asks that the Court order the production of a recording of an August 26, 2018

███████████████████████████████████████  (Mot. at 1, 14.)

### C.  The Demand to Identify Potential Targets for Kwok's Rule 17 Subpoenas

Kwok then asks that the Court require the Government to identify any "other government agencies" that may hold any of the broad swaths of information that he demands, "so Mr. Kwok can subpoena these agencies."  (Mot. at 28.)

## <u>ARGUMENT</u>

The defendant's requested order is unmoored from the law, inconsistent with criminal practice, and contrary to common sense.  His motion should be denied for several reasons.  *First*, the law does not require a prosecution team to search an unbounded universe of materials beyond its possession, custody, or control.  If Kwok's request were granted, the undersigned would be required to search the entire files of each and every agency and arm of the United States Government.  The law does not permit that, and neither should this Court.  *Second*, Kwok has no current entitlement to information (wherever located) that falls outside the scope of *Brady* and Rule 16—and his motion fails to align his demands with either rule's requirements.  And *third*, there is no authority (and Kwok cites none) for Kwok's proposed order that the Government identify federal agencies outside of the prosecution team upon which Kwok might later seek to serve Rule 17 subpoenas.  Such a request would similarly require the undersigned to query every

federal agency and office in the United States to make such a determination.  The law does not

allow Kwok to undertake a fishing expedition and press this prosecution team into service as his

fisherman.

## I.   The Law Does Not Require a Search for Immaterial Information Outside of the Prosecution Team's Files

### A.   Applicable Law

The Government's disclosure obligations are governed by Federal Rule of Criminal

Procedure 16 and the principles of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.[1]  These

obligations are broad—but they are not unlimited.  Information must pass several thresholds before

its disclosure is required under either Rule 16 or *Brady*.

### 1.   The Prosecution Team Limitation

Both Rule 16 and *Brady* limit disclosures to information possessed by the prosecution

team.  "A Rule 16 motion to compel entails the threshold inquiry of whether the discovery sought

is 'within the government's possession, custody, or control.'"  *United States v. Alexandre*, No. 22

Cr. 326 (JPC), 2023 WL 416405, at *12 (S.D.N.Y. Jan. 26, 2023) (quoting *United States v. Stein*,

---

[1] The Government's other disclosure obligations are rooted in the Jencks Act, 18 U.S.C. § 3500 (witness's relevant prior statements), and *Giglio v. United States*, 405 U.S. 150 (1972) (witness's potential impeachment material).  Courts "lack[] power to compel pretrial production of Jencks Act material," but the Government "has an obligation to disclose [it] to defendants sufficiently early to permit them to adequately prepare a defense."  *United States v. Weigand*, 482 F. Supp. 3d 224, 249 (S.D.N.Y. 2020).  It is similarly "well established that a defendant is not entitled" to production of *Giglio* "in advance of trial."  *United States v. Mejia*, No. 98 Cr. 4 (JGK), 1998 WL 456257, at *1 (S.D.N.Y. Aug. 5, 1998) (collecting cases and denying motion to compel production of *Giglio* materials one month in advance of trial where Government "represents that it will make such information available to the defendants in this case at the time that it provides prior statements of witnesses pursuant to the Jencks Act").  The Government is mindful of these additional disclosure obligations and will make timely productions of Jencks Act and *Giglio* materials in advance of trial.  The parties have already agreed to discuss a schedule for pretrial disclosures in January.

488 F. Supp. 2d 350, 360 (S.D.N.Y. 2007)).  In the same way, "*Brady* materials need not be disclosed if the 'prosecution team in the instant case' is unaware of the materials." *United States v. Chalmers*, 410 F. Supp. 2d 278, 288 (S.D.N.Y. 2006) (quoting *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993)).  This limitation is prudential: it avoids the creation of an information-seeking mandate that would make it impracticable to investigate and prosecute crimes.  *See, e.g.*, *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (*Brady* is "not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense.").  Thus, discovery and disclosure obligations only extend to "information known to persons who are a part of the 'prosecution team' . . . who perform investigative duties or make strategic decisions about the prosecution of the case"—that is, only those law enforcement agents "who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (citation omitted); *see also, e.g.*, *United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) ("Interacting with the prosecution team, without more, does not make someone a team member.").  For this reason, the Court's Rule 5(f) order extends the Government's "affirmative obligation to seek . . . information" *only* to certain persons "who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged."  (Dkt. 9 at 2.)  And, accordingly, external offices do not join the prosecution team simply through the common practice of interagency communication or coordination.  *See, e.g.*, *United States v. Loera*, No. 09 Cr. 466

9

(BMC), 2017 WL 2821546, at *7 (E.D.N.Y. June 29, 2017) (denying request for "discovery of communications between the United States and Mexico" in possession of the Department of State and the Department of Justice Office of International Affairs because ordinary "contact between the [various] arms of the U.S. Government . . . does not intimately involve the agencies nor align the agencies for all intents and purposes").

### 2.  The Defendant's Materiality Burden

*Second*, information possessed by the prosecution team is disclosable only if it meets Rule 16's or *Brady*'s substantive standards. Rule 16 requires, for example, the production of a defendant's recorded statement, provided that the statement is in the prosecution team's possession. *See* Fed. R. Crim. P. 16(a)(1)(A), (B); *see, e.g.*, *United States v. Avenatti*, 559 F. Supp. 3d 274, 280 (S.D.N.Y. 2021).  Rule 16 also requires the production of evidence and information, within the prosecution team's possession, that is "material to preparing the defense."   Fed. R. Crim. P. 16(a)(1)(E)(i).  *Brady* and *Giglio* require the production of evidence and information that is "exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence" or "useful for impeachment, *i.e.*, having the potential to alter the jury's assessment of the credibility of a significant prosecution witness," *Avellino*, 136 F.3d at 255 (describing *Brady*'s scope).

An item is "material to preparing the defense" under Rule 16 "if it could be used to counter the Government's case or bolster a defense."  *United States v. Stevens*, 985 F.2d 1175, 1180–81 (2d Cir. 1993); *accord, e.g.*, *United States v. Urena*, 989 F. Supp. 2d 253, 258 (S.D.N.Y. 2013). "Materiality [for Rule 16] means more than the evidence in question bears some abstract logical relationship to the issues in the case.  There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."  *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (cleaned up).  A defendant

10

moving to compel production must make a *prima facie* showing of materiality, *United States v. Finnerty,* 411 F.Supp.2d 428, 431 (S.D.N.Y. 2006), and must "offer more than the conclusory allegation that the requested evidence is material," *United States v. Rigas,* 258 F.Supp.2d 299, 307 (S.D.N.Y.2003) (denying motion to compel where "[d]efendants attempt to equate 'material' with 'useful' in order to meet their burden").  And "if the purported defense for which a defendant seeks to compel the production of certain documents is meritless as a matter of law, then the requested documents are not 'material' for purposes of Rule 16."  *United States v. Abdalla*, 317 F. Supp. 3d 786, 791 (S.D.N.Y. 2018) (denying motion to compel where defendants "fail[ed] to make a *prima facie* showing that the documents they seek from the Government would be material to any non-frivolous defense to their prosecution").  The upshot of these limitations is that "Rule 16 does not entitle a criminal defendant to a broad and blind fishing expedition among items possessed by the Government on the chance that something impeaching might turn up."  *United States v. Scully*, 108 F. Supp. 3d 59, 123 (E.D.N.Y. 2015).

Unlike Rule 16, "*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation."  *Maniktala*, 934 F.2d at 28.  "Accordingly, the purpose of *Brady* 'is not to provide the defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him."  *Weigand*, 482 F. Supp. 3d at 248 (quoting *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973)).  The Second Circuit has declared that *Brady* is a constitutional rule of minimum fairness, not discovery, precisely because it is limited to information that is exculpatory, that is known to the prosecution team, and that is unknown to the defendant.  *Brady* requires disclosure where "the evidence is material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963),

which means that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would [be] different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). And *Brady* has no application to evidence "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997).

## B.   Discussion

Kwok's motion seeks a three-part order from this Court. There is no basis to grant any part of the requested order. For his first and most substantial request, the defendant argues that he needs a massive trove of information—culled from the files of countless federal agencies—to explain to a jury that what might otherwise look like a billion-dollar investment fraud was instead a political movement's response to being targeted by the CCP. To state the defendant's argument is to refute it. The CCP's conduct, and the defendant's political activities, are irrelevant to the charges that the defendant led a scheme to steal people's money through misrepresentations about how that money would be invested in a media venture, a luxury membership club, and a cryptocurrency exchange. Even if such a defense had legal merit—and it does not—the defendant's Motion to Compel would still fail. No rule of law entitles the defendant to direct a government-wide search for documents, and the defendant already has access to the information he seeks. Kwok's other requests should also be denied. His request for a recording █████ ██████████████████████ will be mooted by the Government's forthcoming production, and there is no legal basis (and Kwok cites none) for his request that the Government help him identify recipients of potential defense trial subpoenas.

### 1.   Kwok Is Not Entitled to Information the Prosecution Team Does Not Have

The defendant's arguments flow from an incorrect statement of the law: his motion asserts

12

that the Government is required "to *identify* all material that might aid the defense." (Mot. at 16 (emphases added)). Neither *Brady* nor Rule 16 works that way. Under both disclosure regimes, the Government's duty to obtain and produce information is limited to materials in the possession of the prosecution team. Imposing a duty "on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question"—as the defendant urges this Court to do— "would condemn the prosecution of criminal cases to a state of paralysis." *Avellino*, 136 F.3d at 255 (cleaned up). And this "concern of the Second Circuit in *Avellino* . . . applies with equal force in the Rule 16 context." *United States v. Chalmers*, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006); *accord Alexandre*, 2023 WL 416405, at *12. The defendant is asking the Court to order precisely what the law "does not obligate" the prosecution team to do: "seek out information like a private investigator and valet gathering evidence and delivering it to opposing counsel." *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 457315, at *12 (S.D.N.Y. Feb. 15, 2022) (cleaned up).

Indeed, the defendant's motion does not even attempt to engage with the law limiting the Government's disclosure obligations to the prosecution team's files. The defendant makes no mention of the well-established test for "determining whether another government entity acted as part of the prosecution team for all or part of a given case," *Avenatti*, 2022 WL 457315, at *10 (collecting cases), because the defendant clearly cannot meet that test. For that matter, the defendant does not even argue that any particular agencies have any particular information material to a valid legal defense. Instead, the defendant asks this Court to compel a limitless search across the files of an unbounded series of agencies without any articulated relationship to the prosecution team—much less the required showing that they were "so integral to the prosecution team that imputation is proper." *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013).

The defendant's motion to compel a search across the entirety of the federal government is

13

a transparent attempt to bury the prosecution team with discovery burdens in the lead up to trial. It has no legal basis and serves no legitimate function in the preparation of any valid defense to the fraud charges at issue.  "The Second Circuit has consistently held that knowledge of one part of the government will not automatically be imputed to criminal prosecutors in another case." *Bouloute v. United States*, 645 F. Supp. 2d 125, 132 (E.D.N.Y. 2009) (citing *Locascio*, 6 F.3d at 949; *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971).  Indeed, in *Quinn*, the Second Circuit found a similar request to be "wholly lacking in merit."  445 F.2d at 943.  Like Kwok's motion to compel this prosecution team to discover and disclose information about which it is unaware, *Quinn*'s defendant sought a court order that prosecutors should have disclosed another jurisdiction's sealed indictment of a trial witness.  *Id.* at 943.  More than 50 years ago, *Quinn* noted the impracticability of any rule that would permit a defendant to compel prosecutors to search so far and wide, when "[the] Department of Justice alone has thousands of employees in the fifty States of the Union" with "many more thousands of employees of 'any part of the government.'" *Id.*; *accord United States v. Hunter*, 32 F.4th 22, 37 n.68 (2d Cir. 2022) (citing *Quinn*).  And like *Quinn's* motion, Kwok's motion "can be disposed of on a 'reduction ad absurdum' basis."  445 F.2d at 943.

### 2.  Kwok Cannot Compel the Production of Information He Already Has

No *Brady* remedy lies where "the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence."  *Torres*, 129 F.3d at 717.  There is not a single argument described in the defendant's motion that he could not make with the voluminous materials he has already received, including information produced in this case, information he cites from the public domain, or his own knowledge.

Indeed, the defendant's *own former counsel* was the source for a major part of what the

14

defendant now claims is *Brady* material in the Government's hands.  Kwok's motion misleadingly suggests that "the Government has already acknowledged . . . ███████████████████████ ████████████████████████████████████████," purportedly supporting the premise for the defendant's request for unbounded information about the CCP's targeting of his victims.  (Mot. at 24-25.)  But the June 26 Letter that the defendant refers to made clear that it was *the defendant's own counsel* who told the Government (without providing any corroborating evidence) that an individual claimed *to Kwok's own defense team* to have been ████████████████████████████.  The Government included that information in its June 26 Letter to ensure that Kwok's co-defendant, Wang, was aware of Kwok's claim and could get more information about it *from Kwok's lawyers*.  Indeed, the Government took that step in part because Kwok's former counsel advised the Government that he had *not* told Wang's attorneys about this accusation.  The Court should not endorse the defendant's wholly inappropriate maneuver of feeding information to the Government through counsel, inducing the Government to flag that information for a charged co-defendant in an abundance of caution, and then using that conscientious and unmandated disclosure as a sword against the Government in a motion to compel.  *Cf., e.g.*, *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997) ("[T]he defendants are hoisted by their own petard: without having obtained [a particular] file they would not have a *Brady* argument, but the ease with which they obtained that file defeats their claim.").

In any event, the Government's providing information that a victim in this case was (according to Kwok's counsel) ████████████████████████████ in no way constitutes an acknowledgment that any CCP-targeting of Kwok is exculpatory.  How could it be?  Presumably, the CCP did not coerce Kwok into lying to his victims.  Presumably, the CCP did not coerce Kwok into spending $100 million of his victims' money on a high-risk

investment for his son.  Presumably, the CCP dd not coerce Kwok into threatening his critics.

Presumably, the CCP did not coerce Kwok into spending his victim's money on lavish gifts for

himself, including by way of one small example, two $35,000 mattresses.  Ultimately, to the extent

Kwok thinks any of the Government's victim-witnesses are CCP "plants," he may seek to cross-

examine them about that topic at trial.  And to the extent Kwok thinks that the NFSC is a bona fide

"political movement" and he therefore lacked *mens rea* when repeatedly lying to his followers to

get their money, he may seek to offer evidence to that effect at trial.[2]  While the Government in

no way concedes the propriety or admissibility of either trial effort, it is sufficient at this stage to

acknowledge that neither effort by Kwok would impose discovery obligations on the Government

beyond that imposed by settled law.[3]  For these straightforward reasons, Kwok's motion fails.

### 3.  Kwok Is Not Entitled to Information That is Neither Exculpatory Nor Material to Preparing a Valid Defense

The Government is aware of and is complying with its obligations under Rule 16, *Brady*,

and *Giglio*.  Indeed, the Government has exceeded these requirements in its voluminous production

of Rule 16 materials to date and its disclosure of information beyond what *Brady* requires.

Accordingly, in order to justify a motion to compel the information Kwok seeks, he must make a

"particularized showing that materials exist requiring disclosure."  *United States v. Noel*, No. 19

---

[2] Kwok's motion makes clear that, should he later seek to admit evidence of "the NFSC's bona fides as a pro-democracy dissident movement," (Mot. at 15), he has access to numerous witnesses and materials in service of that  (immaterial) argument.  His motion describes the "hundreds of NFSC members" who reportedly continue to advance that organization's mission, as well as the "prominent American businesspersons and political figures" who "endorse[]" and "support[]" the NFSC.  (Mot. at 6–8).  *Cf.*, *e.g.*, *United States v. Hatfield*, No. 06-CR-0550 (JS), 2009 WL 10673620, at *3 (E.D.N.Y. July 10, 2009) ("[T]he Court finds that the Government did not violate its obligations under *Brady* because [the defendant] was already in possession of the [exculpatory evidence].").

[3] For avoidance of doubt, the legitimacy or illegitimacy of the NFSC is not a defense to the fraud charges—and the defendant has failed to articulate any such defense.

Cr. 830-2 (AT), 2020 WL 12834537, at *2 (S.D.N.Y. June 9, 2020) (quoting *United States v. Juliano*, No. 99 Cr. 1197, 2000 WL 640644, at *2 (S.D.N.Y. May 18, 2000)).  Here, the defendant has not made any showing—much less "put forward some compelling demonstration"—that there has been any "specific failure by the Government to comply with its disclosure obligations."  *Noel*, No. 19 Cr. 830-2 (AT), 2020 WL 12834537, at *2 (quoting *United States v. Minaya*, 395 F. Supp. 2d 28, 34 (S.D.N.Y. 2005)) (internal citations omitted).  And such a showing cannot be made where a defendant seeks materials untethered to the defense of his charges or statements of potential witnesses, the production of which are neither due at this stage of the prosecution, nor susceptible to a motion to compel.[4]

The defendant's proposed order would compel productions responsive to eight requests.  (*See* Mot. at 14).  Six of these eight requests—Requests 2-5 and 7-8—relate to the "targeting" of Kwok and related persons by a foreign government (the "Targeting Requests").  (*See* Barkan Decl., Ex. I at 2–4).  An additional request, Request 6, seeks "[a]ll documents and communications concerning" the NFSC (the "NFSC Request"), which the defendant's motion describes as his "political movement."  (Mot. at 13).

But this is a fraud case.  And the defendant's motion offers no cogent explanation for how materials about a foreign government's conduct or the defendant's political activity are exculpatory or material to any valid defense of charges that Kwok defrauded investors using what he held out to be a media venture, a luxury membership club, and a cryptocurrency exchange.

Rather than make the necessary *prima facie* showing of materiality—because he cannot—

---

[4] Victim-witnesses' statements—including, if any, statements that "reference the NFSC"—will be subject to disclosure pursuant to 18 U.S.C. § 3500 and/or *Giglio*.  The Government will timely produce such statements, but their production cannot be compelled now.  *See United States v. Espinal*, 96 F. Supp. 3d 53, 86 (S.D.N.Y. 2015).

the defendant simply asserts that the information he demands the Government search for is "critical" and "essential" to his defense. (Mot. at 17, 19.) "If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice. . . . [T]he Constitution surely does not demand that much." *See United States v. Agurs*, 427 U.S. 97, 109 (1976). The standard is materiality. And Kwok cannot rely on his own "conclusory allegation that the requested evidence is material." *Rigas,* 258 F.Supp.2d at 307.

To attempt to steer around this obstacle, the defendant's motion ignores the substance of the Indictment to focus on—and critically, misrepresent—just a few of its more than 10,000 words. The defendant says that "the Indictment refers to Mr. Kwok as a 'purported' dissident." (Mot. at 10 (citing Indictment ¶ 6(a)). In fact, the cited paragraph, ¶ 6(a), refers to Kwok as a "purported . . . *billionaire*." Indictment ¶ 6(a) (emphasis added). The rest of the defendant's argument that he is "entitled to defend himself by rebutting the government's attack on his and the NFSC's opposition activities to the CCP," (Mot. at 18), is built on this slippery foundation. (*See, e.g.*, Mot. at 19 (arguing that "[e]vidence of Operation Fox Hunt . . . undercuts the government's narrative that [the defendant] and his movement engage in 'purported,' rather than actual, political activism")).

Even on their own terms, the defendant's arguments fail to show how materials about his political activities and a foreign government's conduct are material (or even relevant) to a defense against fraud charges. The gulf between his requests and those in the three cases he principally relies on further proves the point. The defendant offers *United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991), to justify requests for "[e]vidence of Operation Fox Hunt," (Mot. at 19), "[i]nformation showing that the CCP was interfering with [his] ability to maintain bank accounts

and transfer funds," (*id.* at 23), and "[e]vidence that demonstrates that [he] . . . had a well-founded belief that the CCP was attempting to hack [him]," (*id.* at 24).   But *Coonan* is about the *admissibility* of "background evidence."   923 F.2d at 1561 ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.").   That certain evidence might be admissible at trial says nothing about whether the prosecution team can be compelled to "search for and produce" it, (Mot. at 2), months earlier.   The motion's two other principal authorities are similarly misused. *Rittweger* and *Percoco*, in the defendant's words, call for *Brady* disclosure of any evidence that "lends credence" to a "defendant's innocent belief" or "belief of appropriateness."   (*See* Mot. at 21 (citing  *United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008), and *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017)).   In fact, both cases involved narrow disputes over one or two documents that provided direct support for the defendant's argument that his allegedly criminal conduct was entirely lawful.   Kwok seeks vast materials relevant to "beliefs" about politics and government conduct with no bearing on whether he defrauded investors.   *Rittweger*'s motion focused on a cooperator's undisclosed statements supporting the defendant's theory that he genuinely believed his allegedly material misrepresentations.   524 F.3d at 181.   *Percoco*'s motion aimed at materials in the Government's possession relevant to one defendant's "belief or understanding that [his criminal conduct] had been authorized by an ethics opinion."   2017 WL 6314146, at *23.   And neither case even contemplated ordering the search for and production of materials not held by the prosecution team—indeed, there is no such case, because that is not the law.   *See Rittweger*, 524 F.3d at 181 (transcript of cooperator's grand jury testimony and notes of her later interview); *Percoco*, 2017 WL 6314146, at *23 (ordering Government "to produce any other evidence *it has*" related to single

19

legal opinion that purportedly authorized the conduct constituting the defendant's charge (emphasis added)).

By contrast, the defendant's motion seeks a limitless volume of materials covering broad topics with no relevant nexus to his fraud charges. The defendant cites authority that information bolstering an "innocent belief in connection with an alleged misrepresentation" is discoverable. (*See* Mot. at 21.) But the Government does not allege that the defendant's misrepresentations encompassed lying about *not* being targeted by the CCP. To take just one example: It is of no moment that materials purportedly show that, with respect to the Mahwah Mansion, it was "entirely reasonable" for the defendant to believe the NFSC "required a secure location to conduct its business." (*Id.*) The allegation is that the defendant misappropriated nearly $40 million in G|CLUBS fraud proceeds—intended by victims to purchase memberships in G|CLUBS—for the purchase, renovation, and furnishing of the Mahwah Mansion for the benefit of the defendant and his family. Whatever belief he had about the Mansion's ability to serve *another* organization's needs is no *defense* to the charge that he stole G|CLUBS investors' money to pay for it, and he is not entitled to task the Government with finding documents in support of such an untenable "defense." Moreover, to the extent Kwok purports to advance a defense about his own beliefs as to the CCPs' efforts to target him, he cannot use evidence outside the ken of his own knowledge to support that defense. Indeed, Kwok's beliefs definitionally cannot be informed by information he does *not* know. Thus, assuming hypothetically the Department of Veterans Affairs (or some other Government agency) prepared a report about the NFSC of which Kwok was unaware while committing the charged crimes, Kwok cannot use that report at trial to prove his state of mind. It would constitute hearsay and, more to the point, since Kwok did not know about it, he could not rely on it as evidence relevant to his state of mind. In other words, even putting aside the bedrock

principle of criminal discovery that a prosecution team has no obligation to review the entirety of the federal government's files whenever it brings a case, information about any targeting of Kwok is not even *relevant* (much less material) to this trial unless it was known to Kwok at the time he was committing the charged offenses.   And if it *was* known to Kwok at that time, then that information is already in Kwok's possession.

### 4.   Kwok Is Not Entitled to Information That is Neither Exculpatory Nor Material to Preparing a Valid Defense

Kwok asks the Court to compel the production of "any statement by the government's purported victims in which they discussed the NFSC," (including, apparently, inculpatory evidence) and claims that *any* such statement "would be *Brady* in several ways."  (Mot. at 25.) This is a transparent attempt to seek early 3500 production—which is particularly inappropriate here, given, as this Court has found, Kwok's established targeting of victims and critics.  (*See, e.g.*, Dkt. 50.)  Kwok's request for such a broad swath of victim statements is a blatant attempt to end run around the rule that "the Government is not required to produce *Giglio* material until it produces '3500 material' pursuant to the Jencks Act, so long as the Government provides the *Giglio* material in time for its effective use at trial."  *United States v. Morgan*, 690 F. Supp. 2d 274, 286 & n.61 (S.D.N.Y. 2010) (collecting cases); *see also United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) ("The Second Circuit has held that a request for immediate or early disclosure [of *Giglio* material] has no basis in the law. Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial.") (internal citations omitted).

## 5. Kwok is Not Entitled to "Intelligence Assessments" About His Own "Political Movement"

The defendant's request for "any documents concerning the NFSC, including, but not limited to intelligence assessments about the NFSC and evidence about the targeting of the NFSC," and the unsupported (and unsupportable) assertion that such evidence—if it exists—"is exculpatory" is meritless and should be denied. (Mot. at 26.) This is a fraud case, as all parties agree. The defendant is charged with spearheading an extensive fraud and money laundering scheme. Whether the NFSC has been a target of Operation Fox Hunt does not, as the defendant contends, "refute[] any contention by the government that the movement itself is fraudulent." (Mot. at 27.) The Government has alleged that the defendant leveraged his anti-CCP message to defraud his victims, and the "validity" of the NFSC's mission is inapposite to that allegation. Whether the NFSC was targeted by the CCP or a Government assessment of the NFSC (if any) has no bearing—at all—on whether Kwok made fraudulent misrepresentations to his victims about fraudulent investment vehicles. In addition, the defendant's claim that it is "essential" to his defense that the Government search for this theoretical evidence ignores entirely that it is the *defendant*—and not the Government—who is uniquely situated to provide "evidence showing that the [NFSC] is genuine," (Mot. at 27), because the *defendant* founded and operated the NFSC. Though the Government is not conceding admissibility, the defendant is welcome to seek to introduce at trial whatever evidence he has in his possession to argue that: (a) the NFSC is a legitimate anti-CCP political organization, and (b) the NFSC's stated mission is in any way relevant to a valid defense against the fraud offenses with which he is charged. But the defendant's desire to advance those arguments cannot be twisted into a requirement that the Government

engage in a "snipe hunt" for information that may not exist at all. *Loera*, 2017 WL 2821546, at *7.

## II.   The Request for the August 26, 2018 Recording is Moot

The defendant also asks the Court to compel the Government's production of a recording of an August 26, 2018 meeting ███████████████████████. (Mot. at 1, 27-28.)  The Government will produce a recording of the defendant's August 26, 2018 meeting ████████ ████. Accordingly, the defendant's motion as to this point is moot.

## III.   The Demand That the Government Identify Recipients for Potential Defense Subpoenas Should be Denied

There is no authority (and Kwok cites none) for the defendant's motion to compel the Government to assist in identifying theoretical recipients for potential defense trial subpoenas. That portion of the motion, like the others, should be denied.  If the defendant seeks to serve Rule 17 subpoenas in pursuit of the same materials sought through this motion to compel, he will have to establish that information about a foreign government's conduct and his own political activities is not just relevant but admissible, and not generally useful but specifically necessary. *See generally United States v. Nixon*, 418 U.S. 683, 700 (1974).

The Government will be filing a motion pursuant to Section 4 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3.

23

## **CONCLUSION**

For the reasons set forth above, the defendant's Motion to Compel should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Juliana N. Murray
Ryan B. Finkel
Justin Horton
Micah F. Fergenson
Assistant United States Attorneys
212-637-2314/-6612/-2276/-2190

24