UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

HO WAN KWOK,
    a/k/a "Miles Guo,"
    a/k/a "Miles Kwok,"
    a/k/a "Guo Wengui,"
    a/k/a "Brother Seven,"
    a/k/a "The Principal,"
    a/k/a "Boss," and

YANPING WANG
    a/k/a "Yvette,"
    a/k/a "Y,"

          Defendants.

**S2 23 Cr. 118 (AT)**

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
    - *Of Counsel* -

# TABLE OF CONTENTS

FACTUAL BACKGROUND ............................................................................................ 1

ARGUMENT ............................................................................................................................ 2

I.  Statements of the Defendants' Co-Conspirators and Agents Are Admissible ........................ 2

    A. Applicable Law ............................................................................................................ 2

        1.  The Rule Against Hearsay ...................................................................................... 2

        2.  Rule 801(d)(2)(D) ................................................................................................. 2

        3.  Rule 801(d)(2)(E) ................................................................................................. 3

    B. Discussion .................................................................................................................... 4

        1.  Statements of Co-Conspirators Are Not Hearsay ................................................. 4

        2.  Statements of Kwok Enterprise Agents and Employees Are Not Hearsay ............. 9

        3.  Videos, Posts, Articles, and Translations by the Defendants or Their Agents Are
            Not Hearsay ...................................................................................................... 11

II.  Certain Evidence Is Admissible as Direct Evidence Or Pursuant to Rule 404(b) ................. 12

    A. Applicable Law .......................................................................................................... 13

        1.  Direct Evidence ................................................................................................... 13

        2.  Rule 404(b) ........................................................................................................ 14

        3.  Rule 403 ............................................................................................................. 14

    B. Discussion .................................................................................................................. 15

        1.  Evidence of Interconnected Schemes Is Admissible ............................................. 15

        2.  Evidence of the Defendant's False Promise to Donate $100 Million to the Rule of
            Law Charities Is Admissible .............................................................................. 19

        3.  Evidence that Kwok's Assets Were Seized Prior to His Fundraising Is Admissible
            ............................................................................................................................ 21

        4.  Post-Arrest Conduct Is Admissible with a Limiting Instruction ........................... 23

        5.  Evidence from Kwok's Bankruptcy Is Admissible ............................................... 26

III. The Court Should Admit Certain Evidence Regarding the GTV Private Placement ............ 31

IV. The Court Should Permit the Authentication of Certain Records Under Rule 902(11) ........ 34

V.  The Court Should Admit Bank Records From First Abu Dhabi Bank .................................. 36

VI. The Court Should Preclude the Defendant from Introducing Evidence and Arguments
    That Are Irrelevant and Unfairly Prejudicial ...................................................................... 46

A. The Court Should Exclude Evidence and Argument That This Prosecution is Improperly Linked to the CCP or in Any Way Malicious ............................................. 46

B. The Court Should Preclude the Defendants from Introducing Evidence and Arguments Related to CCP Activities That Are Irrelevant and Unfairly Prejudicial".... 47

    1. The Court Should Limit Evidence and Claims Regarding CCP Activities, Including Targeting ....................................................................................................... 47

    2. The Court Should Exclude Extrinsic Targeting Evidence, Outside of Defendants' Testimony ................................................................................................ 49

    3. The Court Should Closely Police Defendants' Testimony To Avoid Impermissible Bases for a Verdict ......................................................................................... 52

    4. The Court Should Preclude Argument and Evidence Suggesting that the Defendants' Fraud Was Justified, Necessary, or a Result of Duress .................... 56

    5. The Court Should Preclude General Evidence of Contact Between the Chinese Police and Victims ................................................................................................. 57

C. The Court Should Exclude Evidence and Claims of the Defendants' Good Acts (Including Any Dissident Activity Against the CCP) To Prove Their Innocence .......... 58

D. The Court Should Preclude Defense Arguments, Evidence and Cross-Examination Suggesting That the Defendants Are Not Guilty Because of Disclaimers in Transaction Documents ....................................................................................... 62

E. The Court Should Exclude Evidence and Claims That Victims Were Negligent or Failed to Conduct Adequate Due Diligence ..................................................... 65

F. The Court Should Preclude Argument That the SEC or the Government Are Responsible for Victims' Financial Losses ......................................................... 67

G. The Court Should Exclude Evidence and Claims That the Defendants Intended to Repay Victims ................................................................................................... 68

H. The Court Should Exclude Evidence of the Defendant's Personal Circumstances and Potential Punishment ................................................................................... 70

VII. The Court Should Preclude the Defendants from Offering Their Statements for Their Truth ....................................................................................................................... 70

CONCLUSION ....................................................................................................................... 73

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Bourjaily v. United States*, 483 U.S. 171 (1987) .......................................................................... 3

*Feis v. United States*, 394 F. App'x 797 (2d Cir. 2010) ................................................................ 3

*George v. Celotex Corp.*, 914 F.2d 26 (2d Cir. 1990) ................................................................... 2

*In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ................................................................................................................................. 10

*Neder v. United States*, 527 U.S. 1 (1999)................................................................................... 64

*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (2d Cir. 1992)........................................ 3, 9

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627 (2d Cir. 1994) ...................... 35

*Rogers v. United States*, 422 U.S. 35 (1975) ............................................................................... 70

*Shannon v. United States*, 512 U.S. 573 (1994)........................................................................... 70

*United States v. Adelekan*, 567 F. Supp. 3d 459 (S.D.N.Y. 2021) .............................................. 65

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ........................................................... 59

*United States v. Amico*, 486 F.3d 764 (2d Cir. 2007) ................................................................. 65

*United States v. Ayelotan*, 917 F.3d 394 (5th Cir. 2019) ...................................................... 34, 35

*United States v. Bailey*, 444 U.S. 394 (1980) ............................................................................. 46

*United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990) .......................................................... 46

*United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023)...................................................................................................................... 68

*United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) .............................................................................................................................. 69

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) .......................................................... 58

*United States v. Berger*, 188 F. Supp. 2d 307 (S.D.N.Y. 2002) ................................................. 69

*United States v. Buckley*, 101 F.3d 685, 1996 WL 282140 (2d Cir. 1996) ................................. 68

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) .......................................... 13, 27

*United States v. Cheung Kin Ping*, 555 F.2d 1069 (2d Cir. 1977)................................. 67

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)........................................... 13, 14

*United States v. Daly*, 842 F.2d 1380 (2d Cir.)........................................................ 14

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999)........................................ 13, 14, 21

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ............................................ 2

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) ............................................ 14

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ....................................... 15

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995)............................................ 15

*United States v. Gigante*, 166 F.3d 75 (2d Cir. 1999) ............................................ 3

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) ....................................... 13

*United States v. Gupta*, 747 F.3d 111 (2d Cir. 2014) ............................................ 3

*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) ........................................ 70

*United States v. Inserra*, 34 F.3d 83 (2d Cir. 1994)............................................... 21

*United States v. Jabar*, 19 F.4th 66 (2d Cir. 2021)............................................... 68

*United States v. Josephberg*, 562 F.3d 478 (2d Cir. 2009) ................................... 67

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995) ............................................ 46

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................. 69

*United States v. Males*, 459 F.3d 154 (2d Cir. 2006)............................................ 68

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ........................................... 46

*United States v. Miller*, No. 18 Cr. 202 (ARR), 2018 WL 4961458 (E.D.N.Y. Oct. 15, 2018)... 35

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991) ..................................... 69

*United States v. Padilla*, 203 F.3d 156 (2d Cir. 2000).......................................... 3

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997) ................................................ 46

*United States v. Qualls*, 613 F. App'x 25 (2d Cir. 2015) ........................................ 35

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) ........................................ 13

*United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) .......................................... 14

*United States v. Rivera*, 22 F.3d 430 (2d Cir. 1994) ............................................... 4

*United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015). 59

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ................................ 15

*United States v. Rom*, 528 F. App'x 24 (2d Cir. 2013) ............................................ 34

*United States v. Romero-Padilla*, 583 F.3d 126 (2d Cir. 2009) ............................... 21

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) ................................................. 9

*United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) ............................................... 58

*United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980) ........................................... 69

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006) ........................................ 15, 26

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988) .................................... 4

*United States v. Thai*, 29 F.3d 785 (2d Cir. 1994) ................................................ 13

*United States v. Thomas*, 581 F. App'x 100 (2d Cir. 2014) .................................... 68

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993) ............................................... 4

*United States v. Tussa*, 816 F.2d 58 (2d Cir. 1987) ......................................... 15, 26

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ................................................ 64

*United States v. Vincent*, 416 F.3d 593 (7th Cir. 2005) .......................................... 68

*United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) ................................ 68

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) .................................... 64, 65, 66

*United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173 (S.D.N.Y. Feb. 14, 2021) .. 35

*United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993) .......................................... 14

Statutes

18 U.S.C. § 3505 ................................................................................................ 41, 43, 51

Rules

Fed. R. Evid. 104(a) ...................................................................................................... 9
Fed. R. Evid. 402 ........................................................................................................ 65
Fed. R. Evid. 403 ............................................................................................. 21, 32, 52
Fed. R. Evid. 404(a)(2)(A) & 405(a) ............................................................................ 54
Fed. R. Evid. 404(b) .................................................................................................... 20
Fed. R. Evid. 801(c) ...................................................................................................... 8
Fed. R. Evid. 802 .......................................................................................................... 8
Fed. R. Evid. 803(6) .................................................................................................... 42
Fed. R. Evid. 803(6)(D) .............................................................................................. 41

The Government respectfully submits these motions *in limine* in advance of the trial of defendants Ho Wan Kwok and Yanping Wang, scheduled to begin on May 20, 2024.

## FACTUAL BACKGROUND

On January 3, 2024, a grand jury returned Superseding Indictment S2 23 Cr. 118 (AT), ECF No. 215 ("Indictment"). That Indictment charged the defendants with a series of fraud and money laundering offenses for their acts in defrauding more than 1,000 victims out of more than $1 billion. The Indictment also charged the defendants with conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") by conspiring to establish, and operate, an enterprise in furtherance of several fraud and money laundering crimes.

The charges arise out of the defendants' fraudulent misappropriation of million of dollars of funds sent by investors in the Kwok Enterprise, and the defendants' related false and misleading statements to those victim investors, all so that they could obtain and keep the victim money. The defendants then used millions of dollars in stolen funds for a variety of purposes, including, among other things, to make a high-risk, $100 million dollar bet via a hedge fund investment for the ultimate benefit of Kwok's son; to make payments for Kwok's yacht and for a private jet; to purchase, renovate, and furnish a 50,000-square-foot mansion in Mahwah, New Jersey (the "Mahwah Mansion") for approximately $40 million; to purchase a $4 million Ferrari for Kwok's son; to finance a $37 million "loan" relating to Kwok's yacht; and generally to enrich themselves.

At trial, the Government expects to call, among other witnesses, victim investors, former employees of companies within the Kwok Enterprise, and a summary witness whose financial analysis will show the misappropriation of investor funds. The Government also intends to introduce documentary evidence of the defendants' crimes, including, among other things, online broadcasts and posts, financial records, and private communications.

<u>**ARGUMENT**</u>

**I.    <u>Statements of the Defendants' Co-Conspirators and Agents Are Admissible</u>**

At trial, the Government will seek to introduce for their truth out-of-court statements by the defendants' co-conspirators, agents, and employees.  Such statements, including particular statements described below, are admissible and are not barred by the rule against hearsay.

**A.  Applicable Law**

1. <u>The Rule Against Hearsay</u>

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

2. <u>Rule 801(d)(2)(D)</u>

Federal Rule of Evidence 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  To admit a statement under this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement

2

was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537.

### 3. Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v.*

*Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  Under this standard, a co-conspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

### B. Discussion

#### 1. Statements of Co-Conspirators Are Not Hearsay

The Government intends to offer into evidence statements by Kwok's and Wang's co-conspirators, including co-defendant Kin Ming Je and other co-conspirators, such as Qiang Guo, a/k/a "Mileson" (Kwok's son) and Haoran He (the purported beneficial owner of several of the Kwok Enterprise entities, including G|CLUBS and G|FASHION).  These statements were made in furtherance of the charged conspiracy and are therefore not precluded by the rule against hearsay.

The Court can make a preliminary ruling that statements of Je, Mileson, and He are admissible against the trial defendants, subject to the introduction of trial evidence (including the statements themselves) sufficient to show the existence of a conspiracy. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed.).  The evidence at trial readily will show by a preponderance that Kwok, Wang, Je, Mileson, and He entered into a conspiracy, and that these co-conspirators made statements during the course of, and in furtherance, of the conspiracy.

##### a. *Recorded Crane Calls*

One category of evidence containing co-conspirator statements from Je and Mileson

consists of audio-recorded phone calls with an employee of the Kwok Enterprise (Employee-1). Employee-1 recorded a series of calls with individulas within the Kwok Enterprise. Some of the calls were conference calls with groups, at times including the defendants, while others were one-on-one calls directly with Je or one-on-one calls directly with Mileson. The general topic discussed in this series of calls was more than approximately $120 million that had been received by an entity called Crane Advisory Services ("Crane"). In connection with Employee-1's work for the Kwok Enterprise, Employee-1 incorporated Crane and opened bank accounts for Crane. Employee-1 agreed with defendant Wang to receive into a Crane bank account a transfer from a Farm consisting of G|CLUBS membership funds—with Crane acting as an escrow agent for G|CLUBS, which was unable to maintain functional bank accounts. Thereafter, Crane ultimately received more than approximately $120 million of G|CLUBS investor funds into Crane's bank accounts. After being pressured by the defendants to transfer these funds abroad, Employee-1 began recording his calls with the defendants and their co-conspirators. Ultimately, funds received by Crane were transferred to G|CLUBS and the escrow account Aaron Mitchell, an attorney who represented the defendants and G|CLUBS and received the funds on behalf of G|CLUBS. Mitchell's escrow account received approximately $46 million from Crane, which Mitchell did not then transfer to G|CLUBS. Instead, Mitchell transferred the entire amount to a bank account held by Je's purported investment fund, Hamilton. That money was then used to purchase and renovate the Mahwah Mansion, for approximately $40 million. That purchase and renovation was also arranged by Mitchell.

   b. *Examples of Je's Statements*

   As examples of Je's statements regarding the money received by Crane, in a recorded call between Employee-1 and Je on or about May 4, 2021, Je made several statements in furtherance

of the conspiracy that are admissible for their truth.  At the beginning of the call, Je stated that "[t]he principal [*i.e.*, Kwok] called," and Je understood that the remitters of the more than approximately $120 million "have signed up to buy the membership from G Club."  After Employee-1 explained that was not true for all the remitters, and that Crane had received wires in the millions of dollars—far above the highest G|CLUBS membership tier of $50,000—Je explained, "I think they, first of all, they are buying the G Club membership, but they are expecting would probably receive some shares, you know, on on, on the future GTV, I think this is their expectation."  Employee-1 therafter responded that "now you are telling me G Club.  Last week, it was for GTV investment directly.  Ok?  The amounts don't make any sense."  Je replied, "I know. I know. I know."  Je later said, "[I]s Yvette working on this?  Like, I mean, she should be working on this, like she should be negotiating all those [conversations with a key Farm leader]."  Employee-1 replied: "She is involved.  But my involvement with Yvette was . . . the money is coming in to Crane for the purpose of investment in GTV media company in Bahamas . . . But now things shifted last week.  It became the H Coin and then now G Club, and now the . . . the media company."  Je then replied in part, "all these money should belong to G Club."  The call ended with Je stating "[t]he principal [*i.e.*, Kwok] is calling."  This recording (like the other Crane recordings) is admissible, and Je's statements—constituting the statements of a co-conspirator and agent of the defendants (like other Je statements that will be offered at trial)—may be offered for their truth.

c.  *Examples of Mileson's Statements*

Employee-1 also had several recorded calls with Kwok's son, Mileson, despite Mileson having no formal employment with G|CLUBS.  For example, in a call on or about May 6, 2021, Employee-1 recorded a call with Mileson, Kwok, Mitchell, another of the defendants' attorneys,

and the general counsel of G|CLUBS.[1]  During the call, Mileson instructs Employee-1 to send him a documents tracking the investor funds and write on the documents "confidentiality, lawyer's privilege."  Mitchell responds that for privilege to apply, the attorneys have to represent the parties involved, and "Mileson doesn't have, technically, any ownership interest in G Club."  Mileson then replies: "But actually, I do, Aaron [Mitchell] . . . I am the settler of the foundation, so, I do. . . . But I am not actively um, but UBO [ultimate beneficial owner] is Mr. [Haoran] He.  I am just the settlor.  By Dutch law, I do have some sort of saying, but I am not practicing it."  Mileson's statements reference the Dutch foundation that ultimately owned the G|CLUBS entites, which was in turn nominally owned by Haoran He.  Using Haoran He—instead of Mileson—to direct investor funds sent to G|CLUBS back into the hands of the defendants and Mileson was a central part of the conspiracy.  Indeed, on this same May 6, 2021 call, Kwok stated to Mileson, speaking in Mandarin, which the other participants did not understand: "For this money, it's legal.  It's…wire to this foundation [*i.e.*, Hamilton], understand? Just following previously mentioned, two steps. Right?  One is to transfer the money to BVI account [*i.e.*, the bank account of G|CLUBS parent entity, G Clubs International Limited, a BVI-incorporated entity], then Mr. He will command [the transfer of those funds to Hamilton].  Right?  During this period, we do it according to the plan."[2] Of course, as described above, the Crane funds were, indeed, ultimately sent to Hamilton— including by Mitchell—and then used to purchase, renovate, and furnish the Mahwah Mansion for Kwok and his family (which undertaking was also facilitated by Mitchell).  This recording (like

---

[1] As described below, G|CLUBS filed an arbitration claim against Crane regarding the disposition of funds received by Crane.  In commuications with the Government, G|CLUBS has waived privilege as to a variety of subject matter, including the Crane arbitration.

[2] In a later call between just Mileson and Employee-1, Employee-1 asked, "where is the money going? Where do you want it to go?"  Mileson responded simply: "Anywhere out of U.S."

the other Crane recordings) is admissible and Mileson's statements—constituting the statements of a co-conspirator and agent of the defendants (like other Mileson statements that will be offered at trial)—may be offered for their truth.

> d. *Examples of Haoran He Statements*

The evidence will also show that Haoran He was a co-conspirator, and his statements in furtherance of the conspiracy therefore are admissible. As insinuated by Kwok's statements to Mileson described above, Haoran He did, in fact, direct the transfer of G|CLUBS investor proceeds abroad, and on multiple occassions—to the United Kingdom, to Switzerland, to the Kyrgyz Republic. For example, Haoran He directed a transfer, styled as a "loan," of $10 million of G|CLUBS funds to his purported real estate development company in the United Kingdom, named Fiesta Property Developments Ltd. ("Fiesta"). When the bank asked for the purpose of the initial wire, a G|CLUBS employee facilitating the transfer on behalf of Haoran He replied that Fiesta was also owned by Haoran He and this purported loan was "for a possible down payment on a property they plan to purchase for a total of $10 million."[3] After the bank approved the wires and transferred $10 million to Fiesta, the G|CLUBS funds sent to Fiesta were used to pay for a $4 million Ferrari on behalf of Mileson, as shown in bank records, contracts, and email communications with the Ferrari dealer. Statements such as this one, regarding a supposed real estate down payment that Haoran He made, or caused to be made, are admissible as co-conspirator statements.

For many of the same reasons, statements from Je, Mielson, and Haoran He are also statements of the defendants' agents under Rule 801(d)(2)(D). Indeed, Kwok was literally referred

---

[3] This statement is also admissible because it is offered not for its truth, but for its falsity.

to as "the Principal" by his agents, including his co-conspirators. As the proof at trial will demonstrate, Je, Mileson, and Haoran He worked for companies within the Kwok Enterprise, the defendants controlled and ran those companies, and the statements of Je, Mileson, and Haoran He—and employees who worked on their behalf—were within the scope of their agency relationships, and are therefore not hearsay pursuant to Rule 801(d)(2)(D). *See, e.g.*, *Pappas*, 963 F.2d at 537. To the extent the defense were to argue that these recordings and emails document legitimate business discussions as opposed to discussions designed to further a criminal scheme, that fact (which the Government disputes) would not undermine the admissibility of those materials under Rule 801(d)(2)(D), because the rule authorizes the admission of statements designed to further a joint venture with the defendants, whether or not the goal of that venture is criminal. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all.").

### 2. Statements of Kwok Enterprise Agents and Employees Are Not Hearsay

The evidence at trial will show that Kwok and Wang controlled the companies within the Kwok Enterprise, including (but not limited to) the Kwok family office entities, GTV, the Himalaya Farm entities, G|CLUBS, G|FASHION, G News, the HCHK entities, and the Himalaya Exchange. Statements made by Kwok Enterprise employees while they were employed by such companies, or by Farm members, as reflected in documents or as described during their anticipated trial testimony, are statements of the defendants' agents under Rule 801(d)(2)(D) and therefore not hearsay. As noted above, individuals working at companies within the Kwok Enterprise referred to Kwok as "the Principal" or "Boss" and Kwok exercised ultimate control over the companies. Wang played the role of functional Chief Executive Officer ("CEO") at the Kwok Enterprise

companies, despite her typically lacking a formal role or the installment of other, figurehead CEOs at those companies. Similarly, Kwok controlled the Farms, discussing his investment "projects" on his broadcasts—at times directly, at other times more obliquely—and disseminating information and directives through the Farm's hierarchies to his thousands of followers. This same principle applies equally to other categories of agents, such as attorneys,[4] consultants, and translators working on behalf of the defendants or the Kwok Enterprise companies. *See In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012) (statements made by an employee of an entity are admissible when offered against the person who controls the entity).

While this legal framework applies to statements by *all* of the defendants' agents and employees, the Government will not, of course, offer at trial statements from all of those people. In short, when assessing the admissibility of Kwok Enterprise employee or agent statements that the Government will offer, the Court should apply the foregoing framework: the statements are not hearsay and may be offered for their truth.

---

[4] *See United States v. Amato*, 356 F.3d 216, 220 (2d Cir. 2004) (per curiam) (affirming admission of a letter from defendant's prior counsel); *United States v. Arrington*, 867 F.2d 122, 128 (2d Cir. 1989) (there are no "special procedures to be followed, or balancings to be performed as a prerequisite to the evidentiary use of a defendant's counsel's out-of-court statements"); *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) ("The general admissibility of an attorney's statements . . . [is] well established."); *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981) ("Statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney."); *United States v. Dolleris*, 408 F.2d 918, 921 (6th Cir. 1969) (affirming admission of statements made by an attorney at conferences, even though the client was not present at the conferences). The Second Circuit has developed a five-part test concerning the admission of *jury argument* by a criminal defendant's counsel in a *prior criminal trial*. *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984); *see United States v. Amato*, 356 F.3d 216 (2d Cir. 2004); *United States v. Arrington*, 867 F.2d 122 (2d Cir. 1989) (limiting the *McKeon* five-part test to prior counsel's jury argument). That test has no relevance here, as the Government will not seek to introduce any prior jury argument.

3. <u>Videos, Posts, Articles, and Translations by the Defendants or Their Agents Are Not Hearsay</u>

The Government will seek to offer videos, posts, and articles that were made by Kwok or Kwok's agents and often hosted on Kwok's media platforms, such as G News, GTV, and GETTR. This content and translations of this content by Kwok's agents (typically, Farm members working as volunteers)—which is often incorporated into the content itself, such as Kwok's video broadcasts that contain English subtitles—are statements of agents that are not hearsay under Rule 801(d)(2)(D).

The Farms and other NFSC-related organizations (such as NFSC News), which were controlled by Kwok, regularly posted on G News, GTV, and GETTR—media platforms that were controlled by Kwok and Wang.[5] These posts regularly transcribed or summarized in English the content of Kwok's online broadcasts and often included English-subtitled videos of Kwok's broadcasts. For example, a G News post by the Los Angeles Farm (Himalaya Los Angeles Pangu[6]) on November 16, 2021, roughly two weeks after the launch of the Himalaya Exchange, included an English-subtitled excerpt from Kwok's recent online broadcasts in which Kwok explains that people who sent money—"Gclub's buyers" "donors to the Rule of Law Foundation" and "GTV investors, borrowers [*i.e.*, lenders in the Farm Loan Program], and H-Coin owners"—will receive "VVIP treatment in the future." As set forth in the G News post and accompanying video, Kwok then goes on to state that the Himalaya Exchange is worth $2 trillion and GTV investors own 5%

---

[5] Indeed, content on these sites even proves the point. For example, in an April 2020 G News post by Kwok (under the verified handle "Miles"), summarizing one of Kwok's broadcasts, Kwok states: "Comrades, I'm creating G-TV and G-News for you, is that right?" Kwok also goes on to say, "Everyone sees that we are so busy G-TV, G-News, Wang Yanping and all the employees of our rule of law fund." *See* https://gnews.org/m/1096424.

[6] Pangu is a reference to the Pangu Plaza, a real estate development project of Kwok's in Beijing.

of it, or $100 billion:

> According to your different investments, no one in the whole mankind dares to do this
> You never thought about how much total comrades in arms invested in GTV
> less than 1 billion U.S. dollars, and now GTV owns 5% of Himalaya Reserve
> You know how much it is worth? what is 5% of 2 trillion
> 100 billion US dollars, excluding other institutions investment
> How much money do you have, have you calculated it?



Videos such as these—posted by Kwok's agents on websites that Kwok controls, containing statements of Kwok and the English translations of his agents—are not hearsay under Rule 801(d)(2)(D).[7]

## II.     Certain Evidence Is Admissible as Direct Evidence Or Pursuant to Rule 404(b)

As described further below, evidence of the following is relevant and admissible at trial, both as direct proof of the charges and pursuant to Federal Rule of Evidence 404(b): (1) the evolving scams that the defendants used to continue to defraud their victims, including the A10 Project; (2) Kwok's false promise to donate $100 million to the Rule of Law entities; (3) the fact

---

[7] Moreover, statements such as these are not hearsay for another reason: they are not offered for their truth, but for their falsity.

that Kwok's assets in China and Hong Kong were seized prior to his fundraising for the Kwok Enterprise; (4) the defendants' continued leadership of the Kwok Enterprise from jail following their arrests; and (5) Kwok's claim of bankruptcy.[8]

### A. Applicable Law

#### 1. Direct Evidence

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Thus, where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of

---

[8] For the reasons explained herein, this evidence is all direct evidence of the racketeering, fraud, and money laundering offenses, for which no notice under Rule 404(b) is required. In any event, this motion constitutes notice pursuant to Rule 404(b) that the Government intends to offer such evidence at trial.

the conspiracy itself"). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of a charged conspiracy, or the motive and intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)).

      2.  Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Such evidence is admissible if (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76 (citing *Diaz*, 176 F.3d at 79).

      3.  Rule 403

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered

14

evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

### B. Discussion

#### 1. Evidence of Interconnected Schemes Is Admissible

Evidence of the defendants' evolving investment schemes is admissible as evidence of the charged offenses. The Indictment gave illustrative descriptions of the four principal schemes: the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange. The particulars of these various fraud schemes were continually changing and evolving. For example, prior to the official launch of the Himalaya Exchange and its Himalaya Dollars (or H Dollars) and Himalaya Coins (or H Coins), the defendants solicited funds for G Dollars and G Coins at the time of the GTV Private Placement. As part of the Himalaya Exchange scheme, the defendants also solicited investment in a "digital bank." As described in the Indictment, after the illegal GTV Private Placement was haulted, the defendants continued to trick followers into sending money for

GTV shares via the the Farm Loan Program and G|CLUBS.  At a certain point, since GTV was defunct, the investment was purportedly for a new media company called Freedom Media Ventures Limited, a BVI entity named as a member of the Kwok Enterprise in the Indictment. Indictment ¶ 3(a).  When that purported media company went nowhere, the defendants then started raising for money a new scam called the "A15 Project."  According to that scam, the money sent by victim investors would now be used to own 5% of G|CLUBS, 5% of GETTR, and 5% of the Himalaya Exchange—all entities listed as members of the Kwok Enterprise in the Indictment.

Nearing the time of the defendants' arrests, the A15 scam was revised to the "A10 Project," which excluded G|CLUBS shares and thus involved 5% of GETTR and 5% of the Himalaya Exchange.  In online statements, Kwok directed his followers to "Fei Fei" for details on the A10 Project.  A February 17, 2023 post on Kwok's G News platform, which, according to G News, has been viewed 4.3 thousand times, summarizes (in English) the A10 Project as described in Fei Fei's broadcasts as follows:

**About the A10 Project**

The 5% equity of Gettr and the 5% equity of Himalaya Reserve are called A10 together.

GClubs is an operation form of private equity companies. As a top global club, it has a high level of confidentiality, so it does not participate in this project.

An investment of 1 yuan in A10 is equivalent to an investment of 10,000 yuan, and its shares are scarce and have high economic growth value.

Gettr and the Himalaya Reserve will not find institutions to raise funds, but will directly list and trade stocks. At this stage, the fundraising process has been completed through the participation of comrades-in-arms.

Since A10's investment rights are irrelevant to the amount of investment, too much fundraising will dilute future expectations, and coupled with the continuous destruction of the CCP, fundraising will be closed at any time. Comrades who are interested in investing, rapid action is the biggest guarantee for participating in the

A10 project.

How much will A10 stock be worth in the future? You can refer to the current market valuations of high-tech companies such as Twitter, Facebook, Google, and ChatGPT.

Next, with the combination of AI technology and other high- tech, Gettr will be a social media platform with digital currency. What everyone holds is not only 5% of Gettr shares, but 5% of Gate plus 5% of blockchain digital currency.

The cold wallet to be launched by Himalaya Exchange can be exchanged with other digital currencies, which means that some digital assets can be traded.The blockchain technology (NFT) used cannot be faked, and is unique and special. Even the priceless antiques are incomparable, because even the best antiques can be imitated.

A10 has to solve a series of legacy problems, and a lot of money is already in the project. Owners of new and old Gclub cards, SEC refunds, digital bank transfers to A10.

**The Righteous Essence of the A10 Project**

The SEC refund is returned to the private account of the original GTV investor, and individuals have the right to choose whether to invest or not. If you choose not to vote, the H Coin quota will be cancelled. There is no 5% reward for SEC switching, because there was a 0.5 H Coin quota before, but you have a card.

There are two types of new investment: more than 100,000 yuan and less than 100,000 yuan. The new investment is to consider many comrades in small investments, especially those inside the wall. The New Federal State of China has designed companies and funds like SPVs to help them. Every comrade-in-arms with a small amount of investment will have a corresponding contract and also have its own equity. Small grants are under application.

There is a 5% reward for more than 100,000. The new investment is to sign a contract with a new fund, and the individual, as a share of the fund, claims the stock through the fund, and directly issues the stock for listing and trading.

Why should we help comrades with small investment to join the A10 project?

First of all, the New Federal State of China is not an investment institution, but an entity that aims to eliminate the Chinese Communist Party and create beliefs for the Chinese people and create real value.

Secondly, what the Communist Party is more afraid of is the number of people who

17

will destroy the Communist Party and the gathering of people's hearts. We want to gather people with common values, not a group of rich people, so we hope that more comrades in small investment will participate.

**Investment Channel**

In each time zone of the world, whether it is legal currency or HDO, there are corresponding comrades who provide corresponding channels for everyone.

Both old and new GClubs cards have equity. The new investment is to invest in the current new card institution in Abu Dhabi. The nature and service of the two cards are exactly the same. GClubs is the core asset, so it moved to Abu Dhabi for operation.

The card is calculated in the unit of "ten thousand" US dollars. The only obligation of the GClubs card is to pay the annual fee. The activation of the card is handled by the special team of the alliance according to the individual's wishes.

The SEC switched, and there was Gettr coin. Those who enjoy the investment of 0.2 or 0.5 H Coin quota will not have a new 5% reward.

The new 5% reward is a reward for new fiat currency deposits and new investment systems.

The 5% reward of HDO is also the deposit of new fiat currency, because those who have deposited before have already obtained the quota of H Coin.

After 0:00 on January 28, 2023, if you sell H Coin to get HDO or buy a card to invest in A10, you will no longer get a 5% reward.

The farm has detailed records and channels for depositing funds in fiat currency for HDO transfers to FMV account reports, currency refunds, and legal currency deposits after January 1, 2023. If you deposit through farm currency, there is a 5% reward.

https://gnews.org/m/938852 (accessed March 24, 2024).[9] As shown in the foregoing, at the time, which was after the Government had executed the seizure warrants described in the Indictment and shortly before the defendants' arrests, the defendants were also promoting a GETTR Coin

---

[9] Days ago, the Government preserved a copy of this article (and others) and produced a copy to the defendants. This article (and others) are now no longer available on G News.

along with other schemes.

The A10 scam—varying only as to its particular fraudulent details, but consistent in its promise of extremely high returns and a need to act fast—are admissible as direct evidence of the charges in the Indictment.  Indeed, as shown above, the A10 Project is directly connected to earlier and ongoing schemes—with references to the "original GTV investor," the Farms (i.e., the New Fedreal State of China) facilitating investment, the "GClubs card," and HDO and H Coin—and constitutes admissible evidence as to each count charged in the Indictment.  As reflected in the descriptions of recorded conversations about the money sent to Crane, *see supra* 5-8, once the defendants received victim money, they would repeatedly change and misrepresent how the victim funds were supposed to be used or invested.  Were there any doubt that the defendants' myriad scams are connected, the Government expects that victim witnesses will testify they were defrauded across multiple of the defendants' investment "projects."  And there can be no serious dispute that interconnected scams such as the A10 Project are admissible evidence of the charged conspiracy, which includes racketeering, wire fraud, bank fraud, securities fraud, and money laundering offenses.  *See Diaz*, 176 F.3d at 79 ("[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged."); *Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself").

> 2. Evidence of the Defendant's False Promise to Donate $100 Million to the Rule of Law Charities Is Admissible

The charged racketeering conspiracy consisted of a series of interlocking frauds.  Each one fed into the next, and all of them depended on Kwok's false promises.  In November 2018, Kwok falsely represented that he would be donating $100 million to the Rule of Law organizations, a

pair of nonprofits that Kwok established soon after making this false promise.[10]  In truth, Kwok never donated $100 million to the Rule of Law charities.  Indeed, Kwok instead began using those purported charities for his own purposes, including using funds donated to the charities by his followers to pay his family office entity monthly rent and to pay protestors involved in harassing his critics.

Kwok's lie regarding the Rule of Law entities is admissible as direct evidence of the charged offenses.  As a general matter, the evidence relating to the Rule of Law entities is inextricably intertwined with the evidence of the charged offenses.  For example, victim investors in GTV and subsequent fraudulent investment "projects" were required to donate to the Rule of Law entities as a prerequisite to be eligible to invest.  *See* Indictment ¶ 9(b) ("KWOK used the nonprofit organizations to amass followers who were aligned with his purported campaign against the Chinese Communist Party and who were also inclined to believe KWOK's statements regarding investment and money-making opportunities").  As another example, the personnel at the Rule of Law entities overlapped with the personnel working at the other companies in the Kwok Enterprise, and many of these entities all shared a common workspace.  Finally, the time period of the Rule of Law entities' operation, beginning in late 2018, overlaps entirely with the time period of the charged racketeering, fraud, and money laundering offenses.

With respect to the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange, Kwok's supposed $100 million donation lent the false impression that he was capable of *self*-funding his movement and that the investment opportunities were nothing but a

---

[10] *See, e.g.*, Cezary Podkul & Brian Spegele, *Steve Bannon, Chinese Critic Create Fund to Investigate Beijing*, Wall St. J. (Nov. 20, 2018), https://www.wsj.com/articles/bannon-chinese-critic-create-fund-to-investigate-beijing-1542759820 (reporting that "Guo said he would provide the [$100 million] funding for the so-called 'Rule of Law Fund'").

generous benefit being offered by Kwok to his followers; it supplied false reassurance to investors that he would have no inclination to steal their money.  In other words, evidence about Kwok's $100-million-donation misrepresentation is admissible "because [the] schemes were connected": Kwok "used his [Rule of Law donors] as a source of [future investments], and used the connections" to the nonprofits he falsely claimed to generously finance "to burnish his reputation for respectability so as to recruit and reassure potential investors." *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (evidence of prior uncharged Ponzi scheme admissible as direct evidence of later campaign finance fraud); *see also Baez*, 349 F.3d at 93 ("uncharged acts may be admissible as direct evidence of the [racketeering] conspiracy itself"); *Diaz*, 176 F.3d at 79 (an act "done in furtherance of the alleged conspiracy" is considered "part of the very act charged"); *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

Alternatively, Kwok's lie is admissible under Rule 404(b) to show his intent, knowledge, lack of accident, and motive.  Kwok's bald-faced lie about donating a large sum of money to his charities while soliciting donations to those charities shows that Kwok's subsequent lies to investors to obtain their money were done with knowledge and intent, not negligently or by mistake.  Moreover, Kwok's false announcement of his supposed donation came just one month after Hong Kong authorities froze his assets, and is admissible evidence of Kwok's motive to raise funds by deception, as further described below.  *See United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (affirming the admission of other crimes evidence as direct evidence where it shed light on the defendant's motivation to participate in the charged crimes).

   3.  <u>Evidence that Kwok's Assets Were Seized Prior to His Fundraising Is Admissible</u>

21

The fact that, according to Kwok's own statements, Kwok's assets were seized by Chinese and Hong Kong authorities prior to his fundraising—beginning with Rule of Law and continuing with the G entities—is admissible.  The fact of these seizures is admissible "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."  *Inserra*, 34 F.3d at 89.  While Kwok portrayed himself to investors as a billionaire with seemingly limitless assets, in reality, his assets were being seized by Hong Kong and Chinese authorities since 2017, just prior to the start of the charged conspiracy.  Particularly striking is the proximity between the freezing of Kwok's assets in Hong Kong and the start of Kwok's fundraising efforts.  On October 23, 2018, Hong Kong issued restraining orders for the assets of Kwok, his son, and their associates and shell companies.  The very next month, Kwok announced the launch of the Rule of Law entities (and made his spurious promise of a $100 million donation, described *supra*) and soon began soliciting donations.  Accordingly, the fact of these seizures is admissible to provide background to, and complete the story of, the crimes charged.

Alternatively, the fact that Kwok's assets were seized is admissible pursuant to Rule 404(b).  The seizure of Kwok's assets is powerful evidence of motive—obtaining other people's money for Kwok's own use.  This evidence is also admissible to show absence of mistake, knowledge, and intent.  Kwok did not mistakenly use other people's money for his own personal enrichment; he did so because his money was being seized.

To be clear, the Government does not intend to introduce in its case-in-chief any evidence regarding what underlies the asset seizures, such as proving up the conduct that violated money laundering statutes in Hong Kong and led to the seizure order.   The Government simply intends

to prove that Kwok's assets were seized before he started raising money from his followers. And proving the fact of these seizures will be straightforward, as Kwok has described them himself many time—including under oath in his February 2022 affidavit declaring bankruptcy. *See In re Kwok*, No. 22-50073 (JAM), Dkt. 107 ¶ 17 & n.8 (incorporating by citation an October 23, 2018 Hong Kong restraining order and stating that "[s]ince 2017, the CCP has also frozen and seized family assets and purported assets in China and Hong Kong, making it impossible for me even to maintain a bank account"). To the extent there is any risk of unfair prejudice to the defendant by the introduction of the fact of the seizures or the Hong Kong seizure order itself, the Court can cure any such prejudice by issuing a limiting instruction.

4. Post-Arrest Conduct Is Admissible with a Limiting Instruction

The Government intends to offer evidence that the defendants continued to direct the affairs of the Kwok Enterprise following their arrests and detention. These facts are direct evidence of the defendants' roles in the Kwok Enteprise, their control of the Kwok Enterprise, their knowledge of the activities of the Kwok Enterprise, their willful continuation of the Kwok Enterprise's schemes, and, through attempts at concealment, their consciousness of guilt.

First, the Government intends to offer into evidence recorded jail calls made by Kwok following his arrest. By way of example[11]:

- Following Kwok's detention, Kwok, from jail, called into online broadcasts with his supporters. In such a broadcast, Kwok declared that Qidong Xia, a/k/a Changdao, a/k/a "Long Island David," a/k/a "Long Island Brother," a/k/a "Viagra Brother," is the new leader of the Himalaya Alliance.

- In a jail call on March 21, 2023, Qidong updated Kwok on the Kwok's Enterprise businesses, explaining, in sum and substance, that the CEOs of the Himalaya Alliance are all in Abu Dhabi with some financial difficulties but Qidong and others are helping

---

[11] The following summaries are based on English summaries of Kwok's Mandarin calls; certified translations are being prepared.

them as much as possible. Kwok instructs Qidong, in sum and substance, to help them with maximum effort but do not allow the CEOs to leave Abu Dhabi and to keep the operation well run.

- In a March 29, 2023 jail call, Kwok, in sum and substance, instructed his team to follow Qidong's lead unconditionally; after asking about H Coin and G Fashion, Kwok told his team to follow the original without any delays. When Qidong mentioned a certain individual, Kwok cut off Qidong and cautioned him not to say anything or the name of the company that individual works for.

- In a March 30, 2023 jail call with Qidong, Kwok told Qidong, in sum and substance, (1) that Kwok was arrested because the U.S. Government did not want him to testify in the trial of Prakazrel Michel, and (2) the value of a purported contract Kwok was going to sign on March 17, which would have surely been a value of $5 trillion that has disappeared for comrades. In the same call, Kwok and Qidong agreed not to talk about that "Complex"—which appears to be a reference to Mahwah Mansion. Kwok and Qidong continued to discuss the work of the Kwok Enterprise, with Kwok giving priorities and instructions, including (1) license, (2) payment system, (3) "third party," and (4) "Euro."

- In a March 31, 2023 call, Kwok instructed several Alliance members, in sum and substance, that the [investment] projects, big or small, must not stop and continue as they should, despite the funding needs to be controlled temporarily.

- In an April 28, 2023 call with a supporter connected to G Fashion, Kwok, in sum and substance, instructed the individual not to say anything about the company as the call is monitored, and subsequently asked the supporter to pass his words around: this supporter has the final say in operations but must follow the NFSC's decision and financial directives.

In addition to having calls directly with their agents, the Government intends to offer evidence at trial showing that, while detained and while their calls are recorded by the MDC, the defendants have been having attorney meetings with a co-conspirator who is a licensed attorney— and who is not counsel of record in the criminal case—and using that attorney to ferry messages between the defendants and the Kwok Enterprise. Similarly, the Government intends to offer recorded conversations with individuals within the Kwok Enterprise demonstrating that Wang— while in custody, following her arrest in this case—used her prior counsel to ferry her request to retrieve bank checks consisting of millions of dollars of G|CLUBS funds, *i.e.*, fraud proceeds, that

were  in a postal box in New York City.

The foregoing is admissible as direct evidence.  Indeed, it is powerful evidence of willful violations of U.S. criminal laws.  For context, the evidence at trial, including witness testimony, will show how the defendats began moving the operations of the Kwok Enterprise to Abu Dhabi in advance of their arrests.  In broadcasts, Kwok described this as an effort to avoid the "long arm jurisdiction of the United States."  *See* Dkt. 7 at 19 (citing gnews.org/articles/949854); *see also* Indictment ¶¶ 21, 57-58 (charging obstruction of justice for Je's attempt to transfer funds to Abu Dhabi to obstruct the Government's seizures).  Kwok's and Wang's continued control of the Kwok Enterprise even while detained, and their attempt to obtain and conceal the proceeds of their frauds even while detained, is powerful evidence of a lack of good faith, willfulness, and fraudulent intent. That is, even after the defendants were in jail for their conduct related to the G entities, they attempted to secure the fraudulent proceeds of the G entities and instructed their agents to continue the schemes unabated.  Moreover, the fact that the defendants used attorneys to facilitate *and conceal* their control and the continuation of their crimes (because *attorney* communications are not subject to monitoring by the MDC) is further evidence of willfulness and consciousness of guilt.

Admission of evidence showing—through the defendants' own words or the words of their agents—that the defendants continued to control and operate the Kwok Enterprise's schemes from the MDC is not barred by Rule 403.  To start, the probative value of post-arrest evidence is extremely high.  This evidence goes directly to the defendant's fraudulent intent and lack of good faith—the central disputed issue at trial.  That probative value is not "substantially outweighed" by a risk of "unfair prejudice."  Fed. R. Evid. 403.  Indeed, there is nothing *unfairly* prejudicial about introducing the defendnats' own words and actions that were undertaken with full notice of

25

the Government's case and, with respect jail calls, of the fact that their words were being recorded. Nor is this evidence any more sensational than the evidence that will indisputably come before the jury: that the defendants perpetrated a massive con, tricking thosaunds of people out of more than a billion dollars, enriching themselves while leading a lavish lifestyle of yachts, mansions, and other luxuries, and generally operating their scheme in contempt of the law—seeking to evade the enforcement of fraud, money laundering, and bankruptcy laws, and intimidating and harassing their victims in an attempt to silence them.  In any event, to the extent that there is any risk of *unfair* prejudice from otherwise highly probative evidence, the Court may provide a limiting instruction as to the fact that the defendants were detained, as is customary when, for example, a defendant's admissions in jail calls are offered into evidence.  *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions."); *see, e.g.*, *United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) (admitting defendant's recorded prison calls as party opponent admissions); *United States v. Donovan*, 577 F. Supp. 3d 107, 117 (E.D.N.Y. 2021) ("Courts frequently allow the government to introduce statements by defendants made during recorded jail phone calls.").

     5.   Evidence from Kwok's Bankruptcy Is Admissible

Evidence relating to Kwok's ongoing bankruptcy case captioned *In re Ho Wan Kwok, et al.*, Case No. 22-50073 (JAM) (Bankr. D. Conn.) and the related adversary proceedings (collectively, the "Kwok Bankruptcy Cases"), and the events leading up to Kwok's February 15, 2022 bankruptcy filing, are admissible as direct evidence of the charged offenses.

As Kwok has argued twice now, the criminal charges in this case "overlap in many ways with the issues in the [Kwok] Bankruptcy Cases."  Dkt. 131 at 17; *see also* Dkt. 219 at 4.  The

26

Court found insufficient overlap between the bankruptcy and criminal cases to support a stay of the Kwok Bankruptcy Cases, given that the criminal case concerns "questions of criminal liability" and distinct legal issues such as "Kwok's intent and the materiality of his conduct," while the Kwok Bankruptcy Cases seek "to identify properties to compensate Kwok's creditors." Dkt. 204 (Stay Order) at 7-9; Dkt. 250 (Second Stay Order) at 2, 6-7. However, the Court acknowledged that "some overlap between the proceedings exists," and noted that the fact of Kwok's filing for bankruptcy is mentioned in the indictment "in the context of providing examples of Kwok's alleged means of concealing funds within the 'Kwok Enterprise'", *i.e.*, as a means and method of the charged RICO conspiracy. Stay Order at 6-7.

The Kwok Bankruptcy Cases, and the events leading up to Kwok's filing for bankruptcy, are inextricably intertwined with the evidence regarding the charged offenses and are necessary to complete the story of the crimes at issue in the upcoming trial. *Carboni*, 204 F.3d at 44. Details of the Kwok Bankruptcy Cases also help to explain the circumstances surrounding Kwok's fraudulent conduct and explain the intent with which Kwok performed certain acts. *Coonan*, 938 F.2d at 1561.

In 2017—years after Kwok's arrival in the United States, and just one year before Kwok founded the Rule of Law entities—the investment fund Pacific Alliance Asia Opportunity Fund L.P. ("PAX") filed a civil lawsuit against Kwok in New York Superior Court, seeking the repayment of approximately $88 million for an overdue loan that Kwok had personally guaranteed. On or about February 3, 2021, PAX secured a judgment against Kwok in the amount of approximately $116,402,000. *See* PAX Lawsuit, No. 652077/2017, Dkt. 716. (N.Y. Sup. Ct. June 28, 2018) (Ostrager, J.). After PAX secured its judgment, it undertook efforts to enforce the judgment by identifying and then attempting to levy upon Kwok's assets in the United States.

However, "PAX encountered difficulty identifying assets over which Kwok exercised control because Kwok, who is a self-declared multi-billionaire, had secreted his assets in a maze of corporate entities and with family members." PAX Lawsuit, Index 652077/2017, Dkt. 1181, at 7-8 (N.Y. Sup. Ct. Feb. 9, 2022). One such asset was a yacht called the Lady May, which Kwok and his associates had arranged to sail from New York to Florida, and then to the Bahamas, in late 2020. On or about March 16, 2021, Justice Barry Ostrager issued a conditional order of civil contempt, which directed that if Kwok failed to return the Lady May to the jurisdiction of the New York Superior Court by May 31, 2021, he would be subject to a $500,000 fine for each day that the Lady May remained outside the jurisdiction. After a year of Kwok hiding his assets and failing to pay PAX as ordered, on February 9, 2022, Judge Ostrager entered a final Order of Civil Contempt against Kwok for his "efforts to avoid and deceive his creditors by parking his substantial personal assets with a series of corporations, trusted confidants, and family members." PAX Lawsuit, Index 652077/2017, Dkt. 1181, at 1 (N.Y. Sup. Ct. Feb. 9, 2022). The total judgment of $254 million included $134 million in contempt fees, arising from what Judge Ostrager described as Kwok's "shell game" to shield his assets from PAX. The February 9, 2022 decision and contempt order directed Kwok to pay the $134 million contempt fine to PAX within five days, or he would face contempt sanctions. *See id.*, Dkt. 1183, at 2.

Six days later, on February 15, 2022, Kwok filed for bankruptcy. In his initial filings, Kwok claimed to have as much as $500 million in debt and, despite living in expensive properties, surrounded by luxury cars and lavishly expensive furniture, claimed to have no more than $100,000 in assets. *See In Re Ho Wan Kwok*, Case No. 22-50073 (JAM). But in the years leading up to Kwok's bankruptcy filing, Kwok made representations to his victims about his personal wealth in furtherance of the charged fraud offenses to induce them to send him money. Those

28

representations included, among others, that Kwok would fund the Rule of Law entities with $100 million of his own money, and that Kwok personally guaranteed investors against any losses resulting from their investments in his various fraudulent ventures (including GTV).

In bankruptcy court filings, Kwok also has represented that specified assets—including the Lady May—were not his, but rather were properties belonging to family members, shell companies, and other financial entities. On April 19, 2022, HK International Funds Investments (USA) Limited, LLC (the entity owned by Kwok's daughter, Mei Guo, that formally owned the Lady May) entered into a "loan agreement" with co-defendant Kin Ming Je's Himalaya International Financial Group Ltd., pursuant to which HK USA "borrowed" $37 million (*i.e.*, the value of the Lady May) to "be used as security for the court in relation to the Yacht" until "the yacht is returned to the U.S.A." *In re Ho Wan Kwok*, Case No. 22-50073 (JAM), Dkt. 36 Ex. 79 at 3, 5. By side letter dated April 29, 2022, the parties amended the "loan" to become a personal guarantee, rather than a loan secured against the Lady May; the consideration for that side letter amendment was £1. *Id.* at Dkt. 36 Ex. 80. Himalaya International Financial Group Ltd. is one of the entities that is part of the Kwok Enterprise, *see* Indictment ¶ 3(a), and the Government seized approximately $318,000 in Himalaya Exchange fraud proceeds from bank accounts held in the name of that entity between in or about October 2022 and March 2023. *Id.* ¶¶ 59(16), (19). Business records the Government has collected during this investigation and will introduce as evidence at trial include emails relating to this $37 million transaction; specifically, Je's request to transfer the $37 million (in Himalaya Exchange fraud proceeds) from his Himalaya International Financial Group Ltd. account to an escrow account in the name of a particular law firm. The Government's evidence also includes encrypted communications between defendant Yanping Wang and Mei Guo that were recovered from one of Wang's devices, which show Wang coaching

Mei Guo on how to claim (falsely) to attorneys that the Lady May in fact belonged to her, not to Kwok—a perjurious claim that Mei Guo later repeated under oath during her testimony in the Kwok Bankruptcy Cases. *See* Dkt. 255 (Gov't Letter re: Discovery and Scheduling) at 11, Exs. D-G. Indeed, Kwok filmed many of the broadcasts where he promoted the fraudulent investment opportunities from the deck or interior of the Lady May—reinforcing, for his followers and potential investors, his own wealth.

Kwok has also engaged in obstructive behavior in connection with the Kwok Bankruptcy Cases that mirrors his obstruction in this criminal case—including directing protests against victims who have complained about his fraudulent conduct or requested refunds of their investments and evidence tampering. *See, e.g.*, Dkt. 255 at 8-9; Dkt. 51 at 9. That obstruction includes defying court orders and directing his followers and supporters, including members of the NFSC, to harass, threaten, and engage in violence against the trustee of the Kwok Bankruptcy Cases, the trustee's employer, and the trustee's family members and their employers. *Id.* at 9-11. Kwok supporters and NFSC members have also tampered with the Mahwah Mansion post-indictment in an apparent effort to suit Kwok's defense narrative (unsupported by the evidence) that the Mahwah Mansion was purchased not as Kwok's own residence, but as a type of clubhouse for the NFSC and G|CLUBS members. *See* Dkt. 148 (Gov't Letter re: Bankr. Stay) at 4-5; *see also* Dkt. 131 (Kwok Mem. in Support of Mot. to Stay Bankr.) at 20 (claiming that the Mahwah Mansion was purchased as "a covert headquarters for use by" Kwok's supporters "and in furtherance of the business of GTV.").

The circumstances leading to Kwok's bankruptcy filing, and the details of the Kwok Bankruptcy Cases and actions Kwok and his followers have taken in connection with those cases, are admissible as direct evidence of the charged offenses, including the RICO conspiracy and the

conspiracy to launder the fraudulent proceeds. Evidence relating to the Kwok Bankruptcy Cases also provides background for the existence of the charged Kwok Enterprise and explains the intent with which certain acts were performed—including, for example, Je's transfer of $37 million in Himalaya Exchange fraud proceeds to Kwok's daughter to avoid Kwok's being assessed substantial civil penalties for his obstructive conduct in transferring the Lady May outside the jurisdiction of the New York Superior Court. There can be no serious dispute that evidence relating to the Kwok Bankruptcy Cases and the events leading up to Kwok's bankruptcy filing are admissible evidence of the charged conspiracy, which include racketeering, wire fraud, bank fraud, securities fraud, and money laundering offenses.

## III.    The Court Should Admit Certain Evidence Regarding the GTV Private Placement

One of the Government's witnesses ("Witness-1") is expected to testify about conversations he had with Kwok, Wang, and Je regarding the GTV Private Placement and, in particular, legal risks associated with pooling non-accredited investors' funds. As set forth in greater detail below, Witness-1 was acting in a business, and not a legal, capacity at the time he had those conversations; moreover, GTV is no longer a going concern, and there is no one authorized to assert attorney-client privilege over any communications on behalf of GTV. Accordingly, the Court should admit testimony by Witness-1 regarding his conversations with Kwok, Wang, and Je regarding the GTV private placement.

Witness-1 is expected to testify about conversations he had with Kwok, Wang, and Je about the GTV private placement, including the possibility of accepting money from non-accredited investors, or individuals who did not meet the threshold qualifications to participate in an unregistered private placement. At the time, Witness-1 had been appointed as a Director and the Secretary of GTV, but he did not hold a legal position at GTV, nor did Witness-1 have an attorney-

client relationship with Kwok, Wang, or Je relating to the subject matter of GTV.[12]  Further, Kwok and Je did not have any formal association with GTV.

In or about July 2023, former GTV Director Aaron Mitchell testified in the Kwok Bankruptcy Cases in his capacity as a former attorney for GTV and Saraca.  Mitchell testified, in sum and substance: "I believe I still represent GTV and Saraca in a couple of cases."  *In re Ho Wan Kwok, et al.*, Case No. 22-50073 (JAM) (Bankr. D. Conn.), Adv. Proc. No. 22-5003, A. Mitchell Testimony July 18, 2023, Tr. at 29.  Mitchell further testified that when he worked for GTV and Saraca, he would speak with Witness-1 and Wang; that he resigned from GTV and Saraca in April 2023; that "over the last year or so [*i.e.*, from in or about mid-2022 through mid-2023], there's been no one to speak to.  I was the director, so there was no one to speak to.  There was no one else there"; and that he was "not . . . aware of anyone" who was working at Saraca and GTV since in or about December 2022.  *Id.* at 34-35.  Mitchell also testified that GTV "stop[ped] operating . . . several years" before his July 18, 2023 testimony in the Kwok Bankruptcy Cases.  *Id.* at 56.  Specifically, Mitchell testified that, "[p]rior to the settlement with the SEC, the company was no longer operational.  The employees had all left.  The website had shut down.  And then after that it was really just trying to work with the SEC to get the money back to the investors."  *Id.* at 55-56.

As described above, Witness-1 was not acting as a lawyer for GTV, so any conversations Witness-1 had regarding GTV were not protected by any attorney-client privilege.  However, even

---

[12] Witness-1 was the General Counsel of Golden Spring (New York) Ltd., one of the Kwok family offices, from in or about June 2018 through September 2020, at which point Witness-1 transitioned into a business role.  As General Counsel of Golden Spring, Witness-1 was primarily responsible for coordinating with other attorneys regarding Kwok's various civil litigations.  During a telephonic meeting of bankruptcy creditors, Kwok stated that Witness-1 "used to be Golden Spring attorney and my personal attorney."  *See In re Ho Wan Kwok*, Dkt. 876-1 at 12, Ex. 4.

if Witness-1 had been acting in a legal capacity (which he was not), any privilege terminated when GTV's operations ended.  For organizations, the general rule is that when the organization ceases to have legal existence such that no one can act in its behalf, the attorney-client privilege terminates. *See Securities and Exchange Comm'n v. Carillo Huetell LLP*, No. 13 Civ. 1735(GBD)(JCF), 2015 WL 1610282, at \*2-\*3 (S.D.N.Y. April 8, 2015) (privilege does not survive dissolution of corporation); *TAS Distrib. Co. v. Cummins Inc.*, No. 07-1141, 2009 WL 3255297, at \*2 (C.D. Ill. Oct. 7, 2009) ("Absent some compelling reason to the contrary, the attorney client privilege does not survive the death of the corporation."); *Lewis v. United States*, No. 02-2958 B/AN, 2004 WL 3203121, at \*4 (W.D. Tenn. Dec. 7, 2004) (same); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73 cmt. k (2000); 24 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5499 (1st ed. West 2019). *See also Lopes v. Vieira*, 688 F. Supp. 2d 1050, 1068-69 (E.D. Cal. 2010) (former attorney of corporate entity that, although formally still active and in good standing with Secretary of State, had effectively ceased to function did not have authority to assert entity's attorney-client privilege). *Cf. Official Comm. of Admin. Claimants v. Moran*, 802 F. Supp. 2d 947, 949-50 (N.D. Ill. 2011) (stating that courts should look to "practical business realities" rather than technical legal status in determining whether a corporation has "died" for purposes of asserting attorney-client privilege and concluding that plaintiff corporation could assert privilege because it had continued to pursue claim against defendant after it had entered bankruptcy and thus was never entirely defunct).

Here, Witness-1 had conversations with Kwok, Wang, and Je relating to the GTV Private Placement.  To the extent GTV sought to assert attorney-client privilege over those conversations, GTV would need to be a going concern with an employee or representative who is authorized to

assert such privilege.  No such individual exists here.  According to Mitchell's testimony, GTV ceased to exist as of in or about 2020.  Witness-1 is expected to testify that he never held any legal role vis-à-vis GTV (including when he participated in the conversations in question) and that he never signed any agreement relating to, or was compensated for, his apparent appointment as Director and Secretary of GTV.  Moreover, neither Kwok nor Je held formal positions at GTV that would place them within the protection of any corporate attorney-client privilege—if it even existed.  Accordingly, the Court should admit Witness-1's testimony regarding conversations with Kwok, Je, and Wang regarding the terms of the GTV Private Placement.

## IV.    The Court Should Permit the Authentication of Certain Records Under Rule 902(11)

To the extent the defendants do not agree to the authentication of routine business records by stipulation, the Government intends to authenticate certain records that were created and maintained in the regular course of business by certain third parties pursuant to certifications that comply with Federal Rule of Evidence 902(11).

Records of regularly conducted activity that meet the necessary conditions to qualify under the hearsay exception in Federal Rule of Evidence 803(6) may be authenticated, among other methods, by a certification that complies with Federal Rule of Evidence 902(11) for records stored domestically. Fed. R. Evid. 803(6)(D). "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013); *see also United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records 'meet[] the requirements of Rule 803(6)(A)-(C).'"). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating and requires no

extrinsic evidence of authenticity to be admitted. Prior to trial, "the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." *Id.* Similarly, 18 U.S.C. § 3505 provides that a "foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that" the record meets the elements of Rule 803(6). *See also United States v. Qualls*, 613 F. App'x 25, 28 (2d Cir. 2015) (affirming admission of foreign records accompanied by certification of authenticity); *United States v. Miller*, No. 18 Cr. 202 (ARR), 2018 WL 4961458, at *3 (E.D.N.Y. Oct. 15, 2018) ("The language of § 3505 'tracks quite closely to the language of Federal Rule of Evidence 803(6)' and 'should be interpreted in the same manner as the comparable language in Rule 803(6) is interpreted.'").[13]

A record of regularly conducted activity meets the necessary conditions to qualify as a business record under Rule 803(6) when (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge," (2) "the record was kept in the course of a regularly conducted activity of a business," and (3) "making the record was a regular practice of that activity." Fed. R. Evid. 803(6). "A business record may include data stored electronically on computers and later printed out for presentation in court, so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994).

The Government expects to offer into evidence certain records that were created and

---

[13] "[A] custodian's certification pursuant to Federal Rule of Evidence 902(11) is not testimonial," and therefore use of such certifications to authenticate business records does not violate the Confrontation Clause. *United States v. Weigand*, No. 20 Cr. 188 (JSR), 2021 WL 568173, at *1 (S.D.N.Y. Feb. 14, 2021).

maintained in the regular course of business by certain third parties, including: bank records, bank transaction information, IP logs, call detail records, subscriber information, emails from search warrant returns, and business records, which have been provided to the Government either pursuant to subpoenas or voluntarily. The Government has generally produced the relevant certifications for these records in discovery in this case and is unaware of any basis to challenge their status as business records; for any records for which the certification has not yet been produced, the Government will produce the relevant certification in advance of trial. In the event that no stipulations as to authenticity are reached, such evidence may be authenticated through a certificate under Rule 902(11) for domestic records under Rule 803(6), and 18 U.S.C. § 3505 for foreign records.

**V.      The Court Should Admit Bank Records From First Abu Dhabi Bank**

1.   Background

The Government intends to offer at trial a series of bank records, emails, and documents, from First Abu Dhabi Bank, which is a bank in the United Arab Emirates, pertaining to an account held in the name of "ACA Capital Group Ltd." (the "ACA Bank Account"). The ACA Bank Account is an account that was opened by co-defendant Kin Ming Je, a/k/a William Je. As further described below, ACA Bank Account records demonstrate misappropriation of victim funds and are significantly probative evidence that shows the existence of the Kwok Enterprise, the defendants' intent to defraud, and money laundering. These records are substantially important to the Government's case and are appropriately admissible under the circumstances.

The Government obtained the ACA Bank Account records from the Securities and Exchange Commission ("SEC"). As explained in Exhibit A, which is a sworn declaration from Marlee Miller who is the Senior Special Counsel in Securities and Exchange Commission's Office

of International Affairs, the SEC obtained the ACA Bank Account records pursuant to the International Organization of Securities Commissions ("IOSCO") Multilateral Memorandum of Understanding Concerning ("MMoU").  Ex. A ¶ 6.  The MMoU represents an understanding among signatories, which include the SEC and the Securities and Commodities Authority of the United Arab Emirates ("SCA").  *Id.*  Under the MMoU, if the SCA is able to assist the SEC with a records request, the SCA will use its own domestic procedures to obtain requested documents and transmit them to the SEC.  *See* Ex. A ¶ 5.

2.  <u>Applicable Law</u>

Federal Rule of Evidence 807 authorizes the admission of a hearsay statement of an unavailable witness when the statement is "not specifically covered by Rule 803 or 804," but has "equivalent circumstantial guarantees of trustworthiness." This residual exception constitutes a generally applicable basis for the admission of an out-of-court statement when a court finds, on a case-by-case basis, that the statement is sufficiently reliable and meets the other requirements of the rule. *See Idaho v. Wright*, 497 U.S. 805 (1990).  Rule 807 permits admission of hearsay if: (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact that can be obtained through reasonable efforts; (iv) its admission is consistent with the rules of evidence and advances the interest of justice; and (v) its proffer follows adequate notice to the adverse party. *See United States v. Bryce*, 208 F.3d 346, 350 (2d Cir. 1999). Examining these factors in turn:

3.  <u>Discussion</u>

a.  ***The ACA Bank Account Records are Trustworthy***

The "determination of whether a document is sufficiently trustworthy to be admitted under Rule 807 is a highly fact-specific inquiry." *United States v. Turner*, 718 F.3d 226, 233 (3d

37

Cir. 2013).  Courts are instructed to "view the evidence in context," *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 236 (2d Cir. 1999), including by evaluating the process by which the records were obtained, as well as the content and appearance of the records themselves, *see United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 467 (S.D.N.Y. 2017).

First, and as detailed in the accompanying sworn declaration, the ACA Bank Account records were obtained pursuant to a reliable and routine process.  Consistent with the procedures of the MMoU, on February 23, 2021 and March 14, 2022, the SEC requested from the SCA, bank records held in the name of ACA Capital Group Limited ("ACA").[14]  *Id*. ¶ 6.  On May 23, 2021, June 20, 2021, and May 20, 2022,  the SEC received via email the SCA's production in response the request.  This procedure was "consistent with the routine practice for transmitting foreign bank records responsive to requests under the [ ] MMoU."  Ex. A ¶ 10.  That is, the records were obtained in an ordinary manner that is indicative of trustworthiness: one government financial regulator obtained records from another government financial regulator pursuant to an international agreement.  *See* Ex. A ¶ 10 (ACA Bank Account records were provided "in a manner consistent with the routine practice for transmitting foreign bank records responsive to requests under the IOSCO MMoU").  Indeed, courts have admitted records under Rule 807 that were obtained in a manner that is far less trustworthy than the ordinary procedure in this case.  *See Prevezon*, 319 F.R.D. at 465 (admitting bank records obtained under "unique circumstances" by an individual who took "efforts photographing the contents of [a Russian criminal case file containing the records] in a Russian courthouse under the supervision of court staff over the course of several days").  And while the SEC requested a certification statement, and did not obtain one

---

[14] As alleged in the Indictment, ACA Capital Group Ltd. is a part of the Kwok Enterprise.

from the SCA, the SEC reviewed the ACA Bank Account records and confirmed "[t]hese documents are the records of the ACA Account provided by the SCA to OIA [*i.e.* Office of International Affairs of the SEC]."[15]

Second, a review of the appearance of the ACA Bank Account records demonstrates their trustworthiness. The ACA Bank Account records are visually unremarkable. They appear to be bank records, and they bear the insignia of First Abu Dhabi Bank. "While these facts standing alone are not dispositive, they nevertheless bear favorably on trustworthiness. [This is because b]ank records 'provide circumstantial guarantees of trustworthiness because' [as] they are relied on by 'banks and their customers [for] their accuracy in the course of [ ] business.'" *Prevezon Holdings, Ltd.*, 319 F.R.D. at 467 (quoting *United States v. Pelullo*, 964 F.2d 193, 202 (3d Cir. 1992)). Here, the bank records, selections of which are provided in Exhibit F, appear authentic and include documents one would expect a bank to maintain: account opening documentation, signature pages, and excel files containing transactional information.[16]  *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 692 (S.D.N.Y. 2014) (admitting bank records pursuant to Rule 807 and observing the records "appear in the exact manner that one would expect").

Third, an analysis of the content of the ACA Bank Account records demonstrates that the information in those records is authentic and reliable. This is because the transactional information in the ACA Bank Account records is corroborated by *other* business records. By way of example, and as merely a sample, the Government identified twelve transactions that appear in the ACA

---

[15] Any suggestion by the defendants that the UAE financial regulator has some ulterior motive that might taint the production of the records would be no more than speculation. Indeed, Kwok and his co-conspirators have used the UAE as a trusted safe haven. Je has been hiding in the UAE since this case was unsealed. Moreover, Kwok has conceded that he was a Emirati citizen.

[16]  The SCA declined to provide bank statements.

Bank Account records and are corroborated by other sources, as set forth in greater detail below.

i. *October 20 and October 22, 2022 transfers to "Greenwich Land"*

| VAL.DATE | | TRANS.REF.NO | DESCRIPTION | AMOUNT | Beneficary Details | Account number | Bank Name | PAYMENT.DETAILS | |
|---|---|---|---|---|---|---|---|---|---|
| 20 OCT 20 | | FT2029470010 | Telex Transfer | -1,000,000.00 | WESTERN UNION BUSINESS SOLUTIONS | 8901309192 | SW-IRVTUS3NXXX | /RFB/Bank of Princeton BP1701 FFC Greenwich Land Account 3500000199 | |
| 22 OCT 20 | | FT2029670009 | Telex Transfer | -4,000,000.00 | WESTERN UNION BUSINESS SOLUTIONS (USA) LLC | 8901309192 | SW-IRVTUS3NXXX | /RFB/Bank of Princeton (BP1701G) Greenwich Land LLC / Account : 3500000199. | |

The ACA Bank Account records excel file (pictured above) indicates that on October 20, 2020 and October 22, 2020, $1 million and $4 million, respectively, was transferred, via Western Union, to "Bank of Princeton . . . Greenwich Land Account 3500000199."[17]   Greenwich Land LLC is another of the Kwok Enterprise entities named in the indictment.  Certified bank records from the Bank of Princeton, corroborate those two transfers, as indicated in the excerpt below:





The one-day difference in transaction dates between the ACA Bank Account records and the Bank of Princeton records reflect time zone differences between Princeton, New Jersey and Abu Dhabi, as well as any attendant delay from using Western Union to facilitate the transfer.  Further, the fact

---

[17] Due to its format, the Excel file will be provided to the Court separately as Exhibit G.

that the incoming amounts in the Bank of Princeton records were slightly below $1 million and $4 million indicate that transfer fees had been deducted—indeed, the Bank of Princeton records reflect a $25 "incoming" wire fee, with the remainder likely a Western Union fee.[18]

ii. *November 12, 2020 "Loans" to Saraca via "Savio Law LLC"*

| 12 NOV 20 | FT2031770021 | Telex Transfer | -9,500,000.00 | Savio Law LLC | 8136098162 | SW-PNCCUS33XXX | /RFB/Loan to Saraca Part 1 |
| 12 NOV 20 | FT2031770069 | Telex Transfer | -8,500,000.00 | Savio Law LLC | 8136098162 | SW-PNCCUS33XXX | /RFB/Loan to Saraca Part 2 |

The ACA Bank Account records excel file further lists two November 12, 2020 transfers from the ACA Bank Account to a bank account in the name of "Savio Law LLC," with account number 8136098162. The reference on these transfers was "Loan to Saraca Part 1" and "Loan to Saraca Part 2" (*i.e.*, Saraca Media Group, another of the Kwok Enterprise entities). Sure enough, bank records from PNC Bank reflect these transfers and thus corroborate the information in the ACA Bank Account records:

---

[18] These minor differences help to corroborate the authenticity of the ACA Bank Account records because they reflect the realities of bank account transfer times, by way of a third-party, and assessment of transfer fees.

## Payment Instruction

| | | |
|---|---|---|
| Settlement / CCY / | 9,500,000.00 / USD / 11-12-2020 | FX Number / Rate : |
| Debit / CCY / Date | 9,500,000.00 / USD / 11-12- | Credit / CCY / Date : 9,500,000.00 / USD / 11-12- |
| Instructing Bank Id | 021000089 | Instructed Bank Id : |
| CUSIP : | | Par Amount : |
| Receiving Side : | | Sending Information : |

### Debit Information

| | |
|---|---|
| Account Type : | |
| Account# : | AE870357771201996490026 |
| Name : | ACA CAPITAL GROUP LTD |
| Address : | 49F,BANK OF CHINA TOWER,NO.1GARDEN |

### Beneficiary Information

| | |
|---|---|
| Account Type : | D-DDA |
| Account# : | 8136098162 |
| Name : | SAVIO LAW LLC |
| Address : | 3 DALE CT |

The ACA Bank Account is held in the name of "ACA Capital Group Ltd.," which name appears in the PNC records (pictured above).  Similarly, the ACA Bank Account IBAN 23-digit number matches the "Account#" in the PNC records.  And the amounts transferred match.  Indeed, the PNC records have the same reference information—"Loan to Saraca"—as was listed in the ACA Bank Account excel file, as pictured here:

| | | |
|---|---|---|
| Orig to BNF Info | : | /RFB/LOAN TO SARACA PART 1 |

### iii.  *February Transfers to Hudson Diamond NY LLC*

| 02 FEB 21 | FT2103370016 | Telex Transfer | -6,000,000.00 | HUDSON DIAMOND NY LLC | 6807438 | SW-IDBYUS33XXX | /RFB/Loan to Hudson Part 1 of 3 |
|---|---|---|---|---|---|---|---|
| 09 FEB 21 | FT2104070016 | Telex Transfer | -6,000,000.00 | HUDSON DIAMOND NY LLC | 6807438 | SW-IDBYUS33XXX | /RFB/Loan to Hudson Part 2 |
| 10 FEB 21 | FT2104170019 | Telex Transfer | -6,000,000.00 | HUDSON DIAMOND NY LLC | 6807438 | SW-IDBYUS33XXX | /RFB/Loan to Hudson Part 3 |

Finally, the Government highlights three transfers from the ACA Bank Account to an account number ending in "7438," held in the name of "HUDSON DIAMOND NY LLC" (*i.e.*, another of the Kwok Enterprise entities) in the amounts of $6 million, with reference to a "Loan to Hudson."  Corroborating those transfers are bank records from an IDBBANK with the same account name, an account number ending in "7438," and matching transfer amounts.

42

## Regular Checking

**Account Title:** HUDSON DIAMOND NY LLC
**Account Number:** xxxxxx7438

**Transaction History**

| Date | Description | Debits | Credits | Balance |
|------|-------------|--------|---------|---------|
| | Beginning balance on 02/01 | | | $0.00 |
| 02/02 | NON REF<br>/RFB/LOAN TO HUDSON PART 1NTRF<br>ACA CAPITAL GROUP HONG KONG HK | | $5,999,990.00 | $5,999,990.00 |
| 02/03 | FEE REVERSAL<br>FEE REVERSAL VAL 02/02 USDNTRF<br>IDB BANK NY NEW YORK NY | | $10.00 | $6,000,000.00 |
| 02/09 | NON REF<br>/RFB/LOAN TO HUDSON PART 2NTRF<br>ACA CAPITAL GROUP HONG KONG HK | | $6,000,000.00 | $12,000,000.00 |
| 02/10 | NON REF<br>/RFB/LOAN TO HUDSON PART 3NTRF<br>ACA CAPITAL GROUP HONG KONG HK | | $6,000,000.00 | $18,000,000.00 |

The Government is prepared to further detail corroboration of transfers in the ACA Bank Account records to other bank records, to the extent that Court believes it is necessary to do so.

### iv.    _Additional Corroborative Evidence_

Further details in the ACA Bank Account records corroborate their trustworthiness. The ACA Bank Account records also contain biographical information of Kin Ming Je, the account holder, including his passport number (the "Je Passport Number"). William Je also used the Je Passport Number in connection with his attempts to open a bank account at Citibank. Indeed, Je's signature on the Citibank documents appears to match Je's signature in the ACA Bank records:

These examples demonstrate that the ACA Bank Account records are trustworthy.

### b. *The ACA Bank Account Records Bear on Material Facts and Are The Most Probative Evidence Of Those Facts*

That the ACA Bank Account records bear on material facts, and are the most probative evidence of those facts, cannot reasonably be disputed. Analysis of the ACA Bank Account records demonstrates that from August 2020 through February 2021, at least $130 million of Farm Loan Program proceeds were deposited into the ACA Bank Account. Once in the ACA Bank Account, the fraud proceeds were misappropriated through transfers to, for example, a bank account in the name of "Lamp Capital," which is owned by Kwok's son. That Lamp Capital bank account was used to pay for yacht expenses, luxury vehicles, and a private plane, as well as to send hundreds of thousands of dollars to Kwok's daughter. Distributions from the ACA Bank Account also demonstrate $10 million in transfers to William Je and his wife, and a $1 million transfer to a company associated with Steve Bannon, a co-conspirator. Certain of these transfers of fraud proceeds can only be established using the ACA Bank Account records. That is because the ACA Bank Account was a financial hub that collected, and then directed, fraud proceeds from this Abu Dhabi bank to other foreign banks including in Switzerland, the Cayman Islands, the Netherlands, New Zealand, Australia, and the United Kingdom. Collecting records from that many jurisdictions especially because some of those governments have enhanced bank privacy laws, such as Switzerland, is not feasible.

Further, and of significant importance, *only* the ACA Bank Account records establish that William Je, the financial architect of the Kwok Enterprise, opened this account, in Abu Dhabi, in furtherance of the conspiracy to funnel fraudulent proceeds back to Kwok, his family, Je and others. The ACA Bank Account records cannot be reasonably obtained in other ways. The United Arab Emirates provision of records pursuant to a Mutual Legal Assistance Treaty is irregular, at best, nor will the SCA provide a certification for the records to the SEC.

### c.  *Admitting the ACA Bank Account Records Is in the Interests of Justice*

Admitting the ACA Bank Account records advances the cause of justice.  Even though the residual exception is rarely relied upon, it is appropriate where an international criminal conspiracy uses a foreign jurisdiction to try to hide their assets and thwart investigators from uncovering evidence.  *See Prevezon*, 319 FRD at 467 ("At issue in this action are bank and financial records of foreign entities that are alleged to have participated in a massive fraud spawning numerous criminal investigations into the laundering of proceeds.").  Further, the ACA Bank Account records are relevant and not unduly prejudicial.  *United States v. Hwa*, No. 18 Cr. 538 (MKB), 2022 WL 856877, at *5 (E.D.N.Y. Mar. 22, 2022) (records "advance[ ] the interests of justice, as the [information in it is] relevant under Rule 401 and not unduly prejudicial under Rule 403").  And admitting these records is not materially different than admitting bank records pursuant to Rule 902(11), (12) or 18 U.S.C. § 3505.  For similar reasons there are no confrontation clause issues.  *See United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir. 2007), *as amended* (Feb. 13, 2008), *judgment entered*, 264 F. App'x 16 (D.C. Cir. 2008) (citing *Crawford v. Washington*, 541 U.S. 36, 56 (2004)); *United States v. Qualls*, 553 F. Supp. 2d 241, 245 (E.D.N.Y. 2008) ("In the context of traditional hearsay exceptions, the Supreme Court noted that business records 'by their nature were not testimonial'" (quoting *Crawford,* 541 U.S. at 56, 124 S.Ct. 1354)).  In any event, Marlee Miller, or a similarly situated individual at the SEC, is available to testify as to these records at trial if required.

### d.  *The Defendants Have Adequate Notice*

Finally, this motion sereves as written notice that the Government intends to rely upon the residual exception to admit the ACA Bank Account records—Exhibit A identifies each of these records by Bates number.  This notice comes nearly six weeks before trial, which is more than

sufficient time for the defendants to have a "fair opportunity to meet" the evidence.  Fed. R. Evid. 807; *See United States v. Lino,* No. 00 CR. 632 (WHP), 2001 WL 8356, at \*22 n. 7 (S.D.N.Y. Jan. 2, 2001) (Thirty days' notice sufficient); *See Robinson v. Shapiro,* 646 F.2d 734, 741–42 (2d Cir.1981) (notice served six weeks before trial sufficient); *see also United States v. Yonkers Contracting Co.*, 701 F. Supp. 431, 439 (S.D.N.Y. 1988) (one-week notice sufficient in Rule 804(b)(5)).

## VI.    The Court Should Preclude the Defendant from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### A.  The Court Should Exclude Evidence and Argument That This Prosecution is Improperly Linked to the CCP or in Any Way Malicious

The Kwok Enterprise has dispatched a number of statements claiming that this prosecution is the result of malign CCP influence on the Department of Justice.  It should not need to be said,

but the prosecution of the defendants has nothing to do with the CCP or its efforts.  Accordingly, there is no basis to make such arguments, and they must be precluded.  Moreover, any such argument is nothing more than an improper selective prosecution claim.  "[A] selective prosecution defense alleges a defect in the institution of the prosecution, [it] is an issue for the court rather than the jury." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks omitted).  Accordingly, any arguments that the Government has improper motives, or is somehow advancing a CPP-backed effort, must be precluded.  *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004).  After all, "the Government is not on trial." *United States v. Carton*, No. 17 CR 680 (CM), 2018 WL 5818107, at *3 (S.D.N.Y. Oct. 19, 2018).  It would be legally improper for the defense to suggest otherwise.  *See United States v. Preldakaj,* 456 F. App'x 56, 60 (2d Cir.2012) (summary order) (finding district court did not commit plain error by instructing the jury that "the fact that certain investigative techniques were not used by law enforcement authorities[, but t]he government is not on trial, and law enforcement techniques are not your concern").

### B. The Court Should Preclude the Defendants from Introducing Evidence and Arguments Related to CCP Activities That Are Irrelevant and Unfairly Prejudicial"

#### 1. The Court Should Limit Evidence and Claims Regarding CCP Activities, Including Targeting

The Court should preclude under Rule 403 evidence regarding CCP activities, including "Operation Fox Hunt" and other CCP targeting, beyond the defendants' own testimony as to their state of mind, because the probative value of such evidence is substantially outweighed by a danger of confusing the issues and misleading the jury.  Permitting the defense to introduce evidence regarding the CCP's activities, other than testimony regarding the defendants' beliefs that they were targeted, and the bases for those beliefs, "risks creating a 'multi-ringed sideshow of mini-

trials on collateral issues . . . that may have only tangential bearing, if at all, to the issues and claims disputed in this case." *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 325 (S.D.N.Y. 2009); *see* Fed. R. Evid. 403; *United States v. Yousef*, 327 F.3d 56, 128 (2d Cir. 2003) ("Under the Sixth and Fourteen Amendments of the Constitution, a person charged with a crime has a fundamental right to present a defense. Nonetheless, a criminal defendant's right to present a full defense and to receive a fair trial *does not entitle him to place before the jury evidence normally inadmissible*." (citations omitted) (emphasis added)); *United States v. Bifield*, 702 F.2d 342, 350 (2d Cir. 1983) ("A defendant's right to present a full defense, including the right to testify on his own behalf, is not without limits. In responding to the charges against him, an accused must comply with the established rules of procedure and evidence, as must the prosecution, in order to insure a fair trial.").

No matter the level of the CCP's interest in Kwok, any activities targeting Kwok—including efforts to silence him on social media—do not render true the false and misleading statements that Kwok made to obtain victim funds.  Kwok's focus on the CCP's activities, in prior filings, is (at best) an attempt by the defense to improperly portray Kwok as a sympathetic figure, introduce inadmissible good acts, and confuse the jury as to what is at issue at trial.  This trial is not about whether Kwok was a *bona fide* dissident, or whether the NFSC is a pro-democracy movement.  It is not about whether Kwok was targeted by the CCP.  It is about whether Kwok conned victims through false promises about stock and business opportunities so he could get their money.  And the risk that evidence regarding the CCP's activities, including targeting, would generate confusion and unfair prejudice is not hypothetical; it is almost certain.  The Court need look no further than Kwok's filings in this case to understand how Kwok intends to distract the jury away from the charged conduct by creating a mini-trial regarding the CCP's activities and

48

targeting.  Indeed, Kwok has rebranded the Court's order compelling the production of certain materials reflecting the CCP's targeting of Kwok, his family, his co-defendants, and the entities in the indictment as the "*Fox Hunt* Order."  *See*, *e.g.*, Dkt. 259 (Kwok Response) (emphasis added). Kwok's efforts to obtain a Rule 17 subpoena for materials in the possession of a separate prosecution team in the Eastern District of New York that is prosecuting CCP operatives, and his conclusory claim that such evidence is "indisputably helpful to him," *id.* at 8, reveals that he intends only to direct the jury's focus away from the charged fraud offenses in an attempt to impermissibly paint himself as a victim of the CCP's targeting and to "unduly distract[] their attention from the charged crimes through sympathy." *United States v. Malka*, 602 F. Supp. 3d 510, 527 (S.D.N.Y. May 11, 2022).  The Court should not permit Kwok to do so.

> 2. The Court Should Exclude Extrinsic Targeting Evidence, Outside of Defendants' Testimony

As outlined, the probative value of *any* CCP activities, including evidence of targeting, is low in this case.  That is because Kwok's and Wang's guilt or acquittal of the charges in this case do not turn on whether the Chinese government sought to target, repatriate, or silence Kwok.  First and foremost, the CCP's activities have *nothing* to do with the fact that Kwok knowingly lied to investors—over and over, for a period of years—about the use and purpose of their investment, the value of their investment, the risk (or lack thereof) of their investment, the need to act fast to invest, whether Kwok would benefit from the investment, and whether Kwok would personally guarantee investor losses.  Similarly, efforts by the Chinese government to repatriate or silence Kwok have nothing to do with Kwok's misusing and stealing investor money after fraudulently obtaining it—evidencing his clear fraudulent intent.

To be sure, the Court has held that evidence establishing that Kwok, his family, his co-defendants, or the corporate entities relevant to the indictment have been targeted by the CCP is

relevant for purposes of *Rule 16* discovery, which is a "low bar," to the extent such evidence shows "that Kwok's fears of CCP targeting are objectively legitimate" and therefore "'could be used to . . . bolster [his] defense.'"  (MTC Order at 6, citing *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993).)  The relevance of CCP targeting-related evidence identified by the Court is that it could have affected Kwok's *state of mind* when engaging in certain actions that could reflect a guilty mind, such as being secretive about Mahwah Mansion, or his use of dozens of electronic devices.

Accordingly, the Government does not contest that, if Kwok testifies, he could seek to explain—again, within the bounds of Rule 403—that the CCP's targeting of him or his family members informed the actions he took in some way.  Moreover, if Kwok testifies to his belief— contemporaneous with the charged conduct—that he was being targeted by the CCP, he could also testify to the bases for his belief at that time and, indeed, could likely introduce some admissible evidence to establish that his belief was "objectively legitimate."  For example, the defendants might offer public reports that they read at that time regarding efforts to target them, provided such evidence is (a) not offered for its truth, and (b) not cumulative, overly confusing, or unfairly prejudicial.  *See* Fed. R. Evid. 403.  In other words, through his testimony, Kwok could offer his belief about CCP targeting—to the extent relevant to the charges, and in proportion to the probative value of this belief—and any objectively legitimate bases for that contemporaneous belief. Beyond that, however, no targeting evidence is even relevant, much less admissible under Rule 403.  Kwok can show his beliefs were "objectively legitimate" by testifying about the objective evidence he knew at the time—the only such evidence relevant to his state of mind.

However, the defendants should not be permitted to prove up various acts of targeting through experts or other evidence, which would constitute a massive sideshow of trials-within-a-

50

trial regarding issues that go neither to the defendants' state of mind, nor to any element of the charged offenses. *See, e.g.*, *United States v. Sutton*, No. CR 21-0598 (PLF), 2024 WL 278070, at *11 (D.D.C. Jan. 25, 2024) ("Although criminal defendants have a right to present a defense, courts are not required to permit defendants to present to the jury evidence that is not admissible because it is not relevant or probative of a fact of consequence."); *United States v. Carton*, No. 17 CR 680 (CM), 2018 WL 5818107, at *4 (S.D.N.Y. Oct. 19, 2018) (denying Rule 17 subpoena because a defrauded hedge fund's "level of diligence and sophistication is not relevant to [the defendant's] intent to defraud" where defendant was charged lying to obtain an investment and misappropriating the funds; defense strategy was "merely a facile attempt to blame the victim – which is an impermissible strategy in a fraud case"). For example, Kwok has informed the Government that he may call an expert witness to testify generally about "tactics and practices of the government of the People's Republic of China to target political dissidents." The expert notice then lists *twenty-eight* broad topics on which the expert "is expected to testify"—all of which relate to general opinions, and none of which references either Kwok or Wang, or the relevance (if any) of the anticipated testimony to the charged fraud and money laundering offenses in this case. The content of this expert notice alone telegraphs the defendants' intent to derail the trial in this fraud case by advancing an irrelevant—and distracting and confusing—narrative about the CCP's activities and practices. The Court should not permit the defendants to do so. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence."); *United States v. Mi Sun Cho*, 713 F.3d 716, 721 (2d Cir. 2013) (right to present a defense "is not absolute, for a defendant must comply with established rules of procedure and evidence designed to assure both fairness and reliability. Thus, a defendant does not have an unfettered right to offer testimony that is inadmissible under the rules

of evidence."); *United States v. Rivera*, No. 13 Cr. 149 KAM, 2015 WL 1886967, at *5 (E.D.N.Y. Apr. 24, 2015) (The defendants' constitutional right to present a defense does not entitle them to unfettered presentations of inadmissible and irrelevant evidence.").

### 3. The Court Should Closely Police Defendants' Testimony To Avoid Impermissible Bases for a Verdict

The subjects of Kwok's (or Wang's) testimony regarding targeting should be carefully policed, to avoid confusing the jury and/or suggesting they render a verdict on bases impermissible under the law. *See Bifield*, 702 F.2d 342, 350 ("A defendant's right to present a full defense, including the right to testify on his own behalf, is not without limits. . . . The district court's ruling that evidence legally inadmissible was not to be presented to the jury did not therefore deprive appellant of his constitutional right to testify as to other matters which could properly be received."). To date, the defendants' counsel have referenced "Fox Hunt" in discussions about, among other things, the purchase and renovation of the Mahwah Mansion, the GTV private placement and the valuation of GTV, and the defendants' use of hundreds of bank accounts held in the names of numerous entities, including the Kwok Enterprise entities. Even assuming that Kwok or Wang were targets of CCP targeting, that fact does not exculpate either defendant from their legal culpability for the charged conduct. Nor does the CCP's targeting of Kwok, his family members, his co-defendants, or the entities in the indictment offer any defense against the charges in the indictment.

#### a. *The Mahwah Mansion*

The indictment alleges that most of the hundreds of millions of dollars that the defendants collected from G|CLUBS members "did not fund the business of G|CLUBS," and that Kwok misappropriated G|CLUBS funds, including by spending approximately $39.5 million of G|CLUBS membership funds to purchase and renovate his Mahwah Mansion. Indictment ¶ 18(h).

The Government will introduce evidence at trial establishing that the Mahwah Mansion was not purchased for the benefit or use of G|CLUBS members, and Kwok can seek to introduce admissible evidence to rebut that allegation.  However, Kwok cannot take the next step that he proposes and introduce extrinsic evidence regarding CCP targeting (including Operation Fox Hunt) in an effort to justify the alleged need for the purchase of the Mahwah Mansion as a "secure location" for the NFSC "to conduct its business."  (Def. MTC Mem. at 21).  The NFSC is legally separate from G|CLUBS, which is a purported "exclusive, high-end membership program" offering "a gateway to carefully curated world-class products, services and experiences."  Indictment ¶ 18(b).  The Government's allegations relate to Kwok's misrepresentations regarding G|CLUBS, including the claims that G|CLUBS members would receive stock in GTV or G|Fashion and that G|CLUBS membership money would be used to fund G|CLUBS services when, in truth and in fact, members never received stock and Kwok used G|CLUBS money to fund his own lavish lifestyle.  Even if Kwok establishes that he "believed in good faith that purchasing the property was an appropriate and nonfraudulent use of G|CLUBS dues," that belief is not a defense to the fraud charges, because it does not equate to a good faith belief that the representations made to G|CLUBS were true. (MTC Order at 6-7.)  Indeed, testimony that Kwok believed purchasing the Mahwah Mansion was an appropriate use of member dues has no bearing on whether Kwok conducted a scheme to defraud, through the use of wires, to obtain money or property.  *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (citation omitted); MTC Order at 4.  The representations Kwok made to G|CLUBS investors included that the "purchase of G|CLUBS memberships would entitle them to stock in KWOK-affiliated entities, such as GTV and G|Fashion"—he did *not* represent that G|CLUBS would purchase an estate, or provide a physical location where G|CLUBS members could convene.  Indictment ¶ 18(f).

53

### b.  *The GTV Private Placement*

Kwok's argument regarding the relevance of the CCP's targeting of him to the GTV private placement is similarly tortured, and also poses an impermissible risk of distracting the jury from the charges in this case.  If Kwok testifies, he is entitled to introduce admissible evidence to support his claim that he believed, at the time of the GTV private placement, that $2 billion was a reasonable valuation for GTV.  That evidence could include, among other things, financial analyses and data regarding the potential market for GTV.  Kwok can also argue, as he already has, that  that he had believed that his supporters "would be particularly enthusiastic in supporting GTV's business because they were [] committed to GTV's mission to combat the CCP and believed their support of GTV would help that mission," Dkt. 172 at 24, and GTV would be successful and that there was a large market for GTV, including because he understood at the time that the CCP was taking steps to proscribe Kwok's efforts.  But the Court should reject the attenuated and entirely unsupported argument that the CCP's activities and targeting "creat[ed] both the necessity for, and the potential monopoly position of, GTV"—particularly in the absence of evidence that GTV had any potential (much less proven) success in breaking through the great firewall and delivering content to individuals in China.  *See* Dkt. 172 at 25.  That Kwok and Wang misappropriated $100 million in GTV investor funds for a high-risk hedge fund investment on behalf of Kwok's family member within weeks of the private placement belies the self-serving claim that the creation and promotion of GTV was motivated by Kwok's fear of, and opposition to, the CCP.  The Court similarly should reject Kwok's claim that Fox Hunt "is . . . critical to demonstrating Mr. Kwok's intent when making statement concerning GTV's potential value."  *Id.* Any Chinese government efforts to suppress Kwok's access to online platforms would be extrinsic evidence that is not admissible at this trial, other than to establish the defendant's states of mind at

the time of the charged offenses (and, even then, only if the defendants testify), and such evidence would have little probative value with respect to the fraud charges. Moreover, any such value of that evidence would be substantially outweighed by the unfair prejudice that would result from introducing such inflammatory and politically-charged topics at trial. *See Carroll v. Trump*, 20 Cv. 7311 (LAK), 2024 WL 97359, *5 (S.D.N.Y. Jan. 9, 2024). Such evidence would also confuse and distract the jury from the underlying issues—specifically, Kwok's lies to investors and his misuse of money he fraudulently obtained.

### c. *Bank Accounts*

Kwok also should not be permitted to testify about his knowledge of the CCP's general efforts to interfere with *other* dissidents' banking relationships, nor to introduce extrinsic evidence to that effect. *See* Def. MTC Mem. at 23, n.4. Consistent with the reasoning set forth above, Kwok may testify to his state of mind in utilizing of hundreds of bank accounts (testifying, perhaps, that this use was a response to the CCP's targeting of him, rather than his effort "[t]o conceal the illegal source of the funds" he fraudulently obtained). Notably, however, that defense amounts to a concession that Kwok exercised control over those bank accounts, which processed more than $1 billion in fraud proceeds. Regardless, to permit Kwok to introduce extrinsic evidence regarding the CCP's general efforts to interfere with *other* dissidents' banking relationships, creates an "undue tendency to suggest decision on an improper basis." Fed. R. Evid. 402 advisory committee's note. Specifically, allowing such general evidence about the CCP's targeting of banking relationships of other (non-Kwok) dissidents could suggest that the CCP was also targeting Kwok's bank accounts in the U.S., which would invite the jury to draw unsupported inferences.

Accordingly, if (and only if) the defendants testify, evidence regarding the CCP's efforts

to target Kwok, his family members, his co-defendants, or the entities relevant to the indictment are admissible to the extent they are relevant to the defendants' state of mind at the time of the charged offenses. But the Court should strictly police any attempts by the defense to introduce extrinsic evidence regarding the CCP's activities (including targeting) and should exclude any general evidence regarding the CCP's activities against Kwok. The defendants cannot be permitted to put forth a mini-trial regarding CCP targeting that would, unquestionably, impermissibly distract and confuse the jury from the key issues: whether the defendants defrauded their victims to improperly obtain money, and laundered and misappropriated the fraud proceeds.

4.  The Court Should Preclude Argument and Evidence Suggesting that the Defendants' Fraud Was Justified, Necessary, or a Result of Duress

The defendants cannot argue, or introduce evidence tending to suggest, that their actions were justified or necessary as a result of targeting by the CCP (whether through Fox Hunt or otherwise), or that they operated under duress. In order to establish a claim of duress that constitutes a legal excuse for criminal conduct, a defendant must show that "(a) 'at the time the conduct occurred,' he was subject to actual or threatened force, (b) the force or threat was of such nature as to induce a well-founded fear of impending death or serious bodily harm, and (c) there was no reasonable opportunity to escape from the force or threat other than by engaging in the otherwise unlawful activity." *United States* v. *Stevens*, 985 F.2d 1175, 1181 (2d Cir. 1993) (citing *United States v. Mitchell*, 725 F.2d at 837). Evidence of a defendant's "generalized fear" does not satisfy the requirement of a well-founded fear of impending death or serious bodily harm; there must have been a threat that was specific and prospects of harm that were immediate. *See United States v. Esposito*, 834 F.2d 272, 276 (2d Cir. 1987); *United States v. Lorenzo*, 52 Fed. App'x 553, 554 (2d Cir. 2002) (summary order). Moreover, "where there is reasonable opportunity to escape the threatened harm, the defendant must take reasonable

steps to avail himself of that opportunity, whether by flight or by seeking the intervention of the appropriate authorities." *United States v. Bakhtiari*, 913 F.2d 1053, 1058 (2d Cir. 1990) (citation omitted).  The Government is unaware of any evidence suggesting a duress defense can be made.  Absent a specific showing from the defense any argument that the CCP (or anyone else) placed them instate of duress must necessarily be precluded.

For similar reasons, the defendants cannot argue their conduct was necessary or justified due to any external threat by the CCP (or anyone else) or because they promoted any sort of "just" cause.  A justification  defense requires evidence that (1) the defendant was under an unlawful and present threat of death or serious bodily injury; (2) the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) the defendant had no reasonable legal alternative to violating the law; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm. *See United States* v. *Smith*, 160 F.3d 117, 123 (2d Cir. 1998); *see also United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 490-91 & nn.3-4 (2001) (noting that the Supreme Court has never recognized a necessity defense to any federal statute and questioned "whether federal courts ever have authority to recognize a necessity defense not provided by statute").

5.  The Court Should Preclude General Evidence of Contact Between the Chinese Police and Victims

The defendant's *ex parte* memorandum of law, which was provided in part in support of a motion for a subpoena to the USAO-EDNY, states that defense counsel located evidence that "Chinese police have forced some GTV investors into filing false claims with the SEC, FBI, and U.S. financial institutions."  While it could be appropriate cross-examination to challenge any *particular* Government witness about whether their testimony was a result of coercion by the CCP—something the Government has no reason to believe is the case as to its witnesses—it is not

57

appropriate to introduce generalized evidence (or argument) that the Government's case is tainted

by the CCP, including by CCP efforts to coerce victims.  That is, the defendants cannot introduce

*general evidence* about "counsel's investigation" into the Chinese police force to suggest that the

*specific evidence* the Government has introduced at trial is somehow tainted by the CCP.  Such

evidence and argument would be irrelevant and unduly prejudicial to the Government.  By way of

example, even assuming that defense counsel learned that "Witness-A" was coerced by the CCP,

such information has no relevance to this trial unless Witness-A testifies.  For similar reasons, the

defense is not entitled to call their own witnesses, whom the Government did not rely upon, simply

to introduce that those defense witnesses were coerced by the CCP.

### C. The Court Should Exclude Evidence and Claims of the Defendants' Good Acts (Including Any Dissident Activity Against the CCP) To Prove Their Innocence

To the extent that the defendants may seek to present evidence or argument concerning

their prior commission of "good acts" or to offer evidence of non-criminal activities to disprove

guilt of the crimes charged, they should be precluded from doing so. Specific-act propensity

evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through

proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897

F.2d 63, 70 (2d Cir. 1990). Similarly, while under appropriate circumstances a defendant may offer

general testimony from a character witness about his reputation for a "pertinent trait" of character,

or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) &

405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity

with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d

1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because

"character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Federal Rule of Evidence 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendants should be precluded from offering evidence or argument, including in their opening statements, of any charity, philanthropy, or any other specific instance or instances of the defendants' prior good acts, or the lack of commission of other bad acts, is proof of their innocence.

That the defendants may attempt to make such arguments to the jury is not a theoretical concern. In pre-trial submissions, and as discussed above, Kwok has repeatedly attempted to put at issue whether the defendants were *bona fide* CCP dissidents. For example, in Kwok's *ex parte* brief seeking an early return of documents from USAO-EDNY (which was partially disclosed to the Government), Kwok argued that "[t]he government also asserts in the Indictment that Mr. Kwok and his fellow movement members are not genuine dissidents." (March 5, 2024, Kwok *ex*

*parte* brief, at 9.)  This is not true.  Many of the individuals who joined Kwok's movement were genuine dissidents; nevertheless, Kwok and Wang subsequently defrauded them.  More to the point, whether Kwok or Wang were true dissidents is not a question the jury must answer to render a verdict.  Indeed, *Kwok and Wang can be guilty of every crime charged in the Indictment even if they, and any organization associated with them, are anti-CCP*—that point is undeniable and, accordingly, the relevance of the defendants' dissident activities is extremely low, if any.

At most, if the defendants testify, their testimony may provide context and general background—including that they were involved in some anti-CCP activities.   And, the Government recognizes that some evidence of the defendants' anti-CCP efforts will be introduced at trial, to the extent it is necessary for context.  For example, in many cases victims were attracted to Kwok and Wang because of their anti-CCP message and thus provides context about how victims learned of the defendants.   But, beyond that context, the Court should not permit the defendants to introduce   evidence of a collateral matter—the defendants' anti-CCP activities.  Policing such evidence is important to prevent a  (prolonged) trial-within-a-trial about an irrelevant issue—the extent to which the defendants were *bona fide* dissidents.  *Manko v. United States*, 63 F. App'x 570, 573 (2d Cir. 2003) ("[a] trial judge has discretion to exclude evidence [that] is only slightly probative if its introduction would confuse and mislead the jury by focusing its attention on collateral issues and if it would unnecessarily delay the trial") (quotation and citation omitted); *United States v. Doyle*, No. 16 Cr. 506 (ALC), 2018 WL 1902506, at *20 (S.D.N.Y. Apr. 19, 2018) (excluding collateral issue that would "unavoidably result in a mini-trial  . . . .  the finders of fact will be led so far afield from the essence of the charges to be tried that their truth-seeking mission will be lost on them").

Further, and of significant importance, the defense must be precluded from arguing, in

substance, that if the defendants *were bona fide* dissidents, they are *innocent* of the charges.  Any such argument is wrong as a matter of law, and would fundamentally confuse the jury if permitted. The jury is not empaneled to decide whether, and to what extent, Kwok created a movement against the CCP, nor whether the defendants genuinely held anti-CCP beliefs.  The jury's task is only to decide whether the evidence establishes the elements of the crimes charged beyond a reasonable doubt.  No element in the charged crimes requires the Government to prove the *bona fides* of the defendants' dissident activities—nor is proof of those *bona fides* a defense to any of the charged crimes.  Indeed, Kwok's material misrepresentations included promising outsized financial returns and other benefits to his victims.  Kwok is not charged for lying about his status as a dissident. And any argument by the defense that the defendants are not guilty because they were "true dissidents" fundamentally distorts what this trial is about.  The defendants must be precluded from making such arguments.

Third, "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (quotation and citation omitted).  Thus, the defense cannot use the defendants' dissident activities to demonstrate the absence of fraudulent conduct on some other occasions.  *See United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) ("Whether [the defendant] had prepared other, nonfraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent.").

Fourth, evidence of the defendants' dissident activities is improper because it invites jury sympathy and risks jury nullification.  *See In re United States*, 945 F.3d 616, 626 (2d Cir. 2019) ("Our case law is clear: 'it is not the proper role of courts to encourage nullification.'"); *id.* at 630 ("Evidence admitted solely to encourage nullification is by definition irrelevant, and thus

inadmissible, regardless of what other evidence might be introduced at trial").

Accordingly, other than as background if they choose to testify, the Court should preclude the defendants from introducing evidence of their anti-CCP activities, and prohibit entirely any argument that the defendants' dissident activities demonstrate their innocence.

### D. The Court Should Preclude Defense Arguments, Evidence and Cross-Examination Suggesting That the Defendants Are Not Guilty Because of Disclaimers in Transaction Documents

The defendants should be precluded from making arguments, offering evidence, or cross-examining witnesses, which in any manner suggests that disclaimers in transactional documents render the defendants innocence of the charges. Specifically, the defendants should not be permitted to use the disclaimers to argue that the victims should not have relied on other representations, that the disclaimers render other representations immaterial, or that the disclaimers demonstrate the defendants' good faith. The existence of disclaimers is not relevant to the defense and it is likely to confuse and mislead the jury as to the elements of wire fraud.

At trial, the Government expects to offer into evidence the GTV Private Placement Memorandum ("GTV PPM"). That memorandum contains disclaimers including that:

> assumptions and judgments may or may not prove to be correct and there can be no assurance that any projected results are attainable or will be realized. [Investors] may not rely upon this document in evaluating the merits of participating in any transaction referred to herein. This document contains only selected information and does not purport to be all-inclusive or to contain all of the information that may be relevant to your participation in any such transaction. This document does not constitute and should not be interpreted as either a recommendation or advice, including investment, legal, financial, tax or accounting advice . . . . [information in the document] cannot guarantee future results, levels of activity, performance or achievements.

(Ex. B. at 2-4.)

62

The GTV PPM also contains a "risks" section which stated the investors bear economic risks, and stated that "Saraca owns a controlling interest in the Company, and can exercise significant control over the Company."  (Ex. B at 25.)   Ultimately, Kwok and Wang misappropriated $100 million from the GTV Private Placement and invested it in a hedge fund in the name of "Saraca."

With respect to the Farm Loan Program, contracts signed by some victims contain language stating that "Lender is sufficiently experienced in financial and business matters to be capable of . . . evaluat[ing] the merits and risk of this loan and make an informed decision relating thereto." Contracts also declare that the "loan proceeds . . . is for the general working capiral purposes of the Borrower," which the Lender acknowledged in the contract.  (Ex. C)

At certain times, G|CLUBS included a disclaimer in its membership agreement, and on its website, which stated, *inter alia*, to prospective members "[y]ou should not rely on any descriptions by Mr. Guo Wengui or any other person of (i) the benefits that could or would be available to G|CLUBS' members or (ii) any other aspect of the structure or terms of membership in G|CLUBS. Membership is not an investment in G|CLUBS, nor does it provide an equity or ownership interest in G|CLUBS or any other entity."  (Ex. D.)

Finally, the Himalaya Exchange issued "white papers" providing details about the Himalaya Dollar and Himalaya Coin.  Those white papers contain language seeking to limit the Himalaya Exchange from civil liability:

> PROSPECTIVE PURCHASERS OF HIMALAYA COIN OR HIMALAYA COIN CREDITS SHOULD ENSURE THAT THEY UNDERSTAND THE NATURE OF AND RISKS ASSOCIATED WITH SUCH A PURCHASE. . . .  WHILE THE INFORMATION IN THIS DOCUMENT IS BELIEVED TO BE ACCURATE AND RELIABLE, NONE OF THE ISSUER, THE HIMALAYA EXCHANGE OR THEIR AGENTS, ADVISORS, DIRECTORS,

> OFFICERS, EMPLOYEES AND SHAREHOLDERS MAKE ANY
> REPRESENTATION OR WARRANTIES, EXPRESSED OR
> IMPLIED, AS TO THE ACCURACY OF SUCH INFORMATION
> AND EXPRESSLY DISCLAIM ANY AND ALL LIABILITY
> THAT MAY BE BASED ON SUCH INFORMATION OR
> ERRORS OR OMISSIONS THEREOF.

(Ex. E, HCN White paper at 35.)

The disclaimers described above, and those similar to them, are directed at civil causes of action they do not (and could not) release the defendants from criminal liability. Thus, any arguments suggesting otherwise would be improper.  Argument about these disclaimers would serve no relevant purpose and will be more prejudicial than probative. This is because reliance is not an element of the charged crimes." *Weaver*, 860 F.3d at 95  ("common-law requirements of justifiable reliance and damages plainly have no place in the federal fraud statutes" (citing *Neder v. United States*, 527 U.S. 1, 24-25 (1999));; *see also United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (reliance not an element of criminal securities fraud).

Nor do disclaimers go to materiality of the misrepresentation.  Indeed, in *Weaver* the Second Circuit closely examined disclaimers analogous to the ones in this case.  In *Weaver* the defendant deployed a scheme that encouraged victims to purchase vending machines and promised that the victims' investments in these machines "had 'little risk.'"  *Weaver*, 860 F.3d at 92.  Victims then spoke to salespeople who promised "utterly unrealistic earnings and claim[ed] that the investments were sound."  *Id.*  After customers agreed to purchase the machines, they were required to sign a purchase order contract which included "disclaimers in capital letters" that stated:

> this purchase order contains the entire understanding of the
> agreement between the parties and there is no reliance upon any
> verbal representation whatsoever. Seller has not guaranteed any
> minimum or maximum earnings . . . .  It is further acknowledged

64

> that no statements, promises[,] or agreements influenced this purchase or are expected other than anything contained in this purchase order . . . .

*Id.*

The defense argued these disclaimers rendered their prior misrepresentations "immaterial." *Id.* at 93. The Second Circuit flatly rejected that argument, and held that "contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes." *Id.* at 95. That is because "a disclaimer of reliance on certain representations" does not "mean that the [prior] oral representations were immaterial or without tendency to influence," *Weaver*, 860 F.3d at 95, thus disclaimers have no relevant purpose in the trial. Indeed, it would undermine the purposes of the fraud laws to permit "[f]raudsters [to] . . . escape criminal liability for lies told to induce gullible victims . . . to sign a contract containing disclaimers of reliance." *Id.* at 96.

Having no relevant purpose, defense evidence or arguments about disclaimers are also properly excluded under Rule 403 because they are likely to confuse the jury. Indeed, permitting argument relating to the disclaimers could incorrectly lead the jury to believe that civil or common law fraud principles apply to the case, that the jury should evaluate the victims' sophistication, or that disclaimers are somehow probative of materiality, which they are not. *Weaver*, 860 F.3d 90, 95 ("We agree with our sister circuits, and hold that contractual disclaimers of reliance on prior misrepresentations do not render those misrepresentations immaterial under the criminal mail and wire fraud statutes.")[19]

### E.  The Court Should Exclude Evidence and Claims That Victims Were Negligent or Failed to Conduct Adequate Due Diligence

---

[19] At the close of evidence, it may be necessary for the Court to instruct the jury that the existence of disclaimers does not limit their criminal liability and is not probative any supposed good faith.

The defendants should be precluded from arguing or adducing evidence that victims were negligent, gullible, or insufficiently vigilant. "The Court of Appeals routinely has rejected a gullible victim defense for wire-fraud charges." *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) and *United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017)). That is because "reliance is not an element of criminal fraud," and "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent." *Weaver*, 860 F.3d at 95-96. Accordingly, the defendant may not argue that victims should have paid closer attention to the details in the GTV Private Placement Memorandum, G|CLUBS contractual provisions, or that victims should have understood they were engaging in risky transactions. *See United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting and endorsing cases holding that victim's negligence in failing to discover crime perpetrated against it is no defense to criminal conduct).

In particular, the defendants should be precluded from cross-examining witnesses about whether they adequately investigated Kwok's representations or the deal documentation they may have signed. Nor is any victim's risk tolerance or willingness to lose money a relevant fact for the jury to consider. *See United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (affirming instruction that did not require jury to consider materiality from "from the subjective perspective of the victim" because "materiality for purposes of wire fraud, mail fraud, and bank fraud, . . . a matter is material if '*a reasonable man* would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'" (quotation and citation omitted)).

**F. The Court Should Preclude Argument That the SEC or the Government Are Responsible for Victims' Financial Losses**

Kwok, through his various media apparatuses, has made a number of public statements that suggest he may attempt to shift blame for the failure of GTV, or other components of the fraud, to the SEC or the Government. By way of background, after the defendants raised $452 million from the GTV Private Placement, the SEC learned of the impropriety of that purported stock sale. The SEC ultimately recovered money from the fraudulent GTV private placement. In broadcasts, Kwok and his agents have blamed the SEC for the collapse of GTV. Similarly, pursuant to judicially authorized warrants, in the fall of 2023, the Government seized funds from several entities in the Kwok Enterprise, including several hundred million dollars from the Himalaya Exchange. This was done to preserve, for later distribution to victims, the money that the defendants obtained through fraud.

Arguments attempting to shift the blame for GTV's collapse, or any failure of the Himalaya Exchange, onto regulators and the Government are improper and should be excluded. To start, the charged crimes do not require the Government to prove actual harm to any victims. *United States v. Greenberg*, 835 F.3d 295, 305-06 (2d Cir. 2016) ("[T]he wire fraud statute requires the Government to show proof of a scheme or artifice to defraud, 18 U.S.C. § 1343, which itself demands a showing that the defendant possessed a fraudulent intent, but the Government need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims.").

Second, blaming the SEC and the Government is no more than an attempt by the defendants to turn this case into one about policy concerns regarding the role of regulation in the financial markets. *See United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073 (2d Cir. 1977)(affirming

instruction to jury that "law enforcement policy was not its concern," and that it should "focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt"); *see also United States v. Josephberg*, 562 F.3d 478, 497 (2d Cir. 2009) (affirming district court's finding that it was improper for defendant to argue in summation "that the Internal Revenue Service was 'arrogant,' … and that because of this, Defendant should be acquitted").

Because such evidence and argument would have no probative value and would serve only to create a danger of undue prejudice, to confuse the issues, and to mislead the jury, it should be precluded.

### G.  The Court Should Exclude Evidence and Claims That the Defendants Intended to Repay Victims

The defendants should be precluded from offering evidence or arguing that they intended to return or repay victims' funds and therefore that they did not act with intent to defraud. While the crime of wire fraud requires a "contemplated harm to the victim," *Jabar*, 19 F.4th at 76, it does not require that the defendant "intended to permanently deprive the victim's money or property," *United States v. Males*, 459 F.3d 154, 159 (2d Cir. 2006). Thus, "an intent to return money or property is not a defense to the charge of embezzlement." *United States v. Thomas*, 581 F. App'x 100, 102 n.3 (2d Cir. 2014) (citing *United States v. Buckley*, 101 F.3d 685, 1996 WL 282140, at *2 (2d Cir. 1996)). "Nor is it a defense to [wire fraud] that the accused voluntarily returned the funds." *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005). "[i]t is immaterial as a matter of law whether [a] defendant intended to repay the misappropriated funds because the offense is 'complete' where . . . there is an 'immediate intent to misapply and defraud.'" *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 27, 2023).

Here, the defendants should not be permitted to argue that they intended to repay or return the funds of their victims, or that they believed victims would be made whole in the end. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid).

To the extent that the defendants seek to argue that they believed GTV investors would ultimately not be harmed because the value of GTV (or any other Kwok-linked entity) would reach significant heights that would not be a permissible argument to the jury. Where defendants and their co-conspirators "intended to immediately deprive investors of their capital through fraud," their belief, even if truly held, "that in the long-term [their companies] would ultimately succeed," is not a defense to securities fraud or wire fraud. *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *see also United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) ("Were a jury to find that [the defendant] intentionally caused others to issue materially false or misleading statements of the [company's] value to its investors . . . he properly would be found guilty, even if he 'firmly believed' that, in the end, his strategy would 'work out.'"). Thus, the defendants should not be permitted to argue that they are not guilty because they thought victims would not ultimately be harmed.

The defendants should also be precluded from offering evidence about the amount of money and assets the Government have seized for purposes of suggesting to the jury that victims will be made whole. Such evidence is irrelevant, and is no different than improper evidence of a defendant's own efforts to repay misappropriated funds. *See United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980) ("The offense occurred and was complete when the misapplication took place. What might have later happened as to repayment is not material and could not be a

defense.").

### H. The Court Should Exclude Evidence of the Defendant's Personal Circumstances and Potential Punishment

The defendants may not offer evidence or argument concerning family background, health, age, pretrial detention, or any other similar factors. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447-48 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendants should similarly be precluded from offering evidence or argument concerning the punishment or consequences they face if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

### VII. <u>The Court Should Preclude the Defendants from Offering Their Statements for Their Truth</u>

The defendants should be precluded from offering any of their own statements from any emails, mobile chat threads, text messages, voicemails, public statements, or videos, as they are inadmissible hearsay. Although, as described above, the Government may offer a defendant's

statement as a party admission, a defendant does not have a parallel ability to offer his own statements into evidence without subjecting himself to cross-examination. "When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (holding that defendant "could have testified to everything asserted in his statement, [but] he could not offer the document itself for the truth of the matter asserted"); *United States v. Rea*, 958 F.2d 1206, 1225 (2d Cir. 1992) (same); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1987) ("[D]efense counsel wished to place [the defendant's] statement before the jury without subjecting [the defendant] to cross-examination, precisely what the hearsay rule forbids.").



## **CONCLUSION**

For the reasons set forth above, the Court should grant the Government's motions *in limine*.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


By: /s/
　　Micah F. Fergenson
　　Ryan B. Finkel
　　Justin Horton
　　Juliana N. Murray
　　Assistant United States Attorneys
　　(212) 637-2190 / 6612 / 2276 / 2314


Dated:  April 9, 2024
　　　　New York, New York

73