**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   v.<br><br>YANPING WANG,<br><br>               Defendant. | 20 Cr. 118-3 (AT) |

**POST-HEARING BRIEF IN FURTHER SUPPORT OF**
**DEFENDANT YANPING WANG'S MOTION TO SUPPRESS**

Brendan F. Quigley
Sarah Reeves
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, N.Y. 10112
212 408 2520
brendan.quigley@bakerbotts.com
sarah.reeves@bakerbotts.com

*Attorneys for Yanping Wang*

# **TABLE OF CONTENTS**

I. The Agents Violated Ms. Wang's Right to Counsel ...................................................... 1

    A. Documentary Evidence Shows that the Search of Ms. Wang's Apartment Began Only *After* She Invoked Her Right to Counsel ................................................. 1

    B. The Agents Kept Ms. Wang at the Apartment for Over 45 Minutes After She Invoked ............................................................................................................... 3

    C. The Agent's Notes and Report Are Consistent with Post-Invocation Questioning Regarding the Phones .......................................................................................... 4

    D. The Agent Admitted She Might Have Asked Additional Post-Invocation Questions About Ms. Wang's Phone .................................................................... 6

    E. Other Factors Are Consistent with Post-Invocation Questioning Regarding the Phones ................................................................................................................. 7

II. The Government Cannot Meet Its Burden to Show the "777777" Phone Passwords Would Have Been Discovered Absent the *Edwards* Violation ................................................ 8

    A. Applicable Law .................................................................................................. 8

    B. Application ....................................................................................................... 10

III. Suppression Is Appropriate ........................................................................................ 13

CONCLUSIONi ................................................................................................................ 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re 650 Fifth Ave.*,
  830 F.3d 66 (2d Cir. 2016)..................................................................................................9

*In re 650 Fifth Ave.*,
  934 F.3d 147 (2d Cir. 2019)............................................................................................9, 12

*Maryland v. Shatzer*,
  559 U.S. 98 (2010)...........................................................................................................14

*Massiah v. United States*,
  377 U.S. 201 (1964).........................................................................................................11

*Minnick v. Mississippi*,
  498 U.S. 146 (1990).........................................................................................................14

*Nix v. Williams*,
  467 U.S. 104 (1984).........................................................................................................10

*Riley v. California*,
  573 U.S. 373 (2014).........................................................................................................15

*State v. Valdez*,
  ---- P.3d. ---- 2023 UT 26, 2023 WL 8635197 (Utah Dec. 14, 2023) .....................................14

*United States v. Bing Yi Chen*,
  433 F. App'x 14 (2d Cir. 2011).........................................................................................11

*United States v. Djibo*,
  151 F. Supp. 3d 297 (E.D.N.Y. 2015) ..............................................................................15

*United States v. Gilkeson*,
  431 F. Supp. 2d 270 (N.D.N.Y. 2006)..............................................................................15

*United States v. Lauria*,
  70 F.4th 106 (2d Cir. 2023) .................................................................................8, 9, 10, 12

*United States v. McCoy*,
  407 F. App'x 514 (2d Cir. 2010) ......................................................................................14

*United States v. Patane*,
  542 U.S. 630 (2004).....................................................................................................14, 15

*United States v. Shvartsman*,
 No. 23-CR-307 (LJL), 2024 WL 1193703 (S.D.N.Y. Mar. 20, 2024) ....................................13

Yale Kamisar, *Postscript: Another Look at* Pantane *and* Seibert*, the, 2004* Miranda *"Poisoned Fruit" Cases,* 2 Ohio St. J. Crim. L. 97, 105 n.42 (2004). .................................................14, 15

Defendant Yanping Wang respectfully submits this post-hearing memorandum in further support of her motion to suppress.

## I. The Agents Violated Ms. Wang's Right to Counsel

The evidence at the hearing showed that, consistent with Ms. Wang's affidavit, ECF No. 199-4, Ms. Wang invoked her right to counsel before being asked questions about the passwords to her cellphones. This conclusion is supported by (i) the fact the agents did not begin their search of Ms. Wang's apartment until after Ms. Wang's invocation; (ii) after her invocation, the agents kept Ms. Wang at her apartment for 45 minutes while they searched the apartment; (iii) the structure of the agent's contemporaneous report of the search; (iv) the agent's uncertainty about the effect of the assertion of a right to counsel; and (v) the other circumstances present on the morning of March 15, 2023.

### A. Documentary Evidence Shows that the Search of Ms. Wang's Apartment Began Only *After* She Invoked Her Right to Counsel

The documentary evidence at the hearing showed that the search of Ms. Wang's apartment, during which the agents seized the cellphones at issue, began sometime after 6:18 am on March 15, 2023, i.e., *only after* Ms. Wang had asserted her right to counsel at 6:15 am. The timeline established at the hearing is thus consistent with Ms. Wang's affidavit that she invoked her right to counsel before she was asked about her cellphones' passwords.

More specifically, the FBI first knocked on the door of Ms. Wang's apartment no earlier than 6:00 am on March 15, 2023. (Tr. 20:1-8).[1] The FBI had both an arrest warrant for Ms. Wang and a search warrant for the apartment. (Tr. 6:2-:22). At approximately the same time, other teams

---

[1] "Tr." refers to the transcript of the April 9, 2024 suppression hearing.

1

of agents were looking for Mr. Kwok at another apartment in Manhattan and locations in New Jersey and Connecticut. (Tr. 16:7:17; 18:13-16; 20:14-19).

It took Ms. Wang some time to come to the door,[2] and agents called four phone numbers to try to attempt to contact her. (Tr. 20:20-21:24).

Ms. Wang eventually came to the door, opened it, and was "taken into custody" and handcuffed. (Tr. 22:8-14). At approximately 6:05, she was "passed" to Agent Baccari, who read Ms. Wang her *Miranda* rights and began to "interact with" her. (Tr. 6:17-25).

Agents planned to take Ms. Wang back inside the apartment to get her in clothes suitable to go to court, but first had to "clear" the apartment to make sure there was nothing dangerous or no other persons in the apartment. (Tr. 24:20-25:6). Before agents entered the apartment to clear it, Agent Baccari "may" have asked Ms. Wang questions about the presence of other people in the apartment. (Tr. 25:11-15).

Other agents then went in to clear the apartment to make sure it was safe for Ms. Wang to re-enter and for the agents to begin their actual search. (Tr. 26:6-26:14).

Agent Baccari and an another, unidentified female agent remained in the hallway alone with Ms. Wang at this time. (Tr. 7:1-7). While Agent Baccari asserted at the hearing that she did not ask Ms. Wang to make a statement in the hallway and Ms. Wang did not assert her right to counsel at that time (Tr. 7:10-18), Agent Baccari did not dispute that she was more equivocal in prior sessions with the AUSAs, telling them she didn't "*think* I would have asked her in the hallway to make a statement," (Tr. 27:8-9) (emphasis added).

---

[2] As Ms. Wang noted in her affidavit, she was asleep when the agents began knocking. ECF No. 199-4.

Regardless, Ms. Wang invoked her right to counsel no later than 6:15 am, no more than ten minutes after she was read her rights. (Tr. 30:22-31:9).

After agents completed "clearing" the apartment, finding no weapons, pets, or other people inside, an FBI photographer took "entry photos" at 6:18, and the "search commenced thereafter," in other words some time after 6:18 a.m. *and indisputably after Ms. Wang's invocation*.

[redacted]

*DX-2/3501-05*

### B. The Agents Kept Ms. Wang at the Apartment for Over 45 Minutes After She Invoked

Further, while Agent Baccari testified the once Ms. Wang invoked at 6:15 a.m. "the next step" was to prepare Ms. Wang for transport to 26 Federal Plaza, Tr. 44:6-7,[3] the documentary evidence is wildly inconsistent with that statement. Instead, the "next step" was clearly for the agents to search the apartment, a search in which they found and seized numerous cellphones,[4] and to ask Ms. Wang questions about those cellphones.

Indeed, the agents kept Ms. Wang on the scene for *45 minutes* after her 6:15 a.m. invocation, i.e., until approximately 7:00 a.m. (Tr. 34:21-25), a timeline that would have made no sense if the "next step" was simply to get Ms. Wang ready to go to court. Rather, the record indicates—again consistent with Ms. Wang's affidavit[5]—that agents questioned Ms. Wang during these 45 minutes, including about her cellphone password. Indeed, Agent Baccari was clear that Ms. Wang was asked about her cellphones on multiple occasions, including not only the password

---

[3] *See also* (Tr. 12:5-12 (Baccari testimony that once Ms. Wang invoked "our focus would have transitioned to processing her, taking her down to transport and process her")).

[4] (Tr. 35:20-21).

[5] ECF 199-4 ¶¶ 4-5.

3

"777777" for a cellphone found in her bedroom (Tr. 9:16-22), but also passcodes for cellphones found in other areas of the apartment at an uncertain time during the search.[6]

### C. The Agent's Notes and Report Are Consistent with Post-Invocation Questioning Regarding the Phones

The fact that this questioning occurred *after* Ms. Wang asserted her right to counsel is also supported by the structure of the agent's notes of the search and her report on the search.

Her notes, introduced as DX-1 ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

*DX-1/3501-17*

---

[6] (Tr. 12:25-13:15); *see also* DX-3 (indicating that Ms. Wang provided multiple "phones' passcodes").

Further, her report, written just days after the search and before Ms. Wang's suppression motion was filed, introduced as DX-3 at the hearing:



*DX-3/3501-16*

5

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████

In short, the agents' own report is consistent with the fact that Ms. Wang the agents questioned Ms. Wang about her cellphone passwords after she invoked her right to counsel.

### D. The Agent Admitted She Might Have Asked Additional Post-Invocation Questions About Ms. Wang's Phone

Further, despite Agent Baccari's claim that Ms. Wang provided her cellphone password before she invoked her right to counsel, Agent Baccari was, respectfully, at best, unsure of whether an assertion of the right to counsel precluded her from asking questions about cellphones. She acknowledged, for example, telling the AUSAs that she may have asked Ms. Wang questions about her cellphone even after Ms. Wang had invoked her right to counsel. Tr. 32:7-33:11 ("Yes, I guess I said that."). In other words, over a year later, Agent Baccari still had, at best, uncertainty over *Edwards'* requirement that an assertion of the right to counsel requires that all questioning cease, making it more than plausible, on the day of the arrest, she continued asking Ms. Wang questions about her cellphone post-invocation.[7] Agent Baccari also did not recall telling another agent who was questioning Ms. Wang that Ms. Wang had already invoked her right to counsel, Tr. 43:18-21, and did not "recall" "specific[s]" on how Ms. Wang's invocation was relayed to other agents (Tr. 44:2-4)—all this despite *Edwards'* clear rule that a suspect who invokes her right to counsel cannot

---

[7] Overall, the record concerning the search at Ms. Wang's apartment reflects a confused scene, despite the fact that Ms. Wang was indisputably compliant. The search of Ms. Wang's apartment previously required the government to make a corrective disclosure based on a "reinterview[]" of the "FBI agent who served as squad leader for the . . . search." *See* Letter from the Government to Hon. Robert W. Lehrburger, dated Apr. 17, 2023, ECF No. 47.

6

"be subject to further interrogation by the authorities until counsel has been made available," 451 U.S. 477, 484-85 (1981).[8]

### E. Other Factors Are Consistent with Post-Invocation Questioning Regarding the Phones

*Finally*, other factors are consistent with Agent Baccari asking Ms. Wang for a statement, and Ms. Wang invoking her right to counsel, in the opening minutes of her interaction with the FBI, again consistent with Ms. Wang's affidavit.

For one, based on the planning meeting the day before, one of Agent Baccari's aims was to get a statement from Ms. Wang (Tr. 19:15-17 (Baccari's role included "try[ing] to talk to Ms. Wang on the day of [the] arrest")), which is consistent with Agent Baccari asking for a statement as soon as Ms. Wang was in custody.

Second, relatedly, the FBI was "unsure where Mr. [Kwok] was" and had at least three operations "simultaneously" underway to find and arrest him. (Tr. 11:6-7; *see also* Tr. 16: 7-16 (agents were going to simultaneous look for Kwok at the Sherry Netherland Hotel and locations in Greenwich, Connecticut and Mahwah, New Jersey); 18:13-17 (FBI was not sure where Kwok was going to be)). Given this uncertainty, and the amount of FBI resources devoted to locating Mr. Kwok that morning, it would make sense that Agent Baccari asked Ms. Wang about Mr. Kwok's whereabouts—after which even Agent Baccari acknowledges Ms. Wang invoked[9]—before asking about the cellphones it was finding in Ms. Wang's apartment. Put another way, once Ms. Wang was arrested, the cellphones in her apartment weren't going anywhere, but the FBI was obviously concerned that morning (rightly or wrongly) about locating Mr. Kwok, and it would thus have

---

[9] (Tr. 12:3-4).

7

made sense for Agent Baccari to prioritize those questions (after which Ms. Wang indisputably invoked).

***

In short, the hearing evidence, including that the agents did not begin their search of the apartment until after Ms. Wang's invocation, that the agents kept Ms. Wang at her apartment for 45 minutes after she invoked her right to counsel, the structure of the agent's report, the agent's uncertainty about the effect of the assertion of a right to counsel, and the other circumstances present on the morning of March 15, 2023, show that consistent with Ms. Wang's affidavit, the agents asked Ms. Wang about her cellphone passwords *after* she had invoked her right to counsel, and thereby violated her rights under *Edwards*.

## II. The Government Cannot Meet Its Burden to Show the "777777" Phone Passwords Would Have Been Discovered Absent the *Edwards* Violation

The government cannot meet its burden to show, by a preponderance of the evidence, that the contents of Ms. Wang's phones for which passwords was "777777" would have inevitably been discovered absent the *Edwards* violation at her apartment.

For clarity, the inevitable discovery doctrine does *not* apply to items 1b15, 1B16, 1B18, 1B69 through 1B772, and 1B93, which were accessed using the passcode provided by Ms. Wang.[10]

### A. Applicable Law

"The inevitable discovery doctrine instructs that evidence obtained during the course of an unreasonable search and seizure should not be excluded if the government can prove the evidence would have been obtained inevitably without the constitutional violation." *United States v. Lauria*,

---

[10] Based on the evidence at the hearing, items 1B17, 1B20, 1B68, and 1b77 were seized without using the PINs Ms. Wang provided. As such, we are no longer seeking to suppress them based on the *Edwards* violation, but reserve, for purposes of any appeal, the other arguments made in the portion of our motion to suppress which the Court previously denied.

8

70 F.4th 106, 122 (2d Cir. 2023). The government bears the "burden . . . to 'prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered.'" *In re 650 Fifth Ave.*, 934 F.3d 147, 165 (2d Cir. 2019) (quoting *In re 650 Fifth Ave.*, 830 F.3d 66, 102 (2d Cir. 2016)).

Further, "the investigation supporting a claim of inevitable discovery cannot itself have occurred only because the misconduct resulting in the actual discovery was exposed." *Lauria*, 70 F.4th at 123.

Last year, in *Lauria*, the Second Circuit reversed a district court's finding of inevitable discovery and suppressed the results of cell-site location information (CSLI) the FBI had obtained in a robbery investigation. The government's CSLI warrant applications contained numerous misstatements regarding the dates of certain robberies. The district court nonetheless denied suppression because "the government would inevitably have discovered" information placing one of the co-conspirators near the scene of the robbery on the date in question because "the government could have obtained a lawful warrant for these records once it corrected" the original application, and, also, could have discovered communications between the co-conspirators when it lawfully searched another defendant's cellphone. 70 F.4th at 123-24.

The Second Circuit rejected this reasoning, explaining that "[t]he fundamental flaw with the district court's reasoning is that it rests on the assumption that the government, *once alerted to defects in the [CSLI warrant applications]*, could have easily corrected or supplemented its initial supporting affidavits and thereby procured lawful warrants. But the inevitable discovery doctrine does not ask whether the government *could have* obtained the evidence at issue by [lawful means]

9

or *that it would have done so after the defense alerted it to defects*" in the initial search. 70 F.4th at 124 (some emphasis in original).

### B. Application

#### 1. "Biometrics"

The government cannot rely on "biometrics" as a means of inevitable discovery. For one, none of the devices were accessed via biometrics.[11] And while Mr. Isola testified that one of the devices had biometric capabilities, his examinations occurred the day before and the morning of the hearing.[12] As in *Lauria*, the record shows that "but for the defense's exposure of" the potentially unlawful conduct, here the *Edwards* violation concerning the passwords, "the government would have had no reason—and, therefore, would have been unlikely—to pursue alternative lawful means," here the use of the devices' biometric capabilities, "to procure the evidence at issue." 70 F.4th at 124. As such, biometric capabilities do not provide a basis for inevitable discovery.

#### 2. Evidence Obtained from Kwok's Apartment

Nor can the government rely on the fact that the "777777" passcode was provided by Kwok and his assistant in response to Agent Cardenas' questions.

First, inevitable discovery requires the government to show that the information would have discovered by "lawful means." *Lauria*, 70 F.4th at 106 (quoting *Nix v. Williams*, 467 U.S. 104, 122 (1984)). The government cannot show that here, because it cannot show that Agent Cardenas' questioning of Kwok was itself legal, based on the record before the Court.

---

[11] (Tr. 69:13-18 "Q. You testified about biometrics on direct. Do you recall that? A. I do. Q. None of these devices were accessed via biometrics, correct? A. I don't believe so. Q. It certainly doesn't reflect that on this summary chart; correct? A. That's correct.").

[12] (Tr. 80:6-23).

Agent Cardenas testified that, twice, she directly asked Kwok (and "everyone that was in the foyer area") about the passcodes for phones in Kwok's apartment.[13] At the time, however, Kwok had already been indicted,[14] and, as such, his *Sixth Amendment* right to counsel had automatically attached. *United States v. Bing Yi Chen*, 433 F. App'x 14, 15 (2d Cir. 2011) ("The Sixth Amendment right to counsel attaches upon indictment . . . ."). As such, the agents could not "deliberately elicit[]" statements from Kwok without a clear waiver of his right to counsel. *Massiah v. United States*, 377 U.S. 201, 206 (1964) ("We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."). Yet, that is exactly what Agent Cardenas did, asking him, twice, about the passcodes to the cellphones that had been found in his apartment.[15] For that reason alone, the government cannot show that it used "lawful means" to get the passwords from Mr. Kwok.

Second, while the government introduced an email from Agent Zachary Effting in which he approved the use of the "77777" password to unlock two of Ms. Wang's phones, GX 4, the government could not establish that Agent Effting's recommendation and approval was independent from knowledge obtained via the *Edwards* violations at Ms. Wang's apartment.

---

[13] (Tr. 49:12-50:8 ("I just directed the question to the room to everyone that was in the foyer area . . . I directed the question to the room: What is the passcode?")).

[14] (Tr. 18:22-23).

[15] That "Jason" answered the second question (after Kwok answered the first time) should not matter, as both of Agent Cardenas' questions were directed to Kwok and the others in the room, a clear attempt a "deliberate elicitation" from an individual who had a right to counsel.

Agent Effting was one of the case agents on the GTV investigation and involved in the planning of the search on Ms. Wang's apartment. (*See* Tr. 15:4-8). Ms. Volchko acknowledged she did not know "what information Agent Effting had about the search on East 64th Street" when he authorized attempting "777777" passcode to unlock Ms. Wang's devices and had "no way of knowing whether information from" the search of Ms. Wang's "apartment impacted his decision to tell [her] to proceed" with that passcode. (Tr. 71:19-25).

Further, any suggestion that the government would have eventually determined the passcode of Ms. Wang's phone is belied by Ms. Volchko's own contemporaneous warning to the agents that "it's important to note that unsuccessful PIN attempts *always* run the risk of permanently disabling or wiping the device." GX 4 (emphasis added).

Finally, the government cannot show, that at the time of the of the *Edwards* violations at Ms. Wang's apartment, the agents knew they would have obtained Kwok's passwords. *In re 650 Fifth Avenue and Related Properties*, 934 F.3d 147, 164 (2d Cir. 2019) (instructing district courts to "view[] affairs as they existed at the instant before the unlawful search . . ." (citation and quotation omitted)).

### 3. "Brute Force"

Nor can the government rely on the FBI's "Brute Force" tool to claim inevitable discovery. First, the evidence at the hearing showed that Brute Force capabilities are not available for any iPhone that in version 12 or later, meaning it was not available for all but two of the iPhones that the agents unlocked using Ms. Wang's password, *cf.* GX S-1. And, for those two iPhones, 1B70 and 1B71, Mr. Isolda testified he determined that those devices could be "Brute Forced" *the morning of the hearing*. (Tr. 80:3-17). Once again, as in *Lauria*, "but for the defense's exposure of" the potentially unlawful conduct, here the *Edwards* violation concerning the passwords, "the government would have had no reason—and, therefore, would have been unlikely—to pursue alternative lawful means," 70

12

F.4th at 124, here Brute Force on 1B70 and 1B71. Accordingly, Brute Force does not provide a basis for inevitable discovery.

***

The government cannot meet its burden to show the inevitable discovery doctrine applies.

### III. Suppression Is Appropriate

Finally, suppression of the searches of the phones with the "777777" passcodes is appropriate because communicating a cellphone passcode is a testimonial statement and the fruits of an *Edwards* violation should be suppressed.

*First,* communicating a passcode is a testimonial statement; it is a traditional verbal statement, not merely an action. Just last month, Judge Liman held that a suspect's disclosure of a passcode to a law enforcement officer was testimonial. *United States v. Shvartsman*, No. 23-CR-307 (LJL), 2024 WL 1193703, at *23 (S.D.N.Y. Mar. 20, 2024). In doing so, Judge Liman noted that, "under fundamental Fifth Amendment principles," a law enforcement agent's questioning concerning a cellphone passcode meant the suspect "faced the 'cruel trilemma' of 'truth, falsity, or silence," and "required the suspect to "express the contents of his mind . . . by making an assertion[ ] of fact or belief." *See id.* (cleaned up, citations and quotations omitted) (also noting that "had he been confronted with the question before the grand jury, a false statement could have exposed him to a charge of perjury and a refusal to answer could have subjected him to a charge of contempt"). Similarly, as the Utah Supreme Court observed just several months ago, directly providing a passcode to law enforcement is a "traditional testimonial communication":

> directly providing a passcode to law enforcement is not an 'act' It is a statement. There is no need to tease out whether the statement implicitly communicates information to determine whether it has testimonial value. The statement explicitly communicates information from the suspect's own mind. Accordingly, it is a traditional testimonial communication.

13

*State v. Valdez*, ---- P.3d. ---- 2023 UT 26, ¶ 51, 2023 WL 8635197 (Utah Dec. 14, 2023).

*Second*, the fruits of an *Edwards* violation should be suppressed. Whatever the wisdom of the Supreme Court's decision in *United States v. Patane*, 542 U.S. 630 (2004) that a failure to give *Miranda* warnings "does not require suppression of nontestimonial 'physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced,'"[16] *Edwards* violations should be, and are, treated differently than *Miranda* violations. As the Court already observed in its March 22 order directing a suppression hearing be held, "'[t]he merit of the *Edwards* decision lies in the clarity of its command and the certainly of its application,'"[17] in that while police can resume questioning a suspect under certain circumstances following her invocation of the right to silence, "*Edwards* demands that questioning cease until an attorney is present or unless there is a break in custody lasting at least fourteen days."[18] Indeed, *Edwards* itself notes the need for "additional safeguards . . . when the accused asks for counsel." 477 U.S. at 484.

Further, not suppressing the fruit of an *Edwards* violation creates perverse incentives for law enforcement. As Professor Kamisar stated (in an article originally cited by the government in its January 15 opposition to Ms. Wang's motion to suppress), "excluding only the statement obtained by questioning someone who has asked for a lawyer, but not the physical evidence the statement produced, is a woefully weak sanction in a situation where the police have nothing to lose by continuing to question the suspect, but something to gain (the physical evidence)." Yale

---

[16] 3/22/24 Order, ECF No. 251 at 19 (quoting *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010)).

[17] *Id.* at 20 & n.7 (quoting *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990)).

[18] *Id.* (citing *Maryland v. Shatzer*, 559 U.S. 98, 110 (2010)); *see also* Yale Kamisar, *Postscript: Another Look at* Patane *and* Seibert, *the 2004* Miranda *"Poisoned Fruit" Cases*, 2 Ohio St. J. Crim. L. 97, 105 n.42 (2004).

14

Kamisar, *Postscript: Another Look at* Patane *and* Seibert*, the 2004* Miranda *"Poisoned Fruit" Cases*, 2 OHIO ST. J. CRIM. L. 97, 105 n.42 (2004); *accord United States v. Gilkeson*, 431 F. Supp. 2d 270, 294 (N.D.N.Y. 2006) (Explaining that "once an arrestee has invoked the right to counsel, the police know that the interview is the last opportunity they will have to interrogate the arrestee without counsel. There is no incentive to cease questioning if the arrestee can be induced to make incriminating statements or to reveal information which leads to physical evidence that can be admitted in a subsequent criminal case. The fact that the statements themselves would not be admissible is not a sufficient remedy to protect the individual's right to be free from compelled self-incrimination.").

These perverse incentives are particularly high in a case where the information the police obtain in violation of *Edwards* is then used to obtain and access cellphones. As the Supreme Court noted, cellphones "differ in both a quantitative and a qualitative sense from other" kinds of evidence and are, often, "in fact minicomputers" which "typically expose to the government far *more* than the most exhaustive search of a house." *Riley v. California*, 573 U.S. 373, 393, 396 (2014) (emphasis in original). Indeed, in *United States v. Djibo*, 151 F. Supp. 3d 297, 310 (E.D.N.Y. 2015), the court refused to apply *Patane* to the search of a cellphone, noting "in today's modern world, a cell phone passcode is the proverbial "key to a man's kingdom," because a cellphone is the "combined footprint of what has been occurring socially, economically, personally, psychologically, spiritually and sometimes even sexually, in the owner's life . . . ."

*Finally*, the record from the suppression hearing reflects for both the Kwok and Wang searches, frankly, a carefree attitude by FBI agents over whether the defendants had a right to counsel, either through invocation or because adversary proceedings had commenced. As discussed above, Agent Baccari seemingly admitted that Ms. Wang was asked at least some

15

questions about her cellphone after she invoked,[19] it was unclear how (if at all) Ms. Wang's invocation was communicated to the other agents on the search,[20] and Agent Cardenas didn't even care to ask whether Mr. Kwok had asserted his right to counsel before asking him questions about his phone passwords. In other words, the agents' conduct reflects a pattern that is far afield from *Edwards*' bright-line rule that, once a suspect invokes the right-to-counsel, she "is not subject to further interrogation by the authorities until counsel has been made available . . . ." 451 U.S. at 484–85.

## **CONCLUSION**

For the reasons stated above, the Court should grant Ms. Wang's motion to suppress.

Dated: April 12, 2024

Respectfully submitted,

BAKER BOTTS LLP

*/s/ Brendan F. Quigley*

Brendan F. Quigley
Sarah Reeves
30 Rockefeller Plaza
New York, N.Y. 10112
(212 ) 408-2500
brendan.quigley@bakerbotts.com
sarah.reeves@bakerbotts.com

*Attorney for Yanping Wang*

---

[19] (*See* Tr. 32:2-33:11).

[20] (*See* Tr. 43:18-25).