

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 12, 2024

**VIA ECF AND EMAIL**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Yanping Wang*, S2 23 Cr. 118 (AT)

Dear Judge Torres:

The Government writes in response to defendant Yanping Wang's post-hearing submission, (Dkt. 278), and in further opposition to Wang's motion to suppress the contents of her lawfully seized devices as purported fruits of a *Miranda/Edwards* violation.

Testimony at the April 9, 2024 hearing (the "Hearing") established that Wang invoked her right to counsel only *after* providing her relevant phone passcode. The Court should deny Wang's motion on that ground. (*See* Dkt. 251 (Mar. 22 Order) at 20 ("If Wang provided the passwords before invoking her right to counsel or re-initiated contact with the agents after her invocation, then there was no *Edwards* violation, and the issue is moot.")). However, if the Court is inclined to reach the *Edwards* question, there are still two separate and independent bases to deny suppression. First, the agent's undisputed good faith means that there is no "deliberate, reckless, or grossly negligent conduct" to deter through suppression—the only justification for that extraordinary remedy. *Herring v. United States*, 555 U.S. 135, 143-146 (2009). And second, the record established at the Hearing, by at least a preponderance of the evidence, demonstrates that the FBI would more likely than not have obtained Wang's passcode (or otherwise accessed her devices) through the 777777 passcode's independent placement on the case-wide passcode list or through well-established technological workarounds.

For these reasons, Wang's motion should be denied.

    I.    **There Was No *Miranda/Edwards* Violation**

Special Agent Melissa Baccari's live testimony—corroborated by contemporaneous documents—established that Wang did *not* invoke her right to counsel in the brief period that she and Special Agent Baccari were in the hallway outside of her apartment. Even most of Wang's own affidavit is consistent with Special Agent Baccari's testimony. Further, Wang's decision not to testify or call any witnesses means that there is *no* testimony (or any other evidence) supporting

her assertion that she invoked immediately in the hallway upon her arrest. Instead, by at least a preponderance, the evidence shows that after a short interaction in the hallway, Wang returned to her bedroom with two agents and provided the 777777 passcode *before* she asked for a lawyer.

Wang's post-hearing submission attempts to muddy the waters by asserting that the search of Ms. Wang's apartment began only after she invoked her right to counsel. (Def. Post-Hr'g Sub. at 1). That is a red herring. The relevant question is not when "the search" began, but when Wang provided her passcode and when she invoked her right to counsel. Before the hearing (and her receipt of § 3500 materials), Wang's sworn assertion was that her bedroom invocation came "[a] short time" after her hallway invocation. (Dkt. 199-4 at 1). After the hearing, Wang's position shifted, and now appears to be that her invocation *must have* come after "the search" began. But the "documentary evidence" she points to, (Def. Post-Hr'g Sub. at 1), states that "the search" began at approximately 6:40 a.m. If Wang was not taken inside her bedroom until 6:40 a.m., she would have been held outside in the hallway not for the "short time" asserted in her pre-hearing affidavit, (Dkt. 199-4 at 1), but for half an hour *after* agents completed clearing her apartment as she was read her *Miranda* rights. That is not what happened.

The evidence submitted at the Hearing, including Special Agent Baccari's live testimony, the contemporaneous documents, and Wang's own affidavit, established the following sequence of events: FBI agents, including Special Agent Baccari accompanying Wang, entered Wang's apartment before the formal search commenced to attempt to interview her and transport her for booking and a court appearance. After the "[i]nitial walk-through [was] completed" by "~6:10 AM," (*see* DX-2 at 3501-013)—five minutes after Wang was read her *Miranda* rights at approximately 6:05 AM (*see* DX-1 at 3501-017)—five additional minutes elapsed between Wang being walked through one room to her bedroom and answering two questions including the passcode to her phone. *Cf. United States v. De La Cruz*, No. 3:19 Cr. 48 (KD), 2022 WL 88168, at * (D. Conn. Jan. 7, 2022) (crediting agent's testimony of a "four-minute interval" between "the security sweep" of a defendant's premises and questioning him inside).

That sequence is borne out by the evidence. Wang came to her door "shortly after" the FBI's arrest team knocked and announced their presence. (Tr. 6:1-11). She was "placed into custody" and "passed to [Special Agent Baccari]," who "almost immediately" read Wang her *Miranda* rights and advised her of the warrants for her arrest and the search of her apartment. (*Id.* 22:18-20, 6:14-23). As Special Agent Baccari was reading Wang her *Miranda* rights, other agents had gone "[t]o clear the residence, inside [Wang]'s apartment." (*Id.* 7:1-7). Wang did not ask Special Agent Baccari for a lawyer in the hallway or say anything of substance to her at all. (*Id.* 7:10-16). Nor did Special Agent Baccari ask Wang to make a statement in the hallway. (*Id.* 7:17-19). That was deliberate: Special Agent Baccari, experienced with making arrests, (*id.* 4:3-10), intended "to bring [Wang] back inside to attempt to try to speak with her," (*id.* 27:12-18), because the FBI agent "wanted to make [Wang] feel a little bit more comfortable instead of asking her questions in the hallway outside. . . . [j]ust in the hopes that she'd like to speak with me." (*See* Tr. 7:15-8:2).

Special Agent Baccari, Wang, and one other female agent were outside in the hallway for only "[a] couple of minutes." (Tr. 8:5-7). Wang's own affidavit corroborates this point: she claimed to have been taken inside from the hallway "[a] short time later." (Dkt. 199-4 at 1).

Contemporaneous notes of the day's events further corroborate Special Agent Baccari's testimony. Her handwritten notes of Wang's arrest indicate that Special Agent Baccari read Wang her *Miranda* rights at approximately 6:05 a.m. ("est. 0605 Rights Read") and that Wang invoked her right to counsel approximately 10 minutes later ("invoked → est. (615 am)"). (DX-1 at 3501-017). This 10-minute window is consistent with the rest of Special Agent Baccari's testimony and contemporaneous documents written by others that day. Other agents "went in" to clear Wang's apartment "as soon as [Wang] came out of the apartment," (Tr. 22:18-20), while Special Agent Baccari was reading Wang her *Miranda* rights "almost immediately" after her arrest. (*Id.* 25:18-24). A document written by the search team leader—a different FBI agent—stated that this "[i]nitial walk-through [was] completed" by "~6:10 AM," (*see* DX-2 at 3501-013). And Special Agent Baccari's contemporaneous write-up states that "[a]fter the residence was cleared, WANG was taken to the bedroom area." (DX 1 at 3501-016). That is, agents finished clearing the two-room apartment (*see* DX-2 at 3501-011 (diagram of apartment)) approximately five minutes after Special Agent Baccari read Wang her *Miranda* rights. Approximately five minutes later, Wang went inside and answered two short questions in her bedroom—is this your phone, and what is its passcode—then invoked her right to counsel when Special Agent Baccari switched topics to her co-defendant and longtime boss, Miles Guo. (Tr. 6:24-10:12).

There is *no* testimony or other evidence supporting Wang's assertion that she invoked her right to counsel in the hallway. The only material in the case that supports Wang's claim is her own self-serving affidavit. But "by not testifying, [Wang] has failed to contradict the government's evidence . . . even though [she] might have done so without risk that anything [she] said could be later used against [her] at trial." *United States v. Mason*, 660 F. Supp. 2d 479, 491 (W.D.N.Y. 2009) (quoting *United States v. Juvenile Male*, 121 F.3d 34, 42 (2d Cir. 1997)); *see also United States v. Deleston*, No. 15 Cr. 113 (PKC), 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015); *United States v. James*, No. 10 Cr. 1293 (RPP), 2011 WL 6306721, at *7 (S.D.N.Y. Dec. 16, 2011); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002); *United States v. Polanco*, 37 F. Supp. 2d 262, 264 & n.4 (S.D.N.Y. 1999) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if [she] declines to testify at the hearing.").

On the basis of Special Agent Baccari's testimony and its consistency with the contemporaneous summaries of the day's events, the Court should find, by a preponderance of the evidence, that Wang did not invoke her right to counsel until after she provided her 777777 passcode. Suppression should be denied on that basis alone.

    **II.**    **The Agent Indisputably Acted in Good Faith**

Even if the Court were to find that Wang's statement of her passcode was elicited in violation of her *Miranda/Edwards* rights—and for the reasons set forth above, it should not—the agent's indisputable good faith bars application of the exclusionary rule. To grant Wang's suppression motion, the Court must not only set aside Special Agent Baccari's testimony but find that her conduct that morning—arresting Wang with one other female agent, then escorting her to the privacy of her bedroom to ask further questions while she changed clothes for her court appearance—was a "deliberate, reckless, or grossly negligent" attempt to violate Wang's *Miranda* rights. *Herring*, 555 U.S. at 144. The record establishes by more than a preponderance of the evidence that Special Agent Baccari conducted Wang's arrest in good faith, from her immediate

reading of Wang's *Miranda* rights to her taking Wang to a more comfortable setting before asking her substantive questions. *See Missouri v. Seibert*, 542 U.S. 600, 616 (2004) (determining whether "the facts . . . by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings"); *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992) ("The burden is on the government to demonstrate" applicability of the good-faith exception to the exclusionary rule).

Both Wang's pre-hearing submissions and the Court's pre-hearing order cited *United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006), as an exemplar of when suppression may be an appropriate remedy for an *Edwards* violation. (*See* Mar. 22 Order at 20-21 & n.7; Dkt. 236 at 18-19). But *Gilkeson*'s suppression remedy *depended* on its finding that the law enforcement officers involved in that case acted in bad faith. 431 F. Supp. 2d at 293-94 (explaining defendant "requested an attorney three times during his interrogation" while officers acted "in a calculated manner . . . to confuse the defendant and/or undermine his understanding of the effect of his assertion of his right to counsel.") Nothing remotely close to *Gilkeson*'s material facts are even alleged here. Indeed, Wang's own account is that, apart from her uncorroborated claim of a hallway invocation refuted by live testimony, she invoked *after* providing the disputed statement—and she alleges no improper coercion. Moreover, Wang's phones and their contents were subject to search and seizure through a preexisting judicially authorized warrant, whereas Gilkeson's coerced statement "*revealed* incriminating evidence" by uncovering what was otherwise unknown: "the existence and location of the computer in his barn office" that "led [to] the filing of separate and distinct federal charges." *Id.* at 281. *Gilkeson* ultimately ordered suppression to deter "a deliberate attempt" to violate a defendant's rights, *id.* at 294, while recognizing that, "[o]f course, the need for deterrence is not implicated by good-faith police conduct," *id.* 293. The facts of this case are plainly distinguishable.

In the face of a record that showed the care Special Agent Baccari took in undertaking Wang's arrest, Wang's post-hearing submission is unable to assert that law enforcement did not act in good faith that morning. Instead, Wang's submission uses suggestive language—accusing "the FBI agents" of "a carefree attitude" (Def. Post-Hr'g Sub. at 15)—that gestures at, but falls far short of, a route around the good-faith exception to suppression. The most Wang's submission can muster as evidence of this "attitude" is that Special Agent Baccari could not recall certain details of these events. (*See id.*). But suppression requires, at the very least, "grossly negligent" conduct. *Herring*, 555 U.S. at 144; *Gilkeson*, 431 F. Supp. 2d at 293 (suppression remedy for *Miranda* violations extends only to "where the police had deliberately sought to contravene its purposes"). Nothing of the sort is found in this record.

Wang's suppression motion should be denied because her *Miranda/Edwards* rights were not violated. But under any circumstances, Wang's motion cannot survive the good-faith exception to the exclusionary rule, and can also be denied on that basis.

### III.    The FBI Would Have Accessed Wang's Devices Even Without Her Voluntary Statement

Wang provided her passcode before invoking her right to counsel, and in response to an FBI agent's good-faith efforts to lawfully arrest and interview her. For those reasons, her motion should be denied. If the Court were to proceed further, it should find that the record established

by at least a preponderance of the evidence that the FBI would more likely than not have accessed Wang's devices through means independent of her statement. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (preponderance standard for inevitable-discovery exception to suppression); *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 103 (2d Cir. 2016) (application of "more likely than not" standard to each piece of relevant evidence).

Wang falls short in rebutting the evidence that the 777777 passcode was placed at the top of the case-wide Passcode List because it came additionally and independently from Wang's co-defendant Miles Guo, from his assistant Jason Hu, and from a notebook found at Guo's home in Mahwah, New Jersey.

First, Wang's post-hearing submission urges the Court not to consider this extraordinary confluence of independent sources with a last-ditch claim that *Guo*'s passcode was unlawfully obtained. (*See* Def. Post-Hr'g Sub. 10-11 (arguing, for the first time, that Guo's passcode was solicited in violation of his Sixth Amendment right to counsel)). This is, at best, speculation. Guo has not claimed that his rights were violated and Wang may not invoke these rights on his behalf to frustrate a finding of inevitable discovery. *See United States v. Paris*, 954 F.3d 1069, 1071-72 (8th Cir. 2020) (holding that defendant did not have standing to assert Sixth Amendment right to counsel of co-defendant because right "is personal to each defendant"); *accord Justin v. Tingling*, No. 22 Civ. 10370 (NRB), 2024 WL 246021, at *5 (S.D.N.Y. Jan. 24, 2024).

Second, Wang argues that "the government could not establish" that the inclusion of 77777 at the top of the Passcode List "was independent from knowledge obtained via the [purported] *Edwards* violation." (Def. Post-Hr'g Sub. at 11). But the record speaks for itself: the case agents' email to CART's examiners, dated more than a month after the Guo and Wang searches, provided "Potential Passwords/Pins" for "GTV" that were sourced from documents recovered from "Mahwah NJ, Greenwich CT, and the Sherry Netherland Hotel in NY." And while Wang asserts that the limited number of passcode guesses might have frustrated the Government's ability inevitably to gain access to Wang's devices, this argument impermissibly indulges in "speculative elements" rather than "demonstrated historical facts." *Eng*, 971 F.2d at 859. The evidence of "what would have happened," *id.* at 861, is shown in the agents' and CART's email exchanges. The case agents asked "to take a stab at using these passwords" (of which 777777 was *first* on the list, *see* GX-2A) "even if that means risking getting locked out." (GX-2 at 1). And CART's lead examiner on the case-wide review later asked the case agents "if you would like me to attempt 777777" on two of Wang's devices while reminding them of the risks of being locked out—that is, she asked if she should run 777777 without apparently knowing it came from Wang's own statement (or else there would be little reason to warn of the risk of unsuccessful attempts).

Wang's other post-hearing arguments are irrelevant to the inevitable discovery inquiry. It is irrelevant, for example, that "none of the devices were accessed via biometrics," (Def. Post-Hr'g Sub. at 10), when a CART examiner testified that one of Wang's passcode-protected devices *could have been* accessed via biometrics, (*see* Tr. 75:3-79:14). The question is not what *did* occur, but "what *would have happened*" in the counterfactual where the disputed "search never occurred." *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992). Wang also relies on cases involving fundamentally different facts and stating rules inapplicable to her motion. *United States v. Lauria*, 70 F.4th 106 (2d Cir. 2022), cited repeatedly in Wang's post-hearing brief, involved a warrant with

concededly material misrepresentations. *Id.* at 112. The District Court denied suppression on the ground that the Government "could easily have corrected" the misstatements once alerted to them by the defendant's suppression motion. *Id.* at 124. The Second Circuit vacated the order, because "but for the defense's exposure of misstatements in the warrant affidavits, the government would have had no reason—and, therefore, would have been unlikely—to pursue alternative lawful means to procure the evidence at issue." *Id.* In other words, *Lauria* stands for the proposition that the Government cannot claim inevitable discovery for corrective measures taken as a result of a defendant's objection. This is no more than a restatement of *Nix*'s original rule that evidence avoids suppression only if it "would inevitably have been discovered without reference to the police error or misconduct." *Nix*, 467 U.S. at 448. That, of course, is not what the Government argues or what the record shows in this case. Rather, the Court heard evidence of the several alternative means by which the FBI would have accessed Wang's devices—and how they actually accessed other devices seized in the same case—had she did not provided her passcode and CART instead tried to access her 777777-locked devices by reference to the Passcode List, by biometrics, or by brute force.

While the short-hand name for this doctrine references inevitability, the "ultimate or inevitable discovery exception to the exclusionary rule," *Nix*, 467 U.S. at 433, requires only that the Government prove by a preponderance of the evidence that discovery of the challenged evidence "would have been more likely than not inevitable absent" its actual and disputed acquisition. *In re 650 Fifth Ave.*, 830 F.3d at 103. Should the Court reach this question, the record provides an ample basis to avoid "the substantial social costs" of suppression on this ground. *United States v. Leon*, 468 U.S. 897, 907 (1984).

## CONCLUSION

For the reasons set forth above, the Court should deny Wang's motion to suppress the contents of devices that were searched and seized pursuant to a preexisting warrant.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314