```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           23 CR 118 (AT)

5    YVETTE WANG,                                Sentence

6                   Defendant.

7    ------------------------------x

8                                       January 6, 2025
                                        9:30 a.m.
9

10   Before:

11                    HON. ANALISA TORRES,

12                                       U.S. District Judge

13

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  RYAN B. FINKEL
17        JULIANA MURRAY
          MICAH FERGENSON
18        JUSTIN HORTON
          Assistant United States Attorneys
19
     BAKER BOTTS LLP
20        Attorneys for Defendant
          BRENDAN QUIGLEY
21        SARAH REEVES

22
     ALSO PRESENT:  MICHAEL GARTLAND, Paralegal Specialist (USAO)
23                  VICTOR CHANG, Mandarin Interpreter
                    SHI FENG, Mandarin interpreter
24

25
```

```
1              (In open court; case called)

2              THE COURT:  Good morning.

3              We are here in the United States v. Yvette Wang.

4              Would you make your appearances, please.

5              MS. MURRAY:  Good morning, your Honor.

6              Juliana Murray, Ryan Finkel, Micah Fergenson and

7    Justin Horton on behalf of the United States.  We're joined by

8    paralegal specialist Michael Gartland.

9              MR. QUIGLEY:  Good morning, your Honor.

10             For Ms. Wang, who is to my right, Brendan Quigley.

11   I'm joined by my colleague, Sarah Reeves.

12             MS. REEVES:  Good morning, your Honor.

13             THE COURT:  Please be seated.

14             This matter is on for sentencing.  I would like the

15   interpreter to please -- well, both interpreters to identify

16   yourselves, please.

17             THE INTERPRETER:  Good morning, your Honor.

18             Mandarin interpreter Tuo Huang.

19             THE INTERPRETER:  Good morning, your Honor.

20             Mandarin interpreter Shi Feng.

21             THE COURT:  Would you swear the interpreters, please.

22             (Interpreters sworn)

23             THE COURT:  In connection with today's proceeding, I

24   have reviewed the presentence investigation report dated

25   June 26, 2024 and revised on August 8, 2024, including the
```

1  recommendation and addendum, the defendant's sentencing

2  submission dated October 4, 2024, her supplemental letters

3  dated November 7 and December 16, 2024, and her objections to

4  the original presentence report dated July 12, 2024, and the

5  government's sentencing submission dated October 11, 2024, its

6  supplemental letters dated November 22 and December 11, 2024

7  and January 2 and 3, 2025, and the approximately 150 victim

8  impact statements attached to those letters.

9         Have the parties received each of these submissions?

10         MS. MURRAY:  Yes, your Honor.

11         MR. QUIGLEY:  Yes, your Honor.

12         THE COURT:  Are there any further submissions?

13         MS. MURRAY:  The only additional submission, your

14  Honor, was this morning it's an amended consent preliminary

15  order of forfeiture that we provided to the Court

16  electronically with a redline against the version previously

17  provided.  The parties reviewed that this morning, and we've

18  signed it, and passed it up to your clerk for your Honor's

19  consideration.

20         MR. QUIGLEY:  There are no other submissions from

21  defense, your Honor, and we've signed that amended preliminary

22  forfeiture referenced by Ms. Murray.

23         THE COURT:  Mr. Quigley, have you read the presentence

24  report?

25         MR. QUIGLEY:  I have, your Honor.

```
 1              THE COURT:  And you've discussed it with your client?

 2              MR. QUIGLEY:  I have, your Honor.

 3              THE COURT:  Ms. -- is the Wong or Wang?

 4              MR. QUIGLEY:  Wang, your Honor.

 5              THE COURT:  Wang?

 6              MR. QUIGLEY:  Yes, your Honor.

 7              THE COURT:  Ms. Wang, have you read the presentence

 8   report?

 9              THE DEFENDANT:  Yes, your Honor (English).

10              THE COURT:  Did you discuss it with your lawyer?

11              THE DEFENDANT:  Yes, your Honor (English).

12              THE COURT:  Have you had the opportunity to go over

13   with your lawyer any possible errors in the report or anything

14   else that should be taken up with me?

15              THE DEFENDANT:  We did, your Honor.  We did (English).

16              THE COURT:  Has the government reviewed the

17   presentence report?

18              MS. MURRAY:  Yes, your Honor.

19              THE COURT:  Ms. Wang has raised a number of objections

20   to the report regarding factual accuracy, and I will address

21   each matter in turn.

22              First, Ms. Wang objects to the report's use of the

23   word "fictitious" in paragraph 10 which states that she and her

24   co-conspirators operated a series of "complex and largely

25   fraudulent and fictitious businesses."
```

 1              The trial record is replete with testimony that

 2      Ms. Wang instructed subordinates to create business entities

 3      whose only purpose was to provide financial cover for her and

 4      her co-conspirators' crimes.  Accordingly, the objection is

 5      overruled.

 6              Second, Ms. Wang objects to the portion of paragraph

 7      12 of the report that states that she "solicited" investments

 8      by promising large financial returns and other benefits.

 9              As a member of the conspiracy, Ms. Wang is responsible

10      for the actions of her co-conspirators in furtherance of the

11      conspiracy.  Furthermore, testimony from Haitham Khaled

12      demonstrates Ms. Wang oversaw his efforts to market the entity.

13      [Trial transcript page 2304, line 24 to page 2305, line 16.]

14      Accordingly, the objection is overruled.

15              Third, Ms. Wang objects to the report's contention in

16      paragraph 14 that she "was entitled" to millions of dollars'

17      worth of Himalaya dollar, a purported cryptocurrency funded by

18      victim money.

19              Ms. Wang argues that although she was not entitled to

20      the Himalaya dollar, she was "allocated" the purported currency

21      as stated in paragraph 22 of the report.

22              I agree with Ms. Wang.  Probation is directed to

23      delete the word "entitled" in paragraph 14 and substitute the

24      word "allocated" in its place.  The objection is therefore

25      sustained.

1          Fourth, Ms. Wang objects to paragraph 21 of the

2    report, which states that although she held no formal position

3    at G/CLUBS, she exercised control over G/CLUBS' day-to-day

4    operations and ensured that Miles Guo's instructions were

5    implemented.

6          According to Ms. Wang, Haoran He exercised control

7    over G/CLUBS and was senior to Ms. Wang.  Ms. Wang also notes

8    that although G/CLUBS operated out of Puerto Rico, Ms. Wang was

9    based in New York.

10          The government maintains that paragraph 21 is

11    accurate, and that, at best, Haoran He and Ms. Wang had

12    equivalent roles.

13          Trial testimony from Haitham Khaled and Limarie Reyes

14    establishes that Ms. Wang exercised significant control over

15    G/CLUBS' day-to-day operation and was not subordinate to

16    Mr. He.  [See, for example, trial transcript page 2305, lines

17    13 to 16; page 2314, lines 16 to 24; page 2324, lines 6 to 12;

18    page 2357, lines 1 to 12; page 2975, line 25 to page 2976, line

19    10; page 2990, lines 13 to 22; and page 2993, line 1 to page

20    2995, line 9.]  Accordingly, the objection is overruled.

21          Fifth, Ms. Wang objects to the portion of paragraph 22

22    of the report that states that she "worked to transfer fraud

23    proceeds to the Himilaya Exchange," arguing that there is no

24    evidence to support this allegation.

25          Trial testimony established that Haitham Khaled was

1   directed to transfer money from Crane's bank accounts to those

2   belonging to the Himilaya Exchange.  [Trial transcript page

3   2028, line 5 to page 2029, line 10, and page 2030, lines 1 to

4   8.]

5        Limarie Reyes was also instructed to purchase Himalaya

6   dollars from the Exchange on behalf of G/CLUBS.  [Trial

7   transcript page 3060, line 14 to page 3061, line 16.]

8        Both of these witnesses regularly spoke with and took

9   instructions from Ms. Wang, often with regard to transfers

10  between various bank accounts.  Accordingly, the objection is

11  overruled.

12       Sixth, Ms. Wang objects to the portion of paragraph 30

13  of the report that states that she and her co-conspirators

14  fraudulently obtained more than $150 million in victim funds

15  through the Himalaya Farm Alliance.

16       The government contends that Ms. Wang was an

17  "essential member of the conspiracy" and is responsible for all

18  its activities.

19       Furthermore, trial testimony from Ya Li describes

20  Ms. Wang as coordinating transfers between Farm money and other

21  Guo-related bank accounts.  [Trial transcript page 1388, line

22  20 to page 1389, line 16.]  The objection is therefore

23  overruled.

24       Seventh, Ms. Wang objects to paragraph 34 of the

25  report, which states that she and her co-conspirators induced

1    Guo's followers to transfer funds to a purported online

2    membership club called G/CLUBS.

3            The government contends that Ms. Wang directed G/CLUBS

4    and maintained its operation so that victims would be attracted

5    to invest in it.

6            Trial testimony establishes that Ms. Wang was involved

7    in the transfer of funds from victims to G/CLUBS.  [Trial

8    transcript page 2000, line 17 to page 2002, line 2; page 2046,

9    lines 12 to 16; and page 2051, lines 6 to 14.]

10           Testimony from Haitham Khaled shows Ms. Wang oversaw

11   his efforts to market the entity, and testimony from Limarie

12   Reyes establishes that Ms. Wang was involved in efforts to

13   allow G/CLUBS members to purchase multiple memberships.  [Trial

14   transcript page 2304, line 24 to page 2305, line 16, and page

15   3017, lines 14 to 21.]  Accordingly, the objection is

16   overruled.

17           Eighth, Ms. Wang objects to the portion of paragraph

18   36 of the report that states that G/CLUBS provided members with

19   "no discernible membership benefits."

20           In whole, the sentence states that G/CLUBS provided

21   members with "few to no discernible membership benefits."

22           Trial testimony from Haitham Khaled and Limarie Reyes

23   supports the fact that although G/CLUBS members received very

24   little in exchange for their membership fees, they were at

25   times provided material benefits, such as discounts at

1    G Fashion, access to content created by Guo, and attendance at

2    certain events.  [Trial transcript page 2046, lines 19 to 22;

3    page 2055, lines 1 to 10; page 3005, line 25 to page 3007, line

4    8; and page 3018, line 17 to page 3019, line 3.]  Accordingly,

5    the objection is sustained, and probation is directed to delete

6    the words "to no" in paragraph 36.

7         Ninth, Ms. Wang objects to page 37 of the report which

8    explains that she and her co-conspirators used G/CLUBS to make

9    fraudulent stock offerings.  Specifically, the co-conspirators

10   told Guo's followers that buying G/CLUBS memberships would

11   entitle them to stock in other Guo-affiliated entities, like

12   GTV and G Fashion.

13        Trial testimony supports the fact that G/CLUB members

14   were promised stakes in GTV that they ultimately did not

15   receive.  [See, for example, trial transcript page 204 lines 6

16   to 13; page 208, line 25 to page 210, line 9; page 1016, lines

17   15 to 21; and page 2049, lines 7 to 18.]  Accordingly, the

18   objection is overruled.

19        Tenth, Ms. Wang objects to paragraph 38 of the report

20   to the extent it suggests that Ms. Wang personally solicited

21   G/CLUBS members and investors.

22        Paragraph 38 does not suggest that Ms. Wang made

23   personal solicitations.  It states that Wang and her

24   co-conspirators "asked investors to purchase multiple

25   memberships in G/CLUBS, enabling Guo, Je, and Wang to increase

1    the amount of money solicited."

2          Testimony from Haitham Khaled shows that Ms. Wang

3    oversaw his efforts to market the entity, and testimony from

4    Limarie Reyes shows that Ms. Wang was involved in efforts to

5    allow G/CLUBS members to purchase multiple memberships.  [Trial

6    transcript page 2304, line 24 to page 2305, line 16; and page

7    3017, lines 14 to 15.]

8          Furthermore, as a member of the conspiracy, Ms. Wang

9    is responsible for the actions of her co-conspirators in

10   furtherance of the conspiracy.  Thus, the report is correct

11   when it states that Ms. Wang and her co-conspirators asked

12   investors to purchase multiple memberships.  Accordingly, the

13   objection is overruled.

14         Eleventh, Ms. Wang objects to paragraph 46 of the

15   report which states that she and her co-conspirators concealed

16   Guo's funds by moving them regularly, disguising them as

17   "loans" or "investments" and installing figurehead executives

18   at the entities involved in these transactions.

19         At trial Limarie Reyes and Jesse Brown, the CEO of

20   G/CLUBS and the Himilaya Exchange, respectively, testified that

21   they lacked control over the businesses they supposedly ran and

22   received instruction from Ms. Wang and Mr. Je.  [Trial

23   transcript page 3017, loins 10 to 21; page 3064, lines 8 to 12;

24   page 3641, line 15; and page 3645, line 24 to page 3646, line

25   4.]

1        Trial testimony from Haitham Khaled, Ya Li and Karin

2   Maistrello also established that Ms. Wang was regularly

3   involved in moving money between various accounts related to

4   Guo's businesses.  [Trial transcript at page 473, line 16 to

5   page 474, line 15; page 1388, line 1 to page 1389, line 16;

6   page 1915, lines 3 to 12; page 1942, lines 2 to 15; page 1944,

7   line 13 to page 1945, line 3; and page 1949, line 14 to page

8   1951, line 24.]  Accordingly, the objection is overruled.

9        Twelfth, Ms. Wang objects to paragraph 57 of the

10  report which describes a payment made to a bank account under

11  her name labeled as a "director fee."  Ms. Wang appears to

12  argue that the paragraph implies that the payment was somehow

13  wrongful, either because she was not a director of GTV or

14  because other directors did not receive similar fees.

15       Ms. Wang is correct that she served as an executive

16  director of GTV [Report paragraph 20.]  However, paragraph 57

17  does not imply otherwise, and the government points out that

18  Kyle Bass, a director named in the GTV private placement

19  materials, was not paid a director's fee.  Accordingly, the

20  objection is overruled.

21       Thirteenth, Ms. Wang objects to paragraph 119 of the

22  report which states that it appears as if she has the ability

23  to pay a fine through the liquidation of assets.

24       Ms. Wang claims that because she is jointly and

25  severally liable for forfeiture in the amount of $1.4 billion,

1    she lacks the ability to pay an additional fine.

2           According to the government, Ms. Wang has assets that

3    can be used to satisfy her monetary judgments, and it does not

4    matter whether such judgments impose joint and several

5    liability.

6           Ms. Wang's objection is overruled, as it is true that

7    the liquidation of her assets could allow her to pay a fine.

8           Are there any further objections to the presentence

9    report regarding factual accuracy, Mr. Quigley?

10          MR. QUIGLEY:  No, your Honor.  Thank you.

11          THE COURT:  The government?

12          MS. MURRAY:  No, your Honor.

13          THE COURT:  Hearing no further objections, the Court

14   adopts the factual recitations set forth in the report except

15   to the extent that I have modified them today.

16          The presentence report will be made a part of the

17   record in this matter and placed under seal.  If an appeal is

18   taken, counsel on appeal may have access to the sealed report

19   without further application to the Court.

20          Although courts are no longer required to follow the

21   Sentencing Guidelines, we are still required to consider the

22   applicable guidelines in imposing sentence, and to do so, it is

23   necessary that we accurately calculate the sentencing range.

24          I understand that there is a plea agreement in this

25   case in which the parties stipulated to a particular

 1    calculation of the Sentencing Guidelines:  An offense level of

 2    43, a Criminal History Category of I, and a guidelines range of

 3    life imprisonment, which is reduced to a guidelines range of

 4    120 months' imprisonment due to the applicable statutory

 5    maximum penalty.  The parties also stipulated to a guidelines

 6    fine range of $50,000 to $500,000.

 7            The presentence report calculates an identical

 8    guidelines imprisonment range and a fine range of $50,000 to

 9    $250,000.  [PSR at 46.]  Neither Ms. Wang nor the government

10    challenge this calculation.

11            Based on my independent evaluation of the Sentencing

12    Guidelines, I find that the offense level is 43, the Criminal

13    History Category is I, and the guidelines range is 120 months'

14    imprisonment, followed by one to three years of supervised

15    release, and a fine ranging from $50,000 to $500,000.

16            Now, I will hear from the parties.

17            Does the government wish to be heard with regard to

18    sentencing?

19            MS. MURRAY:  Yes, your Honor.

20            This billion dollar fraud would have been impossible,

21    impossible without Ms. Wang.  As Ms. Shroff said during her

22    opening statement in the Miles Guo trial, Guo "had a vision.

23    Had an idea.  What he did not quite have is the

24    infrastructure."

25            And that essential component, the incredibly

complicated infrastructure, that enabled Guo and Ms. Wang and William Je to execute and escalate this billion dollars fraud over five years, that was entirely due to Ms. Wang's work.

She was the puppet master.  She was pulling all of the strings.  She hired figurehead executives, but she still controlled all of the details of the RICO enterprise.  She controlled the bank accounts.  She controlled the corporate structure.  She directed Haitham Khaled to create Crane for the appearance of independence.  She directed him to set up fake office addresses to make it seem like these were distinct entities, but in reality, everything was under her control and she was executing this in connection with Mr. Guo and Mr. Je.

Her daily planners over these five years reflect that she spent every single day tirelessly making this fraud possible.  She spent her entire days meeting with employees associated with all of the companies in the RICO enterprise, from the Rule of Law, to GTV, to G/CLUBS, to HCHK, which is the umbrella organization that they set up after the SEC and the government were on to parts of their fraud, to Gettr, to the Himilaya Exchange, and to subsequent arms of the fraud, like @A10.

She also spent her time trying to obstruct the bankruptcy proceedings and working to help in that effort, including by having Miles Guo's daughter lie to the bankruptcy court.  She was meticulous in the details of continuing the

1    fraud, and she took painstaking efforts to paper these

2    corporations to make them appear legitimate when they simply

3    were not.  They were just a mechanism to defraud thousands of

4    individuals who truly believed in a pro-democracy movement of

5    more than a billion dollars.

6         The offense conduct here is horrific.  The Court heard

7    it during the Miles Guo trial, and it's been outlined

8    extensively in the parties' submissions and in the PSR.  The

9    Court also has the benefit of the victim statements here:  The

10   victim statements during trial testimony of the victims who

11   testified, and, as the Court said, more than 150 people who

12   submitted letters to the Court.

13        In the government's letter dated November 24, 2024, we

14   outlined and summarized some of the categories of harm that

15   were caused by Ms. Wang.  They include financial harm, personal

16   hardship, threats to actual safety, and then the broader harm

17   of undermining the pro-democracy movement.

18        It is true that Miles Guo and William Je most

19   benefited financially from the fraud and misappropriation of

20   the fraud proceeds, but Ms. Wang knew the money was going to

21   Guo and to Je.  She controlled the courts.  We have recordings

22   of her directing personnel to move money to those accounts.

23   She knew that the money was not being used for the purpose that

24   it was being told victim investors it would be used for.  It

25   was not being used to fight the CCP.  It was used for mansions.

1  It was used for a $4.4 million custom car.  It was used for

2  yachts and expensive lifestyle for Miles Guo and William Je and

3  a comfortable lifestyle for Ms. Wang as well.

4          Ms. Wang is not a shrinking violet.  Witnesses have

5  told us and the Court she was demanding.  She was exacting.

6  She could be brutal.  The Court recalls during trial the

7  recording that Mr. Khaled introduced at the end of the meeting

8  where Ms. Wang, who was pushing back against Miles Guo, threw

9  remote control at a TV.  She was angry not because she was

10  trying to do something legal or the right thing.  She was angry

11  that she was getting pushback on her role, her role of making

12  sure that the money transfer appeared legitimate.  She well

13  knew that it wasn't.  She knew that her job was to make sure

14  that everything seemed above board because that's the job that

15  she did for five years.

16          The government did take her relatively lower financial

17  profits into account in the plea that we offered, and that

18  Ms. Wang accepted, which capped her exposure at 120 months, the

19  statutory maximum.  But the fact that she earned less than

20  Miles Guo and William Je cannot be a substantial mitigating

21  factor here, particularly where she is responsible for the

22  actions not only of her co-conspirators but of herself.  And,

23  again, this fraud would have been impossible without Ms. Wang.

24          The Court should also consider her obstructive

25  behavior as a significant aggravating factor here.  As I

1    mentioned, she coached Miles Guo's daughter to lie to the

2    bankruptcy court.  We have evidence that Ms. Wang was already

3    in receipt of the government's subpoenas to G/CLUBS and other

4    entities.  And even after she was aware that there was a

5    criminal investigation into their operations, she was directing

6    employees to not speak with the government.  She was texting

7    about myself and AUSA Finkel and telling people, "This is the

8    same subpoena.  These are the same prosecutors who are looking

9    into G/CLUBS.  Now they're looking into HCHK."  She was aware

10   that the government was trying to investigate this fraud; and

11   instead of taking the offramp, instead of doing the right

12   thing, she just continued to evolve.  They continued to be

13   nimble and to move so that they could continue to raise funds

14   from victims.

15          With respect to specific deterrence, her ongoing

16   involvement for five years cuts against her claim that her

17   dependence on and loyalty to Miles Guo "clouded her judgment."

18   As I said, there were multiple offramps for Ms. Wang over the

19   course of years.  After the SEC entered into the consent

20   agreement regarding the GTV private placement, which Ms. Wang

21   signed, she could have stopped.  Instead, they developed the

22   Farm Loan Program, and they raised money through the Farm Loan

23   Program.  Then G/CLUBS got layered onto it.

24          When the government was onto the corporate structure,

25   they created their umbrella entity HCHK.  Ms. Wang was a

1    99.999 percent owner of that company.  She was involved in the

2    Himilaya Exchange.  And, critically, she was involved in moving

3    all of the operations to Abu Dhabi after the government seized

4    hundreds of millions of dollars in fraud proceeds for the

5    express purpose of moving the fraud proceeds beyond the

6    long-arm jurisdiction of U.S. law enforcement.

7            Finally, even after she was arrested in this case,

8    even after she knew what the government's charges were against

9    her, what our allegations were against Mr. Guo and Mr. Je, she

10   continued her criminal efforts from jail.  She was involved in

11   directing G/CLUBS' members to try to secure checks valued at

12   $7 million worth of victim investor funds from a mailbox that

13   was in Manhattan.

14           In her submission with respect to this particular

15   obstructive behavior, Ms. Wang says she would have been "more

16   self-interested and prudent to have stepped back" from the @G

17   entity operation after her arrest.  It would not have been more

18   prudent to have done so; it would have been non-criminal.  Yet

19   again, even after her arrest, after five years of her extensive

20   involvement, she did not do the right thing.  She continued to

21   perpetuate the fraud.

22           Ms. Wang is very credentialed.  She is bright.  She is

23   capable.  That is not a mitigating factor; it's an aggravating

24   one.  She was capable of coming here and becoming a productive

25   member of society.  The United States welcomed her when she was

1   in a difficult personal position and political position in

2   China, and she made the choice after she came here, after this

3   country welcomed her, not to use her two masters' degrees to do

4   something productive, not to take what is clearly her extensive

5   organizational and managerial skills to do something that was

6   legitimate.  She made the choice day after day to continue to

7   defraud truly vulnerable victims and to prey on their genuine

8   desire to fight the CCP and bring democracy to China.

9        And she still hasn't taken full responsibility for her

10  actions.  She does not appear to express remorse for the

11  victims here, the victims that she actively defrauded; that she

12  and Miles Guo and William Je targeted.  She is unhappy to be in

13  this position.  She says she is sorry for what she has done,

14  but nowhere in the submissions that Ms. Wang has given in

15  connection with this sentencing does she truly acknowledge the

16  scope of harm that is reflected in just a handful of those 150

17  plus victim statements.  She destroyed people's lives.  This

18  continues to have reverberating effects on the victims.

19       The government strongly recommends that the Court

20  impose the statutory maximum sentence here of 120 months.  It's

21  necessary because of the seriousness of the offense conduct.

22  It's necessary to promote just respect for the law of someone

23  who continued to violate the law, knowing full well that the

24  SEC and the government were investigating this action; who

25  continued to violate the law even after she was arrested and

1     was aware of what the allegations were and was aware of the

2     harm that was done to victims here.

3          It's also necessary for general deterrence.  It's

4     necessary to deter smart, capable people like Ms. Wang from

5     using corporate structures and lawyers and hundreds of bank

6     accounts and complicated entities to try to evade law

7     enforcement detection and to continue to defraud people.

8          For those reasons, your Honor, we respectfully submit

9     that a 120-month sentence is absolutely necessary here.

10          THE COURT:  Mr. Quigley?

11          MR. QUIGLEY:  Thank you, your Honor.

12          Your Honor, we think a significant variance from the

13     120-month guideline range is appropriate in this case under 18

14     U.S. Code 3553(a).  And I don't want to belabor the points in

15     our sentencing submission, but I think a number of them are

16     worth highlighting here, and it's also worth responding to a

17     number of things the government has said in its supplemental

18     submissions and on the record today.

19          Ms. Wang is somebody who is 45 years old, soon to be

20     46 later this year.  She stands before the Court as a

21     first-time offender.  The letters submitted on her behalf

22     recognize the severity of her conduct, but I think those

23     letters and her life history more generally show a person who

24     at bottom for decades has been hard-working, kind,

25     compassionate, caring, and considerate.

```
 1            Her involvement in this offense, as we said in our
 2   sentencing submission, came in the series -- came in the midst
 3   of deep personal crises, and, frankly, extraordinary personal
 4   crises.  And it's not disputed that at the time this conspiracy
 5   began, she was being actively targeted by the Chinese security
 6   services; that she was repeatedly hacked; that highly sensitive
 7   personal information of hers was put up on the internet where
 8   it remains, including by an individual who submitted a victim
 9   statement in this case, statement 146; that she was cut off
10   from her family.  These facts are highly unique to Ms. Wang,
11   and they are, frankly, I think, extraordinary.  I think it's
12   fair to say that being targeted by a state security service and
13   regularly hacked is not a common occurrence for a defendant
14   being sentenced in this district, or anywhere for that matter.
15            THE COURT:  Nor is this a common crime.
16            MR. QUIGLEY:  That's fair, your Honor.  But pointing
17   to those facts and considering those facts is not seeking to
18   endorse some bizarre vigilante system of justice, is what the
19   government called it in their sentencing submission, but
20   they're critical to her state of mind at the time of the
21   offense.
22            THE COURT:  Are you saying that the guidelines reflect
23   a bizarre vigilante system?
24            MR. QUIGLEY:  No.  That was the phrase the government
25   used in their sentencing submission to describe our arguments
```

1    about CCP targeted.

2            THE COURT:  Go ahead.

3            MR. QUIGLEY:  I was not suggesting anything about the

4    guidelines at all, your Honor.  Thank you.

5            And her state of mind and her state -- that was

6    targeted at the time of the offense are core Section 3553(a)

7    considerations.  They go to the history and characteristics of

8    the defendant, and the nature and circumstances of the offense.

9            When she was being targeted, when she was being

10   hacked, she couldn't know who her true friends were.  And in

11   this way, I think it's worth noting this is exactly what the

12   Fox Hunt Campaign is designed to do:  It's designed to make

13   people crazy.  There was testimony at Mr. Guo's trial that the

14   purpose of the campaign is to coerce and persecute individuals

15   "with the goals of persuading them to renounce their activities

16   or to return to China to face trial, or where neither of those

17   things are possible, to pressure them into committing suicide."

18   It's designed to mess around with people's minds and people's

19   heads.

20           As Dr. Atkin Source Smith noted in her report that,

21   and we submitted with our sentencing submission, Ms. Wang was

22   left in constant fear and was suffering chronic trauma

23   consistent with this regular harassment, and consistent fear

24   for her safety and that of her family's.

25           So it was in that context that Ms. Wang latched onto

1    the people who were literally providing physical protection for

2    her, who she'd known for ten years, who were helping her to try

3    to get asylum in the U.S., and she looked to her employer and

4    his inner circle.

5            Ms. Murray talked about offramps.  Ms. Wang didn't

6    have an offramp.  She couldn't go back to China.  She had no

7    status in the United States.  Her asylum application was being

8    run through her employer and his attorney.

9            THE COURT:  So this was her only option.

10           MR. QUIGLEY:  I think she didn't have many other

11   options, your Honor, no.  She couldn't go back to China.  She

12   didn't have any legal status here.  She was cut off from her

13   family.  I think -- there weren't many offramps to her.  I

14   disagree with that.  I think that context is important.  And

15   it's critical context for understanding why she was involved in

16   an offense, from which indisputably she gained very little and

17   has already paid for it significantly, and which she deeply

18   regrets.

19           And I disagree with Ms. Murray that she hasn't shown

20   regret or remorse.  That's in her sentencing letter.  It's

21   reflected in Dr. Atkin Source Smith's report.  And you'll hear

22   from Ms. Wang in a few minutes about the regrets she feels

23   about this.  She deeply regrets the pain caused to people who

24   gave money to Mr. Guo and his organizations.  She's happy

25   that -- and credit where credit is due -- the government has

 1    been able to seize a lot of that money already.  There is, I

 2    think over a billion dollars that is already being returned.

 3    That forfeiture order alone, rough estimate has over

 4    $600 million in cash in it, plus Mahwah facility and other real

 5    personal property that can be liquidated on top of almost

 6    $400 million seized by the SEC in this case.  So this is not a

 7    fraud case where there is, you know, thankfully, it's like

 8    getting blood from a stone.  Investors will be repaid, and

 9    that -- I'm not sure, I think when we talk about the loss,

10    without minimizing it, it's important to keep that in context.

11            Unlike many or most -- and considering the nature and

12    circumstances of the offense and just punishment, I alluded to

13    this before, but this is not someone who was living a high life

14    as a result of the fraud.

15            THE COURT:  Didn't she live in the Upper East Side in

16    the Sixties?

17            MR. QUIGLEY:  She did live in an apartment, your

18    Honor.  That money and the government -- that money -- that

19    apartment was not paid for with fraud proceeds.  In fact, the

20    government initially listed in their indictment in the S3 that

21    that apartment was paid for with fraud proceeds.  After we

22    filed a bill of particulars or after your Honor granted in part

23    a bill of particulars asking for wire transfers, they showed

24    she received that money before the GTV offering, before any of

25    the fraudulent conduct.  It was not paid for with fraud

1    proceeds.  It was paid for with her own family money.  They

2    struck that allegation.

3            THE COURT:  All right.  Go ahead.

4            MR. QUIGLEY:  She was paid a salary, which, to be

5    clear, not low by common standards but in the context of 1.4 --

6    what the government has said is a billion dollar fraud, a

7    salary that in total was over the years collectively was about

8    one-tenth of one percent of that total number.

9            THE COURT:  So what was she earning annually?

10            MR. QUIGLEY:  Approximately $200,000, $250,000 a year.

11    I think the last year was close to $400,000.

12            THE COURT:  And you consider that a modest salary?

13            MR. QUIGLEY:  I don't consider it modest by any means,

14    your Honor, but I consider it in the context of what the

15    government -- the government has described as a billion dollars

16    fraud, it's worth noting -- I think Ms. Murray said that before

17    today.  It's a billion dollars fraud.  It's worth noting that

18    her total salary over the years of the conspiracy was less than

19    one-tenth of one percent.  When you consider that relative to

20    her co-conspirators, that's a relevant consideration.

21            THE COURT:  Go ahead.

22            MR. QUIGLEY:  This is not -- your Honor already

23    addressed this, but this is not someone -- and, again, she was

24    not involved dealing face-to-face with investors.  This is not

25    someone who was involved in targeting retaliating victims.

1   Your Honor has seen the victim letters.  The government, you

2   know, obviously were sympathetic to the victims.  I do think

3   it's worth noting though that, you know, there are allegations

4   in there against Ms. Wang that are false; like that she is

5   continuing the fraud from prison; that she's reached out to

6   people from prison.  And I think, you know, the government

7   points to this incident from April 2023, almost two years ago.

8   There is no evidence that she has done anything in prison other

9   than quietly minding her own business over the last 21 months

10   since then.

11          I think in considering what weight to attribute to

12   some of those letters, the Court should and can consider that

13   some of those allegations in there are unsupported.  They also

14   say very little by and large about Ms. Wang.  They talk a lot

15   more about Mr. Guo, considering their relative roles in the

16   conspiracy.

17          THE COURT:  I don't understand the prosecution to be

18   alleging that she continued illegal conduct while in prison.

19   Am I correct?

20          MS. MURRAY:  Your Honor, we are alleging that she did

21   in April of 2023.  Mr. Quigley is correct.  We have recordings

22   with HCHK employees who were doing business on behalf of

23   G/CLUBS where they said that -- first hinted at somebody had

24   directed hem to reach out to a G/CLUBS employee to secure the

25   checks.  And then in subsequent recorded conversation said that

1    "I can't say her name.  Yes, it's Yvette who told me to reach

2    out to you to get the $7 million in victim funds."  That was

3    approximately a month after she was arrested.  It was while she

4    was incarcerated at the MDC.

5         Mr. Quigley is correct, we're not alleging anything

6    after that event, but that is a post incarceratory criminal

7    event.

8         MR. QUIGLEY:  Your Honor, that was -- look, we don't

9    object to the obstruction enhancement.  We consent to it.  I

10   think we would dispute some of the characterizations of the

11   inferences that can be drawn from those recordings.  That said,

12   this was a subject that was litigated before I represented

13   Ms. Wang in connection with her bail application.  We don't --

14   the Court may find it's on that.  We are not intending to

15   re-litigate it here.

16        I think the point for us is in considering what weight

17   to put to the victim letters that actually speak about

18   Ms. Wang.  Many of the victim letters don't really say anything

19   about her at all.  In considering what weight to attach to the

20   ones that actually speak about her, several of them do say she

21   has continued and continues to run the conspiracy from prison.

22   And my point is there is no evidence of that.  That is false,

23   and in suggesting she is doing that up to the present time.

24        THE COURT:  So let me make clear that I would not

25   consider false allegations, allegations that are not being made

1    by the prosecution, in reaching my sentencing decision.

2           MR. QUIGLEY:  Thank you, your Honor.

3           So -- and I think she has accepted responsibility,

4    right?  I mean, Ms. Murray made a point in her presentation

5    that Ms. Wang was aware of the investigation.  That's right,

6    she was aware of the investigation.  The investigation went on

7    for a long time before she was arrested in March 2023.  It was

8    in that context that, unlike Mr. Je, her co-conspirator, who

9    will never see the inside of a U.S. courtroom probably, who got

10   $500,50 million of that 1.4 billion, who went overseas -- who

11   is overseas, remained overseas.  He went further overseas to

12   the Middle East when he learned of this investigation.

13          Ms. Wang came back to the United States from the U.K.

14   in January 2023, and she could have taken that path and

15   remained away, but she didn't.  She came back here.  While her

16   guilty plea was a few weeks before the trial, I think it's

17   perfectly fair game to say that was in response to the first

18   substantive plea offer we got from the government.

19          THE COURT:  Is that the case?

20          MS. MURRAY:  Your Honor, I don't want to get into plea

21   discussions that we had with counsel.  I would state that that

22   is not an entirely accurate description of pretrial resolution

23   conversations that we had with the defense.

24          MR. QUIGLEY:  It's certainly the first plea offer I

25   saw in this case.

```
 1              THE COURT:  Right, but you're not the first lawyer.

 2              MR. QUIGLEY:  My understanding is there were no prior

 3    plea offers made.

 4              MS. MURRAY:  Again, your Honor, I would just say there

 5    were pretrial resolution discussions that well predated the

 6    plea offer.  That was the first written formalized plea offer

 7    after discussions with Mr. Quigley, but there had been broader

 8    discussions about a pretrial resolution.

 9              THE COURT:  Go ahead, Mr. Quigley.

10              MR. QUIGLEY:  So I think where does that leave us,

11    your Honor?  I think you have a defendant who indisputably

12    participated in this offense in the midst of a deep personal

13    crisis, in the context of being targeted by a foreign security

14    service, who took in less than one-tenth of one percent of what

15    the government claims is the loss amount in this case; who has

16    already faced a significant period of incarceration in MDC.

17    She has been at MDC for 22 months.  I don't need to belabor the

18    conditions at MDC over the last 22 months.  That's a

19    significant amount of time in and of itself.  It is, frankly, a

20    long time for a defendant who didn't go to trial to spend on

21    pretrial detention, presentence detention, who will to face --

22    and I am not going to continue to belabor this point because we

23    set it out in our sentencing submission, but who will continue

24    to face conditions that are more punitive than a similarly

25    situated U.S. citizen.
```

1          She will not be assigned to a camp, unlike many white

2    collar criminals.  She will almost certainly face an additional

3    period of incarceration in ICE detention, whether or not she

4    gets an asylum application that is granted after this.  And

5    even in a best case scenario where she is not deported back to

6    China where she would face further imprisonment, and

7    potentially worse, she will have financial penalties that will

8    follow her around for rest of her life.

9          I mentioned that the government, again, to its credit,

10   has seized over a billion dollars in this case.  That will go

11   towards that $1.4 billion money judgment.  It's also true

12   though that to the extent there is a shortfall, that shortfall

13   will, as a practical matter, fall on Ms. Wang.  Mr. Je is never

14   coming back to the United States.  Mr. Guo is bankrupt and

15   unlikely to pay that.  Even if there is a $10 million

16   shortfall -- and I don't disagree with your Honor that a

17   hundred thousand dollars a year is not a small salary by any

18   means, but being liable for a $10, $15, $20 million judgment

19   for the rest of your life is a significant financial penalty

20   with any salary.  So She will continue to face penalties both

21   incarceratory and financial for the rest of her life.

22         And this is not someone, I submit, for whom a

23   120-month sentence is necessary under the circumstances,

24   particularly when you consider the final 3553(a) factor.  I

25   would like to talk about 3553(a)(6), which is the need to avoid

1     unwarranted sentencing disparities between similar defendants

2     convicted of similar conduct.  120 months would be roughly

3     equivalent to the 135-month sentence imposed earlier this year

4     on Elizabeth Holmes in the Northern District of California

5     accounting for the fact that Ms. Holmes is a U.S. citizen.  She

6     is currently in a camp.  She personally told lies to investors

7     that resulted in her receiving millions of dollars.  She

8     jeopardized the health of her companies -- of individuals

9     through the marketing of her company's state blood testing kit.

10    Like I said, she went to trial.

11          Ms. Wang is not Elizabeth Holmes, and I think even the

12    government in their sentencing submission recognized that.  She

13    is not -- 120 months will be longer than the sentence that

14    Judge Swain imposed on Joann Crupi, who was essentially Bernard

15    Madoff's chief-of-staff.  She got seven years.  Again, she went

16    to trial, and personally benefited from her decades-long

17    participation in the Madoff Ponzi scheme, which was the largest

18    Ponzi scheme in history.  In fact, while the investors here may

19    get -- hopefully will get paid back and made whole fairly soon,

20    the government issued a press release last week, 16 years after

21    Mr. Madoff's arrest that they had issued a final distribution

22    to the Madoff investors.  As serious as this crime is, this is

23    nowhere near the Bernie Madoff scheme.

24          THE COURT:  So in the Holmes scheme and the Madoff

25    scheme, were investors told that money would go toward the

1    promotion of democracy?

2         MR. QUIGLEY:  No.  They were told it would go toward

3    good health in the Holmes case; that it would go towards a

4    revolutionary blood testing kit that people could use to

5    determine whether they had cancer or HIV or be pregnant.

6         THE COURT:  Go ahead.

7         MR. QUIGLEY:  I think this case is a akin to, as we

8    say in our sentencing submission, akin to the OneCoin

9    prosecution.  That was a fraud that took in over $4 billion

10   more than the fraud here.  Ms. Murray began her statement today

11   by describing Ms. Wang's importance and significance to the

12   fraud.  The attorney who was sentenced in that case, the

13   attorney for Ms. Dilkinska was described by the government --

14   similarly described by the government in its sentencing

15   submission as "an integral member that of fraud."  She pled to

16   essentially an identical plea agreement earlier this year to

17   Ms. Wang:  Two 371s, a wire fraud, and a money laundering count

18   capping her statutory exposure to ten years.  The guidelines

19   range -- otherwise applicable guidelines range would have been

20   43 life prisonment.  Ms. Dilkinska pled to an obstruction of

21   enhancement, and Judge Ramos sentenced her to 48 months.

22        THE COURT:  Is that a case where the defendant or

23   co-conspirator was portrayed as a heroic figure pursuing

24   justice for millions of other people?

25        MR. QUIGLEY:  I don't know about that, your Honor, but

1    I think it was portrayed as a revolutionary cryptocurrency that

2    got working people investing $4 billion in it.  I don't think

3    -- was it a pro-democracy movement?  No, it wasn't a

4    pro-democracy movement.

5              MS. MURRAY:  If I may briefly respond to that point,

6    your Honor?

7              I was one of the prosecutors on the OneCoin case and

8    also a prosecutor of Ms. Dilkinska.  I would say there are very

9    many differences between these two defendants.  Mr. Quigley is

10   correct that's what the government's sentencing submission

11   said, Ms. Dilkinska was a lawyer, but in that fraud scheme, it

12   is correct it was marketed as a cryptocurrency.  It was

13   marketed as a way for people to make money, to make

14   investments.  There was no democracy and no political angle

15   associated with it.

16             It was also a different scheme in the sense that it

17   was structured as a multilevel marketing scheme, so some of the

18   people who were involved and were investors were actually

19   conspirators.  They weren't the same degree of vulnerable

20   victims to any degree that we have here.  Some of them were.

21   Some of them believed they were buying into a cryptocurrency.

22   But a lot of people who were involved in the OneCoin scheme

23   were involved knowing that what they were doing was making

24   money in kind of mini-Ponzi scheme.

25             The other distinction that I would make that I think

1   is very important, in the OneCoin scheme, the leader of the

2   scheme, Ruja Ignatova, controlled everything.  She, like Miles

3   Guo, was the idea person but she was also the executor.  She

4   operated in the same type of role as Ms. Wang did in this

5   scheme where she directed the opening of bank accounts.  She

6   directed the creation of corporate structures.  So Ms. Wang's

7   conduct in that sense in the day-to-day operations in the

8   complexity of this fraud scheme is more culpable than

9   Ms. Dilkinska's was.

10           And then, finally, again, just really emphasizing the

11   distinction here of the nature of the victims who were being

12   targeted by this broad conspiracy and the absolute gulf between

13   what they were being told their money was going to be used for

14   and what it was in fact used for.

15           THE COURT:  My understanding is that there are many

16   Chinese people, both in China and elsewhere who have passionate

17   feelings against the Chinese government and who support a

18   change, who support democracy, and who were inspired by the

19   messaging of Mr. Guo, and that that was a significant reason

20   that they turned over their money to this fraud scheme.  And

21   it's just an entirely different way of persuading people to

22   turn over their money because they had such deep hopes that the

23   political system in China, which is repressive, that that

24   system would be challenged and possibly changed.  It's very

25   different from having the motivation of doubling your dollar or

 1  a safe investment.

 2       MR. QUIGLEY:  **I hear your Honor.  I understand what**

 3  **you're saying.  But I also think, you know, certainly with GTV,**

 4  **certainly with the Himilaya Exchange, which was a crypto**

 5  **investment, people were looking -- there's nothing wrong with**

 6  **that, but people were looking to not only contribute to the**

 7  **Chinese anti-Communist movement, they were also looking to make**

 8  **money.  Again, there's nothing wrong with that, but I don't**

 9  **think it's that different.  I would just say in terms of**

10  **Ms. Dilkinska's, role the bare reality is, you know, she was**

11  **required to plead to the exact same three-point leadership**

12  **enhancement that Ms. Wang was required to.**

13       MS. MURRAY:  I just want to state the government's

14  objection to the phrase "required to plead to."

15       MR. QUIGLEY:  Sorry.  Pursuant to a plea agreement

16  that was signed by the government, she pled to a -- the

17  stipulated guideline range in that case pursuant to a plea

18  agreement extended by the government included the exact same

19  three-point leadership enhancement that Ms. Wang got.  And the

20  government's sentencing submission alleged that Ms. Dilkinska

21  "created and managed shell companies that were used to hold

22  properties in another co-conspirator's name, open bank

23  accounts, launder proceeds from the scheme."  Very similar

24  conduct to what Ms. Wang is accused of doing here.  And I think

25  a 48-month sentence in that case and a 120-month sentence in

1    this case, I get they're not exactly alike, your Honor, but

2    that would be an unwarranted sentencing disparity between

3    similar defendants with similar records, both Criminal History

4    Category I, convicted and guilty of similar conduct:  Creating

5    and managing shell companies, opening bank accounts, laundering

6    proceeds from the scheme.

7            So I just want -- well, I think one last point, victim

8    letters, your Honor.  Again, I think this has already been

9    covered, but I don't think Ms. Wang should be held responsible

10   for kind of the recent infighting among members of Mr. Guo's

11   movement.  There is a lot of back-and-forth, especially in the

12   more recent victim letters about people, you know, retaliating

13   against people, things like that.  Ms. Wang wasn't involved in

14   any of that.  She hasn't been involved in any of that.  Frankly,

15   she finds attacks on people's families as was set out in the

16   government's verbal attacks and rumor-mongering about salacious

17   details of their personal life, she is, frankly, offended by

18   that, having been for years a target of similar rumors about

19   herself.  I'm not sure your Honor was going to consider that at

20   all, but it's a point that I noted.

21           THE COURT:  So let me make clear that I am basing my

22   sentencing decision on the evidence that was presented at

23   trial.  I listened very carefully to witness testimony.  I am

24   also basing it on what I have learned from the probation

25   report, and, of course, applying the guidelines and other laws

1  that apply to sentencing.

2       Go ahead.

3       MR. QUIGLEY:  Thank you, your Honor.

4       So, again, for all these reasons, I think the

5  defendant, who did not substantially personally benefit from

6  the scheme, became involved in the scheme and in a highly

7  unique and extraordinary system of personal crises which were

8  designed to cloud her judgment intentionally.  So we think a

9  sentence of approximately 48 months similar to what

10 Ms. Dilkinska got is sufficient but not greater than necessary

11 to serve the legitimate purposes of sentencing.

12       THE COURT:  Ms. Wang, would you like to say something?

13       THE DEFENDANT:  Yes, your Honor (English).  Yes, your

14 Honor.

15       THE COURT:  One moment, please.  I do understand that

16 there are victims who are interested in making statements.  Is

17 that correct?

18       MS. MURRAY:  I am not certain that we have confirmed

19 their attendance, but our understanding was there was at least

20 one victim who intended to come, so I guess the government

21 would ask.

22       THE COURT:  Is there someone here who is a victim who

23 would like to speak?

24       MS. MURRAY:  Your Honor, the name we had was Forest

25 Zhou.  I see Ava Chen is raising her hand.  She is not who the

1   government understands was a victim who invested in the fraud.

2   I'm not sure -- it's not going to be a free-for-all.

3           THE COURT:  No, it is not a free-for-all, absolutely.

4   What was the name again?

5           MS. MURRAY:  Forest Zhou.

6           THE COURT:  Is Forest Zhou here?

7           Sir, you may step up.

8           MR. ZHOU:  Thank you.  Thank you, your Honor.

9           My name is Yoe, Y-O-E.  Last name is Z-H-O-U.

10          I came to this country 24 years ago.

11          THE COURT:  Is your name Forest?

12          MR. ZHOU:  Yes.  People call my Forest, but my

13  official name is Yoe, Y-O-E.

14          THE COURT:  You hold yourself out as Forest Zhou.

15          MR. ZHOU:  Yes.

16          THE COURT:  Thank you.

17          MR. ZHOU:  I came here 24 years ago, and I had the

18  privilege of earning any Ph.D. degree at Columbia University

19  here in New York City.  Over the years, I was fortunate enough

20  to live good life.  I run two companies.  YE Engineering

21  Designing, YE Consulting.  I have a wonderful family with two

22  children.

23          So first before I talk about Yvette, I would like to

24  address how much this case has impacted on me and my family.

25  It has been deeply troubling, but in a way that is very

1    different from what you have heard from others.  For instance,

2    I am wearing a G Fashion suit and G Fashion shoes today, which

3    I got at half price, maybe even less, through my G/CLUB

4    membership.  And those clothes are of exceptional design and

5    quality.  And made by Attolini, which has a store on Madison

6    Avenue.

7            THE COURT:  So sir, I want to explain to you the law

8    that applies to victims' statements.

9            The Crime Victims Act defines a crime victim as a

10   person directly and proximately harmed as a result of the

11   commission of federal offense.  18 United States Code, Section

12   3771(e).  The requirement that the victim be directly and

13   proximately harmed encompasses the traditional but for and

14   proximate cause analyses.  *In Re Rendon Galvis*, 564 F.3d 170,

15   175 (2d Cir. 2009).

16           The necessary inquiry is a fact specific one.  A

17   person is directly harmed by the commission of a federal

18   offense where that offense is a but for cause of the harm

19   *Morris v. Nielsen*, 374 F.Supp.3d. 239, 252 (E.D.N.Y. 2019).  A

20   person is proximately harmed when the harm is a reasonably

21   foreseeable consequence of the criminal conduct.

22           Is it your position, sir, that you were directly

23   harmed by Ms. Wang's criminal conduct?

24           MR. ZHOU:  No.

25           THE COURT:  Is it your position that there was --

```
 1              MR. ZHOU:  Well, I would like to address that this
 2   case has negative impact on me, I think that's the harm.
 3              THE COURT:  Sir --
 4              MR. ZHOU:  Sorry.
 5              THE COURT:  -- what is important is there are two
 6   things.  There are really two inquiries.  Obviously, you are a
 7   person with an advanced degree, and you have been successful in
 8   business, so I know that you understand what I'm saying.
 9              MR. ZHOU:  Sure.
10              THE COURT:  So the question is, whether you were
11   directly harmed by Ms. Wang's criminal conduct and whether the
12   harm was a foreseeable consequence of her criminal conduct?
13              You answered no to the first question.  I assume
14   you're answering no to the second also?
15              MR. ZHOU:  Yes.
16              THE COURT:  So then at this point, you essentially
17   don't qualify as a victim under the federal law.
18              MR. ZHOU:  Okay.
19              THE COURT:  I admire your outfit.  It looks very nice
20   on you.
21              MR. ZHOU:  Thank you.
22              THE COURT:  But that has nothing to do with being a
23   victim.
24              MR. ZHOU:  Well, I think by government's definition,
25   whoever purchased a G/CLUBS stock will be redeemed as a victim.
```

```
 1              THE COURT:  No, that is not the definition.  And I
 2    assume that your degree is not in law, is that correct?
 3              MR. ZHOU:  No, it is not.
 4              THE COURT:  So that is not the definition, no.
 5              MR. ZHOU:  So can I speak about who I know for Yanping
 6    as a person?
 7              THE COURT:  No.
 8              MR. ZHOU:  Okay.  The only reason I've been here today
 9    is I want to have my own perspective is heard.
10              THE COURT:  I understand that.  But the law defines a
11    victim of a crime in a very specific way, and I have set out
12    that definition for you, actually, a couple of times.  And
13    there may be numbers of people who admire Ms. Wang, who think
14    that she has a sterling character and is a wonderful person.
15    That's possible, and maybe you fall into that category, but
16    that is not the reason for your presence here.  Only a victim,
17    a true victim, is permitted to make a victim statement, and
18    you're saying you're not a victim as defined by the law.
19              MR. ZHOU:  I'm not a victim of her behavior.
20              THE COURT:  So you'll step back then.  Thank you.
21              MR. ZHOU:  Okay.  Thank you.
22              THE COURT:  Are there any people who do qualify as
23    victims?  You may step up, ma'am.  Did you just here what I
24    said?
25              MS. CHIN:  Yes.
```

```
 1                THE COURT:  What is your name?

 2                MS. CHIN:  My legal is Legia (ph) but people refer to

 3     me as Ava.  Thank you.

 4                THE COURT:  Do you consider yourself to have been

 5     directly harmed by Ms. Wang's criminal conduct?

 6                MS. CHIN:  Yes.  Based on what I heard, you talked to

 7     Forest Zhou, I will be different.  So my answer is yes, and I

 8     provided my investment, I invested $200,000 in GTV and also

 9     G/CLUBS, and still my fund is withheld, and I have been

10     suffering financial consequences because those money are taken

11     away from me.

12                THE COURT:  Do you believe that this loss of money was

13     a foreseeable consequence of Ms. Wang's criminal conduct?

14                MS. CHIN:  Because she pled guilty, so I would say

15     yes.

16                THE COURT:  All right.  Go ahead.

17                MS. CHIN:  I want to just outline as a victim I want

18     to share with you -- and I really want in opening to say thank

19     you because the reason why as a victim I have a platform to say

20     this is because I have to thank the American people because I'm

21     Canadian.  Again, I have to thank the justice system and the

22     Honorable Judge, you, today to give me the opportunity.

23                I want to highlight three points today that I would

24     speak directly why you need to consider lessening the sentence,

25     the 120 months that the prosecutor just asked in support before
```

1    you consider lessening.

2         Three points I'm going to make is, first of all,

3    Wang's contribution to the United States.  And the second is

4    her suffering and the true suffering evidenced by court

5    documents found the CCP spies.  And the last one I'm going to

6    talk about personal touch because I worked with Ms. Wang

7    briefly.  I will tell you what I learned in terms of her

8    character as a person at the ending.

9         So the first point, the contribution to American

10   society, and I wanted to refer you to the Rule of Law

11   Foundation.  And Ms. Wang is a member of the Rule of Law

12   foundation, and if you recall when the breakout of the pandemic

13   happened in 2020, when the City of New York was under lockdown,

14   and the Rule of Law Foundation basically acquired a large

15   amount of personal protection equipment, PPE, including N95

16   masks and also other Airgel products and a lot of those things

17   was basically arranged personally by Yvette Wang, and what we

18   refer to as Himalaya Embassy and risk of her own health, she

19   basically moved all the -- the goods and shipping them to

20   hospitals of New York City and donating them to the NYPD police

21   officers.  And all of those things can be checked.  These are

22   the true.  And there are court documents reflecting what I just

23   say, what I just shared her.

24         And not only on that, she also managed to mail out to

25   the dissident community, because we talked a lot about

1    pro-democracy movement around the world, especially in the

2    United States, she made sure the people who donated for the

3    Rule of Law fund who have the common goal, shared goal is to

4    take down CCP, she is making sure every one of them if they

5    need PPE, they won't mailed to them.  they will get the PPE

6    that was purchased by Rule of Law.

7           If you recall, there is a lot of public reporting

8    about it.  The Chinese Communist Party not only, you know,

9    created in the Wuhan lab which by the final report of the

10   COVID-19 special committee, the house committee that just

11   released the report, but also the CCP vacuumed out all the

12   personal protection equipment in the world, okay, so they can

13   using that as bargaining chips with the United States, with the

14   world's government to say, hey, you have to listen to me

15   because I now hold all the PPE.  I'm the king.

16           So in that backdrop, Rule of law is the only

17   foundation which Yvette Wang is a member of, and personally put

18   at risk, and go taking care of all of those boxes and boxes and

19   boxes of millions of masks and just spread it over to not only

20   New York City residents but also to the dissident community.

21   So that's contribution number one I want to highlight for you,

22   your Honor.

23           The number two point is suffering.  And I want to

24   refer you to legal cases that Mr. Wang brought against a number

25   of -- we refer fake, phony pro-democracy activists.  And one of

1    them, I will highlight his name because there is a legal case,

2    and you can check on the Southern District of New York court

3    docket.  The case is 157786 filed in 2019 August 8th by

4    Ms. Wang against Xiong Xianmin and among other people. Xiong

5    Xianmin is spelled X-i-o-n-g X-i-a-n-m-i-n.

6         In that legal document I discovered she was a victim,

7    a constant victim by, not only hacking, harassment, stalking

8    and also threatening for people taking her life basically.  And

9    that's not according to me; that's according to the court.

10   Because of that legal case, the judge -- I forgot her name, but

11   the judge made a ruling to put a protection order on Wang

12   against those phony pro-democracy activists.  One of them is

13   Xiong Xianmin, and there is an actual protection order.

14        But I wanted to refer to the documents basically in

15   this trial, in this docket in this criminal fraud trial,

16   document number 89, that document, there's 25 pages evidence of

17   who the person I just referred to Xiong Xianmin has been

18   attacking Miles Guo and particularly Yvette Wang.  So the

19   evidence is all there.  This started actually around 2017,

20   prior to the protection order was issued against that Xiong

21   Xianmin, the fake pro-democracy activist.  I encourage you to

22   check that.

23        But not that -- not only they included in that

24   evidence, that 25 pages contains his online cyber-bullying

25   against Wang from 2017 July, all the way to 2018 December.  But

1   not only that, if you can find the court documents in the court

2   case I just referred to, 157786, you will find appalling

3   continuing attack from those people who Wang Yanping and Miles

4   Guo.  This is covering the range about 2019 may 10, all the way

5   to 2024 January 29.

6          So as the trial, as the investigation going on, as

7   Wang has been detained, this person, along with another group

8   of fake pro-democracy activists has been harassing, threatening

9   and smearing and defaming Wang Yanping.  She so suffered

10  greatly.  Not only as the defense counsel mentioned, she was

11  isolated.  You read her letters addressed to you, your Honor.

12  She can't -- she has an only child, but she would not be able

13  to basically raise -- raise him, and she cannot -- she has

14  today, she cannot see her father and mother who now already

15  passed on.  So she suffered greatly.  Why?  Because she started

16  joining the movement, and she followed Miles Guo like I did.

17  Many of my brothers and sisters here sitting together, we don't

18  challenge the fact she pleaded guilty.  We respect the law.

19         But I wanted to say that leading to my personal -- my

20  last point is how do I see Wang?  And I see her, the perception

21  I have, the impression I have about Wang didn't change.  I

22  worked with her very briefly, probably three months back in

23  2022, only three months.  But I saw her as a warm-hearted, as a

24  feisty fighter against the Chinese Communist party.  You said

25  it.  The CCP is very repressive.  No doubt about it.  But CCP

1    is even worse because I'm reading, I'm prepared today to come

2    here today with two reports that are outlined how repressive

3    they are.  One report is from 2019.

4            THE COURT:  So I am very familiar with the depth of

5    repression of the Chinese government.

6            MS. CHIN:  Thank you.  The reason why I wanted to say

7    is the personal touch is not because I worked with her, I know

8    who she is, she is reliable, she's trustworthy, she's tough,

9    and feisty.  And that didn't change a bit for this case.

10    Although she pledded (sic) guilty to the two charge, but I want

11    the one thing I want pointed out, the reason I truly appreciate

12    her is because I'm not talking about the details about this

13    case, this fraud case, but I'm talking about the importance and

14    the significance of having a social media news platform like

15    GTV.  The reason why I brought these documents today is because

16    I want to leave with you, Judge, if you wanted to, but I want

17    read one sentence out of it and just show you the CCP has

18    already controlled every Chinese language media in the United

19    States.  And this is basically said not by me, by the House

20    Committee of Oversight and Accountability Committee that

21    released a report on October 24, 2024.

22            THE COURT:  So I understand that your position is that

23    you admire Ms. Wang and you admire GTV.  Is there anything

24    further?

25            THE DEFENDANT:  I just want to say that -- yes, I do.

1    I want to say I appreciate because the CCP has controlled the

2    media.  They put all the propaganda.  It's very hard for us to

3    find a voice to speak against, so that's why I'm wearing the

4    G/CLUBS benefits.  But only this because I got a steep discount

5    on it.

6          But I want top say the most important thing for me is

7    I find my brothers and sisters in a safe place.  I'm no longer

8    alone because I'm scared because CCP is powerful.  But finding

9    the sisters and brothers in G/CLUB make me brave.  That's why I

10   can stand here and I say that I love her.  This will not change

11   a bit.  And I will say the brothers and sisters sitting there

12   would agree with me.  This is what the value of G/CLUBS and she

13   has suffered enough.  MDC.  We all know what MDC looks like.  I

14   just read the news this year September, the other judges had

15   basically eliminated the sentence for the people who was

16   committed, and he said if he is going to be serving an of

17   sentence in MDC, then he is free solely wanted you to --

18          THE COURT:  Thank you.

19          MS. CHIN:  -- have consideration for lessening the

20   sentence because she has done so much for Chinese people, and

21   she has made so much contribution to U.S. citizens.  And I want

22   you to consider that, and please from us.  And I wanted to

23   share all the documents.  I want to thank you for the

24   prosecutors who timely working on this case.

25          THE COURT:  Time out.  Thank you.  You may step back.

1            MS. CHIN:  Thank you.

2            THE COURT:  Ms. Wang, would you like to say anything?

3            THE DEFENDANT:  (English)  Yes, your Honor.  I will be

4    quick.

5            Thank you, your Honor, for giving me this opportunity

6    to speak.  This is one of the most important days of my life

7    today, so I am deeply grateful to your Honor for your patience

8    to hear me here.

9            First of all, the most important, I want your Honor

10   and all the investors to have my sincerest apology and remorse

11   for what I have done in the past.  Me personally, I had worked

12   alongside with many, many others on GTV Media, the very first

13   pro-democracy and anti-Chinese Communist party outlet.  Me

14   personally, I'd be saying this media outlet start from nothing,

15   zero, to create its first cult to overcome numerous obstacles,

16   to battle and survive with constant hacking and attacks, to

17   prevail with millions of users and subscribers.  But,

18   unfortunately, because of me, my poor judgment and wrong

19   decision under my personal crisis, very painfully, your Honor,

20   I had be seeing GTV struggle and eventually get shut down.

21           I fully understand and appreciate the GTV investors,

22   their faith and G/CLUBS members, their passion for this cause,

23   I have befailed (ph) them.  That hurt me the most.  And I am so

24   sorry for that.

25           I do share the same disappointment to view this whole

1    process.  I do share the same frustration for investors

2    hard-earned investment not fulfilling their mission.  Even I

3    never meant to hurt anyone purposely, but I do deeply realize

4    and profoundly regret the devastating consequences caused by my

5    actions.  So that's the first very important, your Honor.  I

6    befailed my coworkers.  I befailed the investors.  I have

7    befailed the people who support this moment, and that very

8    deeply hurt me.

9         Second, your Honor, I feel I have to say this here.

10   It's a very straightforward personal clarification.  For years

11   and years I've been accused by government after government,

12   even including in the bail litigation of this case, saying I

13   abandoned my child.  I betray my family.  I want your Honor and

14   my family and entire world to hear me here loud and clear.  I

15   never abandoned my son.  I never betrayed my family.  I never

16   did that.

17        My son is turning to 12 this year.  He has been taken

18   away from mother for ten years.  My father's dying wish is to

19   pray his only daughter is safe and alive.  The rest of my

20   family have been arrested, interrogated under close

21   surveillance, living in fear until this very second.  I have

22   paid an extremely high price with my family together, your

23   Honor.  I will never give up loving them and fighting for them.

24        In last ten years, your Honor, I am no hero.  I am

25   just a common, regular woman.  I am a working woman.  I have

1  nothing to do with a hero.  My life has been hell.  If I could

2  trade my son and my father one second back with everything I

3  have right now being accused as a comfortable life, I would do

4  that millions of times.  I would trade with everything I have

5  to trade them back, the time back with them.  But I couldn't

6  because my father and my son, they don't want me to be like

7  okay back with them, but I'm not worthy any more.  I know that

8  for sure.

9         Again, as I said, your Honor, I really appreciate you

10  just said here, there are so many Chinese people are inspired

11  and fighting for democracy.  What I want to say is that this is

12  a personal sorry for me that these ten years is not my choice,

13  your Honor.  I stuck in this for ten years.  I never live in a

14  comfortable, happy life.  But even only by myself at the end

15  I'm fighting for my family.  I'm going to do that because

16  they're my family.  I will fight for them until my last breath.

17  I will never give up.

18         In the end, your Honor, I have been at MDC for 21

19  months and 21 days.  Besides always trying to make best use of

20  my time here -- there by reading, learning, helping other

21  fellow inmates, working in the unit as a volunteer constantly.

22  The most often things I be doing is to reflect my actions and

23  reckon what happened before.  There is no excuse, there is no

24  any personal life allowed me to break the law.  I understand.

25  I learned my very heavy lesson.  I respect it a hundred

1  percent.  There is nobody, nothing under no circumstances can

2  make me go back to those mistakes.  And those pre-years actions

3  of mine cannot and will not define me either, your Honor.  I

4  look forward to an opportunity which could right my wrongs to

5  start from a new point with all the heavy lessons I have

6  learned.

7          Thank you, your Honor, for listening.

8          PERSON IN AUDIENCE:  Your Honor?  May I be allowed to

9  say something?

10         THE COURT:  Are you a victim under the legal

11 definition?

12         PERSON IN AUDIENCE:  I guess legal, a kind of legal.

13         THE COURT:  If you will just step up and say your

14 name.

15         PERSON IN AUDIENCE:  My name is -- Chinese name Ching

16 Li Giu.  Last name G-I-U.

17         THE COURT:  Go ahead.

18         MS. GIU:  I will get to my point.

19         THE COURT:  Do you go by another name here?

20         MS. GIU:  Married name or whatever is Kiger,

21 K-I-G-E-R.

22         THE COURT:  So is it your position that you were

23 directly harmed by Ms. Wang's criminal conduct?

24         MS. GIU:  No.

25         THE COURT:  So, as I mentioned earlier, that is the

```
 1    first inquiry.  And the second inquiry is whether the harm was
 2    a foreseeable consequence of her conduct.  You've answered the
 3    first question no, and so it means that you are not considered
 4    a victim under the law.
 5           MS. GIU:  But I am a victim of American government.
 6    Would that count?
 7           THE COURT:  So --
 8           MS. GIU:  Can I express myself very briefly?
 9           THE COURT:  I can sympathize with you.  If you have
10    been victimized by the American government, that would be
11    wrong.  But your particular circumstances are not relevant to
12    the sentencing of Ms. Wang.  And so I am going to ask you to
13    step back.
14           MS. GIU:  Can I just say one thing?
15           THE COURT:  No.  You may step back.
16           MS. GIU:  Thank you.
17           THE COURT:  Is there any reason why sentence should
18    not be imposed at this time?
19           MS. MURRAY:  No, your Honor.
20           MR. QUIGLEY:  No, your Honor.
21           THE COURT:  As I have stated, the guidelines range to
22    be used is 121 months' imprisonment.
23           Under the Supreme Court's decision in Booker and its
24    progeny --
25           MR. QUIGLEY:  Your Honor, you said 121.  It's 120.
```

1          THE COURT:  I'm sorry, what?

2          MR. QUIGLEY:  I believe you said 120.

3          THE COURT:  No, I said 120, but if you heard 121, that

4    is certainly not what I intended.

5          120 months.

6          Under the Supreme Court's decision in *Booker* and its

7    progeny, the guidelines range is only one factor that I must

8    consider in deciding the appropriate sentence.  I am also

9    required to consider the other factors set forth in 18 United

10   States Code, Section 3553(a).

11         These include:  First, the nature and circumstances of

12   the offense, and the history and characteristics of the

13   defendant;

14         Second, the need for the sentence imposed to reflect

15   the seriousness of the offense, to promote respect for the law

16   and to provide just punishment for the offense; to afford

17   adequate deterrence to criminal conduct; to protect the public

18   from further crimes of the defendant; and to provide the

19   defendant with needed education or vocational training, medical

20   care or other correctional treatment in the most effective

21   manner;

22         Third, the kinds of sentences available;

23         Fourth, the guidelines range;

24         Fifth, any pertinent policy statement;

25         Sixth, the need to avoid unwarranted sentence

1    disparities among defendants with similar records who have been

2    found guilty of similar conduct; and

3          Seventh, the need to provide restitution any victims

4    of the offense.

5          Ultimately, I'm required to impose a sentence that is

6    sufficient but not greater than necessary to comply with the

7    purposes of sentencing that I just mentioned.

8          I have given substantial thought and attention to the

9    appropriate sentence in this case.

10          Probation recommends a guideline sentence of 120

11    months or 60 months for each offense to run consecutively.  The

12    government also advocates for a sentence of 120 months.

13    Ms. Wang seeks a below-guideline sentence of less than 48

14    months.

15          For a period of approximately five years, Ms. Wang

16    knowingly participated in a conspiracy with Miles Guo and

17    William Je to defraud thousands of victims out of more than one

18    billion dollars.  Relying on Guo's massive online presence, the

19    conspirators targeted his followers by promising them outsized

20    financial returns and benefits for investing in various

21    fraudulent businesses and programs.  Many of the victims were

22    led to believe that the money they gave Guo and his

23    conspirators would further pro-democracy efforts in China.  In

24    fact, Ms. Wang and others deliberately misappropriated the

25    money to line the pockets of Guo, his family, and the other

1    conspirators -- taking victims hard earned cash and using it to

2    further their extravagant lifestyles.

3         The conspirators knew that what they did was wrong,

4    and they went to great lengths to conceal their illicit

5    activities.  At Guo and Wang's direction, the conspirators

6    created shell companies and stored and moved their victims'

7    money across hundreds of bank accounts held in various names.

8         Guo, Je, and Wang caused their victims immense harms.

9    The Court has received dozens of letters and emails from around

10   the world recounting how victims continue to suffer from the

11   devastating losses they faced at the hands of the conspirators.

12   Some of the victims believed that their money would go toward

13   initiatives designed to promote democracy in China.  Others

14   invested tens or hundreds of thousands of dollars in the hopes

15   of improving their finances and were shocked when they

16   ultimately lost their homes and retirement savings.

17        The victims have not just experienced financial

18   hardship.  Many have lost relationships with loved ones because

19   of their participation in the scam.  The Court has received

20   letters from people whose partners left them and from parents

21   whose children no longer talk to them because they fell prey to

22   Guo, Je, and Wang.  These victims and others continue to

23   experience depression and severe psychological distress due to

24   the actions of the co-conspirators in this case.

25        Although Ms. Wang was not the senior-most leader of

the conspiracy, she was intimately involved in the scheme from

the start.  She was the de facto leader of multiple of the

scheme's fraudulent businesses.  She made hiring decisions,

directed the businesses' nominal figureheads, opened bank

accounts, created shell companies, and exercised control over

large sums of victim money.  According to the government, about

$34 million in victim funds were maintained in bank accounts

held in the name of entities under Wang's management or

control, and there is evidence that Wang was responsible for

moving hundreds of millions of dollars into and out of

enterprise-related accounts.  Ultimately, Ms. Wang was an

integral part of the conspiracy and knew that what she was

doing was illegal.

For her participation in the scheme, Ms. Wang was

purportedly paid a yearly salary of between $231,900 and

$313,961, although these figures likely underestimate the

extent to which she benefited personally from the massive

fraud.

A few mitigating factors are present:  Ms. Wang

benefited far less from the conspiracy than did Miles Guo or

William Je.  In addition, trial evidence suggests that Ms. Wang

sometimes disagreed with Mr. Guo, but Mr. Guo had the final

say.

I also take into account the length and conditions of

Ms. Wang's pretrial detention.  Ms. Wang has spent

1   approximately 22 months at the Metropolitan Detention Center in

2   Brooklyn.  Courts in this circuit have recognized that the

3   extraordinarily harsh conditions of confinement at MDC counsel

4   in favor of a shorter overall sentence to the extent that that

5   is appropriate.

6        I similarly account for the prison conditions Ms. Wang

7   will face post-sentencing.  As a Chinese national, she is not

8   eligible at placement at a minimum-security camp where many

9   nonviolent offenders serve their sentences.  These prison

10  camps, despite their name, are often considered safer and more

11  desirable than higher-security correctional institutions.  In

12  addition, after serving her sentence, Ms. Wang will likely be

13  transferred to ICE custody.  If she is ultimately required to

14  return to China due to her immigration status, she may face

15  detention there.

16       Finally, I account for the fact that Ms. Wang has

17  taken responsibility for her actions as reflected by her guilty

18  plea and her statement here today.  If there is ever a day in a

19  person's life when she is entitled to be judged on the basis of

20  the entirety of her background and contributions, it is at

21  sentencing, and Section 3553(a), in directing the Court to

22  consider the history and characteristics of the offender, is

23  consistent with that.  The sentence I will impose today will

24  consider the totality of Ms. Wang's conduct.

25       I conclude, for all the reasons stated, that a

1    sentence within the guidelines range is warranted.

2            Ms. Wang, please rise for the imposition of sentence.

3            Ms. Wang, it is the judgment of this Court that you

4    are sentenced to 60 months of imprisonment on each count to run

5    consecutively for a total of 120 months' imprisonment, to be

6    followed by three years of supervised release.

7            Considering your steep forfeiture obligation, I am not

8    imposing a fine, but you must pay a mandatory special

9    assessment of $200, which is due immediately.

10           The mandatory and standard conditions of supervised

11   release listed on pages 49 through 50 of the presentence report

12   shall apply.

13           In addition, the special conditions listed at pages 51

14   to 52 of the report shall apply.

15           These include:  You must obey the immigration laws and

16   comply with the directives of immigration authorities.

17           You must not incur any new credit charges or open

18   additional lines of credit without the approval of the

19   probation officer, unless you are in compliance with the

20   installment payment schedule.

21           You must provide the probation officer with access to

22   any requested financial information.

23           You shall submit your person, any property, residence,

24   vehicle, papers, computer, other electronic communication, data

25   storage devices, cloud storage or media, and effects to a

1   search by any United States Probation Officer, and, if needed,

2   with the assistance of any law enforcement.  The search is to

3   be conducted when there is a reasonable suspicion concerning

4   violation of a condition of supervision or unlawful conduct.

5   Failure to submit to a search may be grounds for revocation of

6   release.  You shall warn any other occupants that the premises

7   may be subject to searches pursuant to this condition.  Any

8   search shall be conducted at a reasonable time and in a

9   reasonable manner.

10          It is recommended that you be supervised by your

11   district of residence.

12          These special conditions of supervised release I just

13   described are reasonably related to the nature and

14   circumstances of the offense and the history and

15   characteristics of the defendant.  Ms. Wang is not a U.S.

16   citizen.  The payment of restitution and forfeiture compliance

17   are mandatory.  The offense involved a massive fraud involving

18   complex financial transactions and fictitious entities, and

19   these conditions will assist probation in protecting the

20   community from further crimes of the defendant and ensure that

21   the defendant complies with her restitution obligations.

22          Now, I understand that the order of restitution has

23   been handed up to the Court, is that correct?

24          MS. MURRAY:  Your Honor, we've handed up the consent

25   order of forfeiture.  With respect to restitution pursuant to

1   Title 18, United States Code, Section 3664(d)(5), the

2   government requests 90 days to assess its position concerning

3   our restitution order.  Our present intent to seek to forego

4   restitution given the complexity of calculating restitution and

5   because there are more than 8,000 victims.  So instead, and to

6   ensure the victims are compensated for their financial losses,

7   the government would proceed with a remission process whereby

8   the government recommends to the DOJ's money laundering and

9   asset recovery section that the hundreds of millions of dollars

10  in assets seized and forfeited be distributed to victims to

11  compensate them for their losses.  The government will confirm

12  its position in writing to the Court within 90 days.

13          THE COURT:  So determination of restitution is

14  deferred for a maximum of 90 days after sentencing and in

15  accordance with 18 United States Code, Section 3664(d)(5).

16          I'm required to remind you, Ms. Wang, you must forfeit

17  to the United States pursuant to 18 United States Code, Section

18  981(a)(1) And 28 United States Code, Section 2461(c) all

19  property that constituted or was derived from proceeds

20  traceable to the commission of the offenses, including a sum of

21  money equal to approximately $1.4 billion in U.S. currency and

22  the specific assets listed in the amended consent order of

23  forfeiture, which I shall sign.

24          Does either attorney know of any of legal reason why

25  this sentence should not be imposed as stated?

 1              MS. MURRAY:  No, your Honor.

 2              MR. QUIGLEY:  No, your Honor.

 3              THE COURT:  The sentence as stated is imposed.

 4              That is the sentence of this court.

 5              You have a right to appeal your conviction and

 6    sentence except to whatever extent you may have validly waived

 7    that right as part of your plea agreement.  The notice of

 8    appeal must be filed within 14 days of the judgment of

 9    conviction.

10              If you are not able to pay the cost of an appeal, you

11    may apply for leave to appeal *in forma pauperis*.  If you

12    request, the Clerk of Court will prepare and file a notice of

13    appeal on your behalf.

14              Are there any further applications?

15              MS. MURRAY:  Yes, your Honor.  The government would

16    move to dismiss open counts against the defendant.

17              THE COURT:  The open counts are dismissed.

18              MR. QUIGLEY:  Your Honor, we would ask that your Honor

19    recommend to the Bureau of Prisons that Ms. Wang be designated

20    to a facility in the Eastern United States, preferably close to

21    the New York consistent with her security classification.

22              THE COURT:  I will do that.

23              Ms. Wang, you stated that you have been trying to help

24    others at MDC during your incarceration there, and I applaud

25    you for that.  You are a person who has an extensive education.

1   Obviously, you're extremely intelligent and capable.  Many of

2   the other individuals that are incarcerated along with you have

3   not had the advantage of a higher education and can greatly

4   benefit from your assistance, and so I ask that you dedicate

5   yourself to offering that.

6           THE DEFENDANT:  Yes, your Honor.  That is what I have

7   been doing along the way.

8           THE COURT:  All right.  That brings our hearing to a

9   close.

10          The matter is adjourned.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25