UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 23 Cr. 118 (AT)

MILES GUO,

Defendant. Sentencing
------------------------------x

New York, N.Y.
June 29, 2026
11:05 a.m.

Before:

HON. ANALISA TORRES,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
BY: RYAN B. FINKEL, ESQ.
MICAH F. FERGENSON, ESQ.
JULIANA N. MURRAY, ESQ.
JUSTIN HORTON, ESQ.
Assistant United States Attorneys

SARAFA ZELLAN PLLC
Attorneys for Defendant
BY: MELINDA M. SARAFA, ESQ.

LAW OFFICES OF JOSHUA L. DRATEL, P.C.
Attorneys for Defendant
BY: JOSHUA L. DRATEL, ESQ.

DOAR RIECK KALEY & MACK
Attorneys for Defendant
BY: JOHN F. KALEY, ESQ.

ALSO PRESENT: DAVID NAGUIB, Paralegal Specialist, USAO
STEPHANIE LIU, Interpreter (Mandarin)
I CHING NG, Interpreter (Mandarin)

THE COURT: Good morning. We're here in the matter of United States v. Guo.

Counsel, please make your appearances.

MR. FINKEL: Good morning, your Honor. Ryan Finkel, Juliana Murray, Micah Ferguson, Justin Horton, and David Naguib, who is a paralegal in our office.

MS. SARAFA: Good morning, your Honor. Melinda Sarafa, John Kaley, and Joshua Dratel for Miles Guo, who is not present.

THE COURT: Please be seated.

I'm informed by the Marshals Service that Mr. Guo is delayed by a couple of hours, and so he will be joining us at about 1 p.m., and so we will adjourn until that time.

(Recess)

(Pages 3-30 SEALED by order of the Court)

(4:01 p.m.)

THE COURT: Good afternoon. This matter is on for sentencing in United States v. Miles Guo.

Would you make your appearances, please.

MR. FINKEL: Yes, your Honor. Ryan Finkel, Juliana Murray, Micah Fergenson, and Justin Horton for the United States. We're joined at counsel table by David Naguib, who is a paralegal in our office.

MS. SARAFA: Good afternoon, your Honor. Melinda Sarafa, John Kaley, Joshua Dratel for Miles Guo, who is also present at counsel table.

THE COURT: Please be seated.

I'm now addressing this question to the defense. Who is going to be speaking for Mr. Guo at this time?

MS. SARAFA: Your Honor, we have divided up responsibilities, so different attorneys will speak to different portions of the proceedings. Mr. Dratel will be addressing the presentence report. I will be addressing the Court with respect to Mr. Guo and our sentencing presentation.

THE COURT: Mr. Dratel, have you read the presentence report?

MR. DRATEL: Yes, your Honor.

THE COURT: And did you discuss it with Mr. Guo?

MR. DRATEL: Yes.

THE COURT: Was it translated for him?

MR. DRATEL: Yes.

THE COURT: Mr. Guo, your lawyer has said that he has read the presentence report and that the report was translated for you. Did you read the presentence report?

THE DEFENDANT: (In English) Yes, your Honor.

THE COURT: Did you discuss it with your attorney?

THE DEFENDANT: (Through the interpreter) Yes.

THE COURT: Has the government reviewed the presentence report?

MR. FINKEL: Yes, your Honor.

THE COURT: Mr. Guo has raised numerous factual objections to the report.

"Fact-finding at sentencing is made by a preponderance of the evidence." *See United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999).

Mr. Guo requests an evidentiary hearing, or *Fatico* hearing, to resolve his factual disputes with the report, particularly with respect to the calculation of the loss amount.

A *Fatico* hearing is a presentence evidentiary hearing during which the parties are permitted to present evidence and arguments on disputed factual matters relevant to sentencing. *See United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979).

A "district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a

full-blown evidentiary hearing in resolving sentencing disputes." *United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005); and *United States v. Litwock*, 611 Fed. App'x 12, 16 (2d Cir. 2015). All that is required is that the defendant have "some opportunity to rebut the Government's allegations." *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996).

I have closely reviewed Mr. Guo's sentencing submissions, which articulate his objections to the presentence report. I have also carefully reviewed the substantial record in this case, including the evidence presented at the two-month trial. Having done so, I conclude that I am able to make the factual determinations necessary for sentencing without an evidentiary hearing.

I will begin by addressing Mr. Guo's factual disputes unrelated to the loss amount.

First, based on my review of the over 230 victim statements submitted by the government, and the trial testimony, Mr. Guo's objection that there are no victims is overruled.

Second, I reject Mr. Guo's claim that he did not purport to act on behalf of a "charitable, educational, religious, or political organization or government agency" in connection with his crimes.

For example, Mr. Guo founded the Rule of Law Society and told people he would use the money to help the Chinese

people. One victim, Jenny Li, testified at trial that she took out a second mortgage on her home to finance Mr. Guo's investments, which started with a $6,000 donation to the Rule of Law Society, made after trusting Mr. Guo's unfulfilled promise that he would donate a hundred million dollars of his own money to the Society first. (*See*, for example, Trial Transcript pages 1170 to 1180, and 1211 to 1213.)

At trial, the Society's former president and treasurer, Karin Maistrello, testified that despite receiving tens of millions of dollars in donations, the organization did "nothing" to help the Chinese people. (*See* Trial Transcript pages 423 to 424, 471, and 3317 to 3320; and Government Exhibit WA30, Summary of Donations for 2019-2023.)

Trial testimony from witnesses Le Zhou, a victim, and Ya Li, one of Mr. Guo's close associates, also shows that Mr. Guo acted on behalf of a political organization——the "New Federal State of China"——by, for example, raising funds through the Farm Loans Program. (*See*, for example, Trial Transcript pages 221 to 227 and 1376 to 1377.)

Third, I overrule Mr. Guo's objection that his fraudulent schemes and money laundering did not involve "fictitious entities" or "shell corporations."

At sentencing for Mr. Guo's co-conspirator, Yvette Wang, I found, based on the evidence at Mr. Guo's trial, that the two "created shell companies" as part of their schemes.

(*See* Wang Sentencing Transcript, page 56, lines 6-7, filed at ECF No. 491.) I reaffirm that finding today.

Fourth, Mr. Guo states that he did not derive more than a million dollars in gross receipts from at least one financial institution. This objection is overruled. I conclude that Mr. Guo "must have profited at least $1 million" from the offense conduct. *United States v. Constantinescu*, 147 F.4th 299, 316 (2d Cir. 25). For example, I find that Mr. Guo and his co-conspirators used G|Club funds that pay personal expenses for Mr. Guo and his family, including the purchase of a multimillion-dollar luxury yacht and mansion. (*See*, for example, Trial Transcript pages 1957 to 1959, 3064 to 3065, and 3701 to 3703.)

Fifth, I overrule Mr. Guo's claim that he did not play an organizing or leadership role in the crimes of conviction. Witnesses testified that Mr. Guo was the "top boss," that he was the spokesperson for the various G entities, and that he would have the final say. (*See*, for example, Trial Transcript pages 421, 1376, 1941, 1995 to 1996, 2978, 2980, and 3162.)

Indeed, the jury convicted Mr. Guo of Count One, which alleged that he was the leader of, and directed, the G Enterprise.

Sixth, I find that it is more likely than not that Mr. Guo willfully obstructed or impeded, or attempted to obstruct or impede justice, in connection with the

investigation, prosecution, or sentencing of this case:

As one example, trial testimony shows that Mr. Guo was involved in creating a "blacklist" of former supporters who criticized him, and Mr. Guo then shared their personally identifiable information online. (*See*, for example, Trial Transcript pages 274 to 276 and 1487 to 1491.) Multiple victim statements refer to the online harassment and intimidation people have experienced for speaking out against Mr. Guo. (*See*, for example, Statements 3, 4, 106, 113, 175, 190B, 209.)

In addition, Mr. Guo——as evidenced by photos retrieved from one of his cellphones and by testimony at trial about statements made during his broadcasts——contributed to and enabled the harassment of the Trustee of his bankruptcy estate. That harassment included protests outside of the Trustee's home and the school where his daughter worked, with graphic signs echoing Mr. Guo's statements on his broadcasts that the Trustee was a "CCP running dog." (*See*, for example, Trial Transcript pages 252 to 259, 4091, and 4214 to 4218; and Government Exhibits VI 194 and 1B124F.) Mr. Guo even instructed witnesses to throw out subpoenas from the Trustee. (*See* Trial Transcript pages 1498 to 1499.)

I, therefore, overrule Mr. Guo's objection.

I now address the factual dispute related to the loss amount.

The presentence report found a loss amount of more

than $550 million. Mr. Guo argues that there is no loss amount.

I will make a few important observations before I proceed with my factual findings.

First, based on the top bracket of the guidelines loss table, I only need to find that the loss amount exceeds $550 million to apply the guidelines enhancement calculated by probation. (*See* U.S.S.G. § 2B1.1(b)(1)(P).)

Second, assuming all other enhancements apply, because the total offense level I will calculate greatly exceeds the highest total offense level under the guidelines, a loss calculation of only $3.5 million would result in the same applicable guidelines range. (*See* U.S.S.G. § 2B1.1(b)(1)(J).)

Third, I share several concerns expressed by some of my colleagues that the guidelines place undue weight on the amount of loss involved in the fraud. *See*, for example, *United States v. Emmenegger*, 329 F.Supp.2d 416, 427-28 (S.D.N.Y. 2004); *United States v. Samuel Bankman-Fried*, 22 Civ. 673, Sentencing Transcript pages 6 to 7.

Finally, although factual findings relating to loss must be established by a preponderance of the evidence, the Second Circuit has said that the Court "need not establish loss with precision but rather 'need only make a reasonable estimate of the loss, given the available information.'" *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009).

Guidelines Section 2B1.1(b)(1) defines "loss" as the greater of "actual loss" and "intended loss." "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offenses." "Intended loss" is defined as the "pecuniary harm that the defendant purposely sought to inflict." "Reasonably foreseeable harm" is harm "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."

At trial, government expert Paul Hinton estimated that $1.3 billion in individual donations flowed into bank accounts associated with the racketeering enterprise, which the jury's verdict on Count One demonstrates was the result of fraud. *See*, for example, Trial Transcript pages 4430 to 4332; and Government Exhibit Z26.

Mr. Guo disputes the government's loss estimate on several grounds. He states that "inflows to the G-Series entities" do not establish loss because this methodology improperly includes acquitted conduct, fails to account for redemptions, refunds, or double counting, and "erroneously includes funds from individuals who deny they were defrauded."

There is no evidence that investors received anything of value before the fraud was uncovered. The inflows into the various G Enterprise entities are, therefore, a reasonable estimate of the loss amount. *See*, for example, *United States v. Stitsky*, 536 Fed. App'x 98, 110-112 (2d Cir. 2013).

Even if I exclude the $411 million in GTV proceeds from the $1.3 billion figure, which Mr. Guo claims derives from acquitted conduct, the loss estimate would still far exceed $550 million. *See* Government Exhibit Z26, page 35; *see also* Affidavit of FBI Special Agent Anthony Alecci, ¶ 18(c), filed at ECF No. 716-2.

I note that this exclusion is conservative because GTV inflows are part of the racketeering conspiracy crime of conviction. For example, one witness, Le Zhou, testified that to join G|Club, individuals were first required to purchase GTV stock. *See* Trial Transcript page 232, and pages 1376 and 4478. In other words, inflows to GTV are connected to the racketeering enterprise as a whole and to other fraudulent schemes.

Next, I reject Mr. Guo's claim that the loss amount should be reduced by "returns" or various "credits" he claims are applicable.

As an initial matter, the Second Circuit has held that "loss in fraud cases includes the amount of property taken, even if all or part has been returned." *United States v. Coriaty*, 300 F.3d 244, 251 (2d Cir. 2002).

Further, based on testimony at trial, and the parties' submissions, I do not find that Mr. Guo's victims received anything of value——or that Mr. Guo intended to give them something of value——that would justify discounting the loss

amount. *See*, for example, testimony of Le Zhou on Trial Transcript pages 409 to 410, testimony of Jenny Li on pages 1211 to 1213, and testimony of Ya Li on pages 1386 to 1387.

Nor is there evidence that Mr. Guo returned the victims' money before the offense was detected, or that he pledged collateral to the victims. *See* U.S.S.G. § 2B1.1 cmt. 3(D)(i) and (ii).

Witness testimony from victims Le Zhou and Wei Chen, and written victim statements, show that individuals sought refund but did not receive them, even when Mr. Guo promised they could withdraw their funds at any time. *See*, for example, Trial Transcript pages 270 to 272, 4504 to 4505; and Victim Statements 168 and 221.

As to potential double counting, Mr. Guo presents only an unsubstantiated statement that G|Club "accepted" Himalaya Exchange funds as "payment methods for G Club membership." He does not offer any evidence establishing this fact, nor does he estimate the percentage of G|Club's inflows potentially attributable to payments made to the Himalaya Exchange.

Further, even if I were to entirely exclude the inflows into G|CLUBS due to double counting concerns, inflows into the Farm Loan Program and the Himalaya Exchange alone exceed $550 million and justify my loss calculation.

Finally, I do not consider whether a person

subjectively regards him- or herself as a "victim" in determining "loss."

A person's subjective opinion of their victim status does not determine whether Mr. Guo's schemes were fraudulent, and therefore, their subjective opinion does not impact either the "actual loss" or "intended loss" calculation.

I find, by a preponderance of the evidence, that Mr. Guo intended to deceive his victims and take their money for personal gain, rather than his promised initiatives, and that it was reasonably foreseeable that his victims would make the payments they made. Therefore, both the actual loss and the intended loss exceed $550 million.

In sum, I reject Mr. Guo's objections and hold that the government's inflow methodology serves as a "reasonable estimate" of the loss attributable to his crimes. Based on the government's estimates of inflows into the various G Enterprise entities, I find, by a preponderance of the evidence, a loss amount of at least $550 million.

Mr. Guo's sentencing submission raises over 50 additional objections to various paragraphs of the presentence report. I have carefully reviewed each of these objections and find that they either rehash the same objections already overruled, contradict the jury's verdict, or do not ultimately influence my sentence.

Are there any objections to the presentence report

regarding factual accuracy, that the defense has not already articulated?

MR. DRATEL: Your Honor, just——and we do obviously reassert those that we did in writing, but we just wanted to add, based on two subsequent developments.

One is the Court's denial of the *Fatico* hearing, which is Docket No. 855, and the order earlier today approving an order of forfeiture, that's 858, and we think that reinforces two factors. One is that a loss amount cannot be determined based on the current record; and second is that a *Fatico* hearing is required. And the reason is, as the Court is not deciding at this time the validity of 853(n) petitions, and we believe——and I know the Court feels differently, but we believe that if someone is not defrauded, it is not part of the corpus of the crime; therefore, it cannot be part of a loss figure. So we have more than a hundred million dollars from——that's just two sets of investors, who represent about 7,000 investors——who have taken the position there was no fraud; their money is not part of a fraud. That would reduce the loss figure in that regard. And with respect to some of the offsets and the other parts, the trial transcript, the way the Court charged the jury, which is the statute, which is that it doesn't matter whether he had a gain at all, whether he made a dime. So the jury's verdict doesn't establish anything with respect to loss amount. And the trial testimony, by our

analysis, would limit that loss amount to less than $1.5 million. And the fact that also the government says, and the Court agrees in the forfeiture order today, that this case is too complicated for restitution, only again reinforces that a loss amount cannot be established on the current record and without a *Fatico* hearing.

And we also think that it should be at a higher burden of proof for the reasons we set forth in our papers.

Thank you, your Honor.

THE COURT: The government has no objections to the factual findings in the presentence report, correct?

MR. FINKEL: That's correct, your Honor.

THE COURT: There being no further objections, I adopt the factual recitations in the report. And it shall be made a part of the record and placed under seal. If an appeal is taken, counsel on appeal may have access to the sealed report without further application to the Court.

Although courts are no longer required to follow the sentencing guidelines, we are still required to consider the applicable guidelines in imposing sentence, and to do so, it is necessary that we accurately calculate the sentencing range.

Following a two-month jury trial——

MR. DRATEL: Your Honor, I'm sorry. I apologize. I missed one that I think the Court may not have discussed in its digest of the objections, and that's with respect to

paragraph 116, the 2S1.1(b)(2)(B) guidelines section that applies to the offense involving sophisticated money laundering, and we specifically objected to that. So I don't know if the Court covered that in its review.

THE COURT: Yes. I will be addressing that later on.

MR. DRATEL: Oh, okay. Thank you, your Honor.

THE COURT: Yes.

As I was saying, after a two-month jury trial, the defendant was convicted of nine of twelve counts of the third superseding indictment:

Count One: Racketeering Conspiracy;

Count Two: Conspiracy to Commit Wire Fraud or Bank Fraud;

Count Three: Money Laundering Conspiracy;

Count Four: Conspiracy to Commit Securities Fraud;

Count Seven: Wire Fraud, in connection with the Farm Loan Program;

Count Eight: Securities Fraud, in connection with the Farm Loan Program;

Count Nine: Wire Fraud, in connection with G|CLUBS;

Count Ten: Securities Fraud, in connection with G|CLUBS; and

Count Eleven: Wire Fraud, in connection with the Himalaya Exchange.

The jury acquitted Mr. Guo of three counts:

Count Five: Wire Fraud, in connection with GTV Private Placement;

Count Six: Securities Fraud, in connection with GTV Private Placement; and

Count Twelve: Unlawful Monetary Transaction.

The presentence report calculates a total offense level of 55, and in accordance with guidelines Chapter 5 Part A, Application Note 2, because the offense level is more than 43, the report treats the total offense level as 43. The report calculates a criminal history category of I, resulting in a guidelines sentence of life imprisonment. However, in accordance with guidelines section 5G1.2(b), the guidelines sentence applicable here is constrained by the maximum statutorily authorized length of imprisonment, which the report calculates as 2100 months, or 175 years. The report calculates a fine range of $50,000 to $5 million.

The government calculates the same guidelines range.

Mr. Guo disputes the presentence report's guidelines analysis. I now address each of his objections:

First, as discussed earlier in this proceeding, Mr. Guo contends that there is no loss amount. For the reasons I have already stated, I find sufficient support in the record that the loss amount exceeds $550 million and apply the 30-level enhancement under guidelines Section 2B1.1(b)(1)(P).

Second, Mr. Guo contends the government has not shown

that there are more than five victims. In light of the over 230 victim statements submitted by the government, and the trial record, which reflects the stunning breadth of Mr. Guo's fraudulent schemes, I agree with probation and apply a 2-level enhancement under Section 2B1.1(b)(2)(A)(i) because there are at least 10 victims.

Third, for the reasons I have already stated, I agree with probation that Mr. Guo acted on behalf of a charitable, educational, religious, or political organization, and apply the 2-level enhancement under Section 2B1.1(b)(9)(A).

Fourth, like probation, I apply a 2-level enhancement under Section 2B1.1(b)(10) because the offense "involved sophisticated means"——namely, the use of "fictitious entities" and "corporate shells," as well as the invention of a phony cryptocurrency. *See*, for example, Trial Transcript pages 3657 to 3666; *see also* pages 2667 to 2668, 2671, and 2673 to 2674.

Fifth, I agree with probation and apply a 2-level enhancement under Section 2S.1(b)(3) because Mr. Guo was convicted of money laundering under 18, United States Code, Section 1956, and the offense involved "sophisticated laundering"——namely, the use of "fictitious entities" and "corporate shells."

Sixth, for the reasons I have already stated, I apply a 4-level enhancement under Section 3B1.1 because Mr. Guo was "an organizer or leader" of the criminal activity, which

involved five or more participants.

Seventh, I apply a 2-level obstruction of justice enhancement under Section 3C1.1 because Mr. Guo "willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." As I discussed earlier, I find by a preponderance of the evidence that Mr. Guo intimidated potential cooperators or witnesses by creating a "blacklist" of his critics and sharing their personally identifiable information with his supporters, who have a pattern of engaging in harassing behavior. *See*, *for example*, Trial Transcript pages 1533, lines 12-17. Separately, I find that Mr. Guo both directly and indirectly contributed to a campaign of harassment to deter the Trustee of his bankruptcy estate from seizing Mr. Guo's property and investigating his finances so that his fraud victims can be repaid.

Based on my independent evaluation of the sentencing guidelines, I find that the offense level is 55, which I treat as 43 because that is the maximum possible offense level; the criminal history category is I; and the resulting guidelines recommendation is 2100 months' imprisonment because of the statutory maximum. I also calculate a fine range of $50,000 to $5 million.

Now I will hear from the parties.

Does the government wish to be heard with regard to

sentencing?

MR. FINKEL: It does, your Honor. And I also want to note for your Honor that there is at least one victim here who wishes to be heard.

THE COURT: I will allow that individual to come forward later on.

MR. FINKEL: Okay.

THE COURT: Actually, you know something, I think that it would be better to have the victim come forward now.

MR. FINKEL: Okay.

THE COURT: I understand that the government has identified a victim who wishes to make a statement.

Before we proceed with victim statements, I want to explain the law that applies to victim statements. The Crime Victims' Rights Act defines a crime victim as a person directly and proximately harmed as a result of the commission of a federal offense. 18, United States Code, Section 3771(e). In other words, you are only a victim if you have been directly and proximately harmed by Mr. Guo and his crimes.

For anyone who wishes to be heard, I'm going to ask you two questions before you start: (1) What is your name? and (2) Are you a victim of Mr. Guo's offenses? If you state that you are not a victim of Mr. Guo's crimes, you will not be permitted to speak. Each individual will have up to two minutes to complete their statement.

So you may call the individual that you have identified.

MR. FINKEL: Yes, your Honor. It's Ms. Chen. If she could please come up.

THE COURT: If she could step to the podium.

MR. FINKEL: While she comes up, your Honor, I may have missed it——apologies——but is your Honor's finding with respect to the base offense level consistent with the recommendation in the PSR of a base offense level of 7?

THE COURT: Yes.

MS. CHEN: My name is Wei Chen. I'm a victim of Miles Guo's fraud, and I testified in June 2024.

I understand only two minutes allowed. However, I prepared I believe more than two minutes. I wonder if possible for me to——

THE COURT: I would like you to limit your statement. And so if you could condense it, please.

MS. CHEN: Okay. I'll be quick.

So, your Honor, I appreciate the opportunity. This fraud destroyed my life and my family. It did not just take money, it took our sense of security; it took our peace of mind; it took our hope; and it took life from us, the best years of our lives. It created a constant mental burden that feels like an ongoing suffering. And this problem has not ended. We live with it every day, every hour. It is anxiety,

regret, guilt towards our family, sleepless nights and constant stress of trying to survive financially after losing years of savings and hard work. And this harm extends beyond individuals. It affects families; it affects children, their education, their future; it affects elderly family members, their care and their stability. Behind every victim is a whole family. Their life has been deeply damaged and destroyed.

Your Honor, one especially harmful part of this fraud is how it unfolded over time. It was one program after another, where we were repeatedly encouraged to give more and more. At first, we used our hard-earned savings, but over time we were pushed into debt. Toward the end of 2021, the fraud introduced new programs with urgency, pressure, and promises of significant returns, pushing us to borrow close to 400,000 at a high interest rate. We took on the debt because we believed in the false promise that returns would come quickly and allow us to repay the debt. Instead, those promises were false, and that loan accumulated about 300,000 in interest since December 2021. It continues to grow every day in a way that is overwhelming and deeply stressful. So for the past ten years, this harm has not been in the past; it follows into the present. It shapes how we live today and affects our tomorrow.

We were once a happy family. The happiness is gone, and it's hard to regain.

What makes it even more painful is that the defendant

continues to deny this fraud. His supporters continue to spread misinformation and continue attacking victims who came forward. Since I testified, I experienced attacks, and some of those attacks made me fear for my safety. That added even more weight to the harm. It would have been easier to stay silent, but I chose to come back and speak here after two years. I chose to do what I believe is right, even when it's painful, even when it feels unsafe. I am here because victims' rights have been delayed and denied for too long. Even though speaking publicly exposes me to more attacks, I am here to tell the Court and the public the truth about the real harm caused by the fraud, by this fraud itself, caused by the fraud network running it, caused by the sentencing delays, and any future delays until the money is returned to the true victims of the fraud, the true victims that are enduring the harm every day from Miles Guo's criminal conduct. Sentencing delay has extended the harm, because for my family, the time is not neutral. Every additional month, every additional day without meaningful financial relief adds more debt from this high-interest borrowing because of this fraud, because of this false promise. Further delays do not simply postpone relief. It creates additional financial harm that becomes harder and harder to overcome.

For years, we the victims waited and waited for so-called investment to deliver the returns we were promised.

And now we find ourselves waiting again——waiting for justice to be served, waiting for closure, waiting for return of our money that rightfully belongs to us, our hard-earned money. We need that money to pay off debts, support our children's education, care for our families, and the basic necessities of life. The continued waiting is not difficult, it is painful.

THE COURT: Thank you, ma'am. If you would please bring your statement to a close. Continue for another 30 seconds and please then stop.

MS. CHEN: So it is not just a financial fraud. It is damaging our health, our stability, our trust, our dignity, our hope, and the future we are trying to build.

And next, I want to address restitution. I understand government position regarding remission, regarding the complexity of the case and number of victims involved. However, victims' loss have been already clearly established through the sworn testimony and of evidence before this Court, including my own. I respectfully ask the Court to consider ordering restitution at his sentencing today.

THE COURT: All right. Thank you, ma'am. I will carefully consider what you have said.

MS. CHEN: Thank you.

THE COURT: Thank you.

Are there any other victims, any other individuals who will come up and answer yes when I ask whether they are a

victim of Mr. Guo?

Please step up.

What is your name?

SPECTATOR: Ching Li Bard Jordan (phonetic).

THE COURT: Are you a victim of Mr. Guo's crimes?

SPECTATOR: Yes, ma'am.

THE COURT: Go ahead.

SPECTATOR: We're here today for Miles's sentencing. We're also here to witness America's funeral, that you killed your nation.

THE COURT: All right. So ma'am, so far I don't hear your saying that you're a victim. And so if you're ready to state how you have been victimized by Mr. Guo's criminal conduct, you may go forward, but so far, I am not hearing that.

SPECTATOR: We do not hate you, nor——

THE COURT: I'm going to have to bring this to a close because what you're making is a political statement unrelated to his various criminal conduct.

Is there any other individual who claims to be a victim of Mr. Guo?

And is there any other individual in the overflow who may be a victim of Mr. Guo?

All right. I've heard word that there is no other individual identifying themselves as a victim in the overflow room.

All righty then. I will hear from the government.

MR. FINKEL: Thank you, your Honor.

Miles Guo is not a Democratic activist. He is a con artist, he is a fraudster, he is a scammer, and a thief. And to afford just punishment for his crimes, to promote respect for the law, to deter him specifically and others who may seek to do what he has already done, to protect the public, to protect the many who, sadly, remain under Miles Guo's spell, this Court should impose a sentence of at least——at least——30 years' imprisonment. And that's because for nearly five years, the defendant preyed on thousands. He lied to them, he brainwashed many, he attacked and harassed others, and he caused all that pain and suffering, not because he cares about any political cause; he did it because he cares the most of all about himself.

This was not a moment of poor judgment or an aberration of an otherwise law-abiding life. Miles Guo did this to feed his narcissism. He did it so he can live a life of luxury and excess——a Bugatti; a Lamborghini; a $26 million mansion; a $36,000 mattress——two of them actually; a $50,000 fire log holder; a music video, promoting himself, holding a light saber.

And Miles Guo sits here today, unapologetic, refusing to accept even a modicum of responsibility. He's steadfast that all of this wreckage, everything he left in his wake,

never even happened. Even worse, he portrays himself as a victim. But the evidence that this Court saw, that a jury saw, proved that Guo was a perpetrator on a grand scale. And it's certainly one thing, your Honor, to deny guilt as a defendant in an American courtroom, but it's another entirely to deny reality. And that's where I'd like to focus my brief remarks, on the reality of the harm that Miles Guo caused, because that should be a primary focus, your Honor, in assessing the seriousness of the offense and deciding what constitutes just punishment.

Your Honor referenced the 235 victim statements that have been submitted to you. They account for the magnitude of the harm. They discuss the financial burden. We just heard from Ms. Chen as well. But it was more than just financial security and money. There's a reality of enduring anguish.

Statement 42: "I lost my passion. My whole body was depressed. I suffered from severe depression and want to kill myself every day."

Statement 200: "I was overwhelmed with shame, guilt, and despair. I struggled with recurring suicidal thoughts. I lost my will to live."

That is the reality of Miles Guo's harm.

And these victims come from across the country and around the world, and they have, generally speaking, a unifying theme. They were part of the Chinese diaspora, and universally

against the Chinese Communist Party, the CCP. And it's Miles Guo's false statements about fighting the CCP that drew victims to him, and that separates Miles Guo from a garden-variety fraud.

Sure, he promised his victims financial gain and riches. But it was more sinister than that. He claimed to be part of their family, their brother. He called them his brothers and his sisters, as someone who could be trusted, claiming to share the same political and moral views as his victims. So your Honor, in that sense it's an extraordinary affinity fraud that the defendant committed because he targeted a community, and, ironically, or perhaps even purposefully, as Statement 157 summed it up well, "While loudly proclaiming his goal to defeat the CCP, he actually served their interests, by discrediting the very cause he claimed to support. By betraying us, the true believers in ending the CCP's tyranny, he tarnished the fight against the CCP itself. Now whenever someone hears about efforts to oppose the CCP, they may question whether it's just another scam." So in a very real way, rather than fight the CCP as he loves to claim over and over again, he helped their cause.

Your Honor, another important point for the Court to consider is his total and utter contempt for United States laws. As your Honor saw during trial, as the jury saw, the defendant's audaciousness in criminality grew over time. He

started out, as your Honor recounted before, with the Rule of Law Society and foundation. It grew into GTV, in which he was investigated and dealt with in a civil regulatory manner. So he changed his efforts. He changed his tactics. He tried to dress up his fraud by, instead of selling stock, pretending to sell farm loans. And then that continued in its audaciousness by creating a fake business called G|CLUBS. And in the summer of 2022, and the fall, when grand jury subpoenas found their way to G|CLUBS and the government seized $630 million, the defendant once again, instead of stopping what he was doing, instead of realizing that he was violating the law, he doubled down and tripled down and quadrupled down, and he launched the 810 and the 815, schemes that collected money by claiming to sell more stock, with the express purpose of sending that money abroad, to the Middle East, expressly out of reach of the U.S. government.

And that contempt, your Honor, continued today—-today, before you, when the defendant lied, malingering, pretending to be ill, to try to avoid sentencing today.

The ever-evolving nature of the defendant's criminality also underscores I think a very important point for this Court: the defendant is and remains a significant danger to society.

Victim statements recount, as Ms. Chen just did, how the enterprise continues, developing new meme coins and

money-luring opportunities. The defendant operates like the law does not apply to him, and only incarceration will keep the public safe. As your Honor mentioned, he has acolytes who are willing to protest in front of an elementary school——an elementary school——because one of the teachers was the daughter of the bankruptcy trustee who was discharging his job to try to obtain money for creditors in accordance with the laws of the United States.

The defendant personally told Ya Li to destroy subpoenas; his daughter was told to lie in a deposition. The defendant moved a boat outside the jurisdiction of the United States to avoid civil contempt. He was held in criminal contempt by a judge of New York State Supreme Court.

He has no respect for the law, and there is nothing that can assure this Court that once released, he won't continue to prey on the victims he has already victimized, and many others.

Now, in their sentencing submission, the defense makes much of defendant's history and characteristics. And they recount his mythology——the same mythology that the defendant used to lure victims into his schemes; the same mythology he used to build a cult of personality and to brainwash victims. I don't know, and I think no one knows, how much of that history is true, but certainly this defendant has little credibility left to spend here before this Court, so I would

submit that instead of evaluating the truth of the defendant's mythology, the truth of his words, or lack thereof, we look at his actions. His actions speak louder than his words. And here's what we know:

The defendant immigrated to the United States in 2015, thereabouts. He claimed he needed asylum, that he needed protection, from the United States. He had access to opportunities that many cannot have access to but wish they could. He's brilliant. He is charismatic. He is smart. He could have lived a successful, law-abiding life in the United States, but almost immediately, he chose to commit crimes on a grand scale. And if anything, while here as an asylee, he should have maintained rigid compliance with the laws of the United States, with its rules and regulations. But instead, he took opportunity after opportunity to engage and engineer a fraud of historic proportions. Those are the actions that is the history and characteristics that should animate this Court's sentence.

Last point, but an important one. The defendant clearly has his supporters, those who speak online and try to scare victims who have come forward; those who try to scare the truth from coming out; supporters who promise that this is all a charade and one day Miles Guo will return to them to lead them. And the reality is that they——many of them, at least——are probably victims too. And the defendant maintains this

hold and grip over them; a grip so tight that he can convince them that they aren't victims at all. And that underscores, your Honor, the danger the defendant poses to the public. If released, it is near certainty, if not absolutely certain, that he will pick their pockets again, that he will victimize those supporters again. Those victims may disclaim their victimhood, they may disclaim that they were defrauded. What was proven at the trial that you presided over, your Honor, is that the defendant Miles Guo intended to defraud them; he acted with knowledge, he knew what he was doing was wrong, but he did it for himself, over and over and over again.

So it is up to this Court, and your Honor alone, to protect those who are unable to protect themselves, and the government submits that a lengthy sentence, one that incapacitates the defendant from harming others, is necessary here.

And so when reflecting on the reality, the reality of what the defendant has done, his course of conduct for five years, all that he built, all the lives he destroyed, it's sort of hard to understand how a person could be responsible for all these significant crimes. Miles Guo's criminality is massive. The harm he caused was and remains devastating to thousands. The obstruction, the flouting of Court's orders, the vengeance on those who stood in his way and their family. Miles Guo did not lead a movement, he led a criminal enterprise

that was built on lies he told so he could take other people's money and spend it on himself. And he strengthened that enterprise through threats and violence and fear.

For leading one of the most extraordinary frauds that this country has seen, to protect the public and those who can't protect themselves, a lengthy and substantial sentence of at least——at least——30 years is absolutely necessary in this case.

Thank you.

THE COURT: Now I'll hear from the defense.

MS. SARAFA: Thank you, your Honor.

I think we can all agree that this is no ordinary case. Miles Guo is no ordinary individual. The U.S. government, not to mention the Chinese government, has a certain view of him.

It's important at this stage of the case to take a deep, full look at who Miles Guo as a person is and how his background relates to why we're here today.

Let me acknowledge that Mr. Guo went to trial. He maintains his innocence. He was found not guilty of the government's core fraud allegations concerning the GTV Private Placement, as well as of engaging in an unlawful monetary transaction. We acknowledge that he was found guilty of other fraud counts related to the Farm Loans, G|CLUBS, and Himalaya Exchange, as well as money laundering and conspiracy-related

counts. We accept that verdict for purposes of sentencing, but it is important to place it in its proper context and understand its limits.

Mr. Guo is a human being like every other defendant who has appeared before this Court. He has a unique personal history that has shaped his fundamental character, motivation, and his orientation to the world. He was born in China two years into the cultural revolution. That lasted a full ten years. And his parents were deemed enemies of the State during that period of time. As a result, his childhood, one of eight brothers born to his parents, consisted of total immersion in the hardships and abuses that an authoritarian government can and does inflict on its people. Now millions of Chinese individuals may have had similar experiences during the cultural revolution, but that fact has not diminished the lasting impact that those experiences have on every single one of them. Mr. Guo's unwavering support for democracy, a more democratic China, and a better life for the people of China, is rooted in his personal experience.

He did not receive much of a formal education. He quit school at about age 15 to work and help support his family. He married young, still in his teens, and had two children with his wife, to whom he remains married to this day, before he reached age 20. That's about how old he was in 1989 when the Tiananmen protests began in China, and given Mr. Guo's

childhood, it's not surprising that he sold his motorcycle, provided the funds to support the protestors of Tiananmen. For that support, he was visited by police officers, who, tragically, shot his brother, who was trying to protect Mr. Guo when a firearm was drawn. Both of them were arrested. His brother died of his wounds. Mr. Guo served approximately two years in prison.

I start here because the government suggests not only——I mean argues strenuously that Mr. Guo is not a genuine political dissident but that he has adopted that persona solely for personal financial gain. In reality, Mr. Guo came to his lifelong commitment to democracy honestly and through the crucible of extreme trauma. I don't think we can gloss over the impact of his witnessing his brother shot and killed by the police. While he was incarcerated, he witnessed at least 50 political prisoners being executed.

He was physically tortured on multiple occasions not only during his post-Tiananmen incarceration but also after he exposed corruption by a prominent Beijing city official.

And to the extent the government maintains that Mr. Guo's personal background is a mythology, I would point to the probation officer's personal observations of the physical scars that Mr. Guo bears to this day as a result of torture. That's referenced in the presentence report.

Experiences like the ones Mr. Guo has endured shape a

person. In this case, they solidified his commitment to opposing authoritarian rule, exposing corruption, and supporting a democratic China. His support of democracy, by the way, also extends to assisting the United States in protecting its own national security and understanding the many ways that China infiltrates this country and attempts to undermine it.

In short, Mr. Guo is a legitimate pro-democracy activist and has been since his youth. Any suggestion to the contrary isn't supported by the facts, not the least of which are the fact that for years Mr. Guo has been the primary target of China's Operation Fox Hunt, and he's had multiple immediate family members as well as employees and supporters arrested and detained for years.

It's worth asking why China would go to the lengths it has to silence and repatriate Mr. Guo. Why is he such a threat to the CCP? The extent of the CCP's efforts reflect its deep concerns about Mr. Guo's ability to undermine his authority and reveal information it does not want disclosed. If Mr. Guo's activities were merely the work of a conman or a fraudster and nothing more, the CCP would not be deploying armies of operatives to discredit him through a staggeringly extensive social media campaign. At some point, in its scope, that social media campaign was second only to the CCP's efforts to discredit the Hong Kong protestors, democracy protestors of

2019. The CCP has spent tens if not hundreds of millions of dollars recruiting U.S. political and business elite to lobby the U.S. government for his repatriation to China. They've pressured U.S. social media companies to de-platform him, they've interrogated, coerced, arrested, prosecuted, jailed individuals in China for just listening to his broadcast. They've taken advantage of the U.S. legal system and the First Amendment freedoms here to file a false rape complaint against Mr. Guo and then orchestrate demonstrations outside his home, calling him a rapist, and then publicize those demonstrations on social media.

We detailed this and more in our sentencing submission, but even the many pages in our sentencing submission that discuss this campaign against him really can't capture the true magnitude of the Chinese government operation against Mr. Guo as well as against those who dare to listen to his broadcast where they can in China, or to engage in any way with any entities associated with him.

And these facts are not in dispute. I mean, the U.S. government itself has brought dozens of criminal prosecutions against individuals who have done the CCP's bidding against Mr. Guo. We've cited complaint after complaint, document after document drafted by the United States government detailing these efforts.

And that brings us to the conduct in this case.

The jury acquitted Mr. Guo of the GTV Private Placement, convicted on other counts. We accept the jury's verdict, but we do recognize that that verdict has limits, especially with respect to proven losses and victimization of investors and supporters. The creation of GTV was a direct response to CCP efforts to silence Mr. Guo, to suppress his speech by pressuring other social media platforms to shut down his accounts. GTV, in contrast, was free from external pressure, and it became a vibrant and active platform. That platform was itself part of the efforts to take down the CCP. That platform was a way to get out messages about corruption, expose what actually is taking place in China at the behest of the Chinese government, and those broadcasts are the effort. So it's not accurate to say that this organization did nothing, that his movement did nothing. That platform was a core part of undertaking the dismantling of the CCP, building a movement.

The Himalaya Exchange provided a safe place to store money outside the prying eyes of the CCP. And that is a service for which there is a tremendous market. It also provided an opportunity for individuals to make money through creating H Coin on the Himalaya Exchange. The letters we provided to the Court contain numerous accounts of individuals who profited substantially from their investment in the Himalaya Exchange, and who invested in it for reasons having nothing to do with the alleged misrepresentations of Mr. Guo,

with respect to the exchange being backed by gold, for instance.

G|CLUBS, G Fashion, the Farm Loans, these were all part of building a brand to support the whistleblower movement.

The luxury cars. The government's made much of those cars. Mr. Guo himself doesn't drive. There's been no observation of him out and about driving around in those cars. The Bugatti never even left the showroom in Texas. They were props for videos, to show what could be, what could be achieved for the people of China, to build the brand for the whistleblower movement.

The mansion, the Mahwah mansion. Again, much has been made of that. There was also testimony at trial that that was intended as a permanent home for the whistleblower movement. Mr. Guo himself lived in Connecticut. He wasn't living at the mansion in Mahwah. That's just not accurate.

These were not personal luxuries that he was obtaining for himself. These were part of the brand which resonated strongly with thousands of individuals who see in the movement hope for a freer and a more democratic China.

I should also note that Mr. Guo——much has been made of his Brioni suits, the yacht. A lot of these things were obtained prior to any alleged misconduct in this case. Mr. Guo's family members were legitimate billionaires long before Mr. Guo came to this country, long before the conduct at

issue in this case. The movement was a separate project, independent of personal wealth. The government narrative about needing the money and creating these entities as a way to obtain money just doesn't make sense. The government knows well that if Mr. Guo had needed or cared about money, it would have been much easier for him to avail himself of the many opportunities to secure the release of billions of dollars in funds seized by the CCP if only he would agree to stop criticizing it and exposing corruption. He was unwilling to do that. He had those opportunities. At least $10 billion in seized assets. He could have just said, okay, I'll stop criticizing the CCP. Those assets would have been unfrozen. But that's not what animates him. That is not what motivates him. That is not why we're here. The simple and indisputable fact that he could have availed himself of those opportunities underscores his genuine commitment to the underlying movement. His fidelity consistently has been to the movement. Even his original pursuit of wealth back in the early '90s, after being released from prison following Tiananmen, was for that very purpose. That's the purpose, to achieve that level of wealth and prominence and then be able to exert the kind of influence that one needs to have in order to build a movement that has any hope of taking on a government and a party as powerful as the Chinese Communist Party.

There is a——

THE COURT: One moment, please.

You may continue.

MS. SARAFA: Thank you, your Honor.

There's a vast gulf in this case between the loss amount advanced by the government, set forth in the guidelines, and the alleged harm to victims, and the overwhelming number of investors and customers who disclaim victim status. This goes straight to the nature and circumstances of the offense, the seriousness of the conduct, and we respectfully submit that this is a case where the 3553(a) factors should weigh more heavily than the guidelines.

There are literally thousands of investors and customers of the G series entities who affirmatively state that they are not victims of Mr. Guo. These are not deluded, brainwashed sycophants. We submitted statements from 1286 unique individuals. We accounted for multiple individuals in our number count and in our statistics, unlike the government, who cites 235 statements but, by our assessment, at least 40 or more are from the same individual. 1286 unique individuals. Of those, 1223 expressly stated that they were not victimized by Mr. Guo. Most of them did not indicate the size of their investments in the submissions they sent to us, but for those that did, the amount totaled more than $72 million. 108 of them reported being interrogated by the CCP. 35 reported being coerced to make statements such as confessions, guarantees,

repentance, or acknowledgment of having been defrauded. Seven reported being forced to file false complaints with U.S. law enforcement and media. 28 reported being arrested and/or prosecuted by the CCP. We continue to receive more of these statements daily. And these are not cookie-cutter presentations. They're unique, detailed, thoughtful accounts of individual deliberation and due diligence in connection with their investments from individuals from all walks of life, many professionals, even one from a non-Chinese lawyer in Australia, who invested at the suggestion of one of his clients. These are not robotic recitations from brainwashed masses lacking agency. And these support——these individuals who provided these statements, they included supporting documents——government-issued IDs, passports, other identification documents. They included videos, audio, recordings of interrogation by Chinese officials, photos, screenshots of text messaging between them and the officials, a tremendous amount of indicia of credibility, and we've included at least one of those in its entirety in our sentencing submission, but there are hundreds of these. And apart from those, apart from those statements, there are more than 6,000 Himalaya Exchange customers who have submitted 853(n) petitions. There are more than 300 Hamilton investors who have submitted 853(n) petitions. Both of those groups, thousands of customers, maintain that they were not victimized by Mr. Guo

and that their investments, the money that's been seized, is not the proceeds of fraud. They're not crime proceeds. That's their position. That's thousands and thousands of investors.

At trial, there was a discussion about extrapolating from the testimony of Yi Jianhu, one of the defense witnesses who said that he'd been pressured by the Chinese government to make false statements. And the government strenuously objected to the defense making any inference about such pressure having been exerted on other witnesses in the case. And the Court said that——the Court granted that request and said it's not proper to extrapolate or speculate because we've only heard——beyond the testimony of the people who testified in this trial.

And yet the loss amount that the government talks about and the loss amount calculated in the PSR is speculation. The witnesses at trial testified to no more than 1.5 million in losses. The individuals in this room, the more than 6,000 Himalaya Exchange customers, the nearly 1300 people who sent us letters, they all say, we were not victimized. We invested for reasons that have nothing to do with the misrepresentations Mr. Guo allegedly made. And these people, these individuals consistently say that any hardship they suffered is a result of their funds being seized and held by the government.

They maintain also that Mr. Guo was up front in his broadcasts about the risk of investment. These are not

victimized, brainwashed people. They talk about receiving real value for the investments they made. Not just G|CLUBS, not just actually getting, you know, G Fashion, not just GTV, but Himalaya Exchange. People made real money with——through the Himalaya Exchange. That's value. In fact, many of them are still holders of H Coin, which retained value to this day. It retained value up until the very day that Mr. Guo was convicted and the platform was shut down. I believe one of the individuals even said the decision to invest with Mr. Guo was one of the most important and correct of his life. And that was a consistent refrain. These individuals say that they've made their own independent decisions about whether to send money to various G series entities. They weren't victimized or brainwashed by Mr. Guo.

The government has, sitting in its coffers, more than $600 million seized. The GTV entities readily settled the SEC case and disgorged more than $500 million. That money is all going back to——it has already——most of it has already gone back to investors; in fact, it had even before the trial.

The money is not——this is not like a Ponzi scheme, where there's preying on subsequent investors because you have to keep bringing in money to give——to pay out original investors. The money was all there. These were operating businesses. Value was obtained by the people investing in them.

Mr. Guo's pro-democracy, anti-CCP message resonated with people around the globe. The supporters' statements overflow with hope. That is inspired by Mr. Guo. That is meaningful. That is meaningful. That in itself is meaningful.

We've talked about some of Mr. Guo's assistance to the United States. We've done our best to provide the Court with that information to the best of our ability, although quite a bit of information is not even available to us. We've requested it; we have not received it.

We've also provided to the Court information about Mr. Guo's physical and mental health, which has deteriorated since he's been at MDC. The conditions at the MDC are well known to this Court. That's no surprise. The conditions in the Bureau of Prisons are not great. Mr. Guo's physical and mental health most likely will get worse as he continues to spend time in incarceration. In this district——and those factors are important and considered by courts, taken very seriously. In this district, less than a quarter of defendants in fraud cases are sentenced within the sentencing guidelines. Most are sentenced substantially below the guidelines. And that is a recognition, as your Honor has recognized, that particularly in fraud cases, that the guidelines substantially overstate the seriousness of the offense. The judiciary sentencing information, the JSIN data, for 2021 to 2025, in cases like this, where 2B1.1 is the primary guideline, the

offense level is 43 and the criminal history category is I, no prior criminal history, excluding cooperating defendants, the average length of imprisonment in those cases is 167 months. The median is 144 months. Sam Bankman-Fried was mentioned earlier. His case involved $8 billion, multiples of what was involved here, and I dare say not thousands of individuals who said they weren't victimized. He received a sentence of 25 years. The government cited that in its brief. We submit that a sentence below that is warranted here. A sentence substantially below the sentencing guidelines is warranted in this case, and substantially below what the government has requested.

The fact that so many people have come forward, and in their own words, not in some prefab template letter, have come forward and told this Court their own story of why they invested, their own reliance on the documentation, the white papers, the credit placement memorandum, the loan agreements, they read those documents. They made their decisions to invest. They understood the risk. They told your Honor that in their own words, that is just, and that really distinguishes this case. That along with the fact that Mr. Guo has been this target of the CCP, which has really been an animating force behind this entire whistleblower movement, and that's the reason the movement resonates so strongly with so many people. It's the reason so many people are here today, because the

oppression that they've experienced by the CCP is something that everybody has an interest in moving on from. And Mr. Guo's message is one of hope and promise for a better future.

The individuals who continue to support him are not deluded. They're very clear-eyed. They've communicated that to the Court. And that really goes to the seriousness of the offense and the nature and circumstances——or the nature and circumstances of the offense, which we submit warrants a sentence substantially below the guidelines level and what the government has requested.

Thank you, your Honor.

THE COURT: Mr. Guo, would you like to say something?

THE DEFENDANT: Your Honor, I would like to ask the interpreter to speak for me.

Initially, I did not plan to speak. I look at this today, I must say something regarding what just happened in your courtroom. And also, in the other room, you asked the marshals to testify and recall how I came to this building. They said only one marshal brought me up here. In fact, there were two marshals who brought me up. You don't have to trust me. You can trust the camera. From 5 a.m. this morning, I fainted and fell on the floor. And 911 sent me to the hospital. So there have been people telling them that, don't send me to the hospital, you have to send him to the court.

After two rounds of injections and the medication I took, the doctors said, you have to stay here, you cannot leave. You don't have to trust me. You can just look at the videos in the hospital and you can look that up.

So two officers from MDC received a call saying that I must return to MDC. And I vomited many times on the way back to MDC, and I vomited as well all through the day. So you don't have to trust me. You can ask the two officers from MDC.

So when I returned to my room in MDC, they asked a doctor to come. So a doctor came. I returned to MDC at 10:30 and then the doctor came at 10:45, and they asked me, are you still okay? And I told them that, look at my face, I have face——I have blood on my face and all over my body. I'm still vomiting blood. And then that doctor said, I'll come back later to give you a treatment, or maybe I just send you back to your unit. I said, I would like to go to the court. You don't have to trust me. You can look at the videos from the hospital.

Around 1:30 p.m. a mysterious woman came——

THE COURT: Mr. Guo, please face me.

One moment. If you would just translate what I just said.

THE DEFENDANT: So that woman in black talked to them, saying that I could bring him to the court. Okay. This lady was riding in another car, she was riding another vehicle, and

I came with the vehicle with the officers. So before I left MDC, they cut up my clothing and wiped off the blood from my face so I got changed into this.

So that lady, she's not a police officer. She is someone else, and she was in another car, and when I came here, she was waiting for me downstairs.

And then, so when I came here, I said, I have tummy ache, I need to go to the bathroom. I don't feel well. They put me into another room. And this lady and the other officer, they were still around. You can look at the videos later. Therefore, regarding what the prosecutor said earlier, that's not the truth. Even for these facts, with these clear facts, he was not telling the truth, and he was playing the role of a doctor, police, and a judge. In this case, whatever the prosecutor said cannot be the truth. So when the prosecutor spoke in front of you, your Honor, he mentioned that there was only one officer. However, he did not mention the other lady. You can ask him who was that lady.

And lastly, I would like to tell the judge that, for the things I would like to say, that's included in the submissions from my lawyers. I believe in the U.S. laws and the judge. The reason I came to the U.S. is to destroy CCP. I lost my family members, and 270 people have been arrested, and I lost billions of dollars.

And your Honor, I thank you for everything you did.

And I will appeal. Thank you.

THE COURT: Is there any reason why sentence should not be imposed at this time?

MS. SARAFA: Your Honor, subject to our objections about loss not being calculable without a *Fatico* and other objections that we put on the record, no. And Mr. Guo's health, as discussed in the other room.

MR. FINKEL: The government believes that sentencing should go forward. And if I may, with respect, your Honor, I just note for the record that Mr. Guo stood and gesticulated with his arms throughout his colloquy with the Court. He was cogent and clear in his presentation and seemed alert. But that, of course, is just from my perspective.

THE COURT: As I have stated, the guidelines range to be used in this case is 2100 months' imprisonment.

Under the Supreme Court's decision in *Booker* and its progeny, the guidelines range is only one factor that I must consider in deciding the appropriate sentence. As I mentioned earlier, I am also required to consider the other factors set forth in Title 18, United States Code, Section 3553(a). These include:

First, the nature and circumstances of the offense and the history and characteristics of the defendant;

Second, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;

Third, the kinds of sentences available;

Fourth, the guidelines range;

Fifth, any pertinent policy statement;

Sixth, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

Seventh, the need to provide restitution to any victims of the offense.

Ultimately, I am required to impose a sentence sufficient, but no greater than necessary, to comply with the purposes of sentencing that I just mentioned.

Probation recommends a below-guidelines sentence of 240 months' imprisonment on Counts One through Three and Seven through Eleven, to run concurrently with each other, and 60 months' imprisonment on Count Four, to run consecutively to the other counts. The total recommended sentence is 300 months' imprisonment.

The government recommends a sentence of at least 360 months' imprisonment, or 30 years.

Mr. Guo argues for a sentence "substantially below the applicable guidelines range and the sentencing recommendation in the [presentence report]," but does not request a specific sentence.

I have given substantial thought and attention to the appropriate sentence in this case in light of all the factors set forth in Section 3553(a) and the purposes of sentencing.

On July 16, 2024, having heard and seen all the evidence in the case, including the testimony of 34 government witnesses and nine defense witnesses, a jury of 12 people unanimously concluded that Mr. Guo was engaged in a series of fraudulent crimes and conspiracies, including a racketeering conspiracy, money laundering conspiracy, and conspiracy to commit securities fraud.

I must first consider the history and characteristics of the defendant.

Mr. Guo, also known by the name Ho Wan Kwok, was born in 1968 in the People's Republic of China. He was the seventh of eight brothers born to his father, a miner, and his mother, a homemaker. His birth occurred shortly after the Cultural Revolution that was launched by Mao Zedong, and Mr. Guo's parents were viewed as enemies of the State. During his childhood, his family lived in poverty, and Mr. Guo witnessed his family suffer from persecution at the hands of the Chinese Communist Party, which I will refer to as the CCP. He reports

that, as a result, both of his parents suffered from significant mental health issues.

Mr. Guo states that between May 1989 and April 1991, he served a 22-month prison term in China, after being charged with subversive activities in connection with his support of the demonstration in Tiananmen Square. He additionally reports being held in an open cell with other political prisoners and witnessing the execution of dozens of inmates.

In 1991, Mr. Guo began his career as a real estate developer. In about 2000, he immigrated to Hong Kong and became a citizen. Sixteen years later, fearing political arrest, he fled to England, and in 2017, he entered the United States on a tourist visa. One month prior to the expiration of his visa, Mr. Guo applied for asylum, and his petition remains pending.

Between 2016 and 2018, Mr. Guo claims that he was engaged in a public campaign to, in his words, expose the CCP and support democracy in China.

I will now turn to the nature and circumstances of the offense, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and protect the public from further crimes of Mr. Guo.

Much of Mr. Guo's sentencing submission outlines abuses that he claims he suffered at the hands of the CCP.

Even crediting these claims, I find that none of them excuse his fraudulent conduct.

For at least five years, Mr. Guo participated in a conspiracy to defraud over a thousand victims from around the world. Relying on his online presence and charismatic personality, Mr. Guo, along with his co-conspirators, targeted his followers by promising them outsized financial returns and benefits for investing in various fraudulent businesses and programs. Mr. Guo and his conspirators told their victims that the money they contributed would be used to support pro-democracy efforts in China. However, Mr. Guo and his conspirators misappropriated the money to line their pockets, as well as those of Mr. Guo's family——taking the victims' money and using it to further Mr. Guo's extravagant lifestyle.

Mr. Guo was known as "Boss" and was in control of the G Enterprise entities. *See*, *for example*, Trial Transcript pages 1941 and 1677 to 1678. He was the face of the business and, through his broadcasts, sought investments from his supporters and made promises to them. Although Ms. Yvette Wang and Mr. William Je also played a significant role in the conspiracy, Mr. Guo was ultimately the boss and had the final say.

Mr. Guo's schemes caused his victims great financial and emotional harm:

One victim writes: "[Mr.] Guo repeatedly fabricated

stories in his broadcasts. . . He convinced us that investing in his projects was the only way to ensure financial safety. Under this fear and persuasion, I sold my property, redeemed all my long-term investments and life insurance, and invested all my funds into his fraudulent ventures." Statement 168.

Another writes: "I invested over $120,000——my entire savings from years of sacrifice. I have no job, and I gave all my money to [Mr.] Guo. Now, I have no idea how I will sustain myself for the rest of my life or how to face my family." Statement 158.

Another states: "My husband and I were cruelly defrauded of more than $1,500,000——our entire life savings. Because of [Mr. Guo] and his accomplices. . ., we fell from a comfortable life into complete poverty. My husband had to do hard physical labor at low wages [and] borrow money from others. . . I had to apply for social assistance. . . Our whole family almost ended up sleeping on the streets." Statement 184.

As I noted during Ms. Wang's sentencing, the victims have not only experienced financial hardship, but many have lost relationships with loved ones because of their participation in Mr. Guo's scams. *See* Wang Sentencing Transcript pages 56-57. The Court has received letters from people whose partners left them and from parents whose children no longer talk to them. These victims and others continue to

experience depression and severe psychological distress due to Mr. Guo's actions and the actions of his co-conspirators.

One victim writes: "I trusted [Mr. Guo] and his associates, which led to a deep sense of personal violation and a prolonged period of distress. The emotional toll of this betrayal has affected my mental well-being and daily life, which caused me a series of unpredictable consequences such as insurance defaults, family discord and quarrels, personal health and psychological breakdown, [and] career interruption." Statement 163A.

Another writes: "The long-term extreme fear, anxiety, and stress caused me to suffer from severe anxiety disorder and I needed medication to sleep. In two months, I lost more than 40 pounds and my hair began to fall out." Statement 188.

Another states: "Trust within my family has been badly damaged. My wife frequently argues with me over this failed investment, and has even threatened to divorce me if we can't recover the money. This has plunged me into a deep state of guilt and suffering." Statement 190B.

I have read countless letters in the record expressing similar sentiments.

Mr. Guo preyed on those seeking to bring democracy to China——people who hoped deeply that the political system in China would be challenged. He also preyed on their deep fears——telling them he provided the best way to keep their

money safe from China. As he took advantage of people's deeply held emotions, Mr. Guo single-mindedly dedicated himself to increasing his own wealth.

To this day, despite the jury's verdict and the hundreds of victim statements submitted to the Court, Mr. Guo takes no responsibility for his actions and instead insists, incredibly, that his conduct caused no loss and harmed no one. Meanwhile, he has called upon his supporters to harass and intimidate those who dare to speak out against him. The seriousness of his crime and the need for deterrence, to protect the public, and to promote respect for the law warrant a serious punishment.

Despite the gravity of these offenses, there are several considerations that support a below-guidelines sentence.

As I said earlier, I recognize that the loss guidelines were not developed by the Sentencing Commission using an empirical approach, and the guidelines placed undue weight on the loss amount. *See, for example*, *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006).

In addition, I must consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

As an initial point, I struggle to compare Mr. Guo's case with any other, given the severity of Mr. Guo's crimes,

his exploitation of a philanthropic purpose, his history of intimidating his critics, and his continued refusal to accept responsibility.

With respect to Mr. Guo's co-conspirator, Ms. Wang, on January 6, 2025, I sentenced her to 120 months' imprisonment, the statutory maximum penalty.

I note, however, that due to the statutory maximum penalty, the applicable guidelines range in Ms. Wang's case was 120 months' imprisonment——roughly only 5 percent of the guidelines range applicable here. *See* Wang Sentencing Transcript at page 13, line 3. And although she played an important role in the fraudulent scheme, she ultimately reported to Mr. Guo, the boss. See *Id.* at page 57, lines 19-23.

Moreover, Ms. Wang accepted responsibility, as evidenced by her guilty plea. See *Id.* at page 58, lines 16 to 17. By contrast, Mr. Guo, to this day, denies responsibility and exhibits no remorse for the harm that he has caused to so many people.

Finally, I do consider the length of Mr. Guo's current confinement. Mr. Guo has spent over three years at the Metropolitan Detention Center. I recognize that the conditions of confinement there are uniquely difficult, which warrants a shorter sentence than might otherwise be imposed. *See United States v. Chavez*, 710 F.Supp.3d 227, 234-35 (S.D.N.Y. 2024).

I conclude, for the reasons stated, that a sentence below the guidelines range is warranted.

Mr. Guo, please rise for the imposition of sentence.

It is the judgment of this Court that with respect to Counts One, Two, Three, Four, Seven, Eight, Nine, Ten, and Eleven, you are sentenced to 360 months' imprisonment. The terms of imprisonment on these nine counts shall be served concurrently to each other.

I do not impose a term of supervised release because, pursuant to guidelines Section 5D1.1(c), courts should not impose supervised release in a case in which it is not required by statute and the defendant is likely to be deported after serving his term of imprisonment.

I shall not impose a fine because probation does not recommend one, but you must pay the mandatory special assessment of $900, which is due immediately.

I shall not order restitution because of the complexity of the case and the number of victims. I instead grant the government's motion to authorize the United States to compensate victims with finally forfeited assets through a remission process, as restitution would be impractical in this case. 18, United States Code, Section 3663A(c)(3).

We'll take a pause at this time. You may be seated.

(Recess)

THE COURT: Please be seated.

Earlier, I stated that Mr. Guo's total term of incarceration is 360 months. I want to clarify that with respect to Counts One, Three, Seven, Eight, Nine, Ten, and Eleven, I'm imposing 240 months' imprisonment, to run concurrently with each other and the terms of imprisonment on all other counts.

With respect to Count Two, I'm imposing a term of 360 months' imprisonment, to run concurrently with the sentences imposed on all other counts.

And with respect to Count Four, I'm imposing a sentence of 60 months' imprisonment, to run concurrently with the sentence imposed on Count Two and to run consecutively with the sentences imposed on all other counts.

Mr. Guo, I'm required to remind you that:

As a result of committing the offense alleged in Count One of the S3 superseding indictment, you shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

Any interest acquired or maintained in violation of Section 1962;

Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise the defendants and their co-conspirators established, operated, controlled, conducted, or participated in the conduct of, in violation of

Section 1962; and

Any property constituting, derived from, any proceeds obtained, directly or indirectly, from the racketeering activity charged in Count One.

As a result of committing the wire fraud and securities fraud offenses alleged in Counts Two, Four, and Seven through Eleven of the indictment, you shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

As a result of committing the money laundering offense alleged in Count Three of the indictment, you shall forfeit to the United States, pursuant to 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offenses.

On August 11, 2025, the Court entered a preliminary order of forfeiture in this case. Mr. Guo filed numerous objections to that order, which I reviewed carefully. Earlier

today I issued an opinion addressing Mr. Guo's objections.

Mr. Guo, you are required to forfeit the property listed in the preliminary order of forfeiture. You are also required to forfeit the property listed in the supplemental order of forfeiture filed by the government at ECF No. 790. The order of forfeiture includes a money judgment of $889 million against you.

I'm aware that numerous third-party petitions have been sent to the Court seeking to assert claims under 21, United States Code, 853(n). The Court will provide further guidance on the handling of these petitions in due course, given the sentence imposed today and the Court's resolution of Mr. Guo's numerous objections to the Court's forfeiture order.

Does the government know of any legal reason why this sentence as stated should not be imposed?

MR. FINKEL: It does not, your Honor.

THE COURT: Does the defense have any objection to the imposition of the sentence as stated?

MS. SARAFA: Just we would reiterate our prior objections, your Honor.

THE COURT: The sentence as stated is imposed.

That is the sentence of this Court. Mr. Guo, you have a right to appeal your conviction and sentence. The notice of appeal must be filed within 14 days of the judgment of conviction.

If you are not able to pay the costs of an appeal, you may apply for leave to appeal *in forma pauperis*. If you request, the Clerk of Court will prepare and file a notice of appeal on your behalf.

Are there any further applications?

MR. FINKEL: One brief one, your Honor. On March 17th, the government filed an application for a limited unsealing of the petitions received by the clerk's office. It's at Docket 818. This will enable the government to compare what the clerk's office has received to what the government has received by individuals seeking to file petitions so that the petition process and forfeiture process with respect to third-party claims can move forward. I don't know if the Court has had an opportunity to review that or if the Court will order that. We can certainly provide again the proposed order for that.

THE COURT: Yes. Is there any objection?

MS. SARAFA: No, your Honor, although with respect to 853(n) petitions, I do want to note that in our letter dated February 24, 2026, we sought an order directing the government to produce to defense counsel copies of all the petitions that they've received either pursuant to 853(n) or that could be construed as pursuant to 853(n), and I don't believe there's been a ruling on that.

THE COURT: First, government's application is

granted.

Mr. Finkel, on the application just made by the defense?

MR. FINKEL: The government objects. The defendant has no right to that information. The forfeiture as to the defendant is final. The defendant has stated previously that he does not assert a personal interest in any of the specific property that is subject to forfeiture. That is what those petitions are about——the specific property that the defendant himself has no interest in, by order of this Court and by his own admission. The defendant's request should be denied.

THE COURT: The application of the defense is denied.

Are there any further applications?

MR. FINKEL: Not from the government. Thank you.

MS. SARAFA: Yes, your Honor. Excuse me, your Honor. We also, in our letter dated June 25, 2026, ECF No. 853, we requested production to the defense of unredacted copies of certain FBI 302s. We specified the Bates range for the documents that we requested unredacted copies of, and I don't believe there's been a ruling on that request.

THE COURT: Mr. Finkel?

MR. FINKEL: I think there was a ruling on that request. Your Honor issued several rulings in the last couple of days, and one a few months ago, as well as other rulings regarding discovery. The government has met its

disclosure obligations in this case, as your Honor explicitly held in a decision I think you issued yesterday. Rule 16 is over, discovery is over, this case before the district court with respect to Mr. Guo is finished. It should be denied.

THE COURT: The application is denied.

MS. SARAFA: Thank you, your Honor.

Two other brief matters. Just to let the Court know, we do intend to make a request to make all of the sealed submissions part of the record for appeal, and I believe we'll do that in writing following today's proceeding.

And then finally, with respect to designation, we would ask the Court to recommend in the judgment that Mr. Guo be designated to the BOP facility in Danbury, and if that is not available for any reason, to designate him to Fairton.

THE COURT: Does the government have any objection?

MR. FINKEL: Your Honor, the government takes no position on this, but it is my understanding that it is the BOP's preference that the defendant request a region as opposed to particular facilities, as it's difficult for them to accommodate specific facility requests.

MS. SARAFA: Your Honor, I——in our collective experience, there have been many recommendations to specific facilities, and I believe the BOP will do its best to accommodate the recommendation and designate within the relevant region, should that specific designation be

unavailable.

THE COURT: So the application is granted. I will make that recommendation.

Any further applications?

MS. SARAFA: Nothing further from the defense, your Honor.

THE COURT: Very well. That brings our sentencing hearing to an end. The matter is adjourned.

ALL COUNSEL: Thank you, your Honor.

o0o